UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

United States of America )
) 13cr30028-MGM
vs )
)
Joseph Buffis )
______________________________)

**Transcript of Trial** Held Before
The Honorable Mark G. Mastroianni,
United States District Court Judge and a Jury,
on **May 20, 2015.**

APPEARANCES:

For the government: Steven H. Breslow and Deepika B. Shukla, 300 State Street, Suite 230, Springfield, MA 01105-2926.

For the defendant:Lori Levinson, Esq., 500 Main Street, Suite 2, Great Barrington, MA 01230.

Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086 Fax: (413)737-7333
alice.moran@verizon.net

INDEX

**May 20, 2015**


| Witness Name: | Page: |
|---|---|
| **Sandra Spinney** | |
| Direct examination by Mr. Breslow | 114 |
| **Tara Viola** | |
| Direct examination by Ms. Shukla | 124 |
| Cross-examination by Ms. Levinson | 169 |
| Redirect examination by Ms. Shukla | 208 |
| Redirect examination by Ms. Levinson | 212 |

| Government's Exhibits: | | Page |
|---|---|---|
| 153 | Stipulation | 110 |
| 1 | Photograph of Inn at Laurel Lake | 112 |
| 2 | Invoices and customer records of Inn | 112 |
| 3 | Ms. Viola's 1-19-12 video recording | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 4 | Ms. Viola's 1-19-12 transcript from video | 112 |
| 5 | Oneline media postings regarding the Inn | 112 |
| 6 | Ms. Viola's notice to appear magistrate hearing | 112 |
| 7 | Mr. Fusco's notice to appear magistrate hearing | 112 |
| 8 | E-mail canceling wedding at the Inn | 112 |
| 9 | Photograph of Southern Berkshire District Court | 112 |
| 10 | Photograph of Southern Berkshire District Court | 112 |
| 11 | 2-21-12 show cause recording | 112 |
| 12 | 2-21-12 show cause hearing transcript | 112 |
| 13 | 2-21-12 agreement | 112 |
| 14 | $4,000 check payable to Laliberte Toy Fund | 112 |
| 15 | TD Bank Check No. 13362 | 112 |
| 16 | Berkshire Eagle article | 112 |
| 17 | Ms. Viola's court docket No. 1329CR00602 | 112 |
| 19 | Mr. Fusco's court docket No. 1329CR00603 | 112 |
| 22 | Mr. Buffis's To Potential Employers letter | 112 |
| 23 | Summary chart re: Cell phone contacts | 112 |
| 25 | Dissemination of Information memo | 112 |
| 26 | Mr. Buffis's Verizon cell phone records | 112 |
| 27 | Photograph of Mr. Bartini's residence | 112 |
| 28 | Photograph of Mr. Bartini's residence | 112 |
| 29 | Copy of March 30, 2012 check | 112 |
| 30 | Mr. Buffis's written statement | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 31 | Lee Bank Check No. 185 in the amount of $2,760 | 112 |
| 32 | Lee Bank Check No. 194 in the amount of $1,000 | 112 |
| 33 | Lee Bank Check No. 236 in the amount of $230 | 112 |
| 34 | Toy Fund's February monthly statement | 112 |
| 35 | Toy Fund's March monthly statement | 112 |
| 36 | Toy Fund's April monthly statement | 112 |
| 37 | November - December 2011 Berkshire Bank statement | 112 |
| 38 | Dec. 2011 - Jan. 2012 Berkshire Bank statement | 112 |
| 39 | January - February 2012 Berkshire Bank statement | 112 |
| 40 | February - March 2012 Berkshire Bank statement | 112 |
| 41 | March - April 2012 Berkshire Bank statement | 112 |
| 42 | Check No. 784 in the amount of $590 | 112 |
| 43 | Summary chart for Counts 1-4 | 112 |
| 44 | Mr. Buffis's *Miranda* waiver | 112 |
| 45 | Mr. Buffis's videotape waiver | 112 |
| 47 | Documents provided by Mr. Buffis | 112 |
| 48 | Documents provided by Agent Meiklejohn | 112 |
| 49 | Berkshire Eagle Toy Fund communications | 112 |
| 50 | Berkshire Eagle fax from Mr. Buffis | 112 |
| 51 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 52 | Berkshire Eagle Toy Fund announcement | 112 |
| 53 | Mr. Buffis's fax to Berkshire Eagle | 112 |
| 54 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 55 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 56 | Berkshire Eagle announcement | 112 |
| 57 | Berkshire Eagle announcement | 112 |
| 58 | Berkshire Eagle announcement | 112 |
| 59 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 60 | Berkshire Eagle announcement | 112 |
| 61 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 62 | Berkshire Eagle announcement | 112 |
| 63 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 64 | Berkshire Eagle announcement | 112 |
| 65 | Mr. Buffis's e-mail to Berkshire Eagle | 112 |
| 66 | Berkshire Eagle announcement | 112 |
| 67 | Mr. Buffis's account inventory summary chart | 112 |
| 68 | Mr. Buffis's accounts large master summary chart | 112 |
| 69 | Disposition of Toy Fund money summary chart | 112 |
| 70 | Toy Fund other expenditures summary chart | 112 |
| 71 | Toy Fund statement activity summary chart | 112 |
| 72 | Toy Fund deposits summary chart | 112 |
| 73 | Mr. Bartini's Toy Fund donations summary chart | 112 |
| 74 | Ms. Fitzpatrick's Toy Fund donations summary | 112 |
| 75 | Ms. Spinney's Toy Fund donations summary chart | 112 |
| 76 | Ms. Gardino's Toy Fund donations summary chart | 112 |
| 77 | Filkins' Toy Fund donations summary chart | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 78 | To Fund cash deposit summary chart | 112 |
| 79 | Toy Fund withdrawals summary chart | 112 |
| 80 | Toy Fund Lee Bank checks | 112 |
| 81 | Checks to cash summary chart | 112 |
| 82 | Mr. Buffis's accounts summary chart | 112 |
| 83 | Mr. and Mrs. Buffis's Visa statement | 112 |
| 84 | Visa expenditures summary chart | 112 |
| 85 | Store purchases summary chart | 112 |
| 86 | Costco purchases records | 112 |
| 87 | Costco purchases summary chart | 112 |
| 88 | BestBuy purchase records | 112 |
| 89 | BestBuy purchases summary chart | 112 |
| 90 | JC Penny purchase records | 112 |
| 91 | Count 8 summary chart | 112 |
| 92 | Berkshire Bank statement | 112 |
| 93 | Counts 9-10 summary chart | 112 |
| 94 | $3,000 Berkshire Bank statement | 112 |
| 95 | Berkshire bank $3,000 withdrawal slip | 112 |
| 96 | Count 11 summary chart | 112 |
| 97 | January - March 2012 monthly statement | 112 |
| 98 | October - December 2011 monthly statement | 112 |
| 99 | LPA monies deposited summary chart | 112 |
| 100 | Toy Fund bank statement, Check No. 950 | 112 |

Government's Exhibits: Page


| Exhibit | Description | Page |
|---|---|---|
| 101 | Toy Fund bank statement, Check No. 1002 | 112 |
| 102 | Toy Fund bank statement | 112 |
| 103 | Toy Fund bank statement, Check No. 702 | 112 |
| 104 | Checks written to Mr. Buffis summary chart | 112 |
| 105 | LPA Legacy Bank statements | 112 |
| 106 | LPA Legacy Bank check No. 872 | 112 |
| 107 | LPA Bank statement deposit of $250 | 112 |
| 108 | LPA Check No. 1061, $250 to Visa | 112 |
| 109 | Mr. Buffis's Visa statement showing $250 payment | 112 |
| 110 | LPA Bank statement deposit of $175 | 112 |
| 111 | LPA Check No. 1007, $175 to Mr. Buffis | 112 |
| 112 | Ms. Buffis's Sears monthly statement | 112 |
| 113 | Citibank record of payment, Check No. 382 | 112 |
| 114 | CitiDiamond credit card monthly statement | 112 |
| 115 | Citibank record of payment, Check No. 385 | 112 |
| 116 | Citibank Home Depot monthly statement | 112 |
| 117 | Credit card late fees summary chart | 112 |
| 118 | Overdraft/returned item fees summary chart | 112 |
| 119 | Mr. Buffis's 2008 Federal income tax return | 112 |
| 120 | Mr. Buffis's 2009 Federal income tax return | 112 |
| 121 | Mr. Buffis's 2010 Federal income tax return | 112 |
| 122 | Mr. Buffis's 2011 Federal income tax return | 112 |
| 123 | Credit Union of The Berkshires monthly statement | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 124 | Records from Zwicker and Associates | 112 |
| 125 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 126 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 127 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 128 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 129 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 130 | Transcript of Mr. Buffis and Mr. Zwicker's call | 112 |
| 131 | Transcript of Mr. Buffis and Mr. Zwicker's call | 112 |
| 132 | Transcript of Mr. Buffis and Mr. Zwicker's call | 112 |
| 132 | Audio recording of Mr. Buffis and Mr. Zwicker | 112 |
| 133 | Credit Union of The Berkshires monthly statement | 112 |
| 134 | Golden Bear Services, Inc. invoice | 112 |
| 135 | Golden Bear Services, Inc. past due notice | 112 |
| 137 | Greylock Federal Credit Union printout | 112 |
| 138 | E-mail between Ms. Rada and Mr. Buffis | 112 |
| 139 | Ms. Rada's letter to Mr. Buffis | 112 |
| 140 | Photographs of toys | 112 |
| 141 | KB Toy outlet receipt for $10.49 | 112 |
| 142 | KB Toy outlet receipt for $29.35 | 112 |
| 143 | Photograph of Acura Toy Fund buying event | 112 |
| 144 | Mr. Buffis's letter to Ms. Devine | 112 |
| 145 | Non-Existent certificate for Toy Fund | 112 |
| 146 | Division of Public Charities filing for LPA | 112 |

| Government's Exhibits: | | Page |
|---|---|---|
| 148 | LPA donations/income summary | 112 |
| 149 | Division of Public Charities Form PC | 112 |
| 151 | Mr. Buffis's letter to potential employers | 112 |
| 152 | Chart for Counts 5-7 | 112 |
| 153 | Stipulation | 112 |
| 154 | Summary chart of timeline | 112 |
| 155 | Summary chart for $4,000 refund | 112 |
| 156 | Summary chart of truth and falsity statements | 112 |
| 157 | Photograph of Konnor and Joseph Buffis | 112 |
| 158 | Certificate of Municipal Liens document | 112 |
| 159 | Registry of Deeds document | 112 |

| Defendant's Exhibits: | | Page |
|---|---|---|
| C | Clips from Ms. Viola's video interview | 174 |
| A | Craig's List advertisement | 215 |

| Court Exhibit: | | Page |
|---|---|---|
| B for ID | Officer Lucy's police report | 215 |

**(Court commenced at 9:32.)**

**(The defendant is present.)**

THE COURT: Good morning.

MR. BRESLOW: Could we approach?

(Sidebar conference.)

MR. BRESLOW: Good morning, Your Honor. I'd like to make one additional comment regarding the proffer regarding the first alternate.

As I explained to defense counsel this morning and I believe you saw Special Agent Lewandowski's notes, it said that the juror said that I think Mr. Buffis should buy him lunch. That's what Special Agent Lewandowski thought he heard but he couldn't be sure. He was not paying much attention at the time. That juror might have said that "crooked cop should buy me lunch," and so I've explained that to Ms. Levinson. I wanted to put it on the record here.

The special agent was sitting close to the alternate juror and was naturally just hearing what he was hearing but not paying too much attention to it.

THE COURT: All right.

MR. BRESLOW: That's why we don't have a precise record of what he said.

THE COURT: Okay. Have you thought about this?

MS. LEVINSON: So my thought is that if the

court were to bring him up here and question him about that, I think it would be pretty hard for him to admit that he said something like that. And if he did say that, that is so troubling that I am extremely uncomfortable having him as an alternate.

I do fear that, you know, not that you are, you know, that intimidating but it's a difficult position for a juror to be put in and asked if he made that kind of incendiary comment.

THE COURT: I think I at least have to have him come to sidebar and ask some type of question about it and we will gauge what we will do next by his reaction.

I agree the way it looks you wouldn't want him here. I don't know. I guess it's a possible reaction he was frustrated and exhausted from the long day and, yeah, I said it. Stupid people say stupid things all the time. I just lashed out, at least he didn't say he wanted the judge to buy him lunch.

MS. LEVINSON: Then that leaves us with the question that since those jurors weren't supposed to be here until 10:30, are we going to pick two alternates or should we pick three more alternates?

THE COURT: We can pick three more just in case he has to go so we can run with four alternates and then once we get everyone in the jury settled, let one of them

go.

THE CLERK: If you want to or I can just add another chair to the back row, whatever you want to do.

THE COURT: All right. Let's plan on that.

MS. LEVINSON: Does that change the number of challenges?

THE CLERK: No.

MS. LEVINSON: Okay.

THE COURT: Let's shoot for that. Let's shoot for getting three more alternates this morning and see how it goes.

THE CLERK: Okay.

MR. BRESLOW: With Ms. Levinson having one remaining challenge and the government two, right?

THE COURT: Right.

MR. BRESLOW: Who leads? The government?

THE CLERK: It's your turn, yes.

THE COURT: We have to go through the whole process.

MS. LEVINSON: Okay.

MR. BRESLOW: I think Your Honor still has my voir dire with the circled questions that you added at the end.

THE COURT: Yes.

MR. BRESLOW: And the entities are also listed

there.

THE COURT: All right. You have more faith in my ability to hold it together than I do. Just remind me if it doesn't go well.

MR. BRESLOW: Okay.

(End of sidebar conference.)

THE CLERK: Would the jury panel please stand and raise your right hand?

(Jury panel sworn.)

THE CLERK: You may be seated.

THE COURT: Okay. Good morning, ladies and gentlemen.

JURY PANEL: Good morning.

THE COURT: Thank you for being here under a little bit unusual circumstances, different circumstances than you're used to what the protocol is for being called in for jury service and so I really appreciate you being here on short notice and picking up the phone yesterday when you were called and not letting it go to voice mail, which in retrospect you may be now wishing you did but thank you. I'm glad you're here.

I'm going to go through some preliminary instructions to give you some information about your potential jury service and then we will get moving with the selection process.

So my name is Mark Mastroianni. I'm the judge for this court who will be presiding over this session of the United States District Court for the District of Massachusetts.

This case is a criminal case. So you know that there's criminal cases and civil cases. This is a criminal case. You will meet all the parties, including the prosecution team and the defendant and the defense team, in a few moments when they all introduce themselves to you.

Those of you who are chosen as jurors will later be told what the precise charges are and what the government has to prove beyond a reasonable doubt in its case against the defendant.

As I told you since this is a criminal defense the defendant, the person charged, is presumed innocent. I believe you watched a DVD this morning that explains some of the process that you're going to be going through today, but I'm going to stress a few other things.

In both criminal and civil cases verdicts are rendered by a jury composed of ordinary citizens. The founders of our nation believed that the right to a jury was so important that they put it in the Constitution and the Bill of Rights.

Jurors have always been composed of ordinary citizens

from all walks of life. People can just bring their common sense and life experience with them when they serve as jurors and those will be really your primary most important tools.

The jury is fundamental to our system of justice and both an obligation of citizenship and an honor to serve, a privilege to serve as a juror.

If you are selected I hope that you exercise your duties responsibly, solemnly, and in accordance with the law. Oftentimes people consider their jury service to be a burden and an imposition on their daily busy life schedule and I certainly understand that, and actually I am sympathetic to your needing to reschedule things to serve as a juror. However, when you balance your citizenship and the rights you have in your citizenship and that you're giving back, this service is something that's just so important.

You know in all the time I've been doing this in speaking to people after their jury service is finished, clearly everyone tells me they weren't too happy and wished they didn't get picked, but by the time it's over people generally are very happy they served. They found it to be a very enlightening experience, one that they benefited from in watching the system unfold and being a part of the system has always been an experience that

jurors when I talk to them at the end of a case are glad that they had the opportunity to experience.

The lawyers in this case tell me they expect the case could last up to three weeks. Now that's a generous estimate. It likely wouldn't go a full three weeks but for purposes of your planning I think we have to say three weeks. We will endeavor to make the trial shorter than that if the opportunity arises to do so.

The normal trial day starts at nine o'clock. We start trial roughly between nine and 9:15 in the morning and we go until eleven o'clock. At eleven o'clock or somewhere around eleven o'clock there's a coffee break and then we go back to court after the coffee break until one o'clock. The lunch hour is between one and two. After the lunch hour we come back into court from two to four. Those hours are all rough hours. They can easily flex 15, 20 minutes one way or the other, longer or shorter.

If anyone has during the jury service an appointment that can't be rescheduled or something either at the end of the day or at the beginning of the day and it just can't be rescheduled, it's a real problem, you can let the clerk know and we can try to work around it and do some things to try to accommodate you if the need be.

Now the parties in this case have the right to a jury that is fair and impartial, one that is not biased or

prejudiced one way or another. You're going to hear those words fairly and impartially throughout the jury selection process.

To serve fairly and impartially as a juror means to hear the evidence in this case and decide its outcome without bias in favor of or prejudice against either side. It means to base any verdict in this case on the evidence presented during the course of the trial as well as the law as I give it to you and not on anything else you may have seen, heard, read, or experienced outside the court system.

Now the lawyers are going to have an opportunity to exercise what are called challenges during the process of selecting people who are going to serve on the jury. It's not something you should really concern yourself with. This is part of the role lawyers play and must play, and that is a process where they try to decide based on very limited information who they think is an appropriate juror for this particular case given the very limited information that the parties will know about you.

We are going to impanel 15 to 16 jurors and there will be alternates within that jury pool. If you are not chosen to sit on this jury, do not think that it reflects upon you personally or your ability to be a good juror. There's really no scientific process involved in this. As

I said, lawyers make a determination based upon the limited amount of information and then exercise challenges.

So as I said there's going to be 15 to 16 jurors in this case. Selection for jurors in this case has already started and you are the second round of selection so people selected today will be added to members of the jury that were selected yesterday.

As I have indicated, the case which you have been called on to sit as jurors is a criminal case. The defendant is charged by the government with violations of federal law. In a moment I will tell you a little bit more about the facts of the case but I want to make a couple of points first.

Most importantly, I'm telling you that the charges at the beginning of this case are just notice. This is just a notice when I tell you about the kind of charges and the facts of this case so that you know generally the type of case that you're going to be involved in.

Charges in a case and allegations, factual allegations in a case are nothing but that, just mere allegations that the government has lodged against an individual, an individual who remains at all times, including right now and throughout the trial, to be presumed innocent.

There is an agreed what's called statement of the case that the parties involved here have prepared and that's just a little glimpse of a factual background that I read to you so you know something about what this case deals with.

In order to help you follow the evidence and understand my instructions I'll give you a brief summary of the allegations in this case. Please keep in mind that what I say now are allegations only, and the evidence will come from the witnesses and exhibits offered during the trial.

The facts are as follows -- the alleged facts are as follows: From 1999 to 2012, Joseph Buffis was employed by the Lee Police Department first as its sergeant and then as its chief.

During this period of time Joseph Buffis operated a toy fund that had been founded to provide toys to needy children during the winter holiday season.

The government alleges that the defendant defrauded the donors of this toy fund by soliciting donations from them without telling them that he was spending a substantial part of their donations on himself and his family.

The government also alleges that Joseph Buffis engaged in four transactions with the toy fund donations

that were designed to hide the nature, source, location, and ownership of the money.

The government also alleges that in 2012 the defendant obtained a $4,000 donation to the toy fund from a husband and wife who were facing prostitution charges, and that he obtained this money by using his official position and by placing them in fear.

The government also alleges that the defendant engaged in three transactions with that toy fund donation that were designed to hide the nature, source, location, and ownership of the money.

Now I said those are the allegations and those are the allegations to which the defendant, Mr. Buffis, has pled not guilty. Those are the allegations to which he is presumed to be innocent of, but those are the allegations that you will be hearing facts and evidence about.

The burden will be on the government to prove all charges beyond a reasonable doubt. If the government fails to do that, the verdict must be a not guilty.

What happens now is I'm going to ask you a series of questions that's going to help the parties in this case and the court understand a little bit about you so that there can be a determination as to who can be an appropriate good selection to be a juror on this case based upon that information.

So everyone should have a notebook and a pen. As I go through these questions, make a note whenever I ask a question that raises an issue for you.

After I'm finished asking all the questions, each juror is going to come up to where I'm sitting, the bench, come over to the side here. You'll meet with myself and the attorneys involved in this case, the parties, and then we will discuss your answers to the questions. We will discuss whatever potential issues that you wrote down the note about that was a response to my questions.

All right. Now to start this I'm going to be asking if you know or have any connection at all with the parties involved so I want the parties to introduce themselves. The first introduction will be from the government's table.

MR. BRESLOW: Good morning. I'm Steve Breslow, an assistant United States attorney and that means that I'm a federal prosecutor.

MS. SHUKLA: Good morning, everyone. My name is Deepika Shukla and I am also an assistant United States attorney and that also means that I am also a federal prosecutor.

AGENT LEWANDOWSKI: Good morning, everyone. I'm Agent Lewandowski; I'm a special agent with the FBI.

MS. LEVINSON: Good morning, everybody. I'm

Lori Levinson. I'm an attorney with a practice in Great Barrington, Massachusetts and I'm here representing --

THE DEFENDANT: I'm Joe Buffis, the defendant in this case.

MS. LEVINSON: And?

MR. LUTTENBERGER: I'm Aaron Luttenberger. I'm a paralegal and I work in Ms. Levinson's office.

THE COURT: All right. The first question I'm going to want to know is does anyone know any of the people involved in this case, Mr. Buffis or any of the staff that's working on this case?

Do you think you know them? Do you think your family member might know them or a friend? Is there any connection at all? If there is, make a note and we can discuss that connection when you're brought up to sidebar.

THE CLERK: Mr. Buffis, I need to present you to the jury.

THE DEFENDANT: Thank you.

THE CLERK: Mr. Buffis, you are now set to the bar to be tried and these good jurors whom I shall call are to pass between the United States and you upon your trial. If you object to any of them, you must do so before they are sworn.

THE DEFENDANT: Thank you.

THE CLERK: You may be seated.

THE COURT: All right. Now in addition to meeting these individuals there are witness lists, potential witnesses that each party may call. I'm going to read you the names of those individuals so again if these individuals ring a bell, you think you might know them, they might have some family connection with you or if there's something there, make a note and we will discuss how you might know that witness at sidebar.

Also know that these witness lists are always longer than who is actually called at trial. It's out of an abundance of caution that the parties put every conceivable person on this witness list.

The witness list is follows and I apologize if I say the names more than once because I have two lists I'm working off of. Theresa Speth from Lee, Massachusetts; Kaila Buffis from Swanzey, New Hampshire; Janet Buffis from Pittsfield, Massachusetts; Susan Wheeler from Pittsfield; Henry Smachetti and Kathy Williams from Lee; Terry Dickhaus from Pittsfield; Liliana Bermudez from Lee; Jeremy Bigalow from Pittsfield; Joanne Nunes-Lunt, Jean Finnigan and William Bartini all from Lee; Sandra Spinney from Lenox, Mass.; Tara Viola from Lee; Thomas Fusco from Lee; Officer Ryan Lucy, Lee Police Department; Richard Smith, a retired captain from the Mass. State police; Clerk Magistrate Thomas Bartini, Southern District --

Southern Berkshire District Court; Sergeant Christopher Meikeljohn, Mass. State police; Richard Shields of Lee; chief and former sergeant Jeff Roosa of the Lee Police Department; Jean Maschino from Lenox; a forensic accountant Christopher Gizzi from the Federal Bureau of Investigation; Robert Bartini from Lee; Deborah McMenamy from Stockbridge; Kellie Bucker from Lee; Miriam Hickson from Great Barrington, Mass.; Patricia Clark and Aja Ostrander both from Lee; Robert Wheeler, Michelle Wheeler, Veronica Wheeler, David Dickhaus, all from Pittsfield; Tracy Dunn from the Lee Police Department; Ronald Glidden, retired chief from the Lee Police Department now of Wellfleet, Mass.; James Loring, retired Lee Police Department; Donna Tyer, Lee Police Department residing in Pittsfield; Kathleen Arment, Lee Police Department; Todd Briggs from the Berkshire County Sheriff's Office; Frank Speth, the Lee Police Department; Timothy Kelly, Lee Police Department; Philip Skowron, a retired police officer from the Lee Police Department; Craig DeSantis, police officer with the Lee Police Department; senior officer Adrian Kohlenberger of the Lee Police Department; Stephanie Burdick, a Lee police officer; William Tierney, retired Lee police officer; Jeffrey Brush from Chicopee, Mass.; Diane Kolarcz of Albany, New York; Ryan McAnaugh of Pittsfield; Daniel Salzarulo, Hinsdale, Mass.; Daniel

Maffuccio from Dalton, Mass.; Susan Brown and Robin Buratto both of Lee; Sandy Monteleone of South Egremont Mass.; Allison Rada of Great Barrington; Anthony O'Borny of Mission Viejo, California; Nora Mann of Arlinton, Mass.; Special Agent Michael Lewandowski of the FBI; Special Agent Ian Smythe, FBI; Joel Cooper from Pittsfield; Terrie Gardino from Lee; Gary Dailey from Amherst; Daniel Papineau from Mount Pleasant, South Carolina; Brian Buratto from Lee; Elizabeth Colins from Lee.

