1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
2                          WESTERN SECTION

3

4

5

       United States of America    )
6                                   )         13cr30028-MGM
       vs                           )
7                                   )
       Joseph Buffis                )
8      _____)

9

10               **Thomas Fusco's Trial Testimony** Held Before
                   The Honorable Mark G. Mastroianni,
11            United States District Court Judge and a Jury,
                          on **May 21, 2015**.

12

13

14
       APPEARANCES:
15

16     For the government:  Steven Breslow and Deepika Shukla,
       300 State Street, Springfield, MA 01105.
17

18

19     For the defendant: Lori Levinson, Esq., 500 Main Street,
       Suite 2, Great Barrington, MA 01230.
20

21

22                    Alice Moran, CSR, RPR, RMR
                      Official Federal Court Reporter
23                    300 State Street, Room 303D
                          Springfield, MA 01105
24            Tel: (413)731-0086  Fax: (413)737-7333
                        alice.moran@verizon.net
25

```
 1                              INDEX
 2                          May 21, 2015
 3

 4

 5    Witness Name:                                    Page:

 6

 7    Thomas Fusco

 8

 9    Direct examination by Mr. Breslow                  15
10    Cross-examination by Ms. Levinson                 124
11

12    Ryan Lucy
13

14    Direct examination by Mr. Breslow                 177
15

16

17    Government's Exhibits:                           Page

18

19    20   Thomas Fusco's immunity letter              111
20    18   Tara Viola's immunity letter                113
21

22

23    Defendant's Exhibits:                            Page
24

25    None
```

```
 1    (Court commenced at 9:27.)

 2    (The defendant is present.)

 3              THE COURT:  Can I see the attorneys at sidebar,

 4    please?

 5    (Sidebar conference.)

 6              THE COURT:  Good morning.  Did you have any

 7    further thoughts about Memorial Day?

 8              MS. LEVINSON:  I did.  My daughter is coming

 9    home from Colorado so I'd like to take the day off.

10              THE COURT:  So Friday remains off.

11              MS. LEVINSON:  Yes.

12              THE COURT:  Upon reconsideration I think I've

13    made an error in one of my rulings that I want to correct.

14    The error was in prohibiting Ms. Levinson from going into

15    cross-examination regarding -- what's her name?

16              MS. LEVINSON:  Ms. Viola.

17              THE COURT:  Ms. Viola's lifestyle --

18              MS. LEVINSON:  Oh.

19              THE COURT:  -- the swinging lifestyle and use of

20    the Inn for that type or those types of druthers and

21    behavior.

22        The reason why I think I've made an error is after

23    listening to her testimony and considering the indictment

24    and the government's theory, the government's theory of

25    extortion is the potential or future loss or fear of loss
```

1   of business, business detracting from the Inn based upon

2   publicity related to I guess sexually nonconforming

3   conduct.

4        Ms. Viola testified that that type of pressure, which

5   would have mounted to extortion, also rose to the level of

6   the community knowing about her involvement in sexual

7   conduct that could be viewed as different from the

8   conservative norm; that off-color sexual comments were

9   made to her for instance she said in the grocery store and

10  she lost business because she was saying, well, if my

11  clientele had a reason of knowing that these kind of

12  things went on at the Inn they would not come stay there.

13       If you contrast that with her lifestyle and what

14  you've told me in these offerings regarding the swinging

15  and use of the Inn for those types of gatherings, it seems

16  to cut clearly against what she is trying to establish as

17  what was the pressure being extorted upon her would amount

18  to extortion that would support the extortion charge.

19       If she's running or engaging in swinging gatherings

20  at her Inn, then this type of information that might hit

21  the newspaper it's hard to see how it would have the

22  effect on her as she's portraying it would have.

23       If she is so concerned about what the people, the

24  conservative people in Lee think about her and that some

25  extortion type pressure that was being extorted upon her,

1    it's really hard to see how she can be running an inn that

2    promotes swinging and invite people who have that same

3    type of interest to the Inn and not worry about how the

4    conservative people of Lee view that, and so given that I

5    think that's now relevant after hearing her testimony.

6         I think that the fairest way to handle it is to allow

7    her to be recalled and that the government, if you choose,

8    address it first so you can get it out there and talk

9    about it in any way that you want to talk about it with

10   any other type of thing that you want to kind of try to

11   take the sting out of it and then let Ms. Levinson

12   cross-examine her.  The alternative would be just have her

13   called, put her back on the stand, and allow you to

14   cross-examine on the issue.

15             MR. BRESLOW:  Your Honor, if I may be heard

16   briefly?  The swinging activities were not publicly known

17   by the people of Lee.

18        What I would suggest is that Your Honor bring Tara to

19   testify at a hearing on the motion in limine outside of

20   the jury to establish -- to allow the government to

21   establish these basic facts which are this:  Swinging

22   activities were separate from the well-known public

23   activities of the Inn of Ms. Viola and Mr. Fusco.

24   Meaning, the greater community of Lee did not know that

25   they were engaged in swinging activities.

1          The swinging activities were confined to a closed

2     group of swingers who within that group knew and

3     understood that the activities were going on, but they had

4     a separate business life and a separate public life in

5     this community life that did not involve the swinging and

6     that the community did not know, and so I don't think the

7     swinging activities are relevant to that degree because to

8     the extent that she's talking about the prostitution

9     effecting her own reputation in the community, that

10    community was unaware of the swinging because it was a

11    closed activity.

12         Now there was some business, some Inn business that

13    was conducted for the swinging community, this separate

14    group of people, but the Inn would be closed for that

15    business.  In other words, people from the community would

16    not be staying at the Inn at the same time that the

17    swinging would take place but that I think was a

18    relatively small, you know, amount of business so the Inn

19    would not be able to survive, for example, solely on the

20    swinging.

21         So what I would recommend is Ms. Viola can come back

22    and give testimony on this point and if Your Honor after

23    Ms. Levinson had an opportunity to cross-examine her

24    outside the presence of the jury and Mr. Fusco as well,

25    then we could -- then Your Honor could really decide but I

1    don't think we have enough.

2           THE COURT:  So on those points, just her

3    involvement in the swinging life and type of activity,

4    even if I accept it completely as you said, just her

5    exposing herself to that type of risk of people knowing

6    about what she does undercuts her emphasis on the

7    extortion conduct being, well, people might know about

8    what I do, just her exposure to that type of risk being

9    involved in the swinging type behavior.

10      I appreciate it makes good sense to bring her in and

11   if she did testify in a way completely consistent with

12   what you have just told me, I'm not sure I would change my

13   ruling because I would be required to make some

14   credibility determinations regarding her, and I am at some

15   point not sure a credibility determination would favor

16   your suggestive take of the evidence and how I should look

17   at it.

18          MR. BRESLOW:  Well, I think I would like the

19   opportunity to have an *in camera* hearing in which Mr.

20   Fusco and Ms. Viola can testify about this, and to the

21   extent that Your Honor is persuaded by our argument and

22   accepts their testimony as credible Your Honor could rule,

23   and if Your Honor finds my argument not persuasive or the

24   facts somehow not compelling, then we can recall them to

25   testify.

1          MS. LEVINSON:  I'd like to bring out a point to
2    remind Mr. Breslow and Ms. Shukla and the court that
3    during jury selection we had a perspective juror from
4    North Adams who knew about the swinging.  She said isn't
5    that a swing place --
6          THE COURT:  That's true.
7          MS. LEVINSON:  -- or something like that so I
8    mean if someone knows about it in North Adams --
9          THE COURT:  That's not in evidence.
10         MS. LEVINSON:  No, but it's argument.
11         THE COURT:  Point well taken.
12         MR. BRESLOW:  I think what she said was she knew
13    that it was a swinging place.  We don't know how she knew
14    that was a swinging place.
15         MS. LEVINSON:  But she knew.
16         THE COURT:  What's your take on a voir dire type
17    of hearing outside the jury?
18         MS. LEVINSON:  Well, I don't know how much Ms.
19    Viola or Mr. Fusco would know about who knows about this
20    swinging or not.  I do know this woman out in North Adams
21    knew about it.  How do you know who knows what?  So that
22    might not be particularly relevant.
23         THE COURT:  I understand the point about who
24    actually knew because we have someone who knew.  I'm
25    concerned about her involvement in that activity creating

1    the risk of people knowing and that shows that her
2    threshold for being extorted by information about her
3    sexuality becoming public is way up here as opposed to how
4    she portrayed it.
5              MR. BRESLOW:  Well, I think there's a pretty
6    substantial difference in her view and quite possibly in
7    the public's view of people who are engaging in an open
8    marriage and something which is not illegal and you know
9    for all we know fairly common and people who are engaging
10   in criminal activity like prostitution.
11             THE COURT:  I agree.
12             MR. BRESLOW:  Those two are quite different.
13             THE COURT:  They are different but she's painted
14   the town of Lee a conservative town.  She didn't want
15   people to know and she was concerned about in that Lee
16   setting this being out.  So again I'm just drawing
17   inconsistences of behavior she chose to be involved in.
18   So consider what your issue -- what your response would be
19   to an *in camera* type of voir dire because we are going to
20   keep moving.
21             MR. BRESLOW:  Our next witness is Mr. Fusco and
22   he's going to give similar testimony that he was involved
23   in the swinging, and so what I'd like to know is even if
24   Your Honor accepts my proffer, is Your Honor's concern
25   that the risk is significant enough because I don't want

1    to be in the position of having to call back Mr. Fusco and

2    Ms. Viola and draw more attention to what really is a

3    satellite issue in the trial.

4        I think if Your Honor is inclined to admit the

5    evidence even with the government's proffer, then, you

6    know, I'd like a few minutes to prepare Mr. Fusco so that

7    his direct examination can encompass this.

8            THE COURT:  I accept the government's proffer at

9    sidebar as to what you believe the testimony would be but

10   accepting it doesn't persuade me that I should rule any

11   differently for the reason I've stated so I think you

12   should prepare your witness, and then I'm assuming you'll

13   want to call her back and deal with her and ask some

14   questions first before?

15           MR. BRESLOW:  Yeah, I think I'm a little

16   concerned about the court's decision to reconsider the

17   testimony in light of the fact that she's already been

18   excused.  Now we don't have an opportunity to sort of --

19   we're taking her out of order and I think this testimony

20   is going to be highlighted even more.

21       I think the government would be prejudiced and Ms.

22   Viola's credibility could be prejudiced with this now

23   coming out in this fashion, and so what I'd like the

24   opportunity to do is to see if the court would consider

25   after Mr. Fusco's testimony whether Ms. Levinson has

1    enough on this point that there would be no need to recall

2    Ms. Viola out of order on this point.

3               THE COURT:   That will I do.

4               MR. BRESLOW:   I will fully develop this with Mr.

5    Fusco.   I'll prepare him at this very late moment to be

6    cross-examined on it.   I don't think he's going to be too

7    happy.

8               THE COURT:   That's a fair offer.   Okay.

9        Let me just say on the record so I can respond to the

10   government's well articulated and good points regarding

11   whether or not the government would be prejudiced, I

12   certainly recognize the risk of and perhaps reality of the

13   government being prejudiced in the fact that the

14   government's witness may look bad in the context of

15   admitting the evidence now.   However, when I'm balancing

16   the prejudice against a man on trial for a criminal

17   offense and his right to a fair trial, I think the

18   prejudice to him and my needs to make sure that he can

19   fairly and fully cross-examine on topics that I think are

20   relevant tips the scale in favor of allowing this in.

21               MR. BRESLOW:   I understand the information will

22   be in.   What I'm saying is I just want the court to have

23   the opportunity to allow the parties, Ms. Levinson and I,

24   to fully ventilate, develop the issue through Mr. Fusco

25   and then consider whether it's necessary to recall Ms.

1    Viola for this sole purpose way out of order in the trial.

2           THE COURT:  Absolutely.  That's a good

3    suggestion.  All right.  Should we go forward now?

4           MR. BRESLOW:  I need a few minutes.

5           THE COURT:  Okay.

6           MR. BRESLOW:  Your Honor, we have no objection

7    to Ms. Levinson spending time with her daughter of course

8    and we are glad that she's going to take the time.

9           MS. LEVINSON:  The Grinch.

10          MR. BRESLOW:  While I'm preparing Mr. Fusco, I

11   think it would be important to advise the jury to pay

12   particular attention because they're going to be out of

13   trial Friday, Saturday, Sunday, Monday and to pay

14   particular attention to the witnesses because we don't

15   have a transcript.

16          THE COURT:  I'll do that and we lost a juror as

17   an alternate.

18          THE CLERK:  She has a stomach flu.  She called

19   last night.

20          THE COURT:  She is excused.

21          MR. BRESLOW:  Okay.

22          MS. LEVINSON:  Wow.

23          THE COURT:  I'm going to send them back to their

24   room right now and tell them I need ten more minutes.

25   (End of sidebar conference.)

1          THE COURT:  Good morning.  First I need to ask

2    you was everyone able to abide by my instruction not to

3    talk about the case, begin deliberations, not look it up

4    on the internet?  Did everyone avoid seeing anything about

5    this on the media?

6          THE JURY:  Yes, Your Honor.

7          THE COURT:  Thank you.  The jury remains fair

8    and impartial.

9        You will note we have one seat empty in the back row

10   so one juror has been excused.  An unexpected situation

11   arose so that the juror is excused which highlights the

12   reason you know that we took great lengths to try to get

13   enough alternates.  This is fairly early on.  Usually it's

14   not this early that a juror might have a reason to leave

15   but it happens and so that's why one juror is gone.

16       Something came up with the court that I was just

17   meeting with the attorneys about that we're going to need

18   approximately ten minutes to resolve that.  I understand

19   that you had some coffee and pastries and things brought

20   to you and so if you didn't finish and you have a

21   half-eaten bagel on the table, you can go finish it.  All

22   right.

23       Please do not discuss the case in any way, begin your

24   deliberations, or start researching the case.  I'll call

25   you back and we will start as soon as we can.

```
1    (The jury left at 9:41.)

2              THE COURT:  All right.

3              MR. BRESLOW:  Should we just send an e-mail to

4    your deputy when we're ready?

5              THE COURT:  Or I'll send her looking for you, so

6    either way.

7              MR. BRESLOW:  Okay.

8    (The jury entered at 10:09.)

9              THE COURT:  Ladies and gentlemen, were you all

10   able to follow my instruction not to discuss the case,

11   communicate in any way, investigate the case in any way?

12      All right.  The jury remains fair and impartial.

13      Okay.  So as we pick up testimony now, remember just

14   feel free if you can't see something or hear something to

15   just raise your hand and we will take care of it.

16      I will remind you that we will not be having court on

17   Friday because we have the holiday.  I know you're already

18   paying very close attention, but you will have to hold

19   this information so pay particular close attention.

20      Mr. Breslow.

21             MR. BRESLOW:  Good morning.

22             THE JURY:  Good morning.

23             MR. BRESLOW:  Good morning, Your Honor.

24             THE COURT:  Good morning.

25             MR. BRESLOW:  We call Thomas Fusco.
```

1          THE CLERK:  Raise your right hand.

2  **Thomas Fusco (sworn)**

3          THE CLERK:  State your name for the record.

4          THE WITNESS:  Thomas Fusco.

5          THE CLERK:  You may be seated.

6  **<u>DIRECT EXAMINATION</u>**

7  Q.   (By Mr. Breslow)  Good morning.

8  A.   Good morning.

9  Q.   Where do you live?  What town do you live in?

10  A.   I live in Lee, Massachusetts.

11  Q.   How long have you lived there?

12  A.   I have lived there about 20 years.

13  Q.   How far did you get in school?

14  A.   I graduated college.

15  Q.   Are you married?

16  A.   Yes, I am.

17  Q.   Who is your wife?

18  A.   Tara Viola.

19  Q.   How many children does Tara have?

20  A.   Tara has three.

21  Q.   Are they boys or girls?

22  A.   All girls.

23  Q.   Can you tell the jury how old are each of the girls

24  now without saying their names?

25  A.   Now the girls are 15, 14, and 10.

```
1    Q.    And do you yourself have children?
2    A.    I do.
3    Q.    How many?
4    A.    I have three.  I have two girls and one boy.
5    Q.    Can you tell the jury how old your children are
6    without saying their names?
7    A.    Now they are 25, 23, and 21.
8    Q.    Now in 2011 -- this question is going to require you
9    to do a little math, but going back a few years in 2011,
10   can you tell the jury how old Tara's children were?
11   A.    They were ten, nine, and six.
12   Q.    And the same question for your own children, how old
13   were your own children in 2011?
14   A.    Twenty-two, 20, and 17.
15   Q.    Now in 2011 where were you and Tara and these
16   children living?
17   A.    We lived at the Inn at Laurel Lake in Lee.
18   Q.    I'm showing you what's in evidence as Government
19   Exhibit 1.
20              MR. BRESLOW:  May I ask the deputy to put on the
21   monitors?
22   Q.    (By Mr. Breslow)  So I'm showing you what's marked in
23   evidence as Government Exhibit 1.  Do you recognize this?
24   A.    Yes, I do.
25   Q.    And in addition to living there in 2011, where were
```

1    you working?

2    A.   I was -- that's where I worked.  That was my home;

3    that was my business.

4    Q.   And where was Tara living?

5    A.   That's where Tara worked as well.

6    Q.   In 2011 who owned the Inn?

7    A.   I did, and then when we got married, we both did.

8    Q.   Tell the jury when did you purchase it?

9    A.   I purchased the Inn in 1996, April of '96.

10   Q.   And tell the jury why did you purchase it?

11   A.   Oh, boy.  Well, my ex-wife and I, her family was in

12   the motel business.  We liked the hospitality business.

13   We thought it was nice but we wanted something more

14   personable than handing the person a key and check them

15   out when they're done.

16        In the inn business, there's a lot more interaction

17   so we decided we wanted to look for an inn.  We looked a

18   long time and we finally found a place that was bad enough

19   that we could afford it and then fix it up and then make a

20   business out of it.

21   Q.   And tell the jury what condition was the Inn when you

22   bought it?

23   A.   The Inn was in very poor condition.  My predecessor

24   was over 90 years old when I bought it from him.  The last

25   bunch of years that he was there, he really didn't do any

```
1   upkeep on it.  It was just sort of a -- he was an older

2   man and he couldn't keep up with it.

3   Q.   How many rooms were at the Inn?

4   A.   There was 25 rooms overall but 19 of them were guest

5   rooms.  We had common areas, game room, dining room, music

6   room.

7   Q.   Tell the jury after you bought the Inn and it was a

8   little dilapidated or a lot dilapidated, can you tell the

9   jury what sort of work you put into the Inn to bring it up

10  to speed?

11  A.   Oh, gosh.  What I did personally, I sanded all the

12  floors.  We re-Sheetrocked all of the plaster.  We took

13  out a lot of carpeting; a lot of the carpeting was old and

14  stale.  We put a new front door in, rebuilt the front

15  porch, added a side porch, decorated it, took down

16  wallpaper, put up other wallpaper.  It needed a lot.

17  Q.   That's the work that you did yourself.  Can you tell

18  the jury about the work that other people did on the Inn?

19  A.   Yes.  We added many bathrooms to the Inn.  When I

20  bought it, it only had five private bathrooms.  My

21  predecessor, being 90, said don't waste money on

22  bathrooms, nobody wants them, but we quickly found out

23  that everybody wanted them so we put a lot of bathrooms in

24  the Inn.  We had a roof put on that was very expensive;

25  that was just a lot of money for the roof.
```

1    Q.    So can you tell the jury the condition of the Inn and

2    what it was like to live there in 2011?

3    A.    Yeah.   In my opinion the Inn was in pretty good

4    condition in 2011.   We had just done the new roof and that

5    was a big part of solving little things that would happen

6    inside, especially during the winter months with leaking

7    roofs and things along that line.   So when we fixed

8    things, they actually stayed fixed.

9         So the Inn itself, the condition of the Inn, I

10   thought was pretty good and it was going over well as far

11   as guest reviews goes so that's my bellwether ringer

12   whether I was in good shape.

13        As far as living there goes, I enjoyed it.   It became

14   a way of life for me because I had been there for 18, 19

15   years, probably 17 years at that point I should say, so it

16   was normal.   It was just a great place to raise the kids

17   because it gave me some freedom in the off-season to go

18   see the things the kids are doing, like plays in school.

19   The summer was difficult because I really didn't have time

20   to do anything, but most of the time I was able to be a

21   pretty good part of their lives.

22   Q.    And what was it like for your children to grow up in

23   the Inn?

24   A.    It was --

25             MS. LEVINSON:   Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  It was great.  I mean, I came from

3   Connecticut, which isn't too far away, but I came from a

4   part of Connecticut that's fairly far so I didn't get to

5   see family a lot so the guests that we had -- the core

6   group I would call them -- were very loyal.  They would

7   come back year after year.  When they started coming, my

8   youngest was about two years old and by the end of it she

9   was going to college.  So, sorry.

10  Q.   It's all right, Mr. Fusco.  Just take your time.

11  Take as much time as you need and if you feel at any point

12  like you need a recess, like you need a break --

13  A.   No.

14  Q.   -- if at any point you feel like you really need a

15  break, let the court know, ask the court for a break.

16  A.   Okay.  Sorry.

17  Q.   You were saying that your daughter was a young girl

18  when you bought the Inn?

19  A.   Right.

20  Q.   And toward the end?

21  A.   So the guests that would go there year after year

22  become very almost like grandparents or extra parents in a

23  lot of ways to the kids.  They would be very interested in

24  their personal life, their social lives.  Again, when it

25  came time to choose a college, they wanted to know where

1   they're going, what they're studying, how they're doing.

2   Q.   So this core group, they were like a sort of extended

3   family for you and the kids?

4   A.   Yeah, in an odd way, yes.

5   Q.   And can you tell the jury what sort of people was

6   this core group of customers that you had at the Inn

7   coming year after year?

8   A.   You mean what they did for a living?

9   Q.   Who they were generally.

10  A.   Oh, gosh.  One guy was an old Harvard lawyer who had

11  a practice in Providence, Rhode Island and he used to come

12  spend the entire summer with us.  He eventually closed the

13  practice and moved to Florida so he would get a room at

14  the Inn for two months.  We had investment people; we had

15  lawyers; we had doctors.  We had somebody that does book

16  publishing.  I'm just trying to think off the top my head

17  of some of these people, all walks of life really.

18  Q.   And can you tell the jury what percentage

19  approximately of your customers came year after year after

20  year?

21  A.   About 50 percent, about 50 percent.

22  Q.   And, briefly, where did these customers come from?

23  A.   Most of our customers came from the big cities; some

24  came from Boston, mostly from New York, New Jersey,

25  Pennsylvania, Vermont, New Hampshire.  They would come

1    from those areas, but we got some from as far out as

2    California; we'd get some from Washington D.C. and

3    Florida.  We had a family that would come up from Florida

4    every year and spend some time with us.

5    Q.   Can you tell the jury what work that you and Tara and

6    your children did at the Inn?

7    A.   Oh, goodness.

8    Q.   Take it in order, what work did you do?  What work

9    Tara did and then your children?

10   A.   I did pretty much everything.  I would be the one

11   that would greet the guests when they first got there.  I

12   would check out the bills when they left.  I would do the

13   laundry.  I would cook breakfast.  You know, stay up late

14   for the late arrivals and get up early for the people that

15   had to leave early.

16        As the owner of a small business like that, you

17   really don't have much of a choice.  You have to be there.

18   You have to be ready.  You have to do it, you know.

19        Tara did a lot of the cooking.  She helped with the

20   chambermaid staff some whenever needed if I was running

21   short or somebody was sick or you know somebody called in

22   I can't make it today.  Most of my chambermaids were

23   teenagers and it's a morning business so that happened

24   occasionally.

25        She also cooked at times.  I don't know if I just

1    said that or not, but she didn't do much in the way of the

2    laundry.  She would help me fold it but I would be the one

3    running up and down the stairs with stuff.  That's what

4    Tara did.

5        The kids, they started at a really young age.  They

6    would do a lot of the -- my kids I should say, they would

7    do the bussing of the dishes in the morning when the

8    guests were done with breakfast.  They would bring new

9    stuff out when it was ready like new eggs or whatever,

10   sausage and bacon, whatever that we were serving that day.

11   Then as they got older, my oldest started being the

12   chambermaid.  I made her the head chambermaid because she

13   grew up with it.  She knew exactly where we put everything

14   and what we did with everything.  She was very valuable

15   for me.

16       My son really wasn't that interested in it to be

17   honest with you.  He didn't really do a lot in the way of

18   work but he's doing good now.

19       My youngest again started in the kitchen part of it

20   and then she became one of the chambermaids when my oldest

21   was too old to help -- not too old too help but too old

22   and moved onto a different place.  My youngest became the

23   head chambermaid and she would have some of her friends

24   help her do the work.

25       Tara's kids they were very young while we were there.

1    I think the middle one liked to flip the waffle thing in
2    the morning and that's about pretty much all that she did,
3    and the youngest one was way too small to do anything and
4    the oldest one was much like my son that didn't want any
5    part of it.
6    Q.    Okay.  So in 2011 can you tell the jury who was
7    living at the Inn with you?
8    A.    Yes.  It was Tara and myself, part time her children
9    because their dad is a very good dad and they share
10   custody very well together.  So half the time they would
11   be at his house and half the time they're at our house and
12   then my youngest who was then 17.
13   Q.    And in 2011 how well did you and Tara and the
14   children enjoy living at the Inn?
15   A.    We loved it.  I mean for Kel -- sorry.  For my
16   youngest, that's all she knew.  She was three when we
17   moved up to the Berkshires so I mean it was just normal
18   for her.  She had her own room.  We had a finished fourth
19   floor apartment up there and she had her own room up there
20   and she loved being up there.  She also had the beach and
21   she'd have her friends over and come hang out on the dock
22   and it was a great place.
23        We used to have this thing every prom season where
24   the local high school would come to our backyard and take
25   pictures before the prom because where the prom was was

1    one mile up the street from our house and so it was kind

2    of perfect because we had a beautiful picturesque sort of

3    backyard so all the high school kids would come and take

4    their prom pictures.

5    Q.    Okay.

6    A.    Sorry.

7    Q.    It's all right.  Just take your time.

8          Okay.  In 2011 can you tell the jury how profitable,

9    if at all, the business was?

10   A.    It was a great business to work at.  It wasn't very

11   profitable.  The winters in the Berkshires are long;

12   they're quiet and they're cold.

13         When you have a 10,000 square foot building, the

14   heating bills can get up there and the electric bills can

15   get up there.  So it was a great place to live but a lot

16   of the money aspect of it was you made it in the summer

17   and you held on for the rest of the year so, yes, it

18   wasn't very profitable.

19   Q.    Can you tell the jury in 2011 how close to the edge

20   were you to losing your business and losing your home?

21   A.    That's really hard to say.  I don't think we were

22   right up along the edge because you always had the summer

23   coming and you know the money is going to come in once the

24   summer starts and it was sort of a normal position for me

25   to be in at that time.

1        I mean, every spring we're kind of looking at the

2   calendar saying, okay, the guests are coming.  It wasn't

3   comfortable but we weren't on the brink I don't think.

4   Q.   So assuming business would stay as usual, you could

5   survive there and make a living?

6   A.   Yes.

7   Q.   Okay.  Can you tell the jury what bank accounts you

8   operated at the Inn?

9   A.   We had two bank accounts at the Inn, one of them was

10  TD BankNorth out of Pittsfield.  That bank account is

11  where all the credit card deposits went.  I got a better

12  interest rate on the loan for the Inn if I had my money

13  deposited with them and so that's where the credit card

14  deposits went.

15       I had an NBT, which is a downtown Lee bank, account

16  which is much closer to the home.  When someone would pay

17  with a check or a traveler's check or any other form other

18  than a credit card, we would run the deposits down into

19  Lee because it was literally five minutes from the house

20  and in the summertime that's really what I got was five

21  minutes.  I don't have time to drive to Pittsfield and

22  fight the traffic and I just didn't feel comfortable

23  sending travelers' checks and checks through the mail so I

24  just dropped it off.

