UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION


United States of America    )
                            )         13cr30028-MGM
vs                          )
                            )
Joseph Buffis               )
_____)


**Transcript of Trial** Held Before
The Honorable Mark G. Mastroianni,
United States District Court Judge and a Jury,
on **May 26, 2015.**




<u>APPEARANCES</u>:


For the government:  Steven H. Breslow, Assistant United
States Attorney, 300 State Street, Suite 230, Springfield,
MA 01105-2926.

Deepika B. Shukla, Assistant United States Attorney, 300
State Street, Suite 230, Springfield, MA 01105.

For the defendant: Lori Levinson, Esq., 500 Main Street,
Suite 2, Great Barrington, MA 01230.




Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086  Fax: (413)737-7333
alice.moran@verizon.net

1                              INDEX

2

3        Witness Name:                                   Page:

4

5        **Ryan Lucy**

6        Direct examination by Mr. Breslow                   6

7        Cross-examination by Ms. Levinson                  45

8        Redirect examination by Mr. Breslow               134

9        Recross-examination by Ms. Levinson               146

10       **Richard Smith**

11

12       Direct examination by Ms. Shukla                  147

13       Cross-examination by Ms. Levinson                 195

14

15

16       Government's Exhibits:                           Page

17

18       167   March 31, 2012 $4,000 original check       168

19

20

21       Defendant's Exhibits:                            Page

22

23       D     Policy memos issued by Mr. Buffis          119

24

25

1    **(Court commenced at 11:27.)**

2    **(The defendant is present.)**

3              THE COURT:  Can I see the parties at sidebar,

4    please?

5    (Sidebar conference.)

6              THE COURT:  All right.  What I want to talk

7    about quickly just as we move forward, I had pulled some

8    of the examination just because of my knowing the leading

9    forms of the questions and the forms of questions that I

10   guess would be characterized as leading but there are

11   different forms of inappropriate questioning and that's

12   when a witness starts on an area and gives some testimony

13   and so then the next question essentially is your own

14   regurgitation of that answer so that your question would

15   be, well, then..., and you give a little speech about what

16   the prior answer was and then ask a question, and then so

17   the third question after that will then be kind of a

18   speech recitation of the first two questions and then it

19   keeps going and going.

20             MR. BRESLOW:  I understand.

21             THE COURT:  There's an objection to some but not

22   an objection to a lot, but I got the transcript of some of

23   them just so I can see how they look on paper versus what

24   I thought I was hearing.

25       I just want you to know that I'm probably going to --

1     if there's no objection, I'm probably going to jump in

2     once in a while myself and say move on or rephrase.

3               MS. LEVINSON:  I'll try to stay on it.

4               THE COURT:  There's two reasons:  I want the

5     questions to be appropriate and if leading questions are

6     done right and you're sliding them under the radar, it's

7     an art.  So if you can do it right, do it good, good for

8     you.

9               MR. BRESLOW:  Okay.

10              THE COURT:  But the ones that are really I think

11    slowing us down and create an unfairness is the building

12    on one to another.

13              MR. BRESLOW:  I got it.

14              THE COURT:   You're much more articulate than

15    the witness so when he says something and you turn it

16    around, your language makes it more clearer.

17              MR. BRESLOW:  Okay.

18              THE COURT:  Just ask the other questions.

19              MR. BRESLOW:  Sure.

20              THE COURT:  Okay?

21              MR. BRESLOW:  Yeah.

22              THE COURT:  Very good.  So we're ready to go.

23              MS. LEVINSON:  Okay.

24    (End of sidebar conference.)

25    (The jury entered.)

1           THE COURT:  Good morning, ladies and gentlemen.

2           THE JURY:  Good morning.

3           THE COURT:  I hope you had a good long weekend.

4     Good?

5           A JURY:  Very good.

6           THE COURT:  Too good?  You had too much fun is

7     that what you're saying?

8           A JUROR:  Yes.

9           THE COURT:  Really?

10        Well, I apologize for the inconvenience coming in

11    late.  It seems it's you who are inconvenienced anyway to

12    be on jury service but you keep being inconvenienced.

13        I had a personal matter that I had to take care of

14    this morning which came up expectedly over the weekend so

15    I needed a few hours this morning to attend to that

16    situation.  I'm sorry for the delay.  I know we ordered

17    some food for this morning.

18        We're going to try to make up for the time by taking

19    shorter breaks today, but let me ask you the question:

20    Were all of you able to abide by my instruction not to

21    discuss the case, begin jury deliberations in any way,

22    investigate the case on the internet or otherwise?  Do any

23    type of research about the case?  Were you all able not to

24    do those things?

25          THE JURY:  Yes, Your Honor.

```
 1            THE COURT:  All right.  The jury remains fair
 2    and impartial and the witness is Officer Lucy.
 3        Good morning.  You may return to the stand.
 4            MS. SHUKLA:  Your Honor.
 5            A JUROR:  I don't have my hearing aid.
 6            THE COURT:  Okay.  So for the first couple of
 7    questions this morning, the people who are using the
 8    hearing devices, just keep your eye on Theresa and let her
 9    know if they're working or not.
10            MR. BRESLOW:  Good morning.
11            THE JURY:  Good morning.
12            MR. BRESLOW:  Your Honor, does Officer Lucy need
13    to be resworn?
14            THE COURT:  Officer Lucy does not, but, Officer
15    Lucy, I remind you that you still are under oath from your
16    previous testimony several days ago.
17            THE WITNESS:  Yes, Your Honor.
18            THE COURT:  All right.
```

19    **Ryan Lucy (previously sworn)**

20    **CONT'D DIRECT EXAMINATION**

```
21    Q.   (By Mr. Breslow) Officer Lucy, do you recall
22    generally that we left off your testimony four days ago
23    with your conversation with Sergeant Bill Bartini?  Do you
24    recall that testimony generally?
25    A.   Yes.
```

1   Q.    Okay.  I want to focus you on a new topic which is

2   what occurred on February 21, 2012.

3   A.    Okay.

4   Q.    Now, on February 21, 2012, did you represent the Lee

5   Police Department at the Viola-Fusco hearing?

6   A.    No, I did not.

7   Q.    Who was the Lee Police Department case officer for

8   the Fusco-Viola case?

9   A.    Chief Joe Buffis.

10  Q.    And was he the case officer or were you the case

11  officer?

12  A.    I was the case officer.

13  Q.    Okay.  So did you misunderstand my question?

14  A.    No, I did not.

15  Q.    I'm asking you -- let me ask it again.

16        Who at the LPD was the case officer for the

17  Fusco-Viola case?

18        MS. LEVINSON:  Objection.  This was asked and

19  answered a moment ago.

20        THE COURT:  I'll allow it.  It was asked and

21  answered.  I allow you to ask it again.  I'm not sure the

22  witness understands the question.

23  Q.    (By Mr. Breslow)  Who at the LPD was the case officer

24  for the Fusco-Viola case?

25  A.    I was.

1    Q.    Who supervised the undercover operation?

2    A.    Excuse me?

3    Q.    Who supervised the undercover operation at the LPD?

4    Who ran it?

5    A.    I did.

6    Q.    Who at the LPD interviewed Tara Viola?

7    A.    I did, along with Sergeant Chris Meikeljohn.

8    Q.    Who wrote the Fusco-Viola probable cause statement

9    that supported the application for a criminal complaint?

10   A.    I did.

11   Q.    Who applied for the Fusco and Viola criminal

12   complaints?

13   A.    I did.

14   Q.    Who drafted an affidavit to search Viola's bank

15   account?

16   A.    I did.

17   Q.    With respect to the criminal complaints, what did you

18   want to have happen at the show cause hearing?

19   A.    The complaints to go forward.

20   Q.    Tell the jury why did you want the complaints to go

21   forward?

22   A.    Because it was a case I had been working on and felt

23   that it should go to the next level of the court.

24   Q.    Who represented the LPD at the Fusco-Viola hearing?

25   A.    Joe Buffis.

1   Q.   Now, on February 21, 2012, did you talk to the

2   defendant after he returned from the hearing?

3   A.   Yes.

4   Q.   Tell this jury what did the defendant -- what did you

5   say to the defendant and what did he say to you?

6   A.   I asked him what happened at the show cause hearing

7   and he told me he was not at liberty to say.

8   Q.   And after he said that he was not at liberty to say,

9   what did he do?

10  A.   Went to his office.

11  Q.   Now, at any point that day did the defendant tell you

12  that he had dropped their charges?

13  A.   No.

14  Q.   At any point that day did he tell you that he had

15  obtained $4,000?

16          MS. LEVINSON:   Objection; leading.

17          THE COURT:   True.   The objection is sustained.

18  Please rephrase.

19          MR. BRESLOW:   Okay

20  Q.   (By Mr. Breslow)   What -- at any point that day what

21  did he tell you about the status of the Viola-Fusco

22  charges?

23  A.   Nothing.

24  Q.   At any point that day what did he tell you regarding

25  a donation?

```
 1    A.    Nothing.
 2    Q.    At any point that day what did he tell you regarding
 3    a nondisclosure agreement?
 4    A.    Nothing.
 5    Q.    Now did the defendant explain to you at any point
 6    that day why he felt not at liberty to tell you what
 7    happened at the show cause hearing?
 8    A.    No.
 9    Q.    Did you want to know what happened?
10    A.    Yes.
11    Q.    Tell the jury why you wanted to know what happened?
12    A.    Because it was my case.  I was curious as to what
13    happened.
14    Q.    Now, after the defendant told you he was not at
15    liberty to talk about what happened, did you pursue the
16    matter with the defendant further?
17    A.    No.
18    Q.    Tell the jury why not.
19    A.    I felt that if Chief Buffis wanted to disclose that
20    information to me that he would.  I wasn't going to ask
21    him further.
22    Q.    Why would you not ask him?
23    A.    Because he was my boss and he already gave me an
24    answer.
25    Q.    Was there anybody at the LPD above Chief Buffis that
```

1    you could appeal to?

2    A.   No.

3    Q.   Now, prior to this case approximately how many cases

4    have you been the case officer for the LPD while the

5    defendant was chief?

6    A.   Approximately a hundred.

7    Q.   Now tell the jury how many of those cases had the

8    defendant refused to tell you what had happened in court?

9    A.   None.

10   Q.   Now I want to focus you on afterward.  Approximately

11   how many cases have you worked on while the defendant was

12   chief after the Fusco-Viola hearing?

13   A.   Dozens.

14   Q.   And of those dozens of cases, approximately how many

15   after had the defendant refused to tell you what had

16   happened in court?

17   A.   Never.

18   Q.   So all of your cases, how many --

19        MS. LEVINSON:  Objection.  It's about to be

20   leading.

21        THE COURT:  Perhaps.  We need to hear the

22   question.

23   Q.   (By Mr. Breslow)  How many of the cases that you

24   worked on under the defendant's supervision has he refused

25   to tell you what happened in court?

1    A.    One.

2    Q.    Which one was that?

3    A.    The Viola-Fusco case.

4    Q.    I want to focus you on a new topic.  On February 22,

5    the day after the hearing, what did the defendant do?

6    A.    Posted a memorandum.

7    Q.    Where did he post it?

8    A.    On the corkboard in the common room of the police

9    station.

10          MR. BRESLOW:  I'm publishing to the jury what is

11   already in evidence as Government Exhibit 25.

12        Your Honor, could you just inquire with the jury to

13   make sure all their monitors are working?

14          THE COURT:  Sure.  Is every one working?

15          THE JURY:  (Indicating.)

16          THE COURT:  Just raise your hand if one goes

17   down.

18   Q.    (By Mr. Breslow) Officer Lucy, do you recognize

19   Government Exhibit 25?

20   A.    I do.

21   Q.    What is it?

22   A.    It is a memorandum from Chief Buffis.

23   Q.    What is the letterhead that it is written on?

24   A.    Lee Police Department.

25   Q.    Who is it addressed to?

1    A.    All officers.

2    Q.    Who is it addressed from?

3    A.    Chief Buffis.

4    Q.    What is the subject?

5    A.    Dissemination of police information.

6    Q.    And what is the date?

7    A.    February 22, 2012.

8    Q.    How many days after your conversation with Chief

9    Buffis, the not-at-liberty conversation, did this memo get

10   published?

11   A.    The next day.

12   Q.    Can you read the subject line?

13   A.    "Dissemination of police information by any officer

14   shall be prohibited without the express permission of the

15   chief or sergeant with the exception of media releases."

16   Q.    Let the record reflect the witness has just read the

17   first line of the memo.  The subject line reads?

18   A.    "Dissemination of Police Information."

19   Q.    Okay.  So focusing you on the line that you just

20   read, the first line, the exception is what?

21   A.    Without the express permission of the chief or

22   sergeant or exception of media releases.

23   Q.    Okay.  Now, who was the media officer for the LPD on

24   February 22, 2012?

25   A.    I was.

1    Q.    What were your responsibilities as media officer?

2    A.    To notify the public of things that were taking place

3    in regards to the Lee Police Department.

4    Q.    How much did the defendant consult with you regarding

5    this memo before it was posted?

6    A.    He didn't.

7    Q.    I'm sorry?

8    A.    He didn't.

9    Q.    Can you read the second line of the memo?

10   A.    "Any officer who has issues with the department

11   policies, staffing issues, or special assignments shall

12   address those concerns to the chief of police and shall

13   not discuss the department operations with any person

14   outside the Lee Police Department."

15   Q.    I want to focus you on the phrase "any person outside

16   the Lee Police Department," Officer Lucy, in addition to

17   your role as the media officer, did you have any other

18   special responsibilities?

19   A.    Yes.

20   Q.    Tell the jury what those were.

21   A.    I was a member of the Berkshire County Drug Task

22   Force.

23   Q.    And tell the jury what people or agencies were on

24   that task force that were outside the Lee Police

25   Department?

A.    The Mass. State Police and surrounding area
departments around Berkshire County.
Q.    Now, tell the jury how did you understand -- let me
back up.
      Did you read the memo when the defendant posted it?
A.    I did.
Q.    Did you read this particular line that we're focused
on now?
A.    I did.
Q.    Tell the jury how, if at all, you understood this
memo to affect your communications with people on the
Massachusetts State Police concerning Lee Police business?
A.    Concerning Lee Police business it shouldn't be
discussed.
Q.    So if you had a case like the Fusco-Viola case, did
you feel that you could discuss that case with the
Massachusetts State Police?
A.    I was skeptical about it.
Q.    Tell the jury why you were skeptical?
A.    Because this resulted in a three-day suspension and
an internal investigation if you violated the policy.
Q.    I want to focus you on that last sentence then.  Can
you read the last sentence aloud to the jury?
A.    "Violations will result in an immediate three-day
suspension followed by an internal investigation."

1    Q.    Now, how long had you been at the LPD when the

2    defendant posted this memo?  Approximately how many years?

3    A.    Approximately three years.

4    Q.    And in those three years had you ever received a

5    three-day suspension?

6    A.    No.

7    Q.    And had you ever been the subject of an internal

8    investigation?

9    A.    No.

10   Q.    Okay.  So what, if anything, did you understand might

11   happen to you if you spoke with Sergeant Meikeljohn of the

12   Massachusetts State Police concerning the Fusco-Viola

13   case?

14   A.    That I would be subject to this order.

15   Q.    And?

16   A.    And ultimately suspended.

17   Q.    Now, can you tell the jury how many times before

18   February 22, 2012 had the defendant posted a memo that

19   concerned the dissemination of police information to

20   agencies like the Massachusetts State Police?

21   A.    None.

22   Q.    Now, Officer Lucy, a few days after the defendant

23   posted this memo, what did the Berkshire Eagle do

24   regarding the Fusco-Viola show cause hearing?

25   A.    Published an article.

1    Q.   And did you read that article?

2    A.   I did.

3    Q.   I'm showing you what's been marked and already

4    admitted into evidence as Government Exhibit 16.  Officer

5    Lucy, the entire article is in your binder, so do you have

6    a binder on the witness stand?

7    A.   Yes, sir.

8    Q.   So I'd like you to take a look at the entire article.

9    I'm only publishing the first paragraph and the date line

10   and the headline now for the jury and the court, but I'd

11   like you to take a look at the entire article for a

12   moment.  You will see it at Tab 16.

13            THE COURT:  Mr. Breslow, is the entire article

14   an exhibit or only the portion highlighted?

15            MR. BRESLOW:  The entire article is an exhibit

16   but what I'm doing right now is highlighting that first.

17            THE COURT:  All right.

18            MR. BRESLOW:  The entire article is in evidence

19   already.

20            THE COURT:  Thank you.

21   Q.   (By Mr. Breslow)  Just take a look at the article and

22   tell me when you're done.

23   A.   Okay.

24   Q.   Is that the article that you read?

25   A.   Yes, it is.

1    Q.    All right.  What is the date of the article?

2    A.    February 24, 2012.

3    Q.    So how many days after the defendant posted his memo

4    at the LPD did the Berkshire Eagle run this article?

5    A.    Two days later.

6    Q.    Now I'm focusing you on two middle paragraphs of the

7    article which are highlighted.  Could you read them aloud

8    into the record?

9    A.    "There is a nondisclosure agreement among the parties

10   involved, Buffis said.  The findings of the magistrate

11   will not be made public.  Buffis wouldn't comment if the

12   ruling means the case is closed against the couple or if

13   it remains open."

14   Q.    Now at this point, February 24, 2012, did you know

15   whether the Fusco-Viola case was open or whether the

16   charges had been dropped?

17   A.    No, I did not.

18          THE COURT:  I'm sorry to interrupt.  Can I see

19   counsel at sidebar quickly?

20          MR. BRESLOW:  Yes.

21   (Sidebar conference.)

22          THE COURT:  Are you operating under the

23   assumption that the quotes attributed to Mr. Buffis in

24   these articles are true?  In other words, the newspaper is

25   correctly reporting this?

```
 1                    MR. BRESLOW:  Yes, Your Honor, we are.

 2                    THE COURT:  Is that agreed?

 3                    MS. LEVINSON:  Not necessarily.

 4                    THE COURT:  Because we spent the first two days

 5      arguing they got everything wrong.

 6                    MS. LEVINSON:  I'm not operating under that

 7      assumption that everything in the article is true.

 8                    MR. BRESLOW:  This article is the subject of a

 9      stipulation.

10                    MS. LEVINSON:  The authenticity of the article.

11                    MR. BRESLOW:  Okay.  That might be a

12      miscommunication the defense counsel and I had.  If she's

13      making an objection to the accuracy of it, I guess I can

14      offer it for which is really my intention to offer it for,

15      the effect on the state of mind on the person.

16                    THE COURT:  Correct.  There's other ways you can

17      offer it for other things, state of mind or other things,

18      but I thought there might be an agreement as to the

19      accuracy of the quotes.

20                    MR. BRESLOW:  I thought there was.

21                    THE COURT:  If there's not, I will tell the jury

22      that the accuracy of the statement may be contested.

23                    MR. BRESLOW:  Well...

24                    THE COURT:  The quotes -- I mean, it's hard for

25      an article to go in quoting the defendant and it appears
```

1    that everyone is agreeing that he actually said that.

2              MR. BRESLOW:  That actually was my understanding

3    when I drafted the stipulation.  There was no exception to

4    it, but I understand if Ms. Levinson wants to either

5    reconsider or interpose the challenge to the accuracy, I

6    don't think it's -- I don't think it's appropriate for the

7    court to give any instruction at this point.

8         I can ask the witness or Ms. Levinson can ask the

9    witness whether he knows if the statement was accurate or

10   not.  I guess I can leave that up to cross.

11             THE COURT:  I mean, it's his reading, does it

12   affect this officer's again general state of mind

13   regarding his testimony.

14             MR. BRESLOW:  Right.

15             THE COURT:  But that's a far cry from telling

16   the jury that you should accept these statements as true.

17             MS. LEVINSON:  Correct, and I didn't plan on my

18   stipulation to include an agreement that everything is

19   correct.

20             THE COURT:  Think about how you want to handle

21   it.  You can object and state something like that in your

22   objection in open court and we can deal with it there or

23   address it through cross-examination or however.

24             MS. LEVINSON:  I'm happy to object.

25             THE COURT:  You deal with it how you need to.  I

1    just wanted to clear that up.

2              MS. LEVINSON:  I will object on the record and I

3    will cross-examine on it.

4              MR. BRESLOW:  Okay.

5              THE COURT:  All of the above.

6    (End of sidebar conference.)

7              MS. LEVINSON:  Your Honor, although I'm

8    objecting to a portion of this Government Exhibit 16 in

9    evidence, the parties had entered into a stipulation as to

10   the authenticity of this article that indeed this was an

11   article that was published by the Berkshire Eagle on

12   February 24th of 2012.  However, we do not necessarily

13   stipulate to the accuracy of the reporting contained

14   within the article and specifically we do not necessarily

15   stipulate that the quote attributed to Mr. Buffis is

16   actually what Mr. Buffis had said.

17             THE COURT:  All right.

18             MS. LEVINSON:  And I'd ask the jury be

19   instructed as to that.

20             THE COURT:  Mr. Breslow, do you offer the

21   article or the quotes in the article to something other

22   than the truth of the matter?

23             MR. BRESLOW:  Yes, Your Honor.  We are offering

24   it to the effect on the listener or in this case the

25   reader.

1          THE COURT:  On the state of mind of Officer Lucy
2    and that is relevant for his carrying on and answering
3    questions about what he did after?
4          MR. BRESLOW:  Yes, correct.
5          THE COURT:  All right.  I find that it is
6    relevant for Officer Lucy's state of mind.
7       So, ladies and gentlemen, what this means is you
8    heard me talk to you a little bit about stipulations at
9    the beginning of the trial, so the parties have stipulated
10   that what you're looking at is part of an article that was
11   in a local newspaper, the Berkshire Eagle.
12      So they stipulate and agreed, yes, this article was
13   in the Berkshire Eagle.  They don't agree that the article
14   is accurate but it was in the Berkshire Eagle.  So there's
15   quotes where the article says, oh, and the defendant Mr.
16   Buffis said X, Y, and Z.  There remains a dispute as to
17   whether or not Mr. Buffis actually said that.  All right?
18      So you are not to consider what's in the article for
19   the truth of the matter.  That is, if the article says Mr.
20   Buffis said A, B, C, and D, you're not to consider the
21   article in thinking, oh, well, Mr. Buffis said A, B, C,
22   and D.  All right?  But you can consider this for the
23   state of mind relative to this witness, Officer Lucy.
24      In other words, you can factor it in saying, well,
25   Officer Lucy read that article and so that may have made

1    him feel this way or that way.  All right?  Do you

2    understand that distinction?

3              THE JURY:  (Indicating.)

4              THE COURT:  All right.  Perfect.  Thank you.

5              MR. BRESLOW:  Yes, Your Honor.  Your Honor,

6    given the objection and Your Honor's instruction, we

7    reserve the right to call Dick Lindsay of the Berkshire

8    Eagle to testify.

9              MS. LEVINSON:  I object.

10             THE COURT:  Well, that may be appropriate.  I

11   don't know if he was named originally.

12             MS. LEVINSON:  No.

13             THE COURT:  We can talk about that when the time

14   comes.  There may have been a new development between an

15   agreed stipulation and maybe an unanticipated disagreement

16   that didn't appear when this stipulation was made so I

17   think we can talk about that.  I'm not going to rule on

18   that right now.

19             MR. BRESLOW:  Yes, Your Honor.  Your Honor, I

20   will proceed.

21   Q.  (By Mr. Breslow)  I can't exactly recall where we

22   left off.  Did you read these two statements into the

23   record?

24             THE COURT:  Mr. Breslow, I'm so sorry to

25   interrupt you again.  Is Mr. Lindsay, the potential

```
 1    witness, someone who's in the courtroom or has been in the
 2    courtroom?
 3              MR. BRESLOW:  I don't believe so but I never met
 4    him personally.
 5              MS. LEVINSON:  He hasn't been.
 6              THE COURT:  Very well.
 7    Q.   (By Mr. Breslow) Officer Lucy, before we went up to
 8    the court at sidebar and had that conversation, did you
 9    read both of these sentences in the record?
10    A.   I did.
11    Q.   Now sitting here, do you know yourself whether the
12    defendant actually said these things to the reporter at
13    the Berkshire Eagle?
14    A.   No, I do not.
15    Q.   Okay.  But you did read them?
16    A.   Yes.
17    Q.   All right.  Now, now, at this point I want to focus
18    you now on the second sentence that you read.  At this
19    point let me focus you on the first sentence first.
20         At this point, two days later, February 24th, had the
21    defendant told you that he had entered into a
22    nondisclosure agreement with Fusco and Viola?
23    A.   No.
24    Q.   And at this point, two days later, had he told you
25    what happened before in the show cause hearing?
```

1    A.    No.

2    Q.    Had he told you the findings of the magistrate?

3    A.    No.

4    Q.    And with respect to the second sentence, two days

5    later, February 24th, had the defendant told you whether

6    the Fusco-Viola case was closed or remains open?

7    A.    He didn't say.

8    Q.    Now, on February 24, 2012, did you yourself know from

9    some other source whether your case remained closed or

10   opened?

11   A.    No.

12   Q.    And at this point, after you read the article, did

13   you ask the defendant whether the case was closed or

14   remains open?

15   A.    No.

16   Q.    Can you tell the jury why not?

17   A.    Because I had already asked him and he gave me an

18   answer.

19   Q.    And were you personally satisfied with that answer?

20   A.    No, I was not.

21   Q.    So tell the jury why you didn't press the matter

22   further with the defendant after this article came out if

23   you were not satisfied with his answer?

24   A.    Because he was my boss and I wasn't going to question

25   him further.

1    Q.   Now, what effect did this article, reading this

2    article and in particular this comment here, have on you?

3    A.   A negative effect.

4    Q.   And can you tell the jury why it had a negative

5    effect on you?

6    A.   Because I still wanted to know what was happening

7    with the case.

8    Q.   At this point having read the article did you have

9    concerns about the case?

10   A.   I did.

11   Q.   Focusing you again now on Government Exhibit 25, who

12   was your counterpart on the Fusco-Viola investigation at

13   the State Police?

14   A.   Sergeant Chris Meikeljohn.

15   Q.   Who did you want to discuss your concerns with, if

16   anyone, at the State Police?

17   A.   Sergeant Chris Meikeljohn.

18   Q.   After the defendant posted this memo, how free did

19   you feel to discuss your concerns with Sergeant

20   Meikeljohn?

21        MS. LEVINSON:   Objection; asked and answered.

22        THE COURT:   It has been, move on.

23   Q.   (By Mr. Breslow) Now, based in part on the article,

24   Government Exhibit 16, did you finally speak with somebody

25   outside the Lee Police Department about the Fusco-Viola

1    case?

2    A.    Can you repeat the question?

3    Q.    Did you finally speak with somebody outside the Lee

4    Police Department about the Fusco-Viola case?

5    A.    Yes.

6    Q.    Who did you speak with?

7    A.    Thomas Bartini.

8    Q.    Who was that?

9    A.    He's a clerk magistrate for the Southern Berkshire

10   District Court.

11   Q.    After you -- what did you tell Thomas Bartini?

12   A.    That I didn't know what had taken place at the show

13   cause level and that I wasn't privy to that information.