There are also some agencies or organizations whose name may come up in this case and those are the Edward J. Laliberte Toy Fund, the Inn at Laurel Lake, the Lee Police Department, the Lee Police Association, the Massachusetts State Police, the Berkshire Eagle, Berkshire Bank, Lee Savings Bank, Greylock Federal Credit Union, Credit Union of the Berkshires, Dreams of Joy, Wattson fund, the Joshua Harr Shane Foundation, and the Massachusetts Division of Public Charities.

So the question to you is do any of the names of the people or the entities, are they familiar to you in a way that would affect your ability to be fair and impartial as a juror? If you've made a note that you think you know someone, we will discuss it when you approach sidebar.

Now based upon the brief description that I've given

you of the case and the parties' identities, do you have any particular knowledge of this case or knowledge of any of the facts in connection with it, including what you may have seen or read on tv, exposed to in the social media, seen in the news broadcast, heard on the radio?

If you have any such information about the case or are even familiar with the case, even to the small extent of just hearing about the case in the media, make a note of that because I'm going to ask you to give me more information about it when you come to sidebar.

Have you or any member of your immediate family or anyone with whom you are close been a victim of or accused of a crime? Or have you been involved in a crime as a criminal defendant, a victim, or a witness?

Do you have any feelings or beliefs about the government, whether positive or negative, that might interfere with or affect your ability to serve as a fair and impartial juror in this case?

Would you believe or disbelieve a law enforcement officer simply on that basis alone, that that person was a law enforcement officer?

Some of you may have had previous service on a civil or criminal state or federal jury and if you do have that prior service, is there anything about that prior service you think that would interfere with your ability to be

fair and impartial in this case?

Now in this case the indictment, in any criminal case, the indictment is simply the charge against the defendant. The fact that a defendant has been charged with a crime is not evidence that he's guilty of that crime.

A defendant is presumed innocent and the government has the burden of proving a defendant's guilt beyond a reasonable doubt. The law never imposes upon a defendant any duty to call any witness or produce any evidence. The burden of proof is always on the government.

Is there anyone who does not accept this basic principle regarding the presumption of innocence and the government's burden of proof? If you have difficulty with that principle we will discuss it further at sidebar.

A defendant also has a constitutional right not to testify in their case. Absolutely no inference of guilt or anything else can be drawn from the fact that a defendant may choose not to testify. For you to draw such an inference would be wrong. Indeed, it would be a violation of your oath as a juror.

Is there anyone who does not accept this basic constitutional principle regarding a defendant's right not to testify? Or is there anyone who would hold it against the defendant simply because a defendant did not testify?

If those are issues for you, then make sure you put a note in there and we can discuss them further at sidebar.

You must follow the law as I will provide it to you in deciding this case. You must put aside any notion about what you thought the law requires or what you think the law should be. You can follow only the instructions and accept the instructions as law as I give them to you during this case and in the final instructions at the end of this case. That will be the law you apply.

So if there's anyone who has difficulty with that principle of how you apply the law and what law you apply, make a note of that and we will discuss it.

Do any of you have any disability, physical or otherwise, that would make serving as a member of the jury difficult or impossible? Or does anyone have any difficulty reading or understanding English? If there is any type of difficulty, we discuss it and perhaps make some type of accommodation to you.

As I indicated, this case may take up to three weeks. So having explained that schedule I need to know is there anyone to which that time frame would pose a serious or extraordinary hardship?

I know that is going to pose a hardship for everyone. That hardship will differ in levels. So if you believe your particular hardship, whatever it may be, work

related, family related, pre-planned vacations, things like that, just tell me about them and we will discuss it and I'll be required to make a determination as to whether or not that issue will allow you to be excused from jury service or whether you will be required to continue to serve.

Now does anyone have any personal beliefs that might interfere with your ability to serve as a fair and impartial juror in this case? If you have any personal beliefs that go to the principles of law that control our jury system, then bring them to my attention and we will discuss how that might interfere with your ability to be fair and impartial.

Do any of you have any religious, philosophical, or other beliefs that would make you unable to render a verdict for reasons unrelated to the law or to the evidence?

Do any of you donate to any charity? If so, we will ask you what kind of charities.

Have you or a close family member or other relative, friend, ever received toys or clothing from a charitable organization?

Does the fact that this case involves allegations that Mr. Buffis stole charitable donations intended for a fund to provide toys to needy children at Christmas, those

allegations alone, does it affect your ability to be a fair and impartial juror?

Does the fact that this case involves allegations that Mr. Buffis used his office as chief of police to extort money from two individuals that had allegedly committed crimes, that allegation alone, again it's a mere allegation, but does that affect your ability to be fair and impartial?

Have you or any family member or a close friend ever been a party to any legal action or dispute with the United States or state government?

Is any member of your family employed by a law enforcement agency or investigative service, whether federal state or local?

Has anyone been involved in a lawsuit, civil or criminal in any respect? You can tell me about that at sidebar.

Are you or any of your family members or close friends currently or formally employed by a court, some judicial body, working as a law clerk, court attendant, deputies, court personal, or in some other capacity?

Are you or any close family members or close friend currently or in the past employed by a jail or correctional facility?

Have you or any of your relatives or any of your

close friends ever been involved as a victim or appeared as a witness or potentially a defendant in any investigation or case in court brought by a state or local agency? And also the question goes to have you been involved in any civil lawsuits as well?

Do you believe that a witness called by the prosecution is any more believable than a witness called by the defense? If you would believe that, then we will discuss that belief at sidebar.

Do you realize that the indictment in this case, the charges in this case, are merely a formal legal pleading? It is a piece of paper handed in by the prosecution in order to start the proceeding, and it has no greater legal effect than that. It's simply to be a charging document.

Will you have any difficulty voting your own conscience if you are a member of the jury? Even if your vote happens to be in the minority when you're back in the jury deliberation room, will you be able to hold true to your conscience when serving as a juror? If you think you may have a problem with that, make a note and that's something that we can discuss.

Do you believe that economic crimes, such as wire fraud and money laundering, are any less serious than other types of crimes and should be treated differently because they're less serious?

Do you have any strong feelings about criminalization or decriminalization of prostitution?

Have any of you ever been subject to any unflattering or negative portrayal on social media or in the public light in any way, shape, or form?

In this case I have explained to you that the defendant, Mr. Buffis, has the right not to testify on his own behalf and you cannot in any way hold that against him. But if the defendant in this case, Mr. Buffis, chose to testify, would you give his testimony the same weight and credence as you would any other witness's testimony, or would you somehow view him differently simply because he's the defendant in this case?

If you would have issues with that question and issues with not treating him the same as any other witness, we will discuss that at sidebar.

Now, finally, is there anything or any reason that I haven't covered in these questions that might interfere with your ability to serve as a fair and impartial juror in this case? If there is, we will have an opportunity to talk about it when you approach.

Do the lawyers need to see me or can we approach? Are you prepared to go forward?

MS. LEVINSON: Yes.

MR. BRESLOW: Yes, Your Honor.

(Sidebar conference.)

MR. BRESLOW: Your Honor, before we proceed, D*** G*** may be related to a child pornography defendant, William G***. I just don't know. It's the same last name.

THE COURT: We'll see what she says.

(A juror approached sidebar.)

THE COURT: Hi, Ms. G***.

A JUROR: Yes.

THE COURT: Come a little closer. How are you?

A JUROR: Pretty good.

THE COURT: Did you answer any of the questions I asked?

A JUROR: I did.

THE COURT: Can you share that with us?

A JUROR: Kathleen Arment is my nephew's mother-in-law so I know her very well.

THE COURT: You know her very well?

A JUROR: Yes. We attend family outings and stuff.

THE COURT: Kathleen Arment is?

MR. BRESLOW: She is a government witness. She's I believe a dispatcher for the Lee Police Department.

THE COURT: Is she likely to be called?

MR. BRESLOW: Possibly, yes.

A JUROR: I also know Phil Skowron. He's a family friend.

MR. BRESLOW: He's somebody who also may be called. He's a former Lee Police officer.

A JUROR: I'm from Pittsfield so the Berkshire Eagle has covered this extensively and I've read a lot about it, about the allegations of the Laurel Lake incident and the toy fund.

THE COURT: All right. So let's begin with the people you know, Mr. Skowron and Ms. Arment. If these individuals testify, would you tend to give their testimony credence right off the bat, choose to believe them just because you know them?

A JUROR: I'm afraid I might. I respect Kathleen Arment a lot and the same with Phil. They're great people and I tend to think that I would be swayed by what they had to say.

THE COURT: So if they were challenged in a way that was designed to cause a jury to question whether or not they were accurately reporting some details, you think you would no matter what just favor what they said?

A JUROR: If it was clearly proven that they were wrong, I would have to decide that they were wrong, but...

THE COURT: You wouldn't like it?

A JUROR: Yeah. My belief would be that they were telling the truth because I know them. They're honest people.

THE COURT: Okay. Now how about your exposure to media in this case. Has that lead you to form any type of opinion?

A JUROR: Kind of, yes.

THE COURT: And that opinion would be negative towards the prosecution or negative towards the defense?

A JUROR: Towards the defense.

THE COURT: All right. Now I think I've already given this instruction but I'm going to give an instruction that you can only make a determination based upon the evidence that you hear in this court.

A JUROR: Correct.

THE COURT: So I mean everyone in life is exposed to outside information but you have to completely put that out of your head and not consider it any way, shape, or form. The question I need to ask you and other jurors are going to come up here is would you be able to completely put out of your head any opinion you've already formed and make a judgment only on what you hear in this case?

A JUROR: I don't think I could. I've read a

lot about it.

THE COURT: All right.

A JUROR: It's just from being where I'm from, it's just all over the papers.

THE COURT: All right. Could you step back a moment?

(The juror left sidebar.)

THE COURT: I'm not sure further inquiry is needed.

MR. BRESLOW: No. We agree that the juror should be stricken for cause.

THE COURT: For cause.

(A juror approached sidebar.)

THE COURT: Hi, Ms. O***.

A JUROR: Yes.

THE COURT: How are you?

A JUROR: Good. How are you?

THE COURT: Very good. Thank you.

Now did you answer any of the questions that I was asking?

A JUROR: I had a restraining order. I had to go to court on my father's girlfriend.

THE COURT: How long ago?

A JUROR: About a year ago, and my sister is a paralegal. She lives in South Hadley and I live in

Chicopee.

THE COURT: Do you discuss her work with her at all?

A JUROR: No.

THE COURT: What court did you go to for the restraining order?

A JUROR: The Chicopee court.

THE COURT: And is the restraining order still active?

A JUROR: No.

THE COURT: Have you read any articles about the case or been exposed to any media in any way?

A JUROR: No.

THE COURT: All right. Very good. What I think is going to happen is the lawyers might want to ask you some generalized questions to get to know you a little better.

A JUROR: Okay.

MR. BRESLOW: Good morning. How are you?

A JUROR: Good.

MR. BRESLOW: So you indicated on your questionnaire that you work at the Pride gas station.

A JUROR: Yes.

MR. BRESLOW: Can you tell us a little bit about what you do?

A JUROR: I'm a deli clerk. We have like a deli cafe. We slice meat, make sandwiches, do the muffins and doughnuts.

MR. BRESLOW: Do you work the register?

A JUROR: Yes.

MR. BRESLOW: Can you tell us how you do that?

A JUROR: It's all electronic.

MR. BRESLOW: So when you take cash, what do you do?

A JUROR: It tells us what to do and we just give them the change.

MR. BRESLOW: Okay. And do you handle like at the end of the day the cash-outs or anything like that?

A JUROR: Yes.

MR. BRESLOW: Can you tell us how that works.

A JUROR: It's computerized. We count the money. We leave a hundred dollars in the drawer. It says how much we need after the one hundred dollars, the cash drop. I put it in electronically and put it in the safe and I go home.

MR. BRESLOW: And you count it to make sure it compares right with the cash register?

A JUROR: Yes.

MR. BRESLOW: Can you tell us what you did before that?

A JUROR: Before that I worked at Poppa John's as a cashier.

MR. BRESLOW: And the same basic process with cash at the end of the day?

A JUROR: Yes.

MR. BRESLOW: And can you just tell how far you got in school?

A JUROR: I went to college, HCC, for early education to be a daycare teacher.

MR. BRESLOW: Did you ever do daycare?

A JUROR: No.

MR. BRESLOW: How come?

A JUROR: I just chose not to.

MR. BRESLOW: All right. Thanks.

MS. LEVINSON: And you said that you never read or heard about this case in the media at all?

A JUROR: No.

MS. LEVINSON: Do you watch tv news or read newspapers?

A JUROR: Not really.

MS. LEVINSON: No?

A JUROR: No.

MS. LEVINSON: Okay. That's all. Thank you.

THE COURT: All right. Can you step back for one minute?

(The juror left sidebar.)

THE CLERK: The government is first.

MR. BRESLOW: We pass.

MS. LEVINSON: We are satisfied.

THE COURT: Satisfied. All right.

(A juror approach sidebar.)

THE COURT: Hi, Ms. M***?

A JUROR: Yes.

THE COURT: How are you?

A JUROR: Fine. Thank you. Nervous.

THE COURT: Okay. Any responses to the questions that I asked, did you have any?

A JUROR: Yes.

THE COURT: Tell us about that.

A JUROR: I'm from Pittsfield so there's been a lot of news coverage.

THE COURT: Let's start with that. Do you regularly read -- what's the paper?

A JUROR: The Berkshire Eagle.

THE COURT: Is that where you get your news?

A JUROR: Yes.

THE COURT: Have you been reading about it just in the last week or previously?

A JUROR: No, previously.

THE COURT: So would it be fair to say that

you've kind of followed the story?

A JUROR: Yes.

THE COURT: Has this been a topic of conversation, this particular story, between you and friends or family in the Berkshires?

A JUROR: Very much so.

THE COURT: All right. Have you formed an opinion about this case based upon conversations or what you read in the media?

A JUROR: Most definitely.

THE COURT: You have. And is that opinion negative towards the prosecution or towards the defense?

A JUROR: Defense.

THE COURT: Defense. All right.

Now I generally give an instruction over and over in the trial that even if you exposed to outside influences, you would have to do your best to make a decision only on the evidence that comes in the courtroom. We kind put out anything else that you heard about the case. Given your situation and exposure you have would you be able to do that?

A JUROR: Honestly I don't think so.

THE COURT: You don't think so?

A JUROR: No.

THE COURT: All right. Can you step back for

one moment?

A JUROR: Sure.

(The juror left sidebar.)

MR. BRESLOW: Nothing further. If we proceed and there are other jurors, I may want to inquire further but no.

THE COURT: Well, I mean when you have answers like that...

MR. BRESLOW: Right.

THE COURT: Okay. So excused for cause.

(A juror approach sidebar.)

THE COURT: You are Ms. S***?

A JUROR: Yes.

THE COURT: How are you?

A JUROR: Pretty good.

THE COURT: Can you step one foot closer so we can hear you?

Did you respond to the questions that I asked?

A JUROR: Yes. I don't know any of the facts about the case but I work in Lee. I was a witness in a trial in April of 2014.

THE COURT: What kind of trial?

A JUROR: It was a criminal trial, assault and battery case.

THE COURT: Can you tell me a little bit about

what you were a witness to?

A JUROR: It was a domestic assault and battery case and I testified for the prosecution.

THE COURT: The prosecution. You were the victim?

A JUROR: No.

THE COURT: You were a witness?

A JUROR: Correct. And they do a clothing drive at my job.

THE COURT: All right. Would your experience in the criminal justice system having been a witness and seeing how it works, would it cause you to favor or think negatively of either side in this case just because of that experience?

A JUROR: No.

THE COURT: All right. And you said you live in Lee?

A JUROR: I work in Lee.

THE COURT: You work in Lee, and you don't know anything about this case? You haven't heard about it on the radio?

A JUROR: I heard of it, but.

THE COURT: Do you know any facts about it?

A JUROR: No.

THE COURT: You just heard the name?

A JUROR: Yes.

THE COURT: Okay. The lawyers I think will ask you some general questions.

MR. BRESLOW: Ms. Levinson, would you like to start?

MS. LEVINSON: Sure. Hi.

A JUROR: Hi.

MS. LEVINSON: So you testified for the prosecution, was it the Berkshire County District Attorney's office?

A JUROR: Yes.

MS. LEVINSON: And as a result of your working with the Berkshire County District Attorney's office do you have any feelings about prosecutors, defense lawyers?

A JUROR: No.

MS. LEVINSON: Do you tend to side with one side or the other?

A JUROR: No.

MS. LEVINSON: Did you feel that court proceeding that you participated in was a fair proceeding?

A JUROR: Yes.

MS. LEVINSON: Were you pleased with the way the whole thing worked?

A JUROR: Yes.

MS. LEVINSON: Did you know the defendant in

that case?

A JUROR: Yes.

MS. LEVINSON: Did you have any fear about testifying --

A JUROR: No.

MS. LEVINSON: -- for the prosecution?

A JUROR: No.

MS. LEVINSON: And you don't hold it against the defense lawyer for cross-examining you?

A JUROR: No, it was pretty quick, just a couple of questions.

MS. LEVINSON: And the fact that you live in Lee --

A JUROR: I work in Pittsfield.

MS. LEVINSON: Have people at work not discussed this case in front of you?

A JUROR: No.

MS. LEVINSON: It's not a topic of conservation?

A JUROR: No.

MS. LEVINSON: Thanks.

THE COURT: All set.

MR. BRESLOW: Hi. How are you?

A JUROR: Good.

MR. BRESLOW: Can you tell us about the work you do?

A JUROR: I work for a uniform company, customer service.

MR. BRESLOW: What do you do like when you get to work, just a typical day?

A JUROR: I get to work. I do a daily deposit for the bank and then I have drivers that call in with questions or customers that call with questions about orders and I place orders, replacements for garments.

MR. BRESLOW: So it's hospital stuff?

A JUROR: Mechanic uniforms. We do have some hospital accounts and we also service like toilet paper, soaps, stuff like that. If a customer is short, I make sure the driver gets it to them.

MR. BRESLOW: What did you do before that?

A JUROR: Before that I worked in -- where did I work right before that? -- in Pittsfield at CET.

MR. BRESLOW: What's that?

A JUROR: Center for Ecological Technology. It's like an energy assessment type place.

MR. BRESLOW: Okay. And what did you do there?

A JUROR: Customer service.

MR. BRESLOW: And do you do any volunteer work, anything outside of your work?

A JUROR: No.

MR. BRESLOW: Okay. Thank you.

A JUROR: You're welcome.

THE COURT: Just step back to the box there.

(The juror left sidebar.)

MS. LEVINSON: We are satisfied.

THE COURT: Satisfied?

MR. BRESLOW: Pass. We are satisfied too.

THE COURT: All right. That's two.

THE CLERK: We need one more.

THE COURT: Right.

(A juror approached sidebar.)

THE COURT: Hi. You are Ms.?

A JUROR: J*** D***.

THE COURT: Thank you. I was on the wrong page. Come a little closer. Ms. D***, did you answer any of the questions that I asked?

A JUROR: Yes.

THE COURT: What was the answer?

A JUROR: I was a criminal witness.

THE COURT: When was that?

A JUROR: It was May of last year.

THE COURT: All right. Can you tell us what kind of case it was?

A JUROR: Yeah, it was my husband and his ex accused him of running her off the road.

THE COURT: All right. So you actually

testified?

A JUROR: Yes.

THE COURT: Now did that experience, just being involved and seeing how charges are brought against someone, being on the witness stand and --

A JUROR: It was terrifying.

THE COURT: -- cross-examined, going through that terrifying experience, did that leave you with any impression that might cause you to think either negatively or positively towards either side in this case?

A JUROR: The only issue I had was the accuser's brother was a cop and it was kind of a setup and he was innocent.

THE COURT: All right. Would that experience cause you to form any opinion, just as you stand here, in the back of your mind somewhere you think either the prosecution in this case was right or the defendant in this case was right?

A JUROR: No.

THE COURT: Do you think you could be fair in this case even though you had a terrifying experience?

A JUROR: Yes.

THE COURT: All right. What else did you answer?

A JUROR: That's about it. I didn't have any

other.

THE COURT: How about any knowledge of this case? Have you heard about it on the radio or seen anything about it in the newspaper?

A JUROR: No.

THE COURT: All right. You live where?

A JUROR: Southampden, Massachusetts.

THE COURT: Where do you usually get your news?

A JUROR: 22 news in the morning.

THE COURT: Okay. Very good. The attorneys are going to ask you some generalized questions just to get a better sense of you.

MR. BRESLOW: Just two topics that I want to touch a little bit about. The first is the case and then just work.

A JUROR: Okay.

MR. BRESLOW: So with the case, I totally get how terrifying for you to be on the witness stand was. How did it feel to see your husband as a defendant?

A JUROR: That was terrible, yeah.

MR. BRESLOW: And totally understandable, but do you think that you might identify with the defendant that if you're on the jury you might look at the defendant and think that could be my husband and somehow sympathize in some way that would, you know, really not allow you to be

fair?

A JUROR: Umm, it's a different case.

MR. BRESLOW: Yeah.

A JUROR: So I don't think so.

MR. BRESLOW: Okay. And were you cross-examined by like a prosecutor, like one of us?

A JUROR: Yes.

MR. BRESLOW: How did that go?

A JUROR: It went well.

MR. BRESLOW: I mean, did you feel like the lawyers treated you fairly on cross-examination?

A JUROR: Yes.

MR. BRESLOW: And then you said that you thought it was a setup because your husband's ex-wife's brother was a police officer?

A JUROR: Yes.

MR. BRESLOW: Can you tell us a little bit more about how you felt that was a setup?

A JUROR: Well, he was a Tewksbury cop and Sean, my husband, was pulled over in Billerica by a Tewksbury cop so that's where she called and they sent him to Billerica.

MR. BRESLOW: Got it. And did you feel like the Tewksbury police officer was dishonest?

A JUROR: Umm, yes, but then he was also a

witness for Sean and he was sympathetic.

MR. BRESLOW: Interesting.

A JUROR: It was an interesting case.

MR. BRESLOW: So here it just so happens that a bunch of the witnesses for the prosecution, and maybe for defense, are going to be police officers and the defendant himself was a former police officer. So how did your experience in that case -- how do you think that's going to shake out as you listen to the testimony and judge this case?

A JUROR: Umm, I mean I have several cop friends and I don't put that case -- I don't judge anything by that particular case.

MR. BRESLOW: All right. Then just a few questions about work. Can you tell us what you do for work?

A JUROR: I work for a CPA.

MR. BRESLOW: What do you do for the CPA?

A JUROR: I'm her assistant.

MR. BRESLOW: Can you tell us a little bit about what you actually do when you get to work and what your day is like?

A JUROR: I do all the appointments. I do audits, bookkeeping, payroll.

MR. BRESLOW: Okay. And do you handle -- you

handle the books for the CPA?

A JUROR: Yes, I do some payroll and bookkeeping.

MR. BRESLOW: How long have you done that?

A JUROR: Fourteen years.

MR. BRESLOW: Thank you.

THE COURT: Can you step back? Thank you.

(The juror left sidebar.)

THE COURT: I find those two jurors that have been selected to be fair and impartial.

MR. BRESLOW: The government is satisfied.

MS. LEVINSON: I will strike her.

THE COURT: That's it for you?

THE CLERK: That's it for defense, yes.

MR. BRESLOW: Judge, I noticed this woman, this next juror, reacted to the length of the trial so you may want to have inquiry if she doesn't bring it up.

THE COURT: All right.

(A juror approached sidebar.)

THE COURT: Hi.

A JUROR: Hello.

THE COURT: Ms. C***?

A JUROR: Yes.

THE COURT: How are you?

A JUROR: Good.

THE COURT: So did you answer yes to any of the questions or make any notes that you need to talk about?

A JUROR: Not really. Some of them I didn't understand.

THE COURT: Well, to start with how about the length of the trial, is that something that's workable for you?

A JUROR: Is my employer going to pay me?

THE COURT: How much is it a day?

THE CLERK: I think it's $40 maybe a day.

A JUROR: Financially it might be an issue for me.