25  Q.   How busy was the Inn during the off-season?

1    A.    Not at all.  Actually it was cost prohibitive for me

2    to heat the Inn during winter months because you'd have to

3    keep a 10,000 square foot building heated while there's

4    nobody there.

5    Q.    I think you said it was cost prohibitive?

6    A.    Yes.  It didn't make sense to keep the building open

7    for guest traffic in the winter time.  We would have

8    certain areas like I had a wood stove in the basement and

9    we had a pellet stove and another pellet stove and we

10   would keep our living areas warm but not the whole Inn.

11        As a matter of fact, the kids' rooms that were on the

12   fourth floor weren't their rooms in the off-season because

13   to get the heat all the way up there was very hard so I

14   would move them down to different rooms during winter

15   months.

16   Q.    Can you tell the jury when the off-season was, like

17   from what month to what month approximately?

18   A.    Usually from mid-November until late April.

19   Q.    Now, if the Inn was basically not operating from

20   mid-November to late April, how important was the on

21   season or the spring and summer season?

22   A.    It was everything.  You know, if we didn't have a

23   good start to the season or a good season, then you would

24   never make it through the next winter.

25   Q.    Now, can you tell the jury a little bit about how you

1    and Tara arranged your own supposal finances?

2    A.   They were totally separate.  When Tara and I met, she

3    had her home; she had her bills.  I had my home; I had my

4    bills.  We each had our three children apiece so our

5    finances were never intermingled.  They were completely

6    separate.

7    Q.   Okay.  So if Tara couldn't pay her bills, were you

8    able to?

9    A.   I wasn't able to comfortably.  I mean, there were

10   times probably.  I don't recall if I ever did pay any of

11   her bills for her.

12   Q.   According to your financial arrangement, Tara had to

13   make her own way?

14   A.   Tara had to make her own way, yeah.

15   Q.   Now in about March Of 2011, did Tara decide to do

16   something to help make her own way?

17   A.   Yes, she did.

18   Q.   Can you tell the jury what did Tara decide to do?

19   A.   Prostitution.

20   Q.   And after she decided to engage in prostitution to

21   make her own way, did you agree with it or disagree with

22   that?

23   A.   I didn't really have an issue with it.

24   Q.   And can you tell the jury why?

25   A.   Because Tara and I had been involved in a lifestyle

1    for a little while at that point and it really didn't seem

2    that abnormal.

3    Q.   Okay.  So I'd like to take a few moments now and I

4    know it might be difficult, Mr. Fusco, tell the jury about

5    that lifestyle.

6    A.   Well, we were involved in a swinging lifestyle,

7    myself more than Tara to be honest with you.  She really

8    didn't do much.  I don't know how you want me to describe

9    it.

10   Q.   I'll just ask you the questions and you can just

11   answer them.

12        So can you tell the jury what a swinging lifestyle

13   means?

14   A.   It's couples generally that will go out and meet

15   other couples.

16   Q.   Okay.  And after the couples meet each other, if they

17   like each other, what can happen in a swinging lifestyle?

18   A.   You could end up having intercourse or sex with them,

19   but more often than not because it's a very difficult

20   thing to match up, let's put it that way.

21   Q.   So in a swinging lifestyle, do the partners have to

22   be compatible with each other?

23   A.   Very much so, yeah.  You have to make sure the other

24   couple is very honest with each other or things could get

25   messy.  We just almost most of the time we end up doing

nothing.

Q.   Okay.  Now, in a swinging lifestyle does each
partner, for example you and Tara, know that the other
partner is engaged in that lifestyle?

A.   Oh, gosh, yeah.

Q.   How do you compare the swinging lifestyle to say an
extramarital affair where a husband cheats on his wife or
the wife cheats on her husband?

A.   I would never cheat on Tara.  I mean, it's hard to
really describe this, but I guess the best way to put it
is there's a lot of openness and honesty between the two
of us.  I would never do anything behind Tara's back never
without her knowing and she would never -- I would assume
never would me either.  There's no reason to.  If I wanted
to do a certain thing, I would say this is what I want to
do and if she had any objections ever to it, I would just
never do it and she never did it.

Q.   Can you tell the jury about how many people were
involved -- how many other people were involved in this
lifestyle with you and Tara?

A.   You mean other people that we know, how many?

Q.   Other couples for example in this swinging lifestyle.

A.   I would say a rough estimate about 200, 250.

Q.   Two hundred people or 200 couples?

A.   About 250 couples.

1    Q.    So about 500 people altogether?

2    A.    That I know of, yeah.

3    Q.    That you knew, right?

4    A.    Yeah.

5    Q.    There might be other people in other parts of the

6    world or other countries but this was just your group?

7    A.    This was just our group.

8    Q.    And can you tell the jury where some of these people

9    came from?

10   A.    Oh, gosh, Connecticut, Massachusetts, Vermont, New

11   Hampshire, New Jersey, everywhere.

12   Q.    And, generally speaking, were these other people,

13   these 500 other people or so, were they married to other

14   spouses?

15   A.    Most are married, yeah.   Some are couples that are

16   not married yet or dating, you know, but mostly married.

17   Q.    Okay.   And can you tell the jury what kinds of jobs

18   these people had that you knew that you came to know and

19   get along with?

20   A.    You realize I only had about five minutes to think

21   about this, right?

22        I know nurses; I know doctors; I know lawyers; I know

23   State policemen; I know -- give me a minute.   I know

24   salespeople; I know office workers; I know a house

25   painter, electricians, a nurse too.   I just know a lot of

1   people in every walk of life really.  You name it, you

2   don't know what happens in private I guess.

3   Q.   Right.  Teachers?

4   A.   Oh, yes.  I forgot teachers, yes.

5   Q.   And can you tell the jury how it is that people in

6   the lifestyle would find each other?

7   A.   Well, the ways that I know -- there's lots of ways I

8   suppose but we went on a website, a swing lifestyle

9   website.

10  Q.   And was that a website that was focused on a

11  particular subject or was it a website where you could go

12  shopping?

13  A.   No.  Well, there are different things you can do on

14  there, but for the most part it's set up just for

15  swinging.  They have parts where they'll advertise for

16  swinging cruises and this and that, but we never did that

17  kind of thing.

18  Q.   And on this website can you tell the jury was there

19  anything called a cert?

20  A.   Yes, it's a certification.  In other words, if we

21  were to go out and we meet somebody -- it's like anything

22  else, you got to be really careful with that kind of

23  thing.  If we go out and we meet a couple that's off or

24  something is wrong or fighting all the time, you don't

25  want to say, hey, go out and meet this couple, they're

1    really great.  A certification means we went out, we met

2    these guys, they're really great, we had a nice time

3    talking to them, and who knows, things might end up

4    different.  For what it's worth, a cert is like that.

5    Q.   Can you tell the jury the swinging lifestyle that you

6    and Tara had, can you tell the jury what steps, if any,

7    that you took to keep it private?  And when I say private,

8    I mean private to you and Tara and private to this group

9    of people that you were swinging with?

10   A.   Up until now, we've kept this very private.  Nobody

11   knows, no kids know, her family doesn't know, my kids

12   didn't know.  Nobody knew.

13        We would -- if any time any of the kids or anything

14   were to be at our house, my kids were home from school,

15   her kids there, never ever did we participate in anything

16   along that line.  It's something that you don't want to

17   just let everybody know that you're doing.

18   Q.   And what steps, if any, did you take to keep your and

19   Tara's swinging private in the community of Lee where you

20   live for so long?

21   A.   The only thing we did is we would put our profile on

22   that website and that's it.  We just tried to keep it away

23   from the general public.

24   Q.   And why, why did you try to keep the swinging

25   activities away from the general public in Lee?

```
1    A.    Because things that two adults do together with trust
2    in one another isn't necessary for everybody to know.
3    There's a time and place for everything to be known and
4    this is not it.
5    Q.    And when you say this, are you referring to this
6    courtroom right here?
7    A.    Yes, I am.
8    Q.    All right.  So approximately how long ago did you
9    learn you would have to testify about this material?
10   A.    Well, if I've been here ten minutes, then 15.
11   Q.    And how did it feel for you to learn just 15 minutes
12   ago --
13              MS. LEVINSON:  Objection, Your Honor.
14              THE COURT:  Sustained.
15   Q.    (By Mr. Breslow)  What are you going to have to do
16   tonight when you leave the court?
17              MS. LEVINSON:  Objection.
18              THE COURT:  Sustained.
19   Q.    (By Mr. Breslow)  Mr. Fusco, you indicated that your
20   children and Tara's children did not know and do not know
21   today that you and your wife, their mother, are engaged in
22   swinging?
23   A.    That is correct.
24   Q.    Tell the jury why.
25   A.    Because we want to keep things away from the
```

1    children.  We want to keep things away from our family,

2    things that people -- certain people don't have to know.

3              MR. BRESLOW:  Your Honor, may I approach

4    sidebar?

5              THE COURT:  Sure.

6    (Sidebar conference.)

7              MR. BRESLOW:  So, Judge, there were two

8    questions that I asked to which you sustained objections

9    and I can't recall exactly the questions, but I think the

10   questions were how did it make you feel to have to testify

11   in court in public about your swinging activities, and the

12   second question was what are you going to have to do when

13   you go home tonight.

14       These questions are entirely relevant to the subject

15   matter that Ms. Levinson wants to explore and that is the

16   nature of this activity, private versus the nature of it

17   becoming public.

18       Ms. Levinson's entire thrust in terms of wanting this

19   area ventilated, and your recent decision to reconsider

20   it, is based on the fact that, well, they might not be,

21   you know, as concerned about the risk of this getting out

22   as one might -- as an ordinary person might be in

23   prostitution.

24       So I think it's entirely proper for this witness to

25   tell the jury how it feels to tell the public or to have

1    the public know that he's engaged in swinging and that's

2    exactly the point that Ms. Levinson wants to address, and

3    I think that --

4              THE COURT:  Okay.  I got the point.

5              MS. LEVINSON:  I still don't think that that's

6    particularly relevant because as I brought up, I mean, he

7    doesn't know what people know and what's known in the

8    community, and I do want to question him on that fact.

9              THE COURT:  You know, I think considering the

10   extent that I'm sure your cross-examine is going to go to,

11   which includes contrasting what he's saying about this

12   versus what he put themselves up on the worldwide Internet

13   about it, your cross-examine I can imagine is going to go

14   quite a distance on this and I will let you have it.

15             MR. BRESLOW:  Thank you.

16   (End of sidebar conference.)

17   Q.   (By Mr. Breslow) Mr. Fusco, how long ago

18   approximately did you learn that you would have to testify

19   to this jury in open court about your and Tara's

20   lifestyle?

21   A.   About five minutes before I came in here.

22   Q.   Okay.  And how did it feel for you to learn that you

23   would have to give that testimony?

24   A.   I had two things to consider:  Myself, about me it's

25   not that important.  I will tell you the truth.  I'll talk

1    to you.  I'll tell you what it is.

2         About Tara, it's completely different.  My kids are

3    older; they're out of the house.  My family is from

4    another state.  They'll hear it because I'll tell them.

5    Tara's got young girls, impressionable girls, teenage

6    girls, underage girls.  They don't need to hear this.

7    Their friends don't need to hear this.  People that she

8    associates with don't need to hear this.  This has nothing

9    to do with anything.  I'm very upset about it actually.

10              THE COURT:  I will strike the last portion.

11              THE WITNESS:  I am.

12   Q.   (By Mr. Breslow) Mr. Fusco, please just wait and let

13   me ask you a question.

14        Mr. Fusco, how old is Tara's youngest daughter?

15   A.   She's ten.

16   Q.   And what schools do they go to, her daughters?

17   A.   She goes to a school called Muddy Brook where she's

18   going to be graduating this year and going to middle

19   school next year.

20   Q.   Are those public schools?

21   A.   Public schools.

22   Q.   Where are they located?

23   A.   Great Barrington, Massachusetts.

24   Q.   How far is that from the town of Lee?

25   A.   Ten minutes.

1    Q.    And, Mr. Fusco, tell this jury what are you going to

2    have to do with your children and with Tara's children

3    when you leave court?

4    A.    First of all, I'm going to have to tell Tara and then

5    we're going to have to talk to our kids about something

6    that I don't want to talk to them about, and then I'll

7    have to call my kids and I will have to tell them that

8    too.   My brother, he knows.   I don't have to hide anything

9    from my brother.   But I think this information is probably

10   better off coming from me than it is from wherever else

11   they might hear it from.

12   Q.    So your brother knows?

13   A.    Yes.

14   Q.    Does anybody else in your family know?

15   A.    Probably not.   I think my mom may suspect something

16   but probably not.

17   Q.    And tell the jury what steps you and Tara have taken

18   to keep your private lifestyle private?   And when I say

19   that, I mean with respect -- I'm asking you the same

20   question basically twice.

21        Tell the jury what steps you've taken until this very

22   moment to keep your private lifestyle private from your

23   children, and then the second question will be from the

24   public, so focus now on your children?

25   A.    Yeah, from the children, there's the website.   The

1    website is not going to be found on our computer history

2    at home.  It's deleted every time.  They've never heard of

3    these websites before.

4         We don't do anything when they're in any sort of

5    earshot.  If they're at our house, we stay at home.  For

6    all exterior appearances, we're mom and pop that sit at

7    home with our kids every night.  When the kids aren't

8    there, they often razz us about not having any social life

9    at all because that's the way it appears.  That's the way

10   we wanted it to appear.  That's the way we made it appear.

11   That's the way we've been able to keep it for the couple

12   of years that we've been doing that, that's the way we do

13   it.  I'm not going to say painstaking but we are careful.

14   Q.   Now, Mr. Fusco, I want to ask you the same question

15   with respect to the public, what steps have you taken --

16   let back up a moment and I want to ask about your public

17   life, your community life.  Tell this jury please what

18   you've done in the community of Lee over the years?

19   A.   I coached a youth softball team.  The defendant's

20   daughter was one of my players.  I coached a basketball

21   team.  You know, I've done a lot of parenting things with

22   the Boy Scouts and Girl Scouts, that's really about it.

23   Q.   Okay.  Now, as a former basketball coach for a youth

24   league, a former softball coach, and someone involved in

25   Boy Scouts, did you say Girl Scouts too?

1    A.    Well, my daughter was, yes.

2    Q.    So as a member of the Lee community, can you tell

3    this jury what steps, if any, that you took to keep your

4    private life style private for the community of Lee?

5    A.    Well, just no one knew.  I mean, it was just we kept

6    it to the website into the community that other people

7    that were in that particular lifestyle would look at.

8    Q.    Did you want your private lifestyle to make public to

9    the community in Lee?

10   A.    Absolutely not.

11   Q.    Tell the jury why not.

12   A.    There's a big difference between keeping something

13   private and putting something in the newspapers.  The

14   choice that my wife and I make with one another and the

15   trust that we have in one another, that particular

16   lifestyle that if you're not in, you might not understand

17   it.  If you're in there and you have a relationship where

18   you're open enough with each other, it's different.

19   Q.    Now you mentioned the newspapers, what do you think

20   -- what do you expect you're going to read in tomorrow's

21   newspaper?

22              MS. LEVINSON:  Objection.

23              THE COURT:  I'll allow it.

24              THE WITNESS:  I can pretty much read it to you

25   already.  It's just going to be trashing the people that

1    are here to say what happened to them and it's going to

2    divert all attention from why we're here onto that

3    subject, which to me is just insane.

4            THE COURT:   Strike that last portion of the

5    witness's answer about his opinion.  Did you hear I struck

6    the last portion of the witness's answer where he

7    expressed his opinion.

8    Q.   (By Mr. Breslow)  Mr. Fusco, I only asked you what

9    you expected to read in the newspaper.

10           All right.  I want to return now to Tara's decision

11   to engage in prostitution in March of 2011.

12   A.   Okay.

13   Q.   Can you tell the jury why you agreed for Tara to

14   engage in prostitution in 2011?

15   A.   Because I didn't really feel it was a big deal.

16   Q.   And did Tara have to pay her way in the marriage?

17   A.   Yes.  Like I said before, she had her own set of

18   bills coming into it.  If the Inn was successful enough,

19   I'm sure that never would have come around to it.  You

20   know, if I could have helped her, I could have paid for

21   things but it wasn't.

22   Q.   Now, can you please tell the jury how did Tara

23   advertise for her customers?

24   A.   She advertised on backpage.com and occasionally would

25   put an ad on Craig's list.

1    Q.    Tell the jury what help, if any, did you provide to
2    Tara?
3    A.    I would occasionally take pictures.  Most of them
4    were vacation pictures and then help her post an ad or
5    two.
6              MR. BRESLOW:  Your Honor, may I approach defense
7    counsel?
8              THE COURT:  Yes.
9              MR. BRESLOW:  Your Honor, may I approach the
10   witness?
11             THE COURT:  Yes, you may.
12             MR. BRESLOW:  I'm showing the witness
13   Defendant's Exhibit A.  I'm not going to publish this to
14   the jury.  They've already seen it.
15             THE COURT:  Very well.
16   Q.    (By Mr. Breslow) Do you recognize that?
17   A.    Yes, I do.
18   Q.    You said that you took photographs of Tara to help
19   her advertise for her customers?
20   A.    Yes.
21   Q.    Who took those photographs?
22   A.    I did.
23   Q.    Who helped her post the ad?
24   A.    I did.
25   Q.    Okay.  Now generally can you tell the jury where you

```
 1     were physically when Tara provided sexual services for a
 2     fee at the Inn?
 3     A.    A couple of rooms away.  There was a room in the back
 4     and then there was the kitchen and then there was my room
 5     and I would generally be in my room.
 6     Q.    Please tell the jury why were you a few rooms away
 7     when Tara provided sexual services for a fee at the Inn?
 8     A.    Because if I heard a lot noise or yelling, then I
 9     could get there.
10     Q.    Okay.  Now, Mr. Fusco, I'd like to focus you on a new
11     topic.
12          Can you tell the jury what happened at the Inn on
13     January 19, 2012?
14     A.    Yes, the police showed up.
15     Q.    And did you ultimately learn the identity of some of
16     those officers who showed up at the Inn?
17     A.    Ultimately, yes, I did.
18     Q.    Who were some of the officers?
19     A.    I guess they were members of the Berkshire County
20     Drug Task Force.  There was also Chris Meiklejohn from the
21     Massachusetts State Police and Officer Ryan Lucy from the
22     Lee Police Department.
23     Q.    Now, tell the jury how did you feel when the police
24     showed up at the Inn?
25     A.    I was kind of surprised actually.
```

1    Q.   Now, after the police showed up, did they end up

2    talking to Tara?

3    A.   Yes, for quite awhile.  When they first arrived, the

4    dogs were barking.  I didn't know why the dogs were

5    barking so I went out into the kitchen where there was an

6    officer standing in the kitchen.  Tara was in the back

7    room for the better part of an hour talking to I'm

8    assuming some of the officers.

9    Q.   And after Tara spoke with the officers for quite

10   sometime, did you see Tara?

11   A.   Yes.  She came out of the back room.

12   Q.   Now tell the jury how did Tara look to you?

13   A.   She was -- her eyes were swollen.  She obviously had

14   been crying.  She was upset, clearly upset.  Yeah, that's

15   the best way to describe it.

16   Q.   Now, did you have a brief conversation with some of

17   the police officers?

18   A.   Umm, during the 45 minutes to an hour, yes.  We

19   really just talked about the upcoming Patriot game that

20   weekend, and then when Tara came out -- well, before she

21   came out I should say, I said what are you here for to one

22   of the officers?  And he responded, "you know what I'm

23   here for."

24   Q.   And how did you respond to the officer?

25   A.   "No, I don't."

1    Q.    Now, was that true?

2    A.    I knew why they were there.

3    Q.    Why were they there?

4    A.    They were there because of the prostitution.

5    Q.    Now tell the jury why did you lie to the officer?

6    A.    To protect my wife.

7    Q.    And who else did you want to protect?

8    A.    Well, ultimately I wanted to protect the business, my

9    wife, the kids, her kids and mine, our families, a lot of

10   reasons.

11   Q.    What about you?

12   A.    Yeah, I said myself, yes.

13   Q.    Okay.  Now, after Tara spoke with the police for

14   awhile where did she go?

15   A.    She went down to the Lee Police Department.

16   Q.    And who went with her?

17   A.    I'm not exactly sure who was in the car with her but

18   I think it was Ryan Lucy and probably Chris Meiklejohn.

19   Q.    Now, was Tara arrested?  Did they take her off in

20   handcuffs in custody?

21   A.    No, she was not.

22   Q.    What about you?

23   A.    No.

24   Q.    Were you arrested?  Were you placed in handcuffs and

25   taken to the police station?

1    A.    No, I was not.

2    Q.    Well, did the police ever arrest Tara on January

3    19th?

4    A.    No, they did not.

5    Q.    Did the police ever arrest you on January 19th?

6    A.    No, they did not.

7    Q.    Well, what about the next day, were either of you

8    arrested at any time?

9    A.    No.

10   Q.    Now I'd like to focus you on a new topic.

11        Tell the jury what happened later that night on

12   January 19th?

13   A.    We received a call from a mutual friend, let's say,

14   that there was an article in the Berkshire Eagle online

15   about a prostitution arrest made at the Inn at Laurel

16   Lake.

17   Q.    Was it about a prostitution arrest or two prosecution

18   arrests?

19   A.    Two prostitution arrests.

20   Q.    Did you read that article?

21   A.    Yes, I did.

22   Q.    And who, according to that article, was arrested at

23   your Inn for prostitution?

24   A.    Both Tara and myself were arrested and arraigned.

25   Q.    Now, were you with Tara when she saw that article?

1   A.   Yes, I was.

2   Q.   Tell the jury how did she react when she saw news

3   online that she had been arrested for prostitution?

4   A.   It was crippling.  I don't even know how to describe

5   it, very, very depressed.  I mean, very, very upset, very

6   worried.  Tara's got a disease called crohn's and it's an

7   intentional disease and stress brings on harsh crohn's

8   attacks, and she was having every bit of every attack that

9   you can imagine that night.

10  Q.   Now, was your name in the paper too?

11  A.   Yes.

12  Q.   And what did it say about you?

13  A.   That I was arrested and arraigned also.

14  Q.   Now tell the jury how did it feel to see your name in

15  the paper as being arrested for prostitution when you had

16  not been?

17  A.   Almost unbelievable really.  I mean, you expect

18  things that you read in the paper to be true.  It wasn't,

19  but it was very embarrassing, worrisome that again

20  everybody was going to hear it.

21  Q.   Now you just said that it was worrisome.  Can you

22  tell the jury who or what you were worried about when you

23  saw news online that you both had been arrested at your

24  Inn for prostitution?

25  A.   Who wasn't I worried about?  I was worried about her

1    children, their reactions to their friends at school.  We

2    live in an age where you just type a few keys and

3    everybody can read everything.  My oldest daughter -- my

4    youngest daughter, I'm sorry, was a senior in high school

5    at that time, and that's -- sorry.

6    Q.    Mr. Fusco, just take a moment.  You don't have to

7    rush through this.

8    A.    Yeah.  Okay.  The senior year is the last year

9    they're really going to be home with you all the time, you

10   know, college and then life happens after that, so I

11   really wanted her last year to be special.

12   Q.    All right.  Mr. Fusco, that night, January 19th, did

13   you know who had told the Berkshire Eagle that you had

14   been arrested for prostitution with your wife at the Inn?

15   A.    No, I did not.

16   Q.    And as you sit here today, do you know who told your

17   wife -- told the Berkshire Eagle that you and your wife

18   had been arrested for prostitution at the Inn?

19   A.    No.

20   Q.    Now, Mr. Fusco, I want to focus you on what happened

21   the very next day.  Can you tell the jury what happened on

22   the morning of January 20th?

23   A.    We had two different news vans show up in the parking

24   lot at the Inn.

25   Q.    And how did you react when you saw two news vans show

1    up in your parking lot?  That's where you lived, right?

2    A.    Yes, that's where my oldest -- my youngest daughter

3    lived too.

4    Q.    Tell the jury how you felt when you saw two news vans

5    show up in your own driveway?

6    A.    Sick.

7    Q.    And did Tara see the news vans show up in your own

8    driveway the next morning?

9    A.    Yes, she did.

10   Q.    How did she react?

11   A.    She was already in a bad place so it didn't -- you

12   know, it's hard to tell an immediate reaction but it added

13   to it.

14   Q.    How many times before had any news vans showed up on

15   your own driveway?

16   A.    Never.

17   Q.    Now, did you happen to read the Berkshire Eagle the

18   next morning?

19   A.    Yes, I did.

20   Q.    And can you tell the jury what did you read in the

21   Berkshire Eagle the next morning?

22   A.    I read the article about the day before.  They had

23   edited their online article.  Their online article said

24   arrested and arraigned, but the printed article didn't

25   have the arrest and arraigned part in there.

1    Q.    Okay.  But what generally did the printed article say

2    in the newspaper?

3    A.    Prostitution alleged at the Inn at Laurel Lake.

4    Q.    And that was your Inn?

5    A.    Yes.

6    Q.    And who was alleged to have engaged in prostitution

7    at the Inn according to the article?

8    A.    Both my wife and I.

9    Q.    Your names were in print?

10   A.    Yes.

11   Q.    And where in this newspaper was this article?

12   A.    Front page.

13             MR. BRESLOW:  I'm publishing to the jury, Your

14   Honor, page 5 of Government Exhibit 5.

15   Q.    (By Mr. Breslow)  Do you recognize this newspaper

16   article?

17   A.    Yeah.

18   Q.    It's hard to read.

19   A.    I do recognize the article, yeah.  I probably

20   couldn't read off of it but I do recognize it.

21   Q.    Do you recall who wrote it?

22   A.    Yes, I do.

23   Q.    Who wrote it?

24   A.    Dick Lindsay wrote it.

25   Q.    And this is the Berkshire Eagle newspaper article

1    that greeted you and your wife that morning?

2    A.    Yes, it is.

3    Q.    Now, how did Tara react when she saw that article?

4    A.    Well, I guess we knew it was coming but she was very,

5    very distraught, very upset and crying.  She actually

6    wouldn't get out of bed.  She stayed in bed for

7    approximately two or three days and it finally got to the

8    point where I called her family.  Her father had to come

9    over and say you get out of that bed.  You get up and you

10   eat something or else.

11   Q.    And how did you react when you saw your name

12   plastered on the front page of the Berkshire Eagle?

13   A.    It just felt like the world was collapsing around

14   you.  Like, hey, for the most part of my life I was an

15   anonymous guy, nobody knew really much about me other than

16   youth coaching and now all of a sudden like everywhere you

17   walk, there's a spotlight on you.  It just felt horrible.

18   Q.    Mr. Fusco, I'd like you to take a look at your jury

19   binder and look at Government Exhibit 5, which is already

20   in evidence.  I'm showing you page 5 of 5, but I want to

21   focus you on the entire exhibit now.  I'm going to publish

22   to the jury the first page of Government Exhibit 5.

23        So what I'd like you to do is just page through the

24   exhibit and ask you to keep a count of how many articles

25   similar to the Berkshire Eagle article in the newspaper

1    are in that exhibit.  And as you page through that I also

2    want you to keep note of the types of locations the news

3    media, where they are, so that you can tell the jury

4    generally what Government Exhibit 5 consists of.

5         As you do, I'm going to show the jury page 3 of

6    Government Exhibit 5.

7    A.    Okay.  I counted 25.

8    Q.    Twenty-five articles.  And can you tell the jury

9    where some of those articles were from, some of the

10   articles that were both close to your home and far away?

11   A.    Okay.  Obviously the Berkshire Eagle.  Then there was

12   MassLive.com, there's Boston, there's the Albany Times

13   Union.  I thought I saw one here from like Ohio.  New

14   York, I already said that with Albany.

15   Q.    Now you mentioned New York.

16   A.    Washington.

17   Q.    You mentioned New York, did you have customers in New

18   York?

19   A.    Yes, I did.

20   Q.    You mentioned Washington, did you have customers in

21   the Washington area from time to time?

22   A.    Yes, I did.

23   Q.    You mentioned Albany, do you have customers who came

24   from Albany from time to time?