14   Q.    And after you spoke with Thomas Bartini, did you

15   speak with anybody else outside the Lee Police Department

16   concerning this case?

17   A.    I spoke to Sergeant Chris Meikeljohn.

18   Q.    And can you tell the jury what you told Sergeant

19   Meikeljohn?

20   A.    That I felt that something wasn't right involving the

21   case even though I don't think that anything illegal had

22   taken place, and I believe I stated that I wasn't going to

23   ask about it because I was a little reserved on answering

24   any questions about it.

25   Q.    And did you mention in your conversation with

1     Sergeant Meikeljohn the defendant's memo, Government

2     Exhibit 25?

3     A.    Yes, I did.

4     Q.    What did you tell Sergeant Meikeljohn about this

5     memo?

6     A.    That I didn't want to speak openly about the case

7     because I was in fear of suspension or an internal

8     investigation.

9     Q.    Did you give Sergeant Meikeljohn a copy of this memo?

10    A.    No, I did not.

11    Q.    Can you tell the jury why not?

12    A.    Because I didn't feel that it was right to remove a

13    copy that the chief posted and hand it out to somebody

14    else.

15    Q.    Did you ask the defendant for permission to give a

16    copy of the memo to Sergeant Meikeljohn?

17    A.    Yes, I did.

18    Q.    Tell the jury what did the defendant say to you?

19    A.    That they know the proper channels to go through to

20    get that document.

21    Q.    So did he give you permission or did he not?

22    A.    He did not.

23    Q.    Can you tell the jury what you understood the

24    defendant to mean when he said the State Police could go

25    through the proper channels?

1   A.   That they would have to obtain some type of search

2   warrant to get that document.

3   Q.   Now I want to focus you on a new topic.

4       Did you have another conversation with the defendant

5   about the Fusco-Viola matter?

6   A.   Yes, I did.

7   Q.   Where did that conversation take place?

8   A.   In Chief Buffis's office.

9   Q.   Describe the defendant's demeanor, how he appeared to

10   you in this conversation.

11   A.   He appeared to be down in the dumps, gloomy.

12   Q.   Tell the jury what the defendant said to you and what

13   you said to him.

14   A.   He stated that he had just spent five hours being

15   interrogated by Captain Rick Smith of the State Police.

16   He had also stated that he would never take any money from

17   the toy fund.  As a matter of fact, in years past he had

18   given a lot of his own money to the toy fund to help needy

19   children.

20   Q.   What did you understand him to mean when he said he

21   had given a lot of his own money to the toy fund?

22   A.   That he had donated his own money.

23   Q.   Did the defendant tell you how much of his own money

24   he had donated to the toy fund?

25   A.   No, he didn't.

1    Q.    How did he describe how much he donated to the toy
2    fund?
3    A.    He didn't.
4    Q.    And did the defendant ask -- did the defendant tell
5    you anything with respect to a donation?
6    A.    Yes.
7    Q.    Tell the jury what he said to you.
8    A.    He stated that Tara Viola and Thomas Fusco had
9    donated $4,000 to the Laliberte Toy Fund and that he had
10   had that money in a safe in his office.
11   Q.    Now, did he say where the money was at the moment you
12   were speaking with him?
13   A.    Yes.
14   Q.    Tell the jury what he said.
15   A.    He said it's right there in the safe in my office.
16   Q.    Okay.  Have you seen that safe before?
17   A.    Yes.
18   Q.    Please describe it for the jury.
19   A.    It's a very old safe.  I believe it's black and red
20   with some inscription on it.
21   Q.    Where had you seen that safe?
22   A.    In Chief Buffis's office.
23   Q.    Where were you when the defendant said that the money
24   was in that safe?
25   A.    In Chief Buffis's office.

1    Q.    Where was the safe to your understanding when the

2    defendant said the money was in that safe?

3    A.    In Chief Buffis's office.

4    Q.    How long ago had the defendant said he had met with

5    Captain Smith?

6    A.    He had just come from there.

7    Q.    Did the defendant show you the money?

8    A.    No, he didn't.

9    Q.    Did he open the safe?

10   A.    No, he didn't.

11   Q.    Did the defendant show you anything else in this

12   conversation?

13   A.    Yes, he did.

14   Q.    What did he show you?

15   A.    He showed me a check that he stated that he wrote

16   out, a $4,000 check back to Tara Viola and Thomas Fusco.

17   Q.    How did he show it to you?

18   A.    He pulled it out of his pocket and stated, look, I

19   offered to give the money back to them and put it back in

20   his pocket.

21   Q.    Did the defendant give you the check to read?

22   A.    No.

23   Q.    Did the defendant say anything to you about taking

24   money out of the toy fund?

25   A.    No.

1    Q.   Now, when the defendant told you that he had put his

2    own money into the toy fund, did you ask him anything?

3    A.   I asked him if he kept records of doing so.

4    Q.   Why did you ask whether the defendant had kept

5    records?

6    A.   Because I believed it would help him with the

7    situation he was in.

8    Q.   And what did the defendant say?

9    A.   That he did not.  It was a loosely run fund.

10   Q.   What day of the week was this, if you recall, that

11   you had this conversation with the defendant?

12   A.   I believe a Thursday.

13   Q.   Now did you speak with the defendant next over the

14   weekend or after the weekend I should say?

15   A.   I did.

16   Q.   Tell the jury about this conversation.  How did the

17   defendant appear to you?

18   A.   He appeared like he had a long weekend.  I asked him

19   how his weekend went.  He stated not good.  That he didn't

20   get much sleep and it was bothering him that his integrity

21   was being questioned.

22   Q.   I want to focus you on a new topic.

23        Are you familiar with the Laliberte Toy Fund?

24   A.   I am.

25   Q.   During your time at the LPD who was in charge of the

1    fund?

2    A.    Joe Buffis.

3    Q.    During your time at the LPD, was anybody else also in

4    charge of the fund?

5    A.    No.

6    Q.    Did you ever see toys that were donated to the toy

7    fund at the LPD?

8    A.    Yes.

9    Q.    How many donations did you solicit yourself from

10   citizens?

11   A.    Zero.

12   Q.    Why not?

13   A.    Because I wasn't part of the toy fund.

14   Q.    How many toys did you distribute to needy families?

15   A.    None.

16   Q.    How many did you package for needy families?

17   A.    None.

18   Q.    How many toys did you see the defendant distribute to

19   needy families?

20   A.    None.

21   Q.    How many toys did you see the defendant package for

22   needy families?

23   A.    None.

24   Q.    How many toys did you see the defendant actually buy

25   for needy families?

```
 1    A.    None.

 2    Q.    How many receipts did the defendant ever show you

 3    relating to purchases for the toy fund?

 4    A.    None.

 5    Q.    How many checks from the toy fund account did he show

 6    you?

 7    A.    Excuse me?

 8    Q.    How many checks from the toy fund did he show you?

 9    A.    None.

10    Q.    How many monthly statements from the toy fund did he

11    show you?

12    A.    None.

13    Q.    How many records of any kind relating to the toy fund

14    did he show you?

15    A.    None.

16    Q.    How many times did you see a needy family pick up

17    toys?

18    A.    I didn't.

19    Q.    You did or did not?

20    A.    I did not.

21    Q.    What town do you live in?

22    A.    Lee.

23    Q.    How long have you lived there?

24    A.    Thirty-three years.

25    Q.    Approximately how many people live in Lee?
```

1   A.   Five or six thousand.

2   Q.   Of the five or six thousand, about how many people do

3   you personally know?

4   A.   Maybe a thousand.

5   Q.   So tell the jury of that thousand people how many do

6   you yourself know who received a single toy from the toy

7   fund?

8   A.   None.

9   Q.   I want to focus you on one final topic.

10       Are you familiar with the Lee Police Association?

11  A.   Yes.

12  Q.   What is it generally?

13  A.   It's an association of the officers where we collect

14  money and use that money for certain occasions.

15  Q.   How long have you been a member?

16  A.   Since 2008.

17  Q.   And while you were at the police association -- who

18  was in charge of the Police Association?

19  A.   Joe Buffis.

20  Q.   Were you a member of Lee Police Association in 2009?

21  A.   Yes.

22  Q.   Showing you what's already admitted in evidence as

23  Government Exhibit 107, can you take a look at the binder

24  as Government Exhibit 107?  I'm publishing to the jury the

25  first page.

1          THE COURT:  What exhibit?

2          MR. BRESLOW:  This is on the screen right now,

3     Government Exhibit 107.

4          THE COURT:  Thank you.

5     Q.   (By Mr. Breslow) Mr. Lucy, Officer Lucy, this is a --

6     I want to focus you on the first page of the document.

7     A.   Okay.

8     Q.   And do you recognize that this is a monthly statement

9     for the Lee Police Association?

10         MS. LEVINSON:  Objection; leading.

11         MR. BRESLOW:  Sure.

12    Q.   (By Mr. Breslow)  Take a look at the document, all

13    three pages, Officer Lucy, and when you're done tell me

14    when you're done.

15         THE COURT:  There was an objection and the

16    question was withdrawn.

17         MR. BRESLOW:  I withdraw it, yes, Your Honor.

18         THE COURT:  All right.

19         THE WITNESS:  Okay.

20    Q.   (By Mr. Breslow)  Okay.  So what is this document?

21    A.   This document is a statement.

22    Q.   Is it a bank statement?

23    A.   Yes.

24    Q.   From what bank?

25    A.   Legacy Bank.

1    Q.   And what is account name?  I'm referring to the first

2    page at the top corner.

3    A.   Lee Police Association, care of Joseph Buffis,

4    treasurer.

5    Q.   And what is the P.O. box?

6    A.   P.O. Box 21, South Lee, Massachusetts.

7    Q.   Did the defendant ever show you this monthly

8    statement?

9    A.   No.

10   Q.   Okay.  What is the date of the monthly statement?

11   A.   February 28, 2009.

12   Q.   According to the monthly statement, was there a

13   deposit?

14   A.   Yes.

15   Q.   And how much money was deposited?

16   A.   $250.

17   Q.   I'm showing you the second page of the document.  I'm

18   publishing it to the jury as well.  What is this?

19   A.   It's a check to the Lee Police Association.

20   Q.   Is it in fact a checking deposit slip?

21   A.   Yes.

22   Q.   In what amount?

23   A.   $250.

24   Q.   I'm showing you the third page now, you can focus on

25   your screen, what is this?

1    A.    A check to the Lee Police Association.

2    Q.    And in what amount?

3    A.    $250.

4    Q.    From whom?

5    A.    Pathfinders Motorcycle Club.

6    Q.    Do you know that place?

7    A.    I don't.

8    Q.    And what's the amount?

9    A.    $250.

10   Q.    What does it say in the memo line?

11   A.    Donation.

12   Q.    Now, did the defendant show you this check?

13   A.    No.

14   Q.    I'm showing you now what's been admitted into

15   evidence as Government Exhibit 108.  Tell the jury what

16   this is.

17   A.    That is a check from the Lee Police Association made

18   out to Visa for $250.

19   Q.    What's the date?

20   A.    February 25, 2009.

21   Q.    Can you read what it says in the memo line?

22   A.    It looks like Laliberte.

23   Q.    And that's the first name of the toy fund?

24   A.    Yes.

25   Q.    And whose signature appears on the check?

1    A.    Joseph Buffis.

2    Q.    So this check is dated February 25, 2009 and --

3              MS. LEVINSON:   Objection; asked and answered.

4              MR. BRESLOW:   Okay.

5              THE COURT:   Sustained.

6    Q.    (By Mr. Breslow) Officer Lucy, I'm showing you a

7    deposit slip.   Can you read the date on the stamp on the

8    deposit slip?

9    A.    February 25, 2009.

10   Q.    Okay.   Did the defendant show you this check?

11   A.    No.

12   Q.    Do you recall whether the Lee Police Association

13   donated money to the Laliberte Toy Fund in 2009?

14   A.    No.

15   Q.    Now as a member of the Lee Police Association, do you

16   know why the defendant would take a $250 donation to the

17   LPA and then write a check from the LPA account to Visa

18   with this memo line?

19   A.    No.

20   Q.    Now how many times did the defendant tell you that he

21   engaged in these transactions?

22             MS. LEVINSON:   Objection.

23             THE COURT:   Sustained.

24   Q.    (By Mr. Breslow) Did the defendant tell you that he

25   engaged in these transactions?

1    A.   No.

2    Q.   When is the first time that you learned that the

3    defendant engaged in these transactions?

4    A.   I'm sorry?

5    Q.   When did you learn that the defendant engaged in

6    these transactions?

7    A.   I didn't.

8    Q.   I'm showing you what's already in evidence as

9    Government Exhibit 110.

10             THE COURT:  Can I see the parties please?

11   (Sidebar conference.)

12             THE COURT:  I just want to check the status of

13   the agreement between the parties for the admissibility.

14   So these checks and the bank records are agreed upon --

15             MR. BRESLOW:  Yes.

16             THE COURT:  -- for admissibility?

17             MS. LEVINSON:  Yes.

18             THE COURT:  Okay.  Now, part of that agreement

19   -- it's fine if it's part of that agreement, the

20   authenticity and the accuracy, correct?

21             MS. LEVINSON:  Yes.

22             THE COURT:  Okay.  All right.  Generally I would

23   expect not to have a police officer who has no idea about

24   banking and managing the account and the statements, et

25   cetera, et cetera, to be going through these.  But if

```
 1    they're admitted and they're not being challenged
 2    regarding authenticity, a keeper of records type issue, no
 3    issue about the business, how it's kept and the checks, if
 4    these are in evidence then it's fine.
 5             MR. BRESLOW:  These were admitted by stipulation
 6    as business records.  The only reason I'm calling him to
 7    testify is precisely to establish that he had no idea
 8    about the transactions as a member of the LPA.
 9             THE COURT:  All right.  I just want to make sure
10    for the benefit of the record by getting on the record
11    that it's the full understanding and it does cover the use
12    you're putting the records on now with this witness.
13             MS. LEVINSON:  Thank you.
14             MR. BRESLOW:  Yes.
15    (End of sidebar conference.)
16    Q.   (By Mr. Breslow)  Officer Lucy, I'm showing you
17    Government Exhibit 110.  Take a look at 110 in your
18    binder, Officer Lucy.  Just read all three pages to
19    yourself or four pages to yourself.  Tell me when you're
20    done.
21             MR. BRESLOW:  I'm just publishing the top
22    portion of the first page to the jury.  For the record,
23    Your Honor, this is Government Exhibit 110.
24             THE COURT:  Thank you.
25    Q.   (By Mr. Breslow) I'm showing you the first page.
```

```
1    A.    Okay.

2    Q.    What is Government Exhibit 110?

3    A.    It's a statement of another bank statement.

4    Q.    For what account?

5    A.    Legacy Bank.

6    Q.    What's the date of the account statement?

7    A.    October 31, 2010.

8    Q.    Now when you say Legacy Bank, what is the account

9    name?

10   A.    Lee Police Association.

11   Q.    Is that the same account as for the document we just

12   looked at earlier, the earlier statement?

13   A.    Yes.

14   Q.    On October 31, 2010, were you a member of the Lee

15   Police Association?

16   A.    Yes.

17   Q.    And according to the monthly statement, what took

18   place on or about October 2, 2010?

19   A.    A deposit.

20   Q.    In the amount of?

21   A.    $175.

22   Q.    And what was the source of the deposit, focusing you

23   now on page 3?

24   A.    LimeLight Productions.

25   Q.    And what was the amount?
```

1    A.    $125.

2    Q.    Now I'm focusing you on page 4, was there another

3    deposit in addition to the 125?

4    A.    Yes, another $50.

5    Q.    What does it say in the memo line there?

6    A.    Donation.

7    Q.    What does it say in the memo line on page 3?

8    A.    2010 contribution.

9    Q.    Now, according to the records, what happened to that

10   $175 deposit?  I'm focusing you now on page 5 of the

11   exhibit.

12   A.    It was withdrawn.

13   Q.    In what form was it withdrawn?

14   A.    It was written out to Joseph Buffis.

15   Q.    And in what amount?

16   A.    $175.

17   Q.    And who signed the check written out to Joe Buffis?

18   A.    Joseph Buffis.

19   Q.    Now, have you ever seen this check before, focusing

20   you on page 5 of Government Exhibit 110?

21   A.    No.

22   Q.    As a member of LPA in 2010, do you know why the

23   defendant would take a $175 donation to the LPA and write

24   a check from that account to himself?

25   A.    No.

1    Q.    Did the defendant ever tell you that he engaged in

2    these transactions?

3    A.    No.

4    Q.    Did you even know that the defendant engaged in these

5    transactions?

6    A.    No.

7              MR. BRESLOW:   Just a few more questions, Your

8    Honor, and then I'm done.

9    Q.    (By Mr. Breslow)   How many monthly statements of the

10   LPA did the defendant show you?

11   A.    Zero.

12   Q.    How many cancelled checks of the LPA did the

13   defendant show you?

14   A.    Zero.

15   Q.    How many times did the defendant organize meetings

16   with LPA members to discuss its financing?

17   A.    None to my knowledge.

18   Q.    How many times did the defendant tell you that he was

19   spending the LPA money in any particular way?

20   A.    He didn't.

21   Q.    How many times did the defendant tell you that he was

22   spending the toy fund money in any particular way?

23   A.    He didn't.

24             MR. BRESLOW:   No further questions.

25             THE COURT:   Thank you.

|    |    |
|----|----|
| 1  | Ms. Levinson, wherever you're ready. |
| 2  | MS. LEVINSON:   Thank you, Your Honor. |
| 3  | **CROSS-EXAMINATION** |
| 4  | Q.   (By Ms. Levinson) Good morning, Officer Lucy. |
| 5  | A.   Good morning. |
| 6  | Q.   I'm Lori Levinson. |
| 7  | So what year did you start with the Lee Police |
| 8  | Department? |
| 9  | A.   2008. |
| 10 | Q.   And at that time who was the chief of police? |
| 11 | A.   Ronald Glidden. |
| 12 | Q.   And at that time Joseph Buffis was a sergeant in the |
| 13 | Lee Police Department, correct? |
| 14 | A.   Yes. |
| 15 | Q.   So he was superior to you from the time you began at |
| 16 | the Lee Police Department? |
| 17 | A.   Yes. |
| 18 | Q.   And prior to this case that we're all here in court |
| 19 | today about, you and former-Chief Buffis had a very good |
| 20 | working relationship, didn't you? |
| 21 | A.   Yes, we did. |
| 22 | Q.   And, in fact, you observed that most members of the |
| 23 | Lee Police Department had a good working relationship with |
| 24 | then-Chief Buffis, correct? |
| 25 | A.   Yes. |

```
 1    Q.    And they also had a good working relationship with

 2    him when he was Sergeant Buffis, correct?

 3    A.    Yes.

 4    Q.    You observed him performing the duties of sergeant

 5    and chief, right?

 6    A.    Yes.

 7    Q.    And you observed how he interacted with people in the

 8    town of Lee, correct?

 9    A.    Yes.

10    Q.    And you observed him interact with other officers in

11    the Lee Police Department?

12    A.    Yes.

13    Q.    And what you observed was that he treated everybody

14    with respect, didn't he?

15    A.    Yes.

16    Q.    And that the police officers in the police department

17    treated him with respect, correct?

18    A.    Yes.

19    Q.    And that the people in the town of Lee seemed to

20    respect him?

21    A.    Yes.

22    Q.    People of the town of Lee seemed to like him?

23    A.    Yes.

24    Q.    He was the kind of police officer that would help

25    people out just for the sake of helping them out, right?
```

1    A.   Yes.

2    Q.   And, in fact, he was the kind of police officer who

3    frequently would give people a break, right?

4    A.   Yes.

5    Q.   He wasn't the kind of police officer who would just

6    want to arrest people, throw them in jail, that type of

7    thing, right?

8    A.   Correct.

9    Q.   He was the kind of police officer who was hoping that

10   people would change and do the right thing, correct?

11   A.   Correct.

12   Q.   And he would also give them the benefit of the doubt?

13   A.   Yes, he would.

14   Q.   And he would give them a break?

15   A.   Yes.

16   Q.   Now, you testified earlier that you were aware of the

17   Laliberte Toy Fund, right?

18   A.   Yes.

19   Q.   But you were not involved in that at all, right?

20   A.   No, I wasn't.

21   Q.   In fact, that wasn't a Lee Police Department run

22   fund, was it?

23   A.   No, it wasn't.

24   Q.   That was run by Joseph Buffis, right?

25   A.   Yes.

1    Q.   And did you understand that prior to Joseph Buffis

2    running that fund, another former police officer had

3    started that fund?

4    A.   Yes.

5    Q.   And that was Ed Laliberte, correct?

6    A.   Correct.

7    Q.   And what you learned was that Ed Laliberte ran that

8    fund on his own also, correct?

9    A.   Yes.

10   Q.   So as a police officer with the Lee Police Department

11   you weren't asked in any way to contribute to the toy

12   fund, right?

13   A.   Right.

14   Q.   And you weren't asked in any way to help collect toys

15   or donations, right?

16   A.   Right.

17   Q.   You weren't asked as a Lee police officer to help

18   package toys or distribute toys, right?

19   A.   Right.

20   Q.   But you did observe some toys at the Lee Police

21   Department, right?

22   A.   Yes, I did.

23   Q.   Now you don't know how those toys got there, right?

24   A.   Right.

25   Q.   You don't know who bought those toys?

1    A.    No.

2    Q.    You don't know what money was used to buy those toys?

3    A.    Right.

4    Q.    Because you were never involved in any of it?

5    A.    Correct.

6    Q.    You did sometimes observe people coming to the Lee

7    Police Department to drop off a donation, is that correct?

8    A.    Yes.

9    Q.    But again your understanding was it wasn't an

10   official part of the Lee Police Department?

11   A.    Correct.

12   Q.    Now, you testified you don't know where those toys

13   that you saw were, right, where they came from, right?

14   A.    Right.

15   Q.    And you testified I think that you never went

16   shopping with Joe Buffis for toys, right?

17   A.    Right.

18   Q.    When you observed toys in the Lee Police Department,

19   were they packaged in big gallon-sized trash bags?

20   A.    Yes.

21   Q.    Okay.  Can you describe what you observed?

22   A.    Gallon sized -- big, black garbage bags opened.  You

23   can see toys coming out of them in the hallway down by the

24   dispatch room.

25   Q.    When you say gallon, was it bigger than a gallon?

1    A.    Yes, they were large 55 gallon.

2    Q.    55 gallon bags like huge black plastic bags, right?

3    A.    Correct.

4    Q.    About how many of those did you observe?

5    A.    There was at least a few.

6    Q.    Now, you always had a good working relationship with

7    Mr. Buffis, right?

8    A.    Yes.

9    Q.    But you never socialized with him, right, outside of

10   police business?

11   A.    No.

12   Q.    Were you ever invited to his home?

13   A.    Yes.

14   Q.    Did you ever go into his basement?

15   A.    No.

16   Q.    Okay.  So let's talk about the investigation into the

17   goings-on at the Inn at Laurel Lake.

18   A.    Sure.

19   Q.    That investigation started because there was a

20   confidential informant who had worked with the Lee Police

21   Department who started to provide you with information

22   about some potential prostitution going on at the Inn at

23   Laurel Lake?

24   A.    Yes.

25   Q.    This was a confidential informant that you personally

1    were familiar with, correct?

2    A.   Yes.

3    Q.   You were the one that the confidential informant

4    contacted?

5    A.   Yes.

6    Q.   The confidential informant didn't contact say

7    Sergeant Meikeljohn, correct?

8    A.   Correct.

9    Q.   You were the contact?

10   A.   Correct.

11   Q.   And so you opened the investigation?

12   A.   Correct.

13   Q.   And this was an investigation that was local to the

14   town of Lee, right?

15   A.   Yes.

16   Q.   This was an investigation that could potentially

17   affect the people of the town of Lee?

18   A.   Yes.

19   Q.   And so you started your investigation?

20   A.   Correct.

21   Q.   You spoke with the confidential informant?

22   A.   Yes.

23   Q.   And you decided that perhaps the best way to go about

24   this investigation would be to get somebody to go

25   undercover into the Inn and get Ms. Viola on tape talking

1    about her prostitution, is that correct?

2    A.    Yes.

3    Q.    And so as the case developed, you developed a plan

4    that you would have somebody undercover to go into the

5    Inn, right?

6    A.    Right.

7    Q.    And that plan finally culminated on January 19th of

8    2012?

9    A.    Yes.

10   Q.    Now, up until the culmination of this plan, the

11   Massachusetts State Police or the Berkshire County Drug

12   Task Force were not particularly involved in this

13   investigation, right?

14   A.    Up until what point, ma'am?

15   Q.    Until you were planning the raid on the Inn.

16   A.    They were involved at that point, yes.

17   Q.    For the raid, correct?

18   A.    Yes.

19   Q.    In fact, you needed additional bodies to be present

20   for the raid, correct?

21   A.    Correct.

22   Q.    So you called on members of the task force to come

23   participate at the Inn on January 19th of 2012, correct?

24   A.    Correct.

25   Q.    And so Sergeant Meikeljohn took the lead with that

1    particular unit, correct?

2    A.    Correct.

3    Q.    So he became your counterpart in that unit?

4    A.    Yes.

5    Q.    But he hadn't been involved in the initial

6    investigation?  That was all you, all Lee, right?

7    A.    Right.

8    Q.    Now, Chief Buffis -- Mr. Buffis was chief of police

9    during the time of this investigation?

10   A.    Yes.

11   Q.    And you kept him generally aware of what was going on

12   in the investigation, correct?

13   A.    Correct.

14   Q.    But he was not going to be participating in the raid

15   on the Inn on January 19th, was he?

16   A.    No.

17   Q.    And he never played any kind of an active role in the

18   investigation?

19   A.    No, he did not.

20   Q.    He would just check in with you every once in awhile

21   how's it going, right?

22   A.    Yes.

23   Q.    And he generally was aware of the fact that there was

24   going to be a raid on the Inn on the 19th, correct?

25   A.    Correct.

1    Q.    And he was generally aware of the fact that your goal

2    in going to the Inn on that date was to get Ms. Viola on

3    tape, right?

4    A.    Yes.

5    Q.    So your undercover officer did have a concealed body

6    recorder, correct?

7    A.    Yes.

8    Q.    So that that undercover officer could potentially get

9    Tara Viola on tape making incriminating comments, right?

10   A.    Yes.

11   Q.    And the plan was once they got -- once she made some

12   incriminating contact, the raid team would come in and

13   potentially arrest her, right?

14   A.    Yes.

15   Q.    And the plan was to arrest Ms. Viola, correct?

16   A.    We still hadn't determined that.

17   Q.    But the plan was to uncover this prostitution

18   business, correct?

19   A.    Correct.

20   Q.    Which was illegal?

21   A.    Yes.

22   Q.    And to bring Ms. Viola and anybody else who was

23   involved in it to justice, right?

24   A.    Yes.

25   Q.    And to bring them to justice would involve bringing

1    them to court, correct?

2    A.    Correct.

3    Q.    And generally somebody is arrested prior to going to

4    court, correct?