THE COURT: What do you do?

A JUROR: I work in a dental office. I'm an office manager/dental assistant.

THE COURT: All right. The financial hardship is always a very big issue for everyone when doing this. Other than that, did you write down any other questions? How about media exposure? Did you see anything about the case in the media?

A JUROR: Not that I'm aware of. I do have a supposedly mandatory meeting on June 12th because we have a new system in our office.

MR. BRESLOW: We should be done.

MS. LEVINSON: We better be done by then.

THE COURT: All right. The lawyers are going to ask you some generalized questions so that --

A JUROR: Oh, boy.

THE COURT: It's just general questions.

MR. BRESLOW: Don't worry about it.

THE COURT: Ask them questions back.

A JUROR: I don't have any questions.

MS. LEVINSON: So you're also a dental assistant?

A JUROR: Yes.

MS. LEVINSON: And an office manager?

A JUROR: Yes.

MS. LEVINSON: What kind of tasks do you do?

A JUROR: Okay. I don't know.

MS. LEVINSON: Do you deal with billing?

A JUROR: Yes.

MS. LEVINSON: What do you do with billing?

A JUROR: I deal with the checks that come in. I deal with patients that owe money and stuff like that, any doctors, and things that need to be handled comes to me. Sometimes ordering but not all the time.

MS. LEVINSON: How do you deal with the patients who are delinquent?

A JUROR: I send out letters.

MS. LEVINSON: Is that the end of your

responsibility?

A JUROR: I send out notes on their billing and then I send out the collection letter one, collection letter two, and then if I don't have any response they send them to collection.

MS. LEVINSON: And do you do any volunteer work outside of work work?

A JUROR: No.

MS. LEVINSON: Thanks.

MR. BRESLOW: Hi.

A JUROR: Hi.

MR. BRESLOW: No hard questions I promise --

A JUROR: Thank you.

MR. BRESLOW: -- but the first question I do have is I know the judge threw a lot at you guys, is there anything that you remember the judge asking that you didn't understand that you could ask the judge now just so that --

A JUROR: No.

MR. BRESLOW: No? Do you remember the rough topic?

A JUROR: I remember roughly like the whole, the whole case itself like that involvement, some stuff.

MR. BRESLOW: This would be a good time to say, you know, I didn't get this part, could you explain it.

He's right here for you.

A JUROR: I know, but I don't remember. I can't remember the exact question to ask him.

MR. BRESLOW: Do you feel you got the general gist of what was going on?

A JUROR: Pretty much.

MR. BRESLOW: That's it.

A JUROR: Okay.

THE COURT: Thanks. Can you step back?

(The juror left sidebar.)

MR. BRESLOW: Is it ours?

THE CLERK: Yes, it is.

MR. BRESLOW: We're satisfied with her.

THE COURT: You're satisfied?

MR. LEVINSON: Yes.

THE COURT: That's it. Now we have four alternates.

THE CLERK: Yes.

THE COURT: There's 16 so we'll bring that juror in. We'll excuse everyone else and I'll bring that other juror in.

Theresa, so we need to get rid of these jurors, send them back, and we need to see -- what's the juror name?

MR. BRESLOW: Mr. L***.

THE CLERK: I don't know if they are here.

THE COURT: If he's here, now would be a good time to bring him here.

THE CLERK: So bring these jurors back and bring him out?

THE COURT: Yeah.

THE CLERK: Then bring them all out?

THE COURT: Then after I meet with him we can bring them all in and then we will swear them in. Then we'll take maybe ten minutes to let everybody get their things together for opening and then we will start.

So we will bring him in first and deal with that. Then we'll bring the whole panel in and swear them in. I'll give them some preliminary instructions about what's going to happen and then take a break.

THE CLERK: Okay.

(End of sidebar.)

THE CLERK: Everybody else is excused. We have a panel. You may have to call in on Friday.

THE COURT: Thank you for coming in. In a moment you're going to be going back to the jury room to become part of the other jury that we have selected on a previous day. You will now be one jury and we will start the case today.

When you go back to meet the other jurors I told them, and I'll tell you the same thing, you cannot discuss

the case with them. You cannot talk to them about anything about the case. Find out their names, whatever, but do not talk anything about this case. All right? Thank you.

**(A recess was taken at 10:38 until 10:43.)**

THE COURT: We'll come to sidebar.

(Sidebar conference.)

THE COURT: So this is Mr. L***?

THE CLERK: L-*-*-*.

THE COURT: Let's wait until Mr. Breslow gets here. I just have one little thing to discuss.

MR. BRESLOW: Sorry.

THE COURT: Okay. We have Mr. L*** approaching sidebar regarding the comments that were made. Now again the comments were?

MR. BRESLOW: In sum and substance, he was critical about the court, talking about suing the court, and perhaps most importantly he indicated that he felt that either Mr. Buffis or someone who he described as that crooked cop --

THE COURT: Okay. Yes.

MR. BRESLOW: -- should pay for his lunch.

THE COURT: Got it. Okay.

(The juror approached sidebar.)

THE COURT: Mr. L***, how are you?

A JUROR: Good.

THE COURT: Thank you for being here this morning.

A JUROR: Yes.

THE COURT: I have a few follow-up questions. Yesterday during the impanel procedure it was a long day.

A JUROR: Yes.

THE COURT: And when you were seated in the audience, other people in the audience thought they overheard you making some comments regarding the defendant, Mr. Buffis, referring to him as what could be construed in a derogatory way. Did you make any comments like that?

A JUROR: No, just the same conversations that everybody was having.

THE COURT: Did you make any comments about that cop or that crooked cop or he should buy me lunch maybe for being here for an extra long day?

A JUROR: Buy us lunch?

THE COURT: Yes.

A JUROR: Nothing more than anybody else said. It was just maybe we should get it on him but --

THE COURT: All right.

A JUROR: -- nothing derogative that I would

call.

THE COURT: You were -- and I understand that everybody was here for a long day.

A JUROR: Yes.

THE COURT: When you're in that situation people say things halfhearted joking, halfhearted out of frustration. So you were making some type of comments about just the drain and drag of being here all day?

A JUROR: Pretty much, yeah.

THE COURT: All right. Do you hold yesterday or today do you hold any negative feelings towards either the government or the defense for any perceived inconvenience to you by being called to serve as a juror?

A JUROR: No. No. This is -- actually I've been not called in before so it's kind of something I'm looking forward to seeing how the process goes and service itself, yes.

THE COURT: All right. Let me ask if either lawyers have any follow up?

MR. BRESLOW: I don't.

MS. LEVINSON: I do. You said that no more than any of the other jurors, what were the jurors saying about this?

A JUROR: Kind of just joking about the fact that we were here and now we go get lunch now, just things

like that, but then we kind of all went downstairs, went into I guess the jury meeting room and had lunch and that was the end of it.

MS. LEVINSON: You're not blaming Mr. Buffis for your inconvenience?

A JUROR: No, no. Just joking. I don't know. I guess we took a juvenile moment that's the best way to explain it.

MS. LEVINSON: Okay.

A JUROR: No harm was intended. It was just joking among ourselves.

THE COURT: Okay. I'm trying to clear up what happened.

A JUROR: Okay.

THE COURT: Thank you.

(The juror left sidebar.)

THE COURT: I need him back here for a minute.

(The juror approached sidebar.)

THE COURT: I need to ask you when you go back to the jury deliberation room the jurors may ask what happened to you. I do not want you to discuss with them what you talked about. All right?

A JUROR: Okay.

THE COURT: You can just tell them the court just had inquiry of you regarding your ability to serve.

Leave it at that. Do not tell them what we talked about.

A JUROR: Okay.

THE COURT: All right?

A JUROR: Perfect.

THE COURT: Any problem with that?

MS. LEVINSON: No.

MR. BRESLOW: Yes, that's fine.

THE COURT: All right. Very good.

A JUROR: All right.

(The juror left sidebar.)

THE COURT: Theresa, you can bring them all out.

MS. LEVINSON: I had listed Janet Buffis on my witness list and I'm not going to be calling her. She's in the courtroom so I just wanted to clear that with the court and counsel.

THE COURT: Okay. Has any party filed a sequestration order actually or orally moved?

MR. BRESLOW: I think we expect to orally move. So she should be excluded is what you're saying?

MS. LEVINSON: Right.

THE COURT: So she can stay in the courtroom?

MS. LEVINSON: Yes.

MR. BRESLOW: Ms. Levinson has already agreed for Special Agent Smythe to stay in the courtroom. Konnor

Buffis is here.

MS. LEVINSON: He will not be a witness.

MR. BRESLOW: Kaila?

MS. LEVINSON: That's not Kaila.

MR. BRESLOW Then we have no issue.

THE COURT: I'll leave it to you to monitor.

MS. LEVINSON: Right.

MR. BRESLOW: Just a question, can the witnesses hear the opening or should they be sequestered?

THE COURT: If they have been sequestered, they cannot hear the opening.

MR. BRESLOW: So we will go off our witnesses for that.

MS. LEVINSON: Yes, I have no witnesses that are going to be here.

MR. BRESLOW: Then just a few housekeeping things. One is we'd like to take not that podium but another podium and direct our questions from our table because the computer hookup is there not in the way of jurors and witnesses, and the second thing is in terms of the questioning does the court have any limitation on where we can be inside this space, meaning at some point can we walk around and leave that podium?

THE COURT: I have no limitations. You can walk around the courtroom as you would like. You don't need to

ask permission. I will stop you if it becomes too confrontational with a witness. I'll stop you and ask you to back up.

In the last trial there was a hearing issue, a hearing impairment issue, and the lawyer needed to stay on the microphone or else certain people just could not pick it up and that became an issue.

MR. BRESLOW: So we could be anywhere in the courtroom?

THE COURT: Yes.

MS. SHUKLA: How about the jury addresses, how close could we get to the jury?

THE COURT: Stay on that side of the bar.

MR. BRESLOW: Okay.

MS. LEVINSON: You don't want to be sitting in their lap.

THE COURT: You cannot stop.

MR. BRESLOW: Do a Derek Jeter.

THE COURT: No, I mean I give free range to attorneys. You would have to really cross the line for me to say something.

MR. BRESLOW: We won't be doing that.

THE COURT: I don't anticipate it.

(The jury entered.)

(End of sidebar conference.)

THE CLERK: If anyone needs headphones, I put them on the edge for you throughout the trial.

THE COURT: So with the headsets, check them out. Sometimes we have to tweak them a little bit to get them to work. So as we are going through preliminary things, if they're not what you want and they're not helping you, just raise your hand and we'll get them right. All right?

THE CLERK: Can you stand and raise your right hand please?

(The jury was sworn.)

THE CLERK: You may be seated.

THE COURT: All right. Very well. So thank you again for your patience yesterday and your service as we go forward. It's very much appreciated and I'm glad to say it went pretty good this morning filling in what we needed to fill in and we are prepared to start today.

So I'm going to give you some preliminary opening instructions that talk generally about your service here as jurors, then the parties are going to kind of gather their paperwork together and prepare for what's called their opening statements that they will give to you and then the evidence will be started.

Some logistical things, it's okay if you want to bring snacks or lunch with you. You will be able to bring

them up and keep them in the jury room. We will also have lunches for you to order and have food here for you on a daily basis, but if you want to bring your own you can do that.

Your cell phones will be allowed to go with you into the jury deliberation room so you can check your cell phones during breaks, lunch break, coffee breaks, whatever but please don't bring them in the courtroom. All right? And with your cell phones I'm sure everybody here has a smart phone, so do not -- no smart phone? Okay. One person in the world who doesn't have a smart phone and she's here today.

(Laughter)

THE COURT: Thank you for being here. But with your phones, when you have phones don't use the phones to go on the internet and do any Google searches or look up whatever media source you want to look up looking into this case. Do no investigation of this case at any time but especially here when you're in court. Don't access anything about the case on the internet by your phone, and that rule goes throughout the trial. You can't look anything up about this case.

Now as far as standing up, there will be long periods of time where you're sitting. If you're uncomfortable and you need to stand and stretch, just stand up. Stand up

where you are and stretch. You will see me from time to time stand up. Oftentimes I'll just stand up and walk over here. There's this special stand right here where I will just watch and officiate over the trial standing like this. The first time I stand up everyone thinks what's going on, but it's fine. You can do the same thing. All right?

If you need a break at any time for whatever reason, if there's an important phone call that you have to make at a certain time, if you need the facilities, if you need to get a drink of water, if you just need a break because your head is full and you just need a break, you need a break to kind of regroup and come back here to help your concentration, just raise your hand.

I will be looking over at you regularly and Ms. Pelegano will be looking over at you regularly. It's really no big deal. It happens all the time and you shouldn't feel at all uncomfortable to raise your hand as often as you want to take as many short breaks as you might need.

Now, again if you have any trouble hearing, if those aren't working, you just raise your hand and we will take a break and have our technical guy come in and he can tweak those to make sure they're working.

If at any time you can't hear a witness because

they're talking too softly, again you raise your hand. A lot of things are going to be put up on the screen. You all have screens in front of you. If your screen isn't on, let us know. If you can't see the witness because they're blocked by their screen or anything like that, you just raise your hand and we will take care of whatever the problem was.

Now it will be your duty to find from the evidence what the facts are. You, and you alone, will be the judges of the facts. You will then have to apply those facts to the law as the court will give it to you. You must follow that law whether you agree with it or not.

Nothing the court may say or do during the course of the trial is intended to indicate what your verdict should be or how you should feel about the evidence. Don't try to assume or infer what I'm thinking about it. It is just not important. What you think about this case is the most important.

The evidence from which you will find the facts will consist of the testimony of witnesses, documents, and other things received into the record as exhibits and any facts that the lawyers agree to or stipulate or that the court instructs you to find.

Certain things are not evidence and may not be considered by you. What is not evidence are statements,

arguments, and questions by the lawyers.

Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered violates the rules, the Federal Rules of Evidence.

You should not be influenced by any objection or by how the court rules on the objection. If the objection is sustained, I agree with the objection, I say that objection is sustained, that means the question is stricken. You have to ignore it. For the first couple of objections I will tell that. I will say objection sustained, you ignore that. Strike that from the record and that means you don't even consider it.

If the objection is overruled, that means it's fine. You can ask that question. You can hear that question and you can listen to the answer. All right?

Testimony that the court has excluded or you are told to disregard, and this will come up, cannot be considered by you in any way, shape, or form.

Anything you may have seen or heard outside the courtroom is not evidence and you must disregard it. You are to decide this case solely on the evidence presented here in the courtroom.

There are two kinds of evidence - direct and circumstantial. Direct evidence is direct proof of a

fact, such as the testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exists. I'll give you further instructions on these matters at the close of the case.

It will be up to you to decide which witnesses to believe and which witnesses not to believe and how much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility of witnesses at the end of the case, but you are the judges of who to believe.

You may listen to a person and not buy one single thing that person says. That's your business. You may split it and say I believe a few things you just told me but not everything, or you may decide everything a person says. This is your call.

As you know, this is a criminal case. There are three basic rules about a criminal case that you must keep in mind. First, the defendant is presumed innocent until proven guilty.

The indictment brought by the government against the defendant is only an accusation and nothing more. It is not proof of guilt or anything else. The defendant, therefore, starts with a completely clean slate.

The second important fact is that the burden of proof

is on the government until the very end of the case. The defendant has no burden at all to prove his innocence or to present any evidence or to testify. Since the defendant has the right to remain silent, the law prohibits you from arriving at your verdict by considering that the defendant may not have testified.

Third, the government must prove the defendant's guilt beyond a reasonable doubt. Now that term "beyond a reasonable doubt" means something, and I will give you a full instruction regarding that term at the close of the case.

Now some of you may have been involved in civil cases or heard about civil cases. Now the burden is very different in civil cases versus criminal cases. Criminal cases is proof beyond a reasonable doubt.

Now I'm going to give you a very brief summary of the applicable law. I read to you a very brief statement of the case, telling you generally what the facts were about. Now relative to the charges I am going to again give you a very brief description of what the law says the elements of the charges are, how the law applies to what the facts you are going to hear.

Now please keep in mind these are preliminary instructions. They're important but not nearly as important as the full instructions that I'm going to give

you at the end of the case. This is just so you have a very general idea of both facts and law as we start the case.

First, relative to the charge of extortion, the government must prove beyond a reasonable doubt that a person knowingly and willfully obtained property from someone; second, that the person did so either through their official position or by wrongful use of fear; third, that the extortion affected interstate commerce.

Now there's some words in there that will be defined for you at the end of the case. Relative to the charge or the indictment of wire fraud, the government must prove beyond a reasonable doubt, first, that there was a scheme to defraud based upon the misrepresentation or concealment of a material fact; second, that the person knowingly and willfully participated in the scheme with the intent to defraud; and fourth, (sic) an interstate wire communication, like a fax or an e-mail, was used for the purposes of executing or furthering the scheme.

Relative to the indictment and charge of money laundering, first, the government must prove beyond a reasonable doubt, first, that a person entered into a financial transaction with a financial institution engaged in interstate commerce; second, that the transaction involved the use of proceeds of either extortion or wire

fraud; third, that the person knew that these were the proceeds of some form of crime; and fourth, that the person knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the extortion or the wire fraud.

Now again that's very general and you will be given much greater details as to these instructions and definitions of certain terms. I will read to you those full and complete final jury instructions at the close of the case and then you will get a copy of those jury instructions to take with you to the jury deliberation room so you will have the benefit of referring to the paper that's defining them to help you with certain terms and certain concepts. All right?

Now you, as jurors, must decide this case based solely on the evidence presented here within the four walls of the courtroom. This means that during the trial you must not conduct any independent research about the case, the matters in this case and the individuals or entities or corporations involved in this case.

In other words, you should not consult any reference materials, search the internet, websites, blogs. Don't use any electronic tools or social media to allow you to gain any information at all about this case. Please do

not try to find out any information about this case from any outside sources, and until you retire to deliberate you may not discuss this case with anyone, even your fellow jurors.

So when you take a coffee break, you can't go back to the coffee break and start talking about the witness that you just heard on the witness stand. You can't start talking about anything to do with this case until this case is completely over.

You can't talk to your spouse or your friends about what you're doing because once you start explaining to whoever you would be talking to about this case, you're actually deliberating because you're forming thoughts as to how you're going to tell the person the facts about the case that you're listening to. So you can't talk to people about this case other than I'm sitting on this criminal case. Here's the name of it and I can't tell you any more. All right.

After you retire to deliberate you may then begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone unless you have returned a verdict after the case is done and then you can talk to your friends and family members and anyone you want about the case.

I've already talked to you about not accessing social

media through your iPhones, your droid, whatever electronics you have with you. That is a hard-and-fast rule.

Finally, do not form any opinion about this case until all of the evidence is in. You must keep an open mind from the start of the case until the end of the case. So it happens all the time you may hear a witness at the beginning of the case that you thought was truthful and compelling and certainly you have to keep that in your mind but that can't form an opinion. You can't form an opinion just because you heard one or two witnesses at the beginning of the case tell you something. You have to keep an open mind and then when the case closes, put it all together and reach your verdict.

Now note-taking, if you want to take notes during the trial you may do so. We will give you notepads and you can use those. Sometimes it's difficult to take detailed notes and pay attention to what's going on at the same time, but that's up to you to decide. You can take as many notes or as few notes as you want to take.

If you do not take notes, do not -- if you do take notes, don't discuss your notes with anyone or share them with anyone. Your notebooks will be left on the chairs when you're not in the courtroom and at the end of the day they are collected by the clerk. No one looks at them and

in the morning you will be given them back. They're private. No one opens your notes and then the notes are destroyed at the end of the case.

Now, when you're taking notes remember that it is your responsibility to listen carefully to all the evidence. There will be no transcript available in this case. This is oftentimes a disappointment because you see our court reporter, Ms. Moran, working very hard and she works extremely hard. It is simply impossible to generate a correct and accurate transcript. There's so much that goes into producing the transcript at the end of the trial for accuracy that there is no way that you're going to get it during your deliberations.

I just want to tell you that upfront so that when you're listening to evidence and taking notes, you're not thinking, oh, I don't have to worry about it because I'm going to look at the transcript. You're not going to look at the transcript so that's how close attention you have to take and consider that when you're taking your notes as to what you want to put in your notes.

Now, the trial is going to begin. The government will first make an opening statement, which is simply an outline to help you understand the evidence as it comes in. Next the defendant's attorney may if they choose, but they do not have to, make an opening statement. Opening

statements are neither evidence nor argument.

The government will then present its witnesses and counsel for the defense will cross-examine the government's witnesses.

Following the government's case the defendant may, if the defense wants, present witnesses and if they do the government can then cross-examine the defense witnesses.

After all the evidence is in the attorneys will present their closing arguments to summarize and interpret the evidence for you, and then I will then instruct you on the law and you will retire to deliberate.

So now what you're going to hear next -- I'm going to take a short break so that the attorneys can kind of get their paperwork together, but what you're going to hear next is called an opening statement. It's important for you to know, I said it three times now, this is not evidence. This is when you get to hear good lawyers make good statements to the jury to try to persuade the jury.

Opening statements should be viewed as a preview. When you go to the movies and you see the preview of what the coming attraction is, it's supposed to give you a general outline of what the parties think the evidence is going to be and paint a picture that they think is going to develop at trial. All right? But what they say is not the evidence.

So I think we should plan on coming back a little bit before 11:30. Is that enough time to prepare? We will do openings and start with witnesses.

MR. BRESLOW: Yes, Your Honor.

THE COURT: All right. Very good. Now do you have -- were pastries brought into you in the jury room? You're all set? If you want to place any orders, I'll run out and get you something.

(Laughter)

THE COURT: Do not begin talking about the case. We will be here soon to start the opening.

**(The jury left at 11:13 until 11:36)**

THE CLERK: Be seated.

MR. BRESLOW: Your Honor, before the jury comes in, we just want to note for the record our objection to the display of Defense Exhibit A which is the Craig's List ad that you allowed into evidence. I just want to note it for the record.

THE COURT: That's fine. That is noted; you preserved your rights.

**(The jury entered at 11:38.)**

THE COURT: You may be seated. Now, ladies and gentlemen, I just need to ask you both during in the last break and last night before you came in this morning were all of you able to follow my instructions not to discuss

this case, begin deliberations in any way, investigate the case, not look the case up, and did all of you refrain from being exposed to any media of the case?

THE JURY: Yes, sir.

THE COURT: All right. For the jurors that just arrived today, were you able to follow my instructions not to discuss the case during this short break?

THE JURY: (Indicating.)

THE COURT: Fine. The jury remains fair and impartial.

Are you ready to proceed?

MS. SHUKLA: Yes.

**OPENING STATEMENT BY MS. SHUKLA**

MS. SHUKLA: Good afternoon.

THE JURY: Good afternoon.

MS. SHUKLA: This case is about a corrupt police chief who committed fraud, money laundering, and extortion and then hid his crimes for about 14 years. From 1999 until 2012 that man, Joseph Buffis, stole nearly $120,000 from a toy fund charity, a charity that was intended to give toys to needy kids at Christmas.

So the defendant collected up the public's donations but he didn't use them to buy toys for kids. So where did the money go? Well, here's where some of it went. On your screen you can see a picture of the defendant's son

Konnor. Konnor is a motocross racer and the defendant used several thousands of dollars of toy fund money to buy expensive toys for Konnor so that he could go to motocross racing school.

Now by February 2012 the defendant successfully defrauded hundreds of donors of the toy fund and then he got even boulder. He used his position as a police chief to extort a $4,000 donation to his toy fund from a couple in exchange for dropping criminal charges against them. He put that money in the toy fund and, just like the rest of the toy fund's money, he took it right out to spend on himself and his family, and when the State Police came to investigate them, investigate him, he told them story after story, false stories.

Let me tell you a little bit about how the toy fund began. It started in the 1950s by a man named Ed Laliberte. Ed was a police officer at the time and he collected toys, broken toys, and he'd fix them up and then donated them to children in town.

Soon the toy fund started to take monetary donations, and the police station would buy toys for needy kids and the police officers would distribute those toys. Now by 1999 the defendant had taken over the toy fund and he had turned it from a genuine charity into his own personal piggy bank.

Now during the trial you're going to hear from an FBI forensic accountant. That forensic accountant looked at all of the toy fund records and he also looked at all the bank records and credit card records of the defendant, and he did an analysis and that analysis showed several things. First, during that 14 years, between 1999 and 2012, the toy fund received about $120,000 in donations from the people of Lee, Massachusetts and the defendant stole nearly all that money.

Then the FBI focused on a smaller time period within those 14 years, the six most recent years from 2007 to 2012, and that's because that's where they had the most complete picture of all of the records, and during that time the toy fund received about $55,000 in donations and again the defendant stole nearly all that $55,000 and used it on himself for things like liquor and to go bowling.