25   A.    Yes.

1   Q.   Okay.  I want to focus you on page 3 of Government

2   Exhibit 5, which is in front of the jury.  You mentioned

3   MassLive, do you know what MassLive is?

4   A.   Not really.

5   Q.   Okay.  Is it an online website?

6   A.   Yes.  It says MassLife.com so I'm assuming it's stuff

7   about Massachusetts that's online, yes.

8   Q.   Focusing your attention on page 3, when was this

9   article published?

10   A.   January 20th -- sorry, it was originally published

11   Thursday, January 19, 2012 at 7:24 p.m.

12   Q.   When was it updated?

13   A.   It was updated Friday at 8:47 in the morning the next

14   day.

15   Q.   And can you read into the record the first two

16   sentences?

17   A.   You mean the highlighted?

18   Q.   No.  Just read the first sentence.  I've highlighted

19   it for you.

20   A.   I got it.

21   Q.   Just read the first sentence highlighted.

22   A.   "The owners of a bed and breakfast near Laurel Lake

23   are in trouble with police for apparently providing more

24   than just a place for weary travelers to put up their feet

25   and unwind."

1    Q.   Can you continue please?

2    A.   "The Berkshire Eagle is reporting Tara Viola, 39, and

3    her husband Thomas Fusco, 47, owners of the Inn at Laurel

4    Lake were arrested Thursday afternoon on charges related

5    to prostitution."

6    Q.   So this is what was on MassLive the very next

7    morning, January 20th, and as of January 20th had you been

8    arrested for prostitution?

9    A.   No, I had not.

10   Q.   Had Tara been arrested for prostitution?

11   A.   No, she had not.

12   Q.   Do you know who told the Berkshire Eagle that you had

13   been arrested for prostitution?

14   A.   No, I do not.

15   Q.   Now, I'd like to focus you on another topic.

16        Can you tell this jury how articles like that

17   affected your business, if at all?

18   A.   It had a huge affect on my business.  The immediate

19   affect was a wedding party -- a wedding party that I had

20   scheduled for the 25th and 26th of May of that year, it

21   was a 19-room sellout for two days associated with a

22   dinner for a hundred people.

23   Q.   Now tell the jury when that wedding had been reserved

24   for?

25   A.   The wedding was reserved for May 25th and 26th of

1    2012, and that's a really good time for us to get a

2    wedding party because it's the season when we really need

3    to get going.  It would be a great kickstart to the

4    summer.

5    Q.    Now I think you said it was a 19-room sellout and a

6    dinner for how many people?

7    A.    Approximately a hundred.  They weren't quite sure but

8    they were assuming about a hundred would respond;

9    sometimes it goes a little higher, sometimes a little

10   lower.

11   Q.    Tell this jury how important was it for your business

12   to lose a 19-room sellout with that big a dinner?

13   A.    Very important.

14   Q.    Why?

15   A.    Because we just came out of a long winter.  We just

16   heated a building; we just paid the electrical bills and

17   the garbage bills and all the other bills, and you eat

18   away at your savings from the previous summer and then you

19   get an injection of cash right before the season starts,

20   you could pay all your bills and get ready for the

21   incoming guests.

22         Sometimes, you know, even though the guest rooms

23   don't get used a lot in the winter months, you'd be

24   surprised what happens in them.  Sometimes you got to buy

25   new towels or you run out of soaps and stuff and so you've

1    got to reload and get ready for the next guest traffic.

2    Q.    Now, in addition to this large wedding cancellation,

3    did you have any other large reservations or large events

4    that you did not book at the Inn in this year that

5    followed the false report in the Berkshire Eagle?

6    A.    Yes.

7    Q.    Tell the jury what some of those events were.

8    A.    We had a gathering planned for the Saturday night

9    after.   This was Friday morning and we had a gathering

10   planned for the 21st and once the news trucks showed up in

11   the driveway, immediately we cancelled that.

12        We had several groups that would book the Inn for

13   different times every year.   We had a family group that

14   would do every other Thanksgiving and this was their year

15   to do their Thanksgiving.   They had been there about eight

16   times during the course of my ownership and they all loved

17   it.   They would come up and I never heard from them again.

18        We had another group in November that would come up

19   the first week of every November.   You know, sometimes the

20   second but mostly the first week of every November.

21   That's another group I never heard from again.   So there's

22   the direct things that you say I got an e-mail, this is

23   why I'm canceling and there's other things that you

24   suspect but you don't really know, you know?   I don't know

25   why the family group didn't come back or didn't return my

1    calls.  I don't know why the other group in November

2    didn't come back or return the calls, but I pretty much

3    could figure that out I think.

4    Q.   So you called the Thanksgiving group, the November

5    group, and they didn't return your call?

6    A.   That's correct, yes, several times.

7    Q.   Did you call again?

8    A.   I called them several times, yeah.

9    Q.   And they never returned your calls?

10   A.   No, they did not.

11   Q.   The religious group, did you repeatedly call the

12   religious group too?

13   A.   Yes.

14   Q.   And how many of those calls did they return?

15   A.   They did not return any.

16   Q.   How dependable was the Thanksgiving group based upon

17   the years past?

18   A.   Clockwork.  We were a perfect group for them because

19   I guess --

20            MS. LEVINSON:  Objection, not responsive.

21            THE COURT:  You can ask another question.

22   Q.   (By Mr. Breslow)  I'll just ask the question again in

23   case there's some misunderstanding.

24        The Thanksgiving group that canceled or that

25   Thanksgiving group that did not book in the year following

1    the false respect in the Berkshire Eagle, how dependable

2    were they as customers in the prior years?

3    A.    Every other year they were there.  I don't know if I

4    can explain why.  I'm not sure.

5    Q.    You can explain it.

6    A.    Okay.  My Inn was 19 rooms.  It was a rather large

7    family, but the size of the group and the size of the Inn

8    really meshed well.  They tried other places in the past

9    that were smaller, not all of them could stay in one

10   place.  They tried other places in other years that were

11   bigger but they felt like they were just a part of

12   everything else that was going on, but when they took my

13   place, it was their place.

14        So for them it was a relief because when you're in a

15   larger place and your kids start running around, you got

16   to watch them.  At my place if their kids run around, they

17   were going to bother their uncles and aunts so they really

18   kind of let their hair down.  They were able to enjoy the

19   weekend or Wednesday, Thursday more than watch their

20   children.

21   Q.    Now, I believe you said that this Thanksgiving group

22   was like clockwork in the years past?

23   A.    Oh, yeah, every other year.  It almost got to the

24   point where we didn't have a lot of communication.  They'd

25   say we'll see you on Wednesday whatever, the 23rd or 24th,

1    whatever it fell on that year and I'd said okay.

2    Q.   And after the false report in the Berkshire Eagle,

3    they just didn't call you back?

4    A.   Nothing.

5    Q.   Now, you mentioned a gathering that you had to cancel

6    because the news vans were in your driveway?

7    A.   Yes.

8    Q.   Can you tell the jury what kind of gathering that

9    was?

10   A.   That was an adult party.

11   Q.   When you say an adult party, just speak plainly what

12   was it?

13   A.   It was a swing party, but that didn't necessarily

14   happen everywhere.  You know, it was a swing party.

15   Q.   Okay.  Now can you tell the jury what percentage of

16   your Inn's business was swing parties or gatherings for

17   swingers and what percentage was ordinary business for

18   people going to Tanglewood or Jacob's Pillow or just

19   enjoying the Berkshire?

20   A.   A very, very small percentage was the swing parties.

21   Q.   Can you put a number on it, what number would you

22   approximately say was the swinging?

23   A.   I would say about 2 or 3 percent.  The problem with

24   swing parties is that they are everywhere.

25                   MS. LEVINSON:   Objection.

1    THE COURT:  Sustained.

2  Q.   (By Mr. Breslow)  So I think what I had asked was

3  what percentage -- if you could put a number on it, what

4  percentage was it?

5  A.   Two or three percent.

6  Q.   Now, so on occasion you held swinging parties at the

7  Inn?

8  A.   Yes.

9  Q.   So can you tell the jury approximately how many times

10 a year approximately you held a swinging part at the Inn?

11 A.   About two to three times a year.

12 Q.   Now, did the folks who came to the Inn for swing

13 parties, did you host them for free or were paying

14 customers like anyone else?

15 A.   They were paying customers but they paid much less

16 than regular customers.

17 Q.   Now, during those swinging parties, what steps did

18 you take to keep their private lives private?

19 A.   Well, first of all, we would only advertise on the

20 swing life website where other people that were in that

21 lifestyle would see.  Then we had a private function sign

22 that we would put out by the road to make sure that people

23 that were just stopping by to possibly just look around

24 just to let them know that they can't just stop and look

25 around.  There was a private sign and we had a private

1   function going on.

2       We also have somebody by the front door making sure

3   that the people that walked up to the door, if anybody

4   ever did, they never did, but if they were to, that they

5   would know that it's a private function that you can't go

6   to.  It's similar to what we would do for a wedding

7   because with a wedding we don't want somebody walking out

8   in the backyard or take a guest that paid a regular price

9   but can't do everything they can normally do at the Inn.

10  I didn't want them walking out in the back of a ceremony,

11  that kind of thing.  We handled it similarly.

12  Q.   What if there was a teacher or a doctor, a lawyer or

13  a sales worker, an office worker, somebody like that who

14  was not involved in swinging and they wanted to book a

15  room at the Inn at the time that you had a swinging

16  gathering, would you take that customer?

17  A.   Well, no, I wouldn't but that never really could

18  happen because again for the most part in the winter we

19  were closed.  We either had a function or we were closed.

20  I didn't heat it up but, no, regular guests could not be

21  anywhere near that.

22  Q.   Tell the jury why not.

23  A.   Well, because, number one, there's dance music

24  playing which is very load.  It would be disruptive for

25  them, but there's obvious answers as well.

1    Q.    What's the obvious answer?

2    A.    That's not what they expect to see at a bed and

3    breakfast.

4    Q.    Now at some point after the undercover investigation

5    did you and Tara receive anything in the mail from the

6    Southern Berkshire District Court?

7    A.    Yes, we did.

8    Q.    Can you tell the jury what you received?

9    A.    We received a summons to appear.

10   Q.    And I'm showing you what's already in evidence as

11   Government Exhibit 7; do you recognize this exhibit?

12   A.    Yes, I do.

13   Q.    What is it?

14   A.    That's the notice of the magistrate hearing.

15   Q.    And what is the date of the magistrate hearing?

16   A.    February 21, 2012.

17   Q.    Now had you ever been to a magistrate hearing?

18   A.    No.

19   Q.    Had Tara ever been to a magistrate hearing?

20   A.    No.

21   Q.    Did that Tara receive a similar notice?

22   A.    Yes, she did.

23   Q.    And I want to focus you on page 2 of Government

24   Exhibit 7.  Tell the jury what charges you were facing at

25   the magistrate hearing?

1    A.    Keeping a house of prostitution and conspiracy.

2    Q.    Now, I'm showing you what is already in evidence as

3    Government Exhibit 8.  Can you tell the jury what this is?

4    A.    Yes.  That's a letter from the bride and groom of the

5    May 25th and 26th wedding of that year canceling the

6    reservation for all 19 rooms and canceling the dinner for

7    about a hundred people.

8    Q.    And what is the date of the e-mail?

9    A.    The date on the e-mail is February 17, 2012.

10   Q.    Now tell this jury, Mr. Fusco, how many days before

11   your magistrate hearing that you received this

12   cancellation?

13   A.    That's four days before.

14   Q.    And tell the jury how you reacted or how you felt

15   when you received this cancellation just four days before

16   you were supposed to show up in court to answer charges on

17   prostitution?

18   A.    The wedding itself actually was very painful to lose

19   because it was a good part of the business.  I was going

20   to get things off and going but there was more to it than

21   that because that's the time of the year that the

22   Tanglewood schedules come out, the theater schedules come

23   out.  That's when everybody starts booking their

24   reservations and I'm thinking, okay, here's one individual

25   thing that I can directly tie to the story that's

1   canceling.  Who else am I not going to hear from again?

2   What other summer reservations am I not going to get?  So

3   it was hard to take.

4   Q.   So please tell this jury what your state of mind was

5   as you were heading into court for the very first time

6   ever and to face prostitution charges related to the Inn,

7   tell the jury what was in your mind?

8   A.   What was in my mind was just to get it done just as

9   quietly and as efficiently as possible.

10  Q.   Now, I'd like to ask you to focus on a new topic.

11  During this period of time, from January 19, 2012, which

12  was the day of the undercover operation, and February 21,

13  2012, which was your scheduled date before the magistrate,

14  did you speak with anyone at the Lee Police Department?

15  A.   Yes, I did.

16  Q.   Can you tell the jury who did you speak with?

17  A.   I spoke --

18  Q.   Go ahead.

19  A.   I spoke with Ryan Lucy and I spoke with Chief Buffis.

20  Q.   Now, I see you pointing at somebody in court.  Do you

21  recognize Chief Buffis?

22  A.   Yes, I do.

23           MR. BRESLOW:  And let the record reflect that

24  the witness has correctly identified the defendant?

25           THE COURT:  The record will reflect that.

1    Q.   (By Mr. Breslow) Before we get to the defendant, I

2    want to focus you on your conversations with Ryan Lucy.

3    About how many times did you speak with Ryan Lucy?

4    A.   Probably eight or nine times.

5    Q.   And tell the jury please what generally did you

6    discuss with Ryan Lucy?

7    A.   Well, I didn't want to call him eight or nine times

8    but Tara wanted me to call him eight or nine times.  Most

9    of the conversations involved the process, what was going

10   to happen, what was next.  Neither one of us had ever been

11   through anything like that before.  We had never done

12   anything so we didn't know what to expect, so that was

13   generally the gist of the calls.

14   Q.   Now, do you recall one of those conversations in

15   particular that involved the defendant?

16   A.   Yes, I do.

17   Q.   And tell the jury about the conversation that

18   involved this defendant.

19   A.   Okay.  Well, once again I had called Ryan Lucy

20   because I think the summons had arrived.  I called Ryan

21   Lucy to say, okay, Ryan, what are we going to do next?

22   Where are we at?  And during that conversation Ryan

23   stopped the phone call.  He said hold on, the chief is

24   talking to me.

25   Q.   And who do you understand the chief to be?

1    A.    Joe Buffis.

2    Q.    Okay.  Please continue.

3    A.    I'm sorry.  Yeah.  So he asked me to hold on, so I

4    held on.  The phone went silent.  Whether he put me on

5    hold or whether he covered the speaker part of it, I don't

6    know.  But when he came back on the phone, he told me that

7    the chief said that if we were to agree to donate the

8    proceeds from the prostitution to a local charity, that he

9    would handle it at the magistrate level.

10   Q.    And what did you understand that to mean, that the

11   case would be handled at the magistrate level if you

12   turned over the proceeds of the prostitution?

13   A.    Well, I understood that -- well, I guess the thought

14   process that I had was that it was a way to make things go

15   away quietly.

16   Q.    Okay.  Meaning did you think the case would be

17   dropped somehow?

18   A.    Yes, I did.  I thought the case would be dismissed

19   because of all the attention and everything else that was

20   brought upon us.

21   Q.    What effect did that have on you, the proposal that

22   if you provided the proceeds of the prostitution your

23   charges would be dropped somehow?  What effect did that

24   statement have on you?

25   A.    I thought that would be great because it would be a

1    big relief for Tara.  The girls wouldn't be exposed to
2    that much.  It would be a big relief for me because my
3    family wouldn't be involved that much.  It would be great
4    for the business so that we can just carry on and just
5    move on from it.  I thought it was a great way to handle
6    it.  I thought because we were the people that we were, we
7    had no record, we were right up and down the line regular
8    normal tax-paying citizens, that it just the way to handle
9    the issue.
10   Q.   Now, did you speak with the defendant in this
11   conversation?
12   A.   Directly to him, no.
13   Q.   Okay.  I want to focus you though on a conversation
14   that you did have with the defendant.  Can you tell the
15   jury how many times did you speak with the defendant?
16   A.   I believe it was two.
17   Q.   So I'd like to take those conversations in order one
18   by one.
19        Tell the jury about the first time that you spoke to
20   the defendant.
21   A.   Well, the first time was when most of the questions
22   were answered, similar to the calls that I had placed to
23   Ryan Lucy.  I wanted to know about the procedure, what was
24   going to happen, what's going to go on.
25   Q.   And what did the defendant say to you?

A.   He said that when we got to the magistrate hearing

that he would ask the magistrate and he would ask the

stenographer to leave so that we would have time just us

and him in the courtroom.   He said that we would have an

agreement.   He didn't really describe the agreement in

full but as long as both sides, I guess all three sides,

Tara, myself and he, agreed to the agreement, then he

would have the case dismissed at the magistrate level.

Q.   Now hold on a second.   You just testified that the

defendant told you that in court the first thing the

defendant was going to do is ask the magistrate to leave?

A.   Yes.

Q.   And you said the stenographer, he was going to ask

the stenographer to leave?

A.   I'm not really good on the court stuff so if it

wasn't --

Q.   So somebody just like the court reporter sitting

here?

A.   Yeah.

Q.   So the defendant told you that he was going to ask

the magistrate, the person in charge of the court hearing,

to leave?

A.   Yes.

Q.   And he was going to ask the court reporter or the

stenographer to leave as well?

1    A.    Yes.

2    Q.    Okay.  Now, how many hearings had you been to before?

3    A.    None.

4    Q.    And what did you think about that idea, the

5    defendant's idea that the magistrate in charge of the

6    court and the stenographer or the court reporter should

7    just leave?

8    A.    I just thought -- it seems odd now but I thought it

9    was normal.  I thought that would be a chance for us to

10   talk privately.

11   Q.    Now, you testified that the defendant said he would

12   have an agreement for you?

13   A.    Yes.

14   Q.    And did he tell you what the agreement was?

15   A.    At that time, no.

16   Q.    Okay.  Did he tell you then that the agreement would

17   bar you from ever talking about what happened in court?

18              MS. LEVINSON:  Objection; leading.

19              THE COURT:  Sustained.

20   Q.    (By Mr. Breslow) Okay.  What did the defendant tell

21   you would be in the agreement?

22   A.    He just said that -- at that time he just said he

23   would have an agreement there for us to look at and if we

24   all agreed, to sign it and that's it.

25   Q.    And what did he say he would ask the magistrate to do

1   when the magistrate returned to the courtroom after your

2   private meeting was over?

3   A.   Okay.   After the magistrate -- after we signed -- if

4   we were to sign the form, he would ask the magistrate to

5   come back in, then we have a public hearing at that time

6   and then he would dismiss the case due to a lack of

7   probable cause.

8   Q.   What did you think about the defendant's idea that he

9   would dismiss -- that the magistrate would dismiss the

10   case for lack of probable cause?

11   A.   I thought that was a good way to do it.

12   Q.   What did you tell the defendant?

13   A.   That that sounds great.

14   Q.   Did you explain to the defendant why you thought that

15   was a great way to do it?

16   A.   Honestly I can't remember if I did at that point in

17   time but I know what I was thinking.

18   Q.   Okay.   Do you remember the defendant telling you

19   anything else in this conversation?

20   A.   No.

21   Q.   Okay.   Now, I want to focus on -- well, let me ask

22   you this, did the defendant -- did you ask the defendant

23   anything about an attorney?

24   A.   Oh, yes.

25   Q.   What did you ask the defendant?

1    A.    I asked him if he felt that I needed an attorney
2    present.
3    Q.    Now, why did you ask the defendant, who was the chief
4    of police, if you should have an attorney present?
5    A.    Because this was very, very unfamiliar territory for
6    me.  I mean, I make beds and cook breakfast for a living.
7    I didn't know anything about the legal process.
8    Q.    Okay.  But did you have an attorney at the time?
9    A.    We had spoken to one.
10   Q.    Had you paid the attorney?
11   A.    No.
12   Q.    Did you want to pay the attorney?
13   A.    I didn't want to have to, no.
14   Q.    So again, I'm asking you why would you ask the chief
15   of police who was bringing charges against you if you
16   should have an attorney?
17   A.    I trusted him?
18   Q.    I'm sorry?
19   A.    I trusted him.
20   Q.    And why did you trust him?
21   A.    He's the chief of police.
22   Q.    Now, what did the defendant say to you when you asked
23   him should we bring an attorney?
24   A.    He said if I wanted to waste my money, I can get one.
25   Q.    I want to focus you on the second conversation.  Mr.

1    Fusco, if you want some water, please take it.

2    A.    I'm great.   Thank you.

3    Q.    I want to focus you on -- let me ask you this before

4    I finish the first conversation.   Who called whom in the

5    first telephone call?

6    A.    I called him.

7    Q.    Tell the jury why did you call the defendant and not

8    Officer Lucy?

9    A.    Because at that point I had felt like the magistrate

10   hearing was now set and that he would be handling the

11   magistrate hearing, not Officer Lucy.   So any answers that

12   I wanted, he was the one that would have them.

13   Q.    Okay.   I want to focus you on the second

14   conversation.   Was it in person or by phone?

15   A.    It was by phone.

16   Q.    Who called whom?

17   A.    I called him.

18   Q.    Why did you call him?

19   A.    We didn't know how much money to bring and I was

20   calling to try to find out what do I need to have with me.

21   I wanted to make sure everything went as smoothly as

22   possible; that we can put it behind us.   We didn't have a

23   dollar amount and I needed to find that out before I went

24   in.

25   Q.    So you wanted to ask the defendant how much money do

1    I need to bring to court?

2    A.   Yes.

3    Q.   Once again, why did you ask the defendant about money

4    in the first place?  Why did you have it in your head that

5    you had to bring money to court?

6    A.   Because one of the last calls that I had with Officer

7    Lucy he brought up the fact if we made a donation, then

8    the charges would be dismissed.  So we knew there was

9    going to be a donation.  We just had trouble getting the

10   actual number.  We didn't know how much to bring with us.

11   Q.   Tell the jury whose idea was it, according to Officer

12   Lucy, that if you made a donation, the charges would be

13   dropped somehow?

14   A.   Chief Buffis.

15            MS. LEVINSON:  Objection.

16            THE COURT:  Overruled.

17            MR. BRESLOW:  I just want to make sure the jury

18   heard the answer.  I'll ask it again.

19            THE COURT:  No need to.

20   Q.   (By Mr. Breslow)  Can you just tell the jury the

21   answer then?

22   A.   Chief Buffis.

23   Q.   Now I want to focus you on this second conversation.

24   What did you say to the defendant and what did he say to

25   you?

1   A.   He said that the amount of the donation wasn't up to

2   him.  He said that Ryan Lucy, Officer Lucy, was handling

3   that part of it; that the number could be anywhere from

4   one dollar to $10,000.  He didn't know.  It wasn't under

5   his control.

6   Q.   So did the defendant give you a particular amount?

7   A.   No.

8   Q.   Who did the defendant say was going to decide the

9   amount?

10          MS. LEVINSON:  Objection; asked and answered.

11          THE COURT:  Overruled.

12          THE WITNESS:  Officer Lucy.

13   Q.   (By Mr. Breslow) And how much did the defendant say

14   you might have to pay at most?

15   A.   At most ten thousand.

16   Q.   Now, do you recall discussing anything else with

17   respect to the potential dismissal of the case with the

18   defendant?

19   A.   Yes.

20   Q.   Can you tell the jury what you said to the defendant?

21   A.   Well, when it was initially brought up for the

22   dismissal, it had a continuance of a year.  I had a

23   concern about that because again I wanted it over.  I

24   wanted it done.  So what I said to him was, "you and I

25   both know this is never going to happen again.  So can we

1    get the continuance down to nothing?"

2    Q.   And what did the defendant say when you asked for the

3    continuance to get down to nothing?

4    A.   He agreed, or he said something about one day.

5    Q.   One day?

6    A.   Yeah.

7    Q.   And how did that sound to you as an idea?

8    A.   It was my idea.  I thought it was a great idea.

9    Q.   Now I want to focus you on a new topic.

10           THE COURT:  All right.  I hear new topic, I hear

11   a chance for a break.

12       So let's take a morning break.  We'll take about 15

13   to 20 minutes.  Please do not discuss the case with each

14   other, begin deliberations, research the case in any way,

15   investigate the case in any way, access the case through

16   your cell phone.  Do not do any of those things.  All

17   right.

18           THE CLERK:  All rise.

19   **(The jury left at 11:35 until 12:01.)**

20           THE COURT:  Please be seated.

21       All right.  You know the question:  Has everyone been

22   able to follow my instructions not to discuss the case,

23   not communicate at all about it, not research the case,

24   not access it on the Internet, and to stay away from any

25   articles in any form of media about the case?

```
 1              THE JURY:  Yes, Your Honor.
 2              THE COURT:  The jury remains fair and impartial.
 3    Very quickly at sidebar.
 4    (Sidebar conference.)
 5              THE COURT:  Just for your information, one of
 6    jurors asked Theresa a question just regarding the term
 7    that was being used.  They don't know what a clerk
 8    magistrate is.
 9              MR. BRESLOW:  Okay.
10              THE CLERK:  They asked if I was the clerk
11    magistrate like in this court.
12              THE COURT:  So keep that in mind.
13              MR. BRESLOW:  Okay.
14         Your Honor, while at sidebar, Your Honor's ruling --
15    we understand Your Honor's ruling.  We respect Your
16    Honor's ruling, although we disagree with it.  Your
17    Honor's ruling is devastating to both Mr. Fusco and Ms.
18    Viola as he testified.
19         Their very young children are now going to know
20    --probably the whole community will know, if they don't
21    know at this very moment -- that their parents are engaged
22    in this sexual lifestyle, and so I am doing everything
23    that I can to fully ventilate and develop this matter on
24    direct examination.
25         I am prepared to give Ms. Levinson extraordinarily
```

1    wide latitude in terms of objections so that it can be

2    fully ventilated on cross-examination to avoid Ms. Viola

3    having to come back and give that same testimony.  So what

4    I am asking for -- I know this might be a little unusual,

5    but if there is any area that the Court or Ms. Levinson

6    would like me to explore on direct, please let me know and

7    I will do it.

8              MS. LEVINSON:  I feel that you have ventilated

9    it very, very fully so I don't think you need to ventilate

10   it any more fully.

11             MR. BRESLOW:  Okay.

12             THE COURT:  No, I think you have -- we'll make a

13   decision regarding Ms. Viola after we hear Ms. Levinson do

14   her cross-examination.

15             MR. BRESLOW  Okay.

16             THE COURT:  It's a horrible situation for them

17   as a family, but it's hard for me to see how it was made

18   much worse by this information considering how they deal

19   with the prostitution information yesterday, when their

20   children learned about the prostitution, so.

21             MR. BRESLOW:  I understand.

22             THE COURT:  It's tough.

23             MR. BRESLOW:  I just want to make sure that --

24             THE COURT:  I hear exactly what you're saying.

25   I think you're on your way there, but I'm not going to

1    make a ruling until that point.

2              MR. BRESLOW:   Okay.

3    (End of sidebar conference.)

4              MR. BRESLOW:   Good afternoon.

5              THE JURY:   Good afternoon.

6    Q.   (By Mr. Breslow)   Mr. Fusco, when we last took a

7    break, you stated that you had two telephone calls with

8    the defendant concerning the hearing that you were

9    scheduled to go to on February 21, 2012?

10   A.   That's correct, yeah.

11   Q.   I'd like to focus you on a new topic now, which is

12   that hearing.   Can you tell the jury where you went on

13   February 21, 2012?

14   A.   We went to the district court in Great Barrington,

15   Mass.

16   Q.   I'm showing you what's in evidence as Government

17   Exhibit 9.   Can you tell the jury what that is?

18   A.   That's the courthouse in Great Barrington.

19   Q.   And had you ever been inside that courthouse before?

20   A.   Yes.

21   Q.   Why were you inside that courthouse?

22   A.   A traffic ticket.

23   Q.   Had you ever been inside that courthouse on anything

24   resembling a criminal matter?