5    A.    Not always.

6    Q.    Not always.  And I think you're referring to

7    sometimes a person is summonsed to court to participate in

8    a show cause hearing?

9    A.    Right.

10   Q.    So one way or another, whether they're arrested or

11   summonsed, they end up in court, right?

12   A.    Correct.

13   Q.    And that was the goal here?

14   A.    Yes.

15   Q.    And you knew going in on January 19th that there was

16   a real possibility that Ms. Viola and anybody else

17   involved in this prostitution business there could end up

18   arrested, right?

19   A.    Correct.

20   Q.    So on the 19th I guess you had an undercover officer

21   go inside the Inn, correct?

22   A.    Yes.

23   Q.    He had his hidden body wire on, right?

24   A.    Yes.

25   Q.    And there were other officers I guess listening to

1    what was being said?

2    A.    Yes.

3    Q.    Were you an officer who was listening to what was

4    being said?

5    A.    Yes.

6    Q.    Mr. Buffis wasn't listening to what was being said,

7    was he?

8    A.    No.

9    Q.    He wasn't there for the raid, right?

10   A.    Right.

11   Q.    And did you have a plan as to when a raid team was

12   going to enter the Inn?

13   A.    Yes.

14   Q.    What was that plan?

15   A.    When she asked the john to disrobe.

16   Q.    And did that happen?

17   A.    Yes.

18   Q.    So she asked the john to disrobe and what exactly did

19   the raid team do then?

20   A.    Knocked on the back door of the Inn.

21   Q.    And who answered the door?

22   A.    Tara Viola.

23   Q.    What was she wearing?

24   A.    I don't recall.

25   Q.    What was said to Ms. Viola?

1   A.   I explained our reason for being there.

2   Q.   Which was?

3   A.   That we were investigating her for allegedly being

4   involved in prostitution.

5   Q.   And she denied it, correct?

6   A.   Yes.

7   Q.   She said I don't know what you're talking about or

8   something to that effect, right?

9   A.   Yes.

10   Q.   But you confronted her, right?

11   A.   Yes.

12   Q.   And she did finally admit you're right, you got me,

13   or words to that effect, correct?

14   A.   Correct.

15   Q.   Now, there was this body wire that the undercover

16   officer was wearing.  That wasn't connected in any way to

17   the Lee Police Station where Chief Buffis may or may not

18   have been at that time, right?

19   A.   Right.

20   Q.   So to the best of your knowledge Chief Buffis doesn't

21   know exactly what was going on at the Inn at the time,

22   right?

23   A.   Right.

24   Q.   But there did come a time when you were still at the

25   Inn that Chief Buffis showed up at the Inn, correct?

1    A.    I don't recall.

2    Q.    Do you recall him coming to the Inn to find out if

3    everything went okay?

4    A.    No.

5    Q.    Do you recall an officer by the name of Officer Todd

6    Briggs?

7    A.    Yes.

8    Q.    Was he a part of the raid team?

9    A.    Yes.

10   Q.    Did you ever see Officer Briggs speaking with Chief

11   Buffis at the Inn?

12   A.    Not that I --

13           MR. BRESLOW:   Objection, Your Honor.  He already

14   stated that he didn't recall the defendant being at the

15   Inn.

16           THE COURT:   Overruled.

17   Q.    (By Ms. Levinson) While you were at the Inn, you had

18   an opportunity to speak at some length with Ms. Viola,

19   correct?

20   A.    Yes.

21   Q.    And the posture or the attitude that she took was, A,

22   she was very, very upset, correct?

23   A.    Correct.

24   Q.    And, B, she was very clear to you that she wanted to

25   do anything possible to help herself, correct?

1    A.    Correct.

2    Q.    And so you asked her if she would come to the Lee

3    Police Department to answer more questions, right?

4    A.    Yes.

5    Q.    And she agreed that she would do that?

6    A.    Yes.

7    Q.    But prior to agreeing to go back to the Lee Police

8    Department with you, you actually had conversations with

9    her at the Inn about whether or not her husband was aware

10   of what she was doing there, correct?

11   A.    Yes.

12   Q.    And she told you that he had no idea that she was

13   engaging in prostitution at the Inn, right?

14   A.    Right.

15   Q.    Now he was there, right?

16   A.    Yes.

17   Q.    And you saw him there?

18   A.    Yes.

19   Q.    And he wasn't far away from the room where she was

20   with her john at the time?

21   A.    No.

22   Q.    He wasn't far?

23   A.    He wasn't far.

24   Q.    So you didn't necessarily believe her that he didn't

25   know anything about what was going on, correct?

```
1    A.    Correct.

2    Q.    But you had no proof that he knew what was going on,

3    right?

4    A.    Right.

5    Q.    You pretty much had proof that she knew what was

6    going on because you had her on tape telling a john to

7    disrobe, right?

8    A.    Right.

9    Q.    And then she admitted it?

10   A.    Correct.

11   Q.    So you asked her to come back to the police station,

12   right?

13   A.    Yes.

14   Q.    Now, she didn't have her own transportation to go to

15   the police station, did she?

16   A.    No.

17   Q.    So she rode back to the police station in a police

18   vehicle, correct?

19   A.    Yes.

20   Q.    Whose vehicle did she ride back to the station in?

21   A.    I believe it was with Officer Todd Briggs and

22   Sergeant Meikeljohn.

23   Q.    And what kind of vehicle was that?

24   A.    It was a police-issued vehicle.

25   Q.    Was it a police car?  Was it a marked police cruiser?
```

1    A.    I don't recall.

2    Q.    But you do recall that she got to the Lee Police

3    Station in the company of at least two police officers,

4    correct?

5    A.    Yes.

6    Q.    And she walked into the Lee Police Station in the

7    company of two police officers, correct?

8    A.    Yes.

9    Q.    And at that time do you recall whether or not Chief

10   Buffis observed her coming into the Lee Police Station in

11   the presence of two police officers?

12   A.    Yes.

13   Q.    Okay.   I believe that you testified last week when we

14   were here that at the Lee Police Station you and Sergeant

15   Meikeljohn conducted an interview of Ms. Viola, correct?

16   A.    Correct.

17   Q.    And that was done in an interview room?

18   A.    Yes.

19   Q.    And can you describe the interview room?

20   A.    It's a small room with a desk in the middle, chairs

21   on both sides, and an audio and visual recording device in

22   there.

23   Q.    You actually obtained her consent to audio and

24   videotape her interview with you?

25   A.    Yes.

1    Q.   And, in fact, you did audio and videotape the
2    interview?
3    A.   Yes.
4    Q.   And you testified last week that this interview room
5    was maybe 30 feet I think you said from Chief Buffis's
6    office?
7    A.   Yes.
8    Q.   The door of the interview room was closed, right?
9    A.   Yes.
10   Q.   You weren't like feeding a live video from the
11   interview room into Chief Buffis's office, were you?
12   A.   No.
13   Q.   And was there any kind of two-way mirror that he
14   could have been watching through?
15   A.   No.
16   Q.   So you and Sergeant Meikeljohn are in this office
17   alone with Ms. Viola, right?
18   A.   Right.
19   Q.   And Chief Buffis is some 30 feet away in a different
20   office not participating in the interview, correct?
21   A.   Correct.
22   Q.   So during the course of the interview, Ms. Viola
23   maintained that she wanted to cooperate in any way she
24   could, right?
25   A.   Yes.

```
 1    Q.    And to that end, she repeatedly told you and Sergeant
 2    Meikeljohn that she had about 6,000 to $6,500 of dirty
 3    money, what she called dirty money in her account, did she
 4    not?
 5    A.    Yes.
 6    Q.    And that dirty money that she told you that she had
 7    in her account was dirty because she made it through acts
 8    of prostitution, right?
 9    A.    Yes.
10    Q.    And she said that she would give that money up,
11    right?
12    A.    Yes.
13    Q.    She was very clear about that?
14    A.    Yes.
15    Q.    You didn't ask her to give the money up, right?
16    A.    Right.
17    Q.    And Chief Buffis wasn't standing next to her
18    whispering in her ear to give the money up, right?
19    A.    Right.
20    Q.    Chief Buffis didn't tell her to give the money up,
21    right?
22    A.    Correct.
23    Q.    Sergeant Meikeljohn didn't tell her to give the money
24    up?
25    A.    Right.
```

1    Q.    That was all her idea?

2    A.    Right.

3    Q.    And she said it over and again, right?

4    A.    Yes.

5    Q.    And she actually came up with the idea of donating it

6    to charity, right?

7    A.    Yes.

8    Q.    She actually used those words?

9    A.    Yes.

10   Q.    She didn't specify what charity, right?

11   A.    Right.

12   Q.    She didn't say anything about a dog shelter, did she?

13   A.    Not to my knowledge.

14   Q.    She didn't say anything about a toy fund, right?

15   A.    Right.

16   Q.    She didn't say anything about a DARE program?

17   A.    Right.

18   Q.    And she certainly didn't say anything about a dog

19   fund, right?

20   A.    Right.

21   Q.    She just said charity?

22   A.    Correct.

23   Q.    Now, I believe that you testified last week that when

24   she said I want to make a donation, I want to give the

25   money up, you said something to the effect of, well, we

1      can't do that here?

2      A.    Correct.

3      Q.    In fact, what you said to her was we can't do that

4      here, that is an issue that has to be decided in court,

5      right?

6      A.    Yes.

7      Q.    And that was your understanding, it had to be decided

8      in the court?

9      A.    Correct.

10     Q.    And at this point in time, in January of 2012, you

11     had been a Lee police officer for how long?

12     A.    Approximately three years.

13     Q.    And at that point had you ever tried to forfeit

14     somebody's money in the way Ms. Viola was talking?

15     A.    No.

16     Q.    And do you recall --

17            MR. BRESLOW:   Objection, Your Honor.   May I

18     approach?

19            THE COURT:   Sure.

20     (Sidebar conference.)

21            MR. BRESLOW:   I appreciate the question was had

22     you ever tried to forfeit somebody's money in the way that

23     Ms. Viola was talking, and I think intentional or not the

24     question is conflating forfeiture with an offer to donate

25     the proceeds.   The testimony on direct was very different

1    and so I object to the question and move to strike the

2    answer.

3               THE COURT:  That's true, you used the word

4    forfeiture and that has connotations.  I think there was a

5    similar objection when Mr. Breslow used it earlier in the

6    trial, someone used it before and we were talking about

7    forfeiture having a specific legal meaning.

8               MS. LEVINSON:  I can try to rephrase.

9               THE COURT:  I think it's a matter of semantic.

10              MS. LEVINSON:  I will rephrase it.

11              THE COURT:  So I am going to sustain the

12   objection and ask that the question be stricken.  I'll

13   just ask you to rephrase.

14              MS. LEVINSON:  Okay.

15              MR. BRESLOW:  I may object further to the extent

16   that the questioning seems to suggest that the in-court

17   references or reference to forfeiture -- well, let me

18   rephrase.  I may be objecting to some similar questions to

19   form or to assuming facts not in evidence.  We will see

20   how it goes.

21              THE COURT:  We will see how it goes.

22              MS. LEVINSON:  Okay.

23   (End of sidebar conference.)

24              THE COURT:  Ladies and gentlemen, for the last

25   question there was an objection and the objection was

```
 1    sustained so, therefore, the question the way it was
 2    phrased is stricken.  So disregard the question that was
 3    asked and on that same topic, Ms. Levinson, just rephrase.
 4              MS. LEVINSON:   Okay.  Thank you.
 5    Q.   (By Ms. Levinson)  Officer Lucy, prior to this case
 6    with Ms. Viola, had you ever worked on anything in which
 7    someone tried to donate proceeds?
 8    A.   No.
 9    Q.   So this was new to you?
10    A.   Yes.
11    Q.   And you already agreed that you told Ms. Viola that
12    that was something that would be handled in court, right?
13    A.   Yes.
14    Q.   And Sergeant Meikeljohn was present, right?
15    A.   Yes.
16    Q.   And he also weighed in on it and said something to
17    the effect that, yes, that's something that will be dealt
18    with later in court, right?
19              MR. BRESLOW:  Objection, Your Honor.
20              THE COURT:  Basis?
21              MR. BRESLOW:  I don't believe that fact is in
22    evidence and the transcript is -- so I would suggest that
23    the lawyer use the transcript.
24              THE COURT:  I will give Ms. Levinson just a
25    moment to make an offer.
```

```
 1              MS. LEVINSON:  Yes, Your Honor.  I am referring
 2    to grand jury testimony offered by Officer Lucy on
 3    December 16, 2012.
 4              THE COURT:  And after having reviewed that
 5    testimony, do you have a good-faith basis for asking the
 6    question?
 7              MS. LEVINSON:  Yes, I do.
 8              THE COURT:  Please proceed.
 9              MR. BRESLOW:  Your Honor, if the questioning is
10    limited to the recording, that recording is in evidence.
11    The transcript portions of it are in evidence, so the
12    witness's recollection of what was said in the interview
13    that was recorded isn't really relevant if there's a
14    recording.
15              THE COURT:  I'm not quite sure.  Why don't I
16    hear you at sidebar and develop that a little further.
17    (Sidebar conference.)
18              THE COURT:  So one more time.
19              MR. BRESLOW:  I believe that the -- so I believe
20    the transcript speaks for itself.  The recording speaks
21    for itself.  That's in evidence.  The recording is in
22    evidence and the transcript which we stipulated to was
23    fair and accurate and is in evidence.
24         I believe that the transcript states that Sergeant
25    Meikeljohn referred to telling the district attorney's
```

```
 1          office.  Ms. Levinson is asking about Sergeant
 2          Meikeljohn's statement about this being handled in
 3          court.
 4                    THE COURT:  I do recall Meikeljohn saying we
 5          will bring it to the attention of the DA's office.
 6                    MR. BRESLOW:  That's my point, and I have the
 7          transcript which is in evidence, Government Exhibit 4, and
 8          it's on the final page.
 9                    THE COURT:  Take it to the district attorney's
10          office.
11                    MR. BRESLOW:  So I just --
12                    THE COURT:  What are you talking about?
13                    MS. LEVINSON:  I'm talking about Officer Lucy
14          testifying in grand jury on December 16, 2012 on page 8,
15          line 21.
16                    THE COURT:  Which is not in evidence.
17                    MS. LEVINSON:  It's not in evidence but he
18          stated to the grand jury that Sergeant Meikeljohn and
19          myself both advised her numerous times that we would
20          handle the money at a later date in the court.
21                    THE COURT:  Okay.  So it's two different things.
22          I'm not sure -- I think you're entitled to use both.  You
23          can use this which is in evidence which talks about him
24          bringing it to the attention of the district attorney's
25          office.
```

1          If you have a good-faith basis for cross-examining

2     now on that particular issue and if he doesn't remember,

3     you can try to refresh his recollection.  If he testified

4     different from the grand jury, you can impeach him with

5     grand jury testimony.  So we have two documents and we

6     have to be clear which one you're using in a particular

7     time.

8               MR. BRESLOW:  I don't have a particular

9     objection if she focuses her question on the non-recorded

10    conversations that happened at the end, for example.  I

11    would not object to that.  We have a recording.  I don't

12    think she has a fair basis to ask about something that

13    happened in the recording when it's not in the

14    recording.

15              THE COURT:  Unless he testified in the grand

16    jury in a way that opens the door for her to ask different

17    questions.

18              MR. BRESLOW:  Okay.

19              THE COURT:  I think that would be fair.

20              MR. BRESLOW:  Okay.

21              MS. LEVINSON:  I will work on it.

22              THE COURT:  Work on that.  Okay.

23    (End of sidebar conference.)

24    Q.   (By Ms. Levinson) So, Officer Lucy, we talked about a

25    recorded interview with you, Sergeant Meikeljohn, and Ms.

1    Viola, correct?

2    A.    Correct.

3    Q.    And in addition to the recorded interview with you,

4    Sergeant Meikeljohn, and Ms. Viola, you also had a

5    conversation with Ms. Viola back at the Inn, right?

6    A.    Yes.

7    Q.    And at the Inn there was discussion prompted by Ms.

8    Viola about her donating the proceeds of her prostitution

9    business to charity, correct?

10   A.    Yes.

11   Q.    And there was discussion among you, Sergeant

12   Meikeljohn, and Ms. Viola back at the Inn about her

13   wanting to donate to charity and how that could possibly

14   be done, right?

15   A.    I'm sorry, can you repeat that?

16   Q.    There was discussion back at the Inn that was not

17   recorded about her wanting to donate to charity, correct?

18   A.    That she couldn't donate to charity.

19   Q.    But that she wanted to?

20   A.    Right.

21   Q.    And there was some discussion that, well, we're not

22   going to do it here, right?

23   A.    Right.

24   Q.    That was back at the Inn so it wasn't recorded?

25   A.    Right.

1    Q.    Both you and Sergeant Meikeljohn told Ms. Viola, not

2    when it was recorded, that that was the kind of issue that

3    would be handled at a later date in court, right?

4    A.    Correct.

5    Q.    So by the time you're in the police station and

6    you're recording the interview and you were talking about

7    the donation and how it could be handled later in court,

8    it was already made clear to Ms. Viola that she was going

9    to end up in court, right?

10   A.    Yes.

11   Q.    You and Sergeant Meikeljohn made it perfectly clear

12   to her that she would be summoned to court at a later

13   date, correct?

14   A.    Correct.

15   Q.    Now during the course of your interview with Ms.

16   Viola and her offers to cooperate to help herself in any

17   way that she could, you inquired of her whether or not she

18   knew other women who were similarly engaged in acts of

19   prostitution, correct?

20   A.    Yes.

21   Q.    And you hoped that she would participate in an

22   undercover investigation that would uncover more

23   prostitution, right?

24   A.    Right.

25   Q.    And to that end you asked her questions about other

1   women that she knew who were doing the same thing that she

2   was doing, right?

3   A.   Right.

4   Q.   But she had a problem, she didn't really know

5   people's names, right?

6   A.   Right.

7   Q.   She just knew some people but she couldn't really

8   point to their name or where to find them?

9   A.   Correct.

10   Q.   So although she wanted or apparently wanted to help,

11   she wasn't really in a great position to help because she

12   couldn't give you names, addresses, and the like, right?

13   A.   Right.

14   Q.   And eventually you testified last week that any offer

15   of hers to cooperate by going undercover and getting other

16   prostitutes never worked out because there was so much

17   publicity that the whole undercover investigation had to

18   go away, right?

19   A.   Right.

20   Q.   That wasn't going to work because now the newspapers

21   were full of prostitution at the Inn, her name was in the

22   public domain, right?

23   A.   Right.

24   Q.   So she would not be useful as a confidential

25   informant, right?

1    A.    Right.

2    Q.    But she also really didn't have any substantive

3    information to help you with?

4    A.    In regards to another female she didn't.

5    Q.    Now during your recorded interview with Ms. Viola,

6    you asked her on a number of occasions whether or not her

7    husband knew about what she was doing, right?

8    A.    Right.

9    Q.    On a number of occasions in response to yours or

10   Sergeant Meikeljohn's questions she repeated that he did

11   not know about it, right?

12   A.    Right.

13   Q.    And she was very insistent that he didn't know about

14   it?

15   A.    Right.

16   Q.    And, in fact, at one point in time she offered to

17   take a lie detector test to prove that she was telling the

18   truth that her husband didn't know about it?

19   A.    I don't recall.

20   Q.    If I showed you a clip of the interview, might that

21   refresh your recollection?

22   A.    Yes.

23            MS. LEVINSON:   Ms. Pelegano.

24   (Videotaped playing.)

25            THE COURT:   Ms. Levinson, was that an exhibit?

1          MS. LEVINSON:  Yes, I'm sorry.  That was from

2     Defendant's Exhibit C in evidence.

3          THE COURT:  All right.

4          MR. BRESLOW:  Just so the record is clear, I

5     think Defendant's C contains a number of clips which are

6     on the screen now.  I don't believe that all have been

7     offered in evidence and all may not be offered into

8     evidence so I think it might be helpful to specify by the

9     number on the screen which clip has been offered into

10    evidence.

11         MS. LEVINSON:  That was clip number 11.

12         THE COURT:  Clip number 11 and there was

13    reference or the words lie detector were spoken.

14         MS. LEVINSON:  Ms. Pelegano, you can switch it

15    off.

16    Q.   (By Ms. Levinson) Having seen that clip, is your

17    recollection refreshed as to whether or not she offered to

18    take a lie detector about whether or not she had told her

19    husband?

20    A.   Yes, ma'am.

21    Q.   And what did she tell you with respect to her

22    husband?

23    A.   That he had no clue as to what she was doing.

24    Q.   And that she was willing to take a lie detector test,

25    right?

1    A.   Yes.

2    Q.   Now, there came a time where the interview that was

3    being recorded was coming to a close, right?

4    A.   Correct.

5    Q.   And by that time she still hadn't told you that her

6    husband was at all involved, correct?

7    A.   Correct.

8    Q.   You didn't necessarily believe her, did you?

9    A.   No, I didn't.

10   Q.   But she kept denying it anyway, right?

11   A.   Right.

12   Q.   And, in fact, because she had gotten a ride to the

13   police department with police officers, her husband was

14   going to be coming to pick her up, correct?

15   A.   Correct.

16   Q.   And she asked you and Sergeant Meikeljohn if it would

17   be all right for her to talk in private in the interview

18   room with her husband, right?

19   A.   Yes.

20   Q.   And she said she wanted to talk in private with her

21   husband in the interview room because she was nervous

22   about telling him, confessing to him what she had been

23   doing, right?

24              MR. BRESLOW:   Objection, Your Honor.

25              THE COURT:   Sustained.   It goes to her state of

1  mind.  I'm not sure this witness has a basis for answering

2  that.

3  Q.   (By Ms. Levinson) Well, do you recall that her

4  husband Thomas Fusco did come to the police station?

5  A.   Yes.

6  Q.   And do you recall that you did in fact afford her an

7  opportunity to speak privately with her husband?

8  A.   Yes.

9  Q.   And after her husband had the opportunity to speak

10 with her privately, he left the interview room, right?

11 A.   Yes.

12 Q.   And she stayed in the interview room?

13 A.   Yes.

14 Q.   And you and Sergeant Meikeljohn then went back into

15 the interview room with only Ms. Viola, correct?

16 A.   Correct.

17 Q.   And you didn't record the conversation that you had

18 with her following her meeting with her husband, correct?

19 A.   Correct.

20 Q.   But during that meeting with her you confronted her

21 again saying that you really thought she had been holding

22 back from you, right?

23 A.   Yes.

24 Q.   You really thought that he knew about what she was

25 doing, right?

1   A.    Yes.

2   Q.    She finally admitted to you, yes, he knew what I was

3   doing?

4   A.    Yes.

5   Q.    And, in fact, she told you during this second part of

6   your interview, the unrecorded part, that although the

7   happy-ending massages had originally been her idea, when

8   she told him about it soon after she started, he was all

9   for the idea, correct?

10  A.    Correct.

11  Q.    In fact, he helped her prepare the ad that was going

12  to go out online, right?

13  A.    Right.

14  Q.    He took pictures that would be used in the ad?

15  A.    Yes.

16  Q.    And he helped promote her business, right?

17  A.    Yes.

18  Q.    She told you all that?

19  A.    Yes, she did.

20  Q.    She also told you that at some point in time she was

21  very unhappy about giving these happy-ending massages,

22  right?

23  A.    Yes.

24  Q.    And she wanted to stop?

25  A.    Yes.

1    Q.    But that her husband actually intimidated her into

2    continuing giving these happy-ending massages, right?

3    A.    Yes.

4    Q.    In fact, she said that she was afraid that if she

5    didn't continue doing it, he was going to kick her out,

6    right?

7    A.    Correct.

8    Q.    And make her leave the Inn?

9    A.    Yes.

10   Q.    And she expressed to you and Sergeant Meikeljohn some

11   level of fear --

12   A.    Yes.

13   Q.    -- about him, right?

14         And you did learn that at some point in time that Mr.

15   Fusco does have a bit of a temper, didn't you?

16   A.    Yes.

17   Q.    Do you recall receiving a call from an individual by

18   the name of John Kelly who worked at the Dressor Hull

19   Lumber Yard?

20   A.    Yes.

21   Q.    He told you that he felt intimidated by Mr. Fusco,

22   right?

23   A.    Yes.

24   Q.    He had gotten into with Mr. Fusco what Mr. Kelly

25   called a disturbance with him, right?

```
1    A.    Yes.

2    Q.    That Mr. Fusco --

3              MR. BRESLOW:  Your Honor, we object.

4              THE COURT:  Basis?

5              MR. BRESLOW:  Hearsay; move to strike these

6    answers if not offered for their truth -- if offered for

7    their truth.

8              THE COURT:  Are these being offered for the

9    truth of the matter?

10             MS. LEVINSON:  Not necessarily, Your Honor.

11             THE COURT:  Tell me what they're being offered

12   for.

13             MS. LEVINSON:  For the effect on the officer.

14             THE COURT:  The officer's state of mind as to

15   his opinion regarding Mr. Fusco's temper?

16             MS. LEVINSON:  Yes.

17             THE COURT:  I'll allow it.

18             MS. LEVINSON:  Thank you.

19   Q.    (By Ms. Levinson) So this Mr. Kelly reported that Mr.

20   Fusco confronted him about how the rumors started that Ms.

21   Viola was performing acts of prostitution at the Inn?

22   A.    Yes.

23   Q.    And that Mr. Fusco in reaction to that caused a

24   disturbance, right?

25   A.    Yes.
```

1    Q.    And you, in fact, confronted Mr. Fusco and you told

2    him that he can't go around intimidating people anymore,

3    right?

4    A.    Yes.

5    Q.    And you had in your mind already by the time that he

6    had intimidated his own wife into continuing acts of

7    prostitution when she didn't want to do it anymore, right?

8    A.    Right.

9    Q.    Okay.  So you were very clear during your interview

10   with Ms. Viola that she wanted to get rid of this dirty

11   money, right?

12   A.    Yes.

13   Q.    And at some point shortly after this interview with

14   Ms. Viola you actually spoke to your chief, Chief Buffis,

15   about the fact that she wanted to donate the money, right?

16   A.    Yes.

17   Q.    And what Chief Buffis told you to do was to prepare

18   some kind of paperwork to submit to the district

19   attorney's office so that you could proceed with a formal

20   legal forfeiture or seizure procedure, correct?

21   A.    I don't recall.

22   Q.    You don't recall that?

23   A.    No, ma'am.

24   Q.    Well, do you recall that at some point after your

25   interview with Ms. Viola when you knew about her offer to

1    donate the proceeds that it was decided that you would

2    attempt to secure a search warrant for any of her bank

3    records and to seize the money?

4    A.    Yes.

5    Q.    And you testified already that you didn't -- you

6    hadn't done anything like that before, right?

7    A.    Correct.

8    Q.    And so you spoke to your chief about the procedure

9    for going about seizing money, forfeiting the money, et

10   cetera, right?

11   A.    I don't recall if we had that conversation.

12   Q.    Well, you do recall preparing an affidavit in support

13   of a search warrant, correct?

14   A.    Yes.

15   Q.    And the purpose of that search warrant was to seize

16   bank account records of Ms. Viola, right?