During those same six years the defendant didn't make one single purchase out of his own bank accounts at a toy store, and during those six years his Visa card received $18,000 of toy fund money to pay his Visa card and in those six years the defendant used his Visa card at a toy store only once for $311.

Also for 2007 to 2012 the defendant wrote about $25,000 in toy fund checks to cash but he didn't cash those checks. He took those checks that he wrote to cash

to his own bank account and he deposited those checks to cash into his own banks then again he used that money on himself and his family.

So how did the defendant get away with this for so long? Through fraud. Here's how the defendant's fraud scheme worked. You can see on your screen there a chart and on the left-hand corner that's the defendant. There are arrows going to the right, and he sent faxes and e-mails year after year soliciting donations for the Berkshire Eagle newspaper.

The Berkshire Eagle Newspaper, which is on the right-hand corner, top corner of the chart, printed those solicitations in the newspaper and then donors read those solicitations. After reading them, they made donations to the toy fund. The defendant put their donations into the toy fund account, and then you see the arrow going up to the toy fund account right back to the defendant. He took almost all of the money back out of the toy fund for himself. And, most importantly in this fraud scheme, those wires, the faxes and e-mails that the defendant sent, he never disclosed in them to the Berkshire Eagle or to the donors who eventually read the Berkshire Eagle that he was taking a substantial portion of the toy fund donors' money to use on himself.

Now during the trial you're going to hear from some

of the victims of the defendant's fraud, the toy fund donors. They're going to tell you that the reason they donated to the toy fund was because they wanted to make a needy child's Christmas brighter. They're also going to tell you that they didn't know the defendant was taking a substantial part of their money that they donated to make a needy child's Christmas brighter for himself.

You're also going to hear from his other victims, the struggling parents of Lee who tried to get toys from the toy fund so that they could make their own kids Christmas brighter and they were unsuccessful. They weren't able to get toys from the toy fund.

You're also going to learn how the defendant tried to hide his fraud from the world. As I told you, he wrote many checks to cash that he didn't cash. He deposited those checks to cash into his own bank accounts so that they couldn't be traced back to the toy fund.

I'm going to show you four examples of how the defendant stole from the toy fund and hid it from the world. On your screen you can see that the donors donated to the toy fund. Sometimes they gave the donations directly to the defendant and then the defendant deposited that money into the toy fund.

And then you can see in the middle of the slide here's one example where the defendant wrote a check to

cash for $975 and, as I said, he didn't cash that check that he wrote to cash. He deposited it into his account with his son, the motocross racer, and then on the right-hand side of the chart you can see what he did with that money immediately after he deposited the toy fund check into his own account. He made charges at Exxon, paid for a motorhome, bowling, and he took out some money with an ATM card.

Here's another example: Again the donor made donations to the toy fund and the defendant deposited those donations to the toy fund account. Here's another check he wrote to cash, this time $3,000 to cash. Again, he did not cash that $3,000 check. He deposited it into that same account with his son and then the very next day he took out the same amount, $3,000, in cash from his account with his son, further preventing it from being traced back to where it came from, the toy fund.

Here's one final example: Again the donor made donations to the toy fund and the defendant deposited those donations into the toy fund account, and here's another check that he wrote to cash. This one is for $325. It's in the middle of the slide there. One more time he did not cash that check. He deposited it this time into a joint account with his wife at the Credit Union of the Berkshires, and on the right-hand side of the

slide you see what he did with it. Right after depositing that money he spent the money at a clothing store, JC Penny, spent it for insurance, cable tv, to pay off his daughter's college debt, and at Costco.

As the FBI reviewed the defendant's financial records, they found something else. He had been paying tens of thousands of dollars to pay off his daughter's college debt and to pay for his son's motocross racing school. His credit cards were frequently past due because they were frequently overdrawn. He was drowning in debt.

So from 2007 to 2012 the defendant deposited about $55,000 of toy fund money that he put into the toy fund and then he took nearly all of it for himself, and the defendant purchased nearly no toys with that money from all of his own accounts.

So could the defendant have been reimbursing himself for cash he had spent out of his own accounts on toys? Well, the evidence will show that the clear answer to that is no, the defendant did not buy $55,000 worth of toys out of his own accounts with cash and here's why: That's not what the defendant said he did.

You can see on the slide there's a written statement of the defendant. The defendant was interviewed by the State Police several times in the investigation, and at one of the interviews he signed an 8-page written

statement. He initialed every single page of that statement certifying everything in that statement was true, and you can see on the page that he said that the only times he reimbursed himself for buying toys with toy fund money was when he used his Visa card at the Greylock Federal Credit Union.

He never said in this statement that he used cash out of his own accounts to buy toys and then that he was reimbursing himself with the toy fund money for that cash he used, $55,000 worth of cash. He never said that.

So when the FBI looked into the defendant's Visa records, they saw what toy fund money went in and what went out. Well, almost $18,000 of toy fund money went to pay the defendant's Visa bill, and the defendant made one single purchase at a toy store during that time in 2007 for $311. Instead, he used that Visa card for many of his son's motocross raising expenses.

So during that time period from 1999 to 2012 the defendant had gotten away with depleting the toy fund for over a decade and then he got even bolder. In early 2012 the toy fund money from the past season had dried up. He already spent it all and he saw another opportunity to grab $4,000 for himself.

One of the Lee police officers, along with State Police, had conducted a sting operation of an inn in Lee.

At the Inn a couple, a husband and wife, had been selling sex for money. So the sting operation was successful and the wife immediately agreed to cooperate. She wanted to do all she could and part of that she offered to donate the proceeds of prostitution to charity.

Well, the State Police didn't take her money, but the defendant found out about her offer and he decided to take the money for the toy fund and then take that money out for himself.

So the couple was scheduled to go to court in February 2012, and the defendant made sure that he was the one representing the police department at that hearing. At that hearing the wife was humiliated. She was crying; she was distraught. She had young children and the last thing she wanted was public prostitution charges, and the husband, who owned the inn, already seen his business go down because there was also some press coverage about it knew if the charges stuck that he would be in even deeper water with the inn, and the defendant was the police chief. He had the power to either proceed with charges or drop them and he used that power.

He told the couple that he would drop the charges if, if, the couple dominated $4,000 to charity and not any charity, the toy fund charity, the same charity that he had made a long habit of stealing from. So the couple who

just wanted the charges to go away said okay. They gave him the $4,000 and the defendant dropped the charges against the couple, and that's how the defendant extorted the $4,000 from the husband and wife.

So how did he keep that extortion secret? Well, the defendant had a way of making sure that no one would find out what happened at that hearing about the donation and about dropping the charges. He made the couple sign a nondisclosure agreement that bound them to secrecy.

You see on your screen -- I know it's small. I'm not asking you to read it right now. You're going to get an opportunity to see this in detail during the trial, but this is the document that the defendant signed and the couple and it bound the couple to secrecy. They could not say that the charges were dropped and they could not say that they gave a $4,000 donation to the toy fund and he didn't stop there.

The very next day after the hearing at the Lee PD he posted a memo and that memo said that anyone in the Lee PD was prohibited from disseminating any information about police matters to anyone in the public including the State Police, and if someone violated that policy, they would pay with a three-day suspension and an internal investigation. Remember this policy was posted the day after the defendant extorted the couple in court as a Lee

police matter.

So after ensuring that his extortion would be kept secret, here's what the defendant did with the couple's toy fund money. Here's another chart on your screen. The left-hand side that's the husband, he gave the $4,000 check to the defendant and then the defendant deposited that into the toy fund.

Then in the middle part of the screen you can see three checks that the defendant within a few weeks of receiving that toy fund donation wrote to cash, and those checks totaled $3,990, just $10 shy of the $4,000 donation, and like the other checks I showed you on the other slides he did not cash any of those checks that he wrote to cash. He deposited them into his account with his wife. And then what did he do with it? On the right-hand side you see what he did with it. He spent the money in a hardware store and liquor store and to pay off credit card bills.

So eventually word got back that the couple's charges had been dropped to the State Police so the State Police looked into it, and they were concerned when they found out that the charges were dropped in exchange for a donation so they began to investigate the defendant. They interviewed him four separate times, and on each occasion the defendant had the opportunity to come clean and tell

the truth to the State Police, and on each separate occasion the defendant chose not to do that. He decided to tell story after story and here's one example of how he told story after story.

During the first interview he told the State Police that he had only spent $1,000 of the couple's $4,000 donation to the toy fund, then during the second interview, which was only a few hours later after the first one, he said he had not spent any of the money, and then in the third interview, in an effort to reverse what he had done at the hearing, he started the interview off this way with the State Police: He pulled out a check from his pocket and he said he wanted to give the money back to the couple, $4,000.

He said that he wanted the charges to come back and he said he wasn't comfortable keeping the money in the toy fund account. He wanted to move it to another account. You can see on your screen at the top of the slide is that check that he presented to the State Police. It's made out to the husband in the amount of $4,000 and it's posted for the date after the meeting with the State Police and in the memo line -- I know it's small but again you're going to be able to see this up close during the testimony -- it says donation refund.

The second part of the slide is an excerpt from the

written statement, the same 8-page written statement I showed you a little earlier, that the defendant signed and initialed each page.

Well, he said in that written statement that there was $4,000 in the toy fund at that point and that $4,000 of that money was the couple's but that wasn't true because the third part of this slide is a copy of the bank account statement from the toy fund, and at the same time that the defendant uttered those words that there was $4,000 in the bank account, there was only $54 because as you saw before he had written all but $10 of that $4,000 in checks to cash that he deposited into his bank account.

Now at the forth and final interview with the State Police the defendant gave a fourth story about the $4,000. This time he said that he cashed three checks from it to cash and that he put the cash in his office safe, and at that interview a sergeant from the State Police was interviewing him so the sergeant showed the defendant the three checks that he wrote to cash and the defendant responded, well, those are the checks that I cashed but he started to sweat and tremble.

Then the sergeant showed the defendant his own bank account statement showing that, no, he didn't cash those three checks to cash. He deposited them into his own bank account. So the defendant began to sweet and tremble even

more and he started to tremble so hard that the sergeant could hear the paper rustling in his hands. (Indicating)

Then the sergeant asked, "how do you justify spending toy fund money to pay your bills?" And the defendant responded, "well, I was reimbursing myself for toys that I bought." He hadn't told that story before. Then the sergeant asked why he didn't provide this explanation earlier and this was his fourth interview with the State Police, and the defendant, who had been a police Officer for over 30 years, said this: "I didn't think it was relevant."

Then the sergeant asked whether the defendant had any receipts to back up that he had bought toys and the defendant said this: "I don't have any receipts." So the sergeant asked how he knew the amount to reimburse himself if he didn't keep any receipts, and the defendant said this, "Well, I just came up with a number in my head."

So the defendant gave false statement after false statement to the State Police. He never revealed the truth that he had stolen nearly $120,000 from the toy fund over a period of a decade, and he never revealed the truth that he had hidden his massive fraud from everyone by writing checks to cash that he didn't cash but deposited into his bank accounts, and he never revealed the truth that he stole $4,000, extorted it from a couple in

exchange for dropping criminal charges.

So you now heard what the trial will show. Now here are the charges that the government will prove: First, the defendant is charged with extorting the couple of the $4,000 by using his position as police chief and by causing them fear to get the money out of them.

You're going to hear that the husband and wife have immunity for their testimony, that means that the federal government can't use their testimony against them in a federal prosecution. Now the judge is going to instruct you at the end -- he said I'll give you instructions at the end of the trial. He's going to instruct you about immunity and he's going to tell you that the government agrees that you should view their testimony carefully because they have immunity, and you're also going to see that what the husband and wife say in their testimony is going to be backed up by other evidence that you're going to see and hear.

For example, they're going to tell you that they donated the $4,000 to the toy fund so this defendant would drop the charges. He was the police chief and then you're going to see that $4,000 donation check and see the defendant's written statement, the same statement I showed you a couple of times today and the defendant himself says the same thing.

Now the indictment also charges the defendant with three separate instances of wire fraud. Those are e-mails and faxes that he sent to the Berkshire Eagle. Those are called wires, e-mails and faxes. He sent those to the Berkshire Eagle, and the reason why they're fraudulent is because he never disclosed to the Berkshire Eagle or to the toy fund donors who eventually donated to the toy fund that he was using a substantial part of the toy fund donor's money on himself and his family, not to buy toys for needy kids.

Lastly the defendant is charged with several counts of concealment, money laundering. Now that may be an unfamiliar term to some of you and that's okay. The judge already instructed you a little bit about it and he's going to give you full and detailed instructions at the end of the trial, but for now what that means is that the defendant on several instances wrote cash -- wrote checks from the toy fund to cash that he didn't cash but deposited into his accounts, and the reason he did that was to conceal where the money came from, the toy fund.

Now at the end of the trial we will have a chance to review all of the evidence with you one more time and at that time we are going to ask you to find the defendant guilty of all counts of the indictment. Thank you.

THE COURT: Whenever you're ready.

MS. LEVINSON: Thank you, Your Honor.

**OPENING STATEMENT BY MS. LEVINSON**

MS. LEVINSON: Good afternoon, everybody.

THE JURY: Good afternoon.

MS. LEVINSON: Well, we have been waiting a really long time for this day, and Mr. Buffis and his family and I are really glad that it's finally here because let me just start by saying that there are many things that you could call Joe Buffis. You could call him old-fashioned; you could call him small-town, unsophisticated, naive, trusting, disorganized and sloppy, but Joe Buffis is not a thief. He's not a liar and he's not a criminal.

Joe Buffis did not extort money from this couple in Lee. Joe Buffis did not launder any money from the toy fund or from this couple in Lee, and Joe Buffis did not commit the crimes of wire fraud and mail fraud.

What Joe Buffis did was run this toy fund in a plain and simple old-fashioned small town way, and he ran it by the seat of his pants. He ran it much the same way as his predecessor, Ed Laliberte, had run it on a cash basis.

The evidence in this case will show that all year round, from January to December, Joe and his wife Janet purchased toys with their own money from their own pockets whenever they were someplace and they saw toys for sale.

Now the toy fund only solicited donations in the months of October and so when the donations started to come in, Joe would reimburse himself and his wife and his family for the money that they had personally spent out of their own pockets. All year long this would go on. He would buy toys. He would store them in his basement, sometimes store them at the police department, but more often than not in the basement of his house on shelves that he had specifically built to store these toys, and when donations came in he would reimburse himself.

Now, did he keep meticulous records of this? No, he did not. Did he keep any records of it? No, he did not. Now in retrospect was this the stupidest thing this man could have done? You bet it is. But the evidence will show you that for about 30 years that Joe Buffis was running this toy fund charity he ran it in this old-fashioned small town way. He ran it in his own way and he ran it in a way that worked, and it worked so well that for 30-or-some years not one citizen in the town of Lee, which is a small town -- he was a well-known police officer -- 30 years not one citizen came up to him and said, Joe, where are my toys? We know about this fund. We know you've been collecting. I didn't get toys. No one complained because people got their toys.

Joe Buffis did not do anything wrong or criminal,

but I can tell you right now that the government is going to prove to you a thousand ways that Joe Buffis is incompetent, and I can tell you that incompetence is not criminal.

Being incompetent does not convict you of a federal crime and that's why we're here today really, not because Joe Buffis extorted money, not because he laundered money, not because he committed wire fraud or mail fraud, but because he was too simple, too old fashion, and too small town, and he was an incompetent manager of a charitable organization.

Now, I want to tell you basically what we think the evidence in this case will show. One, Joe Buffis did not extort any money from the couple in Lee. You will learn that this couple in Lee, they have names, their names are Tara Viola and Thomas Fusco. You will learn, as Ms. Shukla already told you, that Ms. Viola immediately when confronted by the police offered to donate the proceeds of her prostitution business to charity.

So, two, Joe Buffis did not steal the money that was donated by Tara Viola and her husband Tom and he didn't try to cover it up by laundering it. As I said, he planned on using it the way he used other money that was donated to the toy fund to reimburse himself and his wife and his family for money they had spent throughout the

year before donations had come in.

The evidence will show, as I already said, how incompetent Joe Buffis was to run this fund, how he didn't keep any records, he didn't keep receipts for very long, he was sloppy, he was disorganized, but he didn't steal.

The evidence will show that Joe Buffis is not some modern-day grinch who stole Christmas. You will learn that Joe Buffis is a man who loves children and loves giving of himself and who loves Christmas and Santa Claus and everything that goes along with that, and that this was his favorite charity; this was his favorite way to give back.

The evidence will also show that when law enforcement officers who had been involved in this prostitution case in Lee found out how Joe Buffis handled their case that he had nothing to do with originally, they got really angry and they started a witch-hunt with Joe Buffis as their prey.

Joe Buffis is not a liar. When Ms. Shukla just told you how Mr. Buffis changed his story from time to time from time, what I suggest the evidence will show is that he wasn't changing his story from time to time to time. The investigators and the government heard what they wanted to hear and couldn't conceive that he could have been telling the truth. They weren't lies but the

government wants them to be lies because he didn't do things the way the government thinks things should be done.

So I know that Ms. Shukla just described all these horrible things to you that the government says Mr. Buffis did, and it's certainly not hard for me to imagine that having heard that you're all sitting here thinking to yourselves what a creep. What a horrible person. Who in good conscience could possibly steal money from a fund that is dedicated to providing toys for needy children at Christmastime?

I mean, to steal money from needy children in effect is what Ms. Shukla is saying, that's a terrible thing, but I can tell you that to sit in that chair right there were Mr. Buffis is sitting today charged with committing this kind of horrible crime when you didn't do anything wrong, when you were just incompetent is a terrible, terrible thing.

Remember, just because the government says that Joe Buffis did something wrong doesn't mean he did something wrong. What you just heard are accusations that have been filed and brought by the government. As Judge Mastroianni already told you and he will tell you again and you will get sick of hearing it but I'm going to say it again as Joe Buffis sits here right now he's presumed to be

innocent. He's presumed to be innocent and you must presume that he is innocent throughout this entire trial, and you must presume him to be innocent unless or until at the end of the case after you've heard everything you are convinced beyond a reasonable doubt that he is not innocent.

So it's your job as you sit here to keep open minds. Despite the nature of charge here you cannot and you must not rush to judgment. Now I know it could be hard to keep an open mind when you hear these kinds of terrible things said about a person, but, I mean, we were here all day yesterday and you saw how we talked to each and every juror who walked into this courtroom and out of the I think 70 or so people who walked in here, you lucky people were selected because you lucky people were people that we all believed were the kind of people who would keep an open mind and who would give Mr. Buffis the kind of fair trial that he deserves and is constitutionally entitled to.

So everybody knows that there are two sides to every story, and as you sit here over the next couple of weeks, and I hope not much longer than that, you are going to learn a lot more about the other side of the story.

You will learn that Joe Buffis was a police officer in the town of Lee, was well-loved, a well-respected

police officer. He was a typical small town police officer saying hello to everybody on the street. You know, as cliche as helping little old ladies cross the street, that's the kind of police officer he was.

He was particularly known to be fair and to give people the benefit of the doubt, to try to give people a second chance. If some kid was found spraying graffiti or something, he would be the kind of police officer to grab the kid by his ear and take him home to his parents and say, here, do something with this kid and not immediately slap handcuffs on him and haul him off to court.

So here he is being conscientious, a small town police officer and then this whole mess of a case started with the Lee Police Department investigation into this suspected prostitution ring at the Inn at Laurel Lake.

You will learn that Tara Viola, who ran the Inn with her husband Tom Fusco, decided to make a little extra money on the side by giving what she called happy ending massages at the Inn. And you will hear from Tom Fusco and Tara Viola and you will hear how they actually put up an advertisement on the internet that catered to advertisements for prostitutes advertising the fact that she would be providing happy ending massages at the Inn.

I'm going to be showing you a copy of an ad. Here's the ad that Ms. Viola placed advertising the fact that she

would be providing happy ending massages at the Inn at Laurel Lake. You will learn that for about six months or so she was providing these services to people who found her on the internet, and then all of a sudden the Lee Police got a tip from a confidential informant that this was going on at the Inn and an investigation started and lo and behold on January 19th the Lee Police, along with some assistants from the Berkshire County Drug Task, conducted a raid at the Inn and confronted Tara Viola and her husband Tom Fusco about the illegal prostitution business that had been running out of the Inn.

So police brought Tara Viola back to the Lee Police Department to interview her or interrogate her, whatever you want to call it, and Joe Buffis, who had nothing to do with this investigation but who was the chief of police of the small town, immediately alerted the media.

He called a friend at the Berkshire Eagle because this was a pretty unusual and sensational story for the town of Lee. He was proud of his police department that they had uncovered this crime, and he leaked the story to the press.

Well, what he finds out is that when Tara Viola is interviewed at the police station, she is distraught. She is hysterical. She's crying. She is so concerned now about her reputation and about the possibility that her --

she had young kids at home, what would happen to them, and he found out that she was distraught about this. Then lo and behold the Berkshire Eagle, an online media -- you know, today everything is immediate -- starts running with the sensational story and it's all out in the news, and over the next couple of weeks Tom Fusco calls and calls and calls the police station saying you've got to do something, Tara is a mess. She's hysterical. It's all over the news. What are we going to do? And Joe Buffis, being the kind of police officer that he is, decided he would do something that police officers sometimes do which is, you know, bring them into court, which you really have to do when this kind of a charge is out there, but he was going to try to give Ms. Viola the benefit of the doubt, give her a break.

He really felt badly that he had leaked this to the media and that this media firestorm had erupted, and so he wanted to give her a second chance. He didn't want to subject her to more and more attention and so he came up with a way that he thought would be fair, and what he thought would be fair, in light of the fact that during her interview with investigators she kept repeatedly offering to donate all of the proceeds she had made from prostitution to charity, he thought, okay, great. We will have her donate the proceeds of her prostitution to

charity and I'm not going to subject them or her to a full-fledged criminal prosecution. I will put that case on file. Let her donate what she even called it "dirty money" I think. Let her donate the dirty money and let her have a second chance.

Well, the evidence will show that she kept talking about $6,000 in prostitution money and when she and her husband get to court they offered to donate a thousand dollars to a dog shelter in the city of Pittsfield. Joe Buffis said, well, I don't think so. You said you made $6,000 doing prostitution and why should we benefit the dogs of Pittsfield when there is a wonderful worthwhile charity right here in Lee? That's where it should go.

He also brought up that the police department for years had a DARE program, a drug awareness program that they run for the schools and Lee had lost funding for that for a number of years but it was starting back up again. So he said I'll tell you what, we'll do half into DARE and half into the toy fund and they said okay. He didn't extort that money from Ms. Viola. She was begging to give this money to charity and he gave them a break. He gave her a second chance.

So as Ms. Shukla mentioned investigators got word of what happened with this case, that the criminal charges weren't filed and that a donation of the proceeds of

prostitution were made to a charity, and all of a sudden, all of a sudden this sort of small ordinary local little investigation turned into this monster of a federal case.

Look at what we have here. We have two assistant United States attorneys. We have an FBI agent here sitting here ready to prosecute Mr. Buffis. We have thousands of pages of documents and exhibits. We have dozens of witnesses coming into court to testify against Joseph Buffis. This is not a federal case. Incompetence is not criminal.

Now, I know that we are all going to meet Ms. Viola probably this morning, not this morning anymore, this afternoon. It will be the first time I'll meet her and the first time you will meet here, but I am sure that she will testify how embarrassed she is, how humiliated she is. I expect she's going to tell you how she hated to do these happy ending massages, and I fully expect that she will probably cry on the witness stand and the government will paint her, and has painted her, as a victim of Joe Buffis's extortion. How he extorted her hard earned happy ending massage money right from her. But as I said, you will hear again and again after she was caught all she wanted to do was donate this dirty money to charity or anything, and the government will argue to you that Joe Buffis extorted her because he knew he had an

easy mark.

I mean, she was distraught. She was desperate. You will hear her saying in her interview "I'll do anything. I'll do anything," and so he preyed on this poor victim and made her feel that she had to donate this money to him to make the case go away in order to avoid more publicity, but the media firestorm had already erupted. That ship had already sailed. That bell was not going to be unrung. She had been the subject of intense media focus, and so at this point in time to make it go away, the harm that she had perceived had already been done.

Now I expect that she will tell you that she felt intimidated and threatened into giving the money, but keep in mind, as Ms. Shukla noted for you, she will be testifying here under a grant of immunity. She can't get prosecuted for anything that she says here that might incriminate her, but what you should also know is that the charges in Berkshire County were eventually filed against her and her husband and that case has been pending and pending and pending in the Berkshire County courts and it hasn't been resolved yet.

I will suggest, and the evidence will show, that that case hasn't been resolved because they're all waiting to see what happens here in the federal case. She is cooperating with the prosecution here and she will expect

to get consideration from the district attorney's office and from a judge in Berkshire County for her help to the government in this case by testifying against Joseph Buffis, and so I ask you to scrutinize her testimony carefully when she tells you that she felt threatened and intimidated by Joe Buffis into donating that money.