25   A.   No, never.

1   Q.   I'm showing you what's already in evidence as

2   Government Exhibit 10.  Do you recognize that?

3   A.   Yes, I do.

4   Q.   What is that?

5   A.   That's the courtroom where the hearing took place.

6   Q.   Now, when you and Tara arrived in that courtroom, can

7   you tell the jury who was already there?

8   A.   The stenographer, the clerk, and Chief Buffis.

9   Q.   And can you tell the jury what your understanding of

10  the clerk magistrate is, right or wrong, just what you

11  understood the clerk magistrate to be?

12  A.   I understood basically to be a judge, to have the

13  power to dismiss the charges if he wanted to or keep the

14  charges if they wanted to go forward with them.

15  Q.   Now, did the clerk magistrate sit on a higher bench

16  as in the courtroom like this judge is here?

17  A.   Yes.

18  Q.   And was the stenographer sitting close by the way

19  this court reporter is somewhere nearby?

20  A.   Somewhere nearby.  You can't see where she was in

21  this.  She was way off in the corner around the left-hand

22  side.

23  Q.   There was some other woman there and the clerk

24  magistrate was sitting on that higher bench?

25  A.   Yes.

1    Q.   By the flag?

2    A.   Yes.

3    Q.   Was the clerk magistrate wearing a black robe like

4    Judge Mastroianni is, if you remember?

5    A.   I honestly don't remember.  I don't think so but I

6    don't remember.

7    Q.   Okay.  Now, can you tell the jury what the defendant

8    did after you walked in with Ms. Viola?

9    A.   Yeah, it was just like our conversation.  He asked

10   the clerk magistrate and the stenographer to leave the

11   courtroom.

12   Q.   And did they do what the defendant asked?

13   A.   They got up right away and left.

14   Q.   Now when the defendant asked the clerk magistrate and

15   the stenographer or the other person to leave, who was

16   left in the room?

17   A.   My wife Tara, myself, and Chief Buffis.

18   Q.   Now you see here that the court reporter is basically

19   tapping on her machine and taking down every word that you

20   say and I say and that the judge says, right?

21   A.   Yes, I do.

22   Q.   Was there anyone in that courtroom that's on your

23   screen right now, was there anybody who was taking down

24   the words that the defendant said and you said and Ms.

25   Viola said in that courtroom?

A.    No.

Q.    So we often talk about things that are off the record
and on the record.  Was this conversation on the record or
off the record?

A.    Well, yeah, it would be off the record.  As far as we
were concerned, it was on the record but officially it
would be off the record.

Q.    Meaning --

        MS. LEVINSON:  I'm going to object for the
moment and ask to come to sidebar if I could?

(Sidebar conference.)

        MS. LEVINSON:  I fear that this line of
questioning could be a little misleading.  The reason is
that I've been practicing in the Southern Berkshire
District Court for 20 years and there is no stenographer
ever at a show cause hearing ever.  So the fact that Mr.
Breslow is trying to establish that there's something
untoward going on that there's no stenographer for the
private conference, I think is misleading.

        THE COURT:  I think that's information that Mr.
Breslow has gotten from this witness regarding that.

        MR. BRESLOW:  Right.  So I've never practiced in
the Southern Berkshire District Court but our next witness
-- one of the next witnesses will be the clerk magistrate
and I think what he will say is that there's a recording

1    device that takes everything down.  I think what he's

2    going to say is that this recording device wasn't on for

3    this meeting.  That he turned it on when he came back.

4              THE COURT:  I agree for at least a hearing in

5    the Hampden Court there's rarely a stenographer, so it's

6    always recorded.

7              MR. BRESLOW:  He may be thinking that it's

8    somebody maybe like a clerk or somebody like that, but I

9    can't tell him.  I can't tell him that there's not.

10             THE COURT:  So you have a good-faith basis or

11   reason to believe that when another witness comes, they're

12   going to clarify as to what the exact equipment was.

13             MR. BRESLOW:  Mr. Bartini will.  I just didn't

14   feel it was my point to sort of change his information.

15             THE COURT:  But I think you should refrain from

16   asking any further questions if you know he's testifying

17   in error, good faith or not. I don't think you should be

18   asking any more questions about that.

19             MR. BRESLOW:  Okay.

20             MS. LEVINSON:  Thank you.

21   (End of sidebar conference.)

22   Q.   (By Mr. Breslow)  Okay.  Now, Mr. Fusco, I'd like you

23   to tell the jury when you were alone with the defendant

24   and Ms. Viola in that courtroom, what did the defendant

25   do?

1  A.  He had an agreement for us to look at.  He pulled out

2  the agreement and we both read it, all three of us read

3  it.

4  Q.  And I'm going to show you now what's already in

5  evidence as Government Exhibit 13.  Just focusing you on

6  the top part of the page for now.  We will get to the rest

7  of the text later, but whose letterhead is on this

8  agreement?

9  A.  The Lee Police Department from Lee, Massachusetts.

10  Q.  And whose name is at the very top of the letterhead?

11  A.  Chief Joseph Buffis.

12  Q.  And tell the jury what the agreement is called?

13  A.  Agreement Between Parties, Accord & Satisfaction.

14  Q.  Now, did you write this agreement?

15  A.  No, I did not write the agreement.

16  Q.  When was the first time you saw this agreement?

17  A.  That morning.

18  Q.  I want to focus you on the first paragraph.  What did

19  the parties agree in this first paragraph that was found

20  on February 21, 2012 in that court?  Was there probable

21  cause to issue the complaint or not?

22  A.  It says, "probable cause to issue criminal

23  complaints," yes.

24  Q.  Okay.  And I want to focus you on the second

25  paragraph.  In the second paragraph what did the parties

1   agree?

2   A.   In the second paragraph we're agreeing not to discuss

3   anything about our meeting with anybody.

4   Q.   Now, in your two phone calls with the defendant, had

5   the defendant ever told you that in court you were going

6   to agree not to tell anybody about what was to happen in

7   court?

8   A.   No, he did not.

9   Q.   Tell the jury as you read that agreement and in

10  particular as you read the paragraph what was your

11  reaction?  What were you thinking when you read that

12  paragraph?

13  A.   I was thinking that I wanted to leave that meeting

14  and be able to say that the charges were dismissed.

15  Q.   Why?  Why did you want to be able to leave that

16  meeting and say the charges were dismissed?

17  A.   For lots of reasons.  I'll start at the beginning:

18  My wife, her family, the children, myself, my children, my

19  business, lots of reasons.

20  Q.   I want to focus you on the following paragraph.  In

21  the following paragraph, what does the agreement require

22  you and Tara to do or what does it prevent you from doing?

23  A.   Going after any civil action against the town or any

24  of its employees.

25  Q.   And who in your mind was included as a town employee?

1    A.    Chief Buffis.

2    Q.    And as well as other people at the Lee PD?

3    A.    Well, anybody that was on the letterhead basically.

4    Q.    Now, as you read the agreement in court, did you know

5    who had falsely reported to the Berkshire Eagle that you

6    had been arrested?

7    A.    No.

8    Q.    But in your mind what organization was likely or

9    responsible for leaking that false information?

10   A.    The police department.

11   Q.    Did you know who in the police department was

12   responsible?

13   A.    No.

14   Q.    So when you read this paragraph, how did you react?

15   How did that make you feel?

16   A.    Well, just like the other ones, like there was no

17   choice.

18   Q.    Okay.  But did you want some possibility of taking

19   action against the town or any of its police officers,

20   including the defendant?

21   A.    You know, you're angry at the time so you think so

22   possibly.  You don't know who said the words, the damaging

23   words that went out to the media.  So in the back of your

24   mind you think so, but who knows.

25   Q.    Did you want to agree to this provision?

1    A.    No.

2    Q.    I want to focus you on the last provision.  Can you

3    read that out load to the -- hold on.

4         Can you read that out loud to the jury and in the

5    record of this court?

6    A.    "Proceeds in the amount of" blank "shall be donated

7    to the Laliberte Toy Fund as a voluntary donation in lieu

8    of criminal fines or civil forfeiture action by the close

9    of business this date."

10   Q.    Now I want to focus you on this paragraph for a

11   moment.  You read blank, proceeds in the amount of blank,

12   Was the agreement when the defendant presented it to you

13   left blank?

14   A.    Yes.

15   Q.    What number is written in there now?

16   A.    $4,000.

17   Q.    Do you know who wrote that in?

18   A.    Yes.

19   Q.    Who did?

20   A.    The chief did.

21   Q.    But when the defendant presented you this agreement,

22   had he already written in the $4,000?

23   A.    No, he had not.

24   Q.    Okay.  But the Laliberte Toy Fund, that was already

25   specified in this agreement?

1    A.    Yeah, that's printed.

2    Q.    Now, had you ever donated to the Laliberte Toy Fund

3    before?

4    A.    No.

5    Q.    Had you even heard of the Laliberte Toy Fund before?

6    A.    I hadn't, no.

7    Q.    So you testified earlier that you understood from

8    Ryan Lucy that the defendant had said to you that you were

9    going to have to give up some money at this hearing?

10   A.    Yes, I did.

11   Q.    Okay.  You didn't know how much money?

12   A.    No.

13   Q.    And what did the defendant tell you when you asked

14   him how much money?

15   A.    It could be from one to $10,000.  It's not up to him.

16   Q.    Who did he say it was up to?

17   A.    Officer Lucy.

18   Q.    Okay.  Was Officer Lucy in court?

19   A.    No, he wasn't there that day.

20   Q.    He wasn't there that day at all?

21   A.    No.

22   Q.    Was he in your meeting with Chief Buffis and Tara?

23   A.    No.

24   Q.    Okay.  So the document was blank and at some point

25   the defendant wrote in $4,000?

1    A.    That's correct.

2    Q.    Now I want you to tell the jury if you had never

3    donated to the Laliberte Toy Fund before and if you had

4    never even heard of the Laliberte Toy Fund before, what

5    did you think about this provision that required you that

6    said a certain amount shall be donated to the Laliberte

7    Toy Fund?

8    A.    That's not where Tara and I had talked about donating

9    to.

10    Q.    Tell the jury what had you and Tara talked about in

11    terms of a donation recipient?

12    A.    There's an animal shelter in Pittsfield called the

13    Sonsini Center.  We had adopted a Boston Terrier from them

14    about six months before all of this.  Part of the adoption

15    process -- since we have four now but we had two then --

16    was to make sure that the dogs get along, the two male

17    dogs wouldn't fight.

18        So when we went out to adopt him, we took our

19    leashes, we took our two dogs and we walked all three dogs

20    around the place for a good hour and a half to let them

21    mingle.  During that process the place makes a nice

22    impression on you.  You see a lot of hard-working people

23    working with whatever they have and so that's where we

24    wanted to go with the money.

25    Q.    Fair to say that you and Tara are dog people?

1   A.   Yeah, dogs on everything.  We have Boston terriers in

2   particular.

3   Q.   Okay.  And so you wanted to donate money to the

4   Sonsini Dog Center.  What did you tell the defendant when

5   you saw that this agreement specified a charity that you

6   had never even heard of?

7   A.   That not where Tara and I decided we want to donate

8   and how much.  We said we want to donate a thousand and to

9   the Sonsini Center.

10  Q.   So you said you want to donate how much?

11  A.   One thousand to the Sonsini Center.

12  Q.   Okay.  Well, what did the defendant say when you said

13  to him we're happy to donate money, a thousand dollars to

14  Sonsini Dog Center?  How did he respond to you?

15  A.   He said $1,000 isn't enough and that it's going to

16  the Laliberte Toy Fund.

17  Q.   Did you want to donate more than a thousand dollars?

18  A.   No.

19  Q.   Did you want to donate money to the Laliberte Toy

20  Fund?

21  A.   No.

22  Q.   Did you agree to donate more than a thousand dollars?

23  A.   Yes.

24  Q.   How much did you agree to?

25  A.   Four thousand.

1    Q.    Who proposed that number?

2    A.    He did.

3    Q.    Did he say that it was Officer Lucy's number?

4    A.    No.

5    Q.    Did you want to donate $4,000?

6    A.    No.

7    Q.    Did you ultimately agree to donate to the Laliberte

8    Toy Fund?

9    A.    Yes.

10   Q.    Tell the jury if you and Tara wanted to donate only a

11   thousand dollars to a dog shelter in Pittsfield that you

12   had a connection with, why you decided to donate $4,000 to

13   a toy fund you had never even heard of?

14   A.    I just felt like we didn't have a choice.

15   Q.    Tell the jury why you felt like you didn't have a

16   choice?

17   A.    I initially objected.  I kind of didn't want to do

18   that amount of money and I didn't want it to go there, and

19   then I take a look at Tara who was sitting right next to

20   me and she starts to cry.  She starts to get upset and I

21   just felt like I can see everything coming back.

22   Q.    Tell the jury what you mean when you testified by

23   saying everything was coming back?

24   A.    I can see a trial going forward; I can see more media

25   attention; I can see again everything, the children

1    getting hurt and the business getting hurt and the
2    families getting hurt.
3    Q.   So you walked into the court having gotten a notice
4    to come to court and an application for a criminal
5    complaint for prostitution charges --
6              MS. LEVINSON:  Objection; leading.
7    Q.   (By Mr. Breslow)  Had you received that notice before
8    coming in?
9              THE COURT:  Hold on, Mr. Breslow.  I have to
10   make a ruling on the motion.  It was leading.  Given the
11   context of what we are talking about, I'm going to allow
12   it to stand but just be warned about the leading nature of
13   the question.
14             MR. BRESLOW:  Yes, Your Honor.
15             THE COURT:  So the previous question if you need
16   it read back.
17             THE WITNESS:  Yes.
18   (Question read back.)
19   Q.   (By Mr. Breslow)  Had Tara received a similar notice?
20   A.   A similar notice, yes.  The same date and same time.
21   Q.   What did you think was going to happen with your
22   charges if you told the chief of police, no, I'm not going
23   to sign your agreement?  I want to donate a thousand
24   dollars to the Sonsini Rescue Center.  I want to be able
25   to sue anybody, including you.  I want to be able to tell

1    the world that I was cleared of charges.  What did you

2    think was going to happen with your own charges if you

3    took that position with the chief of police?

4    A.    I thought it was going to go to trial.  I thought it

5    was going to go public.

6    Q.    And what did you think was going to happen with Tara

7    Viola's charges, your wife's charges, if you told the

8    chief of police no?

9    A.    The same thing.

10   Q.    What effect did you think your saying no to this

11   agreement would have on the business that you have worked

12   so hard at and actually lived in?

13   A.    I already saw it.  I had the cancellation for the

14   Memorial Day weekend.  It just happened a few days prior

15   to.  Again, that was a very pivotal time of year in the

16   inn business.  That's when the phone starts to ring for

17   the schedule.  That's when the schedule comes out.  That's

18   when people want to start making their reservations so I

19   could see it all coming around again at a really bad time.

20   Q.    And as you and the chief of police were negotiating

21   about how much to give and who to give it to, where was

22   Tara Viola?

23   A.    Next to me.

24   Q.    Tell the jury what your wife was doing as you were

25   bargaining with the chief of police?

1   A.   She was sobbing.

2   Q.   Sorry?

3   A.   Crying.  She didn't say a word.  She didn't have to.

4   Q.   So tell the jury how did your bargaining with the

5   chief of police end up?  What did you ultimately agree to?

6   A.   The number that he said.

7   Q.   And after you agreed to it, who signed this document?

8   A.   All three of us signed.

9   Q.   Now, how many of these agreements on Lee Police

10  Department letterhead did the chief of police bring to

11  this hearing?

12  A.   He brought two.

13  Q.   What did he do with each one of those?

14  A.   He kept one and we kept one.

15  Q.   How satisfied were you with your agreement?

16  A.   It's a tough question because I didn't want to agree

17  to that much.  I didn't want it to go there but I did want

18  it to be over, so I don't know how to answer that.

19  Q.   Okay.  Now, after you agreed to donate $4,000 to a

20  charity you had never even heard of, what did you do?

21  A.   I wrote a check for $4,000.

22  Q.   I'm showing you what's already in evidence as

23  Government Exhibit 14.  Mr. Fusco, do you recognize this?

24  A.   Yes, I do.

25  Q.   What is it?

1   A.   That's a check from my personal account to the toy

2   fund for $4,000.

3   Q.   And who wrote out that check?

4   A.   I did.

5   Q.   What is the date of the check?

6   A.   February 21, 2012.

7   Q.   What did you write in the memo line?

8   A.   Toy fund donation.

9   Q.   Who did you give this check to?

10   A.   I gave it to Chief Buffis.

11   Q.   Mr. Fusco, please tell the jury in court that day

12   what had you brought with you to make a donation?

13   A.   I brought a blank check.

14   Q.   And from what account was that blank check?

15   A.   That check was my personal account.

16   Q.   And tell this jury, Mr. Fusco, how much money was in

17   your bank account on February 21, 2012?

18   A.   Usually it's a little over a thousand dollars.

19   Q.   So did you have enough money to write that check?

20   A.   No, I did not.

21   Q.   Did you have enough money to write the one thousand

22   dollar donation that you wanted to give?

23   A.   Yes.

24   Q.   So tell the jury when you gave this check to the

25   defendant, what did he say?  What did you say to him

1    rather?

2    A.   I said that he would have to hold the check for, I

3    don't know if it was a day or two, give me time to get to

4    the bank and transfer money from what I called my mortgage

5    account, my business account, into my personal account to

6    make the check clear.

7    Q.   You earlier testified that the defendant told you

8    that Ryan Lucy would pick the number, right?

9    A.   Yes.

10   Q.   And you just testified a moment ago that Ryan Lucy

11   wasn't there, it was the defendant instead?

12   A.   Yes.

13   Q.   Now do you know why Ryan Lucy didn't appear in court?

14   A.   I just thought that's the way the magistrate

15   hearings were, just one person.  I don't know.  My prior

16   experience going in for a traffic ticket was one police

17   officer and it wasn't even the one that wrote the ticket.

18   Q.   And I want to focus you back on Government Exhibit 7

19   for a moment.  Showing you Government Exhibit 7, which is

20   your notice of the magistrate hearing that you received,

21   and I want to focus you on page 2.  Is page 2 of the

22   application for a criminal complaint, for your own

23   criminal complaint?

24   A.   Yes.

25   Q.   And who was the complainant?  Is it defendant or was

1    it Ryan Lucy according to the signature?

2    A.    Ryan Lucy.

3    Q.    And who showed up at your house for the undercover

4    operation along with Chris Meiklejohn?  Was it the

5    defendant or was it Ryan Lucy?

6    A.    It was Ryan Lucy.

7    Q.    But who was the only person from the Lee Police

8    Department to appear in court on February 21st when your

9    charges were dismissed in exchange for a $4,000 donation?

10   A.    Chief Buffis.

11   Q.    I'm now showing you Government Exhibit 15, which is

12   already in evidence.  Take a look at Government Exhibit 15

13   and tell me in you recognize it?

14   A.    Yes.  That is a check from my business account to me

15   personally dated February 21, 2012 for $4,000 with the

16   notation of transfer to personal.

17   Q.    Tell the jury why you wrote that check?

18   A.    Because the check that I wrote for $4,000 wasn't

19   going to clear unless I did so I had to get the money into

20   that account so he can go ahead and cash the check.

21   Q.    Now, I'd like to focus you on a new topic.

22         By this point you had already written the check from

23   your own personal account, given it to the defendant, and

24   you already signed that nondisclosure agreement?

25   A.    Yes.

1   Q.   Can you tell the jury after your private meeting with

2   the defendant what happened next?

3   A.   Well, the last thing he said as that meeting was

4   winding up was that "sometimes good people do bad things,"

5   and then he called the clerk and the stenographer-type

6   person to come back into the courtroom.

7   Q.   The defendant said "sometimes good people do bad

8   things," who did you think he was referring to?

9   A.   Tara and I.

10  Q.   Who came back in the court?

11  A.   The clerk and the stenographer.

12  Q.   Now sitting here today --

13  A.   I'm assuming the stenographer.

14  Q.   -- you've never been to a magistrate court before?

15  A.   A traffic ticket.

16  Q.   Except for that?

17  A.   Yes.

18  Q.   Are you concern in your mind that that person was a

19  stenographer and not just somebody like the deputy?

20  A.   I just assumed because, I mean, every time you watch

21  on tv there's somebody doing that.  I didn't know what she

22  was doing because she was so far off in the corner but I

23  assumed that's what she was doing.

24  Q.   Okay.  But the point is, that the two people in the

25  court were present when you walked in along with the

1    defendant.  The defendant asked them to leave, the court

2    people.  They left.  You had your private conversation and

3    then --

4                   MS. LEVINSON:  Objection; asked and answered.

5                   THE COURT:  And to the form, sustained.

6                   MR. BRESLOW:  I will move on.

7    Q.   (By Mr. Breslow) Tell the jury what happened after

8    the two people from court came back into the room?

9    A.   The chief talked to the magistrate and he said that

10   the parties in question and he have come to an agreement

11   and that we have decided to -- I don't know if he used the

12   word dismissed, but, yeah, dismiss the charges due to lack

13   of probable cause and it was I guess good for that day,

14   like at the end of the day it would take effect.

15   Q.   Okay.  Now, did you later learn that after the clerk

16   magistrate came back into court that there was a complete

17   recording of what happened in court, what you just

18   summarized?

19   A.   Later I learned, yes.

20   Q.   So I'm going to focus you on what is already in

21   evidence as Government Exhibit 12, which is the transcript

22   of the magistrate hearing that you participated in in the

23   Southern Berkshire District Court.  I'm not going to ask

24   you to read the entire transcript and not ask the jury to

25   read the entire transcript now, but I'll just ask you

1    about specific portions of it.

2    A.    Okay.

3    Q.    So you have it on your screen and I'll focus you on

4    page 2, lines 27 through 30.  So if you could, take a look

5    at page 2, first focus on page 2, lines 3 to 9.

6        Read it to yourself and tell me when you're done and

7    let's let the jury read along silently.

8    A.    I'm sorry, did you 2 to 12?

9    Q.    Just read lines 3 through 9.

10   A.    Okay.

11            MR. BRESLOW:  Can the Court see?

12            THE COURT:  Yes, I can.  Thank you.

13            THE WITNESS:  Okay.

14   Q.    (By Mr. Breslow) Now, what you just summarized

15   happened at the hearing, is that some of what is in the

16   recorded transcript?

17   A.    Yes.

18   Q.    And when the defendant said "we're going to continue

19   this until the end of today," what did you understand him

20   to mean?

21   A.    That --

22   Q.    What happened at the end?

23   A.    That at the end of the day it would be dismissed.

24   Q.    And when he said, "they're going to donate the

25   proceeds," what did you understand the defendant to mean?

1    A.    That we were making a donation.

2    Q.    Did you understand that was the donation to the toy

3    fund that you heard of?

4    A.    Yes.

5    Q.    Now I want to focus you on another piece of this

6    page.   I want you to read lines 3 through 30 by yourself

7    silently and tell me when you're done and allow the jury

8    to read along too.

9    A.    Okay.

10   Q.    I want to focus you on line 27.   Tell the jury what

11   was your wife's demeanor at the time?   What was she

12   actually doing?

13   A.    You can tell by the stuttering start of it.   She was

14   again very upset at the meeting.   She wanted to get it

15   over with.   We just wanted to get the whole situation

16   behind us and we wanted to move on.

17   Q.    And I want to focus you on lines 23 through 24 when

18   the defendant said "We're agreeing not say anything other

19   than it was taken care of at the show cause level and the

20   results of which are not public, end of story," what did

21   you understand the defendant to be saying?

22   A.    That neither one of can talk about what happened in

23   the courthouse that day from the moment we walked in until

24   the moment we left.

25   Q.    Did you understand that -- according to you, did that

 1    include the private conversation that you had with the

 2    defendant and your wife after the two court people had

 3    left?

 4    A.    Yes.

 5    Q.    And did you want to be able to say something other

 6    than it was taken care of at the show cause level and the

 7    results are not public, end of story?

 8    A.    Yes, I did.

 9    Q.    What did you want to be able to say at the end of the

10    day?

11    A.    I wanted to say the charges were dismissed.

12    Q.    Why?

13    A.    We keep going over it, but Tara, her children, her

14    family, my children, my family, myself, my business.   I

15    had every reason in the world to want it over and want it

16    over quickly and quietly.

17    Q.    I want you to focus on page 3 now, lines 18 through

18    20, and just read it to yourself and tell me when you're

19    done.

20    A.    Okay.

21    Q.    What agreement did you understand the defendant to be

22    talking about?

23    A.    The agreement that we signed before the clerk came

24    back in.

25    Q.    And what did you understand him to be saying was the

1    scope of it?

2    A.    That we couldn't talk about it.

3    Q.    And did you understand that what the defendant was

4    saying here, did that include the fact that you had made a

5    donation to a charity you had never heard of?

6    A.    Yes, that included everything.  That we couldn't --

7    that we had to abide by the agreement first and then we

8    couldn't talk about the agreement second.

9    Q.    I want to focus you on page 4.  I want you to read to

10   yourself silently and allow the jury to read along with

11   you and just tell me when you're done.

12   A.    Okay.

13   Q.    Okay.  What newspaper are you talking about?

14   A.    The Berkshire Eagle.

15   Q.    And what was your main gripe about the Berkshire

16   Eagle?

17   A.    That they misreported what happened with us.  That

18   they reported that we were arrested and arraigned in the

19   Berkshire Superior Court and that neither one of those two

20   things were true.

21   Q.    And how far away from you was the defendant when you

22   were complaining about the false information in the

23   Berkshire Eagle?

24   A.    He was right next to me.

25   Q.    Closer than he is right now next to you?

1    A.    Yeah.

2    Q.    And when you say, "it reached my clientele base down

3    in New York City, it reached my summer guests, it reached

4    everybody," what do you mean?

5    A.    Again I was fresh off of the cancellation of the May

6    wedding.

7              MS. LEVINSON:   Objection; that has been asked

8    and answered a number of times already, Your Honor.

9              THE COURT:   It's true this has.   I'll allow it

10   to stand but we have gone over this a number of times.

11             MR. BRESLOW:   Okay.

12   Q.    (By Mr. Breslow)  The wedding that's referenced here,

13   is that the one in the e-mail?

14   A.    Yes.

15   Q.    Okay.  And the party you had scheduled for 5,000,

16   what was that?

17   A.    That was the Saturday night after the news vans were

18   in the parking lot.

19   Q.    Why did you tell the jury -- I'm sorry.  Why did you

20   tell the court that you were satisfied with the town of

21   Lee?  What does that mean?

22   A.    I thought they were helping me.  I thought they were

23   getting it put behind us.

24   Q.    I want to focus you on page 5, read lines 1 to 6 to

25   yourself.

1    A.    Okay.

2    Q.    Tell me when you're done?

3    A.    I'm done.

4    Q.    Okay.  And why did you say twice "it was dismissed at

5    the show cause level?"

6    A.    Because I got a thick head.  I wanted to be able to

7    say that it was dismissed.

8    Q.    And what did the defendant say when you were

9    communicating I want to be able to say my case was

10   dismissed at the show cause hearing?  Just read it into

11   the record.  What did the defendant say?

12   A.    "You don't even say that.  You tell them that the

13   results of the show cause hearing are confidential."

14   Q.    And on lines 18 through 24, I want you to read that

15   to yourself and tell me when you're done.  I'll let the

16   jury read along silently.

17   A.    Okay.

18   Q.    So tell the jury what did you understand the clerk

19   magistrate to be saying here when he said "If Chief Buffis

20   wanted to go forward with this, he has the right to go

21   forward with this and it would be probably on the front

22   page of the Berkshire Eagle."  What does go forward with

23   this mean?

24   A.    Go forward with the criminal complaint; that it could

25   go back into the front page of the Eagle again and draw

1   more attention to us.

2   Q.   And I want you to read into the record for the jury

3   what the defendant said when Clerk Magistrate Bartini

4   brought up the prospect that your case would be all over

5   the Berkshire Eagle?

6   A.   "All over again."

7   Q.   Now as he was standing there right next to you

8   hearing everybody talk about the Berkshire Eagle, did he

9   ever tell you who provided the false information to the

10  Berkshire Eagle?

11  A.   No, he didn't.

12  Q.   I want you to take a look at page 11 and read for

13  yourself silently lines 22 through 28.