17   A.    Right.

18   Q.    So that you can see what kind of money was actually

19   in the account?

20   A.    Right.

21   Q.    Because she didn't give you an exact dollar amount,

22   right?

23   A.    Correct.

24   Q.    She said between 6,000 and 6,500?

25   A.    Yes.

1    Q.   And so you wanted to actually see the bank account

2    and then you wanted to seize the money or forfeit the

3    money in some way, right?

4    A.   Yes.

5    Q.   And you had never done this before, right?

6    A.   Right.

7    Q.   And Mr. Buffis was your chief, right?

8    A.   Right.

9    Q.   So it would stand to reason that you would have

10   conferred with him about the proper procedure that you, an

11   officer who had never done this before, would take in

12   order to initiate the procedure, right?

13               MR. BRESLOW:   Objection, Your Honor.

14               THE COURT:   Basis?

15               MR. BRESLOW:   The witness has already testified

16   repeatedly now that he doesn't recall having any such

17   conversation with the defendant.

18               THE COURT:   All right.   I'm going to sustain the

19   objection.

20   Q.   (By Ms. Levinson) Well, you somehow came up with the

21   idea that you should file something formal, correct?

22   A.   Correct.

23   Q.   And submit it to somebody at the district attorney's

24   office, right?

25   A.   Right.

1    Q.   To see how and hopefully get some kind of legal

2    authorization for seizing the money, right?

3    A.   Correct.

4    Q.   And, in fact, you recall having a conversation with

5    Chief Buffis soon after your interview with Tara Viola in

6    which he told you we better do something about seizing

7    that money because they could go off and spend it?  Do you

8    remember that?

9    A.   No, I don't.

10   Q.   Okay.  In any event, you did prepare a search and

11   seizure affidavit, correct?

12   A.   Yes.

13   Q.   And you forwarded it by e-mail, did you not?

14   A.   Yes, I did.

15   Q.   You forwarded it by e-mail to Lieutenant Brian Foley

16   at the district attorney's detective unit, correct?

17   A.   Correct.

18   Q.   And in your e-mail you forwarded the affidavit and

19   you asked him to take a look at it, right?

20   A.   Right.

21   Q.   And then to get back to you?

22   A.   Right.

23   Q.   But I believe you testified last week that he didn't

24   get back to you, is that right?

25   A.   Right.

1    Q.    The reason you believe he didn't get back to you is

2    because he was very busy with a big homicide case, right?

3    A.    Right.

4    Q.    And so you had prepared an affidavit, right?

5    A.    Yes.

6    Q.    And you never heard back about the proper way to go

7    about seizing the money?

8    A.    Right.

9    Q.    And lo and behold you did learn that Ms. Viola and

10   now Mr. Fusco had both been summoned to the Southern

11   Berkshire District Court for a hearing, right?

12   A.    Yes.

13   Q.    And by the time the hearing was coming around, you

14   still hadn't heard back from Lieutenant Foley about how to

15   go about seizing these assets or the proceeds in the

16   proper way, correct?

17   A.    Correct.

18   Q.    And it was during this period of time in the days

19   before the show cause hearing that you were engaged in a

20   number of other phone conversations with Mr. Fusco,

21   correct?

22   A.    Correct.

23   Q.    Because he kept calling the Lee Police Department to

24   talk to you about what was happening, right?

25   A.    Yes.

1    Q.    He was very concerned about the publicity that had

2    come out about the case, right?

3    A.    Right.

4    Q.    And he was also concerned and worried about what was

5    going to happen at this hearing?

6    A.    Right.

7    Q.    And so you were trying to reassure him, right?

8    A.    Yes.

9    Q.    And at some point in time the issue of, well, what

10   are we going to do with this money came up, right?

11   A.    Right.

12   Q.    And at this time you hadn't heard back from

13   Lieutenant Foley?

14   A.    Right.

15   Q.    And during one of the phone calls Chief Buffis was

16   within earshot, right?

17   A.    Yes.

18   Q.    And would it be fair to say that at that point in

19   time he knew that you hadn't heard back from Lieutenant

20   Foley about how to go about seizing this money?

21                MR. BRESLOW:  Objection, Your Honor.

22                THE COURT:  Sustained.

23   Q.    (By Ms. Levinson) Do you know whether or not Chief

24   Buffis knew whether you had gotten approval to seize the

25   money from Lieutenant Foley?

1   A.   Yes, he knew I did not have approval to seize the

2   money.

3   Q.   Okay.  And he knew you didn't have approval to seize

4   the money, right?

5   A.   Correct.

6   Q.   And now it's getting very close to the show cause

7   hearing?

8   A.   Right.

9   Q.   And Tom Fusco wants to know what's going to happen

10  with the money?

11  A.   Correct.

12  Q.   And Tara Viola wants to know what's going to happen

13  with the dirty money, right?

14  A.   Yes.

15  Q.   And so Chief Buffis says to you tell Tom that we can

16  take care of that at the show cause hearing, right?

17  A.   Yes.

18  Q.   And you told Tom Fusco that?

19  A.   Yes, I did.

20  Q.   And you actually thought that sounded like a great

21  idea, right?

22  A.   Yes.

23  Q.   Because at this time you had done the paperwork,

24  right.

25  A.   Yes.

1    Q.    And you had gotten no response from any higher-ups?

2    A.    Right.

3    Q.    And Chief Buffis was your higher-up, right?

4    A.    Yes.

5    Q.    And he had been a police officer for many, many

6    years, right?

7    A.    Yes.

8    Q.    And you and Sergeant Meikeljohn had already told Tara

9    Viola way back when you interviewed her that the money

10   would be taken care of in court, right?

11   A.    Right.

12   Q.    And now here's Chief Buffis saying, okay, we will

13   take care of it in court, right?

14   A.    Right.

15   Q.    So nothing caused you to have any suspicion

16   whatsoever about that, right?

17   A.    Right.

18   Q.    It sounded totally legit?

19   A.    Yes.

20   Q.    Because that's actually what you had told Ms. Viola

21   was going to happen?

22   A.    Right.

23            MR. BRESLOW:  Objection, Your Honor.

24            THE COURT:  Overruled.

25   Q.    (By Ms. Levinson) Last week when you testified I

1    believe that you said in response to a question by Mr.

2    Breslow about you actually taking the money from Ms. Viola

3    during the interview, I believe you testified last week

4    and said we couldn't just take the money, legally you

5    can't do that?

6    A.    Right.

7    Q.    Do you remember giving that answer?

8    A.    Yes.

9    Q.    Now, you were interviewed by the FBI on a couple of

10   occasions prior to testifying here today, right?

11   A.    Yes.

12   Q.    And you testified in a prior proceeding before a

13   grand jury prior to testifying here in court, correct?

14   A.    Yes.

15   Q.    And you never said to any FBI interviewer or to the

16   grand jury that you couldn't just take the money because

17   legally you can't, did you?

18   A.    I don't recall.

19   Q.    Well, you never called say Lieutenant Foley and said

20   to him, listen, you got to get back to me on this

21   affidavit because legally we can't take the money any

22   other way, right?

23   A.    Correct.

24   Q.    You really didn't know legally how you could take the

25   money?

```
1    A.    Are you asking me if I can just take the money?
2    Q.    You didn't -- withdrawn.
3          You didn't tell that to Lieutenant Foley you had been
4    waiting to hear back from him, right?
5                MR. BRESLOW:  Objection, Your Honor, to the
6    form.
7                THE COURT:  No, I think it's appropriate for
8    cross.
9                MR. BRESLOW:  Just don't know what "that" is.
10               THE COURT:  Good point.
11   Q.    (By Ms. Levinson)  When you were waiting to hear back
12   from Lieutenant Foley about your affidavit, you didn't
13   pick up the phone and call him and say you need to get
14   back to us because legally we can't get the money any
15   other way, right?
16   A.    Right.
17   Q.    And you already testified that Mr. Buffis told you we
18   can just take it at the show cause hearing and you didn't
19   think there was anything wrong with that, right?
20   A.    Right.
21   Q.    Because you knew that Ms. Viola wanted to get rid of
22   the money?
23   A.    Right.
24   Q.    And so you didn't think anything was wrong with that
25   until you had a conversation with Sergeant Bill Bartini,
```

1   right?

2   A.   Right.

3   Q.   And this conversation that you had with Sergeant Bill

4   Bartini was when you got the first incline that maybe

5   something was wrong with the way Chief Buffis was going

6   about this?

7   A.   I still didn't believe Sergeant Bartini that Chief

8   Buffis was handling anything wrong.

9   Q.   So let's talk about Sergeant Bartini for a little

10  bit.  Sergeant Bartini the time you called him was working

11  for the Great Barrington Police Department, correct?

12  A.   Yes.

13  Q.   And prior to that he had been employed by the Lee

14  Police Department, is that right?

15  A.   Yes.

16  Q.   Were you two employed by the Lee Police Department at

17  about the same time?

18  A.   Yes.

19  Q.   And he left Lee Police Department under --

20           MR. BRESLOW:  Objection, Your Honor.

21           THE COURT:  Why don't we go to sidebar and you

22  can give me an offer.

23  (Sidebar conference.)

24           THE COURT:  Is this Bartini related to the

25  clerk?

1            MR. BRESLOW:  There's no relationship.

2            THE COURT:  None?

3            MR. BRESLOW:  It turns out there's lots of

4   Bartinis in and around southern Berkshire.

5            THE COURT:  Okay.  So maybe we should just get

6   that out there.

7            MS. LEVINSON:  Okay.

8            THE COURT:  Okay.  Where are you going with

9   this?

10            MS. LEVINSON:  I am going to establish that

11   there's some bad blood between Chief Buffis and Bill

12   Bartini because Joe Buffis had investigated him for

13   wrongdoing and that he didn't like Chief Buffis.  He held

14   a grudge against Chief Buffis and so he's agitating Ryan

15   Lucy in an attempt --

16            THE COURT:  Why does it even matter?  Because

17   Bartini is going to say, no, what Buffis is doing with the

18   money is wrong?

19            MS. LEVINSON:  Right, and agitating Lucy into

20   thinking there's something wrong.

21            MR. BRESLOW:  Your Honor, we are not calling

22   Bill Bartini to testify, the defense is.  So to the extent

23   that she wants to impeach her own witness in some fashion

24   she can, but to impeach her own witness before he's called

25   through this witness I just think is not appropriate.

1           THE COURT:  Well, it's not necessarily

2    impeaching him.  This witness has already testified that

3    he got information -- the first time he got information

4    that there might be some type of impropriety was from

5    Bartini.

6           MR. BRESLOW:  He just testified that even after

7    that conversation he still didn't think the defendant had

8    done anything wrong, so the matter should end there.

9           THE COURT:  Well, I don't think so.  I think

10   given that answer you would want to probe a little more,

11   but I don't think -- I'm not sure you can go into the full

12   thing about so there was an investigation of him and

13   Buffis did the investigation of Bartini, et cetera, et

14   cetera, et cetera, but I do think you can explore so

15   Bartini told you this and you didn't believe him.  Why

16   not?

17      If it starts coming in that there's some bad blood

18   between Bartini and Buffis, that's okay.  I'll let that

19   in, but I don't want to get into detail the specifics

20   about the whole investigation.

21          MR. BRESLOW:  I think it's hearsay.  I think

22   it's really -- I don't think it's relevant, but if she

23   wants to ask him why after the conversation he still

24   believed that the defendant wasn't doing anything wrong,

25   that's a fair question.

1          THE COURT:  It's a fair question.  If he says,

2    well, because I know these guys didn't like each other, I

3    didn't trust Bartini, I thought it was the remnants of

4    their dislike of each other, whatever, that's going to his

5    state of mind and is non-hearsay, but stay away from the

6    investigation.  Okay?

7          MS. LEVINSON:  Okay.

8          MR. BRESLOW:  So could Your Honor move to strike

9    the question that she was asking which was concerning the

10   circumstances surrounding Bartini's departure?

11         THE COURT:  Yes.  It may come up in another way

12   that is appropriate but this way it's not.

13         MS. LEVINSON:  Okay.

14         MR. BRESLOW:  Okay.

15   (End of sidebar conference.)

16         THE COURT:  Ladies and gentlemen, the last

17   question there was an objection which is sustained so that

18   objection is allowed, which means you should strike the

19   question.  The objection is sustained and I agree with the

20   objection.  The question is stricken, but on that topic

21   I'll allow you to rephrase the question.

22         MS. LEVINSON:  Thank you, Your Honor.

23   Q.   (By Ms. Levinson)  I believe that you just testified

24   that you had a conversation with Sergeant Bartini about

25   the search warrant affidavit, right?

1    A.    Yes.

2    Q.    And he may have said something to you about that not

3    being proper, right?

4    A.    Right.

5    Q.    But I think you just testified that you didn't

6    believe him, right?

7    A.    Correct.

8    Q.    And why didn't you believe him?

9    A.    Because I told him that Chief Buffis was an

10   experienced hearings officer and that I didn't believe the

11   court would allow anything illegal to take place, so.

12   Q.    So you contradicted him?

13   A.    I did.

14   Q.    And after you contradicted him and said that you

15   didn't believe that there was anything wrong with it, he

16   actually said, well, I'm going to look into this a little

17   bit myself, right?

18   A.    Yes.

19   Q.    And that was sort of the end of that, right?

20   A.    Yes.

21   Q.    Now, you did submit the affidavit to Lieutenant Foley

22   by e-mail, right?

23   A.    Yes.

24   Q.    And he's a lieutenant of a fairly large unit of

25   officers, right?

1    A.    Yes.

2    Q.    So it would be fair for you to infer that there were

3    other people in the unit who were aware of the fact that

4    this affidavit was floating around out there waiting for

5    approval?

6              MR. BRESLOW:  Objection, Your Honor.

7              THE COURT:  I'll allow that.

8              THE WITNESS:  I don't know if other people were

9    aware of it.

10   Q.   (By Ms. Levinson)  Well, it wasn't something that you

11   were trying to keep secret?

12   A.   I had sent it to only Lieutenant Foley so I don't

13   know who else saw his e-mail was aware.

14   Q.   But it wasn't something you were trying to hide?

15             MR. BRESLOW:  Objection; asked and answered.

16             THE COURT:  It was asked, sustained.  Move on.

17   Q.   (By Ms. Levinson) When there was talk between you and

18   Mr. Fusco and Mr. Buffis about donating the proceeds to

19   charity, an exact amount was never mentioned, correct?

20   A.   Correct.

21   Q.   You were aware of this 6,000 to $6,500 amount,

22   correct?

23   A.   Correct.

24   Q.   And to the best of your knowledge you had informed

25   Chief Buffis that that was the amount that had been thrown

1    around by Ms. Viola, right?

2    A.    Right.

3    Q.    Now, you testified earlier that you were the case

4    officer on this case, right?

5    A.    Right.

6    Q.    That Chief Buffis was not the case officer?

7    A.    Correct.

8    Q.    And you were the one who actually had firsthand

9    knowledge of what she said as far as the amount of

10   proceeds that she had in her possession as a result of her

11   prostitution, right?

12   A.    Right.

13   Q.    And you testified that even though you were the case

14   officer, Chief Buffis was not the case officer, you didn't

15   do the show cause hearing, right?

16   A.    Right.

17   Q.    Now there is nothing whatsoever unusual about the

18   case officer not doing the show cause hearing, is that

19   correct?

20   A.    Correct.

21   Q.    In fact, in your experience at the Lee Police

22   Department it is generally the chief who does show cause

23   hearings?

24   A.    The sergeant or the chief, correct.

25   Q.    The sergeant or the chief.  Okay.

1          And you were neither sergeant nor chief, correct?

2     A.    Correct.

3     Q.    So there's nothing unusual about Chief Buffis going

4     and doing the show cause hearing?

5     A.    Correct.

6     Q.    And, in fact, you know that in all police departments

7     at least in Berkshire County frequently the actual case

8     officer is not the officer who goes to court for the show

9     cause hearings, right?

10    A.    Correct.

11    Q.    You're aware of the fact that at a show cause hearing

12    any representative of the police department can go to

13    represent the interests of the police department?

14    A.    Yes.

15    Q.    And in the case of the Lee Police Department, more

16    often than not it was Chief Buffis who was your

17    experienced hearings officer, right?

18    A.    Yes.

19    Q.    So when you were not asked to go to cover the show

20    cause hearing, that was not in the slightest bit unusual,

21    right?

22    A.    Right.

23    Q.    Even though you prepared the paperwork, correct?

24    A.    Correct.

25    Q.    You participated in the interview, right?

1    A.    Correct.

2    Q.    You had all the first-hand information?

3    A.    Correct.

4    Q.    But Chief Buffis going to the hearing, totally

5    standard operating, right?

6    A.    Yes.

7    Q.    Now going back to January 19, 2012, at the Inn you

8    did the raid at the Inn and you take Tara Viola back to

9    the police station, right?

10   A.    Yes.

11   Q.    She's interviewed at the police station?

12   A.    Yes.

13   Q.    Thomas Fusco comes and they leave, right?

14   A.    Right.

15   Q.    And you had a conversation with Chief Buffis about

16   the media having been contacted, right?

17   A.    Yes.

18   Q.    Chief Buffis told you something to the effect of he

19   called Dick Lindsay at the Berkshire Eagle to give him a

20   heads-up about the operation that had occurred at the Inn

21   at Laurel Lake, correct?

22   A.    Correct.

23   Q.    And because you were the media liaison person, he

24   asked you to follow up to call Dick Lindsay and to provide

25   the details of the investigation and the follow up?

1    A.    Right.

2    Q.    And it was at that point that you told Chief Buffis,

3    Sergeant Meikeljohn said not to call the police, right?

4              MR. BRESLOW:   Objection, Your Honor.   I think

5    defense counsel misspoke and said called the police.

6              MS. LEVINSON:   Call the press.

7              THE COURT:   So the objection will be sustained

8    and the question will be rephrased.

9    Q.    (By Ms. Levinson) You told Chief Buffis that Sergeant

10   Meikeljohn had instructed you not to go to the press,

11   right?

12   A.    Right.

13   Q.    And the reason he didn't want you to go to the press

14   was because Ms. Viola was going to be cooperating with law

15   enforcement, right?

16   A.    Yes.

17   Q.    And that could blow the whole operation if there was

18   one, right?

19   A.    Yes.

20   Q.    But Chief Buffis then told you, well, it's too late.

21   I already called, right?

22   A.    Right.

23   Q.    Now he wasn't in on that interview, right?

24   A.    Right.

25   Q.    He didn't know that Tara Viola had offered to

1    cooperate?

2    A.   Right.

3    Q.   So when he called the Berkshire Eagle, Dick Lindsay

4    at the Berkshire Eagle, he didn't know that he was blowing

5    some potential undercover operation, right?

6    A.   Right.

7    Q.   And then he -- you told him that Sergeant Meikeljohn

8    told you not to call, he said, well, I already called and

9    you need to follow up, right?

10   A.   Right.

11   Q.   And you followed up because, one, he was your chief,

12   right?

13   A.   Right.

14   Q.   And, two, you know the cat was already out of the

15   bag, right?

16   A.   Yes.

17   Q.   The press knew?

18   A.   (Indicating.)

19          THE COURT:  You need to articulate, officer.

20   Your last answer was yes?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  Okay.

23   Q.   (By Ms. Levinson)  And you already testified that

24   when Ms. Viola came into the police station she was in the

25   company of police officers, right?

1   A.   Yes.

2   Q.   And so would it have been fair for Chief Buffis to

3   assume or to infer --

4              MR. BRESLOW:  Objection; speculative.

5              THE COURT:  It sounds like it's going there but

6   I will let you finish the question.

7   Q.   (By Ms. Levinson)  Would it have been fair for Chief

8   Buffis to infer that Ms. Viola coming into the police

9   station in the company of police officers had been

10  arrested pursuant to the plan that was hatched and that he

11  knew about?

12             MR. BRESLOW:  Objection.

13             THE COURT:  Sustained.  That will be stricken.

14  Q.   (By Ms. Levinson) Now it was the day after the raid,

15  so that would have been January 20th of 2012, that the

16  media erupted with the news of prostitution at the Inn at

17  Laurel Lake, right?

18  A.   Yes.

19  Q.   And you received a telephone call or calls from Mr.

20  Fusco?

21  A.   Yes.

22  Q.   And he informed you that he and particularly his wife

23  Tara Viola were very, very upset about all the media

24  coverage, right?

25  A.   Right.

1          THE COURT:  Ms. Levinson, just make a mark in

2     your notebook where we're stopping.  We are going to take

3     a lunch break.

4          MS. LEVINSON:  Okay.

5          THE COURT:  Is this a good spot?

6          MS. LEVINSON:  Perfect.

7          THE COURT:  So, ladies and gentlemen, we are

8     going to take a lunch break.  My understanding is your

9     lunch is here.  It has been here for awhile.  I was hoping

10    that we could take maybe 30, 35 minutes, a shorter lunch

11    than usual.  If anyone has plans and needs to have a

12    longer lunch, let me know.  So let's plan on being back in

13    here at five after.  All right?

14       Do not discuss the case with each other or with

15    anyone else, make any phone calls, talk about the case.

16    Don't investigate the case, do any research on the

17    internet or expose yourself to any media reports about the

18    case.  All right?  Thank you.

19    **(The jury left at 1:30.)**

20         MR. BRESLOW:  Your Honor, can we excuse Officer

21    Lucy?

22         THE COURT:  Sure. Okay.

23         MR. BRESLOW:  Before Your Honor leaves, we are

24    pretty sure that Your Honor had set today as a deadline

25    for jury instructions, but I seem to recall that when we

1    last talked Your Honor may have said --

2         THE COURT:  I'm willing to be fairly flexible,

3    recognizing the demand of being on trial and where we are

4    at now.

5         MR. BRESLOW:  We are prepared to file today if

6    Your Honor wants us to.

7         THE COURT:  Are you on jury instructions?

8         MS. LEVINSON:  I'm not quite as far as the

9    government, Your Honor.

10        THE COURT:  I will let you file something by the

11   end of tomorrow so hold yours in case you want to add to

12   them.  I'd like something from each party by the end of

13   tomorrow and this does not need to be a final version.  I

14   recognize we are going back and forth with this but I need

15   to start so I need to know what your thoughts are.

16        MS. LEVINSON:  Okay.  Thank you.

17        MR. BRESLOW:  Okay.

18   **(A recess was taken at 1:32 until 2:09.)**

19        THE COURT:  You may be seated.  So, ladies and

20   gentlemen, were you able to comply with my instructions

21   not to begin deliberations, not to discuss the case, to

22   avoid any media on the case, to avoid any research or

23   internet searches on the case?

24        THE JURY:  Yes, Your Honor.

25        THE COURT:  Has anyone in any way, shape, or

1   form attempted to influence you in any way or get

2   information to you that shouldn't be getting to you?

3              THE JURY:  No.

4              THE COURT:  All right.  Very good.  The jury

5   remains fair and impartial.

6              MS. LEVINSON:  Ms. Pelegano, may I have your

7   assistance in getting this online?

8   Q.   (By Ms. Levinson)  Officer Lucy, before we take up

9   where we left off, I just want to ask you a couple of

10  questions about a document.  Can you see your screen

11  functioning?

12  A.   Yes, ma'am.

13  Q.   Okay.  So I'm going to be referring to Government

14  Exhibit 24 which is already in evidence, and I believe

15  that we were talking earlier today about this particular

16  e-mail.  Do you recognize that?

17  A.   Yes, I do.

18  Q.   Okay.  And what do you recognize that as?

19  A.   That is an e-mail to Lieutenant Foley from me and a

20  response from Lieutenant Foley back to me.

21  Q.   And what is that about?  Can you please just explain

22  that to the jury?

23  A.   I explained to Lieutenant Foley that this is what I

24  have so far for the bank affidavit and he wrote, "Ryan, I

25  will try to look it over this afternoon."

1    Q.   And what was the date of that e-mail exchange?

2    A.   That was on January 24, 2012.

3    Q.   So that was just a couple of days after the raid at

4    the Inn?

5    A.   Yes.

6    Q.   Okay.  When we broke for lunch I believe I was asking

7    you some questions about the press, the media frenzy that

8    followed Chief Buffis's report to the Berkshire Eagle.

9    A.   Yes.

10   Q.   Now before that media frenzy started, you were in the

11   police station on January 19th with Sergeant Meikeljohn

12   and Ms. Viola and had been interviewing her, correct?

13   A.   Yes.

14   Q.   And as we said before, Chief Buffis was in his office

15   not in that room, correct?

16   A.   Correct?

17   Q.   And do you recall at some point late in the interview

18   with Ms. Viola you went in to see Chief Buffis to tell him

19   specifically that Sergeant Meikeljohn did not want the

20   press to be informed?

21   A.   I don't recall.

22   Q.   You don't recall that?

23   A.   No.

24   Q.   Do you recall telling Sergeant Meikeljohn that Chief

25   Buffis had already called the press?

1    A.    I don't recall.

2    Q.    Do you recall Sergeant Meikeljohn going to talk to

3    Chief Buffis about the fact that Chief Buffis had

4    prematurely called the press?

5    A.    Yes.

6    Q.    Okay.  And do you recall that Sergeant Meikeljohn was

7    very, very angry that Chief Buffis had called the press?

8    A.    Yes.

9    Q.    And that they started yelling at each other?

10   A.    Yes.

11   Q.    And it became a fairly heated and aggressive

12   conversation?

13   A.    Yes.

14   Q.    And it was because Sergeant Meikeljohn was angry

15   because having called the press was going to negatively

16   impact a possibility of Ms. Viola continuing to cooperate,

17   correct?

18   A.    Correct.

19   Q.    And you were present during that argument, right?

20   A.    I could hear it.

21   Q.    You could hear it because it got very loud, right?

22   A.    Right.

23   Q.    And you later went on to learn that Sergeant

24   Meikeljohn started to head up the State Police

25   investigation of Chief Buffis, is that correct?

1    A.    Yes.

2    Q.    Now, wouldn't you agree that it is not standard

3    operating procedure for a police officer to become a lead

4    investigator after having that kind of confrontation with

5    a subject?

6              MR. BRESLOW:  Objection, Your Honor.

7              THE COURT:  Sustained.  You've got to lay some

8    groundwork to show that he's qualified to answer a

9    question like that.

10   Q.    (By Ms. Levinson) Well, you heard that there was a

11   confrontation between Sergeant Meikeljohn and Chief

12   Buffis, right?

13   A.    Yes.

14   Q.    You later learned that Sergeant Meikeljohn became the

15   lead investigator in a criminal case against Chief Buffis,

16   right?

17   A.    Yes.

18   Q.    You knew that Sergeant Meikeljohn had had a personal

19   heated argument with Chief Buffis before he became the

20   lead investigator, correct?

21   A.    Yes.

22   Q.    Now, you were also aware that after Chief Buffis

23   learned that he had prematurely called the press, that he

24   actually felt terrible about having done that?