Now, as far as everything that Ms. Shukla said about Joe Buffis getting the money into the toy fund and laundering it and hiding it and money coming into the fund and coming out as checks and cash and paying his bills, guess what? We don't dispute one word of that.

The evidence will clearly show donations came into the toy fund and one way or another they went out into Joe Buffis's pocket to pay his bills, his family bills, et cetera, but as I said before and as the evidence will show he was reimbursing himself and his wife for toy purchases they made throughout the entire year. And, yes, he was a totally sloppy, horrible bookkeeper and incompetent manager of the toy fund. He didn't keep records. He didn't keep receipts for long. It was a total mess but it worked.

I also want to point out to you something that you're going to hear, which I think sheds a lot of light on how Joe Buffis ran the toy fund. You will hear testimony and see evidence about how Joe Buffis and his wife Janet

managed their own personal finances, very old fashioned, very small town, very unorthodox.

They kept envelopes in the house and you will see them at some point during the trial, each one marked with a word like mortgage and a number on it, electric with a number on it. Every week Joe Buffis would cash his paycheck and Janet would cash hers and they would put cash into envelopes to pay for their household bills. When they had bills that were due, they'd take the cash, get another check and pay the bill. Now this was a family that operated on this cash kind of basis on coming in and going out and so that sheds some light on how and why Joe Buffis ran the toy fund the way he did.

You will hear evidence at this trial -- hear testimony from people who saw hundreds of toys in Joe Buffis's basement who helped Joe and Janet Buffis shop for toys for the children and helped package the toys and helped distribute the toys at Christmastime. This wasn't a mirage. This wasn't a shell game. Joe Buffis was providing toys to needy children at Christmastime.

In conclusion let me just say that we believe what the evidence will show is that in investigating this case the investigators and the government closed their eyes to the possibility of innocence here.

They did not give Joe Buffis the benefit of the

doubt, but you as jurors can't do that. You cannot close your eyes to the possibility of innocence. That is why we have juries in this country to stand between the accused and the government to make sure that justice is done, and we believe very strongly that by the end of this trial after you've heard all the evidence, heard all the witnesses, evaluated everything, you will find that the government has come far short of proving beyond a reasonable doubt that Joe Buffis is guilty of any crime whatsoever. Thank you for your attention.

MR. BRESLOW: Call our first witness, Your Honor?

THE COURT: Yes, one moment.

We are going to start hearing evidence from the witnesses, but let me now reinstruct you relative to the opening statements that you just heard. Remember I told you there's two types of statements at the beginning and the close of the case. It's called opening statements and it's called closing arguments. It's not called opening arguments, which is a lot of what you just heard. All right.

Opening statements are intended to be a preview of what the parties believe the evidence will be. Opening statements are not designed to be arguments about what the evidence is, assuming that evidence has already been shown

to you. There has been no evidence put to you.

The opening statements are not evidence. To the extent that it was told to you in argument form that certain things have been established should be absolutely disregarded, and you should accept what the lawyers just presented to you as the opening statement and use that in your mind as a framework now to see how the case fills in. All right. Thank you.

MR. BRESLOW: Your Honor, before we call our first witness, we would offer Exhibit 153 which is a stipulation and ask that the clerk turn on the courtroom monitors.

THE COURT: Yes.

**(Government's Exhibit 153 admitted.)**

MR. BRESLOW: Your Honor, I'm not going to read all of this stipulation right now but just admit into evidence certain documents that are specified as admissible.

THE COURT: Let me tell you, ladies and gentlemen, something called a stipulation is an agreement between the parties that you can accept it as evidence as if it came in from a witness on the witness stand. So anything that you hear introduced as a stipulation, and you will get it, you can accept that as true as evidence just as if someone sat on the witness stand and talked

about it. All right.

MR. BRESLOW: Your Honor, we offer Government Exhibits 1, 9, 10, 27, 28, 140, 143, 157.

THE COURT: I'm going to ask you to slow down and then go back so we can get all these on the record.

THE CLERK: I have 1, 9, 10, and 27.

MR. BRESLOW: Then 28, 140, 143, 157, 161, 3, 11, 125 through 128, 4, 12, 129 through 132, 2, 8, 14, 15, 26, 31 through 42, 80, 83, 86, 88, 90, 92, 94 through 95, 97 through 98, 100 through 103, 105 through 116, 123 through 128.

THE CLERK: 123 through 128?

MR. BRESLOW: Yes. 133 through 135, 137 through 141, 142, 145, 146, 6 and 7, 11, 17, 19, 119 through 122, 145 through 146, 158 through 159, 13, 22, 25, 29, 30, 44 and 45, 49 through 51, 53 through 55, 57, 59, 61, 63, 65.

THE CLERK: Hold on. I have to add a page here. Go back to 59.

MR. BRESLOW: Sure. 59, 61, 63, 65, 119 through 122, 125 through 128, 138, 144, 148, 149, 151 through 163, 23, 43, 67 through 79, 81 through 82, 84 through 85, 87, 89, 91, 93, 96, 99, 104, 117, 118 -- I'm almost done -- 5, 16, 47, 48. I believe I already said 49 earlier but if not, 49, 52, 56, 58, 60, 62, 64 and 66. Those are admitted through stipulation.

THE COURT: Ms. Levinson --

MS. LEVINSON: Yes, Your Honor.

THE COURT: -- there's an agreement between both parties that those should be admitted as stipulated evidence?

MS. LEVINSON: Yes, there is an agreement.

THE COURT: All right. Now the jury will have those items. They may be referred to during the trial but you certainly will have them in the jury deliberation room and they are being indicated that they are stipulated to. So again, because they're stipulated to, both sides agree that is evidence that you can consider. All right.

**(Multiple government exhibits admitted.)**

A JUROR: Your Honor, could I use the bathroom?

THE COURT: Absolutely. We can take a break. If anyone else needs to take a break, we will take five or ten minutes.

(A juror left.)

THE COURT: You can go to the jury room or if you feel more comfortable just stay here to stretch your legs.

(Some jurors leaving.)

**(A recess was taken at 12:43 until 12:48.)**

THE COURT: In the brief two-minute, three-minute break I need to ask you a question to make

sure no one discussed the case, began deliberations, researched the case in any social media on the internet in any way, is that correct?

THE JURY: (Indicating)

THE COURT: All right. The jury remains fair and impartial.

You may call your first witness.

MR. BRESLOW: Yes, Your Honor. Before I do, may I approach your deputy to give her copies of the government exhibits?

THE COURT: Yes.

MR. BRESLOW: Would your law clerk like one as well?

THE COURT: Yes.

MR. BRESLOW: Your Honor, we call Sandra Spinney.

THE COURT: All right.

THE CLERK: Raise your right hand and stand.

**SANDRA SPINNEY (sworn)**

THE CLERK: Please state your name for the record.

THE WITNESS: Sandra Spinney.

THE CLERK: Thank you. You may be seated.

**DIRECT EXAMINATION**

Q. (By Mr. Breslow) Good afternoon.
A. Good afternoon.
Q. Can you tell the jury what town do you live in now?
A. Lennox.
Q. And where did you grow up?
A. Lee.
Q. How many siblings do you have?
A. I have one sister who's a year older and a sister a year younger.
Q. How are you employed now?
A. As an occupational therapist with the Visiting Nurses.
Q. And before that how were you employed, your job before that?
A. I've been an occupational therapist for 30 years.
Q. Did you ever work as an EMT?
A. Yes. I was a volunteer EMT in Lee.
Q. I want to focus you on the Laliberte Toy Fund. Are you familiar with that?
A. Yes, I am.
Q. Have you ever donated money to the toy fund?
A. Yes, I did.
Q. When approximately did you begin donating?
A. It was approximately December of '97, '98.
Q. Can you tell the jury the frequency you donated after

1997?

A. Yearly.

Q. Please tell the jury how much you donated every year?

A. I donated from my funds a hundred dollars every December and then $50 from my uncle's fund who was my mom's mentally retarded brother and I was his guardian.

Q. And did you donate your money in honor or memory of someone?

A. Yes, I did.

Q. Who was that?

A. My mom.

Q. And your uncle who's disabled, did you donate his money in honor or memory of someone?

A. Yes, I did.

Q. Who was that?

A. My mom who was his sister.

Q. And why did you begin to donate in honor or memory of your mother?

A. Because as a child my family was the recipient of the funds or toys from the Laliberte Toy Fund and then my mom donated and then after she was deceased I donated in her memory.

Q. So in about 1997 she passed away?

A. She passed away in '96.

Q. So you picked up the immediate year after that?

A. It was roughly '97 I believe, yeah.

Q. Can you tell the jury in what form did you give your donations?

A. Check.

Q. And in what form did you give your uncle's donations?

A. A check also.

Q. Did you ever donate in cash?

A. No.

Q. Can you tell the jury why did you always donate in check form and never in cash?

A. It was a way for me to keep track of funds, kind of a paper trail for me and for tax purposes.

Q. And how did you get your checks to the toy fund?

A. I usually dropped them off at the police station office.

Q. How did you know where to drop off your donations?

A. It was listed in the Berkshire Eagle, the paper.

Q. And please tell the jury how did you know when it was time to donate?

A. Well, there would be an article in the paper in the Berkshire Eagle.

MR. BRESLOW: Your Honor, I'm publishing Government Exhibit 75 which is already in evidence.

Q. (By Mr. Breslow) Just focusing you on the period 2007 through 2009, Ms. Spinney, do you recall writing checks in

those amounts to the toy fund --

A. Yes.

Q. -- totaling $250?

A. Yes, I do.

Q. Now, compared to your own personal finances, how significant an amount of money were these donations and the donations that you made since your mother passed away in 1996? How did they compare, for example, to the spare amount of money that you had?

A. Well, the hundred dollars is a significant donation for me financially.

Q. And was that hundred dollars always a significant amount of money to contribute to a charity over the years from 1996 on?

A. From '97 on for the most part, yes.

Q. Can you tell the jury then why you decided to donate year after year such a large amount of money for you to the toy fund?

A. Well, because as a child I was a recipient of the toy fund for years from my understanding, from what my mother told me, and it was meaningful for me to give to other families in the town of Lee.

Q. And very briefly what were your personal circumstances when you were growing up with your two sisters?

A. Well, my mom was divorced and we were not financially well off.

Q. And just in terms of like a decade, approximately how long ago was it that you yourself and your siblings received toys from the toy fund?

A. In the '70s.

Q. And just one or two last questions or two last topics, what can you recall about receiving those toys from the toy fund? What do you remember about those Christmases?

A. Well, I remember that most of our Christmases because my mom just didn't have a lot of money we might have one or two gifts under the tree but we'd come down in the morning and there would be this large box with toys, dolls, and everything else that was kind of referred to as the "share box" that my sisters and I, you know, would share toys, dolls, games, stuff like that.

Q. Do you remember any particular toys?

A. We had Ker Plunk -- this is aging me -- Ker Plunk, Candy Land. We had dolls, dolls with hair that grows, Thumbelina.

Q. And can you tell the jury how important was it for you to receive that share box from the toy fund?

A. It was very meaningful. I don't know how important but it was meaningful. I don't think we would have a

Christmas that would be meaningful without it.

Q. Do you know a man named Joseph Buffis?

A. Yes, I do.

Q. Can you tell the jury how you know him?

A. He was my family, myself and my mom's landlord I think for about a year. I knew him because he was a police officer in the town of Lee and I was an EMT in the town of Lee and my mom worked at the courthouse.

Q. What courthouse was that?

A. It was Lee and then Southern Berkshire.

Q. Do you recognize him in court?

A. Yes, I do.

Q. Can you please point to him and describe what he's wearing?

A. A green suit with red, yellow, green, blue tie.

MR. BRESLOW: Okay. Let the record reflect that the witness has identified the defendant?

THE COURT: The record will so identify, yes. Mr. Buffis has been identified by this witness.

Q. (By Mr. Breslow) Now, Ms. Spinney, would you please tell the jury during the years that you donated who did you think personally operated the toy fund?

A. I believed it was the Lee Police Department overseen by Joe.

Q. And can you tell the jury who did you think that the

Lee Police Department or in particular the defendant was using your donations for?

A. My assumption was that it was being used to buy toys or help needy families in the town of Lee.

Q. And one last question. If you could tell the jury how much of your money year after year did you think the defendant was using to buy toys for needy children?

A. I believed all of it.

MR. BRESLOW: No further questions, Your Honor.

THE COURT: Ms. Levinson.

MS. LEVINSON: I have no questions.

THE COURT: All right. Very well.

Ma'am, you may step down.

MR. BRESLOW: We do have the next witness but I noticed that it's five of one. The next witness I expect is going to be a relatively long witness, so.

THE COURT: We will go a little past one to try to get some testimony in so you can call the witness.

MR. BRESLOW: Your Honor, one moment?

THE CLERK: Attorney Breslow, the exhibits that you showed, what exhibit was that?

MR. BRESLOW: I'm sorry, that was Government Exhibit 75.

THE CLERK: We just need them identified whenever you're showing them.

MR. BRESLOW Your Honor, may we approach for a moment?

THE COURT: Yes.

(Sidebar conference.)

MR. BRESLOW: Our next witness is going to be Tara Viola and we have provided this discovery in a document regarding Tara Viola, Docket No. 401, and it involves an application for a criminal complaint on Tara Viola involving an assault and battery, sort of a domestic situation.

Ms. Levinson wanted to know the status. We ran her criminal history this morning and the case didn't appear. We have not had an opportunity to talk with Ms. Viola about the status of the case and we don't think that the nature of the charge is relevant under 608. It's an assault and battery, certainly not a conviction under 609, so we don't think there should be any cross-examination on this particular matter.

THE COURT: Did someone apply for a charge against her?

MS. LEVINSON: In December.

MR. BRESLOW: The application.

MS. LEVINSON: December of 2012.

MR. BRESLOW: The date's right there.

(Indicating)

THE COURT: The offense date was August of '12.

MS. LEVINSON: It did not show, no.

THE COURT: There's no record of what happened at the magistrate hearing?

MS. LEVINSON: Exactly.

MR. BRESLOW: They don't know even if there was a magistrate hearing because it looks like the case was continued at the defense -- at the request of the defense.

MS. LEVINSON: So here's what I'd like to do. My suspicion is that this case was continued at the show cause level and that's why it doesn't show up anywhere, and since the government is alleging that Mr. Buffis did something wrong by continuing Ms. Viola's case at the show cause level in the prostitution case, I think it's relevant to show that another police officer may have had this continued at the show cause level without going into it. I mean, I agree with Mr. Breslow that under 609 the assault and battery does not go in.

THE COURT: Right. We have to establish what happened with that first.

MS. LEVINSON: Right.

MR. BRESLOW: So the individual officer is the applicant for the criminal complaint. We can ask Ms. Viola now. We didn't want to pose the question to her in

the middle of testimony so we can ask her briefly now and then discuss the matter later.

MS. LEVINSON: We have the lunch break.

THE COURT: Put her on the witness stand and start and we'll deal with it after the lunch break and you can talk about it.

MR. BRESLOW: We have permission to ask her about this during her direct examination?

MS. LEVINSON: Oh, right.

MS. SHUKLA: She will already be sworn.

THE COURT: During her direct?

MR. BRESLOW: During the lunch break.

THE COURT: Yes, even though she is sworn but on that issue only, yes. Just share the information with Ms. Levinson.

MS. LEVINSON: Okay.

(End of sidebar conference.)

MR. BRESLOW: The United States calls Tara Viola.

THE CLERK: Can you stand and raise your right hand, please?

**TARA VIOLA (sworn)**

THE CLERK: Please state your name for the record.

THE WITNESS: Tara Viola.

THE CLERK: Thank you. You may be seated.

**DIRECT EXAMINATION**

Q. (By Ms. Shukla) Good afternoon, Ms. Viola.
A. Good afternoon.
Q. What do you currently do for a living?
A. I work at a nursing home.
Q. I'm sorry, you might have to speak a little louder into the microphone.
A. I work at a nursing home.
Q. What do you do in a nursing home?
A. I do their admissions and sales and marketing.
Q. And how long have you been doing that?
A. With the current job or throughout?
Q. With this job.
A. Two and a half years.
Q. Are you married?
A. Yes.
Q. Who are you married to?
A. Thomas Fusco.
Q. How long have you been married?
A. Four years.
Q. Do you have any kids?
A. Yes.
Q. How many kids do you have?
A. Together six.

Q. Okay. What are their ages?
A. Twenty-six, 24, 21, and then 15, 14 and 10.
Q. What town do you currently live in?
A. Lee, Mass.
Q. Lee, Massachusetts. How long have you lived in Lee?
A. I bought my house there in 2008.
Q. And where did you live before that?
A. In Becket. I rented a house in Becket.
Q. How far is Becket from Lee?
A. Ten, 15 minutes.
Q. And while you were in living in Lee -- where do you currently live?
A. 40 Martin Avenue.
Q. Where did you live before that? How long have you lived at your current address.
A. I lived there -- I moved in in 2008. I was there until 2011 and then I moved to the Inn with the kids and we rented out my house.
Q. What's the Inn?
A. My husband's former bed and breakfast.
Q. And you lived at the Inn?
A. Yes.
Q. When did you live at the Inn?
A. I want to say we moved everything over in 2011.
Q. When you lived at the Inn, were you also employed

there?

A. (Indicating)

Q. You have to answer verbally.

A. Yes.

Q. And what did you do as part of your employment at the Inn?

A. Cooking, cleaning, anything that was done, the big parties.

Q. Okay. Now I'm going to show you Government's Exhibit No. 1. What is depicted in Government's Exhibit 1?

A. The picture of the Inn.

Q. Can you tell the jury what it was like to visit the Inn and to work at the Inn?

A. The Inn was a lot of fun, a lot of kids but a lot of elderly; some elderly that had come back for years and years. It was a very peaceful place. They liked to swim. They had a rope swing that they could jump off and go into the water. We had kayaks, canoes. There was tennis there.

Q. Did you also care for people at the Inn?

A. Yes, one time I did, yes.

Q. Tell the jury a little bit about that.

A. A gentleman had been coming there for over 50 years and he was getting up in age. His family wouldn't stay with him and he was one that maybe you could say was

getting a little dementia and so we made it work out with the family that I would provide his care. He comes up for the whole summer because Tanglewood was his life and so we would cook his meals, bath, dress, get him to and from the concerts for that summer.

Q. Did you also have large events at the Inn?

A. Yeah, birthday parties, anniversaries, Halloween parties.

Q. So how did the Inn get business?

A. We had our website and we had visitors from California, New York, New Jersey. We had a diplomat family that came up every year and stayed with us. We had people from Canada, foreign groups would come through, and there was a group at Jacob's Pillow their group would come and at the end of each summer we would do a big shindig for their group for the whole weekend.

Q. What's Jacob's Pillow?

A. It's a dance festival in Becket, Mass.

Q. So you testified that you did some cooking and some care for some people at the Inn and at one point did you decide to supplement your income by also giving massages at the Inn?

A. Yes.

Q. And in approximately March of 2011 did you supplement your -- did you decide to supplement your income further

by offering sexual services as part of the massage --
A. Yes.
Q. -- for money?
A. Yes.
Q. And how long did you do that?
A. Off and on.
Q. Was it for a few months?
A. Yes, if that.
Q. And when did you stop doing that?
A. January 19, 2012.
Q. Why did you stop?
A. Because the police came over to our house.
Q. Okay. Did you speak to the police?
A. Absolutely. I wasn't going to hide anything.
Q. Well, what did you tell the police about your husband's involvement in your exchange of sex for money at first?
A. At first I said he didn't know anything about it because I didn't want to drag him into it.
Q. So you lied to the police?
A. I lied to the police about, but then I said that he did know what was going on, yes.
Q. So why did you initially lie to the police about your husband's involvement?
A. To protect him and the kids.

Q. Were you arrested that day?
A. No.
Q. What happened that day?
A. We met with -- we had a long conversation at the Inn and then I went down to the station just for more discussion but I was never arrested.
Q. Do you remember who you spoke to at the station?
A. Ryan Lucy.
Q. Is that a Lee police officer?
A. Yes.
Q. Did you also talk to someone from the State Police?
A. Meikeljohn.
Q. Is that Christopher Meikeljohn?
A. (Indicating.)
Q. Now I'm going to play for you --

MS. SHUKLA: Actually, Your Honor, I have some transcripts that I'd like to distribute to the jury. How long are we going to go?

THE COURT: Probably ten minutes.

MS. SHUKLA: Okay. I can probably get through it in that time. May I distribute the transcripts?

THE COURT: Is this by agreement?

MS. LEVINSON: Yes, Your Honor.

MS. SHUKLA: If the jury can pull out Exhibit 4? It should be the first one in your folder and it says at

the top Tara Viola interview.

MR. BRESLOW: Your Honor, could Ms. Pelegano let us know if the jurors are missing a binder.

THE COURT: Yes.

MS. SHUKLA: The first transcript says Tara Viola interview, January 19, 2012.

THE COURT: Does every member of the jury have the particular document that's being referenced so they can follow along? Do you need reference to the number again?

MS. SHUKLA: I'm sorry?

THE COURT: I'm just checking with the jury if they have what they need. Go ahead.

Q. (By Ms. Shukla) I'm going to show you Government Exhibit 3, the recording from your interview that day, and you have a binder in front of you there and you can turn to tab 4 to follow along.

MS. SHUKLA: Now this interview has been clipped so it will phase into one part to another and for the jury's ease there's some parts that have an ellipsis, dot, dot, dot, and that means some of the video has been cut and we are going to phase into the next clip.

Is everyone ready?

(Videotape playing.)

Q. (By Ms. Shukla) Before we get into much of the

video, who's that sitting in the chair in the video?

A. I can't see it. It's like --

Q. You can't see it?

A. No, it's dark. Myself.

Q. Who else is in the room?

A. I think it's Chris Meikeljohn.

MS. SHUKLA: Can the jury hear?

THE JURY: No.

Q. (By Ms. Shukla) Can you speak up?

A. I'm sorry. It was myself -- I got to stand up -- Ryan Lucy and Chris Meikeljohn.

Q. Would you pull the mike closer? You can pull the actual base closer. Are you all set?

A. Yes.

Q. So the jury can follow along starting at page 2 of the transcript. Also the words will scroll on top of the screen so if you'd like to read them that way and watch the video, you can view them that way.

(Videotape playing.)

THE COURT: Ms. Shukla, would you turn the volume up?

MS. SHUKLA: Yes.

THE COURT: It can't be turned up here?

THE CLERK: We are as high as we can go.

THE COURT: I want to make sure the jury is

hearing it okay.

MS. SHUKLA: We are at maximum volume.

THE COURT: All right. Proceed.

MS. SHUKLA: Would you like me to play it from the beginning?

THE COURT: No.

(Videotape playing.)

Q. (By Ms. Shukla) I'll pause it there and ask you a couple of questions.

Do you remember when you said in the video you have crohn's disease? What's crohn's disease?

A. It's a disease. Crohn's disease is a disease that affects the intestines.

Q. What effect does it have on you?

A. I've had several surgeries. Stress plays a big part in it, like coming out here today very bad, but.

Q. What are the different triggers for crohn's disease?

A. Stress usually.

Q. Now, I'm going to direct you to page 2, line 28 of the transcript where you're talking about your kids. What were your concerns with respect to this whole thing regarding your kids, can you tell the jury?

A. That I would lose my children.

Q. So why did you think you were going to lose your kids?

A. Because of all of this.
Q. What do you mean all of this?
A. Publicity and not knowing.
Q. Now I'm going to direct you to line 41 on page 2 where Sergeant Meikeljohn asked about what you did with the money. So what money are you talking about here?
A. The money from the Inn.
Q. From?
A. Both working at the Inn and the massages.
Q. And how much money did you make from the massages?
A. I would say about over the whole time period maybe 4,000.
Q. Okay. I'm going to play the rest of the video and the jury can follow along at the top of page 3.
(Videotape playing.)
Q. (By Ms. Shukla) What was your state of mind during this interview? Talk into the microphone.
A. Crazy, very emotional, scared.
Q. Were you crying?
A. Yeah.
Q. About how much of the interview were you crying?
A. I think I cried the whole time and have been crying since, so.
Q. I'm going to direct you on page 3, line 7, where the sergeant asks what you can help with and you give a

response. So why were you offering to cooperate? Tell the jury why you were offering to cooperate?
A. I just wanted to do whatever for my kids and my family. I didn't want anything to happen to them or them taken away from me.
Q. What did you want to happen to the charges against you or possible charges?
A. I think I had told Meikeljohn I'll do whatever as long as I don't lose my kids.
Q. Now on page 3 at line 21 where Sergeant Meikeljohn says "you're not going to jail yet," what was your impression at this time of what was going to happen to you?
A. That I was going to jail because he said not yet.
Q. Did you think you were going to jail that day?
A. No. No.
Q. Did you think you were going to get arrested?
A. Worried and they said no, because I was cooperating with everything.
Q. Now also on page 3 at line 33 you asked, "Does it go in the records and stuff, I mean in the papers and stuff," why were you concerned about the papers?
A. Because I first wanted to hit my family up with what was going on and prep my children, and Meikeljohn and Lucy both said they're not going to go back and call the

Berkshire Eagle and say this is what it is. I wanted to get the chance to get to my family first and say, hey, this is what's going on but that's not what happened.