14  A.   Okay.

15  Q.   What agreement do you understand Clerk Magistrate

16  Bartini to be talking about?

17  A.   The agreement that we both signed prior to him coming

18  back in and that again stating that if that agreement

19  wasn't abided by by both sides, that he could bring

20  charges back up against us.

21  Q.   So if you told anyone, somebody at the Berkshire

22  Eagle or even your mother or your daughter that charges

23  against you were dismissed, what did you understand Chief

24  Buffis could do?

25              MS. LEVINSON:   Objection; leading.

```
1              MR. BRESLOW:  It was an open-ended question,
2    Your Honor.
3              THE COURT:  I'll allow it.
4              THE WITNESS:  I understood that he could bring
5    the charges back up.  As a matter of fact, the State
6    Police showed up at our door about a month after and I
7    didn't want to talk to them.  I didn't know who they were.
8    I just sat there with my mouth shut.
9              MS. LEVINSON:  Objection.  Move to strike, not
10   responsive.
11             THE COURT:  The last portion of the answer will
12   be stricken as non-responsive.  All right, the last
13   portion.
14             MR. BRESLOW:  Your Honor, may I approach for a
15   moment on that?
16             THE COURT:  No.
17   Q.   (By Mr. Breslow)  I want to read page 12 -- I'm
18   sorry, page -- yes, page 12, lines 12 through 20.  Sorry,
19   page 10, lines 12 through 20.
20   A.   Okay.
21   Q.   Just tell the jury what the defendant said after you
22   and your wife were complaining about the false information
23   in the Berkshire Eagle?
24   A.   That he didn't read The Eagle.
25   Q.   And just one or two last questions about this
```

```
 1    document, on page 12 can you read to yourself lines 22
 2    through 25?  Okay.
 3    A.    Okay.
 4    Q.    What exactly did the defendant tell you when you
 5    asked him if you should bring a lawyer to the hearing?
 6              MS. LEVINSON:  Asked and answered; objection.
 7              THE COURT:  Overruled.
 8              THE WITNESS:  His actual words were, "If we
 9    wanted to waste our money, we can have one present."
10    Q.    (By Mr. Breslow)  I want to focus you on a new topic
11    now.  Mr. Fusco, have you been prosecuted by the U.S.
12    Attorney's office or the federal government for your
13    involvement in your wife's prostitution?
14    A.    No, I have not.
15    Q.    So do you even expect to be prosecuted by the federal
16    government for your involvement in your wife's
17    prostitution?
18    A.    No, I don't.  I don't think so, no.
19    Q.    Do you have any immunity for your trial testimony
20    today from the federal government?
21    A.    Yes.
22    Q.    And can you tell the jury in your own words what you
23    think that means?
24    A.    That anything that I talked about today, the federal
25    government couldn't press charges against me for.
```

1    Q.    Now, do you have pending state charges, charges by

2    the state government for your role in your wife's

3    prostitution?

4    A.    Yes, I do.

5    Q.    And does the federal government immunity extend to

6    that state prosecution?  Let me put it another way.

7          Can the state use your trial testimony against you to

8    prosecute your pending case for prostitution?

9    A.    Yes.

10   Q.    When were your charges, the initial charges that you

11   came to court for, dismissed?

12   A.    On February 21, 2012.

13   Q.    And who was responsible for dropping those charges?

14   A.    Chief Buffis.

15   Q.    Now, did you ultimately get recharged by the state --

16   A.    Yes.

17   Q.    -- for those crimes?

18   A.    Yes, I did.

19             THE COURT:   Parties at sidebar please.

20   (Sidebar conference.)

21             THE COURT:   I'm concerned regarding the legal

22   correctness of his assertion regarding the state's ability

23   or inability to prosecute him under the plea agreement.

24             MR. BRESLOW:   Under the --

25             THE COURT:   Under the immunity agreement, yes.

1    Is the immunity agreement going to be entered into

2    evidence?

3              MR. BRESLOW:  So I was planning on entering it

4    into evidence in the rebuttal.  I assumed that Ms.

5    Levinson was going to be cross-examining on this.  I can

6    enter it now.  I can present it to you for review before

7    we do so.  I think what I asked him was, does the federal

8    immunity extend to the state?  I'm happy to present it at

9    any time Your Honor wants.

10        One thing about the immunity agreement is just due to

11   the timing, it is signed by our office but not by their

12   lawyer.  Their lawyer I was expecting to have come to

13   court.  She didn't.  It's been extended to her.  It's not

14   been countersigned but it is the agreement that we have

15   with their lawyer with them.

16             THE COURT:  What's your position regarding the

17   admissibility of the agreement?

18             MS. LEVINSON:  I didn't know that it wasn't yet

19   signed by Attorney Quigly.

20             MR. BRESLOW:  We had given it to her.

21             MS. LEVINSON:  Yeah, I didn't notice that.  I

22   would not object to it.

23             THE COURT:  To admissibility?

24             MS. LEVINSON:  Yes.

25             THE COURT:  You have it?

```
 1                    MS. LEVINSON:  Yeah.
 2                    MR. BRESLOW:  She's had it for awhile.
 3                    THE COURT:  All right.
 4                    MR. BRESLOW:  Do you want to see a copy of it?
 5                    THE COURT:  I'm just not sure as to the accuracy
 6     of the assertion that the state is not bound by it.
 7                    MR. BRESLOW:  I'm pretty sure basically that's
 8     what it says.
 9                    THE COURT:  That what it says specifically?
10                    MR. BRESLOW:  Yeah, but let me double check.
11                    THE COURT:  You can do that during the lunch
12     break.
13                    MR. BRESLOW:  Okay.  I can.  Yeah, that's fine.
14                    THE COURT:  Keep moving on.
15     (End of sidebar conference.)
16                    MR. BRESLOW:  Your Honor, with the Court's
17     permission, I'd like to offer into evidence a document
18     that's not been offered into the evidence yet.  It's
19     Government's Exhibit 20.  It's the immunity letter from
20     the U.S. Attorney to Mr. Fusco's counsel.  The Court
21     should have a copy and your law clerk should have a copy
22     but I'm prepared to provide it to you now.
23                    THE COURT:  All right.  Objection?
24                    MS. LEVINSON:  No objection.
25                    THE COURT:  No objection.  All right.  Without
```

```
 1   objection, that will be admitted and we just have to
 2   determine what letter or number that exhibit will be
 3                 MR. BRESLOW:  Government Exhibit 20.
 4                 THE COURT:  It's 20.  All right.
 5                 MR. BRESLOW:  Your deputy and law clerk should
 6   have copies.
 7                 THE COURT:  All right.  Is that in the binder?
 8                 MR. BRESLOW:  Yes, it should be.
 9                 THE COURT:  Okay.
10                 MR. BRESLOW:  If the Court looks, I would direct
11   the Court's attention to paragraph 3.
12                 THE COURT:  Thank you.
13   (Government's Exhibit 20 admitted.)
14   Q.   (By Mr. Breslow) Okay.  I just want to ask you a
15   question about the agreement.  I know you're not a lawyer
16   and you've never been to law school, but what do you
17   understand the agreement to extend to?  Do you understand
18   the agreement provides you immunity from state prosecution
19   for your testimony?
20                 MS. LEVINSON:  Objection to leading at this
21   point.
22                 THE COURT:  It is leading.  Given this area,
23   I'll allow you to be careful but to use some leading
24   questions to get through the legal technicality.
25                 MR. BRESLOW:  Okay.  I actually asked him what
```

1    does he understand.  I don't think I was leading.

2    Q.   (By Mr. Breslow)  But what do you understand the

3    immunity agreement covers -- does not cover with respect

4    to your state testimony?

5    A.    It doesn't cover anything on the state testimony.

6    I'm still up on charges there.

7    Q.    Okay.  And do you understand whether or not the state

8    could prosecute you based on your statements under oath

9    today?

10   A.    I understand that they could, yes.

11   Q.    Okay.  I'm showing you what's already in evidence as

12   Government Exhibit 19.  Just focusing you on that caption,

13   is this your pending criminal case?

14   A.    Yes, it is.

15   Q.    And when approximately were you charged after the

16   defendant had dropped your charges in court?

17   A.    Well, this one is August 8th of 2013, so about 16

18   months after.

19   Q.    Okay.  And what were you charged with 16 months after

20   giving the defendant $4,000?

21   A.    The same charges, keeping a house of prostitution and

22   conspiracy.

23   Q.    And was it the defendant who brought those charges

24   again?

25   A.    No, it was not.

```
1              MR. BRESLOW:  Judge, I offer Government Exhibit
2    18, which is a virtually identical immunity letter for
3    Tara Viola.
4              MS. LEVINSON:  And I have no objection to that.
5              THE COURT:  Very well.  That will be admitted
6    also.
7    (Government's Exhibit 18 admitted.)
8    Q.   (By Mr. Breslow) So in August 2013, even though you
9    had already paid your donation to the defendant, what
10   happened?
11   A.   The charges were brought back.
12             THE COURT:  I'm sorry?
13             THE WITNESS:  The charges were brought back up
14   again.
15   Q.   (By Mr. Breslow) And was Tara charged with her
16   original charges around the same time?
17   A.   Yeah, same day.
18   Q.   Now, I want to focus you on events that happened
19   after the hearing.
20   A.   Okay.
21   Q.   The hearing took place on February 21st.  I'm showing
22   you what's already in evidence as Government Exhibit 16,
23   and what is Government Exhibit 16?
24   A.   That's an article that ran three days after the
25   magistrate hearing and it says "Secrecy in Sex Case
```

1    Involving Owners of the Inn at Laurel Lake."

2    Q.    Did you read this article?

3    A.    Yes.

4    Q.    I want to focus you on the middle of the page and

5    three paragraphs that are either quoting or paraphrasing

6    the defendant.  Did you read the defendant's quote, "there

7    is a nondisclosure agreement among the parties involved.

8    The findings of the magistrate will not be made public?"

9    A.    Yes, I did.

10   Q.    And did you read the part of the article that said

11   "the defendant wouldn't comment if the ruling means the

12   case is closed against the couple or if it remains open?"

13   A.    I did read that.

14   Q.    Now, tell the jury three days after the hearing was

15   your case closed or open?

16   A.    It was opened.  I'm sorry, the case?

17   Q.    Yes.

18   A.    I missed the question.

19   Q.    I'll ask it again.

20         Tell the jury three days after the hearing, the day

21   this article came out in the newspaper and you read it,

22   was your case closed or was it open?

23   A.    Our case was closed, but that nondisclosure thing is

24   why I thought he put it in there.  So if I said something,

25   it could get opened again.

1    Q.   So how did it feel to you with respect to -- I'm not

2    going to ask you to reiterate your concerns, but how did

3    it feel to you with respect to all those concerns you

4    talked about, when you read in the newspaper that the

5    defendant wouldn't tell the public that your case which

6    had been closed was in fact closed?

7    A.   That he was abiding by the agreement, but I would

8    again like to say it was dismissed but I couldn't.

9    Q.   And did you call up the Berkshire Eagle after you

10   read that article and say your case was closed?  It wasn't

11   open any more?

12   A.   No.

13   Q.   Why not, in a sentence?

14   A.   Because I didn't think they would get it right

15   anyway, but I just didn't because I had the agreement and

16   it said I couldn't.

17   Q.   Now in the week after the hearing, did you have

18   contact with the defendant?

19   A.   Yes.

20   Q.   And can you tell the jury how you communicated with

21   the defendant?

22   A.   I wrote him an e-mail.

23   Q.   Okay.  In addition to the e-mail, did you have any

24   other kind of contact with him?

25   A.   No.  After the Secrecy article ran, I believe I

1   texted a couple of times.  I think I tried to call but I

2   think he was in some sort of meeting, away, like in Boston

3   or something like that.

4         So I texted about the article because there was some

5   comments underneath that had to do with recordings that I

6   didn't know there were recordings and if they could be

7   made public, so I asked him and he said that that was

8   sealed.  Everything was sealed.

9   Q.   Okay.  And you said you communicated with him by

10  e-mail?

11  A.   I did send him an e-mail at one point, yes.

12  Q.   Tell the jury why did you send the defendant an

13  e-mail after your case had been closed and you had paid

14  the money he wanted you to pay?

15  A.   Because Tara had been working for many, many years in

16  the nursing home business and we were trying to get her a

17  job back in that business again, but every time she'd get

18  an interview, somebody would do a Google search.  While

19  nothing showed up on CORI checks at that point, everybody

20  --

21  Q.   What's a CORI check?

22  A.   A CORI check is like a background criminal

23  background, criminal background record, your appearances

24  in court or something like that.

25        Anyway, even though it wouldn't show up on a CORI

1    check, it would show up if somebody googled the name and

2    so I wanted to see if I could get a letter from the chief

3    that would say, you know, disregard what you read in the

4    media.  It's inaccurate so maybe to help her gain

5    employment again.

6    Q.    And --

7    A.    And I sent him -- I'm sorry, I sent him like a

8    paragraph of what we were looking for.

9    Q.    So I'm showing you what's already in evidence as

10   Government Exhibit 23.  I'm showing you what's already in

11   evidence as Government Exhibit 21, and can you tell the

12   jury what this is?

13   A.    That's the sample copy of the e-mail that I sent to

14   Mr. Buffis.

15   Q.    When did you send it?

16   A.    March 1, 2012.

17   Q.    And did you send it to his personal e-mail account?

18   A.    No, I sent it to the town of Lee.

19   Q.    That was an e-mail account that he had in his

20   capacity as chief of police?

21   A.    I'm assuming, yes.

22   Q.    And what is the subject of the e-mail?

23   A.    A letter for Tara.

24   Q.    So I'd like you to read for the jury and into the

25   record what you said in your e-mail to the defendant?

1    A.    The whole thing?   "To whom it may concern:   Tara A.

2    Viola is a valuable member of our community.   Her and her

3    husband Thomas Fusco have owned and operated a business

4    locally for 16 years.   They have six children between the

5    two that are all well-adjusted and cared for.   Both have

6    been active in our local community, whether it be coaching

7    youth sports or helping with our local toy drive during

8    the Christmas season."

9         "Recently our local newspaper ran a story that was

10   full of inaccuracies.   Because of these inaccuracies, Tara

11   has been finding it difficult to gain employment.   While I

12   have no control over what the paper has written, I have

13   full confidence in telling you Tara Viola's record is, and

14   always has been, spotless.   You should consider her for

15   any position with full confidence.   Joe Buffis, chief of

16   police, town of Lee."   Then I wrote, "Probably could be

17   worded better.   Let me know what you think.   Tom."

18   Q.    I want to focus you on the sentence that reads "both

19   have been active in our local community, whether it be

20   coaching youth sports or helping with our local toy drive

21   during the Christmas season," you earlier testified that

22   you had never even heard of the Laliberte Toy Fund, is

23   that right?

24   A.    That is right, yes.

25   Q.    Had you in fact donated to other toy drives in Lee?

A.    I hadn't, no.  Tara made some sort of donation the

prior December to some sort of charity.  I don't know what

it was.

Q.    Are you aware that there are other Christmas

charities in the town of Lee other than the toy drive?

A.    I would assume there's quite a few charities, yes.

Q.    So was that a reference to what Tara had done?

A.    Yes.

Q.    Now, after you sent this e-mail, what happened?

A.    It was reworded and a copy sent back to me, an e-mail

from Joe.

Q.    When you say it was reworded, who reworded it?

A.    I'm assuming Joe did.

Q.    Okay.  You don't know but you received a different

version?

A.    It came from that same e-mail address, yes.

Q.    Okay.  And I'm showing you now what's already in

evidence as Government Exhibit 22.  Is this what you

received?

A.    Yes, I'm sorry.  Yeah, that is what I received, yes.

Q.    From the defendant?

A.    Yes.

Q.    And whose letterhead is this letter on?

A.    Lee Police Department, the town of Lee.

Q.    And who is the letter addressed to?

1    A.    Potential employers.

2    Q.    Who is it from?

3    A.    Joseph Buffis.

4    Q.    I just want to focus you on a few lines of the actual

5    letter.  Can you read the highlighted language?

6    A.    "I have been acquainted with Tara Viola for the past

7    several years."

8    Q.    Is that true or false?

9    A.    That's not true.  No.

10   Q.    And when was the first time that the defendant met

11   Tara Viola?

12   A.    At the magistrate hearing.

13   Q.    And can you read the highlighted language starting

14   with the line "Tara and Thomas?"

15   A.    "Tara and Thomas have been youth sport coaches,

16   ardent supporters of our DARE program and generous donors

17   to the Laliberte Toy Fund during the holiday season."

18   Q.    Now you had not written that in your earlier e-mail,

19   had you?

20   A.    No, I had not.

21   Q.    And so where it says "Tara and Thomas have been

22   generous donors to the Laliberte Toy Fund during the

23   holiday season," is what the defendant wrote back to you

24   true or false?

25   A.    Well, it was false.

1    Q.    And had you been generous donors to the Laliberte Toy

2    Fund during the holiday season?

3    A.    No.

4    Q.    Had you ever donated to the toy fund at all?

5    A.    No.

6    Q.    When was the donation -- on what date did you provide

7    the only donation to the toy fund?

8    A.    February 21, 2012.

9    Q.    And it says here that you have each been "ardent

10   supporters of the DARE program."  Do you know what the

11   DARE program is?

12   A.    Yes.

13   Q.    What is it?

14   A.    I believe it's a dare to keep your kids away from

15   drugs.  It was fairly prevalent in the elementary school

16   when my kids came up through, and when my daughter was in

17   elementary school I did make a donation to it and I did

18   used to see them in the Founders Day Parade.  There would

19   be a section for DARE, things like that.

20   Q.    Okay.  So as an ardent supporter to the DARE program,

21   according to the defendant, how many times had you

22   donated?

23   A.    I donated probably once.

24   Q.    And as an ardent supporter to the DARE program,

25   according to the defendant, how much did you donate?

1    A.    $25.

2    Q.    And when approximately did you donate?

3    A.    About eight years prior to that when my daughter was

4    in elementary school.

5    Q.    So is what the defendant wrote about you and Tara

6    true or false as it regards the DARE program?

7    A.    I wouldn't call that accurate, no.

8    Q.    And I want to focus you back to the bargaining that

9    you engaged in with the defendant at the magistrate's

10   hearing in that private meeting.

11        Did you or Tara mention the DARE program to the

12   defendant in that meeting?

13   A.    You know, I don't recall that.  I know I didn't.

14   Whether she did or not, I don't know.

15   Q.    Okay.  So you don't have any memory of the DARE

16   program being said?

17   A.    No.  I don't remember that at all, no.

18             MR. BRESLOW:  Okay.  I just have two or three

19   more questions.

20             THE COURT:  Sure.

21   Q.    (By Mr. Breslow) Can you tell the jury -- in the

22   beginning you talked at length in the beginning part of

23   your testimony, do you still own the Inn?

24   A.    No, I don't.

25   Q.    And tell the jury why not.

1    A.   It went through a foreclosure.

2            MR. BRESLOW:  Your Honor, I have no further

3    questions.

4            THE COURT:  All right.  Instead of starting the

5    cross-examine now, why don't we do a lunch break.

6            THE CLERK:  All rise.

7            THE COURT:  So during the lunch break do not

8    discuss the case, begin deliberations, research the case

9    in any way, try to access it on your phones or by any

10   other means.  Do not read any media accounts if you should

11   happen to have access to them.  All right.

12   **(The jury left at 1:12.)**

13           MR. BRESLOW:  Your Honor, I already told defense

14   what our next several witnesses are to aid them in

15   preparing.

16       When should we come back?

17           THE COURT:  I think we should come back so we

18   can have the jury back in the box at 2:15, so maybe ten

19   after.

20           MR. BRESLOW:  A little before 2:15.

21           THE COURT:  Yeah, thank you.

22   **(A recess was taken at 1:13 until 2:14.)**

23           MR. BRESLOW:  Your Honor, before the jury comes

24   back, Ms. Levinson informed me she does not intend to

25   require additional testimony from Ms. Viola.

```
 1            THE COURT:  Okay.  Good.  So that issue is
 2   resolved?
 3            MS. LEVINSON:  Yes.
 4            THE COURT:  All right.
 5            MR. BRESLOW:  Would you like the witness to take
 6   the stand?
 7            THE COURT:  Yeah.
 8   (The jury entered at 2:15.)
 9            THE COURT:  Be seated.  Ladies and gentlemen,
10   were you able to comply with my instructions not to being
11   discussing the case, begin deliberations, not accessing
12   the media about the case, or do any research about the
13   case?
14            THE JURY:  Yes, Your Honor.
15            THE COURT:  Good.  Thank you.  The jury remains
16   fair and impartial.
17        Ms.  Levinson.
18            MS. LEVINSON:  Thank you, Your Honor.
19   CROSS-EXAMINATION
20   Q.   (By Ms. Levinson) Good afternoon, Mr. Fusco.
21   A.   Good afternoon.
22   Q.   I'm Lori Levinson.
23   A.   Nice to meet you.
24   Q.   I'm Mr. Buffis' attorney.
25        Prior to appearing here today in court, you had an
```

1    opportunity to prepare for your testimony with Mr.

2    Breslow, Ms. Shukla, Special Agent Lewandowski, Agent Ian

3    Smythe, didn't you?

4    A.   Yes, I did.

5    Q.   And can you tell us please how many times you met

6    with members of the government prosecution team prior to

7    testifying?

8    A.   I believe it was three.

9    Q.   Do you recall over what period of time the three

10   meetings occurred?

11   A.   A week.

12   Q.   Over the past like last week?

13   A.   Yes.

14   Q.   Okay.  And you came here to Springfield to meet with

15   them, correct?

16   A.   Yes.

17   Q.   And, in fact, you even practiced testifying sitting

18   here in a witness box, correct?

19   A.   Yes.

20   Q.   During the times you were preparing for your

21   testimony, you had an opportunity to review any prior

22   statements that you had made in relation to this case,

23   correct?

24   A.   I reviewed the testimony that I gave to the grand

25   jury, yes.

1   Q.   And were you also afforded the opportunity to review

2   statements that your wife Ms. Viola made?

3   A.   No.

4   Q.   You did engage in conversations with the government

5   team, did you not?

6   A.   With the government team, yes.

7   Q.   And during those conversations with the government

8   team you did touch upon different pieces of evidence,

9   correct?

10  A.   Yes.

11  Q.   And during your conversations in trial preparations

12  with the government team, you went over the different

13  documents that were going to be referred to during your

14  testimony, is that correct?

15  A.   Yes, I did.

16  Q.   So prior to your appearing in court today, you had

17  recently become re-familiarized with all of the documents

18  that you were going to be talking about today, correct?

19  A.   Yes.  It's been quite a while, yes.

20  Q.   And I also take it that you and Ms. Viola you're

21  still are married, right?

22  A.   Yes, we are.

23  Q.   Still live together?

24  A.   Yes, we do.

25  Q.   And I take it the two of you have discussed the

```
 1   upcoming trial between the two of you?
 2   A.   No, we haven't.  She is very -- and so am I, we are
 3   ready to do it.
 4             THE COURT:  Ms. Levinson --
 5             A JURY:  She's having trouble hearing.
 6             MS. LEVINSON:  Do I need to start over?
 7             A JUROR:  No.
 8             A JUROR:  I seen it so I wanted to bring it to
 9   your attention.
10             THE COURT:  Thank you.  I appreciate that.
11   Q.   (By Ms. Levinson)  During your preparation to testify
12   here, did you have an opportunity to review the transcript
13   of the magistrate's hearing in the Southern Berkshire
14   District Court?
15   A.   Yes.
16   Q.   And did you have a chance to review the transcript
17   that was made of that hearing?
18   A.   Yes.
19   Q.   And having reviewed that transcript, were you
20   satisfied that that was a fairly accurate transcription of
21   the magistrate's hearing that you attended in the Southern
22   Berkshire District Court?
23   A.   Yes.
24   Q.   To the best of your recollection?
25   A.   Yeah.
```

1   Q.    Now, you testified earlier today that when you

2   learned that your wife was engaging in acts of

3   prostitution at the Inn, you didn't think that was a

4   really big deal, right?

5   A.    That is right, yes.

6   Q.    And, in fact, you supported her doing that as a means

7   of supplementing her income, correct?

8   A.    That is correct, yes.

9   Q.    And one of the reasons you didn't think it was such a

10  big deal is because based on your kind of lifestyle,

11  prostitution isn't that far a step away from swinging,

12  would that be fair to say?

13  A.    That's not fair at all, no.

14  Q.    So you would agree that you and your wife are

15  involved in an unconventional sexual lifestyle?

16  A.    At the time probably, yes.  Now, not really so much.

17  Q.    Now you're not involved in it so much?

18  A.    Not really, no.

19  Q.    But back in 2011 and 2012 you were?

20  A.    Yeah.  We were never huge into it but, yes.

21  Q.    And you would agree that that is non-mainstream kind

22  of activity, correct?

23  A.    Yes.

24  Q.    Now you did testify that you personally know about

25  500 people --

1    A.    That's correct.

2    Q.    -- who participate, correct?

3    A.    That's right.

4    Q.    From all walks of life, right?

5    A.    Yes.

6    Q.    And it would be fair to say that you're not close

7    personal friends with all 500 of them?

8    A.    That's fair to say.

9    Q.    So you have no way of knowing out of those 500 or so

10   people that you know who participate in this lifestyle,

11   you don't know who's saying what to whom, right?

12   A.    No.

13   Q.    You don't know who of those some 500 people are

14   sharing their lifestyle with other people in the

15   community?

16   A.    No, I would assume some are and I would assume some

17   aren't.  It's up to them; that's their choice.

18   Q.    So being associated with so many people, you knew

19   that you were taking a risk of having your lifestyle

20   exposed outside of the confines of your home?

21   A.    There are certain things you can do to limit that.

22   There are risks involved, yes, but you tend to be careful.

23   Q.    And you and Ms. Viola did try to be careful as you

24   explained to us earlier today?

25   A.    Until today they knew nothing about it.

1    Q.   Well, you're aware of the fact that for years there
2    have been rumors going around Lee that there was swinging
3    going on at the Inn at Laurel Lake, right?
4    A.   There's a lot of rumors in Lee about everything.
5    Q.   And you know that there have been rumors in Lee about
6    swinging at the Inn at Laurel Lake?
7    A.   I didn't hear them but it wouldn't be hard to
8    believe.
9    Q.   And, in fact, would it surprise you to learn that
10   right here in this courtroom during jury selection --
11             MR. BRESLOW:  Objection, Your Honor.
12             THE COURT:  Sustained.
13   Q.   (By Ms. Levinson) So it wouldn't surprise you if
14   people in Lee were talking about swinging at the Inn?
15   A.   No.
16   Q.   And you said that during these swinging events that
17   you would host at the Inn, you would put a private
18   function sign out in front, right?
19   A.   Yes.
20   Q.   And that would hopefully deter people from the street
21   just walking in, right?
22   A.   More than hopefully.  It worked.  We didn't have
23   anybody from the street walk in.
24   Q.   But you don't know, do you, what the people of Lee
25   would think when they see this private function sign

1    outside the Inn?

2    A.   No.   I would assume they would think there's a

3    private function at the Inn.

4    Q.   And based upon your supposition that there are rumors

5    around Lee you're hosting swinger events there, wouldn't

6    it be fair to infer that some people seeing that sign

7    would infer that there was a swingers' event going on?

8              MR. BRESLOW:  Objection, speculation.

9              THE COURT:  Sustained.

10   Q.   (By Ms. Levinson) So when your wife told you that she

11   was engaging in prostitution at the Inn, you thought that

12   was an okay idea to supplement her idea?

13   A.   If I had hindsight, I would have said no, but I

14   didn't at the time, yes.

15   Q.   At the time you supported it?

16   A.   Yes.

17   Q.   And you supported it to the extent that you actually

18   helped make up the ads that would appear online?

19   A.   Yes.

20   Q.   And you supplied the photographs that she would use

21   in her advertisements?

22   A.   Those were the photographs that I took of my wife on

23   vacation.

24   Q.   And you suggested that those photographs be used in

25   her online advertisement?