25             MR. BRESLOW:  Objection, Your Honor.

```
 1                    THE COURT:   The question was you learned?
 2                    MS. LEVINSON:   Yes.
 3                    THE COURT:   All right.   I'll allow the
 4      question.
 5                    THE WITNESS:   Yes.
 6      Q.   (By Ms. Levinson) In fact, Chief Buffis actually told
 7      you that despite the fact that these two individuals, Tara
 8      Viola and Tom Fusco, had committed a crime, he actually
 9      felt bad for them, right?
10      A.   Yes.
11      Q.   And he said he felt bad for them because of this
12      horrible media frenzy that erupted, correct?
13      A.   Correct.
14      Q.   And that he mistakenly alerted the media to the fact
15      that they had been arrested when they hadn't been
16      arrested, right?
17      A.   Correct.
18      Q.   And that he felt that it was somehow his fault, his
19      responsibility that they were getting all of this horrible
20      media attention?
21      A.   Yes.
22      Q.   Now talking about the media, during your direct
23      testimony earlier today Mr. Breslow showed you an article
24      that had come out shortly after the show cause hearing
25      entitled Secrecy in Sex Case or something?
```

1    A.    Correct.

2    Q.    And we looked at a couple of quotes in that article,

3    right?

4    A.    Yes.

5    Q.    And those quotes were purported to come from Chief

6    Buffis, right?

7    A.    Yes.

8    Q.    Now you weren't present when he was interviewed for

9    that article, correct?

10   A.    Correct.

11   Q.    And you weren't the reporter, right?

12   A.    Right.

13   Q.    So you have no idea if the reporter got his quotes

14   correctly or not, right?

15   A.    Right.

16   Q.    You just know what you saw in the newspaper?

17   A.    Right.

18   Q.    Now you spent some time this morning discussing what

19   happened the day of the show cause hearing when Chief

20   Buffis came back to the police station.  Do you remember

21   that testimony?

22   A.    Yes.

23   Q.    And you told us that you asked Chief Buffis what had

24   happened at the show cause hearing, correct?

25   A.    Correct.

1  Q.   And he told you he wasn't at liberty to say, is that

2  right?

3  A.   Yes, ma'am.

4  Q.   At the time you asked him that question, your wife

5  was with you in the police station, wasn't she?

6  A.   Yes.

7  Q.   And she is not a member of the Lee Police Department,

8  correct?

9  A.   No, she is not.

10  Q.   And it would not be proper for you and Chief Buffis

11  to be discussing a police investigation and case in front

12  of somebody who was not a member of the police department,

13  correct?

14  A.   Correct.

15  Q.   Now, you testified that when he told you he wasn't at

16  liberty to say, you just decided to not ask him again,

17  right?

18  A.   Right.

19  Q.   Because he was your chief and he had given you an

20  answer?

21  A.   Right.

22  Q.   But nothing stopped you from going into his office

23  after your wife left and saying to him, okay, my wife is

24  gone, tell me what happened, right?

25  A.   Right.

1    Q.    Nothing stopped you from doing that?

2    A.    No.

3    Q.    But you didn't?

4    A.    No, I didn't.

5    Q.    And then we heard this morning about Government

6    Exhibit 25 which I'll put on the viewer, Government

7    Exhibit 25 in evidence, which is a Lee Police Department

8    memorandum to all officers about dissemination of police

9    information, right?

10   A.    Yes.

11   Q.    And that memorandum is dated February 22nd of 2012?

12   A.    Yes.

13   Q.    Which is the day after the show cause hearing?

14   A.    Correct.

15   Q.    And you testified that you felt that based upon that

16   memorandum being posted in the police department that you

17   could not talk even to Sergeant Meikeljohn about what was

18   going on with the investigation?

19   A.    Right.

20   Q.    Because the memorandum specifically says that you

21   shall not discuss department operations with any person

22   outside the Lee Police Department, right?

23   A.    Yes.

24   Q.    However, you could have gone into Chief Buffis's

25   office and said to him may I discuss this with Sergeant

1    Meikeljohn, correct?

2    A.    Yes.

3    Q.    Now you may have thought that the answer would be no

4    because of the dustup that Chief Buffis had with Sergeant

5    Meikeljohn, correct?

6    A.    Yes.

7    Q.    But nothing stopped you from doing that?

8    A.    Right.

9    Q.    Also in the second paragraph of Government Exhibit 25

10   it specifically references that "any officer who has

11   issues with department policies, staffing issues, or

12   special assignments shall address those concerns to the

13   chief of police and shall not discuss department

14   operations with any person outside the Lee Police

15   Department," correct?

16   A.    Correct.

17   Q.    Now you were aware of the fact that prior to the

18   posting of that memo from Chief Buffis there had been a

19   lot of talk in the Lee Police Department about the

20   selection process for a sergeant's position, is that

21   correct?

22   A.    I'm not --

23             MR. BRESLOW:  Objection.

24             THE COURT:  Relevance?

25             MS. LEVINSON:  Relevant to the reason for the

1    policy being posted.

2              THE COURT:  I will let you ask a few questions

3    *de bene* if you can tie it together.  If not, I will strike

4    the questions if you can't establish a relevance.

5    Q.   (By Ms. Levinson) In the months prior to February of

6    2012, a new sergeant was selected in the Lee Police

7    Department, correct?

8    A.   Yes.

9    Q.   And not everybody agreed with the selection process

10   or the person who was selected, correct?

11   A.   Correct.

12   Q.   And there was a lot of talk among the officers within

13   the Lee Police Department about that process?

14             MR. BRESLOW:  Objection, Your Honor.

15             THE COURT:  Overruled.

16             THE WITNESS:  There was some, yeah.  There was

17   scuttlebutt in the station.

18   Q.   (By Ms. Levinson)  There was also scuttlebutt that

19   went on outside the station among other police

20   departments?

21   A.   I'm not aware of that.

22   Q.   You're not aware of that?

23   A.   (Indicating.)

24   Q.   But you do agree that that non-dissemination

25   memorandum talks about if people within the department

1    have issues with department policies, staffing issues,

2    special assignments, they should come to the chief of

3    police or segregant and not go outside of the police

4    department, right?

5    A.    Right.

6    Q.    So it specifically dealt with staffing issues and

7    department policies, this memorandum?  You want me to put

8    it back again?

9    A.    Sure.

10   Q.    I'm putting Government Exhibit 25 on the viewer,

11   second paragraph, "any officer who has issues with

12   department policies, staffing issues, or special

13   assignments," correct?

14   A.    Yes.

15              MR. BRESLOW:  Your Honor, move to strike all

16   that.

17              THE COURT:  Yes, I'm going to strike that.  I

18   don't see that you've tied that together as that being a

19   motivating factor there.  So I am going -- the last

20   inquiry, which was the last several three or four

21   questions regarding the policy and the sergeant's exam or

22   selection of sergeant, that area will be stricken.

23   Disregard the questions.

24       If it comes up again in a different context, it may

25   be appropriate with this witness or a different witness in

1   a different way, but for now it's stricken.  Disregard it.

2           MS. LEVINSON:   Thank you.

3       May I approach the witness to show him a document?

4           THE COURT:   Yes.

5   Q.   (By Ms. Levinson) Officer Lucy, I'm going to show you

6   a document that I have marked as Defendant's Exhibit D for

7   identification at this point.  It's a packet of documents.

8   If you could just take a moment and look at that.

9       Do you recognize the documents that are contained

10  within Defendant's Exhibit D for identification?

11  A.   I do.

12  Q.   What do you recognize those documents as without

13  telling us what the contents are?

14  A.   Memorandums from the chief of police.

15  Q.   And did you personally see those memoranda?

16  A.   Yes.

17  Q.   Where did you see those memoranda?

18  A.   I don't recall.

19  Q.   Did you see these memoranda posted anywhere in the

20  Lee Police Department?

21  A.   I don't know if they were posted or if I read them in

22  the policies book.

23  Q.   So do you recognize these to be policies of the Lee

24  Police Department?

25  A.   Yes, ma'am.

1          MS. LEVINSON:  I would offer the documents

2     contained in Defendant's Exhibit D into evidence.

3          MR. BRESLOW:  We object as relevant, Your

4     Honor.

5          THE COURT:  I'll see counsel.

6     (Sidebar conference.)

7          THE COURT:  What's your offer of proof?

8          MS. LEVINSON:  In or about the same time Chief

9     Buffis posted the non-dissemination police information, he

10    also posted or disseminated a bunch of other memoranda

11    that he was preparing as the new chief of police.  He had

12    been revamping --

13         THE COURT:  It was all somewhere early February

14    2012?

15         MS. LEVINSON:  Yes.  They're within the relevant

16    time period, not exactly on the same date but not that far

17    away.

18         THE COURT:  So your offer is there's not

19    something so suspicious about the policy because it was

20    introduced in with other policies that he was introducing

21    at the time regarding --

22         MS. LEVINSON:  Yes.

23         THE COURT:  -- administrative-type issues of the

24    police department?

25         MS. LEVINSON:  Yes.

1          MR. BRESLOW:  Your Honor, I would agree

2    completely with that argument if they were posted together

3    but they were not.  As you can see, the first one is March

4    1st and all of the others are on February 10th, none of

5    them are on February 22nd.  None of them are even within

6    days or a week of February 22nd so I don't think they're

7    relevant at all.

8        I think under Rule 403 they're going to be confusing

9    and misleading to the jury and I think whatever slight

10   probative value they might have is outweighed

11   substantially.

12         THE COURT:  I don't see any potential prejudice.

13   I see that they're separated by about a week so it would

14   be a stronger inference if they came out on the same day,

15   but coming within a couple weeks of each other could very

16   well be taken by the jury -- the jury could infer that in

17   his startup in the first couple of months he's coming up

18   with policies and procedures so I think it's marginally

19   relevant and I don't see the prejudicial effect.

20         MR. BRESLOW:  Okay.

21         MS. LEVINSON:  Thank you.

22   (End of sidebar conference.)

23         MS. LEVINSON:  So will this be admitted as

24   Defendant's Exhibit D in evidence?

25         THE COURT:  Over objection it will be admitted.

1   Is that the correct letter?

2           THE CLERK:  Yes.

3   **(Defendant's Exhibit D admitted.)**

4   Q.   (By Ms. Levinson)  Officer Lucy, I'm going to briefly

5   show you some of the documents that are contained in

6   Defendant's Exhibit D in evidence.  Can you describe

7   generally what this top document purports to be?

8   A.   It's titled death/serious injury.

9   Q.   Is this a document that was prepared by Chief Buffis?

10  A.   Yes.

11  Q.   What's the date of this document?

12  A.   March 1, 2012.

13  Q.   And in March of 2012 Chief Buffis had only been chief

14  for about six or seven months at that time, is that

15  correct?

16  A.   I don't recall.

17  Q.   You don't recall when he became chief?

18  A.   No.

19  Q.   Would it be fair to say that he hadn't been chief for

20  that long in early 2012?

21          MR. BRESLOW:  Objection.

22          THE COURT:  I'll allow it.

23          THE WITNESS:  Yes.

24  Q.   (By Ms. Levinson)  On page 2 of Defendant's Exhibit

25  D, is that another policy issued by Chief Buffis?

```
 1    A.    Yes.

 2    Q.    And the date of that policy?

 3    A.    February 10, 2012.

 4    Q.    And page 3, is that another policy issued by Chief

 5    Buffis?

 6    A.    Yes.

 7    Q.    Yes?

 8    A.    Yes.

 9    Q.    And the date?

10    A.    February 10, 2012.

11    Q.    And the next page is another policy issued by Chief

12    Buffis?

13    A.    Yes.

14    Q.    And that's also February 10, 2012?

15    A.    Yes.

16    Q.    And the next page, is that another policy issued by

17    Chief Buffis?

18    A.    Yes.

19    Q.    And that was February 10, 2012?

20    A.    Yes.

21    Q.    Another memorandum issued by Chief Buffis?

22    A.    Yes.

23    Q.    Another departmental policy, yes?

24    A.    Yes.

25    Q.    Also February 10, 2012.
```

1           And the following page is another policy memorandum

2      issued by Chief Buffis on February 10, 2012?

3      A.    Yes.

4      Q.    The following one, another policy issued by Chief

5      Buffis on February 10, 2012?

6      A.    Yes.

7      Q.    The following page, another departmental policy

8      issued by Chief Buffis on February 10, 2012?

9      A.    Yes.

10     Q.    And finally -- not finally, two more, another

11     departmental policy issued by Chief Buffis on February 10,

12     2012?

13     A.    Yes.

14     Q.    And finally -- no, still not finally, there's two

15     more, another policy by Chief Buffis on February 10, 2012?

16     A.    Yes.

17     Q.    And finally, another policy issued by Chief Buffis on

18     February 10, 2012, right?

19     A.    Yes.

20     Q.    They're all on similar letterhead and similar format?

21     A.    Yes.

22     Q.    They're all similar to the non-dissemination policy

23     issued by Chief Buffis on February 22nd of 2012, correct?

24     A.    Correct.

25     Q.    You testified earlier about Sergeant Meikeljohn

1    asking you to produce for him a copy of the

2    non-dissemination policy; do you recall that testimony?

3    A.    Yes.

4    Q.    And that question was asked of you in the context of

5    Sergeant Meikeljohn's investigation into possible criminal

6    activity by Chief Buffis, correct?

7    A.    Correct.

8    Q.    And you testified earlier that you asked Chief Buffis

9    if you could give a copy of that policy to Sergeant

10   Meikeljohn, correct?

11   A.    Correct.

12   Q.    And Chief Buffis said no, you can't give it to him.

13   He knows the proper way to go about getting it, right?

14   A.    Right.

15   Q.    Something to that effect?

16   A.    Yes.

17   Q.    And this is in the context of a criminal

18   investigation that Sergeant Meikeljohn was conducting into

19   Chief Buffis, right?

20   A.    Yes.

21              MR. BRESLOW:   Objection, Your Honor.

22              THE COURT:   Overruled.

23   Q.    (By Ms. Levinson) And at the time that you asked

24   Chief Buffis for permission to produce that document to

25   Sergeant Meikeljohn, Chief Buffis knew that he was being

1    investigated, right?

2              MR. BRESLOW:  Objection.

3              THE COURT:  Sustained.  You can't ask the

4    question that way.

5    Q.   (By Ms. Levinson) When was that conversation that you

6    had with Sergeant Meikeljohn in which he asked you to

7    produce a copy of the non-dissemination policy?

8    A.   It was during a conversation at the State Police

9    detective unit.  I don't recall the date.

10   Q.   And this conversation at the State Police Department

11   detective unit was your being interviewed by Sergeant

12   Meikeljohn about facts that you're testifying here today,

13   correct?

14   A.   I don't know if he had asked for it prior to that

15   interview or during that interview.

16   Q.   But you know it was during the course of this

17   criminal investigation, correct?

18   A.   Yes.

19   Q.   And, in fact, you testified that you had a

20   conversation with Chief Buffis in his office about Chief

21   Buffis's interview --

22   A.   Yes.

23   Q.   -- by Sergeant Meikeljohn, correct?

24   A.   Rick Smith I believe.

25   Q.   Rick Smith.  Okay.

1          You recall and you testified that there was a day

2     that you saw Chief Buffis at the station and that he

3     looked down in the dumps or something to that effect?

4     A.    Yes.

5     Q.    And you asked him if he wanted to talk about it,

6     right?

7     A.    I did.

8     Q.    He said that he did?

9     A.    Yes.

10    Q.    And this was in March of 2012, is that correct?

11    A.    Yes.

12    Q.    Just a couple of months after the raid at the Inn,

13    which was in January?

14    A.    Right.

15    Q.    And then the show cause hearing was in February,

16    right?

17    A.    Right.

18    Q.    And this was in March?

19    A.    Yes.

20    Q.    And Chief Buffis said, yes, I would like to talk

21    about it, right?

22    A.    Yes.

23    Q.    During that conversation he explained to you that he

24    had been interrogated by Captain Rick Smith for

25    approximately five hours, right?

```
 1    A.    Yes.
 2    Q.    And it would be fair to say that in addition to his
 3    demeanor of being down in the dumps, he seemed pretty
 4    upset as well, didn't he?
 5    A.    Yes, he did.
 6    Q.    And he even mentioned something to you about being
 7    upset that his integrity was being challenged, right?
 8    A.    Yes, he did.
 9    Q.    He said something to you about the effect that he has
10    been a police officer for over 30 years and that no one
11    has ever questioned his integrity before?
12    A.    Correct.
13    Q.    And he said something to the effect that if a police
14    officer doesn't have his own integrity he's got nothing,
15    right?
16    A.    Right.
17    Q.    He seemed greatly offended by that?
18    A.    Yes, he did.
19    Q.    And very, very upset, right?
20    A.    Yes.
21    Q.    And he described how he was interrogated for five
22    hours, right?
23    A.    Yes.
24    Q.    And at that time he willingly, readily, easily told
25    you what happened at the show cause hearing back in
```

1   February, right?

2          MR. BRESLOW:  Objection to characterization,

3   Your Honor.

4          THE COURT:  It's cross-examination.  Go ahead.

5   Q.   (By Ms. Levinson) Did he freely tell you what

6   happened at the show cause hearing?

7   A.   Yes, he did.

8   Q.   And he explained to you how knowing that Tara Viola

9   wanted to donate the proceeds of her prostitution business

10  to charity, he had her donate the proceeds to a Lee

11  charity that he thought was a worthy charity, correct?

12  A.   Yes.

13  Q.   And he also told you that he did not go forward with

14  following through on criminal charges against Tara Viola

15  and Tom Fusco, right?

16  A.   Yes.

17  Q.   And he described to you that he felt badly for all

18  that they had gone through before they even got to the

19  show cause hearing, right?

20  A.   Yes.

21  Q.   And from your knowledge of how Chief Buffis operated

22  as a police officer, that was not unlike something he

23  would do, right?

24  A.   Correct.

25  Q.   Now, he also explained to you at that conversation

```
 1    that you had the reason he didn't tell you about what
 2    happened at the show cause hearing the afternoon of the
 3    show cause hearing when you asked him, do you recall that?
 4    A.   I do.
 5    Q.   And he said to you I didn't tell you --
 6             MR. BRESLOW:  Objection, Your Honor.
 7             THE COURT:  Why don't you phrase the question
 8    what he was told.
 9             MR. BRESLOW:  The objection is to hearsay.
10             THE COURT:  Well, out-of-court statement by Mr.
11    Buffis, by a party.
12             MR. BRESLOW:  By a party opponent, it has to be
13    offered by a party opponent.
14             THE COURT:  Let me see you at sidebar.
15    (Sidebar conference.)
16             MR. BRESLOW:  So I can brief this if Your Honor
17    wants, but it's very clear that the defense cannot offer
18    the defendant's own in this case self-serving statement
19    without subjecting the defendant to cross-examination.
20    It's just inadmissible hearsay.
21             MS. LEVINSON:  I counter that with Mr. Breslow
22    does make a good evidentiary point, but the rule of
23    completeness would allow me to inquire because Officer
24    Lucy already testified at some length as to the contents
25    of this discussion with Chief Buffis and this is a
```

1    relevant portion of that discussion.

2                THE COURT:  So develop that a little more.  What

3    was the rest of the -- what was the first part of the

4    discussion?

5                MS. LEVINSON:  Well, on direct testimony Officer

6    Lucy testified about Chief Buffis sitting down in his

7    office and explaining what had happened at the show cause

8    hearing and the whole thing about how badly he felt for

9    Ms. Viola and Mr. Fusco and his reputation and all of

10   that, and this is just another part of that conversation

11   that the government didn't put in but it's a relevant part

12   of it.

13               THE COURT:  You already got this in it seems.

14               MS. LEVINSON:  His wife was there.

15               THE COURT:  What's the next question?

16               MS. LEVINSON:  Well, the reason he explained to

17   you -- the reason he didn't tell you was because your wife

18   was there.

19               THE COURT:  I'm going to sustain the objection.

20               MS. LEVINSON:  Okay.

21   (End of sidebar conference.)

22               THE COURT:  That last objection was sustained

23   which means disregard the question.

24   Q.   (By Ms. Levinson) You testified on your direct

25   examination that during that conversation Chief Buffis

1   told you that he wanted to give the money back to Ms.

2   Viola and Mr. Fusco, right?

3   A.   Yes.

4   Q.   And you testified that he actually reached into his

5   pocket and withdrew what appeared to be a check, right?

6   A.   Yes.

7   Q.   You didn't get a really good look at it, did you?

8   A.   No, I didn't.

9   Q.   But that was in the context of him explaining it to

10  you?

11  A.   Yes.

12  Q.   And he explained to you that he wanted to give the

13  money back but that Captain Smith didn't take it?

14  A.   Correct.

15  Q.   He also explained to you as you testified earlier

16  today how he loosely ran the toy fund, right?

17  A.   Yes.

18  Q.   I think that's the words that you used, that he

19  loosely ran it?

20  A.   Yes.

21  Q.   And that he told you that he put a lot of his own

22  money into the toy fund, right?

23  A.   Yes.

24  Q.   And you were asked a lot of questions about whether

25  or not you'd seen documents pertaining to the toy fund and

1    you said that you hadn't, right?

2    A.    Right.

3    Q.    And Chief Buffis never shared with you any documents

4    about the toy fund, right?

5    A.    Right.

6    Q.    As you said earlier this wasn't part of the police

7    business, right?

8    A.    Yes.

9    Q.    You weren't part of the toy fund, right?

10   A.    Right.

11   Q.    And you never asked him to see any documents relating

12   to the toy fund?

13   A.    No, I didn't.

14   Q.    And finally, during this conversation that you had

15   with Chief Buffis in his office when he was down in the

16   dumps and upset he told you that he expected that you were

17   going to get a call to go meet with Captain Smith, right?

18   A.    Yes.

19   Q.    And what did he tell you to say?

20   A.    He told me to go be a hundred percent honest.

21   Q.    He told you to go and be a hundred percent honest,

22   right?

23   A.    Yes.

24   Q.    In fact, the day came that you did go and provide

25   statements to investigators in this case?

1    A.    Yes.

2    Q.    Now do you recall that some time after that

3    conversation with Chief Buffis when he told you to be a

4    hundred percent honest, you called him to tell him that

5    you really couldn't talk to him about this investigation

6    anymore?

7    A.    I remember having a conversation with him.  I don't

8    know if it was over the phone.

9    Q.    Okay.  So you remember having a conversation with him

10   and you recall as part of that conversation saying that

11   you really couldn't discuss this investigation with him

12   anymore, right?

13   A.    Correct.

14   Q.    And specifically Sergeant Meikeljohn had told you you

15   cannot discuss this investigation anymore, right?

16   A.    Right.

17   Q.    And you said something to Chief Buffis along the

18   lines that they've got me pretty threatened up here; do

19   you recall that?

20   A.    No, I don't.

21   Q.    Well, when you spoke to Sergeant Meikeljohn he was

22   fairly aggressive with you in informing you that you

23   weren't supposed to discuss his investigation with

24   anybody, right?

25   A.    I wouldn't state it as aggressive, no.

1    Q.    He was very clear?

2    A.    He was very clear.

3    Q.    He was very clear?

4    A.    (Indicating.)

5    Q.    Do you recall Sergeant Meikeljohn telling you

6    specifically that you, Officer Lucy, might actually be a

7    victim of intimidation of a witness by Mr. Buffis?

8    A.    Yes.

9    Q.    And that was directly in connection with the

10   non-dissemination memorandum?

11   A.    Yes.

12   Q.    And you informed Sergeant Meikeljohn that you were

13   not interested in being a victim of anything, right?

14   A.    Yes.

15   Q.    Now, you spoke earlier about how after the show cause

16   hearing and after Chief Buffis didn't tell you what

17   happened at the show cause hearing and you really wanted

18   to know what had gone on, right?

19   A.    Right.

20   Q.    But you didn't go above Chief Buffis to find out

21   anything, right?

22   A.    Right.

23   Q.    And you didn't call any investigators to say that

24   something wasn't right, did you?

25   A.    Right.

1    Q.   You never called anybody above Chief Buffis in any

2    other department to say that you really wanted a complaint

3    to issue and that you were upset about it, right?

4    A.   Right.

5              MS. LEVINSON:   If I could just have a minute,

6    Your Honor?

7              THE COURT:   Sure.

8    Q.   (By Ms. Levinson)  Mr. Breslow asked you a few

9    questions earlier about how many people you personally

10   knew who received toys from the Laliberte Toy Fund, right?

11   A.   Right.

12   Q.   You testified that you didn't know anybody, right?

13   A.   Right.

14   Q.   Over the years how many people complained to you that

15   they didn't get any toys from the Laliberte Toy Fund?

16   A.   Zero.

17   Q.   Mr. Breslow asked you a series of questions about the

18   Lee Police Association account, right?

19   A.   Yes.

20   Q.   And you testified that Chief Buffis never shared with

21   you any of the bank statements from that account, right?

22   A.   Right.

23   Q.   You didn't know about any deposits that were made

24   into that account?

25   A.   Right.

1    Q.   You didn't know about any withdrawals that were made

2    into that account, right?

3    A.   Right.

4    Q.   You never asked him to look at the Lee Police

5    Association account, did you?

6    A.   No.

7    Q.   There wouldn't have been any reason for you to ask to

8    look at those accounts, would there have been?

9    A.   No.

10            MS. LEVINSON:   I have nothing further.   Thank

11   you.

12            THE COURT:   Mr. Breslow.

13   **REDIRECT EXAMINATION**

14   Q.   (By Mr. Breslow) Good afternoon.

15   A.   Good afternoon.

16   Q.   Officer Lucy, do you recall just now being asked on

17   cross-examination whether you ever asked the defendant

18   about the Lee Police Association account?

19   A.   Yes.

20   Q.   Tell the jury why did you never ask him?

21   A.   Umm, because I felt that it was none of my business

22   and I honestly wasn't that concerned with it.

23   Q.   And tell the jury why were you not concerned about

24   the defendant's handling of the Lee Police Association

25   account?

1    A.    Because I knew that it would be handled properly.

2    Q.    And why did you know that the defendant would handle

3    the Lee Police Association properly?

4    A.    Because he's my chief.

5    Q.    Now, you recall just immediately before that Ms.

6    Levinson asked you whether you made calls to people above

7    Chief Buffis?

8    A.    Yes.

9    Q.    So who was your boss?

10   A.    Chief Buffis.

11   Q.    And how long had the defendant been at the Lee Police

12   Department?

13   A.    At that time roughly 30 years.

14   Q.    And how old are you?

15   A.    Thirty-three.

16   Q.    So how old were you when the defendant started at the

17   Lee Police Department?

18   A.    Thirty years old.

19   Q.    How old were you?  How old were you personally when

20   the defendant started?

21   A.    Three years old.

22   Q.    And how long had you been a member of the Lee Police

23   Department?

24   A.    At that point three years.

25   Q.    So who at the Lee Police Department was there to

1    complain to about the defendant?

2    A.    Nobody.

3    Q.    Why not?

4    A.    Because there was nobody higher than Chief Buffis.

5    Q.    Now do you remember Ms. Levinson asking you a

6    question about whether the defendant told you to be a

7    hundred percent honest when or if you were interviewed by

8    the State Police?

9    A.    Yes.

10   Q.    Did you go to the show cause hearing?

11   A.    No.

12   Q.    When the defendant returned from the show cause

13   hearing, what did he tell you about what happened?