Q. Now I'm going to play the rest of the video and the jury can follow along after line 16 of page 4.

THE COURT: Ms. Shukla, this will be probably not the most convenient but we're going to take the lunch break right now and pick up when we come back.

MS. SHUKLA: Sure.

THE COURT: Ladies and gentlemen, there's a lunch waiting for you in the jury room. As you go back to the jury room, remember my instruction not to discuss the case with each other or anyone else. Do not investigate the case; do not try to access the case on social media through your phones or any computer.

All right. Have a good lunch.

**(The jury left at 1:23.)**

MR. BRESLOW: What time would you like us back, Your Honor?

THE COURT: At 2:15 please.

**(A recess was taken until 2:17.)**

MS. LEVINSON: I'd like to bring something to the Court's attention if I could?

THE COURT: Yes.

MS. LEVINSON: During the recess I was walking

in the hall and there was a juror who was out in the hall and she said to me "I'm locked out. I don't know what to do." And just at that moment one of the court security officers came along and helped her back in, but it occurred to me that I don't think the jurors were instructed that the jurors are not to have any contact with any of the parties, anyone like that bumping into them in the hall.

THE COURT: All right. Thank you.

**(The jury entered at 2:19.)**

THE COURT: You could be seated. All right. Were all the members of the jury able to comply with my instructions to not begin deliberations, discuss the case, investigate the case, access the case through social media or any type of Internet searches?

THE JURY: Yes, Your Honor.

THE COURT: The jury remains fair and impartial.

You can re-call the witness to the stand.

MR. BRESLOW: She is coming in, Your Honor.

THE COURT: All right.

Can I see the attorneys at sidebar very quickly?

(Sidebar conference.)

THE COURT: Is there a stipulation as to the accuracy of the transcript? In other words, what's coming across the screen?

MR. BRESLOW: Yes.

THE COURT: Is either side requesting an instruction to the jury that if they hear the video or the audio is different than what they see written, it's what they hear?

MS. LEVINSON: Yes, I would like that instruction.

THE COURT: Even though you're agreeing it's correct?

MS. LEVINSON: Yes.

MS. SHUKLA: The pattern instruction that I submitted, I think that's part of the pattern instructions that the evidence is the recording itself. So if they hear something different, they go by what they heard.

THE COURT: Right. I did see that but I wanted to check. I'll tell them that essentially it's how they hear it.

MS. LEVINSON: Okay.

MR. BRESLOW: If you want, we can read that part of the stipulation to the jury?

THE COURT: Let me see what I have.

MR. BRESLOW: Government Exhibit 153.

THE COURT: This one?

MS. SHUKLA: Yes, that's the pattern instruction.

THE COURT: All right. I'll just read this to them.

MR. BRESLOW: Also, Your Honor, with respect to that case that there was an application for a criminal complaint, Ms. Levinson and I attempted to reach Tara Viola's lawyer and the preliminary information that we obtained from Ms. Viola, as well as from a paralegal in the firm, is that that case has not moved beyond the show cause hearing, the magistrate's hearing, but the reason was is that the actual complainant who is alleged to have been the victim of the assault and battery did not show up in court. I have not gotten that confirmed from the attorney but that's the information that Ms. Viola recalled and what the paralegal recalled.

THE COURT: That would be indicated on the clerk record, so get the clerk record.

MR. BRESLOW: We don't have that but we could try to get it.

THE COURT: All right. Yeah, it's potentially relevant but not until we find out why. If it didn't go forward because the complainant didn't show, that's not relevant.

MS. LEVINSON: Correct.

THE COURT: We'll wait and see how you can update me on that and getting the clerk record would be

the best way.

MR. BRESLOW: Right.

(End of sidebar conference.)

THE COURT: Ladies and gentlemen, I wanted to read you an instruction relative to your viewing this video and looking at a transcript of what's being said on the video at the same time.

This is proper evidence for you to consider. In order to help you, you have a transcript to read along as this audio and video is being played. The transcript is merely to help you understand what is said on the recording.

If you believe at any point that the transcript says something different from what you hear on the recording, remember, it is the recording that is evidence, not the transcript.

At any time there may be a variation between the recording and the transcript, you must be guided by what you hear on the recording. So as you're listening to it, if you think that's not what's in the transcript, it's what you as each individual juror hears on the recording. All right.

Q. (By Ms. Shukla) Ms. Viola, I'm going to play the rest of your interview and the jury can follow along on page 4 at line 16.

(Videotape playing.)

Q. (By Ms. Shukla) Ms. Viola, do you remember testifying that you had made about $4,000 from your massages?

A. Yes.

Q. Could you just speak into the microphone?

A. Yes.

Q. And you said here in this part of the tape, do you see on page 6 on line 5, "I'll give $6,000?" Why is there a difference?

A. Because that's what was in the account.

Q. Can you explain that further?

A. That was other money from cleaning and cooking and everything from the Inn. It was just in one account.

Q. So are you talking about a bank account?

A. Yes.

Q. So what sort of money was in that bank account?

A. Where did it come from?

Q. Yes.

A. My rent money, the massages, and just doing dinners and cleaning and stuff at the Inn. It's where all my money went to pay bills.

Q. So can you tell the jury why you offered to pay the money to charity?

A. Because I didn't want it.

Q. Why didn't you want it?

A. What's it called, dirty money?
Q. And what was your impression of what was happening with the charges at this point?
A. I don't remember. I don't recall.
Q. Now, when you offered the money, did Sergeant Meikeljohn accept it from you?
A. No. He said no, that's something that you have to -- you can't take a donation just like that. There's steps you have to take with a donation.
Q. Could you lean in a little bit more when you're answering the questions.
All right. Thank you.
Now, after this interview occurred -- actually can you tell me what day this interview was with respect to when you were confronted with the police at your Inn? When was the interview?
A. The same day.
Q. So what happened after, the day after this interview?
A. It was in the papers is that what you're?
Q. What was in the paper?
A. That we had been arrested and arraigned and tried in court already.
Q. That was in the papers?
A. Yes.
Q. And was that true?

A. No.

Q. How did you hear about that you were arrested and arraigned and that that was in the papers? How did you hear about that?

A. It was in the Berkshire Eagle online.

Q. You can turn to Exhibit 5 in your binder. I'm going to show Exhibit 5 to the jury. On page 3 can you tell the jury what Exhibit 5 is? You can see it on your screen.

A. "Owners of historic bed & breakfast in Lee charged with offering prostitution services for guests."

Q. We are actually done with the transcripts. This is just going to appear on the jury's screens.

Could you please repeat your answer? What is Exhibit 5?

A. Do you want me to read from the start or just the highlighted?

Q. Just briefly identify it for the jury.

A. It says, "The Berkshire Eagle is reporting Tara Viola, 39, and her husband Thomas Fusco, 47, owners of the Inn at Laurel Lake were arrested Thursday afternoon on charges related to prostitution."

MS. SHUKLA: I just want to check with Your Honor, there might be some confusion about the exhibits with the jury. The exhibit will show on your screen. You don't have that in your folder. The folders only have the

transcripts.

THE COURT: Thank you.

Q. (By Ms. Shukla) So what did you think when you read this?

A. I wasn't arrested.

Q. How did you feel about reading that you were arrested when you weren't?

A. How do I explain that one? You know, it's there in black and white and how are you going to explain to people that you weren't arrested when it says you were arrested.

Q. So besides seeing the article in the Berkshire Eagle, did you see other articles?

A. Yes.

Q. Where did you see other articles?

A. From many different -- people were sending them to us over the Internet.

Q. Now you can flip through your binder on tab 5 and I'll flip through on the screen for the jury some of these articles.

A. Oh, yes.

Q. Where did these articles come from?

A. All over. I am having trouble reading that.

Q. Were they from outside of Massachusetts?

A. Yes. There were from Florida, Maryland, California.

Q. And what was the effect on you seeing these articles

--

A. A mess.

Q. -- from all over the country on the Internet?

A. A mess.

Q. Can you elaborate a little bit how you felt?

A. How I felt? There's been stories like this many, many times but nothing ever -- you don't see across-the-country articles.

Q. How did you feel seeing them hit news all across the country?

A. Horrible.

Q. What was most upsetting about these articles?

A. That they were getting out there, getting out there to clients of Tom's that stay at the Inn, my family, the kids. Some were from the Trans-Union; some were from Vermont.

Q. Now you mentioned that the news was getting to clients, did the news of the prostitution at the Inn have an effect on the Inn's business?

A. One we know of, yes.

Q. Okay. I'm going to show you Government Exhibit 8. Can you tell the jury what Government Exhibit 8 is?

A. It was a letter to Tom and I and it said, "We have viewed the news articles concerning the recent issues at the Inn at Laurel Lake. In view of the current

situation's uncertainty, particularly as this is for our wedding, we have decided to change our plans and use an alternate venue for both housing our guests and our welcome dinner. Please cancel all the rooms, including our own, that have been booked for May 25th through the 27th."

Q. How did you get this information?

A. In the mail. No, as an e-mail, yes, e-mail.

Q. How much business was that wedding going to be for the Inn?

A. At least fifteen grand, ten to fifteen.

Q. Speak up a little bit.

A. At least ten to fifteen grand.

Q. So did the couple show up or did they cancel their booking?

A. They cancelled their booking, yep.

Q. Now do you remember in the interview when Officer Lucy and Sergeant Meikeljohn said you would get summoned to appear in court?

THE COURT: Can you hold on one second, ma'am?

A JUROR: Is it possible to get the screen out?

THE COURT: It's blocking?

A JUROR: Yes.

THE COURT: Absolutely. A good point. It happens in every trial and always for whoever is in those

seats.

Now do the height adjustment on your seat. If that doesn't work, let me know and we will tilt the screen flat if this doesn't help. All right.

THE JURY: Thank you.

Q. (By Ms. Shukla) Before we re-adjust, you said that you got a summons. I'm showing you Government Exhibit 6. Can you tell the jury what Government Exhibit 6 is?

A. Lee PD versus Tara Viola, magistrate hearing.

Q. Did you receive this?

A. Yes.

Q. And what is it, just generally?

A. A magistrate hearing to go to court at Great Barrington.

Q. Was this a notice that you got?

A. Yes.

Q. And what date was the hearing scheduled for?

A. 2/21/12 at 9:15 a.m., a magistrate hearing.

Q. Where were you supposed to go?

A. Southern Berkshire District Court in Great Barrington.

Q. Whose name is that that appears under case name? It's near the top.

A. Lee PD versus Tara Viola.

Q. Is that you?

A. Yes.
Q. Did you appear at the Southern Berkshire District Court on 2/21, February 21, 2012?
A. Absolutely, yes.
Q. Now I'm going to show you Government Exhibit 9. What's that in Exhibit 9?
A. The courthouse.
Q. Is that where you went on February 21st?
A. Yes.
Q. I'm showing you Government Exhibit 10. What is in Government Exhibit 10?
A. That's where we sat.
Q. Were you sat when?
A. Before and during the magistrate hearing.
Q. So this is the courtroom you went to?
A. Yes.
Q. Now when you showed up for the hearing, did you have an attorney with you?
A. No. We were told we didn't need one.
Q. Who told you that?
A. Mr. Buffis.
Q. What happened when you first got to the courtroom, can you tell the jury?
A. We -- my husband and I went in with Mr. Buffis into this room and Mr. Bartini was not in there at that time.

Q. Who's Mr. Bartini?
A. The court magistrate.
Q. Was he presiding over the hearing?
A. Yes, but he was not in the room at that time.
Q. So what happened before you got in the room?
A. We had a discussion with Mr. Buffis.
Q. You said "we," who are you talking about?
A. My husband and I.
Q. Was your husband there with you?
A. Yes.
Q. Was he also a named defendant?
A. Yes.
Q. Can you tell the jury what happened during that discussion?
A. We were -- Mr. Buffis had a form he had pre-written up and we were to discuss what funds we could donate in lieu of.
Q. I'm going to pull up Exhibit 13. You said there was a form, is this the form that Mr. Buffis had?
A. Yes, he came in with it.

THE COURT: I'm going to stop you for a moment and ask the attorneys to come to sidebar.

(Sidebar conference.)

THE COURT: This isn't really working how this is going. Is there any way you can show her the documents

instead of putting it on the screen and her continuing to duck behind the screen, staring at the screen --

MS. SHUKLA: Sure.

THE COURT: -- when she shouldn't be looking at the screen, and we can't keep track of the documents. Every time you ask her to look at the exhibit, you're going to need to make a record what's on the screen.

MS. SHUKLA: Okay.

THE COURT: Otherwise we'll never keep track of it. We've been trying to keep track of what exhibit it is.

MS. SHUKLA: I'll zoom in on the exhibit.

THE COURT: Or just say it.

THE CLERK: It has to be said. The Court of Appeals is only going to look at the transcript, otherwise they wouldn't know what we're looking at.

MS. SHUKLA: I thought I was saying I'm showing you government exhibit X, Y, and Z. I can be more clear.

THE COURT: A couple of times you may have, but we've just got to make it clear. The witness tends to have a habit once something is on the screen, she sits there just looking at the screen almost like she's studying it and it's really distracting and the jury is looking at me trying to figure out what's happening.

I don't know if it helps by giving her a document

instead of using the screen. The screen setup is bad. We will try to work on that but I wanted to bring it to your attention to work with it.

MS. SHUKLA: Is the screen issue your concern mostly with this witness, or do you think that you would prefer us not to use the screen?

THE COURT: The screen issue is with every witness. The way it is you can't -- in her position she's looking at it and because of the glaring light, you can't really see so she needs to keep turning it and then she gets herself in a position to see it.

MR. BRESLOW: What we can try to do, Your Honor, with this witness is turn off her monitor. We can give her a paper copy and Ms. Shukla, to aid the jury and the court, can use the monitors.

THE COURT: That would be fantastic.

MR. BRESLOW: That's what we can do. So you would use the computer and she would be looking at the piece of paper and actually just take her monitor and put it down.

THE COURT: Until we find a better spot for the monitor. Thank you.

MR. BRESLOW: Can I just have a moment to explain that to her?

THE COURT: Yes.

(End of sidebar conference.)

THE COURT: Ladies and gentlemen, we're just trying to make some adjustments midstream here to try to make this more presentable where we can all see and hear. That screen was causing just a lot of issues, not only for you but for me as well.

THE JURY: Thank you, Your Honor.

Q. (By Ms. Shukla) So, Ms. Viola, I'm going to show you Government Exhibit 13. If you can turn to Exhibit 13 in your binder?

You mentioned that there was a document that the defendant had written up. Is this the document you're talking about?

A. Yes.

Q. And what does it say at the top of the document?

A. "Agreement between parties Accord & Satisfaction."

Q. How about at the very top?

A. Lee Police Department.

Q. Then you said that was an agreement between parties. To which cases did it relate where it says "Commonwealth?"

A. "Commonwealth versus Fusco: Keeping house of ill fame and conspiracy. Commonwealth versus Viola: Sexual conduct of a fee; keeping house of ill fame, conspiracy."

Q. Who's Fusco?

A. My husband.

Q. Now I turn your attention to the part of the document, the second paragraph. It says, "It is further agreed by the parties that all proceedings on this date are confidential and subject to this non-disclosure agreement." What was your understanding of that part of the document when you saw it?

A. That this can't be talked about further.

Q. I'm going to show you the third paragraph that says "Parties Fusco and Viola are forever barred from bringing any action against the town of Lee or any of its employees or any other governmental agency." Did you understand what that meant?

A. Yes.

Q. What was your understanding?

A. If we spoke of it, nothing can be done. We can't go after the town or the town officials.

Q. I'm going to show you the next paragraph. It says, "Proceeds in the amount of $4,000 shall be donated to the Laliberte Toy Fund as a voluntary donation in lieu of criminal fines or civil forfeiture action by the close of business on this date." What was your understanding of that part of the agreement?

A. That we had a choice of what to donate.

Q. Can you explain what you mean by that?

A. Well, first we thought we were able to donate to a

charity of our choosing.

Q. What did you think you could donate to?

A. I rescue dogs and so we were going to donate it to the Sonsini Dog Shelter in Pittsfield.

Q. Did you have a discussion with the defendant about that?

A. We were told no, we can't. It had to go to the Laliberte Toy Fund.

Q. And where it says Laliberte Toy Fund on here, was this already on the form when the defendant presented it to you or did he add that later?

A. The Laliberte Toy Fund was already on there.

Q. Now you mentioned the Sonsini Dog Shelter, can you say what that is?

A. It's a rescue center. We rescue Boston terriers and they're always in need of something and I don't know anything about the Laliberte Toy Fund so we thought we would donate to something but he said it had to be to the toy fund.

Q. When you say "he" said, who are you talking about?

A. Mr. Buffis.

Q. And where it says $4,000, was that filled in when the defendant presented it to you or was it blank?

A. I don't recall, but I know that we were planning on donating a thousand and he said no, four.

Q. So why did you want to donate a thousand and not 4,000?
A. We thought that was actable.
Q. I'm sorry?
A. We thought that would be enough.
Q. So did you want to donate $4,000?
A. No.
Q. So why did you agree to donate $4,000?
A. I felt like I didn't have a choice.
Q. Why did you agree to donate to the toy fund when you wanted to donate to the dog rescue center?
A. Because he said it had to go to the toy fund.
Q. When you said that you had no choice, can you explain that for the jury?
A. It was already printed out and he said it was going to go to the toy fund and it was going to be more than just a thousand dollars. It was going to be four.
Q. So what was going to happen if you didn't agree to this?
A. I just felt threatened if we didn't do it so we did what we in a court of law were told to do.
Q. And what was your understanding of what was going to happen with respect to the charges if you didn't agree to give $4,000 to the toy fund?
A. It wasn't going to be hush-hush quite.

Q. So I'm going to show you the bottom of the agreement. Whose signature appears at the bottom of the agreement?
A. The one to the left is my husband's and then mine and then former chief Buffis.
Q. Who was present when you discussed this agreement and signed it?
A. Nobody but us three.
Q. Who were the three of you?
A. My husband, myself, and the former chief of police.
Q. Was the clerk magistrate there?
A. No, he was not.
Q. So before you signed this agreement and agreed to give the $4,000 to the toy fund, did you think you would be charged with criminal charges?
A. If we didn't donate it?
Q. Right.
A. I felt intimidated, yes.
Q. Did you --
MS. LEVINSON: Objection, not responsive, Your Honor.
THE COURT: Sustained. That response will be stricken. Rephrase the question.
Q. (By Ms. Shukla) What did you think was going to happen with the charges, with respect to the charges against you if you didn't sign this agreement?

A. They would go forward.

Q. Now, during the time that you had this meeting, the three of you, you said that the clerk magistrate, Mr. Bartini, wasn't there. Where was he during this time?

A. I don't know. Out in another room.

Q. And if the charges went forward against you as you thought they would if you didn't sign this agreement, what effect would that have on you?

MS. LEVINSON: Objection; speculation.

THE COURT: The effect it would have on her?

MS. LEVINSON: (Indicating)

THE COURT: Overruled.

Q. (By Ms. Shukla) You can answer my question.

A. Can you state it again please?

Q. Yes. If the charges were to go forward as you testified you thought they would if you didn't sign the agreement, what effect was that going to have on you?

A. Devastating, possibly losing my children.

Q. During this meeting you had with your husband and Mr. Buffis, what happened after the meeting, during the hearing after the meeting?

A. After this meeting?

Q. Right.

A. We went into the magistrate, with the magistrate.

Q. So he came into the room?

A. Yes.

Q. Did you have a hearing there?

A. Yes.

Q. Now I'm going to play Exhibit 11, which is the show cause hearing recording and the jury can follow along in their folders at Exhibit 12. That's a transcript of the show cause hearing.

THE COURT: Can you make a record one more time? The tape is one exhibit number and the transcript is another separate one?

MS. SHUKLA: Yes, the recording --

THE COURT: Put that on record.

MS. SHUKLA: The recording is Exhibit 11 and the transcript is Exhibit 12.

THE COURT: All right.

MS. SHUKLA: For the jury following along, this is the document that says Government Exhibit 12 in the bottom right-hand corner and then at the top it says magistrate hearing, so you can follow along at page 2.

(Audiotape playing.)

Q. (By Ms. Shukla) I'm going to pause it there. We are on page 3 at line 21.

What was your understanding about what you could talk about after leaving this hearing?

A. Nothing. I could talk about nothing.

Q. Could you speak up a little lit?
A. I could talk about nothing.
Q. And earlier on page 3 at line 5 you say "and so I want this over with, what he says, I want it," what did you want over with?
A. This whole thing. I just wanted to be able to say it's done. It's continued without a finding, something.
Q. In that same section you say that the Berkshire Eagle said that you were arrested, can you tell the jury what effect the Berkshire Eagle saying that you were arrested in the newspaper had on you?
A. A very big emotional one, but for my kids to hear that their mom was arrested and couldn't understand how that could be a lie if I really wasn't so it was difficult.
Q. I'm just backing up a bit. Can you identify the voices who was there at the hearing?
A. The magistrate hearing that we just listened to?
Q. Right.
A. It was myself, my husband Tom Fusco, Mr. Buffis and Tom Bartini.
Q. Do you recognize Mr. Buffis?
A. Uh-huh.
Q. Do you see him in the courtroom today?
A. (Indicating.)

Q. Can you point him out and describe what he's wearing?
A. With a happy tie, glasses, wearing a happy tie.
MS. SHUKLA: Let the record reflect that the witness has identified the defendant.
THE COURT: The record will reflect that, yes.
Q. (By Ms. Shukla) Now I'm going to play some more of the recording and the jury can follow along at line 22 of page 3.
(Audiotape playing.)
Q. (By Ms. Shukla) I'll just pause it there. On page 5, line 18, where Clerk Magistrate Bartini says, "If Chief Buffis wanted to go forward with this," and you said, "Oh, absolutely," can you explain what you meant there, what your understanding was.
A. That I understood that he could have gone forward with this.
Q. What's this?
A. The charges.
Q. Now we're at page 5. I'm going near the bottom. I'm going to keep playing the recording.
(Audiotape playing.)
Q. (By Ms. Shukla) We are now on page 8 near the top.
(Audiotape playing.)
Q. (By Ms. Shukla) I'm going to pause there. We are on page 11 near the bottom.

I direct your attention to line 18 of page 11 where Clerk Magistrate Bartini says something indiscernible but he says that "I'm sure that Chief Buffis knows this, I know this, but the Lee police can charge you again if there's certain problems," what was your understanding of what would happen if you violated the nondisclosure agreement that you had signed with Mr. Buffis in your private meeting?

A. We would be arrested.

Q. What do you think would happen with the charges?

A. They would go right up again.

Q. I'm going to continue playing the rest of the recording. We are on page 11 at line 26.

(Audiotape playing.)

Q. (By Ms. Shukla) Now I'm going to direct you to page 13, line 6, where after a few lines earlier when the clerk magistrate asked you why you didn't show up with an attorney and your husband, Mr. Fusco, says "we went with Joe's recommendation," what did that mean?

A. That he said -- well, we asked him if we should bring a lawyer and he said you're not in need of one.

Q. When you say we asked "him," who's him?

A. Mr. Buffis.

Q. Was that before the hearing or after?

A. Before, prior to.

Q. So did you and your husband ultimately pay $4,000 to Mr. Buffis?

A. Yes, my husband did.

Q. What happened with the charges?

A. They're still there.

Q. What happened with those charges?

A. These charges?

Q. Yes.

A. They're still open, is that what you're asking?

Q. I'm going to show you back at document 6, can you turn to the tab in your binder and for the jury I will show you on the screen. These particular charges that are shown in Exhibit 6, the hearing that you went to on February 21, 2012, what happened with those particular charges after you gave the $4,000 donation to the toy fund?

A. They were supposed to be continued without a finding is what I understood.

Q. And what does that mean?

A. (No verbal response.)

Q. Okay. So you mentioned a little while ago that the charges are still there?

A. Yes.

Q. I'm going to show you another document.

THE COURT: Can we go back? I'm sorry, did the

witness respond to the question before the last one?

COURT REPORTER: No, no verbal response.

THE COURT: Could you re-ask that question?