1    A.    That I'm not sure.  She might have picked the ones.

2    I'm not good at pictures and things.

3    Q.    And the two of you together decided which kind of

4    pictures should appear online, right?

5    A.    Again, I would assume that's possibly her but it's

6    possible.

7    Q.    And would it be fair to say that you both wanted the

8    ads online to portray her in a very attractive way?

9    A.    That is usually how that works.

10   Q.    So that she would attack more customers, right?

11   A.    Yes.

12   Q.    And you knew what was going on in her happy-ending

13   massages?

14   A.    Shortly after.

15   Q.    In fact, you testified that you would be present at

16   the Inn a couple away rooms when she was engaging in acts

17   of prostitution?

18   A.    That is right, yes.

19   Q.    Now the ad for her happy-ending massages was over the

20   Internet, right?

21   A.    Yes, it was.

22   Q.    And you're aware of the fact that people all over the

23   world are able to access that kind of material?

24   A.    Sure.

25   Q.    And you were aware that people in Berkshire count can

1    access that material?

2    A.   Yes.

3    Q.   People in the town of Lee can access that type of

4    material?

5    A.   Yes.

6    Q.   Parents of your children's and her children's friends

7    can access that kind of material?

8    A.   Yes.

9    Q.   And the same thing with your swingers website, right?

10   A.   Not really.

11   Q.   Well, that's not -- you don't need a password to get

12   into that kind of website, do you?

13   A.   You need to have an account, yes.

14   Q.   But if you have an account, anyone in the world can

15   access that website?

16   A.   Unless you pay to be on there, then you could only

17   see certain things.

18   Q.   But if you pay to be on there --

19   A.   Yes.

20   Q.   -- anybody in the whole world?

21   A.   Yes.

22   Q.   Including people from Berkshire County?

23   A.   Yes.

24   Q.   Including people from Lee?

25   A.   Sure.

1   Q.   So you were well aware of the fact that you were out

2   there in cyberspace able to be discovered, right?

3   A.   Absolutely.

4   Q.   And that was a risk that you and Ms. Viola decided to

5   take?

6   A.   Yes.

7   Q.   And the same thing with her prostitution, that was a

8   risk that you were willing to take, correct?

9   A.   Yes.

10  Q.   Now, you were married prior to your marriage to Ms.

11  Viola?

12  A.   Yes.

13  Q.   And your ex-wife and you engaged in the swinging

14  lifestyle together, did you not?

15  A.   To a much, much -- it was different back then.

16  Q.   What was it like?

17  A.   It was like the stone age.  The Internet really

18  wasn't around so much back then.

19  Q.   But you did engage in sex with other couples?

20          THE COURT:  Relevance?  Is there an objection?

21          MR. BRESLOW:  Yes, Your Honor.  I was

22  considering it but, yes.  We object to relevance of the

23  participation of the ex-wife.

24          THE COURT:  Well, given that time frame, you're

25  talking about a prior marriage, that objection is

1    sustained.  The question will be stricken.

2    Q.   (By Ms. Levinson) When you and Ms. Viola got married,

3    she had not previously been involved that lifestyle?

4    A.   No, she had not.

5    Q.   And you introduced her to the lifestyle?

6    A.   I wouldn't state it that way, no.

7    Q.   But you were already involved, right?

8    A.   No, not prior to that.  My ex-wife and I divorced

9    back in 2000.  I didn't meet Tara until 2010.  There was a

10   ten-year gap so during that ten years no, nothing.

11   Q.   So you started the swinging lifestyle once you became

12   married to Ms. Viola?

13   A.   I believe we were engaged or dating.

14   Q.   And that's when you decided to start?

15   A.   Yes, that's when the subject came up, yeah.

16   Q.   And she agreed to participate with you?

17   A.   Yes.

18   Q.   Now, you testified here earlier how devastated you

19   and your family and Ms. Viola are going to be by potential

20   media coverage of your testimony about swinging, right?

21   A.   Yes.

22   Q.   And back in 2012, specifically January 19th of 2012,

23   you testified how devastated your wife and you were by

24   media coverage about the prostitution business that had

25   been going on at the Inn?

1    A.    That is correct, yes.

2    Q.    And now prostitution is illegal, right?

3    A.    It is, yes.

4    Q.    And swinging is not technically illegal, is it?

5    A.    Technically?

6    Q.    Right.

7    A.    It's not illegal, no.

8    Q.    Well, in the Commonwealth of Massachusetts isn't it

9    still illegal to commit the crime of adultery?

10   A.    I'm not a lawyer.

11              MR. BRESLOW:  Objection.

12              THE COURT:  Sustained.

13   Q.    (By Ms. Breslow)  Do you know whether or not there is

14   a crime of adultery in Commonwealth of Mass?

15              MR. BRESLOW:  Objection.

16              THE COURT:  Strike the question.  I'm not going

17   to allow you to go there.

18              MS. LEVINSON:  Okay.

19   Q.    (By Ms. Levinson)  But you were aware of the fact

20   that the crime of -- that prostitution was illegal at the

21   time you were promoting Ms. Viola in her prostitution

22   business?

23   A.    Yes, I do.

24   Q.    And being aware that it was illegal, you must have

25   been aware that there was a possibility that if discovered

```
1    either or both of you could be arrested and charged with
2    criminal acts?
3    A.    As we were, yes.
4    Q.    Now you testified at some length about how upset both
5    of you were that the Berkshire Eagle printed false
6    information about what happened with you and Ms. Viola at
7    the Inn on January 19th of 2012, correct?
8    A.    Yes, I did.
9    Q.    You were very upset that The Eagle published a news
10   article saying that the two of you had been arrested,
11   correct?
12   A.    Arrested and arraigned, yes.
13   Q.    And the arrested and arraigned had been in an earlier
14   online post, correct?
15   A.    From the Berkshire Eagle, yes.
16   Q.    And then an updated version came out that didn't say
17   anything about arraigned, correct.
18   A.    That's correct.
19   Q.    And the updated version didn't say anything about
20   arrested, did it?
21   A.    No, it did not.
22   Q.    The updated version -- if I may, I'm going to show
23   you what has previously been introduced into evidence as
24   Government Exhibit 5.
25   A.    Okay.
```

1    Q.   Page 5 of that exhibit, and I'm going to ask you to

2    take a look at the highlighted portion.  Do you see that?

3    A.   It's not on.

4    Q.   Your monitor isn't on.

5         THE CLERK:  You can tap the screen.

6    Q.   (By Ms. Levinson)  Can you see it now?

7    A.   Yes, I can.

8    Q.   Could you read for us the highlighted portion?

9    A.   Yep.  "On Thursday night, Fusco refuted in a brief

10   statement to The Eagle the police report that he and his

11   wife will be charged in connection to the alleged sex

12   crimes."  That's not what I said.  "Later, police

13   confirmed that those charges are indeed pending."

14   Q.   So what the newspaper just said, what the newspaper

15   reported was not true?

16   A.   Yes, that's not true.

17   Q.   So it's says in the newspaper that you said that it

18   was false that you and Ms. Viola will be charged in

19   connection with this, right?

20   A.   Lee is a small town and my son went to school with

21   Dick Lindsay's son.

22   Q.   I'm going to ask you to stop there.

23   A.   I can tell you where you're going wrong.

24   Q.   I actually have some more questions.

25   A.   Can you repeat the question please?

1    Q.   Sure.  You just said that what the newspaper reported

2    that you said is incorrect?

3    A.   That is correct.  I said it was wrong.

4    Q.   So what you're saying is you did not tell The Eagle

5    that you and your wife would not be charged?

6    A.   What I told the Eagle, if you're interested in

7    hearing this --

8    Q.   Go ahead.

9    A.   I told the Eagle that we were not arrested and

10   arraigned that afternoon, that's it.

11   Q.   But it is true that the portion of that that is

12   absolutely true is that you will be -- that you have been

13   charged and the charges are pending?

14   A.   I can't comment on that.  You asked what I corrected

15   and that's what I corrected.

16   Q.   No I'm asking you a new question.

17            MR. BRESLOW:  Objection; that's not in evidence.

18   The statement, according to the document, is Thursday

19   night January 19th and the application for a criminal

20   complaint  is already in evidence is January 20th so her

21   question presumes facts that are not in evidence.

22            MS. LEVINSON:  I'm now referring, Your Honor, to

23   a paragraph in an article.  May I?

24            THE COURT:  The objection is overruled.  You may

25   go ahead.

1    Q.    (By Ms. Levinson)   So in the article, the last

2    sentence of the highlighted paragraph, states "later,

3    police confirmed that those charges are indeed pending,"

4    correct?

5    A.    Yes.

6    Q.    Now to the best of your knowledge and belief when Ms.

7    Viola left the Lee Police station on January 19, 2012,

8    after having been interviewed by Officer Lucy and Sergeant

9    Meiklejohn, she was told that she would be summoned to

10   court to face criminal charges?

11   A.    I don't remember her saying that.

12   Q.    Well, you were aware that something with court was

13   going to happen after Ms. Viola left the Lee Police

14   Department on January 19th?

15   A.    Once the phone calls started going to -- I don't know

16   if --

17              THE CLERK:   Try pulling it down a little bit.

18              THE WITNESS:   Okay.   Can you guys hear me?

19        Once the phone calls went to Officer Lucy, that's

20   when we started.   That's when we knew what the next steps

21   were going to be once the phone calls with Officer Lucy.

22              THE COURT:   We are going to take a time out and

23   get the microphone straightened out.   Let's get it

24   adjusted as you normally would need to use it.   So you're

25   comfortable with that?

1           THE WITNESS:  Yes.

2           THE COURT:  You can pull it a little closer.  I

3   don't know what's going on with it.  Let's give it a try.

4   Q.   (By Ms. Levinson)  So you don't recall Ms. Viola

5   telling you when she got back from the Lee Police

6   Department that she and possibly you were going to be

7   summonsed to go to court at a later date?

8   A.   I wasn't aware of that, no.

9   Q.   Well, you did go to the Lee Police Department to meet

10  with Ms. Viola to pick her up on January 19, 2012,

11  correct?

12  A.   That's correct, yes.

13  Q.   And when you got there, she was in a room waiting to

14  speak with you, correct?

15  A.   That's correct, yes.

16  Q.   And when you got there and you went into the room to

17  speak with her, she told you that she had lied to the

18  police about your participation in the prostitution

19  business?

20  A.   She may have.  That was quite a while ago.  I don't

21  recall that, no.

22  Q.   Now let's go back to earlier on January 19, 2012, you

23  testified that you were at home at the Inn and Tara had a

24  massage client with her, right?

25  A.   That's correct.

1    Q.    And then all of a sudden you heard dogs barking?

2    A.    We have four Boston terriers and they bark, yes.

3    Q.    And that brought your attention into the kitchen?

4    A.    That is right.

5    Q.    And there's where you found a police officer,

6    correct?

7    A.    There was someone standing there with a badge, yes.

8    Q.    And it was at that time that you learned that the

9    police had basically found out that your wife was

10   providing happy-ending massages?

11   A.    That's correct, yes.

12   Q.    And you testified how she spent some amount of time

13   speaking to officers privately?

14   A.    Yes.

15   Q.    And you spent some time talking to somebody from the

16   police department about a Patriot's game?

17   A.    Yes, they were playing Baltimore that weekend.

18   Q.    And at that time you were stating to the police that

19   you didn't know anything about any potential prostitution?

20   A.    No.

21   Q.    No, what?

22   A.    No, I didn't.  We talked about the Patriot's game,

23   that's it.  Initially I said why are you here?  He said

24   you know why.  That's all the conversation that went on.

25   Q.    So you never made an admission that you knew why they

1    were there?

2    A.    I didn't need to.

3    Q.    But there came a point when the police were at your

4    house that you got into a verbal altercation with Sergeant

5    Meiklejohn, didn't you?

6    A.    Yes.

7    Q.    Can you tell us about that verbal altercation?

8    A.    I asked him to leave.  They didn't want to leave,

9    that's it.

10   Q.    Okay.  Things got a little heated?

11   A.    A little bit.

12   Q.    And you lost your temper, be fair to say?

13   A.    It was an emotional moment.

14   Q.    So it be fair to say that you lost your temper?

15   A.    I think more he lost his temper than I did but, yes.

16   Q.    When you say he lost his temper, can you tell us what

17   -- how it is that you perceived him to be losing his

18   temper?

19   A.    He said this could go down a very different way.  We

20   are doing this a nice way.  Your wife is cooperating; I

21   suggest you do too, so I did.

22   Q.    And did you feel intimidated by the way he talked to

23   you?

24   A.    Not really.  I saw her and that calmed me down.  She

25   was telling me to stop.

1    Q.    But would it be fair to say that he was being

2    aggressive towards you?

3    A.    Yes.

4    Q.    Now, sometime after January 19, 2012 you ended up

5    having a confrontation with somebody at the Dresser-Hull

6    Lumber Yard in Lee, didn't you?

7    A.    A confrontation?

8    Q.    Yes.

9    A.    Or a discussion?

10   Q.    A confrontation.

11   A.    No.

12   Q.    So do you recall having a conversation with a

13   gentleman who works at the Dresser-Hull Lumber about the

14   fact that you believed it was his wife who had turned you

15   and Tara into the police?

16   A.    Yes.

17   Q.    And that was a heated confrontation?

18   A.    Not really.  I took him for a ride in the car.  We

19   drove and just sat and talked for a minute, and then I

20   dropped him back off.

21   Q.    You were angry, weren't you?

22   A.    You know, at the time you're not really thinking

23   clear.  I probably should have made better decisions then,

24   yes, a lot of better decisions, yeah.

25   Q.    So it would be fair to say that you were angry?

1    A.    It wasn't a heated discussion with him.   It was a

2    drive in a car.   We stopped; we chatted.   I drove him back

3    to work and dropped him off.   That's it.

4    Q.    Now, do you recall that on January 20th, which would

5    have been the day after the news article came out, the day

6    after the police came to the Inn, that Ms. Viola was so

7    upset about the publicity in the newspapers that she asked

8    you to call the Lee Police Department to speak to Officer

9    Lucy?

10   A.    Time and time again, yes.

11   Q.    So specifically that morning of January 20th you did

12   call the Lee Police Station to talk to Officer Lucy?

13   A.    Yes, I did.

14   Q.    And you told him how upset Ms. Viola was about the

15   publicity?

16   A.    Yes.

17   Q.    You told him how upset she was because the newspaper

18   got it wrong because they said that you are arrested,

19   right?

20   A.    Well, actually she, not me, but she -- I don't know

21   if I can say this, but was told the day before it wasn't

22   going to go to the media so that's what she was upset

23   about so, yeah, I did call that morning for that reason,

24   yes.

25   Q.    So she was upset because she thought it wasn't going

1   to go to the media?

2   A.   She was told it wasn't going to go to the media.

3   Q.   And then it ended up in the media?

4   A.   Yes, it did.

5   Q.   And she was very upset that it said that she was

6   arrested, right?

7   A.   She was upset about a lot of things, but one of them

8   was being arrested and arraigned, yes.

9   Q.   But the truth of the matter is that she had been

10  committing the crime of prostitution in the end, right?

11  A.   That's correct.

12  Q.   And that was true what the newspaper published?

13  A.   Most of the newspaper article was true, yes.

14  Q.   And that was a risk that she and you knowingly took

15  when you decided to let her be a prostitute?

16  A.   I think when people take those risks, any risk, they

17  don't expect those consequences.

18  Q.   But you understood that that was a risk?

19  A.   I did.

20  Q.   And here it came home to roost?

21  A.   It sure did, way bigger than anybody could have ever

22  imagined I believe.  Three and a half years later we're

23  still sitting here.

24  Q.   Well, do you recall that in response to your phone

25  call to the Lee Police Department Ryan Lucy actually came

1    over to the Inn, right?

2    A.   Yes, I do.

3    Q.   And he actually apologized for the publicity,

4    correct?

5    A.   I don't recall that.

6    Q.   Okay.  Do you recall him telling you that that they

7    were very sorry, that the Lee Police Department was very

8    sorry that the media had gotten ahold of the story?

9    A.   Yes, I do.

10   Q.   And do you also recall him reassuring Ms. Viola that

11   she wasn't going to be taken away in handcuffs?

12   A.   Yes.

13   Q.   And that she wasn't going to lose her kids?

14   A.   Yes.

15   Q.   And then as you testified over the next period of

16   time, days, weeks, Ms. Viola had you call Officer Lucy a

17   number of times, right?

18   A.   More times than I actually did call him, yes.  A lot

19   of times I would go in the other room, come back and say,

20   well, he wasn't there just because I didn't think he had

21   anything new to say.

22   Q.   And what she wanted to know and what you wanted to

23   know was what's going to happen next, right?

24   A.   Yeah.

25   Q.   And you testified that during these conversations --

1    I believe you testified that Ryan Lucy told you, well, you

2    would be brought to court at some point in time, right?

3    A.    Yes.

4    Q.    And I think that by the time you were having some of

5    these conversations with Officer Lucy you, and Ms. Viola

6    had already received your summons to go to the Southern

7    Berkshire District Court on February 21st?

8    A.    The summons came in some time during those phone

9    calls, yes.

10   Q.    So during some of these phone calls you already knew

11   that you would be going to court?

12   A.    Yes.

13   Q.    And you were anxious to know what to expect when you

14   went to court?

15   A.    Yes.

16   Q.    And you had a number of telephone calls about that?

17   A.    Yes.

18   Q.    And you recall that during one of the phone calls

19   Officer Lucy either put down the phone or covered the

20   phone so you couldn't hear something that was going on --

21   A.    Yes.

22   Q.    -- on his side of the line?

23   A.    That is correct.

24   Q.    And then he came back on the line and he said

25   something to the effect that he was talking to the chief,

1    meaning Mr. Buffis, and that Mr. Buffis had said that if

2    you donated the proceeds of the prostitution business to

3    charity, he would continue the case and not have it go to

4    a full complaint, right?

5    A.    That's correct, yes.

6    Q.    Now you were aware of the fact that when Ms. Viola

7    met with Officer Lucy and Sergeant Meiklejohn on January

8    19th, she repeatedly volunteered to donate $6,000 of

9    prostitution money to charity?

10   A.    I was not aware of that, no.

11   Q.    You learned that, didn't you?

12   A.    Not really, no.

13   Q.    So is it your testimony that living with Ms. Viola,

14   being involved in this very traumatic event with her, you

15   never learned that she told the police that she would

16   voluntarily donate $6,000 of prostitution money to

17   charity?

18   A.    No, I did not.  I can tell you that Tara's mental

19   state during this whole process was not good.

20   Q.    I didn't ask you that.

21   A.    That's what I'm telling you.  So whatever she might

22   have said doesn't necessarily translate.

23   Q.    Mr. Fusco, I didn't ask that question.

24   A.    Okay.

25   Q.    Do you recall having a telephone conversation with

1    Officer Lucy in which you told him that of the $6,000 that

2    was in Ms. Viola's account, not all of it was prostitution

3    money?

4    A.    Yeah, there was actually between 65 and $6,600 in

5    there but not all of it was from that, yes.

6    Q.    So you had a conversation with Officer Lucy in which

7    you said there is less than $6,500 of prostitution money

8    in Ms. Viola's account?

9    A.    With Officer Lucy, yes.

10    Q.    And, in fact, at some point you recall having a

11    conversation with Officer Lucy in which you asked him if

12    it was okay for Tara to start paying bills out of that

13    account?

14    A.    Yes.

15    Q.    You asked that question about whether it was okay for

16    her to start paying bills out of that account because you

17    knew that the police department was looking to forfeit

18    that money, is that correct?

19    A.    I asked it because we were told not to touch it.  She

20    needed to use it.  She needed to pay her bills, so I said

21    can she use this.

22    Q.    And you knew that the reason you had to ask

23    permission to use the money was because the police

24    department was looking to forfeit the money?

25    A.    I didn't know how much they were looking to forfeit.

1    We had asked several times.  We never got an answer for

2    that.

3    Q.    And you're testifying here today you didn't know that

4    Ms. Viola had offered $6,000?

5    A.    I am testifying today I did not know that Ms. Viola

6    was offering $6,000.

7    Q.    But you do know that or to your best guestimate there

8    were possibly 4,000 or so dollars of prostitution money in

9    that account?

10    A.    I had no idea how much money was in that account.  I

11    just didn't know.  I had my bills; she had hers.

12    Q.    So you inquired of Officer Lucy if Ms. Viola could

13    pay bills?

14    A.    Yes, I did.

15    Q.    And you were told no, she could not pay bills?

16    A.    The first time I asked that question, yes.

17    Q.    And then you had subsequent conversations with

18    Officer Lucy, right?

19    A.    I had one more, yes.

20    Q.    And there was talk during that conversation of Ms.

21    Viola donating the proceeds of her prostitution business,

22    correct?

23    A.    The next call with Officer Lucy was again to ask if

24    we can go ahead and use the proceeds -- I mean, not

25    proceeds, excuse me, to use the money in the account to

1    pay her bills and he said yes.  I believe he said

2    something to the effect of be careful or something like

3    that.  I didn't really understand what that means, but she

4    had bills and she paid them.

5    Q.    You just slipped, you said proceeds but in fact you

6    were aware that some of the money in that account were

7    proceeds of the prostitution business?

8    A.    Some of the money in the account, yes, I was aware of

9    that, yes.

10   Q.    Now do you recall in the conversation with Officer

11   Lucy in which he came back told you that the chief,

12   meaning Mr. Buffis, had suggested that if Ms. Viola

13   donates money to charity, that the charges could be dealt

14   with on a show cause level?

15   A.    Yes.

16   Q.    And, in fact, what Officer Lucy said to you was that

17   if you donated the proceeds to a local charity, whatever

18   we, the police, determine the proceeds to be, then we can

19   handle the case at the magistrate level?

20   A.    Yes.

21   Q.    So that's what Officer Lucy told you that Chief

22   Buffis had conveyed to him?

23   A.    Yes.

24   Q.    So as you sit here now, can you tell us what charity,

25   if any, Officer Lucy mentioned to you during that phone

1    call?

2    A.    As I sit here now?

3    Q.    Yes.

4    A.    He mentioned the DARE program and he mentioned

5    another one but I don't remember the other one.   I do

6    remember the DARE program.

7    Q.    So you recall that in a conversation prior to going

8    to court you spoke to Officer Lucy about the possibility

9    of Tara donating proceeds to DARE, right?

10   A.    Yes.

11   Q.    And you recall that there was another charity but you

12   can't remember the name of that charity as you sit here

13   right now?

14   A.    That's true, and I honestly wouldn't remember the

15   name DARE if the kids weren't involved in it, but that did

16   stick.

17   Q.    So you do remember that?

18   A.    I remember DARE, yes.

19   Q.    And your reaction to Chief Buffis's suggestion was

20   that, hey, that's a good idea, right?

21   A.    I thought that was a good idea, yes.

22   Q.    And you knew from your own conversations with Ms.

23   Viola that she actually wanted to get rid of the money

24   that she had made in the prostitution business, right?

25   A.    Yes.

1   Q.   She was calling it dirty money, right?

2   A.   Yes, she was.

3   Q.   And she said she didn't want it anymore?

4   A.   That's correct.

5   Q.   So this was a great solution, right?

6   A.   It seemed like the right answer at the time, yes.

7   Q.   Get rid of the charges, get rid of the dirty money,

8   right?

9   A.   Right.

10   Q.   You had no objection to that?

11   A.   No.

12   Q.   Ms. Viola had no objection to that?

13   A.   No.

14   Q.   Do you recall a conversation with Officer Lucy after

15   the conversation involving Chief Buffis in which you

16   asked, on Tara's behalf I assume, if he knew how much the

17   donation would be?

18   A.   I believe there were several of those phone calls,

19   but, yes.

20   Q.   And do you recall Officer Lucy telling you, well, we

21   don't know right now because we are still reviewing Ms.

22   Viola's bank records?

23   A.   That's correct.

24   Q.   And do you remember having some discussions with Ms.

25   Viola about how did they get the bank records or something

1    like that?

2    A.    I knew there was some talk about that.  They seemed

3    to have them and we didn't know how.

4    Q.    So Officer Lucy was telling you we'll get back to you

5    with an amount.  We are still reviewing the records?

6    A.    Yeah.

7    Q.    And at that time you didn't know what steps, if any,

8    Officer Lucy was taking to prepare to forfeit the funds,

9    did you?

10   A.    No.

11   Q.    And at that time you didn't know what kinds of steps,

12   if any, Chief Buffis was taking to prepare to forfeit

13   those funds, right?

14   A.    No, I had no idea.

15            MR. BRESLOW:  Your Honor, objection to both the

16   questions to forfeit.

17            THE COURT:  I'm sorry?

18            MR. BRESLOW:  I object to move to strike both

19   the questions because they used the phrase forfeit.

20   Forfeiture has a particular meaning here and that's not

21   what happened.

22            THE COURT:  That's true.  That objection will be

23   sustained.  Those previous questions and answers will be

24   stricken from the record.

25       Attorney Levinson, you can certainly go into that

1    same area, just please re-ask the question.

2            MS. LEVINSON:  I will, but can we very briefly

3    approach at sidebar?

4    (Sidebar conference.)

5            MS. LEVINSON:  In fact, during this relevant

6    time period Officer Lucy was in communication with the

7    district attorney's office about a forfeiture action.

8            THE COURT:  A formal filing?

9            MS. LEVINSON:  Yes.

10           MR. BRESLOW:  What he was preparing -- he's

11   going to be the next witness.

12           THE COURT:  Lucy?

13           MR. BRESLOW:  Yes.  He was in contact with a

14   State Police lieutenant named Brian Foley, who was

15   Sergeant Meiklejohn's supervisor, and he had prepared a

16   seizer affidavit, an affidavit to seize the funds.

17   There's no forfeiture.  Forfeiture is when the court is

18   involved and the order is actually taken as you know to

19   take the money.  This was a seizure warrant that would

20   have been signed by the magistrate clerk.

21           THE COURT:  Well, whatever the language may be,

22   why don't you keep the language simple with this witness,

23   something like lose the money, take the money, then the

24   next witness comes on you can get a little more technical.

25           MS. LEVINSON:  Well taken.

```
 1              THE COURT:  Okay.
 2    (End of sidebar conference.)
 3              THE COURT:  Any need for a recess?
 4              THE JURY:  No.  Thank you, Your Honor.
 5    Q.   (By Ms. Levinson) At the time of these conversations
 6    were you aware of any actions that either Officer Lucy or
 7    Chief Buffis were taking to formally take the funds from
 8    Ms. Viola?
 9    A.   No.
10    Q.   Now, do you recall that the night after the police
11    came to the Inn, you called an attorney to discuss what
12    was going on?
13    A.   Yes.
14    Q.   And that was attorney Aaron Wilson, correct?
15    A.   Yes.
16    Q.   And you arranged to meet him the following week?
17    A.   Yes.
18    Q.   And by the time you met with him, you had already had
19    several discussions with Officer Lucy and you were aware
20    of the fact that there was a potential plan for Tara to
21    donate the money and for the charges to be either
22    dismissed or kept at the show cause level; do you recall
23    that?
24    A.   Yes, I do.
25    Q.   And do you recall that Attorney Wilson actually said
```

1    to you that sounds like a really reasonable solution?

2    A.    He said that it seemed like a common way of doing

3    things; that's the impression I got when I left there.

4    Q.    So your impression was it's a common way of doing

5    things and he actually explained to you this is frequently

6    done?

7    A.    Yes.

8    Q.    And so nothing about this struck you as unusual,

9    right?

10   A.    Nope.

11   Q.    And by this time I think you testified earlier you

12   hadn't actually retained Attorney Wilson to represent you?

13   A.    No, we never paid him.

14   Q.    So you never paid him?

15   A.    No.

16   Q.    But you knew there was possibility that you might

17   want him to go to court with you?

18   A.    Yes.

19   Q.    You if you thought the need would arise?

20   A.    Right.

21   Q.    And by the time you left his office for that meeting,

22   you had not yet determined whether or not you would be

23   hiring him to go to court with you?