14   A.    He didn't.

15   Q.    Outside of what the defendant told you in that last

16   conversation, what did you know about what actually

17   happened at that show cause hearing?

18   A.    I didn't.

19   Q.    Now do you remember Ms. Levinson asking you about

20   questions about Chris Meikeljohn and witness intimidation?

21   A.    Yes.

22   Q.    So I'm showing you what's already in evidence and

23   what Ms. Levinson showed you earlier as Government Exhibit

24   25.   When did the defendant post this memo?

25   A.    February 22, 2012.

1    Q.    How many days after the defendant declined to tell

2    you what happened at the show cause hearing did he post

3    this memo?

4    A.    One day.

5    Q.    How free did you feel to discuss your concerns about

6    the show cause hearing with Chris Meikeljohn?

7    A.    I didn't.

8    Q.    Tell the jury why not.

9    A.    Because the memorandum was just posted.

10   Q.    And who posted the memorandum?

11   A.    Chief Buffis.

12   Q.    Now do you remember Ms. Levinson asking you a number

13   of questions about your second to last conversation or

14   your final conversation with Chief Buffis when he pulled

15   out the check?

16   A.    I do.

17   Q.    Okay.  Now what did the defendant tell you about a

18   private meeting that he had with Tara Viola and Thomas

19   Fusco?

20   A.    Nothing about a private meeting.

21   Q.    What did he tell you about the Sonsini Dog Rescue

22   Center?

23   A.    Nothing.

24   Q.    Did he mention the Sonsini Dog Rescue Center?

25   A.    No.

1    Q.    What did he say about nondisclosure agreement and I'm

2    now referring to Government's Exhibit 25?

3    A.    Nothing.

4    Q.    Did he show you a nondisclosure agreement?

5    A.    No.

6    Q.    Did he mention a nondisclosure agreement?

7    A.    No.

8    Q.    And what did he say that he had personally done with

9    Tara Viola and Tom Fusco's donation?

10   A.    That he had taken the money and put it in a safe in

11   his office.

12   Q.    And where did you believe at the time you were

13   speaking with him that money was?

14   A.    In the safe in his office.

15   Q.    Tell the jury why you believed that on the day of

16   Captain Smith's interview their donation was sitting in a

17   safe in his office?

18   A.    Because Joe Buffis just told me it was.

19   Q.    And why did you believe Joe Buffis?

20   A.    Because he's the chief of police.

21   Q.    Now do you remember Ms. Levinson asking you a series

22   of questions about other memos that the defendant wrote?

23   A.    Yes.

24        MR. BRESLOW:   Okay.   Ms. Levinson, may I have

25   Defendant's Exhibit D?

1          May I approach the witness?

2               THE COURT:  Yes.

3    Q.   (By Mr. Breslow) Tell the jury how many memos are

4    there?

5    A.   Ten.

6    Q.   Of the ten memos how many were written before the

7    undercover operation on January 19th?

8    A.   Zero.

9    Q.   How many were dated the day after the show cause

10   hearing, February 22nd?

11   A.   One.

12               MR. BRESLOW:  May I approach?

13               THE COURT:  Yes.

14               MR. BRESLOW:  Your Honor, may I ask the witness

15   to look again?

16               THE COURT:  Yes.  What do you want him looking

17   for?

18               MR. BRESLOW:  The question that I posed were how

19   many were dated on February 22nd, the day after the show

20   cause hearing.

21               THE COURT:  You're asking the question again?

22               MR. BRESLOW:  Yes.

23               THE WITNESS:  Zero.

24   Q.   (By Mr. Breslow)  So when you said one earlier --

25   A.   I was referring to the dissemination memorandum.

```
 1   Q.    Okay.  So you were referring to Government Exhibit
 2   25, what's on your screen?
 3   A.    Yes.
 4   Q.    Just so there's no confusion, in Defendant's Exhibit
 5   D, the ten memos that are right before, how many were
 6   written on February 22nd the day after the show cause
 7   hearing?
 8   A.    Zero.
 9   Q.    And how many of those memos concern nondisclosure of
10   Lee Police information to entities like the State Police?
11   A.    Zero.
12   Q.    And do you remember Ms. Levinson asking you a number
13   of questions regarding this exhibit, Government Exhibit
14   25?
15   A.    Yes.
16   Q.    What did the defendant tell you the day before he
17   posted this memo about the show cause hearing?
18   A.    That he was not at liberty to tell me about it.
19   Q.    Now do you remember Ms. Levinson asking you a
20   question about your wife?
21   A.    Yes.
22   Q.    So what did the defendant say about your wife in that
23   conversation?
24   A.    Nothing.
25   Q.    Well, did the defendant ask permission to speak
```

1    privately with you?

2    A.    No.

3    Q.    Can you tell the grand jury or the jury rather where

4    you were?

5    A.    In a common room.  It's a computer room/report office

6    room at the station.

7    Q.    Did the common room have a door?

8    A.    It did.

9    Q.    Did the defendant's office have a door?

10   A.    Yes.

11   Q.    How long would it have taken you and the defendant to

12   walk away from your wife and to his office?  How many

13   seconds would it have taken the defendant?

14   A.    Five to ten.

15   Q.    Now did your wife stay with you all day?

16   A.    No.

17   Q.    At some point she left?

18   A.    Yes.

19   Q.    Approximately how long did she stay with you?

20   A.    Just a little while.

21   Q.    After she left, did the defendant see you again in

22   the police station without your wife?

23   A.    Yes.

24   Q.    And what did the defendant say about the show cause

25   hearing then?

1    A.    Nothing.

2    Q.    Now, do you remember Ms. Levinson asking you about

3    the article about the Secrecy in Sex Case?

4    A.    Yes.

5    Q.    And when that article came out, what had the

6    defendant told you about the status of the case, was it

7    open or closed?

8    A.    When the article came out, he didn't tell me the

9    status.

10   Q.    So did you know the status of the case when the

11   article came out?

12   A.    No, I didn't.

13   Q.    Whose case was it?

14   A.    My case.

15   Q.    Now, do you remember Ms. Levinson asking you

16   questions about whether it was unusual for the case

17   officer to not go to court?

18   A.    Yes.

19   Q.    And I believe you testified that it was not unusual

20   for you not to go to court?

21   A.    Correct.

22   Q.    Okay.  So tell this jury how unusual is it for the

23   chief to go to court and decline to tell you what happened

24   in court?

25            MS. LEVINSON:  Objection.

1          THE COURT:  Overruled.

2          THE WITNESS:  It's unusual.

3    Q.   (By Mr. Breslow) When you say unusual, how many other

4    times on any of the cases that you've had has Chief Buffis

5    gone to a show cause hearing and declined to tell you what

6    happened in court?

7          MS. LEVINSON:  Objection.  This was gone over at

8    great length during Mr. Breslow's direct examination of

9    Officer Lucy.

10         THE COURT:  Overruled.

11         THE WITNESS:  He hadn't.

12   Q.   (By Mr. Breslow)  I'm sorry?

13   A.   Can you repeat the question?

14   Q.   How many times had he gone to a show cause hearing,

15   come back, and declined to tell you what happened in

16   court?

17   A.   Zero.

18   Q.   How unusual is it for the defendant to have placed a

19   memo like Government's Exhibit 25 on the police department

20   board the day after a show cause hearing?  And when I say

21   a memo like that, I mean a nondisclosure memo.

22   A.   I felt that it was unusual.

23   Q.   Well, had he ever done it before?

24   A.   No.

25   Q.   Had he ever done it since?

1   A.   No.

2   Q.   Now, do you remember Ms. Levinson asking you a number

3   of questions concerning your conversation with Sergeant

4   Bartini?

5   A.   Yes.

6   Q.   And you remember her asking you a number of questions

7   about what you and Sergeant Meikeljohn told Tara Viola

8   about what was going to happen with the donation?

9   A.   Yes.

10  Q.   And do you remember that, in sum and substance, you

11  said to Tara Viola that the donation would be handled in

12  court?

13  A.   Yes.

14  Q.   And that you wouldn't take the donation?

15  A.   Yes.

16  Q.   Tell the jury why you would not take her donation

17  when she offered it?

18  A.   Because by law we can't do that.

19  Q.   And you stated to her instead that it would be

20  handled in court?

21  A.   Yes.

22       MS. LEVINSON:   Objection; leading.

23  Q.   (By Mr. Breslow) Well, what did you tell her instead

24  of taking her money?

25       THE COURT:   So there was an objection made and I

```
1    need to rule on it first.

2         You're withdrawing the question?

3              MR. BRESLOW:  Yes, I will.

4              THE COURT:  So the question was withdrawn as

5    leading; rephrase it.

6              MR. BRESLOW:  Okay.

7              THE COURT:  You just did but now you forgot

8    it.

9    Q.   (By Mr. Breslow)  What did you tell Ms. Viola instead

10   of taking her money?

11   A.   That it would be handled in court.

12   Q.   Now, who went to court on behalf of the LPD for the

13   Fusco-Viola show cause hearing?

14             MS. LEVINSON:  Objection; this has been asked

15   and answered.

16             THE COURT:  It has been and I've allowed quite a

17   bit of rehashing based upon the cross-examination, but

18   there comes a point where we have gone over this and over

19   this.

20             MR. BRESLOW:  Okay.

21             THE COURT:  So I will sustain the objection.

22   Q.   (By Mr. Breslow) Well, one final question.  Other

23   than what the defendant told you, do you know what

24   actually happened in court with your case?

25   A.   No.
```

1          MR. BRESLOW:  No further questions.

2          MS. LEVINSON:  Very briefly.

3     **RECROSS-EXAMINATION**

4     Q.    (By Ms. Levinson)  Mr. Breslow asked you if there was

5     anybody higher in rank than Chief Buffis?

6     A.    Yes.

7     Q.    And you said there wasn't, right?

8     A.    Right.

9     Q.    But the town administrators are somebody who's higher

10    in rank than Chief Buffis, right?

11    A.    Not in my eyes.

12    Q.    You could go to a town administrator to complain

13    about the chief of police if you wanted to, couldn't you?

14    A.    I could.

15    Q.    You could go to the board of selectmen of the town to

16    complain about the chief of police, couldn't you?

17    A.    Yes.

18    Q.    And Mr. Breslow asked you a couple of questions about

19    how long your wife was at the police station the day of

20    the show cause hearing.  After she left you didn't

21    approach Chief Buffis and ask him for more information

22    about the show cause hearing, did you?

23    A.    No.

24          MS. LEVINSON:  Thank you.  Nothing further.

25          THE COURT:  All right.  Very well.  Okay.

1    Officer, you may step down.

2             THE WITNESS:  Thank you, Your Honor.

3             MS. SHUKLA:  The United States call Richard

4    Smith.

5             THE COURT:  Okay.  I'm going to take this

6    opportunity to stand and stretch.

7             THE CLERK:  Raise your right hand.

8    **RICHARD SMITH (sworn)**

9             THE CLERK:  Please state your name for the

10   record.

11            THE WITNESS:  Richard M. Smith, Jr.

12            THE CLERK:  You may be seated.

13            THE WITNESS:  Thank you.

14   <u>**DIRECT EXAMINATION**</u>

15   Q.   (By Ms. Shukla) Good afternoon.

16   A.   Good afternoon.

17   Q.   How are you currently employed?

18   A.   I'm actually retired right now.

19   Q.   When did you retire?

20   A.   I retired last July, 2014.

21   Q.   And before you retired, what did you do?

22   A.   I was a Massachusetts State Police captain.

23   Q.   You were a captain?

24   A.   Yes.

25   Q.   And how long were you a captain for the Massachusetts

1    State Police?

2    A.   Since 2008.

3    Q.   And where did you work as a captain for the Mass.

4    State Police?

5    A.   I worked in the Berkshire County District Attorney's

6    Office.  I was the commanding officer of an investigate

7    unit tasked to that office.

8    Q.   What were your roles as the commanding officer of

9    that office?

10   A.   Well, I was responsible for directing the

11   investigations that the office conducted, as well as the

12   personnel issues that arose and anything related to our

13   headquarters staff with respect to what we did for work

14   and training and whatnot.

15   Q.   And how long did you serve as the commanding officer

16   of your office?

17   A.   I've been commander since 2002.

18   Q.   How long did you work for the Massachusetts State

19   Police?

20   A.   Thirty-four years.

21   Q.   Do you know Joseph Buffis?

22   A.   Yes, I do.

23   Q.   How do you know him?

24   A.   I know him as a law enforcement acquaintance, someone

25   that I worked with for approximately 30 years.

1    Q.    And do you see Joseph Buffis in the courtroom today?

2    A.    Yes, I do.

3    Q.    Can you point him out and describe briefly what he's

4    wearing?

5    A.    He's the gentleman sitting between counsel with the

6    dark jacket and the colorful tie.

7              MS. SHUKLA:  Let the record reflect that the

8    witness has identified the defendant?

9              THE COURT:  The witness has identified Mr.

10   Buffis, yes.

11   Q.    (By Ms. Shukla) Now are you familiar with the

12   investigation of the defendant?

13   A.    Yes.

14   Q.    Did you have a role in that investigation?

15   A.    Yes, I did.

16   Q.    Can you tell the jury what your role was with respect

17   to the investigation of the defendant?

18   A.    My role was to go and make official contact with him,

19   to speak with him, to ask him some questions about a case

20   that we were involved with investigating in the town of

21   Lee.

22   Q.    So can you also tell the jury how your role in

23   investigating the defendant began?

24   A.    It was from a request by the District Attorney in

25   Berkshire County, David Capeless.

1    Q.    What was that request?

2    A.    That we go down and speak with him about a show cause

3    hearing on a prostitution case that we worked with him on.

4    There had been a recent article in the newspaper and he

5    wanted me to ask him some questions about what had taken

6    place at the hearing.

7    Q.    Now I'm going to show you Government Exhibit 16

8    already in evidence.  You mentioned that there was a

9    newspaper article --

10              MS. SHUKLA:  Ms. Pelegano, could we connect our

11   computer?

12              THE CLERK:  Yes.

13              MS. SHUKLA:  I just want to confirm that the

14   jury can see the screen?

15              THE COURT:  Everyone can see?  All right.

16   Great.  Thank you.

17   Q.    (By Ms. Shukla) So I'm showing you Government Exhibit

18   16 already in evidence.  You mentioned a newspaper article

19   that you discussed with the DA.  Is this that article?

20   A.    There was an article in the paper, yes.  This looks

21   like the online version of the article.

22   Q.    Now if it's easier for you to see, there's also a

23   binder in front of you with the hard copy and you can turn

24   to the tab of the exhibit, whatever you want to.

25   A.    Okay.

```
 1    Q.   I'm going to direct your attention to a portion of
 2    the article.  Just read that quietly to yourself and the
 3    jury can also read it quitely.
 4    A.   Yes.
 5    Q.   Now when you read this article, what concerns did you
 6    have?
 7    A.   First of all, the nondisclosure agreement was
 8    something that I had never heard of having been utilized
 9    in a show cause hearing.  It was something that was
10    unfamiliar to us, so it was something the DA wanted us to
11    ask Chief Buffis about.
12    Q.   Can I ask you to pull the microphone a little closer
13    to you?
14              MS. SHUKLA:  Did the jury get that?
15              THE JURY:  (Indicating.)
16    Q.   (By Ms. Shukla)  So after reading the article and
17    having a meeting with the DA, what did you do?
18    A.   I called Chief Buffis on his cell phone to try to
19    arrange a meeting with him.
20    Q.   What day was that?
21    A.   That was on Thursday, March 29, 2012.
22    Q.   And did you arrange a meeting with him on a phone
23    call?
24    A.   Yes.
25    Q.   When was the meeting arranged for?
```

1    A.    It was arranged for the same day at 12:30 in the

2    afternoon at his home in Pittsfield.

3    Q.    And did you then go to his home in Pittsfield?

4    A.    Yes.

5    Q.    Who did you go with?

6    A.    I went with Lieutenant David Brian Foley.  He goes by

7    his middle name, Brian.  So Lieutenant Foley and I went in

8    my cruiser to Chief Buffis's home on Elaine Drive in

9    Pittsfield.

10   Q.    Can you briefly tell the jury who Lieutenant Foley

11   was?

12   A.    Lieutenant Foley was my second-in-command.  He was in

13   charge of our narcotics unit.  He was also the coordinator

14   of the Berkshire County Drug Task Force which is comprised

15   of 16 member towns, including Lee, that had officers

16   assigned part time to work in conjunction with us on major

17   cases, primarily narcotic cases.  He was the coordinator

18   of that particular organization which changed its name

19   shortly thereafter to the Berkshire Law Enforcement Task

20   Force.

21   Q.    I'm going to show you Government Exhibit 28 already

22   in evidence.  Can you look at this first photograph and

23   also the next and tell me what is shown in Exhibit 28?

24   A.    That is a picture of Joseph Buffis's home at 131

25   Elaine Drive in Pittsfield.

1  Q.   Is this where you met the defendant on March 29th

2  with Lieutenant Foley?

3  A.   Yes, it is.

4  Q.   So once you got in the home, what did you disclose to

5  the defendant at the beginning of your interview with him?

6  A.   I told him we were there out of concern that both we

7  and the District Attorney had about the way the Laurel

8  Lake Inn prostitution case how it was handled, that show

9  cause hearing in particular.

10      I told him that we had already spoken with Clerk Tom

11  Bartini about that investigation and that we had obtained

12  a copy of the recording of that hearing, and at the start

13  of the hearing he was heard saying they're going to donate

14  the proceeds.

15  Q.   And I just want to back up a little.  You mentioned

16  that you told the defendant that you spoke to Clerk Tom

17  Bartini?

18  A.   Yes.

19  Q.   Can you just explain to the jury who that is?

20  A.   Clerk Thomas Bartini is I think the presiding clerk

21  or the senior clerk at the Southern Berkshire District

22  Court in Great Barrington.

23  Q.   And what relation did he have to the show cause

24  hearing of Ms. Viola and Mr. Fusco?

25  A.   He was the clerk who actually heard the hearing who

1    met with Chief Buffis and Tara Viola and Thomas Fusco.

2    Q.   So after you expressed your concern to the defendant

3    and told him that he was heard saying that a donation was

4    made, what did you ask the defendant?

5    A.   I asked him what happened at the show cause hearing.

6    Q.   And how did he respond?

7    A.   He answered with several bits of information about

8    what took place.

9    Q.   What did he say?

10    A.   The first thing he said was that he was aware early

11    on and again later that they were willing to donate the

12    proceeds from this illegal activity.

13    Q.   Who's they?

14    A.   This is Tara Viola and Tom Fusco.

15    Q.   Okay.

16    A.   That it was their idea to make the donation; that

17    neither one of them had a criminal record; that they were

18    charged with misdemeanors; that they ran a business in

19    town and they were on the tax roll.  He also said he felt

20    very badly about the negative press that they had received

21    and he said that what the press did to them was worse than

22    the criminal charges.

23    Q.   When he mentioned the press, what did he mention, if

24    anything, to you about who spoke to the press about what

25    happened with the couple's case?

1  A.    Nothing at that time.

2  Q.    Okay.  Did he respond anything else in response to

3  your questions of what happened at the show cause hearing?

4  A.    Yes.  He said that at the hearing Tom and Tara had

5  signed a nondisclosure agreement and agreed to donate

6  $4,000 to the Laliberte Toy Fund.  He said that they paid

7  him by check and that 2,000 of that $4,000 went to the toy

8  fund and another 2,000 went to DARE at their request.

9  Q.    Okay.  Sorry to interrupt, can you just explain what

10 DARE is?

11 A.    DARE stands for Drug Abuse Resistant Education.  It

12 was a program that many local law enforcement agencies

13 offered within the communities.  It's an educational

14 program, a drug abuse and drug awareness, self-esteem.

15 It's taught in the elementary schools to children.  It's a

16 program that is supported primarily by state funding and

17 that money pretty much dried up many years ago.

18 Q.    How much of the 4,000 did he say went to DARE?

19 A.    He said 2,000 went to DARE.

20 Q.    So after he said that, what else did he say?

21 A.    I asked him another question.

22 Q.    What did you ask him?

23 A.    I asked him who controlled -- what officers

24 controlled the Laliberte Toy Fund account.

25 Q.    What did he respond?

1    A.    Initially he said that he and Bill Bartini controlled

2    the fund but he added that since Bill left the department,

3    it was just he who controlled the toy fund account.

4    Q.    Just to clarify, does Bill Bartini have any relation

5    to Clerk Tom Bartini?

6    A.    Not that I'm aware of.  It could be a distant

7    relationship, but I don't think they're related.  I don't

8    know.

9    Q.    When did Bill Bartini leave the Lee Police

10   Department?

11   A.    He left -- he made a lateral transfer to the Great

12   Barrington Police Department where he's currently a

13   sergeant.  He left in February of 2010.

14   Q.    Did you ask anything about the oversight of the toy

15   fund?

16   A.    I first asked him if he did any annual reports on the

17   fund's activities.

18   Q.    What did he say?

19   A.    He said no, he didn't.  I then asked him if any other

20   town officials were aware of the fund's activities or

21   anything, the disposition, and were they aware of what

22   happened at the show cause hearing.

23   Q.    What did he say?

24   A.    He answered no to both parts of that question.

25   Q.    So beside asking whether town officials knew about

1   what happened at the show cause hearing, did you ask

2   anything else about other people's knowledge?

3   A.   Eventually I did, but I asked him another question

4   first.

5   Q.   What did you ask him?

6   A.   I asked him if he was concerned at all about how this

7   appeared that money is donated into a toy fund that he

8   alone controls and then criminal charges don't go forward

9   against this couple.

10  Q.   How did he respond?

11  A.   He responded that he had been doing show cause

12  hearings like this with Clerk Bartini and other clerks for

13  as many as 15 years.  He said he's had cases where

14  suspects have paid victims primarily in larceny and

15  vandalism cases restitution in lieu of criminal charges

16  going forward.

17       He said sometimes the Police Association would take

18  care of restitution to a victim, that way they could avoid

19  having probation from the court be involved.  He said he's

20  had a case where the suspect wrote a check to the victim,

21  the police department got the check to the victim, and

22  insured that the conditions of the agreement between the

23  defendant and the police department were followed through

24  and that restitution was made.  If not, then criminal

25  charges could go forward.

1    Q.    In those cases he described where restitution was

2    paid, what was your understanding of how those cases

3    compared to this case, the prostitution case?

4    A.    He was talking about cases where in my mind the

5    identified victim was out some money.  This case was

6    different in that this was a prostitution case where there

7    really wasn't a victim, so to speak, who needed to be

8    compensated for some financial loss.

9    Q.    And did the defendant acknowledge that difference?

10   A.    Yes, he did because I asked him if he had consulted

11   with anybody about this disposition, given the unusual

12   nature of the case.

13   Q.    How did he respond?

14   A.    He recognized that this case was different than the

15   ones he had used as examples for me, and he said that he

16   consulted several law enforcement colleagues who had an

17   opinion that -- you know, so I asked him what was their

18   take on it and he said they were 50/50.

19   Q.    When he said they were 50/50, what did you understand

20   that to mean?

21   A.    I understood that half of the people that he asked

22   about what he proposed to do at the show cause hearing

23   thought it was okay, yet the other half thought it was

24   maybe questionable.

25   Q.    Now I want to back up just a moment.

1       When you spoke about the $4,000 donation, you said

2   that the defendant said 2,000 went to the toy fund and

3   2,000 went to DARE, did you ask him about whether he had

4   spent any of the money in this conversation at the home?

5   A.   Yes.   When I asked him about the $2,000 that went to

6   DARE, he said that he had spent about a thousand of it.

7   Q.   And what was your understanding of what that thousand

8   dollars was spent on?

9   A.   I didn't ask him to elaborate, just that it was spent

10  on something related to DARE, the DARE program.

11  Q.   Now, how did this meeting in the defendant's home

12  end?

13  A.   By making arrangements to get ahold of him in the

14  next day or so to schedule an interview for the first

15  following week.

16  Q.   At the end of the meeting did you ask the defendant

17  whether he would cooperate with you?

18  A.   Yes.

19  Q.   And how did he respond?

20  A.   Yes, he was willing to cooperate with us.

21  Q.   So after you and Lieutenant Foley left the

22  defendant's home, where did you go?

23  A.   I went to my office with Lieutenant Foley where we

24  collaborated on the information we obtained from Chief

25  Buffis and I did a report about what he told us at his

1    home.

2    Q.    So you started writing that down?

3    A.    Yes.

4    Q.    How far was your office from the defendant's home?

5    A.    It's about three and a half miles.

6    Q.    Did you go straight there?

7    A.    Yes.

8    Q.    So after you started writing down what happened

9    during the meeting at the defendant's home, what did you

10   do?

11   A.    Later in the afternoon about four o'clock in the

12   afternoon I made a call to him to try to schedule that

13   meeting with him for the first of the following week.

14   Q.    So when you say you made a call to him, who is him?

15   A.    To Joseph Buffis.

16   Q.    And did you schedule another meeting on this phone

17   call?

18   A.    Yes.

19   Q.    Was that the general purpose of the call?

20   A.    Yes.

21   Q.    And what -- when did you schedule that meeting for?

22   A.    I scheduled it for the next day, nine o'clock in the

23   morning at my office.

24   Q.    When you scheduled that meeting for the next day, did

25   you ask him or request of him anything?

1   A.   Yes.

2   Q.   What did you ask him?

3   A.   I reminded him to bring a number of materials with

4   him, including the complete Lee Police Department

5   investigative case file that would --

6   Q.   I'm sorry.

7   A.   -- that would include a copy of the DVD of Tara

8   Viola's initial interview, the nondisclosure agreement

9   that was executed at the show cause hearing.

10      I also asked him to bring a copy of the check that

11  the couple had given him for the donation to the toy fund,

12  and also I asked him to bring any records or receipts that

13  he had on the Laliberte Toy Fund account, in particular

14  information that would show how he spent the thousand

15  dollars.

16  Q.   And after you asked him to bring these records

17  related to the case and the toy fund, what else did you

18  discuss?

19  A.   Well, he said that he had a speaking engagement down

20  in the southern part of the county that night and he would

21  stop by the police station to pick up the requested

22  materials.  I told him I understood that it was short

23  notice and he could get what he could of the toy fund

24  records and he said he would do that.

25  Q.   Okay.  Did you ask him what he did with the $4,000

1    from the couple?

2    A.   Yes.  Just to clarify, I asked him on the phone if --

3    I asked him what account he put the $4,000 check into and

4    if there was more than one account.

5    Q.   How did he respond?

6    A.   He said he put it in the Laliberte Toy Fund account

7    and he explained that it was the one that he managed.  He

8    said it was a long-standing account that had been in

9    existence for 30 years.  He said the account -- the money

10   in the account was used strictly for toys and that he had

11   toys in the station and in the basement of the police

12   station in Lee.

13        He said that with the money in the fund he buys toys

14   all year-round and he said, for example, if he goes to

15   Walmart and he sees toys, John Deere tractors on sale, he

16   would buy like 25 at a time because they were cheap.

17   Q.   So when he told you that all of the $4,000 went into

18   the toy fund account, how did that compare with your

19   understanding of what he had told you at his home?