Q. (By Ms. Shukla) Can you answer verbally what that means?

A. Restate the question again for me.

Q. What is your understanding of continued without a finding is?

A. It's gone. It's continued but they didn't have a finding.

Q. What do you mean by it's gone?

A. It's not on our record.

Q. Now you said a little earlier that the charges still exist. I'm going to show you Government Exhibit 17. What's Exhibit 17?

A. I'm on tab 17?

Q. Yes.

A. It's a criminal docket.

Q. Are these the charges you were referring to when you said they still exist?

A. Yes, correct.

Q. What date was this complaint issued in these charges that still exist? You can look at the document.

A. I think it was back in 8, 8/13.

Q. When was the hearing?

A. In '12.
Q. So were those charges the same as these?
A. Yes.
Q. Was it the same case as this?
A. Yes, but it --
Q. Do you have an attorney for these charges?
A. Oh, yes.
Q. Did you have one back then?
A. We hired Betsy the day back in March of 2012.
Q. So for the hearing that you appeared with the clerk magistrate --
A. We did have a lawyer consulting us but he did not come up.
Q. Why didn't that lawyer come up?
A. Because after my husband consulted with Mr. Buffis, we took what he said and he said, well, I think you'll be okay. Just let me know what's going on so we felt comfortable enough being in a court of law that everything was going to go by the book.

THE COURT: Ma'am, who said "I think it will be okay?"

THE WITNESS: My lawyer.

THE COURT: Who was your lawyer?

THE WITNESS: Bacon & Wilson I believe. It's been a long time.

THE COURT: Did you tell your attorney what Mr. Buffis had said to you?

THE WITNESS: Yes.

THE COURT: And your attorney said what to that?

THE WITNESS: He said if you're comfortable with that, then that's okay. He had seen that go on before.

THE COURT: All right.

Q. (By Ms. Shukla) Okay. Now I'm showing you Exhibit 17 again. You testified earlier that you gave the $4,000 to Mr. Buffis. Did you get your $4,000 after these charges were issued? Did you get the $4,000 back after these charges in Exhibit 17 were issued?

A. Were reissued, no.

Q. Now after the publicity, what was it like trying to get work?

A. Hard. The hardest thing was living in the town of Lee, not just the sex stuff but a lot of townspeople trusted a lot in Mr. Buffis and so we were the scapegoats, you guys ruined the chief of police. We'd have guests going down -- we'd send guests down to restaurants, so, where are you saying? The Inn at Laurel Lake. Oh, they costed us the best chief police ever. We hear it time after time again. You know, I'll claim mine but I'm not going to claim that.

Q. So did you do anything to try and help you get some

work?

A. (Indicating.)

Q. What did you do?

A. Asked Mr. Buffis just to write a letter that stated I wasn't arrested and stuff because that was the big thing, being arrested. Somebody wouldn't even look at you if the word arrested is there.

Q. Did Mr. Buffis write a letter for you?

A. Yes, he did.

Q. I'm going to show you Government Exhibit 22 which is a letter, Government Exhibit 22. What appears at the top of the letter, the very top?

A. Lee Police Department.

Q. Is that the letterhead?

A. Yes.

Q. And then who is next to?

A. Potential employers.

Q. Who is it from?

A. Chief Joseph Buffis.

Q. And who is it regarding?

A. Tara Viola.

Q. I'm going to focus you on certain parts of this letter, the first line where it says "I have been acquainted with Tara Viola for the past several years," was that true?

A. No.

Q. And then it says that "Tara and Thomas have been youth sport coaches, ardent supporters of our DARE program and generous droners to the Laliberte Toy Fund during the holiday season," is that true?

A. No. I never heard of the Laliberte Toy Fund until I sat that day in the magistrate hearing.

Q. And what was the first time that you met the defendant?

A. Mr. Buffis?

Q. Yes.

A. I met him at the magistrate hearing.

Q. Was that in February 2012?

A. Yes.

Q. Now it says the DARE program, did DARE ever come up in your discussions with Mr. Buffis?

A. Yes.

Q. Can you explain to the jury how it came up?

A. It came up because when he wanted us to donate the $4,000 to the Laliberte Toy Fund, I didn't really know a lot about it but I knew a lot of drug issues in Lee and I asked if half could be donated to the DARE fund.

Q. What did he say?

A. I don't remember but I thought that's what we had agreed on, half and half.

Q. Now turning back to this letter in Exhibit 22, what did you do with this letter after you got it?

A. Put it away.

Q. Did you ever use?

A. No, I couldn't because I didn't know him.

Q. Why didn't you ever use this with employers?

A. Because I didn't know -- this was false.

Q. This was false, what does that mean?

A. I didn't know him. I met him once. I didn't know him, and I wasn't really a valuable member of the community. I just moved into Lee and I did not donate to the toy fund.

Q. Now can you remind the jury how long you lived in the town of Lee?

A. I bought my house in 2008.

Q. Have you had any interactions with the public in Lee regarding this ordeal?

A. Oh, many times, yes.

Q. Can you tell the jury about some of those?

A. Umm, a couple months back one of the little old ladies that was a very good follower of Mr. Buffis right in front of my kids, "how dare you lie and cheat and we lose our chief of police and you think you can hold your head up high."

You know, if it wasn't in front of my kids, I could

have taken it. And then there's a little store on the Main Street that came up with, "oh, yes, Joe Buffis said you had a black book. Where's your black book?"

The hardest one was at the grocery store. I was with my daughter and two baggers said, "oh, we're not feeling good. Our backs are hurting. Let's go over and get some more than massages at the Inn at Laurel Lake." You know, I can take it when you say it to me but not when your kids are around.

Q. Ms. Viola, do you have immunity from the federal government for using your testimony against you in a federal prosecution?

A. Yes, I do.

MS. SHUKLA: May I have one moment, Your Honor?

THE COURT: Uh-huh.

MS. SHUKLA: I have no further questions. Thank you.

THE COURT: All right.

THE COURT: Ladies and gentlemen, how we doing for breaks? Would anyone like to take a break? Are you good to keep going? All set? All right. We'll keep going.

MS. LEVINSON: Just take a second to move the podium?

THE COURT: Sure.

**CROSS-EXAMINATION**

Q. (By Ms. Levinson) Good afternoon.

A. Good afternoon.

Q. Okay. So just to get this straight, back in about March of 2011 nobody forced you to start offering sex for money, did they?

A. No.

Q. You did that of your own free will, right?

A. Correct.

Q. And you came up with that idea with the bunch of girlfriends one night in Springfield?

A. Correct.

Q. You were at a bar called Mardi Gras?

A. Yes.

Q. Is that a gentlemen's place type with topless women?

A. Uh-huh.

Q. And you were there with some girlfriends?

A. Yes.

Q. And you were a massage therapist at that time?

A. Correct.

Q. But they were legitimate massages?

A. Yes.

Q. And in conversation with some of these women, the idea of your giving happy-ending massages came up, right?

A. Correct.

Q. Can you tell the jury what a happy-ending massage is?
A. Sexual at the end.
Q. What kind of sexual at the end?
A. Could be oral mostly.
Q. Mostly oral sex?
A. Yes.
Q. And so you decided that that might be a good way to pick up some extra spending money, right?
A. Uh-huh.
Q. Because you were having trouble making ends meat?
A. Correct.
Q. So you thought that was a pretty good idea?
A. Yes and no.
Q. Well, you did it?
A. Absolutely.
Q. So having had this conversation with these women friends, you decided that you would in fact start offering happy-ending massages, right?
A. Uh-huh.
Q. And that you would do these at the Inn that your husband was running for some time?
A. Correct.
Q. And so you understood that giving a happy-ending massage was actually committing the crime of prostitution, right?

A. I -- yes.
Q. And you understood that you were offering sex for money, right?
A. Uh-huh, yes.
Q. Would it be fair to say that when you first started with the happy-ending massages, you were not giving oral sex, right? Let me put it another way.

You did -- after the police came to the Inn and confronted you with the fact that you were giving these massages, you went to the police station and we saw some clips of an interview.
A. Yes.
Q. During the interview you were asked a lot of questions about what kind of sexual activity you were offering in exchange for money, is that correct?
A. Uh-huh. Yes, sorry. It's been a long time, yes.
Q. And you told investigators that when you first started with happy-ending massages, you were giving men what you called hand jobs; do you remember that?
A. Yes.
Q. And then I believe you said that you were able to charge $50 more for a massage with a hand job than you were able to for just a plain massage, right?
A. Correct.
Q. But then you learned that maybe you could make a

little more money if you increased that to oral sex, right?

A. Correct.

Q. And in your interview with investigators when they were asking you questions, you were very freely calling oral sex blow jobs, right?

A. I don't remember, sorry.

Q. Well, if I played you some video clips, might you remember? Might that refresh your recollection? Might it refresh your recollection if I played you some video clips?

A. I really don't want the video clips. It's just been three and a half years.

Q. I understand.

A. So I don't remember everything.

Q. I understand that, but if I played you a video clip, might that help refresh your recollection as to what you said to investigators back there in January 2012?

A. (Indicating.)

Q. What's your answer? Do you have an answer, Ms. Viola?

A. Sorry, I just don't recall.

Q. So if I played --

THE COURT: Ma'am, the question to you -- would you pose it one more time? You do have to answer on the

record. Please pose the question one more time.

Q. (By Ms. Levinson) If I played you a video clip, might that help refresh your recollection as to what you were saying to investigators?

A. Sure.

MS. LEVINSON: Is this on?

(Videotape playing.)

THE COURT: Press the pause please. I just need to know the exhibit number.

MS. LEVINSON: This is Exhibit 3 -- no, Exhibit 11.

MS. SHUKLA: It's Exhibit 3. However our Exhibit 3 is just clips. So if it's included in what we played, then it would be our Exhibit 3.

MS. LEVINSON: Then I would have to mark my clips as a defense exhibit.

MR. BRESLOW: We have no objection to introduction of the evidence.

THE COURT: All right. So we're going to need to mark this.

THE CLERK: I think you have to unhook because she's not switching over.

MS. LEVINSON: It's not showing up.

THE CLERK: You're hooked in wrong.

THE COURT: Don't look at me for help with the

technical stuff.

All right. Now the recording you're about to play to refresh this witness's recollection will be defense exhibit what?

MS. LEVINSON: C.

THE CLERK: I'm trying to get the system to come up.

THE COURT: All right.

**(Defendant's Exhibit C admitted.)**

THE COURT: If you're ready, go ahead. It's going to be Defense Exhibit C.

(Videotape playing.)

Q. (By Ms. Levinson) I'll stop it there for a minute and go back to something that we see on that clip. I'm going to skip the first question about whether it refreshes your recollection.

When you first started giving happy-ending massages, did you tell your husband what you were doing?

A. Yes.

Q. And so by the time you went to the police station in January of 2012, your husband knew what you were doing, right?

A. Yes.

Q. During the course of your interview with the police investigators on January 19, 2012, you told them on a

number of occasions that your husband did not know what you were doing, correct?

A. Correct.

Q. And is this clip one of those clips where you were telling investigators that your husband did not know?

A. Because I wanted to protect him.

(Videotape playing.)

Q. (By Ms. Levinson) So the investigators there were saying to you that he does know more, correct?

A. Yes.

Q. And you were still denying it, correct?

A. To protect him and the kids.

Q. But you were denying it?

A. Yes.

Q. So in fact you were lying to them?

A. To protect them, yes.

(Videotape playing.)

Q. (By Ms. Levinson) And again you shake your head in response to your husband not knowing?

A. Yes.

(Videotape playing.)

Q. (By Ms. Levinson) Now in that clip did you hear yourself saying that you weren't having sex?

A. Right, yes.

Q. Was that true?

A. No.
Q. And the investigators said you were giving a blow job, right?
A. Apparently they take that as one.
Q. And you said yes, correct?
A. Correct.
Q. Again that was in the context of whether or not your husband knew about it, correct?
A. Correct.
Q. Once again, you were lying to them about whether he knew about it?
A. Yes, to protect him and my family.
Q. Now, in fact, not only did he know about it but he actually helped you set up your advertisement, is that correct?
A. Correct.
Q. And how did you guys find out where to advertise your happy-ending massages?
A. I don't remember.
Q. Well, was it your husband who found out where to advertise?
A. He did most of it, yes, so probably.
Q. Did he take pictures for you to use in your advertisement?
A. Yes.

Q. And in fact did you post an advertisement over the Internet?

A. Yes.

MS. LEVINSON: Ms. Pelegano, can we switch media?

THE CLERK: Let's hope so.

Q. (By Ms. Levinson) I'm going to show you Defendant's Exhibit A I hope. Let me ask you if you recognize Defendant's Exhibit A. You can't see it because you don't have a screen anymore.

MS. LEVINSON: May I approach?

THE WITNESS: I can see it over there.

THE COURT: You can either give her a copy of what was on the screen or just ask her to look at the screen which is across the courtroom.

THE WITNESS: I can see it, yes.

Q. (By Ms. Levinson) Okay. Is that a copy of the advertisement that you posted?

A. Yes.

Q. Does that advertisement say, "For all you classy men that like a clean, well-educated provider, look no further. No worries of nonprofessional. Not only do I know how to give a massage but like to treat my men right. I have a clean professional massage area in a safe secured environment, two hundred dollars for the hour session. I

schedule appointments Monday through Friday. I will not answer e-mail that do not include picture of themselves, X, O." Is that the ad that you posted?

A. Correct.

Q. And I see that there is one picture on top of the text?

A. Yes.

Q. Then there are several other pictures also included on the ad, is that correct? Do you recognize those pictures?

A. From what I can see.

Q. Are those pictures that your husband took of you for the purpose of putting on the ad?

A. I can't say what the pictures were.

THE COURT: You can approach the witness and show her the exhibit that you had on the monitor.

THE WITNESS: No, not just for that purpose. That was a trip that we took but we used them for that.

THE COURT: Just make a record of what that is.

MS. LEVINSON: The witness just identified pictures that are contained on a two-page exhibit which is Defendant's Exhibit A.

THE COURT: Thank you.

Q. (By Ms. Levinson) Now you knew that this

advertisement that you posted was going out over the Internet, right?

A. Correct.

Q. So you knew that people all over the world were going to have access to this if they clicked on that website, correct?

A. They may, yes.

Q. And you knew that people from the town of Lee could potentially have access to the advertisement on the website, right?

A. Correct.

Q. You knew that people all over Berkshire county could have access to the advertisement, correct?

A. Possibly.

Q. You knew that it was even possible that parents of your children's friends could have access to that website, right?

A. Possibly.

Q. And you did it anyway, right?

A. Uh-huh.

Q. And nobody forced you to do that, right?

A. No.

Q. You did it of your own free will?

A. Uh-huh.

Q. Now, so your husband Tom helped you set up the ad and

he took photographs. Did he also help promote your business in any way?
A. No.
Q. Did you always have him present in the Inn when you were giving a happy-ending massage in case anything happened?
A. Correct.
Q. To protect you in case you needed protection?
A. Correct.
Q. Did there come a time, Ms. Viola, that you decided you actually wanted to stop giving happy-endings massages?
A. Correct.
Q. And isn't it true that your husband Tom insisted that you keep doing it, right?
A. He was in support of me to keep doing it.
Q. Well, didn't you tell investigators that you wanted to stop but he threatened to leave you if you stopped giving happy-ending massages?
A. I don't remember that.
Q. If I showed you a document, might that help refresh your recollection?
A. Sure.

MR. BRESLOW: No objection.

MS. LEVINSON: May I approach?

THE COURT: Please indicate what the document

is.

MS. LEVINSON: It's just a one-page part of a police report written by Officer Ryan Lucy of the Lee Police Department.

THE COURT: All right.

Q. (By Ms. Levinson) And, Ms. Viola, I'm just going to ask you to read this to yourself. Okay? I'll point out where and just after you finished reading that portion there, see if that refreshes your recollection as to what you said to Investigator Lucy.

A. I agree.

Q. Having read what I just handed you --

A. Yes.

Q. -- is your recollection refreshed as to what you said?

A. Yes.

Q. And, in fact, you told Investigator Lucy that you felt intimidated by your husband to keep continuing doing happy-ending massages, right?

A. For money purposes.

Q. But you told him you felt intimidated, correct? And --

THE COURT: Wait a minute. The witness did not respond with an answer.

THE WITNESS: I don't remember. It's been so

long.

Q. (By Ms. Levinson) Well, do you remember now --

A. Yes, on this, yes.

Q. -- saying that here?

A. Yes.

Q. And did you also tell Investigator Lucy that you were afraid he was going to leave you or kick you out of the Inn if you didn't continue?

A. That I do not recall saying.

Q. Would it help refresh your recollection --

A. Like I said, this has been a long time.

Q. I understand.

MS. LEVINSON: May I approach again, Your Honor, with the same document?

THE COURT: Well, pose the question again as to whether or not her recollection could be refreshed.

Q. (By Ms. Levinson) Do you recall telling Investigator Lucy that you were afraid of Tom leaving you and kicking you out of the Inn?

A. I don't remember.

Q. If I showed you a document, would that help refresh your recollection?

A. It may.

MS. LEVINSON: May I, Your Honor?

THE COURT: Okay.

Q. (By Ms. Levinson) Again just read it to yourself.
Having read that, is your recollection refreshed as to what you told Investigator Lucy?
A. Yes, but I can also voice that I think I was in such an emotional state that I was saying anything.
Q. Sure. But you do admit that you said that too?
A. Right, but in an emotional state, correct.
Q. And it is correct that your husband wanted you to continue giving happy-ending massages, right?
A. I think he would have gone either way with me.
Q. And so you did continue to do it, right?
A. No.
Q. Well, you started giving happy-ending massages in about March or April of 2011, is that correct?
A. Yeah, but as soon as this all came out nothing ever again.
Q. So from March or April 2011 until January 19th of 2012, you were engaged in prostitution at the Inn at Laurel Lake, right?
A. Say those dates again.
Q. March or April of 2011 until January 19th of 2012.
A. I had surgery in May for my crohn's and I didn't do anything all summer.
Q. So would it be fair to say you were engaging in prostitution from March or April of 2011 until May of 2011

when you had surgery?
A. Possibly, yes.
Q. Yes?
A. Yes.
Q. Then when did you start up again?
A. The fall.
Q. The fall of 2011?
A. Yes.
Q. And you continued giving happy-ending massages until the police came to the Inn on January 19, 2012, right?
A. Correct.
Q. So you didn't stop on your own. You stopped because the police came and caught you, correct?
A. Uh-huh.
Q. And the way the police came and caught you is by using a confidential informant who was posing as somebody who wanted to get a happy-ending massage, correct?
A. Correct.
Q. And how did you end up making an appointment with this confidential informant to give him the happy-ending massage?
A. Honestly I don't remember, that's three and a half years ago. I'm sorry, I don't remember.
Q. Well, in general how did you arrange for this?
A. Either e-mails or cell phones.

Q. So someone would e-mail you?
A. Or cell phone, yes.
Q. And you would make arrangements to give them a massage?
A. Yes.
Q. Tell them where to come to?
A. Yes.
Q. And to the best of your knowledge is that how you ended up making an appointment with the confidential informant?
A. Correct.
Q. Now do you recall the confidential informant coming into the Inn on January 19, 2012 for his massage appointment?
A. From what I can remember, yes.
Q. And can you tell us what you do remember about that appointment?
A. He wanted to offer me more money and I said no.
Q. Offer you more money for what?
A. Sex.
Q. And when you say sex, what do you mean?
A. He wanted more money -- he offered more money and I said no.
Q. But you were planning on giving him a happy-ending massage, correct?

A. I can't remember.
Q. You don't remember if you were planning to give him a happy-ending massage?
A. It's been three and a half years of emotional turmoil.
Q. But it would be fair to say that you were advertising on the Internet that you were giving special massages, correct?
A. Yes.
Q. And this confidential informant apparently responded to your on-line ad, correct?
A. (Indicating.)
Q. Correct?
A. Correct.
Q. So would it be fair for us to infer that you believed that he was coming to the Inn for a happy-ending massage?
A. Correct.
Q. And did you have a conversation with him before you realized that the police were involved?
A. Yes. He asked if he could get more with more money and I said no.
Q. And then did you also tell him that you had a Massachusetts State Police officer as a client?
A. It was to make him relax.
Q. So you did tell him that you had?

A. Yes, I did.
Q. Because did he seem nervous?
A. Yes.
Q. And so you told him you had a client that was a Massachusetts State Police officer, right?
A. Yes.
Q. But that was not true?
A. Correct.
Q. And then how did you first -- how did the police first confront you? What happened?
A. They just came in and started talking. They were very pleasant.
Q. How many police officers came in?
A. Again three and a half years ago, I have no clue.
Q. Mr. Buffis was not one of the police officers who came in, was he?
A. No.
Q. You said that they just came in and started talking?
A. Uh-huh.
Q. And it was a pleasant talk?
A. Yes.
Q. They questioned you about whether or not you were selling sex for money, right?
A. Yes.
Q. And you admitted that you were?

A. We cooperated with them fully.

Q. You agreed to cooperate with them fully right then and there at the Inn, yes?

A. Yes.

Q. And in furtherance of your full cooperation, you agreed to go to the Lee Police Station to make a statement, correct?

A. Correct.

Q. And we have seen portions of the video recording of that statement here today, correct?

A. Uh-huh.

Q. Now what we have seen so far here in the courtroom is not the whole interview you had with Officer Lucy and Sergeant Meikeljohn, is it?

A. It's what?

Q. The clips that we have seen here in the courtroom today, that is not the entire interview that you had with them?

A. Apparently not.

Q. Excuse me?

A. Apparently not.

Q. You were there for approximately an hour, would you say?

A. Again three and a half years ago, I'm blocking it out. It's very hard to have to bring this all back up.

Q. But again, Ms. Viola, you voluntarily put yourself in this position, right?

A. Three and a half years ago, yes, I will own that but I'm not going to own sitting here today.

Q. Well...

A. Correct.

Q. And at the time that you were offering happy-ending massages, you knew that there was a possibility you could get caught, right?

A. In the back of my mind, yes.

Q. And you know once you got caught, you were extremely concerned about the effect it was going to have on your children, right?

A. Correct.

Q. But at the time you decided to put yourself out there online offering sex for money, you obviously were not thinking about your children?

A. Actually I was so I could support them and not steal from other people but do something that I could support my kids.

Q. Well, let me ask you this. You have a master's degree, don't you?

A. Yes, I do.

Q. And you are gainfully employed now at a --

A. Correct.

Q. -- rehabilitation center. What is a rehab center?
A. A nursing home.
Q. Okay. So you have skills?
A. Yes.
Q. There are other ways that you could have made money other than prostitution, weren't there?
A. Yes, but I couldn't travel because my crohn's is very bad. I literally had to be at home.
Q. So this was your idea of a good at-home business at the time?
A. Stupid but, yes.
Q. Now, Ms. Shukla asked you some questions about how you are testifying in court today under a grant of immunity.
A. Correct.
Q. What does that mean to you? What does a grant of immunity mean to you?
A. Here today anything I say won't be held against me.
Q. And have any federal charges been filed against you?
A. No.
Q. And you don't believe that any will be filed against you, is that correct?
A. Correct.
Q. But you did mention that the charges that you thought were being dismissed at the show cause hearing in Great

Barrington are still pending, is that correct?

A. Correct.

Q. And those charges are still pending today?

A. Correct.

Q. And you've been to court on that case a number of times since March?

A. Just to show up that we've been there and doing what we're supposed to be doing, yes.

Q. What is it that you're supposed to be doing?

A. Showing up there, not just blowing it off and thinking it's no big deal.

Q. What happens when you show up there?

A. It's continued.

Q. And why is it continued?

A. Because of this.

Q. Okay. When you say because of this, what do you mean by that?

A. Because I'm --

Q. Let me ask you this. Nothing has happened in that case yet, correct?

A. Correct.

Q. And charges are open and pending against you?

A. Absolutely.

Q. And you face a possible conviction for prostitution in state court, correct?

A. Correct.

Q. You could choose to have a trial, correct?

A. Yes.

Q. And at a trial it would be like this where witnesses would come and testify, right?

A. Correct.

Q. But you have not opted to have a trial, correct?

A. Correct.

Q. Instead you have opted to wait to see what happens here in the trial of Mr. Buffis, right?

A. Correct. I've been advised.

Q. You've been advised by counsel, right?

A. Correct.

Q. You have an attorney in that case?

A. Yes, I do.

Q. And your attorney has given you very good advice to protect you, correct?

A. Yes.

Q. And part of her advice is for you to continue to fully cooperate?

MR. BRESLOW: Objection, Your Honor.

THE COURT: Sustained. That portion of the question will be stricken.