24   A.    Yeah, we weren't sure that we needed him.

25   Q.    And one of the reasons that you weren't sure you

1    needed him was because you were trying to work out an

2    agreement with the Lee Police Department before going to

3    court, right?

4    A.    No.  One of the reasons why we called him and wanted

5    to meet with him in the first place is because we were

6    unfamiliar with the process.  We didn't know what to do,

7    what to expect.  We weren't sure if this was the right way

8    to do it so we talked to him.  He seemed to think it was

9    the right way.

10   Q.    So he gave it his lawyerly blessing, right?

11   A.    Yes, with caution.

12   Q.    But he said if you need me to go to court, I'm happy

13   to go to court with you, words to that effect?

14   A.    What he said was that "if."

15   Q.    You knew that he would be available to go to court

16   with you if you wanted to pay him, right?

17   A.    If I needed him, yes, he would have come.

18   Q.    And having already spoken to the Lee Police

19   Department, hearing that they were agreeable to having

20   Tara forfeit the money, having the charges not go forward,

21   you felt pretty comfortable with that?

22   A.    I felt pretty comfortable with that, yes.

23   Q.    So you felt knowing that there would be a real good

24   chance of having an agreement that the charges weren't

25   going to go forward, that you didn't need an attorney to

1    go with you?

2    A.    Yes.

3    Q.    So when Chief Buffis said something to you to the

4    effect of, well, you only need an attorney if you want to

5    waste your money, he wasn't really far off the mark, was

6    he?

7    A.    No.

8    Q.    Now you did after this conversation where Ryan Lucy

9    was communicating to you what Chief Buffis was saying, you

10   then switched over and you had an actual telephone

11   conversations with Chief Buffis?

12   A.    That is correct, yes.

13   Q.    You had two of them?

14   A.    Right.  I believe two of them, yes.

15   Q.    And again you were worried about how the hearing was

16   going to go.  You were asking him for specific questions?

17   A.    I wasn't as worried as she was.

18   Q.    So you were calling on behalf of Tara?

19   A.    I was calling on Tara's behalf.

20   Q.    And the gist of the call was what's going to happen?

21   A.    Well, we had some unanswered questions and we wanted

22   to get the answers.

23   Q.    One of the unanswered questions was how much was the

24   donation going to be?

25   A.    Yes.

1  Q.    In fact, in one of your conversations with Officer

2  Lucy, he told you that they didn't know but you could

3  expect somewhere between a thousand dollars and $10,000,

4  right?

5  A.    I don't recall that.  I don't recall that, no.

6  Q.    You don't recall that?

7  A.    It's very possible, but I don't recall that.

8  Q.    Okay.  And back to a conversation with Chief Buffis,

9  when you were asking him what to expect at the hearing, he

10 told you that he was going to bring an agreement for you

11 to sign to the hearing?

12 A.    Yes, he did.

13 Q.    So when you arrived at the courthouse on the date of

14 the hearing and he presented an agreement to you, that did

15 not come as a huge surprise?

16 A.    The fact that there was an agreement, no, that didn't

17 come as any surprise at all.

18 Q.    In fact, you and Ms. Viola wanted an agreement,

19 right?

20 A.    We were looking forward to seeing an agreement, yes.

21 Q.    And he also during this conversation in which he told

22 you that he would bring an agreement to court, he actually

23 told you that he would ask for the case to be continued

24 for one year and that it would be dismissed after one

25 year, correct?

1   A.   Initially that's what he said, yes.

2   Q.   And you said couldn't you make it shorter?  We're

3   good people.  We've never been in trouble before, words to

4   that effect.

5   A.   Yes.  That's probably exactly what I said, yes.

6   Q.   Okay.  And in response to your, you know, putting

7   your case in front of him in that way, he said, okay?

8   A.   Yes.

9   Q.   He said, words to the effect, you are good people;

10  good people do bad things sometimes?

11  A.   Yes, he did say that.  I'm not sure when that came

12  out but he did say that at one point.

13  Q.   He agreed pretty readily to just continue the case

14  for one day?

15  A.   That's correct, yes.

16  Q.   He was willing to give you and Ms. Viola a break,

17  right?

18  A.   Yes.

19  Q.   Because you knew that he could have gone the whole

20  route?  You could have been arrested, gone to court, had a

21  trial, right?

22  A.   Yes.  We realized that was a possibility, yes, we

23  did.

24  Q.   So this was a really nice break that he was giving

25  you?

A.    Yes.

Q.    He was giving you guys a second chance?

A.    Yes.

Q.    And you were assured him you will never see us do anything like this again?

A.    Yes.

Q.    And obviously you meant that with every inch of yourself, right?

A.    And even more.

Q.    So by the time you finished that conversation with the chief, you felt reasonably secure that you would go to court on the date of the hearing, February 21st, that you would sign an agreement, you would donate in money and the case would be dismissed at the end of the day?

A.    That's what we felt going in, yes.

Q.    So we get to February 21, 2012, you arrive at the courthouse, you go into the courtroom, and you finally for the first time meet with Chief Buffis about this case, right?

A.    That's correct, yes.

Q.    Let's switch gears for a minute.  That was not the first time you ever met Chief Buffis?

A.    Me personally, no.

Q.    You've known him for years, right?

A.    I coached his daughter in softball.  Lee is a small

1    town and occasionally we see each other passing.  We'd

2    never, you know -- I'd say, hey, how's it going?  Good.

3    You know.

4    Q.   And you met him in his capacity as a police officer,

5    right?

6    A.   He probably came to shag people off the rocks.

7    Q.   I was just going to ask you about that.  Your Inn is

8    on a lake?

9    A.   Yes.

10   Q.   There's rocks behind the Inn?

11   A.   Uh-huh.

12   Q.   It was kind of a popular place for kids to gather and

13   jump off the rocks into the lake?

14   A.   My insurance company called it an attractive

15   nuisance.

16   Q.   So occasionally you would have to call the Lee Police

17   Department to come and get the kids out of there?

18   A.   Occasionally.  I would try to handle it most of the

19   time myself, but then you'd get the cigarets and you'd get

20   the bad language when there's guests sitting in chairs, so

21   it's a cat-and-mouse game, yes.

22   Q.   On occasion actually Joe Buffis would arrive at the

23   Inn to help out?

24   A.   He very well could have.  There were different police

25   officers every time, yeah.

1    Q.    So this was an individual person that you had contact
2    with before?
3    A.    Oh, yes.
4    Q.    And do you recall any specific instances when he also
5    met your ex-wife?
6              MR. BRESLOW:  Objection, relevance.
7              THE COURT:  What is the relevance?
8              MS. LEVINSON:  May I approach?
9              THE COURT:  No.  I'm going to sustain that.
10   Q.    (By Ms. Levinson)  Okay.  So back to the 12th, you
11   meet with Joe Buffis.  You knew who he was, right?
12   A.    Yes.
13   Q.    And as soon as --
14   A.    I'm sorry, the 21st or 12th of February?
15   Q.    February 21st.
16   A.    You're talking about the magistrate, not the 12th,
17   the 21st.  Go ahead.
18   Q.    Sorry.
19         And you testified that when you got to the courtroom
20   Buffis asked the clerk magistrate and some other woman who
21   you thought was a stenographer, asked them to leave the
22   courtroom so you could speak privately?
23   A.    Yes, he did.
24   Q.    And you had never been to court before as you
25   testified?

1    A.    I had been for a traffic violation, not criminal
2    court I guess you call it.
3    Q.    So when Chief Buffis asked them to leave the room,
4    you had no idea if that was a normal practice or not?
5    A.    I thought it was normal, yeah.
6    Q.    Okay.  And, in fact, you were left in private to
7    discuss how this agreement was going to work, right?
8    A.    Yes.  Well, can I step back for a second?  I thought
9    it was normal because they just got up.  They didn't say,
10   what are you doing so I just said, okay, that's the way it
11   goes.
12   Q.    It seemed normal?
13   A.    Can you repeat the question?
14   Q.    Not yet.  So it seemed perfectly normal to you?
15   A.    To me, yes.
16   Q.    The clerk magistrate, Magistrate Bartini, didn't seem
17   at all confused or offended by the request to leave the
18   room?
19   A.    No.  He got up and left.
20   Q.    Okay.  And you were left in private with Joe Buffis?
21   A.    Yes, we were.
22   Q.    So that you can finally discuss the details of the
23   agreement?
24   A.    Yes.
25   Q.    Because there were still some details missing?

1    A.    Yeah.

2    Q.    You hadn't seen the agreement yet?

3    A.    No idea, hadn't seen it.

4    Q.    So Chief Buffis presented you with an agreement?

5    A.    Yes.

6    Q.    I'm putting on the screen what's previously been

7    marked into evidence as Government Exhibit 13, and again,

8    I'll ask you if you recognize that agreement?

9    A.    Yes, I do.  That's the agreement that we all signed,

10   yes.

11   Q.    And everything in that agreement is typed except the

12   signatures and the amount of the donation, correct?

13   A.    That is correct, yes.

14   Q.    So the fund, the charity that the donation was going

15   to go to, was already typed in?

16   A.    That was typed in, yes.

17   Q.    And you can't recall but it's possible that that is a

18   charity that was mentioned to you over the phone in a

19   conversation with Officer Lucy?

20   A.    It's possible that that was the one, yes, but leading

21   up to that, we thought it was our choice.

22   Q.    But nobody told you specifically that it's your

23   choice?

24   A.    Usually you donate to charity, you choose the

25   charity.

1    Q.    Nobody told you specifically that it was your choice,
2    right?
3    A.    Nobody told me specifically it was my choice.
4    Q.    But you and Tara talking between yourselves decided
5    that you would like to donate to the Sonsini Dog Rescue?
6    A.    Because nobody else was giving us that answer.  We
7    looked, we asked, we called, we called, we called.  Nobody
8    gave us the answer so at that point in time we thought it
9    was up to us how much and where it's going.
10   Q.    But nobody told you that that was your assumption?
11   A.    That was my assumption, that's correct.
12   Q.    So having your own assumption but not being told
13   anything by anyone, you appeared in court with a check and
14   you were prepared -- it was a blank check, right?
15   A.    It was.
16   Q.    So you were prepared to donate $1,000?
17   A.    That's what I was prepared to do, yes.
18   Q.    Even though you didn't know how much money was in Ms.
19   Viola's account that was attributable to the prostitution
20   business?
21   A.    If somebody had told us prior to how much the
22   donation was going to be, the check would have covered
23   that money.
24   Q.    That wasn't my question.
25   A.    That's the answer.

1  Q.   You didn't know how much money Ms. Viola had in the

2  account attributable to prostitution?

3  A.   Yeah, I had no idea.

4  Q.   You had no idea but she had told the investigator she

5  had $6,000?

6  A.   I don't know what she told the investigators.

7  Q.   And, in fact, when you got there and you told Chief

8  Buffis that you were prepared to donate $1,000 to the dog

9  shelter in Pittsfield, he disagreed with that, right?

10 A.   Yes, he did.

11 Q.   He said no, a thousand dollars is too little,

12 correct?

13 A.   He said two things.  He said a thousand dollars was

14 too little and that it was going to the toy fund and not

15 the Sonsini Center.

16 Q.   And the reason it was going to the toy fund was

17 because that was a charity that would benefit people of

18 Lee?

19          MR. BRESLOW:  Objection, Your Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  I don't know what his reason was.

22 Q.   (By Ms. Levinson) He told you that the reason he

23 wanted you to donate to the toy fund because it would

24 benefit people in the town of Lee and this was a crime

25 that occurred in the town of Lee and effected the people

1   of town?

2   A.   His exact words were "a thousand dollars isn't enough

3   and it's going to the Laliberte Toy Fund," that's the

4   words.

5   Q.   And you have no idea then what analysis Chief Buffis

6   and Officer Lucy had done of Ms. Viola's account that led

7   them to conclude that a thousand dollars was not enough,

8   correct?

9           MR. BRESLOW:  Objection, Your Honor.

10          THE COURT:  Overruled.

11          THE WITNESS:  How would I possibly know that?

12  Q.   (By Ms. Levinson)  So it was altogether possible that

13  they had -- that they told you that they were reviewing

14  Ms. Viola's bank account, correct?

15  A.   It's altogether possible, yes.

16  Q.   They told you they were reviewing her bank accounts?

17  A.   They told us they were reviewing the bank account but

18  up until that morning they never told us an amount.

19  Q.   But that morning Chief Buffis told you the amount?

20  A.   So somehow before nine o'clock in the morning that

21  number popped up and they didn't know it before that.

22  Q.   But he knew it then, right?

23  A.   He knew it then.

24  Q.   The amount was not filled in when you got to court?

25  A.   That's correct.

1    Q.    It was blank?

2    A.    Yes, it was.

3    Q.    And the number 4,000 was handwritten in?

4    A.    Yes.

5    Q.    And you wrote that number?

6    A.    I don't think I wrote that number.  I think the first

7    time I grabbed that pen was to sign.

8    Q.    So you don't think you wrote that number?

9    A.    I would strongly doubt that I wrote that number.

10   Q.    I'm going to show you what's been already admitted

11   into evidence as Government Exhibit 14 and what do you

12   recognize that exhibit to be?

13   A.    That's the check from my personal account to the

14   Laliberte Toy Fund $4,000.

15   Q.    Did you bring that check to court on February 21,

16   2012?

17   A.    Yes, I did.

18   Q.    And it was a blank check when you brought it?

19   A.    It was a blank check.

20   Q.    And who filled out that check?

21   A.    I filled out that check.

22   Q.    And what number is written on the line?

23   A.    In the dollar amount?

24   Q.    Yes.

25   A.    $4,000.

1   Q.   And is that in your handwriting?

2   A.   Yes.

3   Q.   One more time, back to Government Exhibit 14 in

4   evidence, and I see that the check is dated February 21,

5   2012?

6   A.   Yes.

7   Q.   And that was date of the hearing?

8   A.   Yes.

9   Q.   And you testified that you handed this check over to

10   Mr. Buffis right there in the courthouse?

11   A.   Yes, I did.

12   Q.   In fact, Mr. Fusco, you brought that check to the Lee

13   Police Department and handed it to a secretary at the desk

14   two days after the show cause hearing?

15   A.   That's absolutely false.  I handed a check over that

16   day.

17   Q.   That is absolutely false according to your testimony?

18   A.   When?

19   Q.   Two days after the hearing?

20   A.   I went and I transferred money to make that check

21   good.  I did not bring a check to the Lee Police

22   Department.

23   Q.   Okay.  Do you recall going to Lee Police Department

24   on Friday of the week of February 21st?

25   A.   I do not recall, no.

1  Q.   You do not recall handing a check -- asking if Chief

2  Buffis was present in the police station?

3  A.   I don't recall that, no.

4  Q.   Now you gave some testimony earlier today about this

5  letter of recommendation that Chief Buffis wrote for Ms.

6  Viola, correct?

7  A.   Yes, I did.

8  Q.   And you testified that there was some inaccuracies in

9  that letter?

10  A.   Yes.

11  Q.   One of the inaccuracies that you pointed to was the

12  phrase in that letter that you had been I think generous

13  donors to the Laliberte Toy Fund?

14  A.   Ardent supporters, yes, something about that, yeah.

15  Q.   Something to the effect you were supporters of the

16  Laliberte Toy Fund?

17  A.   Yes, during that holiday season, yeah.

18  Q.   Well, in fact, by the time that letter was written by

19  Chief Buffis, you and Ms. Viola had donated or given a

20  $4,000 dollar check to Mr. Buffis that said Laliberte Toy

21  Fund?

22  A.   We gave him the check on February 21st.  Normally the

23  holiday season is before Christmas, or I do at least.

24  Q.   But wouldn't it be your understanding that toy fund

25  monies would be used during the holiday season?

1    A.    Be used during a holiday season, yes.

2    Q.    And you also mentioned that there was some discussion

3    on the telephone that some of the funds were going to be

4    donated to a DARE account, correct?

5    A.    I don't recall that.

6    Q.    Well...

7    A.    We talked -- when I talked to Ryan Lucy, he mentioned

8    that as a possible destination, but when I saw the

9    agreement and the agreement was printed out Laliberte Toy

10   Fund and I wrote the check Laliberte Toy Fund, I assumed

11   at that point it was going to the Laliberte Toy Fund.

12   Q.    Do you recall having a discussion with Chief Buffis

13   at the show cause hearing or prior to the actual hearing

14   when you were meeting privately with him about how you and

15   Ms. Viola would agree that $2,000 would go to the

16   Laliberte Toy Fund and $2,000 would go to DARE because

17   DARE was a program that you supported?

18   A.    I don't recall that.  I do remember DARE being

19   brought up in conversations with Ryan Lucy on the phone.

20   I don't remember DARE being anywhere near that courtroom.

21   Q.    Now, subsequent to the show cause hearing in the

22   Southern Berkshire District Court on February 21, 2012,

23   you didn't contact anybody in law enforcement to complain

24   about the way the hearing was handled, did you?

25   A.    To complain about the way the hearing -- can you

1    repeat that question, please?

2    Q.    After this hearing --

3    A.    After the hearing.

4    Q.    -- in the Southern Berkshire District Court on

5    February 21, 2012, you did not contact anybody in law

6    enforcement to complain about the way the hearing had been

7    handled by Chief Buffis?

8    A.    I don't believe so, no.

9    Q.    You didn't call any member of law enforcement to say

10   that you felt that you had been forced to sign an

11   agreement, did you?

12   A.    At the time I was happy to get it over with, yeah.

13   Q.    And you didn't call anyone to tell them to complain

14   that you felt you had been forced to donate money in order

15   to get charges dismissed?

16   A.    No, I didn't.  I signed an agreement that said I keep

17   my mouth shut and I did.

18             MS. LEVINSON:  If I can just have a moment, Your

19   Honor?

20             THE COURT:  Yes.

21             MS. LEVINSON:  I have nothing further.

22             THE COURT:  All right.

23             MR. BRESLOW:  Your Honor, may I have a moment

24   please?

25             THE COURT:  Yes.

1           MR. BRESLOW:  Your Honor, we have no redirect

2    and we are prepared to excuse Mr. Fusco and call our next

3    witness.

4           THE COURT:  You're excused, sir.

5       Is this a good time to take a ten-minute break?

6           THE JURY:   Yes.

7           THE COURT:  Very good.  Please do not discuss

8    the case, begin deliberations, try to access any media

9    reports of the case.  All right.

10          THE CLERK:  All rise.

11   **(The jury left at 3:18.)**

12          THE COURT:  Okay.  I'd like to have them back in

13   their seats by 3:35.

14          MR. BRESLOW:  3:35?

15          THE COURT:  Yes.

16   **(A recess was taken from 3:19 until at 3:36.)**

17          THE COURT:  Was everyone able to follow my

18   instruction not to discuss the case, begin deliberations,

19   be exposed to any media, or start any investigation about

20   the case?

21          THE JURY:  Yes, Your Honor.

22          THE COURT:  All right.  Thank you.  The jury

23   remains fair and impartial.

24       The next witness?

25          MR. BRESLOW:  Yes, we call Ryan Lucy.

1          THE COURT:  All right.

2          MR. BRESLOW:  Can you hear?

3          A JUROR:  I can hear you without this.

4          THE COURT:  What?

5          MR. BRESLOW:  I said, can you hear and she said

6     I can hear you without the headphones.

7                    (Laughter)

8     **Ryan Lucy (Sworn)**

9          THE CLERK:  State your name for the record.

10         THE WITNESS:  Ryan Lucy, L-u-c-y.

11         THE CLERK:  Thank you.

12    **DIRECT EXAMINATION**

13    Q.   (By Mr. Breslow) Good afternoon.

14    A.   Good afternoon.

15    Q.   Can you tell the jury how are you employed?

16    A.   I'm employed as a patrolman by the Lee Police

17    Department.

18    Q.   How long have you been a patrolman at the Lee Police

19    Department?

20    A.   Approximately six years.

21    Q.   And tell the jury briefly what your responsibilities

22    are as a patrolman?

23    A.   To patrol the streets of Lee, make sure they're safe,

24    maintain order, respond to emergencies.

25    Q.   And can you tell the jury who your supervisors have

1    been since 2008?

2    A.    Sergeant Joseph Buffis, Chief Joseph Buffis; Sergeant

3    Jeffrey Roosa, Chief Jeffrey Roosa; Sergeant Craig

4    DeSantis.

5    Q.    Now you mentioned Joe Buffis, do you recognize him in

6    court?

7    A.    I do.

8    Q.    Can you point him out?

9    A.    He's sitting right there with the tan suit.

10             MR. BRESLOW:  I'd like the record to reflect

11   that the witness has identified the defendant.

12             THE COURT:  The record will reflect

13   identification of Mr. Buffis was made.

14   Q.    (By Mr. Breslow) Now, how long have you worked or had

15   you worked with the defendant?

16   A.    A few years.

17   Q.    Do you know who his son is?

18   A.    I do.

19   Q.    What is his son's name?

20   A.    Konnor Buffis.

21   Q.    I'm showing you what's already in evidence as

22   Government Exhibit 157.  Do you recognize Konnor Buffis?

23             MR. BRESLOW:  I don't think we have the

24   courtroom monitors on.  This is why I went to law school.

25   It was not plugged in.

1    Q.    (By Mr. Breslow)  Can you see it now?  I'm showing

2    you what's already in evidence as Government Exhibit 157.

3    Do you recognize anybody in the photograph?

4    A.    Yes, I do.

5    Q.    Who do you recognize?

6    A.    Joseph Buffis and Konnor Buffis.

7    Q.    And with respect to Konnor Buffis, did you know what

8    Konnor Buffis did for an avocation?

9    A.    Yes.

10   Q.    What did he do?

11   A.    He was working his way up through the professional

12   motocross circuit I believe.

13   Q.    I'm going to focus you on a new topic.  Can you tell

14   the jury what your assignment was on January 19, 2012?

15   A.    My assignment was to carry out a search warrant at

16   the Inn at Laurel Lake located at 615 Laurel Street in

17   Lee, Massachusetts.

18   Q.    And were you working as part of a task force?

19   A.    Yes, I was.

20   Q.    Just really briefly, can you tell the jury what a

21   task force is?

22   A.    It's a group of individuals, police officers,

23   assigned to a certain unit for certain specific tasks.

24   Q.    And were you the case officer for the Lee PD for this

25   investigation?

1    A.    Yes, I was.

2    Q.    And was there a State Police case officer?

3    A.    Yes, there was.

4    Q.    Who was that?

5    A.    Sergeant Chris Meiklejohn.

6    Q.    And were there particular targets of the

7    investigation?

8    A.    Yes, there were.

9    Q.    Who were the people that your investigation was

10   focused on?

11   A.    Tara Viola and Thomas Fusco.

12   Q.    And you said that -- where was the location of the

13   investigation?

14   A.    It was at 615 Laurel Street in Lee, Massachusetts.

15   Q.    And had you been there before?

16   A.    I had.

17   Q.    And I'm showing you what is in evidence as Government

18   Exhibit 1.  Do you recognize this?

19   A.    I do.

20   Q.    What is it?

21   A.    That's the Inn at Laurel Lake.

22   Q.    And can you tell the jury what happened on January

23   19, 2012 in your investigation?

24   A.    On January 19, 2012 we sent an undercover state

25   trooper in to pose as a john to the business of the Inn at

1    Laurel Lake.

2    Q.   Can you just pause for a moment?

3    A.   Sure.

4    Q.   What is a john?

5    A.   Someone who solicits prostitution.

6    Q.   Okay.  And what is an undercover officer, just in a

7    sentence or two?

8    A.   Somebody who poses as a regular civilian.

9    Q.   Okay.  And this undercover officer, was he with the

10   LPD or State Police?

11   A.   State Police.

12   Q.   All right.  And what actually happened at the Inn at

13   Laurel Lake?  Were you there that day?

14   A.   I was.

15   Q.   Okay.  Please tell the jury what happened in your

16   investigation?

17   A.   The trooper entered the residence, was asked to

18   disrobe at which time we -- the so-called raid team that

19   was waiting next door knocked at the rear entrance to the

20   Inn.

21   Q.   You're mentioning a raid team, for those of us who

22   aren't in law enforcement, can you tell the jury in a

23   sentence what a raid team is?

24   A.   This is a team of officers prepared to enter the

25   residence to collect evidence.

```
1    Q.    Were you part of the raid team?

2    A.    Yes.

3    Q.    And who else was part of that team?

4    A.    Sergeant Chris Meiklejohn, Sergeant Scott Colbert.

5    Q.    And some others?

6    A.    Yes.

7    Q.    Okay.  Can you tell the jury what happened after you

8    and Sergeant Meiklejohn and the rest of the group entered

9    the Inn?

10   A.    We were met by Tara Viola and Tom Fusco.

11   Q.    And can you tell the jury or describe her demeanor,

12   how she looked and was behaving when you and the raid team

13   came into the Inn?

14   A.    She was visibly upset and crying.

15   Q.    Did she mention any concerns to you?

16   A.    She did.

17   Q.    What were those concerns?

18   A.    She was concerned about this being leaked out and her

19   prostitution because of her children.

20   Q.    And after you confronted Tara Viola, did she

21   ultimately admit her involvement in the prostitution?

22   A.    Yes, she did.

23   Q.    Can you tell the jury did she make any offers to you,

24   to Sergeant Meiklejohn?

25   A.    Yes, they did.
```

1    Q.    What were those offers?

2    A.    She offered to hand over the money that she had made

3    from her prostitution; she offered to donate that money.

4    Q.    And did she make any other offer in addition to

5    donating money with respect to your investigation?

6    A.    She said she wanted to give it away.

7    Q.    Right.  But with respect to your investigation, did

8    she make any other offer with respect to the State Police

9    investigation?

10   A.    She wanted to participate in a reverse sting

11   operation.

12   Q.    Can you tell the jury what a reverse sting operation

13   is?

14   A.    This would be an operation to lure in johns who are

15   seeking prostitutes.

16   Q.    Okay.  Now, at the Inn when Tara Viola offered to you

17   to donate her prostitution money, did you accept her offer

18   when you were at the Inn?

19   A.    No.

20   Q.    Did Sergeant Meiklejohn accept her offer?

21   A.    No.

22   Q.    Did you accept her other offer, the offer to

23   cooperate in your investigation?

24   A.    It was a possibility, yes.

25   Q.    Okay.  And did you want her to cooperate?

1    A.    Yes.

2    Q.    So after she offered to cooperate, can you tell the

3    jury where did you and Sergeant Meiklejohn and Tara Viola

4    go?

5    A.    We went to the Lee Police Department.

6    Q.    And what did you do at the Lee Police Department?

7    A.    Sat down for a recorded interview.

8    Q.    Did she consent to the recording?

9    A.    Yes, she did.

10   Q.    And did she waive what are called _Miranda_ rights?

11   A.    Yes, she did.

12   Q.    I'm showing you what's already in evidence as

13   Government Exhibit 4, which is the transcript of your

14   interview with Tara Viola and Sergeant Chris Meiklejohn

15   present.

16        I want to focus you on just a few portions of this

17   interview.  I want to focus you on page 2, line 5.  Now,

18   do you recall Tara Viola's demeanor in her interview at

19   the Lee Police Department?

20   A.    Yes.

21   Q.    Tell the jury how was she behaving.

22   A.    She was very upset, kept crying.

23   Q.    Okay.  And I want to focus you a little bit down the

24   page on lines 28 to 33.  You had mentioned that Tara Viola

25   had some concerns about her children, can you tell the

1    jury just by quoting from the record how she described her

2    children?

3    A.    "They're my world."

4    Q.    I want to focus you on page 5.   Take a look at page 5

5    and read to yourself lines 2 through 10.   Just tell me

6    when you're done.

7    A.    Okay.

8    Q.    Why did you -- first of all, what is a summons?

9    A.    It's a piece of paper telling you that you need to

10   report to court.

11   Q.    Why did you tell Tara Viola that she would be getting

12   a summons to go to court?

13   A.    Because I did not arrest her and she would ultimately

14   have to go to court to answer the charges.

15   Q.    Okay.   What usually happens to a person who is placed

16   under arrest?   How soon do they have to go to court?