20   A.   I initially understood him to say 2,000 went to DARE

21   and so I assumed that it went to a different account,

22   another account.

23   Q.   Now did you discuss anything about the Lee Police

24   Association with the defendant on the phone?

25   A.   Yes.  I asked him about the Lee Police Association

account and he told me that it was an account that was

managed by Lee police officer Stephanie Burdick and that

the money from that account was primarily obtained through

officers' dues and it was used for things such as buying

flowers for funerals of officers' deceased relatives.

Q.    So when he said that the Lee Police Association

account was managed by Stephanie Burdick, what, if

anything, did he disclose on the phone about his role in

managing the Lee Police Association?

A.    At that time nothing.

Q.    On that phone call?

A.    On that phone call, no.

Q.    Did you have any further discussions on the phone

call about where the DARE money went?

A.    Yes.

Q.    And can you describe those discussions to the jury?

A.    Yes.  I asked him where the DARE money went, the

$2,000 that he said had gone to DARE, and he said that

that went into the Laliberte Toy fund account.  He said

that he hadn't yet spent that money because it was for

this year.

Q.    When he said he hadn't yet spent the money, how did

that compare to what he told you at his home?

A.    It was contrary to what he told us at his home.

There he told us that he spent about a thousand dollars

1    and now he was telling me that he hadn't spent any of the

2    money.

3    Q.   Now, just to be clear, how long after you had the

4    conversation in this home was this phone call?

5    A.   We met at his home at 12:30.  We finished the

6    interview at 1:15.  This phone call was between four

7    o'clock and 4:15, so about three hours.

8    Q.   So when the defendant told you something different

9    about how much money he had spent, did you express any

10   concerns to him at that point?

11   A.   Yes.  I told him that the facts of what happened here

12   were foggy and that I needed to establish that this was a

13   legitimate account, not a personal account.  He needed to

14   show that the money didn't go into a personal account or

15   into his back pocket.  I told him I wanted to see receipts

16   for how that thousand dollars was spent.

17   Q.   After you asked for receipts, what did he say?

18   A.   He said he wasn't the best bookkeeper and he might

19   not have all the receipts, and then he said you can have

20   the money.

21   Q.   What did you understand that to mean?

22   A.   That he wanted to give me the money that he had that

23   had been given to him by Tara and Tom.

24   Q.   The $4,000?

25   A.   I wasn't sure at that point if it was $4,000 or

```
 1    $3,000.  You know, I waiting to see records and

 2    information, receipts to see or bank statements, something

 3    that I could rely on for accuracy in terms of what was

 4    currently in the account.

 5    Q.   So after the defendant offered to give you the money,

 6    how did you respond?

 7    A.   I told him I wanted to hold off on what to do with

 8    the money for now.

 9    Q.   So you didn't accept his offer?

10    A.   No, it was on the telephone.  He wasn't able to give

11    it to me and we planned on meeting the next day so I knew

12    there would be more discussion about it.

13    Q.   Did you have any further conversations on that phone

14    call about the defendant vetting his idea of what to do at

15    the show cause hearing?

16    A.   Yes.  He said that since we had left his house, he

17    had been thinking more about how he handled this at the

18    hearing as being aboveboard.  He said that he felt that

19    way because prior to the hearing, before the recording, he

20    spoke off the record with Clerk Bartini about the contents

21    of the nondisclosure agreement.

22    Q.   And did he mention anything about Clerk Bartini in

23    your first meeting in his home?

24    A.   No, he said he vetted it with several law enforcement

25    officers.
```

1    Q.    And what did he say about the nondisclosure agreement
2    about whose idea it was on the phone call?
3    A.    I had asked him near the end of our call whose idea
4    the agreement was.
5    Q.    What did he say?
6    A.    He said it was their idea.  It was at their
7    insistence because they didn't want any more stories in
8    the press.
9    Q.    Who did you understand "their" to mean?
10   A.    That was Tara Viola and Tom Fusco.
11   Q.    So how did that phone call end?
12   A.    It ended with him understanding that he was going to
13   meet me in the morning with the requested materials at my
14   office and he was going to continue to cooperate with our
15   inquiry and explain more about what happened.
16   Q.    And did you then meet him the next day at your
17   office?
18   A.    Yes, I did.
19   Q.    Who was present for that meeting?
20   A.    That was just he and I that met in my office.
21   Q.    And what was the purpose of that meeting?
22   A.    I explained to him the purpose was to follow up and
23   inquire of him at DA Capeless's request about what had
24   happened, how this prostitution case was handled at the
25   district court show cause hearing.

1    Q.    Can you just clarify who's DA Capeless?

2    A.    District Attorney David Capeless is a long-sitting

3    Berkshire County district attorney.  He's the chief

4    prosecutor, the chief law enforcement in Berkshire County.

5    He's a state employee elected official and he directs the

6    major cases that we investigate, assigns us to do the work

7    that he needs to look into the facts of different cases

8    that he's responsible for.

9    Q.    He's the same DA who you had an initial conversation

10   and put you on the case?

11   A.    Yes.

12   Q.    Can you tell the jury how this meeting on March 30th

13   began with the defendant?

14   A.    If I remember correctly, in addition to reminding him

15   why we were there, I thanked him for coming in.  One of

16   the first things he did was he took out a check from his

17   shirt pocket and he gave me a check.

18              MS. SHUKLA:  Now, may I approach the witness?

19              THE COURT:  Yes.

20   Q.    (By Ms. Shukla) I'm going to show you Government

21   Exhibit 167 and ask you to just take a look and do you

22   recognize that exhibit?

23   A.    Yes.

24   Q.    Can you just briefly tell the jury what that is?

25   A.    This is Check No. 239 written on the Edward J.

1    Laliberte Toy Fund.  It's dated March 31, 2012.  The

2    amount payable is $4,000; the payee is Tom Fusco and it's

3    signed by Joseph Buffis with a notation in the memo

4    section "donation refund."

5    Q.   Is that the check that the defendant pulled out at

6    the meeting?

7    A.   Yes.

8    Q.   Is it fair and accurate?

9    A.   Yes.

10            MS. SHUKLA:  The government moves Exhibit 167

11   into evidence.

12            MS. LEVINSON:  No objection.

13            THE COURT:  That's the original or a copy?

14            MS. SHUKLA:  This is the original.

15            THE COURT:  Very well.

16            MS. SHUKLA:  May I approach the jury by passing

17   it?

18            THE COURT:  All right.

19   **(Government's Exhibit 167 admitted.)**

20   Q.   (By Ms. Shukla) Now I'm going to show you Government

21   Exhibit 29.  How does Government Exhibit 29 compare to 167

22   which the jury is viewing?

23   A.   I believe this is a photocopy of the check that you

24   just showed me.

25   Q.   So after the defendant pulled this check out, what

1    did he say?

2    A.    He said that they could have the money back; that

3    Tara had violated the nondisclosure agreement anyway by

4    talking with other people about the case.

5    Q.    And did he say anything about how he felt about

6    keeping the money?

7    A.    Yes.  He said he felt uncomfortable about keeping the

8    money in the Laliberte Toy Fund account.  He said he

9    wanted to move the money from that account to another

10   account.  He said he also recognized that controlling the

11   toy fund by himself -- in other words, without anybody

12   else -- was a bad practice, and so he was going to make an

13   effort to get others involved and he was going to remove

14   himself from the toy fund account.

15   Q.    Okay.  Now I know you described this check earlier

16   but since now it's in view of everyone, I just want to ask

17   a couple questions about it.  Who is the check made out

18   to?

19   A.    Tom Fusco.

20   Q.    And what's the amount of the check?

21   A.    $4,000.

22   Q.    Who signed the check?

23   A.    Joseph Buffis.

24   Q.    And what is written in the memo line of the check?

25   A.    Donation refund.

1  Q.   What date is on the check?

2  A.   March 31, 2012.

3  Q.   What was the date where the defendant handed this

4  over to you in your interview?

5  A.   It was the day before.  The date on the check was

6  Friday, March 30, 2012.

7  Q.   The date on the check was the next day?

8  A.   Yes.

9  Q.   So when the defendant handed you this check and said

10  he wanted to give the money back, what was your

11  understanding of how much money was in the toy fund

12  account on that date, March 30th?

13  A.   I didn't know for sure.  I assumed there was $4,000

14  which he handed me, but again I had that issue with him

15  having said he spent a thousand of it already and so I

16  didn't know if it was 3,000 in there or 4,000 or even less

17  than that.

18  Q.   So when the defendant offered you this check, what

19  did you do?

20  A.   I didn't take it.  I told him to hold onto it.  I

21  reminded him that this check represented money that was

22  made illegally through prostitution.  I told him I didn't

23  know what we were going to do with this check.  I wanted

24  an opportunity to consult with the district attorney on

25  how we were going to proceed so I told him to just hold

1    onto the check for now.

2    Q.   Did you make a copy of the check?

3    A.   Yes.  Later in the interview when we got to that

4    portion of his statement to me, I asked him if I could

5    have the check to make a photocopy of it, primarily so I

6    could have bank account information from the information

7    on the check.

8    Q.   Okay.  Now I believe you testified that on the phone

9    call you had asked the defendant to bring certain records

10   to this meeting?

11   A.   Yes.

12   Q.   Can you just tell us briefly what sorts of records

13   you asked for?

14   A.   Again I asked for the complete investigative case

15   file on the prostitution case to include the recording of

16   Tara Viola's interview, the nondisclosure agreement, a

17   copy of the check that they had given him for the toy

18   fund, and also any records or receipts he had on the toy

19   fund including how the thousand dollars had been spent.

20   Q.   So you asked him to bring toy fund records --

21   A.   Yes.

22   Q.   -- to this meeting?

23       Okay.  And when the defendant showed up for the

24   meeting with you in person, how many toy fund bank

25   statements did he bring with him?

1    A.    None.

2    Q.    How many receipts, toy fund receipts did he bring

3    with him?

4    A.    None.

5    Q.    Did he say anything about why he didn't bring any

6    receipts?

7    A.    He said he didn't have any toy fund records or

8    receipts because there really weren't any, but then he

9    said what few he might have he wasn't able to obtain them

10   in the short time that there was from the time I made the

11   request, which was just the day before in the afternoon,

12   until the time of our meeting at nine that morning.

13   Q.    Did you ever get any toy fund receipts even after

14   this meeting from the defendant?

15   A.    No.

16   Q.    At that meeting how many toy fund ledgers did the

17   defendant bring with him?

18   A.    None.

19   Q.    How many toy fund cancelled checks did the defendant

20   bring with him?

21   A.    None.

22   Q.    What did he bring to show how he had spent the

23   thousand dollars of the toy fund money that he told you he

24   had spent at the meeting at his home?

25   A.    Nothing.

1    Q.   Now, can you tell the jury what else happened during

2    that meeting?

3    A.   During that meeting, you know, I told him that I

4    wanted to take a formal statement.  In other words, to

5    memorialize what we discussed during this meeting.  I told

6    him I wanted to take a written statement of what had

7    happened.  I told him he didn't have to provide a written

8    statement, that it was up to him.

9         I told him that he was not under arrest and he was

10   free to leave at any time.  I told him that at some point

11   during the interview it was possible that I could inform

12   him of his *Miranda* rights, but I told him it was up to

13   him.  I told him -- well, he asked me a question.

14   Q.   Okay.  What did he ask you?

15   A.   He asked how long the statement would take.  I told

16   him I didn't know.

17   Q.   So after you asked to make a formal written

18   statement, what did the -- how did the defendant respond?

19   A.   He was concerned a little bit about leaving the town

20   short.  It was he and one other officer providing coverage

21   that day in the town of Lee but he said that he would

22   cooperate and provide the statement and we agreed that we

23   would see how it goes.  If he had to leave to answer a

24   call, something like that, he would do that.  He

25   preferred, as I did, that he didn't have to come back to

1  resume the statement; that he'd try to accomplish getting

2  it finished that morning or early afternoon.

3  Q.  Did you finish a written statement with the defendant

4  that day?

5  A.  Yes.

6  Q.  I'm just going to show you Government Exhibit 30

7  already in evidence and if you'd like, you can turn to it

8  in the binder.

9      Just briefly identify Government Exhibit 30 for the

10  jury.

11  A.  This is a copy of the written statement that I

12  obtained from Joseph Buffis on Friday, March 30, 2012.

13  Q.  And what appears at the bottom of each page of the

14  written statement in the bottom right-hand corner?

15  A.  His initials, J.B.

16  Q.  So did you request that he initial each page?

17  A.  Yes.

18  Q.  Why?

19  A.  It's kind of physical proof of the fact that he read

20  this particular document.  He had adopted it and he

21  initialed each page in the lower right-hand corner.

22  Q.  And I'm showing you page 8 of the written statement.

23  Whose signatures appear at the end of the statement?

24  A.  My signature is to the left and his is on the right,

25  and he also noted the date of the interview and the time

1    that the interviewed concluded.

2    Q.   And before the defendant signed and initialed each

3    page, did you give him an opportunity to review the

4    statement?

5    A.   Yes.  When I had finished with the statement I

6    printed it, presented it to him, asked him to read it

7    carefully and make sure it was accurate, to call anything

8    to my attention that wasn't accurate.  That would include

9    misspellings, typographical errors, anything that he

10   wasn't comfortable with I asked him to call to my

11   attention.  I gave him a pen and a highlighter to

12   highlight those areas that he had any concern about.

13   Q.   How many changes to the eight-page statement did the

14   defendant make before initialing each page and signing the

15   end of it?

16   A.   He made one correction on the fifth page.

17   Q.   I'm showing you page 9 of the statement, can you just

18   tell me what page 9 is?

19   A.   Page 9?

20   Q.   What appears on your -- it's a page that was added to

21   the back of the eight-page statement.

22   A.   Oh, okay.  Yes.  What it is so we have a complete

23   record I saved the page that he made the correction on and

24   reprinted that page with the correction he asked me, but I

25   kept it and added it.

1    The statement was actually eight pages but having

2    this fifth page repeated with the correction that he made

3    makes it nine pages, so he had me change the word

4    "natural" which was incorrect to the correct word which

5    was "neutral."

6    Q.   Can you read the sentence or the two sentences that

7    highlighted that change?

8    A.   "Tom didn't indicate that there would be any problem

9    with what I proposed for the hearing.  I felt I'd vetted

10   the idea or compromise with a natural third party who

11   didn't think it was a problem."

12   Q.   Which change did he make?

13   A.   He circled the word natural and called to my

14   attention the word should be neutral.

15   Q.   Beside changing the word natural to neutral, how many

16   changes did the defendant make to his written statement

17   before signing it?

18   A.   That was the only one.

19   Q.   Now I want to ask you some questions about this

20   statement.  I'm going to start on page 1 of Exhibit 30.

21   Did you ask the defendant how he knew Ms. Viola?

22   A.   Yes.

23   Q.   Can you read to the jury how he responded?

24   A.   "I didn't know Tara Viola and hadn't met her until

25   this investigation."

1  Q.   Now I'm going to show you page 2 of the defendant's

2  statement.   Did you ask the defendant about his

3  involvement in the press coverage surrounding the

4  prostitution case?

5  A.   Yes, that was part of what I asked him about, yes.

6  Q.   And can you read his response in the highlighted

7  portions of page 2?

8  A.   "I was not involved in the case the day the officer

9  went to the Inn.   I called Dick Lindsay, a reporter from

10  the Berkshire Eagle.   I called Dick and told him we made a

11  couple of arrests at the Inn at Lee for prostitution.   I

12  later learned they hadn't been arrested.   I instantly felt

13  responsible for what would be the ensuing media frenzy."

14  Q.   Now turning back to your interview the day before

15  with the defendant, what did he tell you about the press

16  coverage relating to the prostitution case?

17  A.   That day before at his home?

18  Q.   Yes.

19  A.   I don't think there was any information that he

20  shared with me about how the press was notified.

21  Q.   Not about the press, how he felt about the press.

22  A.   Oh, yes.   He had said that in terms of explaining

23  what had happened at the show cause hearing, he said that

24  he felt bad about the negative press that the couple had

25  received and he said what happened to them in the press

1    was worse than the criminal charges.

2    Q.   And in that interview in his home the day before this

3    statement, what did the defendant say about his

4    involvement in notifying the press?

5    A.   He didn't say anything about having notified the

6    press at that point.

7    Q.   When was the first time that you learned that he was

8    the one who told the Berkshire Eagle about the arrests at

9    the Inn?

10   A.   When I was obtaining the formal statement in my

11   office on March 30th.

12   Q.   I'm going to turn you to page 3 of the statement.

13   Did you ask the defendant about any procedures related to

14   seizing Ms. Viola's prostitution proceeds?

15   A.   Yes.

16   Q.   And how did the defendant respond?

17   A.   He said, "Within a couple of days of the 19th,

18   Officer Lucy told me about funds that Tara offered to

19   donate to us because she didn't want them.  I told Officer

20   Lucy that we should seize her bank account because she

21   could write a check tomorrow and we could lose the money."

22   Q.   I'm going to show you a portion on the bottom of page

23   3 and top of page 4 of the defendant's statement.

24        What further discussions -- did you ask the defendant

25   anything else about the media coverage?

A.   Yes.  I asked him if he had some conversations with
Tom and Tara about that.

Q.   And who's Tom here?

A.   That would be Tom Viola -- I'm sorry, Tom Fusco.

Q.   And Tara is who?

A.   Tara Viola, his wife.

Q.   When you asked the defendant what discussions he had
had with Mr. Fusco and Ms. Viola, what did he respond?

A.   He said, "Tom was very concerned and upset about the
amount of media coverage.  I reminded Tom that they were
not arrested.  I told Tom that when the press called me
about the case, I told the press that they had not been
arrested.  I did not tell Tom that I'd mistakenly told
Dick Lindsay initially that Tom and Tara had been
arrested.  I didn't think it would have made a difference
in the grand scheme of things if I told them that I
initially told the press they'd been arrested."

Q.   I want to direct you to the middle of this quote
where the defendant said "I told Tom that when the press
called me about the case, I told the press that they had
not been arrested," how did that compare to what he told
you in this same interview about what he had told the
press?

A.   I'm sorry, could you ask the question again?

Q.   Yes, sorry.  That was confusing.

1    So I want to direct you to the sentence in the middle

2    of this quote where the defendant said "I told Tom that

3    when the press called me about the case, I told the press

4    they had not been arrested," what had the defendant told

5    you about his contact with the Berkshire Eagle during this

6    same interview?

7    A.    He said that he had in fact been the person to notify

8    the press and he did so on his way from the Inn after the

9    operation to the station, on his way to station is when he

10   made the call.

11   Q.    I'm going to you show you another section.  Did you

12   ask the defendant about concerns about being sued?

13   A.    Yes.

14   Q.    What did you ask him?

15   A.    I asked him if that was a concern of his, if he was

16   worried about being sued.

17   Q.    And how did he respond to you?  If you can just talk

18   into the microphone.

19   A.    He said, "It never occurred to me that I could be the

20   subject of a civil suit in this case."

21   Q.    So what did you think when he responded that way?

22   A.    I thought that was contrary to the information that

23   he just provided me in the statement between the parties,

24   the agreement, the accord and satisfaction or, as we're

25   calling it, the nondisclosure agreement.  I thought that

1    was in conflict with the nondisclosure agreement.

2    Q.   Now before we look at the nondisclosure agreement, I

3    just want to turn your attention to one more section of

4    this statement.

5         What did the defendant say about who drafted the

6    nondisclosure agreement in this written statement?

7    A.   He said, "I drafted the nondisclosure agreement at my

8    office.  I created the document on my computer.  I had no

9    assistance from any other person in drafting this

10   agreement."

11   Q.   Now I'm going to show you the portion of the written

12   statement and at the bottom is a portion of Exhibit 13,

13   the nondisclosure agreement.  So when the defendant said

14   "it never occurred to me that I could be the subject of a

15   civil suit," can you read what he had written in the

16   nondisclosure agreement?

17   A.   "Parties Fusco and Viola are forever barred from

18   bringing any action (civil or criminal) against the town

19   of Lee or any of its employees or any other governmental

20   agency."

21   Q.   Now back on page 4 of the written statement, did you

22   ask the defendant what effect the case had on Mr. Fusco

23   and Ms. Viola?

24   A.   Yes.

25   Q.   And what did he say?

1    A.    He said, "I was feeling very badly for Tom, Tara and

2    their children.   In my mind they had been both put through

3    the ringer.   They lost business and it impacted their

4    reputation."

5    Q.    And what did you understand the "both put through the

6    ringer" to mean?

7    A.    That was a reference to the amount of media attention

8    that the investigation of the Inn was getting.

9    Q.    I'm going to direct your attention to the bottom of

10   page 4 of the statement.   Did you ask the defendant about

11   any negotiations he had had with Mr. Fusco and Ms. Viola

12   before the hearing started?

13   A.    Yes.

14   Q.    Before the day of the hearing?

15   A.    Yes.

16   Q.    What did he say?

17   A.    He said, "I told Tara she could donate the money to

18   anybody that she wanted to and the amount was up to her.

19   I told her that we -- meaning the Lee Police Department --

20   had several in-house charities, including the Laliberte

21   toy fund and the DARE account."

22        "They were still very concerned about the rumors

23   going around town and all that they had been through and

24   they didn't want to do that again."

25        "I did not tell them that if they made a donation,

1    the charges against them would go away.  I never said

2    that.  I think it was more that Tara wanted to get rid of

3    the money, because of how it was gained, regardless of the

4    outcome of the show case" -- it says show case, it should

5    be cause -- "show case hearing."

6    Q.   Did he say that the toy fund was a Lee Police

7    Department charity?

8    A.   Yes.

9    Q.   Now I'm going to turn you to page 5 of the statement.

10   Did you ask the defendant what conversations he had had

11   with the Clerk Bartini in advance of the hearing?

12   A.   Yes.

13   Q.   What did he say?

14            THE COURT:  Can I see the parties, please?

15   (Sidebar conference.)

16            THE COURT:  I spoke about this a little earlier

17   in the day.  If you want -- if you have no problem with

18   leading questions, then I'm not going to get involved, but

19   I can't take it anymore.  If it's tactical, I'm not trying

20   the case, so.

21            MS. LEVINSON:  Right.  Yeah, I mean, I know it's

22   coming out and I can jump up and down every question and

23   object.

24            THE COURT:  I'm just making a record --

25            MS. LEVINSON:  Yes.

1              THE COURT:  -- that you're an extremely

2    experienced trial counsel and so if you're making a

3    tactical choice because you're going to handle this

4    information in some other way, then fine.  It's not going

5    to be my place to insert myself.  Okay.

6              MS. LEVINSON:  Okay.

7    (End of sidebar conference.)

8              MR. BRESLOW:  Your Honor, may we approach?

9              THE COURT:  Yes.

10   (Sidebar conference.)

11             MR. BRESLOW:  Your Honor, just as guidance, when

12   Ms. Shukla -- so there's a written statement, many

13   different statements made, different copies.  Do you

14   regard it as leading for Ms. Shukla to say in this

15   conversation did you ask him about topic A?

16             THE COURT:  (Indicating.)

17             MR. BRESLOW:  You do?

18             THE COURT:  Yes.

19             MS. SHUKLA:  Rather than, what did you ask him?

20             THE COURT:  The appropriate question is what did

21   you ask him.  Look at your statement, did you ask him

22   about any other topics?  You're giving him a topic and

23   you're using the exact language that you want him to

24   parrot back from the question and then, as I said at the

25   beginning, then using his answer to preface your next

1  question.

2      I mean, it's very effective.  You're very good.

3  You're getting away with it so you are good.  It's all

4  tactical how people try cases, but in this sense because

5  the government is using the approach so much I just think

6  the record needs to be protected that, number one, that

7  it's a tactical choice by defense not to be objecting.

8      If this should be reviewed on appeal, I'm clearly

9  finding that we have one of the most experienced defense

10 counsel in this area that I know of, and so if it's

11 tactical, it's tactical.

12          MR. BRESLOW:  Okay.

13          THE COURT:  All right?

14          MR. BRESLOW:  Yes.

15          MS. SHUKLA:  Is there any issue with me using

16 the statement?  We're not reading the entire statement in,

17 but I'll be directing him to certain parts of it.

18          THE COURT:  You know, in a strict adherence to

19 the rules the statement speaks for itself.  It's in

20 evidence and you shouldn't even be -- if it was being

21 objected to, you wouldn't be allowed to read from it like

22 you've been doing, but the statement is in evidence and it

23 speaks for itself.  I mean, that's playing by all the

24 restrictions.

25          MR. BRESLOW:  It's also a nine-page statement.

1          THE COURT:  It is.  It is.

2          MR. BRESLOW:  Much the same way a check is in

3   evidence, it speaks for itself but there has to be

4   inquiry.

5          THE COURT:  But a check when you put it up and

6   ask for the date or two or three parts of the check, it's

7   one thing.  But to have a statement that's introduced into

8   evidence and having him read it line for line and then

9   comment on it is inappropriate.  The statement speaks for

10  itself and it is in evidence.

11      Now if you have one particular or two particular

12  points in that statement, that's a different story.  You

13  can put it up and just go to those two points, but again

14  that's a pretty technical rule.  That doesn't mean it's

15  the best way to do things from your point of view or from

16  the defense's point of view because if Ms. Levinson is

17  allowing it to go in this way, she gets the benefit of

18  that document when she cross-examines.

19          MR. BRESLOW:  Okay.

20          THE COURT:  All right.

21  (End of sidebar conference.)

22          THE COURT:  Nice personal fan, very impressive.

23          A JUROR:  A hot flash.

24          THE COURT:  I'm looking at the time.  Is four

25  o'clock a time you would like to break now or is closer to

1   4:30 acceptable for everyone?

2                THE JURY:   Now.

3                THE COURT:   If we take a break, do you want to

4   come back a little?

5                A JUROR:   No, we'll come back.

6                THE CLERK:   All right.

7                THE COURT:   Remember don't discuss the case;

8   don't begin deliberations.

9   **(The jury left at 3:59 until 4:12.)**

10               THE COURT:   Ladies and gentlemen, returning from

11  that short break were you able to comply with my

12  instruction not to discuss the case, begin deliberations,

13  research the case in any way and avoid being exposed to

14  any media report?

15               THE JURY:  Yes, sir.

16               THE COURT:   Thank you.   The jury remains fair

17  and impartial.   All right.

18  Q.    (By Ms. Shukla) Okay.   I want to direct your

19  attention to the top of page 5 of Exhibit 30 where we left

20  off.   What, if anything, did the defendant say about Clerk

21  Bartini?

22  A.    "I called him to bounce this off of him because this

23  was a little different than anything I'd done I the past

24  at a show cause hearing.   Tom knew about the charges

25  because he had the complaints and was going to do the

1    hearing.  I didn't mention the nondisclosure agreement.  I

2    didn't think Tom needed to know about the agreement."

3    Q.    Who is Tom referring to here?

4    A.    That's Clerk Tom Bartini.

5    Q.    How does this compare to what he said the day before

6    in the phone call?

7    A.    It was different than the day before.  He said that

8    he called him to discuss it with him and he told him about

9    the contents of the nondisclosure agreement.