Q. (By Ms. Levinson) You want to fully cooperate with the prosecutors in this case, don't you?

A. Yes.

Q. And you want the criminal charges that are pending against you in the state court to go away, right?

A. I have no idea what's going to happen there.

Q. Well, my question is you want them to go away, correct?

A. I think anybody would, yes.

Q. You are hoping that by continuing to cooperate with the government here, those charges will either be dismissed or you will be treated leniently; wouldn't that be fair to say?

A. Possibly.

Q. Well, are you hopeful that that is the case?

A. Yes. After what I've gone through with this, yes.

Q. Now you said that those charges are still pending in the Berkshire Court?

A. Yes.

Q. But to the best of your knowledge and belief, no criminal charges were filed against either you or your husband following the show cause hearing in the Southern Berkshire District Court, correct?

A. Correct.

Q. And, in fact, no charges were formally filed against you until March of 2013, correct?

A. Correct.

Q. And that was after the whole investigation into Mr. Buffis had come to light?

A. Correct.

Q. And you also said in answer to one of Ms. Shukla's questions that you never got your -- you and your husband never got your $4,000 back, right?

A. Correct.

Q. Well, do you know where that $4,000 is right now?

A. No.

Q. Would it surprise you to know that that $4,000 is in the custody of law enforcement officials?

MR. BRESLOW: Objection, Your Honor.

THE COURT: Basis?

MR. BRESLOW: Assumes a fact that is not in evidence. I don't think there's a fair basis for her to ask the question.

MS. LEVINSON: I believe that there is a fair basis.

THE COURT: Can you approach and make me an offer?

(Sidebar conference.)

THE COURT: The government is correct about that not being a fact in evidence. What's your good-faith showing?

MS. LEVINSON: My good-faith showing is that on

information and belief the government seized the $4,000 during the investigation of Mr. Buffis.

MR. BRESLOW: Okay. So the government -- the Massachusetts State Police did take $4,000 from an individual in Lee named Richard Shields. That is not the same $4,000 that the defendant extracted from this witness and her husband. That $4,000 was put into the toy fund account and then moved into his personal bank accounts and then spent, and at some later point the defendant mustard up $4,000 in approximately April of 2012 to give to this businessman to hold onto as a cover story. So it is not in evidence and it will not be --

THE COURT: Hold on, that's your view of the evidence and there's another view of the evidence. I don't think based on those two conflicting views that I can assume that you can go there.

I mean, if other witnesses come on and you can lay a foundation through other witnesses about the money and the trail of the money, fine, but I don't think you're there yet.

MS. LEVINSON: Okay.

THE COURT: All right.

MS. LEVINSON: As long as we're here, I'll just ask if I can ask this next question. Would I be able to ask this witness if she's aware of the fact that Mr.

Buffis offered to give State investigators a check that said Fusco refund donation on it?

MR. BRESLOW: It doesn't have any bearing on the witness's testimony. I think it's outside the scope of the direct and I don't see why she's attempting to --

THE COURT: I don't know what the relevancy would be if she even had knowledge of it. How is it relevant right now?

MS. LEVINSON: Well, she said we don't have that money back, but Mr. Buffis did offer the money back to the State investigators and they didn't take it.

THE COURT: I'm not sure this is the witness to get that information out from. I'm sure you will have witnesses you will be able to get that out from.

MS. LEVINSON: Okay.

MR. BRESLOW: Your Honor, I'd ask that the jury be instructed that the question be disregarded entirely, and to just remind the jury that the questions posed by lawyers are not evidence.

MS. LEVINSON: As long as we're here, how much longer are we going to go?

THE COURT: I'll ask them. As long as they're comfortable, I will stay until 4:30.

MS. LEVINSON: Okay.

THE COURT: Is that okay with everybody?

MS. LEVINSON: Okay.

(End of sidebar conference.)

THE COURT: Let me check with the members of the jury. Are you comfortable continuing to sit? Does anyone need a break, or we can set a time of 4:30 this afternoon to end if that's good or we can end earlier and take a break right now and come back.

Stay right here? All right. Very good.

Now, the last question before we went to sidebar with the attorneys is stricken from the record. I just want to remind you that questions from attorneys are not evidence and anything that I say is stricken is disregarded from your consideration into evidence. All right.

MS. LEVINSON: May I continue?

THE COURT: Yes.

MS. LEVINSON: Thank you.

Q. (By Ms. Levinson) So let's go back to your interview with Officer Lucy and Sergeant Meikeljohn on January 19th of 2012 right after you were confronted at the Inn. At that time you repeatedly told them that you had $6,000 in your account from the happy-ending massages, is that correct?

A. Yes.

Q. And you actually brought that up several times, right?

A. Correct.

Q. And you kept using the figure of $6,000, right?

A. Correct.

Q. And you yourself said to the investigators "I'll donate it to charity," right?

A. Correct.

Q. And you wanted to get rid of this money as you said before because you felt it was dirty money, right?

A. Correct.

Q. And they told you that that possibility could be discussed at some later time, correct?

A. Yes.

Q. And, in fact, over the next several days your husband made several telephone calls to Officer Lucy to discuss what was going to be happening going forward, is that correct?

A. He might have. He would do things out so I didn't hear because I would have a breakdown.

Q. By the time you left the police station on January 19, 2012, you knew that you were going to be summoned to appear in court?

A. Correct.

Q. And that was on the 19th of January, right?

A. Correct.

Q. So you knew you were going to be summoned to court

and then lo and behold these articles starting coming out in the Berkshire Eagle and online saying that you had been arrested, right?

A. Correct.

Q. And that really offended you because you actually had not been arrested, right?

A. Correct.

Q. But you had been caught, right?

A. If that's what you want to call it.

Q. Your prostitution activities had been caught by the police, right?

A. Correct.

Q. And you were told that you were going to be brought to court, right?

A. Yes.

Q. You were told you were going to be charged with some crimes, right?

A. Possibly, yes.

Q. And nevertheless when the articles starting appearing saying that you were arrested, that really offended you, correct?

A. Correct.

Q. And although it was technically true that you had not been arrested, you were going to be charged with these crimes, right?

A. It was going to go to the court magistrate and go from there.

Q. But when you were at the interview with Officer Lucy and Sergeant Meikeljohn, they didn't tell you anything about a clerk magistrate, did they?

A. I honestly don't remember who told us that.

Q. In fact, they told you that you were going to be summonsed to court at a later date, isn't that true?

A. Correct.

Q. And it was only later that your husband told you that you were going to go to court for a clerk magistrate hearing, is that right?

A. Correct.

Q. And you learned that from your husband after he had had several discussions with Officer Lucy who informed him that that's how it was going to proceed, right?

A. Yes.

Q. And you also learned from Officer Lucy -- from your husband who was in touch with Officer Lucy that there was a possibility of your donation coming true, right, that you had offered?

A. Correct, but not $4,000.

Q. Well, you had told the investigators that you had $6,000 in prostitution?

A. To get rid of, to get rid of, but not to come to

court where he's already got it written up, who it had to go to and that.

Q. But you said I made $6,000 and I want to donate it to charity?

A. Yes, in a very emotional state. I think anybody would have said something.

Q. But that's what you said, correct?

A. Correct.

Q. And in your interview with these investigators, you didn't say, well, maybe it was $4,000, right?

A. I don't recall.

Q. Do you recall saying it was only a thousand dollars?

A. I think that's what my husband said we were bringing with us.

Q. But I'm talking about you talking to the investigators, you only used the figure $6,000, isn't that true?

A. I don't recall.

Q. Well, you recall saying that several times, don't you, using that $6,000 figure; do you recall that?

A. Possibly.

Q. I'm going to play a couple of other clips if I may.

THE COURT: Just make a reference to the exhibits.

MS. LEVINSON: This is Defendant's Exhibit C.

THE COURT: Has it actually been introduced?

MS. LEVINSON: I will introduce it.

**(Defendant's Exhibit C previously admitted.)**

(Videotape playing.)

Q. (By Ms. Levinson) Did you hear yourself saying, "I made $6,000?"

A. Yes, and you know what, saying that in that state I just wanted it all to go away so my kids wouldn't be taken away from me.

Q. But you didn't say $4,000, right?

A. It's three and a half years ago, I can't remember all of this.

THE COURT: Ma'am, try to answer the question.

THE WITNESS: Yes.

MS. LEVINSON: May I?

(Videotape playing.)

Q. (By Ms. Levinson) Right there you said you would donate $6,000 to charity, right?

A. Was it to the Laliberte Toy Fund? No.

Q. But you said $6,000?

A. Charity.

(Videotape playing.)

Q. (By Ms. Levinson) Now at that time you didn't specify the Sonsini Dog Shelter either, did you?

A. No, not until we got into the courtroom.

Q. And when you got to the courtroom and you spoke to Mr. Buffis, you did suggest the Sonsini Dog Shelter in Pittsfield, right?
A. Correct.
Q. And he said no, this money should go to a charity in Lee that benefits the people of Lee because your crime occurred in the town of Lee, isn't that correct?
A. Yes. But having not heard of the Laliberte Toy Fund, I asked him could we do half and half, half go to the drug DARE and that never went.
Q. Well, he said that he would do half to DARE and half to Laliberte, didn't he?
A. He didn't do that.
Q. That's not my question. He said that half would go to DARE and half would go to Laliberte, correct?
A. Sure.
Q. And these were both charities that would have benefited the people of Lee, correct?
A. Correct.
Q. And it would make sense that the charities should benefit the people of Lee since the crime occurred in the town of Lee, correct?
A. Correct.
Q. Now you testified that you did consult with an attorney prior to going to the court hearing in Great

Barrington?

A. Correct.

Q. And that it was Attorney Wilson, is that correct?

A. Correct.

Q. And you and Tom actually went to meet with him in his office, correct?

A. Yes.

Q. You spent about an hour with him there?

A. Correct.

Q. And this was after your husband had made arrangements with Mr. Buffis to donate the proceeds of your prostitution, is that correct?

A. I have no recollection of that.

Q. Well, do you recall testifying in a grand jury proceeding in connection with this case?

A. I remember being there.

Q. And do you remember giving testimony?

A. As much as I can remember.

Q. And would it be fair to say that when you testified in front of this grand jury you told them that you had spoken to your lawyer about making a donation and he told you that that would be a thing that you could do, that's sometimes done?

A. Yes, correct.

Q. He told you that sometimes people make donations in

lieu of paying fines or restitution, correct?
A. Correct.
Q. That he saw nothing wrong with doing that, right?
A. Correct.
Q. Now you also testified a little bit about why you didn't bring an attorney to the magistrate's hearing with you, correct?
A. Correct.
Q. You said that it was because Mr. Buffis said that you didn't need to bring a lawyer with you, right?
A. Correct.
Q. But by the time you went to court that day, your husband and Mr. Buffis had already come to an agreement about the charges not going forward in exchange for your donation of the proceeds of prostitution to a charity, is that correct?
A. I just knew about the paper that he had drawn up and then we were going to discuss the amount and where it would go.
Q. Now when you walked into the courthouse that day for the show cause hearing, the magistrate hearing, you believed that the charges were not going to go forward, is that right?
A. I didn't know anything.
Q. So you didn't have any conversations with your

husband that led you to believe that there already had been an agreement?

A. I don't think my husband knew about that piece of paper.

Q. And would it be fair to say that you believed that there was an agreement, at least an understanding, that the charges would not go forward that day and that you would donate the proceeds to charity?

A. Yes and no, I mean.

Q. Let me break it down.

When you walked into court for that hearing, you believed that there would not be charges going forward?

A. We had hope. We had hope.

Q. And you hoped that the charges would not go forward because there had been discussions about donating the proceeds, correct?

A. That it would be a no -- no disclosure, I don't know what they call it. Without a finding, continued without a finding it would have been.

Q. So you believed that your case was going to be continued without a finding?

A. That's what we were hoping for.

Q. That's what you were hoping for?

A. Correct.

Q. And had you had discussions with your attorney about

that possibility?
A. Uh-huh.
Q. And would it be fair to say that he did not insist on coming to court with you, correct?
A. Correct.
Q. That he said if you're comfortable going without me, that's okay, right?
A. Correct.
Q. And you and your husband determined that you felt comfortable going forward without him?
A. Because we trusted Mr. Buffis.
Q. So you felt comfortable going to court without your attorney, correct?
A. Yes.
Q. And that's because you had some understanding or some hope that the charges were not going to go forward, right?
A. Correct.

MS. LEVINSON: If I could just have one minute, Your Honor?

THE COURT: Yes.

MS. LEVINSON: I have nothing further. Thank you.

MS. SHUKLA: Just brief redirect.

THE COURT: Uh-huh.

**REDIRECT EXAMINATION**

Q. (By Ms. Shukla) Ms. Viola, do you remember when Ms. Levinson asked you about all of the details for quite a long time about the sexual exchanges you had?
A. Her?
Q. Yes, the defense attorney.
A. Yes. Yes. Sorry.
Q. How did you feel having that displayed on the front page of the Berkshire Eagle?
A. Awful.
Q. How did that feeling affect your desire to give the defendant the $4,000 donation for his toy fund?
A. Awful.
Q. How did that relate to your desire to give the donation?
A. We didn't feel like we had a choice.
Q. Do you remember being shown your Internet ad?
A. Correct.
Q. Did you list your name on that ad?
A. No.
Q. Did you list your address on that ad?
A. I don't remember. It's been so long.
Q. Did you list how many children you had on that ad?
A. I don't think so.
Q. Would it refresh your recollection if I showed you the ad?

A. Yeah.

Q. Did you list how many children you had on that ad?

A. I don't see it unless I'm blind. No.

Q. What about your address?

A. No.

Q. So why didn't you list your name, your address, how many kids you had on the ad?

A. Why would I do that?

Q. Why didn't you do that?

A. Because I don't want some freak showing up at my house with my kids there.

Q. And did you show your face on that ad?

A. No.

Q. Why didn't you show your face on the ad?

A. I didn't want nobody to know who I was.

Q. Do you remember being asked some questions about the immunity you have from the federal government?

A. Uh-huh.

Q. Do you remember being asked about state charges?

A. Correct.

Q. What is the status of those state charges currently?

A. They're still there.

Q. Are they pending?

A. They're pending.

Q. And what sort of deal do you have with the

government, the federal government, regarding your charges in the state?

A. I have nothing.

Q. What sort of deal do you have with the state district attorney's office regarding your state criminal charges?

A. Nothing.

Q. What sort of deal do you have with the state district attorney's office regarding your testimony here today?

A. Nothing.

Q. Do you remember testifying that you didn't know about the agreement before you went to the hearing?

A. Correct. I didn't know about that.

Q. I'm going to show you Exhibit 13, if I can.

MS. LEVINSON: I'm going to object as being outside the scope of cross-examination.

MS. SHUKLA: This was asked about on cross about her knowledge of the agreement between her husband and Mr. Buffis.

THE COURT: I believe it was. I'm going to allow it.

Q. (By Ms. Shukla) When was the first time you saw this exhibit in Exhibit 13 that we looked at on your direct examination?

A. The one that he brought into the courtroom?

Q. Yeah, let me show it to you. Exhibit 13.

A. The day I got into the courtroom Mr. Buffis had it.

Q. Who brought this to the hearing?

A. Mr. Buffis.

Q. Do you remember being asked some questions about the $6,000 that you offered to charity to Mr. Meikeljohn, Sergeant Meikeljohn?

A. In this?

Q. No, I'm sorry. I'll take that off.

Back to your interview with Sergeant Meikeljohn and Officer Lucy, do you remember that?

A. Yes.

Q. Do you remember being asked questions about that by the defense attorney?

A. Yes.

Q. And do you remember being asked about the amount you offered to charity?

A. Uh-huh.

Q. What was that amount?

A. Six thousand, whatever I had in my account.

Q. So what does that six thousand represent?

A. In?

Q. Where did you get that number, $6,000?

A. That's what was just in my savings.

Q. Can you remind the jury what money you put into the account?

A. Some from the massages, I was renting my home, parties, and working at the Inn itself. That was my account, everything went into there.

Q. Do you remember offering that amount to charity when you talked to Sergeant Meikeljohn?

A. (Indicating.)

Q. What did Meikeljohn say to you -- Sergeant Meikeljohn say to you when you offered that money to him?

A. He can't take that; that has to be discussed at a different level.

MS. SHUKLA: I have no further questions. Thank you.

MS. LEVINSON: Just a couple.

**RECROSS-EXAMINATION**

Q. (By Ms. Levinson) You testified that you don't have a formal deal with the state prosecutors about charges that are pending?

A. Right.

Q. But as far as you know they are aware of the fact that you're testifying in this case today, correct?

A. I would assume, correct.

MS. LEVINSON: Thank you.

THE COURT: All right. Is that it?

MR. BRESLOW: Yes.

THE COURT: Ma'am, you can step down.

THE WITNESS: Thank you.

THE COURT: Can I see the attorneys at sidebar?

(Sidebar conference.)

THE COURT: So I formally said before that we would skip Friday as a trial day. I'm still fine to skip it as a trial day, but I want to float it out as to whether it's a possibility -- I mean, are you available if the jurors wanted to come in?

MR. BRESLOW: Yeah.

MS. LEVINSON: Well, I made plans but it's not the end of the world.

THE COURT: Did you?

MS. LEVINSON: I did.

THE COURT: I don't want to interfere with that.

THE CLERK: Judge, a few of the jurors had concerns.

THE COURT: They might but before I ask them I wanted to know if it was agreeable to you. Think about it and let me know in the morning. We can ask them. I don't want to interfere with your plans.

MS. LEVINSON: Okay. We will talk about it, and I will give you my exhibit list.

THE CLERK: I'll talk to both sides about the exhibits because today was messy.

THE COURT: You have to talk about exhibits and we need you to put in C and D, and I'd like to make a habit of marking for identification what you're refreshing the witness's recollection with.

THE CLERK: The stipulation needs to be marked as an exhibit as well.

MS. LEVINSON: It is.

THE COURT: That is.

THE CLERK: It was not. I don't know.

MR. BRESLOW: It's in there.

THE COURT: There's a lot, so we need to take some time in the morning or this afternoon to go over it. All right.

MS. LEVINSON: Yes.

THE COURT: We'll go on the record what needs to be marked now.

(End of sidebar conference.)

THE COURT: So I just want to go back on the record. Attorney Levinson, you were going to offer two exhibits, two things as exhibits, the recording that you have played now, is that defense -- where are we?

MS. LEVINSON: That would be Defendant's C.

THE COURT: It was one recording?

MS. LEVINSON: It's a clip. I have a little.

THE COURT: And that's the only one that you

used?

MS. LEVINSON: No, I also used the advertisement and that was Defendant's A.

THE COURT: All right. A, those are both admitted without objection?

MR. BRESLOW: No objection, Your Honor.

THE COURT: No objection, so those are admitted.

**(Defendant's Exhibit A admitted.)**

**(Defendant's Exhibit C previously admitted.)**

THE COURT: I just want to make sure because there's so many exhibits that we have them and we are keeping track of them. The other thing is that you refreshed the witness's recollection with a document, I believe it was a police report from Officer Lucy?

MS. LEVINSON: Yes.

THE COURT: That will be marked for identification only.

MS. LEVINSON: Okay.

THE CLERK: What's the next letter that you have?

MS. LEVINSON: That would be B. I'll do that B for identification.

THE COURT: All right. Fine.

**(Defendant's Exhibit B marked for identification)**

MR. BRESLOW: Your Honor, I know there was

discussion of the witness's grand jury testimony but I can't recall if that was actually presented to the witness.

THE COURT: I don't believe it was.

MS. LEVINSON: It was not.

THE COURT: All right. So, ladies and gentlemen, when we are referring to things as exhibits, all right, exhibits as I told you -- I told you a lot to keep in mind -- but exhibits, those are things you will get. You will see. You're going to have in your hands and you can read them as exhibits or you can listen to the recordings if they are exhibits.

We just talked about something and I said you can mark that for ID for identification. That's not an exhibit. All right. You will not get something that's marked for identification. So when you hear this, ladies and gentlemen, you will know what you're going to see and what you're not going to see.

So what was marked for identification was a document that was shown to a witness to refresh that witness's memory. That's not an exhibit. That wasn't in evidence and was used for a limited purpose to refresh the memory of the witness. You're not going to have that. That's the difference between an exhibit and what's marked for identification. All right?

Okay. So we have concluded for the day. I'm going to give you the instruction not to discuss the case with anyone, begin your deliberations, research the case in any way, try to access the case through the internet, and do not -- if there are any media reports, avoid them, turn them off. Do not read newspapers or articles about this case. All right? Very good.

A JUROR: Excuse me, Your Honor. What do we do with these? Do they stay here?

THE COURT: Just leave them right on your chair.

MR. BRESLOW: Two items, Your Honor. The first is could Your Honor ask the jury members who have headsets whether they're working and urge them to indicate to the court if they're not working.

THE COURT: Sure. Would you let me know? Are they working fine?

A JUROR: They're not really the best. They break up off and on.

THE COURT: Is Tom here tomorrow? Our tech person is in the building tomorrow. The last trial we had similar issues and he made it work a little better. We will try some other things in the morning. We will keep experimenting.

Are you able to up until this point, is it --

A JUROR: I've been able to follow most of it.

They're just very uncomfortable.

THE COURT: The headphones?

A JUROR: And you have to keep spreading them further apart so that they work.

THE COURT: Ma'am, are yours working all right?

A JUROR: Yeah, they're okay.

THE COURT: They're working okay.

THE CLERK: It may be that set.

THE COURT: Okay. We can try another set, ma'am. The jury is excused.

Could I see you at sidebar? I want to talk to you more about what you're hearing or not hearing during the trial.

A JUROR: What time here tomorrow?

THE COURT: Nine o'clock.

MR. BRESLOW: The second item, do you recall Ms. Levinson had asked that we have no objection to -- that the jury be instructed about contact with the parties.

THE COURT: Oh, yes. I've been informed during lunch break -- you're certainly allowed to walk around to go outside. So when you are walking around the building or walking outside, you should not have contact -- you should avoid contact with anyone involved in the case.

You shouldn't approach the attorneys. You shouldn't approach any of the parties or anyone that you see in the

audience that may be connected as family members or spectators. You should avoid that.

They're going to be avoiding you and they're not being with rude in any respect. You should not -- that's the rule, to stay away from jurors when they're walking around the building to avoid any potential appearance and you shouldn't even have a conversation. Smile and say hello and that's it. All right?

Ma'am, could I see you for one second?

A juror: Sure.

(The jury left at 4:33.)

(Sidebar conference.)

THE COURT: Hi. What's your name?

A JUROR: Sue.

THE COURT: Sue. Okay. What's your last name?

A JUROR: Hern.

THE COURT: Ms. Hern?

A JUROR: That's right.

THE COURT: Okay. We are at sidebar with Sue Hern. What's your number?

A JUROR: Five.

THE COURT: Very good. Juror No. 5. This juror has been using headphones, amplification headphones to assist her in hearing the proceedings, and we had a discussion on the record just a few moments ago because

there's another juror using the headphones as to whether or not they're working.

For one juror they seem to be working fine and you said this was working okay, and I want to make sure to determine if you think you're missing anything?

A JUROR: I don't think so. The hardest time was this last witness when she would cover her mouth but I was able to see enough that I inferred her answers, whether it was yes or no. She didn't give a whole lot of yes or no's.

THE COURT: I'll put on the record that's not unique to you. I was observing and having the same problem with the witness myself and then included the problem with the screen that was blocking the face and we had the screen removed.

A JUROR: Yes.

THE COURT: So are you confident that you have heard everything in this case and not missed any important pieces?

A JUROR: I don't think I've missed anything.

THE COURT: You don't think you missed anything?

A JUROR: Uh-uh, but I will say the longer I have to have that ear phone in my ear, the more painful it gets.

THE COURT: I know the last trial we had to get

something to work so Tom is familiar with it. Let's try to get Tom here first thing in the morning.

A JUROR: The juror behind me said if you open them both up, they work and he was right.

THE COURT: Some of them work better than others.

A JUROR: That's why I was sitting the way I'm sitting.

THE COURT: Do you have any questions regarding that?

MR. BRESLOW: Just to ask the court to encourage not just this juror but the other jurors and all of the jurors that if they cannot hear the testimony to please let the parties know.

THE COURT: We will do that in the morning.

MR. BRESLOW: Okay.

THE COURT: Thank you.

A JUROR: Thank you.

THE COURT: See you in the morning.

A JUROR: Yes.

(End of sidebar conference.)

THE COURT: We're good.

THE CLERK: All rise.

**(Court recessed at 4:27.)**

C E R T I F I C A T E

I, Alice Moran, RMR, RPR, CSR, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing transcript constitutes, to the best of my skill and ability, a true and accurate transcription of my stenotype notes taken in the above-entitled matter.

Date: September 8, 2016

/s/ Alice Moran

Alice Moran
Offical Court Reporter

Alice Moran, CSR, RPR, RMR
Official Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
413-731-0086
alice.moran@verizon.net