17   A.    It's usually immediately.

18   Q.    And in court are those proceedings for people who are

19   arrested when they're appearing before a judge, are they

20   generally private or public?

21   A.    Public.

22   Q.    And in court because those things are public, what

23   happens sometimes with respect to noteworthy cases and the

24   media?

25   A.    Articles are written.

1   Q.   Okay.  Now, was Tara Viola under arrest at that

2   point?

3   A.   No, she was not.

4   Q.   You could have arrested her?

5   A.   Yes.

6   Q.   Tell the jury why did you not arrest her?

7   A.   Because she was cooperative and I wanted to get a

8   statement from her and there was no reason to disrupt that

9   cooperation.

10  Q.   Was Tara Viola's husband Tom Fusco under arrest?

11  A.   No, he was not.

12  Q.   Why did you not arrest him?  Let me back up.  Could

13  you have arrested him?

14  A.   Yes.

15  Q.   Tell the jury why you did not arrest him?

16  A.   For the same reasons.

17  Q.   And what were you hoping to do with Tara Viola's

18  cooperation?

19  A.   A reverse sting operation.

20  Q.   What effect would a public arrest have on your plans

21  to do a reverse sting operation?

22  A.   It would deteriorate the effect.

23  Q.   I'm sorry, it would what?

24  A.   It would deteriorate it.  We wouldn't be able to do

25  it.

1    Q.    Tell the jury please why a public arrest would
2    prevent you from advancing your investigation through a
3    reverse sting?
4    A.    It would prevent us from advancing because anybody
5    that read the article would know not to go to the Inn.
6    Q.    Now, on lines 6 to 7 Ms. Viola is asking questions
7    about whether her court appearance would go to the papers
8    and whether there would be a big article?
9    A.    Yes.
10   Q.    Do you see that?
11         Can you tell the jury as you were with Ms. Viola and
12   Sergeant Meiklejohn on January 19th at the police station,
13   did you want there to be a large article?
14   A.    No.
15   Q.    Why not?
16   A.    Because we were still talking about doing the reverse
17   sting.
18   Q.    And where were you as you were talking with her?
19   A.    In the interview room at the Lee Police Department.
20   Q.    How far away was that interview room from the chief
21   of police's own office?
22   A.    Approximately 30 feet.
23   Q.    So here you are in the witness chair and there's the
24   jury across the courtroom, it's about the same distance?
25   A.    Yes.

1    Q.    Who was the chief of police at that time?

2    A.    Joseph Buffis.

3    Q.    And where was he while you were interviewing Tara

4    Viola and Tom Fusco?

5    A.    I believe he was in his office.

6    Q.    So while you're interviewing Tara Viola and she was

7    offering to cooperate and you were hoping to get her to

8    cooperate, Chief Buffis was about 13 paces away from you

9    in his own office?

10   A.    Yes.

11   Q.    I want to focus you on page 6.  Can you read lines 5

12   through 12 to yourself silently and let the jury read

13   along with you and tell me when you're done.

14   A.    Okay.

15   Q.    Now, were you present when Tara Viola offered to give

16   the $6,000 to charity?

17   A.    Yes, I was.

18   Q.    Where were you -- how close were you to Sergeant

19   Meiklejohn and Tara?

20   A.    Just across the desk.

21   Q.    Okay.  And sitting there Sergeant Meiklejohn

22   responded "We wouldn't take your money and give it to

23   charity."  You didn't say anything at this point?

24   A.    Correct.

25   Q.    Did you disagree with Sergeant Meiklejohn?

1   A.   No.

2   Q.   Now in 2012 while you were at the LPD with Tara Viola

3   and Sergeant Meiklejohn, did you have a favorite charity

4   or two?

5   A.   Yes.

6   Q.   Now, tell the jury why if you had a favorite charity

7   or two you wouldn't take her money and give it to that

8   charity?

9   A.   Because I can't do that.

10   Q.   Now at some point did Chris Meiklejohn and Tara Viola

11   leave the Lee Police Department?

12   A.   Yes, they did.

13   Q.   Before they left -- I just want to focus you on page

14   3 lines 33 to 41.  Just read that to yourself and tell me

15   when you're done.

16   A.   Okay.

17   Q.   Oh, you okay?

18   A.   Yes.

19   Q.   Now as you were in the interview room, did you intend

20   to -- let me back up.

21        In addition to being a patrolman in 2012 did you have

22   any other particular responsibilities at the LPD?

23   A.   Yes.

24   Q.   What was that?

25   A.   I was assigned to the Berkshire Drug Task Force.  I

1    was also press liaison officer.

2    Q.   Can you tell the jury a little bit about what a press

3    liaison officer does?

4    A.   Gives press releases.

5    Q.   Okay.  So sitting there listening to Ms. Viola ask

6    about whether her case is going to go "in the papers and

7    stuff," and listening to Sergeant Meiklejohn say "we don't

8    give out press releases and we don't tell the papers,"

9    your job is, in part, to be the person who gives out the

10   press releases for the LPD, right?

11   A.   Right.

12   Q.   As you were listening to Sergeant Meiklejohn and Tara

13   Viola talk about the media and her case, were you

14   intending to issue a press release?

15   A.   No.

16   Q.   Why not if it's part of your job?

17   A.   Because of the reverse sting operation.

18   Q.   Okay.  So after Chris Meiklejohn and Tara Viola left

19   the Lee Police Department, did you have a conversation

20   with Chief Buffis?

21   A.   Yes, I did.

22   Q.   And tell the jury about this conversation.

23   A.   Chief Buffis advised me that he spoke to Dick Lindsay

24   of the Berkshire Eagle and he was awaiting a phone call

25   from me to give him the details of the story that took

1    place, and I advised him that Chris Meiklejohn didn't want

2    to do a press release and he thought it was for the better

3    good that the town know that we, the police, did something

4    about crime that was taking place in town.

5    Q.   So let's back up for a moment.  Who is Dick Lindsay?

6    A.   He's a reporter for Berkshire Eagle.

7    Q.   And whose case was this --

8    A.   Mine.

9    Q.   -- within the LPD?

10   A.   Mine.

11   Q.   Who was the media officer?

12   A.   Me.

13   Q.   And what did the defendant say he had already done

14   with respect to your case?

15   A.   Spoke to Dick Lindsay.

16   Q.   Generally what did he tell you that he told Dick

17   Lindsay of the Berkshire Eagle?

18   A.   That I would be giving him a phone call to fill him

19   in with further details.

20   Q.   Okay.  So he was directing you to issue a media

21   release?

22   A.   Yes.

23   Q.   To Dick Lindsay?

24   A.   Yes.

25   Q.   Let's back up a bit.  What did the defendant tell you

1    generally that he had already said to Dick Lindsay?

2    A.   I don't recall.

3    Q.   Well, did he tell you that he had already in some way

4    or form talked to Dick?

5              MS. LEVINSON:  Objection; leading.

6              THE COURT:  Very much.  Sustained.

7              MR. BRESLOW:  Let me rephrase.

8              THE COURT:  Sure.

9    Q.   (By Mr. Breslow) Do you recall whether he told you

10   that he told Dick Lindsay anything about the case?

11             MS. LEVINSON:  Objection.

12             THE COURT:  Sustained.

13             MR. BRESLOW:  Okay.  I'll move on, Your Honor.

14             THE COURT:  Or just rephrase, whatever you

15   choose.

16   Q.   (By Mr. Breslow) What do you remember the defendant

17   telling you about what he told Dick Lindsay?

18   A.   That he had informed him of what took place and that

19   I would be calling him with further details.

20   Q.   Okay.  So the defendant told you that he had taken it

21   on his own initiative to tell the Berkshire Eagle what had

22   taken place at the Inn?

23   A.   Yes.

24   Q.   And he directed you to do what?

25   A.   Give further detail.

1          MS. LEVINSON:   Objection.   This has been asked

2     and answered.

3          THE COURT:   I'll allow it.

4     Q.   (By Mr. Breslow)   What did he direct you to do?

5     A.   To give further details to the operation that had

6     taken place.

7     Q.   What did you tell him when he gave you that order?

8     A.   That Sergeant Meiklejohn did not want to do a press

9     release.

10    Q.   And ultimately what did you do?   Sergeant Meiklejohn

11    did not want you to issue the press release, Chief Buffis

12    wanted you to, what did you do?

13    A.   Gave the press release.

14    Q.   Tell the jury why.

15    A.   Because Joe Buffis was my chief.

16    Q.   Now, I like to focus you on a new topic.   The day --

17    the morning after the undercover operation on January

18    20th, did you read an article in the Berkshire Eagle?

19    A.   Yes.

20    Q.   And how did that article compare with the news

21    release that you provided at the defendant's direction to

22    the Berkshire Eagle?

23    A.   It was inaccurate.

24    Q.   It was inaccurate or accurate?

25    A.   Inaccurate.

1    Q.    How was it inaccurate?

2    A.    It stated that the two had been arrested.

3    Q.    Okay.  And had they been arrested?

4    A.    No.

5    Q.    Had you told the Berkshire Eagle that they had been

6    arrested?

7    A.    No, I did not.

8    Q.    Now are you recalling that this report of the

9    Berkshire Eagle that falsely reported they had been

10   arrested, are you recalling whether that took place on the

11   morning of January 20th or that evening the day of the

12   undercover operation January 19th?

13   A.    Can you repeat the question?

14   Q.    When, to the best your memory, I realize it's a long

15   time ago, when did the article come out that falsely

16   reported that Tara Viola and Thomas Fusco had been

17   arrested, was it that evening say --

18         MS. LEVINSON:  Objection to giving more

19   information in the question.

20         THE COURT:  Rephrase the question.

21   Q.    (By Mr. Breslow)  Okay.  When did you recall the

22   article came out?

23   A.    The following morning.

24   Q.    The morning.  Okay.

25         Did you read it online or in the newspaper?

1    A.    In the newspaper.

2    Q.    Now after reading the article that falsely reported

3    their arrest, who did you talk to?

4    A.    I talked to Tara Viola and Tom Fusco.

5    Q.    Where were you?

6    A.    In their home.

7    Q.    And how did they appear to you?

8    A.    Very distraught, shaken up.

9    Q.    What did you say to them and what did they say to

10   you?

11   A.    I just gave them the best advice I could on how to

12   handel press coming to their residence.  I also asked them

13   to sign consent to search forms for two computers we had

14   seized.

15   Q.    Now, the press had come to their home?

16   A.    Yes.

17   Q.    How did that affect them?

18   A.    It affected them greatly.  They were very distraught

19   about it.

20   Q.    And what advice did you give to the two people who

21   had been falsely reported in the newspaper as having been

22   arrested and had the newspaper or media people shown up at

23   their home?  What advice did you give them?

24   A.    I tried to calm them down and let them know that

25   things will get better with time.

1    Q.    And that same day, in addition to obtaining their

2    consent to keep computers, what did you do with respect to

3    the case?

4    A.    I signed an application for criminal complaints

5    against Tara Viola and Thomas Fusco.

6    Q.    I'm showing you what's already in evidence as

7    Government Exhibit 6, page 2.  What is this?

8    A.    That's the application for a complaint.

9    Q.    And who was the complainant?

10   A.    Me.

11   Q.    And can you tell the jury why you completed the

12   application for a criminal complaint and not the

13   defendant?

14   A.    Because it was my case.

15   Q.    And I'm showing you Government Exhibit 7, page 2,

16   what is this?

17   A.    It's an application for a criminal complaint against

18   Thomas Fusco.

19   Q.    And who is the complainant here signing?

20   A.    I am.

21   Q.    And why again did you sign this and not the

22   defendant?

23   A.    Because I was the case officer.

24   Q.    Now, in your application for a criminal complaint,

25   did you include a statement of facts describing some of

1    the investigation?

2    A.   Yes.

3    Q.   And in that statement of facts, can you tell the jury

4    just a few of the pertinent facts that you included?

5    A.   Sure.  That prostitution was taking place; that it

6    was taking place at 615 Laurel Street at the Inn at Laurel

7    Lake, and that Tara Viola and Tom Fusco did conspire to

8    commit those acts of prostitution.

9    Q.   Did you include in your report any of Tara Viola's

10   offers to donate her money?

11   A.   Yes.

12   Q.   And what did you do with your police report?  Who did

13   you give it to?

14   A.   The district court.

15   Q.   In addition to the district court, who else at the

16   police station, if anybody, did you give your report to?

17   A.   I don't recall.

18   Q.   Well, for example, did you give your report to your

19   boss?

20              MS. LEVINSON:  Objection.

21              THE COURT:  Basis?

22              MS. LEVINSON:  He testified that he didn't

23   recall.

24              THE COURT:  I'll allow the question.

25   Q.   (By Mr. Breslow)  Do you recall whether you gave your

1    police report to the defendant?

2    A.    No, I don't.

3    Q.    Okay.

4          Now based upon these applications, what did the

5    Southern Berkshire District Court do?

6    A.    Set a date for a magistrate hearing.

7    Q.    Now, around January 20th, around the time that you

8    had applied for these criminal complaints, did you take

9    any steps regarding Tara Viola's offer to surrender her

10   prostitution proceeds?

11   A.    Yes.

12   Q.    Tell the jury what you did.

13   A.    I typed an affidavit for a search warrant for her

14   bank account records.

15   Q.    And who did you submit that affidavit to?

16   A.    I submitted that to Lieutenant Brian Foley of the

17   Massachusetts State Police.

18   Q.    And, first of all, just let's back up and in a

19   sentence can you tell the jury what an affidavit is?

20   A.    It's my report.

21   Q.    Okay.  And why did you give the affidavit for the

22   search warrant for her bank account to Lieutenant Foley of

23   the State Police instead of the defendant?

24   A.    Because this was a task force case and any search

25   warrants that are issued had to be approved by Lieutenant

1    Foley prior to issuing the search warrant.

2    Q.   Did you give a copy of that affidavit to the

3    defendant?

4    A.   No, I didn't.

5    Q.   Now, I'm going to show you Government Exhibit 24,

6    which is already in evidence.  Can you tell the jury what

7    Government Exhibit 24 is?

8    A.   It's an e-mail.

9    Q.   Okay.  Now, in fact, is it not just one e-mail but

10   two e-mails, meaning an e-mail exchange back and forth?

11   A.   Yes.

12   Q.   Okay.  And let's focus on the original message.  Who

13   sent the original message?

14   A.   I did.

15   Q.   And when did you send it?

16   A.   I sent it on January 23, 2012.

17   Q.   Who did you send it to?

18   A.   Lieutenant Foley.

19   Q.   What did you send him?

20   A.   I sent him a copy of the affidavit that I had typed

21   up for Viola's bank accounts.

22   Q.   Okay.  And what did you expect the affidavit would

23   allow you to do if a court approved it?

24   A.   Get a search warrant for her bank records.

25   Q.   Would that allow you to look at the bank records or

1    actually seize the money?

2    A.    Look at the bank records and ultimately seize the

3    money.

4    Q.    Okay.  Can you tell the jury how Lieutenant Foley

5    responded on January 4th by e-mail?

6    A.    He stated that he would look it over that afternoon.

7    Q.    And did he ever get back to you about approving your

8    affidavit to search Tara Viola's bank records?

9    A.    No, he did not.

10   Q.    And do you know whether Lieutenant Foley was occupied

11   with another investigation at that time?

12   A.    I do.

13   Q.    Can you tell the jury briefly what that investigation

14   was?

15   A.    It was a triple homicide he was working on.

16   Q.    A triple homicide meaning?

17   A.    Three people were murdered.

18   Q.    Okay.  Now while you were waiting to hear back from

19   Lieutenant Foley, did you have a conversation that

20   involved both Tom Fusco and this man here, the defendant?

21   A.    Yes.

22   Q.    Can you tell the jury about that conversation?

23   A.    I was speaking to Tom Fusco on the phone.  I had

24   mentioned to him that I was drafting a search warrant to

25   seize the money out of the Berkshire Bank account the

1   proceeds from the prostitution.  During that Chief Buffis

2   overheard the conversation and --

3   Q.   Hold on one second.  Before we get there, I do want

4   to interrupt for a moment.

5        You were drafting an affidavit to get a search

6   warrant to seize these records?

7   A.   Yes.

8   Q.   And you had sent it up to Brian Foley?

9   A.   Yes.

10  Q.   If Brian Foley had approved it, what were you going

11  to do with that affidavit?

12  A.   Bring it to court.

13  Q.   To court.  And to what court would you bring it?

14  A.   To the Southern Berkshire District Court.

15  Q.   And who would you present it to?

16  A.   To a clerk magistrate.

17  Q.   Okay.  And who are some of the clerk magistrates in

18  Southern Berkshire District Court?

19  A.   Thomas Bartini.

20  Q.   And if Thomas Bartini had approved your application,

21  what would that have given you the authority to do?

22  A.   To get Tara Viola's bank records for Berkshire Bank.

23  Q.   And what were you hoping to do after looking at the

24  bank records?

25  A.   Seize the money.

1    Q.    Okay.  And tell the jury please how does a police

2    officer seize money from a bank?

3    A.    From a judge.

4    Q.    When you say from a judge, tell the jury what you

5    mean?  Do you go to the judge to get the money?

6    A.    No.  You present the evidence to the judge and the

7    judge decides whether or not you can go ahead and seize

8    the money.

9    Q.    Okay.  So you had a lot of paperwork to do to get the

10   approval from a judge --

11             MS. LEVINSON:  Objection; leading.

12             THE COURT:  Leading, yes.  Rephrase.

13             MR. BRESLOW:  I'll rephrase.

14   Q.    (By Mr. Breslow) So why were you taking the trouble

15   to prepare this affidavit and get approval from a judge to

16   take Tara Viola's money?

17   A.    Yes, because that's what needed to be done and she

18   had illegal funds sitting in an account.

19   Q.    Well, she had offered them to you and to Sergeant

20   Meiklejohn.

21   A.    Correct.

22   Q.    So why didn't you just take the money?  She was

23   offering it.

24   A.    Because we couldn't.

25   Q.    Why not?

1    A.    Legally we can't.

2    Q.    Now let's go back to this conversation.

3          What did Tom Fusco -- what did you tell Tom Fusco?

4    A.    That Chief Buffis stated that the money could be

5    turned over to a show cause hearing.

6    Q.    And why did you tell Tom Fusco that?

7    A.    Because that's what Chief Buffis had relayed to me.

8    Q.    Now, did Chief Buffis say that he was going to go to

9    the clerk magistrate with an affidavit and get an order to

10   search her bank accounts?

11   A.    We had not discussed that.

12   Q.    You had or had not?

13   A.    Had not discussed that.

14   Q.    And had you discussed with Chief Buffis that you were

15   going to go to the clerk magistrate with an affidavit for

16   a petition to seize the money from the bank account?

17   A.    No.

18   Q.    What did Chief Buffis tell you?

19   A.    To tell Tom Fusco the money could be turned over at

20   the show cause level.

21   Q.    What did you understand that to mean?

22   A.    That the money could be turned over at a show cause

23   hearing in front the magistrate.

24   Q.    Who from?

25   A.    From Thomas Fusco and Tara Viola to Joe Buffis.

1    Q.    So no affidavits, no warrants?

2    A.    Correct.

3    Q.    What did you think of the defendant's idea?

4    A.    I thought it was a great idea.

5    Q.    Why?

6    A.    Because it saved me work going through the trouble of

7    getting a search warrant and going to the judge to seize

8    the money.

9    Q.    Well, I think earlier you just testified that you

10   didn't take Tara Viola's money when she offered it because

11   you thought it would be illegal?

12   A.    Correct.

13   Q.    Now why did you think that what the defendant was

14   proposing was a great idea?

15   A.    Because he's an experienced hearings officer and I

16   thought that what he was saying would be allowed and that

17   the court wouldn't allow anything improper to take place.

18   Q.    You trusted your chief?

19   A.    Yes.

20          MS. LEVINSON:  Objection.

21          THE COURT:  Allowed.

22   Q.    (By Mr. Breslow) Now, as the defendant was telling

23   you to tell Tom Fusco that he was going to take the money

24   at the show cause level, did the defendant tell you to

25   tell Tom Fusco he was going to drop the charges?

```
 1    A.    No.
 2    Q.    Did the defendant tell you ever that he intended to
 3    drop the charges?
 4    A.    No.
 5    Q.    As the case officer in charge of the case, did you
 6    want the charges to be dropped?
 7    A.    No.
 8    Q.    Tell the jury why not.
 9    A.    Because I had worked hard on the case and felt that
10    there's enough probable cause to where Tara Viola and Tom
11    Fusco should pay for the crimes.
12    Q.    Now, outside of this conversation did the defendant
13    ever discuss with you the particular amount that Tom Fusco
14    and Tara Viola would have to pay?
15    A.    No.
16    Q.    Well, I want to focus on this for a moment.  Did the
17    defendant tell you that Tom Fusco and Tara Viola would
18    have to pay as little as one dollar and as much as
19    $10,000?
20    A.    No.
21    Q.    Did the defendant ever tell you, Officer Lucy, that
22    it was you who would choose the amount that he would be
23    able to donate?
24    A.    No, he did not.
25    Q.    Well, tell the jury what, if at all, did the
```

1    defendant tell you about what amount they would have to
2    donate?
3    A.    He didn't.
4    Q.    And did the defendant tell you where they would have
5    to donate?
6    A.    At the show cause level.
7    Q.    Okay.  Okay.  So that question was a little
8    ambiguous.
9         He told you that they would actually be donating at
10   the show cause hearing?
11   A.    Yes.
12   Q.    Okay.  So let me ask it a little better.
13        Did the defendant ever tell you what recipient would
14   receive the donations?  What entity would actually be
15   receiving the money?
16   A.    No.
17   Q.    He did not?
18   A.    No, he didn't.
19   Q.    Not before the hearing?
20   A.    No.
21   Q.    Not after the hearing?  I'll get to after the hearing
22   later.  But at any time prior to the hearing he never told
23   you where he thought the money should be going?
24   A.    No.
25   Q.    And did you have any conversation that you can recall

1    with Tom Fusco or Tara about where the money might be

2    donated?

3    A.    No.

4    Q.    Do you recall whether you had suggested any local

5    charity in particular?

6    A.    No.

7    Q.    You had a few charities of your own, right?

8    A.    Right.

9    Q.    What were they at the time?  What were your favorite

10   charities?

11   A.    Cancer research, heart research, stuff.

12   Q.    Okay.  You're on the phone with Tom Fusco, right?

13   A.    Yes.

14   Q.    Why did you not tell Tom Fusco that you think the

15   money should go to cancer research and heart research,

16   those are perfectly good charities?

17   A.    That wasn't --

18             MS. LEVINSON:   Objection.

19             THE COURT:   Sustained.

20   Q.    (By Mr. Breslow) Why did you tell -- I'll rephrase.

21   Why did you tell -- why did you not tell Tom Fusco that

22   they could donate to cancer research or heart research?

23   A.    Because that wasn't where I intended the money to be

24   going.

25   Q.    Where did you want the money to go?

1    A.    Into a seizure account.

2    Q.    Okay.  Can you tell the jury what a seizure account

3    is?

4    A.    It's an account where seized money goes to from cases

5    like this.

6    Q.    All right.  So from time to time does law enforcement

7    seize money that are criminal proceeds?

8    A.    Yes.

9    Q.    And that money goes where?

10   A.    Into funds -- into certain accounts for law

11   enforcement.

12   Q.    And do you know who controls those accounts?

13   A.    I don't.

14   Q.    But you don't?

15   A.    I don't.

16   Q.    And that's where you wanted this money going?

17   A.    Yes.

18   Q.    Okay.  Now, shortly before the hearing -- I want to

19   focus you on a slightly new topic.

20        Shortly before the hearing did you speak about the

21   Fusco/Viola case with any former or current LPD officer?

22   A.    Yes.

23   Q.    And did you have this conversation after the one in

24   which you were relaying the defendant's plans about taking

25   care of the money at this show cause level?

1    A.    Yes.

2    Q.    Who was that person that you spoke with?

3    A.    Sergeant William Bartini.

4    Q.    Who is he?

5    A.    He worked for Lee and then the town of Great

6    Barrington and he was a sergeant in the drug task force

7    that I work for.

8    Q.    And tell me how did the conversation begin?  What did

9    Sergeant Bartini ask you?

10   A.    He asked me if my affidavit for the search warrant

11   for the bank accounts was completed and I told him, yes,

12   that it was, but it didn't matter because Chief Buffis was

13   going to handle it at the show cause level.

14   Q.    And how did Sergeant Bartini respond to you?

15   A.    He stated that he couldn't do that.

16   Q.    And did he say what had to be done instead?

17   A.    He said it had to be seized in front of a judge.

18   Q.    And that was your initial plan?

19   A.    Yes.

20   Q.    So what did you say to Sergeant Bartini when Sergeant

21   Bartini said the defendant can't do what he wants to do?

22   A.    I told him that obviously he could do what he was

23   intending to do because he knows what he's doing and the

24   court wouldn't allow anything illegal to take place in

25   court.

1    Q.    And why did you say that?

2    A.    Because Joe Buffis is an experienced hearings

3    officer.  He's been doing it for years and I believed that

4    he could do what he said he would do and that the court --

5    if the court would allow it, then it would be allowed.

6    Q.    Now I want to focus you on February 21, 2012.

7              THE COURT:  Mr. Breslow, we are wrapping up soon

8    so depending on how long this area is, if it's just a few

9    minutes, then keep going.  If it's going to be longer, we

10   will stop now.

11             MR. BRESLOW:  Okay.  We can stop.  I think I got

12   like 15 or 20 minutes with this.

13             THE COURT:  We won't make it then.

14             MR. BRESLOW:  You want to stop?

15             THE COURT:  Yes.

16             MR. BRESLOW:  Okay.  With the Court's

17   permission, he's excused?

18             THE COURT:  Yes, you're excused, sir.  Thank

19   you.

20             THE WITNESS:  Thank you, Your Honor.

21             THE COURT:  Ladies and gentlemen, leave those

22   things on your chair.

23        Now there's a long weekend and we won't see you back

24   obviously until Tuesday.  So between now and Tuesday you

25   will have to heed my instructions every day.  Don't

1    discuss the case with anyone; don't begin deliberations;

2    don't do any investigation about this case; don't search

3    anywhere on social media or the internet for this case.

4    Don't try to visit any places that have been talked about,

5    get in a car and drive around trying to find spots that we

6    are talking about.  Do not do anything that even resembles

7    those things.

8         Stay away from any media accounts.  If this happens

9    to be on television or on the radio, turn it off, walk

10   away.  Do not pick up a newspaper or open the page.  If it

11   looks like you see a headline that looks like this,

12   obviously you've got to stay away from it.

13        All right.  So we will see you Tuesday morning.

14   Report here Tuesday morning at nine o'clock and I hope you

15   have a fantastic long weekend.

16             THE JURY:  Thank you.  Be safe.

17             THE CLERK:  All rise.

18   **(The jury left at 4:21.)**

19             THE COURT:  Anything we need to discuss?

20             MR. BRESLOW:  No.  I mean, I have given the

21   defense the order of witnesses pretty much for the next

22   day or two so we don't have anything, Your Honor.

23             MS. LEVINSON:  I don't have anything.

24             THE COURT:  Okay.  We will see everyone Tuesday.

25             MS. LEVINSON:  Thank you.

1          THE COURT:  Have a good afternoon.

2          MR. BRESLOW:  Have a good weekend.

3     **(Court recessed at 4:22.)**

4

5                  C E R T I F I C A T E

6

7     I, Alice Moran, RMR, RPR, CSR, Official Court

8     Reporter for the United States District Court for the

9     District of Massachusetts, do hereby certify that the

10    foregoing transcript constitutes, to the best of my skill

11    and ability, a true and accurate transcription of my

12    stenotype notes taken in the above-entitled matter.

13

14

15    Date:  September 9, 2016

16

17    /s/ Alice Moran

18    _____
      Alice Moran
19    Offical Court Reporter

20

21

22              Alice Moran, CSR, RPR, RMR
                 Official Court Reporter
23              300 State Street, Room 303D
                   Springfield, MA 01105
24                   413-731-0086
                 alice.moran@verizon.net

25