10   Q.    I'm going to show you and direct your attention to

11   the middle of page 5, what did the defendant say about

12   vetting the agreement?

13   A.    He said, "Because this something I hadn't done

14   before, I also vetted this with a couple of other law

15   enforcement officials, who I don't want to identify, and I

16   again received no negative feedback.  They thought it was

17   a great idea."

18   Q.    How does this compare to what the defendant told you

19   in his home the day before?

20   A.    The day before he told me that those colleagues he

21   consulted were about 50/50.

22   Q.    Now I'm going to direct your attention to the bottom

23   of page 5 and the top of page 6.  What did the defendant

24   say about the donation?

25   A.    "Tom said they wanted to donate $1,000.  I said

1    Officer Lucy's report indicated that $6,000 was made from
2    this venture.  I said I think we need to think of a larger
3    amount in lieu of what Tara said she made and was in the
4    account."
5    Q.   Who are the Tom and Tara in this part of the
6    statement?
7    A.   Tom Fusco and Tara Viola.
8    Q.   How did this compare with what the defendant told you
9    earlier in his statement?
10   A.   He said earlier when he spoke with them that he told
11   them that the donation amount was up to them, including
12   the charity they donated to.
13   Q.   Now I'm going to turn your attention to the bottom of
14   page 6 and the top of page 7.  What did the defendant say
15   about the toy fund account?
16   A.   "I control the bank account for the Laliberte toy
17   fund.  That is a checking account at the Lee Bank.  I gave
18   Captain Smith a check to copy so he could have the account
19   information.  I brought the check made out in the amount
20   of $4,000 to give to Captain Smith to be given back to the
21   Violas, to clear the case."
22        "I have been in control of this account for 30 years.
23   I am the only person who writes checks out of the account.
24   I write checks mostly to cash to buy toys with.  I do this
25   because they are two-party checks and no one will cash

1    them."

2    Q.    What are two-party checks?

3    A.    Well, what I understood from talking to him was that

4    a two-party check is a check where the name on the

5    account, in this case it was the Laliberte Toy Fund, his

6    name is Joseph Buffis, two parties, two different entities

7    or persons.  I understood him to say that vendors weren't

8    willing to cash the check because the signature, his

9    signature, didn't match the name on the account.

10   Q.    Now I'm going to turn your attention a little bit

11   further down still at the top of page 7.  What, if

12   anything, did the defendant say about the expenses of the

13   toy fund?

14   A.    "I write most checks to cash and cash the checks at

15   the bank.  I then use the cash to buy toys.  The only

16   funds used for expenses is if our Visa card is used, then

17   I will write a check from the fund to pay my Visa bill.  I

18   have used my personal Visa card to purchase gifts and then

19   reimbursed myself from the fund.  My Visa account is

20   through the Greylock Credit Union."

21   Q.    I'm showing you two portions on page 7 of Exhibit 30.

22   What, if anything, did the defendant say about the

23   recipient of the toy fund?

24   A.    He said, "I receive all the applications and everyone

25   gets a gift.  Typically between 100 to 130 kids get gifts.

1    We try to do $75 to $100 per kid, depending on how many

2    kids we have.  Other officers receive donations and help

3    package and deliver the toys if people can't pick them

4    up."

5    Q.   I'm turning your attention to the middle of page 7.

6    What, if anything, did the defendant say about the balance

7    in the toy fund account?

8    A.   "Presently there is $4,042 in the fund.  Four

9    thousand dollars of that was donated from Tom and Tara."

10   Q.   I just have a couple more questions about this

11   statement.  Further down on page 7 what did the defendant

12   say about DARE?

13   A.   "We haven't done DARE in years.  This hasn't been a

14   DARE program in Lee since the state funding dried up maybe

15   12 years ago."

16   Q.   And how did that statement compare to what he said

17   about DARE in your first meeting?

18   A.   That he had donated $2,000 of the 4,000 to DARE at

19   their request.

20   Q.   Now turning your attention to the last statement on

21   page 7.  What, if anything, did the defendant say about

22   the Lee Police Association?

23   A.   He said, "There is also Lee Police Association

24   account that Officer Stephanie Burdick is a signatory to.

25   I think I came off the account when Stephanie went on it."

1    Q.   How did that compare to what he told you about the

2    Lee Police Association earlier?

3    A.   I understood that just Stephanie was in control of

4    the account.  I didn't realize that he had been in control

5    of the account or had some part of it.

6    Q.   Now after you completed that written statement with

7    the defendant, how did the meeting with him end?

8    A.   Umm, it ended.  He asked me for a copy of the

9    statement.

10   Q.   What did you do?

11   A.   I made a copy including the corrected -- I don't

12   think I gave him a copy of the corrected page but I gave

13   him a copy of the complete adopted and signed statement.

14   Q.   Was this meeting on March 30th the last time you

15   spoke to the defendant?

16   A.   No, I spoke to him one other time.

17   Q.   When was that one other time?

18   A.   That was the following Thursday, March 5th, at about

19   11:45 in the morning.  I called him at the police station.

20   Q.   Was that March 5th or April 5th?

21   A.   I'm sorry, April 5th, yes.

22   Q.   So you said you called him at the police station?

23   A.   At the Lee Police Department.

24   Q.   Tell the jury what you discussed in that

25   conversation?

1    A.    I told him that I was following up with him because
2    we left it that he wanted to continue to cooperate with
3    the investigation and meet with us again with any records
4    that he might have, particularly with the toy fund
5    account.   I told him we consulted with the district
6    attorney and that he wanted us to continue the
7    investigation, and I encouraged him to cooperate.
8    Q.    How did he respond?
9    A.    He said he was willing to cooperate.   He said as he
10   told me before several times that he might have some
11   records that he would make available.
12         At our -- prior to the end of our meeting on the 30th
13   where I obtained the statement from him, I also asked him
14   if he notified any town officials of this inquiry that we
15   were conducting and he made a point to tell me that he had
16   taken my suggestion and he notified the town manager that
17   we were making an inquiry into the show cause hearing and
18   the toy fund account.
19   Q.    What, if anything, did he say about his feeling about
20   the inquiry?
21              MS. LEVINSON:   Objection.
22              THE COURT:   Basis?   I'm sorry, what's the
23   question?
24              MS. SHUKLA:   What, if anything, did he say about
25   his feelings about the inquiry?

```
 1                    THE COURT:  His feelings of the inquiry?
 2                    MS. SHUKLA:  It's a little bit confusing.  I
 3       will rephrase.
 4                    THE COURT:  I'll sustain it and ask you to
 5       rephrase.
 6       Q.    (By Ms. Shukla) What, if anything, did the defendant
 7       say about his thoughts about this being a criminal
 8       investigation?
 9       A.    Yeah, I had told him that this was now a criminal
10       investigation and he asked what for.
11       Q.    And how did you respond?
12       A.    I told him that we wanted to look at the Laliberte
13       Toy Fund account, particularly we wanted to see the money
14       going in and out of the account, and then I encouraged him
15       to cooperate with the investigation.
16       Q.    And what else did he say to you near the end of the
17       phone call?
18       A.    He said to me that he would never risk his job or his
19       pension for $4,000.
20                    MS. SHUKLA:  No further questions.
21                    THE COURT:  Thank you.
22                    MS. LEVINSON:  Your Honor, I see it's almost
23       4:30.  I'm certainly going to have more than a couple of
24       minutes of cross-examination for Captain Smith.
25                    THE COURT:  I certainly imagine you're going to.
```

1    It doesn't make much sense because we had just taken a

2    break so I think we are good for sitting for ten, fifteen

3    minutes.  I'm going to ask you to cover a couple areas, so

4    go ahead.

5    **CROSS-EXAMINATION**

6    Q.    (By Ms. Levinson)  Good afternoon, Captain Smith.

7    A.    Good afternoon.

8    Q.    So you testified about how you got involved in this

9    investigation because you were contacted by District

10   Attorney Capeless, right?

11   A.    Yes.

12   Q.    And he's the Berkshire County District Attorney,

13   right?

14   A.    Yes.

15   Q.    He's the district attorney for Berkshire County?

16   A.    Yes.

17   Q.    And he's charged with investigating local matters

18   having to do with potential crimes that are committed in

19   Berkshire County, right?

20   A.    Yes.

21   Q.    He has nothing to do with the federal government?

22   A.    That's correct.

23   Q.    He's not a federal investigator?

24   A.    That's true.

25   Q.    And obviously you know that we are here today in

1    federal court, right?

2    A.    Yes.

3    Q.    So this is not a case that ended up being brought in

4    the state court system?

5    A.    This portion of the case, no.  It's still pending,

6    the prostitution case is in state court.

7    Q.    You're referring to there are state charges currently

8    pending against Tara Viola and Thomas Fusco in the state

9    court, right?

10   A.    Yes.

11   Q.    But as far as the prosecution of Mr. Buffis goes,

12   District Attorney David Capeless, the Berkshire County

13   District Attorney's Office has nothing to do with the case

14   that's going on here?

15   A.    That's correct.

16   Q.    And in fact after -- withdrawn.

17         So DA Capeless asked you to head up an investigation

18   for his office?

19   A.    Yes.  He asked myself, Lieutenant Foley, and Sergeant

20   Meikeljohn to initially inquire first and then the

21   investigation as well.

22   Q.    And then ultimately you and Lieutenant Foley turned

23   this case over to the Federal Bureau of Investigation,

24   right?

25   A.    That's not exactly correct, no.

1   Q.   The Federal Bureau of Investigation got involved in

2   this case, right?

3   A.   Yes, they did.

4   Q.   A case that involved local goings-on in the town of

5   Lee, right?

6   A.   Yes.

7   Q.   And, of course, you have cooperated with the Federal

8   Bureau of Investigation and the United States Attorney's

9   Office for the District of Massachusetts in their

10   continuing investigation and prosecution, correct?

11   A.   Yes.

12   Q.   Now, shortly after being contacted by District

13   Attorney David Capeless you contacted Mr. Buffis to see if

14   you could come and talk to him, right?

15   A.   Yes.

16   Q.   And when you first contacted him, you didn't tell him

17   that it was a criminal investigation, right?

18   A.   No.   I told him that we wanted to speak with him

19   about how he handled the prostitution case at the Laurel

20   Lake Inn.

21   Q.   And at that time when you told him you wanted to look

22   into how he handled the prostitution case at the Laurel

23   Lake Inn, you didn't mention anything specifically about

24   the Laliberte Toy Fund and investigating that, correct?

25   A.   That's correct.

```
 1    Q.    And so he made himself available to you pretty much

 2    right away the same day that you called, right?

 3    A.    Yes.

 4    Q.    And it was you and I believe Lieutenant Foley who

 5    showed up at Mr. Buffis's house in Pittsfield, correct?

 6    A.    Yes.

 7    Q.    And I think you already testified that he was very

 8    cooperative with you, correct?

 9    A.    Yes.

10    Q.    And he was willing to answer your questions?

11    A.    Yes, he was.

12    Q.    And particularly at his home it was a fairly informal

13    setting, correct?

14    A.    Yes.

15    Q.    And you had a fairly informal conversation, correct?

16    A.    Yes.

17    Q.    You didn't ask him if you could record the

18    conversation in any way, right?

19    A.    That's correct.

20    Q.    Now, you had told him, I believe, that you had been

21    contacted by the district attorney because Mr. Buffis

22    hadn't informed the district attorney's office of what he

23    was going to be doing at this particular show cause

24    hearing, is that right?

25    A.    That was one of the concerns that neither we, nor the
```

1    DA, had any, you know, advanced information or

2    conversation with the Lee Police Department about how the

3    case that we worked with them on was going to be handled.

4    Q.    And when you say we worked with them on, specifically

5    you're referring to Sergeant Meikeljohn?

6    A.    Sergeant Meikeljohn, Trooper Speth, and other members

7    of the task force.

8    Q.    You were aware, of course, though that the

9    investigation into the Inn at Laurel Lake and the

10   activities going on there was primarily a Lee Police

11   Department investigation?

12   A.    Yes.   It was spearheaded by Officer Ryan Lucy who's a

13   member and works with the task force as well.

14   Q.    But he was conducting that investigation not in his

15   capacity as a member of the task force but in his capacity

16   as a Lee police officer?

17   A.    I would say in both roles but the jurisdiction, the

18   primary jurisdiction would be Lee because that's where at

19   least with the Inn at Laurel Lake, that's where the crimes

20   we were concerned about were occurring.   But we were also

21   open-minded to other suspects, both johns and people

22   providing the service in other parts of the county, so we

23   were keenly aware that this might spread outside of Lee.

24   Q.    And you were aware of the fact that the way the

25   investigation got started within the Lee Police Department

1    was that Officer Lucy was actually contacted by a

2    confidential informant who he had worked with in the Lee

3    Police Department in the past?

4    A.    Yes.

5    Q.    And that this confidential informant told Officer

6    Lucy that he had seen some online ads about potential

7    prostitution going on in the town of Lee, right?

8    A.    That's correct.

9    Q.    So it would be fair to say that this was primarily a

10   Lee Police Department investigation?

11   A.    With quite a bit of assistance from our office.

12   Q.    And the assistance from your office really came into

13   play for the raid that was planned at the Inn on January

14   19th of 2012, correct?

15   A.    That was part of it but we also provided other

16   assistance.

17   Q.    In fact, some of the assistance you provided was an

18   undercover officer to wear a body wire and to go in and

19   pose as a john for Tara Viola, right?

20   A.    Right, among some other assistance that we provided.

21   Q.    Now, so DA Capeless was concerned that the district

22   attorney's office, your unit, hadn't been informed of what

23   had gone on at the show cause hearing, is that right?

24   A.    Yes.

25   Q.    Now, every week in Berkshire County there are show

1    cause hearings held in the various local courthouses,

2    correct?

3    A.    Yes.

4    Q.    And the district attorney's office is not kept

5    informed about every show cause hearing that goes on in

6    Berkshire County, right?

7    A.    That's correct.

8    Q.    The local police departments generally handle their

9    own show cause hearings, correct?

10   A.    That's correct.

11   Q.    And whoever is the designated hearings officer for

12   the particular police department will go to court and

13   present a number of complaints to a clerk magistrate,

14   right?

15   A.    Yes.

16   Q.    And the clerk magistrate will determine based on the

17   reports that are presented whether or not there's probable

18   cause, right?

19   A.    To issue complaints, yes.

20   Q.    And, generally speaking, the district attorney's

21   office does not get involved until after a clerk

22   magistrate determines that there's sufficient probable

23   cause for a complaint to go forward, right?

24   A.    Generally I would agree with that, yes.

25   Q.    And only after a complaint is issued does an

1    assistant district attorney then pick up the case and get

2    to present that case in court, right?

3    A.    Right.  If we're not involved on the front end of it

4    as I described, yes, that would be normally the case.

5    Q.    So for any show cause hearing there's nobody from

6    the district attorney's office that's present or required

7    to be present for a show cause hearing?

8    A.    Not usually, no.

9    Q.    Now during your initial conversation with Mr. Buffis

10   at his house you asked him some questions about what went

11   on at the show cause hearing, correct?

12   A.    Yes.

13   Q.    And he did tell you that at the show cause hearing

14   Tom Fusco and Tara Viola donated $4,000 of prostitution

15   money, correct?

16   A.    Yes.

17   Q.    And he told you that they donated it to the Laliberte

18   Toy Fund?

19   A.    Yes.

20   Q.    And the DARE program?

21   A.    He said to DARE.

22   Q.    He said to DARE?

23   A.    Which I inferred to be the DARE program.

24   Q.    Because you knew what DARE was?

25   A.    Right.

1    Q.    And he also told you that the parties, meaning Chief

2    Buffis and Tara Viola and Tom Fusco, signed and entered

3    into a nondisclosure agreement at the show cause hearing,

4    correct?

5    A.    He said that they signed a nondisclosure agreement.

6    I didn't realize that he had signed it as well until I

7    actually saw the document the following day.

8    Q.    But he did mention a nondisclosure agreement, right?

9    A.    Yes.

10   Q.    I mean, you didn't grill him about that, right?

11   A.    No.

12   Q.    He volunteered that?

13   A.    Yes.

14   Q.    He provided you with that information?

15   A.    He also made that statement in the press in the

16   newspaper article on February 24th so we knew that was

17   consistent with what was reported in the paper.

18   Q.    So clearly this was not something that he was trying

19   to hide, right?

20   A.    I would say no.

21   Q.    And when he told about the $4,000 donation, he

22   apparently wasn't trying to hide that from you either?

23              MS. SHUKLA:  Objection.

24              THE COURT:  Overruled.

25              THE WITNESS:  No, I don't think he was trying to

1   hide that they made a donation.

2   Q.   (By Ms. Levinson) Now you testified that Mr. Buffis

3   said something about having spent about a thousand

4   dollars, correct?

5   A.   Yes.

6   Q.   But he wasn't clear to you about what that thousand

7   dollars was spent on, right?

8   A.   I understood him to say that the thousand he spent

9   was part of that 2,000 that went to DARE, that's how I

10  understood it.

11  Q.   Now when you say that's how you understood it, it

12  basically was an assumption that you were making, correct?

13  A.   Based on information that he supplied before.

14  Q.   But he never actually said to you I took $1,000 and I

15  purchased X number of books for the DARE program with a

16  thousand dollars, right?

17  A.   Not at that point, no, he didn't.

18  Q.   It was very vague, very general, right?

19  A.   Yes.  He said I spent about a thousand dollars and I

20  understood him to mean of the 2,000 that went to DARE.

21  Q.   But that was your understanding, not necessarily the

22  exact words that Mr. Buffis said to you?

23  A.   Yes.

24  Q.   And then after having this initial conversation with

25  Mr. Buffis at his house, you determined that you'd rather

1    have a more formalized statement and you asked him to come

2    to your office in Pittsfield the following day if possible

3    to continue the conversation, correct?

4    A.    Yes.

5    Q.    And your intent was to have a more formalized

6    interview with Mr. Buffis?

7    A.    Right, and to review any records that he had that

8    could show how he spent this money and what he did with

9    the money that was donated at the show cause hearing.

10   Q.    And he was pretty clear to you that he was not a

11   particularly meticulous record-keeper, right?

12   A.    Not at that point, not while we were at his home.

13   Q.    When he came to see you he didn't have that many

14   documents, right?

15   A.    Right.  When he came with the materials I requested,

16   what was missing was any toy fund records that would show

17   how expenditures were made or even how much money was in

18   the account so that's the materials that said he wasn't

19   the best bookkeeper with and he actually said there

20   weren't any records.

21   Q.    Now at the time you had this interview, this

22   conversation with Chief Buffis, were you aware of how and

23   when the Laliberte Toy Fund started?

24   A.    Umm, I think -- I certainly was aware as a Berkshire

25   County resident that it was a long-standing fund.  It

1    would be advertised in the Berkshire Eagle newspaper.  I

2    would see it pretty much every year.

3    Q.   And prior to your interview with Mr. Buffis, you had

4    never obtained or tried to obtain any records of the

5    Laliberte Toy Fund as it existed prior to Mr. Buffis's

6    taking it over, correct?

7    A.   No, I don't believe so, no.

8    Q.   And in the course of the investigation that you and

9    the federal government have been undertaking, have you

10   ever uncovered any records kept or maintained for the

11   Laliberte Toy Fund back in the day when Ed Laliberte was

12   running the fund?

13   A.   I was not involved with that part of the

14   investigation.  The FBI and the U.S. Attorney became

15   involved later so I don't know and that was a part that

16   they were handling so I don't know what, if any, records

17   they have from that period of time.

18   Q.   So you personally have -- you've personally never

19   seen any records with respect to the Laliberte Toy Fund

20   from the days when Ed Laliberte was running the fund?

21   A.   No.

22   Q.   Now so the day that Mr. Buffis came to your office

23   was March 30th, correct?

24   A.   Yes.

25   Q.   And your office is up in Pittsfield, correct?

1    A.    Yes.

2    Q.    And it's in the same building as the district

3    attorney's office?

4    A.    Right.

5    Q.    It's downstairs from where the district attorney's

6    office was?

7    A.    It was at that time, yes.

8    Q.    And you had him come into your office, correct?

9    A.    He met me upstairs in the DA's office.  I escorted

10   him.  We walked downstairs.  We went in my office where we

11   meet privately.

12   Q.    Can you describe your office?

13   A.    My office used to be a drive-up window for a local

14   bank, so it was a little cold, a little drafty, about

15   10-by-12.  It's not very nice but it certainly affords the

16   privacy we needed and had the equipment I needed to

17   formalize the information he was about to give me.

18   Q.    What kind of equipment are you referring to?

19   A.    My computer and the equipment I need to take a

20   statement, a printer and whatnot.

21   Q.    So it's a 10-by-12 office and cold you say?

22   A.    A little drafty.

23   Q.    A drive-up window?

24   A.    It used to be a drive-up window for a bank and

25   converted to an office.

1    Q.    What does that window look out on or what did it look

2    out on at the time?

3    A.    It looked out into the central passage way between

4    the building next door, but the window is covered with a

5    shade so you can't see into the office.

6    Q.    And did the office have a door?

7    A.    Yes.

8    Q.    And did you close the door during your interview with

9    Mr. Buffis for privacy?

10    A.    Yes.

11    Q.    And it was just the two of you in there?

12    A.    Yes.

13    Q.    And after you got Mr. Buffis into the office, did you

14    ask him if you could record your interview with him?

15    A.    No.

16    Q.    Did you tell him that you would be making notes of

17    the interview?

18    A.    I told him that I wanted to take a formal statement

19    from him.

20    Q.    Now when you say a formal statement, can you describe

21    to the members of the jury what you mean by formal

22    statement?

23    A.    That means I basically would ask him questions -- we

24    would have a conversation and he provides me information

25    based on what I'm looking for.  As he's giving me that

1    information, which I try to get chronologically to tell a

2    story about what it is we're interested in, I would be

3    typing that onto a computer which is right at my desk and

4    we would go basically at my speed so I could be sure to

5    get the information in that was accurate.

6        It's just a good way of doing it because it allows me

7    to see what we've already talked about, what we may have

8    covered or not covered and I can also produce or print it

9    and give it to him so when the interview is over, unlike a

10   recording, we're not going to play the recording for four

11   and a half hours.  I can give him a statement and he can

12   read it and make sure that it's accurate and be sure there

13   isn't anything he needs to change or correct.

14   Q.   So you just said we're not going to play a recording

15   for four and a half hours.  That four and a half hours is

16   a reference to the amount of time that you were

17   interviewing Mr. Buffis on March 30th of 2012, is that

18   correct?

19   A.   Yes, it is.

20   Q.   He was in your office for about four and a half

21   hours?

22   A.   Yes.

23   Q.   And during that four and a half hours you were asking

24   him question after question about what happened at the

25   show cause hearing, right?

1    A.    Among other things, there was a progression.

2    Q.    And what did he do with the money that was donated?

3    A.    Right.

4    Q.    And during this four and a half hours of you

5    questioning and Mr. Buffis answering as you said you were

6    typing down answers, right?

7    A.    Yes, that's correct.

8    Q.    And did you break for lunch at some point in time?

9    A.    I asked him several times if he needed a break or use

10   the restroom and each time he said he was fine and we

11   continued.

12   Q.    Was he in uniform?

13   A.    Yes, he was.

14   Q.    And do I take it that you did not wear a uniform to

15   work at that time?

16   A.    I was just dressed similar to this without the sport

17   coat.

18   Q.    He was clear on who you were?  You said that you've

19   known each other in a law enforcement capacity for some

20   time, right?

21   A.    That's correct.

22   Q.    So you're a captain in the detective unit, correct?

23   A.    Yes.

24   Q.    And Mr. Buffis was made perfectly aware by you that

25   you were told to look into his actions with respect to a

1   show cause hearing that he conducted, right?

2   A.   That is correct.

3   Q.   So you were looking into the propriety or the

4   potential impropriety of some of his actions?

5   A.   Yes.

6   Q.   Now do you recall that at some point early on in your

7   interview you told him that he was not under arrest,

8   right?

9   A.   Yes.

10  Q.   That he was free to leave any time he wanted to?

11  A.   That's correct.

12  Q.   But you also told him that at some point in time you

13  might end up advising him of his *Miranda* rights, correct?

14  A.   That's right.

15  Q.   And can you tell the members of the jury what are

16  *Miranda* rights?

17  A.   *Miranda* rights are rights that an officer would give

18  someone who was in a situation where he was providing

19  information in a custodial situation in most cases against

20  his own interest, in other words, making incriminating

21  statements.

22       These *Miranda* warnings are warnings to make him aware

23  that he has certain rights that he doesn't have to talk to

24  me; that he could have an attorney present if he wanted

25  one and so on and so forth.

1   Q.   You said a phrase, a custodial situation.  What did

2   you mean by a custodial situation?

3   A.   I mean, where a person is even though they might not

4   physically be free to leave or you haven't announced that

5   to them, in their mind they may not think they're free to

6   leave so I always make it clear to the person that I'm

7   talking to that I have no intention of arresting you,

8   you're free to leave at any time.  This interview is

9   completely cooperative; it's up to you if you want to

10   participate or not.

11   Q.   But you did tell him that the focus could change at

12   some point, correct?

13   A.   Yes.

14   Q.   That you could end up reading him his *Miranda* rights,

15   correct?

16   A.   Absolutely.

17   Q.   And this was an experienced law enforcement officer

18   you were dealing with, correct?

19   A.   Yes.

20   Q.   So you could easily infer that he understood the

21   import of what you were saying when you told him that you

22   could end up advising him of his *Miranda* rights?

23   A.   I understood that he would know that if he started to

24   incriminate himself and make statements that were

25   inculpatory, that he would realize that he should be

1    getting his *Miranda* rights.

2    Q.    In fact, during this four and a half hour interview

3    that you conducted, you never did find it necessary or

4    appropriate to inform him of his *Miranda* rights?

5    A.    That's right.

6              THE COURT:  All right.  Ms. Levinson, thank you.

7              MS. LEVINSON:   Okay.

8              THE COURT:  We are going to break.  We will see

9    you tomorrow morning at the usual time.  We will try to

10   get started tomorrow if we are here around nine, get

11   started about 9:15 once we all get settled.

12        Do not discuss the case with anyone, begin

13   deliberations in any way, seek the case out on the media.

14   Do not do any research or internet social media type of

15   search of this case.  All right.  Have a good evening.

16             THE CLERK:  All rise.

17   **(Court recessed at 4:46.)**

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4        I, Alice Moran, RMR, RPR, CSR, Official Court

5   Reporter for the United States District Court for the

6   District of Massachusetts, do hereby certify that the

7   foregoing transcript constitutes, to the best of my skill

8   and ability, a true and accurate transcription of my

9   stenotype notes taken in the above-entitled matter.

10

11

12   Date:   February 12, 2016

13

14   /s/ Alice Moran

15   _____
     Alice Moran
16   Offical Court Reporter

17

18

19                   Alice Moran, CSR, RPR, RMR
                       Official Court Reporter
20                   300 State Street, Room 303D
                        Springfield, MA 01105
21                         413-731-0086
                        alice.moran@verizon.net
22

23

24

25