```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2                          WESTERN SECTION

 3

 4                                      )
                                        )
 5      United States of America        )
                                        )              13cr30028-MGM
 6           vs                         )
                                        )
 7      Joseph Buffis                   )
                                        )
 8      _____)

 9

10            Before The Honorable Mark G. Mastroianni
                   United States District Court Judge
11                 Trial Held on June 4, 2015.

12

13

14

        APPEARANCES:
15

16      For the government:  Steven H. Breslow and Deepika Shukla,
        Assistant United States Attorneys,300 State Street, Suite
17      230, Springfield, MA 01105-2926.

18

19      For the defendant: Lori Levinson, Esq., 500 Main Street,
        Suite 2, Great Barrington, MA 01230.
20

21

22                      Alice Moran, CSR, RPR, RMR
                        Official Federal Court Reporter
23                      300 State Street, Room 303D
                           Springfield, MA 01105
24                            (413)731-0086
                          alice.moran@verizon.net
25
```

```
 1                           INDEX

 2   Witness Name:                                  Page

 3

 4   Joseph Buffis

 5   Redirect examination by Ms. Levinson             4

 6   Recross-examination by Mr. Breslow              12

 7

 8   Susan Brown

 9   Rebuttal direct examination by Mr. Breslow      25

10   Rebuttal cross-examination by Ms. Levinson      29

11

12   Government's Exhibits:                          Page

13

14   None

15

16

17   Defendant's Exhibits:                           Page

18

19   N    Stipulation                               23

20

21

22   Closing argument by Ms. Shukla                  40

23   Closing argument by Ms. Levinson                68

24   Rebuttal closing argument by Mr. Breslow        92

25   Judge Mastroianni's jury instructions          107
```

1    **(Court commenced at 9:28.)**

2              THE CLERK:  All rise.

3              THE COURT:  Good morning, everyone.

4              THE JURY:  Good morning

5              THE COURT:  Was everybody able to comply with my

6    instructions not to discuss the case, begin discussions or

7    communications about the case in any way, avoid media

8    reports of the case, and do not engage in any Internet

9    type of research or social media type investigation of the

10   case?

11             THE JURY:  Yes, Your Honor.

12             THE COURT:  All right.  Thank you.  The jury

13   remains fair and impartial.

14        All right.  We were with Mr. Buffis on the stand and

15   Ms. Levinson, redirect.

16             MS. LEVINSON:  Thank you.  Good morning, Your

17   Honor.

18             THE COURT:  Good morning.

19             MS. LEVINSON:  Good morning, everybody.

20             THE JURY:  Good morning.

21             THE DEFENDANT:  Good morning, Your Honor.  Good

22   morning, ladies and gentlemen.

23             THE COURT:  Good morning.

24

25

1    **Joseph Buffis (previously sworn)**

2    <u>**REDIRECT EXAMINATION**</u>

3    Q.    (By Ms. Levinson)  Good morning again, Mr. Buffis.

4    A.    Good morning again all.

5    Q.    Okay.  I'm going to ask you to turn your attention to

6    the nondisclosure clause in the agreement that you entered

7    into with Tom Fusco and Tara Viola that is Government

8    Exhibit 13 in evidence.  Do you know what document I'm

9    talking about?

10   A.    Yes, I do.

11   Q.    Why did you put a nondisclosure clause in that

12   agreement?

13   A.    To protect the Fuscos from further media coverage and

14   to hopefully end the media frenzy for them.

15   Q.    Was there another reason as well?

16   A.    To prevent myself and anyone in my department from

17   discussing that issue as well.

18   Q.    And why?

19   A.    Certainly because it was a very highly-publicized

20   case and we really wanted it to end.

21   Q.    Now, did you put that clause in the agreement to try

22   to hide the contents of the show cause hearing from law

23   enforcement?

24   A.    Of course not.

25   Q.    Who besides you knew about what happened at the show

1    cause hearing?

2    A.    Myself, Mr. and Mrs. Fusco, and Tom Bartini the clerk

3    magistrate.

4    Q.    Did you try to hide from Tom Bartini the fact that

5    the Fusco-Viola couple wanted to make a donation to

6    charity?

7    A.    I did not.

8    Q.    And, in fact, did you have any discussions with him

9    prior to the hearing about that?

10    A.    I did and he replied that the donation was outside

11    the scope of his responsibilities and he had nothing to do

12    with it if they were making a voluntary donation.

13    Q.    Did he ever tell you that in his mind there was

14    anything wrong with their making a donation to charity?

15    A.    He did not.

16    Q.    Did you ever try to hide from Tom Bartini the fact

17    that you had a nondisclosure clause in the agreement?

18           MR. BRESLOW:   Your Honor, the past several

19    questions have been leading and I have not objected, but I

20    think now I am going to.

21           THE COURT:   Ms. Breslow is correct.

22    Sustained.

23    Q.    (By Ms. Levinson) Do you recall yesterday Mr. Breslow

24    was showing you what is in evidence as Defendant's Exhibit

25    I which is a log of the show cause hearings?

1    A.    Oh, yes.   Yes.

2    Q.    Why do Tom Fusco and Tara Viola's names not appear in

3    the entry for February of 2012?

4    A.    The Massachusetts Rape Shield Law requires that any

5    case, either victim or defendant, of a sexual nature be

6    kept separate and redacted from any other files.   A sexual

7    assault case and/or a file is kept completely separately

8    from any other files in the police department in a

9    separate locked filing cabinet.

10   Q.    Thank you.   Why didn't you show Tom Fusco and Tara

11   Viola the agreement prior to the date of the hearing?

12   A.    I had discussed the overall contents with Tom I think

13   on Friday and didn't see a need to brief him further.

14   Q.    Now you testified yesterday that January through

15   December is your holiday season; do you remember that

16   testimony?

17   A.    Yes.

18   Q.    What do you mean by that?

19   A.    That's when we generally purchase most of the toys

20   starting in January and working our way through the end of

21   November.

22   Q.    Why did you go to Tom Bartini's house the night of

23   March 29, 2012?

24   A.    To see if I had perhaps made a misstep and to seek

25   his advice and counsel on what perhaps I should do next.

1    Q.    What led you to ask him that?

2    A.    The phone call from Captain Smith.

3    Q.    And what about that phone call made you think you

4    should check with Clerk Magistrate Bartini?

5    A.    Because of the adversarial relationship I had had

6    with Captain Smith through the years, I didn't anything

7    good would come of the conversation and I trusted Tom to

8    point me in the right direction or at least give me some

9    counsel and advice.

10    Q.    And why on March 30th of 2012 when you went to meet

11    with Captain Smith did you bring a refund check for Tom

12    Fusco?

13    A.    It was my intention to just give the money back to

14    the Fuscos, the donation that they had given, and then

15    bring the misdemeanor complaints forward.

16    Q.    Why did you decide to do that?

17    A.    It just seemed at that time that's what the District

18    Attorney's office wanted and from what I was gathering is

19    that the Fuscos would also be amenable to that.

20    Q.    Now, if you can, can you explain to us what happened

21    to the $4,000 donation that Tom Fusco and Tara Viola made

22    to you after it ended up in your office safe?

23    A.    Once it ended up in my office safe, it sat there.

24              MR. BRESLOW:  Your Honor, I'm fairly certain

25    this was asked and answered on redirect yesterday

1   afternoon.

2           MS. LEVINSON:  I think I was asking questions

3   about how it got to the safe, not what happened to it

4   after the safe.

5           THE COURT:  I think you both might be a little

6   bit correct in your memories.  I'm going to overrule the

7   objection.

8           MS. LEVINSON:  Thank you.

9           MR. BRESLOW:  I'd ask the witness then to limit

10  his answer to only to what happened after the money was in

11  the safe.

12          THE COURT:  Fair enough.

13          MS. LEVINSON:  That was my question.

14          THE COURT:  Just rephrase it so we know exactly

15  where we are.

16          MS. LEVINSON:  Okay.

17  Q.   (By Ms. Levinson)  What happened to the Fusco-Viola

18  donation after you had put the money in your safe in your

19  office?

20  A.   At some time later I gave it to a local businessman

21  on the advice of counsel.  His name was Richard Shields.

22  Q.   When you say you gave it to him, can you describe

23  what you did?

24  A.   I had walked across the street, had a conversation

25  with him, explained the situation about the $4,000 and

```
 1      asked if he would be responsible for holding it.

 2      Q.    Why did you do that?

 3      A.    I trust Dick.  His dad was one of the founding

 4      fathers of the Laliberte Toy Fund and I had known Dick

 5      since I was four or five years old.

 6      Q.    But why did you decide to move the money from your

 7      safe to Dick Shields?

 8      A.    Again that was on the advice of the Mass. chiefs of

 9      police attorneys.

10      Q.    Approximately when, if you remember, did you move

11      that money?

12      A.    I'm going to say sometime in April.

13      Q.    Of?

14      A.    2012.

15      Q.    Do you have any idea where that money is now?

16      A.    I do.

17      Q.    Where is that money now as far as you know?

18      A.    It's in the hands of the Berkshire County District

19      Attorney's office.

20      Q.    Now do you recall yesterday Mr. Breslow had you

21      testify that you intentionally didn't tell Captain Smith

22      about what you did with the money donated by Tom and Tara?

23                MR. BRESLOW:  Objection to the form, Your Honor.

24                THE COURT:  Overruled.

25      Q.    (By Ms. Levinson)  Do you remember being asked that
```

1   question?

2   A.   Yes.

3   Q.   And do you remember agreeing with Mr. Breslow?

4   A.   Yes.

5   Q.   Did you intentionally not tell Captain Smith exactly

6   what you did with the money?

7   A.   No, he didn't ask.

8            MS. LEVINSON:   I'm going to -- if I could have

9   the document reader, Ms. Healy?

10            THE CLERK:   Yes.

11   Q.   (By Ms. Levinson) What did you think the purpose of

12   your meeting with Captain Smith was on March 30th of 2012?

13   A.   To memorialize the conversation that we had had at my

14   house the previous day.

15   Q.   What was that conversation about?

16   A.   It was about the conduct of the show cause hearing

17   with the Fuscos and Violas.

18   Q.   Was the conversation about how you ran the Laliberte

19   Toy Fund?

20   A.   It was not.

21   Q.   What was the main focus of the conversation on March

22   30th with Captain Smith?

23   A.   A little bit about the -- a lot about the show cause

24   hearing and a little bit about the toy fund.

25   Q.   I'm going to put on the document viewer what has

1    previously been marked into evidence as Government Exhibit

2    30 in evidence.  Do you recognize what that document is?

3    A.    I do, yes.

4    Q.    What is that document?

5    A.    That's the statement I gave to Rick Smith.

6    Q.    And are you fully familiar with the contents of that

7    statement?

8    A.    For the most part, yes.

9    Q.    Have you gone over that document?

10   A.    Yes, I have.

11   Q.    And are you familiar as you sit here right now with

12   how much of that document and how much of your statement

13   had to do with your operation of the toy fund?

14   A.    Yes.

15   Q.    How much?

16   A.    I think about three or four paragraphs.

17   Q.    I'm showing you what is page 7 on this copy of

18   Government Exhibit 30 and ask you to take a look at how

19   many paragraphs you believe were dedicated to the

20   discussion of the toy fund?

21   A.    It looks like three and a half.

22   Q.    Did Captain Smith ask you any detailed questions

23   about how you ran the fund?

24   A.    No, not specifically.

25   Q.    Did you provide him any details with how you ran the

```
1    fund?
2    A.   I believe I gave him a broad overview of how I ran
3    it.
4    Q.   Why did you give him a broad overview and not
5    details?
6    A.   He didn't ask for specific details.
7              MS. LEVINSON:  With that I have no further
8    questions.
9              THE WITNESS:  Thank you, Ms. Levinson.
10             MR. BRESLOW:  Your Honor, just four or five
11   topics.
12             THE COURT:  Very well.  Mr. Breslow, whenever
13   you're ready.
14   RECROSS-EXAMINATION
15   Q.   (By Mr. Breslow) Did you just testify that you didn't
16   tell Captain Smith what you did with the donation money,
17   meaning taking the donation money and putting it into your
18   bank account in those three checks to cash, spending it
19   the way you did, did you just testify that you didn't tell
20   him because he didn't ask you?
21   A.   Yes.
22   Q.   Okay.  Now, on March 29th when you met with him in
23   your home, he asked you how you spent the money, correct?
24   He asked you how did you spend the donation money,
25   correct?
```

1 A. He did.

2 Q. And later that night on the phone he asked you how

3 you spent the donation money, correct?

4 A. I think he asked me to bring documents.

5 Q. Documents showing how you spent the donation money,

6 correct?

7 A. Yes.

8 Q. And you had those documents in your basement,

9 correct?

10 A. Well, yes.

11 Q. Right.  You had your wife's bank statements in your

12 basement, correct?

13 A. Yes.

14 Q. Those would have shown that you had written three

15 checks to cash, correct?

16 A. Yes.

17 Q. And deposited those checks into your wife's bank

18 account, correct?

19 A. Yes.

20 Q. And then spent that money, correct?

21 A. Correct.

22 Q. And on March 30th, you went to Captain Smith and he

23 asked you again in a four-hour meeting how you spent that

24 donation money, correct?

25 A. I don't remember him asking that specifically, no.

1    Q.   Well, sir, he had just asked you the night before to

2    bring all documentation that you had about how you spent

3    the money, correct?

4    A.   Yes.

5    Q.   So of course he asked you in the interview how you

6    spent the money?

7             MS. LEVINSON:   Objection.

8             THE COURT:   Sustained.

9    Q.   (By Mr. Breslow) Now, at the end of the day yesterday

10   you testified on redirect that when you went to Sergeant

11   Meiklejohn's interview, the final one on June 25th, you

12   actually had receipts on your bulletin board because the

13   toy fund owed you money, correct?

14   A.   Yes.

15   Q.   That's what you testified on redirect yesterday after

16   afternoon?

17   A.   Yes.

18   Q.   Now, that's not what you told Sergeant Meiklejohn,

19   correct?

20   A.   Yes.

21   Q.   And, in fact, that's not what you testified to this

22   jury on cross-examination, right?

23   A.   I don't recall what I testified to.   I'm sorry.

24   Q.   Okay.   Well, do you recall testifying in the opening

25   minutes of your cross-examination that Sergeant Meiklejohn

1    asked you did you have any receipts?

2    A.    Yes.

3    Q.    And do you recall answering in testimony, answering

4    no, I did not have any receipts?

5    A.    That is correct.

6    Q.    And do you recall Sergeant Meiklejohn then asking

7    you, well, if you didn't have any receipts, how much money

8    did you know to take from the toy fund to reimburse you?

9    A.    Correct.

10   Q.    You remember that?

11   A.    I do.

12   Q.    Do you remember telling this jury that you said you

13   basically came up with a number in your head?

14   A.    I do.

15   Q.    But just yesterday afternoon for the first time you

16   told this --

17               MS. LEVINSON:   Objection, characterizing it the

18   first time.

19               THE COURT:   I will let that go.   Continue the

20   question.   Go ahead.

21               MR. BRESLOW:   So that part is overruled?

22               THE COURT:   Yes.

23   Q.    (By Mr. Breslow)  Just yesterday for the first time

24   in this trial and for the first time in the context of the

25   entire State Police investigation, which consisted of four

```
 1    interviews, you said that you actually had receipts on
 2    your bulletin board?
 3    A.    Correct.
 4    Q.    That's just not true, is it?
 5    A.    Yes, it is.
 6    Q.    So what you said to Sergeant Meiklejohn was false?
 7    A.    I had receipts.  I just didn't recall that I had them
 8    at that point on my bulletin board.  I was at work and the
 9    interview was at noontime.  I was meeting with the
10    attorney the first thing in the morning and I had a lot on
11    my mind and I just overlooked that.
12    Q.    Well, you knew, sir, that just as with the March 30th
13    interview Sergeant Meiklejohn wanted to see all of your
14    receipts relating to the toy fund?
15              MS. LEVINSON:  Objection.
16              THE COURT:  Basis?
17              MS. LEVINSON:  I don't think there's a
18    foundation for what he knew about what Sergeant Meiklejohn
19    wanted.
20              THE COURT:  I think at this point it could be a
21    fair inference.  That's overruled.
22              MR. BRESLOW:  Overruled.  Okay.
23    Q.    (By Mr. Breslow)  Well, hadn't your attorney told you
24    prior to Sergeant Meiklejohn's interview to bring --
25              MS. LEVINSON:  Objection.
```

```
 1              THE COURT:  Yes, sustained.  That goes directly
 2   to discussions between them.
 3              MR. BRESLOW:  That's fine.
 4   Q.   (By Mr. Breslow)  Hadn't you received a request, a
 5   specific request before Sergeant Meiklejohn's interview to
 6   bring any and all receipts relating to the toy fund to
 7   that interview?
 8   A.   Yes.
 9   Q.   Okay.  And the receipts were right on your bulletin
10   board?
11   A.   Yes, they were.
12   Q.   And you just walked out of your house to an interview
13   concerning those receipts without bringing them to the
14   meeting?
15   A.   That's correct.
16   Q.   Now, at the end of the day on redirect yesterday you
17   testified that on Tuesday, meaning the day before
18   yesterday, you learned for the first time that you were
19   legally responsible for your daughter's student loans,
20   right?
21   A.   Yes.
22   Q.   That's what you testified to yesterday?
23   A.   I was being facetious.
24   Q.   Okay.  Were you being truthful?
25   A.   In that I knew that I was responsible for my
```

1    daughter's loans?

2    Q.   When you testified yesterday to this jury that you

3    first learned you were legally responsible for the student

4    loans, were you being truthful?

5    A.   I was being truthful and facetious, yes.  Of course,

6    I knew I was responsible for my daughter's loans.  I

7    co-signed them.

8    Q.   No.  Sir --

9    A.   Yes, I --

10   Q.   -- you testified yesterday --

11            MS. LEVINSON:  Mr. Breslow is interrupting Mr.

12   Buffis's answer.

13            THE COURT:  All right.  I'll overrule that

14   objection and you can ask the next question.  Again, we've

15   been through this, Mr. Buffis and Mr. Breslow, about just

16   giving each person time to develop the question and ask it

17   and then time to answer it.  All right.  So why don't you

18   rephrase that, yes.

19   Q.   (By Mr. Breslow)  Sir, I'm going to try to phrase the

20   question to you that you can answer only yes or no, and if

21   you cannot answer yes or no, just say I cannot answer that

22   question yes or no and I will try to rephrase another

23   question.  Okay?

24   A.   Okay.

25   Q.   Yesterday did you testify to this jury that the first

1    time you learned you were legally responsible for your

2    daughter's college loans was the day before yesterday?

3    A.    No.

4    Q.    You did not say that?

5    A.    I said that I was responsible for my daughter's

6    loans.

7    Q.    Now, you know as a 30-year police officer that

8    prostitution offenses are not sexual assault charges,

9    correct?

10   A.    They're sexually-based offenses.

11   Q.    That's not what I'm asking you.

12         You know that prostitution charges are not sexual

13   assault charges, correct?

14   A.    They're sexually-based offenses.

15   Q.    I'm going to ask you the question one more time.   If

16   you can answer it yes or no, please do.

17         You know that prostitution charges are not sexual

18   assault charges?

19   A.    No.

20   Q.    Now do you remember being asked questions yesterday

21   on redirect by Ms. Levinson about why you did not use the

22   so-called two-party checks at stores?

23   A.    Yes.

24   Q.    You never told Sue Brown at Lee Bank that the stores

25   would not take your two-party checks, did you?

1    A.   I believe I had a conversation.  I said I was having

2    trouble with the stores taking two-party checks, could I

3    write the checks to cash?

4    Q.   You didn't have that conversation, sir, did you?

5    A.   Yeah, I believe I did.

6    Q.   Okay.  And she never told you, did she, that you

7    should write the checks to cash?

8           MS. LEVINSON:  Objection.

9           THE COURT:  Overruled.

10   Q.   (By Mr. Breslow)  She never told you that?

11   A.   I believe she did.  It was 15 years ago and I

12   remember a conversation of that nature in my kitchen.

13   Q.   Okay.  I'm just going to ask you about one last

14   topic.

15       Do you remember Ms. Levinson asked you why you

16   deposited so much of the toy fund money to all of your

17   personal accounts?

18   A.   Yes.

19   Q.   Isn't it true that the reason you did that was so

20   that you could disguise the fact that you were actually

21   using the toy fund money to pay your personal expenses?

22   A.   Absolutely not.

23           MR. BRESLOW:  No further questions.

24           THE COURT:  All right.  Thank you.

25           MS. LEVINSON:  Nothing further.

1           THE COURT:  Mr. Buffis, you can step down.

2           THE WITNESS:  Thank you, Your Honor.  Thank you,

3   ladies and gentlemen.

4           THE COURT:  All right.  Ms. Levinson, anything

5   further?

6           MS. LEVINSON:  Yes, Your Honor.  I have a

7   stipulation that the government and defense have entered

8   into.

9           MR. BRESLOW:  I have not read this.  We've

10  discussed it.

11          THE COURT:  I understand.  Why don't you take a

12  minute now.

13          MR. BRESLOW:  That's fine.

14          MS. LEVINSON:  Ms. Healy, what exhibit number am

15  I up to?  Can you find that out?

16          THE COURT:  You're going to read the

17  stipulation?

18          MS. LEVINSON:  Yes.

19          THE COURT:  You can put it on the monitor.

20       So, ladies and gentlemen, as I instructed a few times

21  already what a stipulation is.  I don't think you need to

22  hear it again but we are going to tell you briefly again.

23  It's an agreement between both parties that what you will

24  hear in the stipulation, the facts contained therein, is

25  accurate and you can consider it as evidence like you

1    would any other evidence that comes from the witness

2    stand.  There doesn't need to be a person to go take the

3    stand to get this into evidence.  All right.

4              MS. LEVINSON:  I believe I might be up to

5    Defendant's Exhibit O.  I know there isn't one so we will

6    just call it Defendant's Exhibit O.

7              THE CLERK:  Yes.

8              MS. LEVINSON:  So I have Defendant's Exhibit O

9    on the document reader and I will read it aloud to the

10   jury.  The case name is the United States of America

11   against Joseph Buffis defendant.  Stipulation:  "The

12   defendant, Joseph Buffis, by and through his counsel, Lori

13   H. Levinson, Esquire, and the United States of America by

14   and through Carmen M. Ortiz, United States Attorney for

15   the District of Massachusetts, and Steven H. Breslow,

16   Assistant United States Attorney, hereby stipulate:  One,

17   if called to testify at trial, Todd Briggs would testify

18   as follows:  A, in January 2012, he was a police officer

19   working at the Lee Police Department; B, on January 19,

20   2012, he was one of the law enforcement officers

21   participating in the raid at the Inn at Laurel Lake in

22   Lee, Massachusetts; C, at some point after Tara Viola had

23   been confronted by law enforcement officers at the Inn, he

24   saw his police chief Joseph Buffis on the scene at the Inn

25   at Laurel Lake; D, he believes that he had a conversation

1    with Joseph Buffis at the Inn in which he told Joseph

2    Buffis that Tara Viola and Tom Fusco had been taken into

3    custody.  Two:  He is unavailable to testify at trial.

4    Three:  This stipulation is admissible in evidence," and

5    it is signed Lori H. Levinson, attorney for Joseph Buffis,

6    Steven H. Breslow, Assistant United States Attorney and it

7    is dated June 3, 2015.

8              THE COURT:  All right.

9              MS. LEVINSON:  The defense rest.

10              THE COURT:  I think there might be some question

11    -- before you rest, there might a question of a particular

12    evidence number that we are up to.

13              THE CLERK:  It is N.

14              MS. LEVINSON:  May the record reflect that the

15    stipulation is Defendant's Exhibit N?

16              THE COURT:  All right.  That stipulation from

17    Mr. Briggs.  All right.

18              MS. LEVINSON:  Thank you.

19    **(Defendant Exhibit N admitted.)**

20              THE COURT:  All right.  Now I think I

21    interrupted you, Ms. Levinson.  Do you formally have any

22    witnesses?

23              MS. LEVINSON:  Formally I have no more witnesses

24    so the defense rests.

25              THE COURT:  The defendant rests.  All right.

```
 1          Mr. Breslow?

 2              MR. BRESLOW:  We have one very short witness.

 3              THE COURT:  A rebuttal witness?

 4              MR. BRESLOW:  Yes.

 5              THE COURT:  Very well.  So, ladies and

 6   gentlemen, as I've explained to you at the trial goes on,

 7   the government puts their case on and as you've seen

 8   unfold the defense puts their case on.

 9          Now in some circumstances, it's not unusual, it

10   happens quite frequently, the government can if they would

11   like to put on what's called a rebuttal case and that

12   would be calling one or two or whatever number of

13   witnesses they think is appropriate to rebut or address

14   certain issues that may have come up in the defense case.

15   So Mr. Breslow is prepared to call a rebuttal witness.

16   All right.  So now this is back to the government's case.

17              MR. BRESLOW:  But very briefly.

18              THE COURT:  Okay.

19              MR. BRESLOW:  Your Honor, we would call Susan

20   Brown.

21              THE CLERK:  Ms. Brown, please stand and raise

22   your right hand.

23   Susan Brown (sworn)

24              THE CLERK:  You may be seated.

25
```

1  **REBUTTAL DIRECT EXAMINATION**

2  Q.   (By Mr. Breslow) Good morning.

3  A.   Good morning.

4  Q.   There's some water there --

5  A.   I'm fine.

6  Q.   -- you can have it.

7       How are you employed?

8  A.   I'm employed at Lee Bank in Lee, Massachusetts.

9  Q.   And how long have you been employed there?

10 A.   Thirty-five years.

11 Q.   And what is Lee Bank?

12 A.   Lee Bank is your hometown bank in Lee, Massachusetts.

13 Q.   And what are your responsibilities?

14 A.   I am vice president of the administration so I wear

15 hats.  I work for the president.  I do HR, security

16 officer, building and maintenance.  There's a lot of

17 duties.

18 Q.   Are you also the keeper of the records?

19 A.   Yes, I am.  As security officer that's where that

20 comes in.

21 Q.   And can you tell the jury what the keeper of the

22 records is?

23 A.   All the keeper of the records is is when we receive a

24 subpoena it's making sure that we comply with the

25 confidentiality of it.  If it falls under the right of the

1    financial privacy what records we can give, what records

2    we can't give out.  It's kind of overseeing the gathering

3    of the records on the subpoena.

4    Q.    Okay.  Are you familiar with the Lee Bank account

5    records for the Laliberte Toy Fund?

6    A.    Yes, I am.

7    Q.    And how did you become familiar with those records?

8    A.    Well, the subpoena that I received a few years ago

9    regarding the Laliberte but the Laliberte Toy Fund has

10   been a staple in town of Lee.  I've known about it for a

11   long time.

12   Q.    Okay.  You referenced a subpoena, did you as the

13   keeper of records provide records from approximately 1999

14   through 2012 to the government pursuant to a request?

15   A.    Correct.

16   Q.    Okay.  In the course of that function did you review

17   those records?

18   A.    Yes.

19   Q.    Okay.  And is it fair to say that you're pretty

20   familiar with them by now?

21   A.    Well, there was a lot of them but, yes.

22   Q.    And can you tell the jury are you familiar with a man

23   named Joseph Buffis?

24   A.    I am.

25   Q.    How long have you known him?

```
 1    A.    Well, since high school, for a long time.

 2    Q.    How do you know him?

 3    A.    Well, I knew Joe in high school.  It wasn't -- I just

 4    knew of him in high school and then after high school his

 5    association with the police department and then when I had

 6    my first child back in 1995 Joe's wife Janet took care of

 7    my children for about five to six years.

 8    Q.    Do you have any sort of a professional relationship

 9    with him?

10    A.    Professional, no.

11    Q.    Is he -- does he own accounts at your bank?

12    A.    Lending accounts.

13    Q.    And do you recognize him here in court?

14    A.    Yes, I do.

15                MR. BRESLOW:  The witness has identified the

16    defendant?

17                THE COURT:  Yes, there was identification by the

18    witness of Mr. Buffis.

19    Q.    (By Mr. Breslow) Okay.  Now can you tell the jury

20    what an account sigantory is?

21    A.    An account signatory someone who is able to sign --

22    to withdraw money from that account, deposit money.

23    Anybody can deposit money to an account so it's just

24    withdrawal of money.

25    Q.    Okay.  Who is the account signatory for the Laliberte
```

1    Toy Fund account?

2    A.   Joe Buffis.

3    Q.   And how many times has any check been returned to Lee

4    Bank by a third-party vendor because it was rejected as an

5    improper two-party check, meaning the check is in the name

6    of the Laliberte Toy Fund but the check was actually

7    signed by Joe Buffis and not the Laliberte Toy Fund?

8    A.   Never.

9    Q.   And how many times to your memory has the defendant

10   complained to you that local stores would not accept toy

11   fund checks because they were two-party checks?

12   A.   Never.

13   Q.   And how many times did you ever advise the defendant

14   that he should write toy fund checks to cash?

15   A.   Never that I can recall.

16   Q.   How easy or hard is it for an account signatory in

17   the name of a company -- meaning when the account is in

18   the name of a company but you have a live person as the

19   signatory -- how easy is it for that person to get his or

20   her name added to the actual face of the check?

21   A.   Well, I didn't know.  I had ask this question and

22   it's easy if the --

23             MS. LEVINSON:  Objection.  She based her answer

24   on hearsay obviously since she doesn't know herself.

25             THE COURT:  Sustained.  You can lay some

1   foundation as the basis of her answer.  It may be

2   appropriate to answer based upon training and experience

3   so just lay the foundation.

4         MR. BRESLOW:  Okay.

5   Q.   (By Mr. Breslow) Based on your training and

6   experience and knowledge of the operations of Lee Bank, as

7   a vice president of Lee Bank in all of the capacity that

8   you've talked about, do you know how easy or hard it is

9   for an individual account signatory to get his name added

10  to the face of say a corporate check or a charitable

11  check?

12  A.   No, I don't.

13        MR. BRESLOW:  Okay.  No further questions.

14        THE COURT:  Thank you.

15        MS. LEVINSON:   Thank you.

16  **REBUTTAL CROSS-EXAMINATION**

17  Q.   Good morning, Ms. Brown.

18  A.   Good morning.

19  Q.   Could you tell us approximately how many times you've

20  been at Joe and Janet Buffis's house?

21  A.   Umm, numerous times bringing my children there every

22  morning and picking them up.

23  Q.   And that was for about five years you said?

24  A.   My daughter is 20 so five to six years because I had

25  a second daughter.

1   Q.   And when you would go to the Buffis house you would

2   conversations with Joe Buffis if he was there, correct?

3   A.   Absolutely.

4   Q.   And you were aware of the fact back when Janet Buffis

5   was watching your kids that Joe Buffis was a signatory on

6   the Laliberte Toy Fund account?

7   A.   I believe so, yes.

8   Q.   In fact, did you open that account for him?

9   A.   I don't believe so, no.

10  Q.   Do you not believe so or do you not remember?

11  A.   I don't remember, but, no, I've never been in the

12  capacity at the bank to be a community banker to be a

13  customer service person.

14  Q.   And during the course of the five or six years that

15  you were dropping your kids off at the Buffis house and

16  having occasion to speak to Joe Buffis, can you today sit

17  here and tell this jury that you never had a discussion

18  with him about checking accounts?

19  A.   I can't say that, no.

20  Q.   Do you remember every conversation you ever had with

21  him?

22  A.   No.

23  Q.   And specifically going back to 1999 to the year 2000,

24  can you specifically remember having any conversations

25  with him about a checking account?

```
 1    A.   No.

 2               MS. LEVINSON:   Thank you.

 3               MR. BRESLOW:   No further questions, Your Honor.

 4               THE COURT:   All right.   Ma'am, thank you very

 5    much.

 6               THE WITNESS:   Thank you.

 7               MR. BRESLOW:   We have no more rebuttal

 8    witnesses, Your Honor, so to the extent that we need to

 9    rest again we are resting.

10               THE COURT:   All right.   Okay.

11               MS. LEVINSON:   May we be seen at sidebar?

12    (Sidebar conference.)

13               MS. LEVINSON:   At the close of all evidence, I

14    renew my motions for judgment of acquittal under Rule

15    29.

16               THE COURT:   All right.   Do you want to make any

17    specific arguments on any of the specific indictments?

18               MS. LEVINSON:   No, I will rely on the same

19    arguments I made at the close of the government's case

20    with respect to all of the counts of the indictment.

21               THE COURT:   Very well.   Well, at the close of

22    all evidence the motion will be denied.

23               MS. LEVINSON:   Thank you.

24               THE COURT:   Okay.   So are we ready to keep

25    moving?
```

1          MR. BRESLOW:  Ms. Levinson and I had talked and

2     if we could have about 20 to 30 minutes just to sort of

3     organize ourselves before we sum up?  We should be done by

4     lunchtime.

5          THE COURT:  How necessary is it for you to have

6     20 or 30 minutes?

7          MS. LEVINSON:  How about 15?  Can we negotiate?

8          THE COURT:  Ten minutes, put your things

9     together.  All right.

10         MS. LEVINSON:  Okay.

11         THE COURT:  Okay.

12         MS. SHUKLA:  Can I ask about the timing?  I know

13    the government's closing is about 50 minutes and the

14    rebuttal is ten and the defendant's closing is 60 minutes.

15    As far as for keeping time, would you permit -- I'll be

16    giving the closing but would you permit Mr. Breslow to

17    just remind me when I have ten minutes left?

18         THE COURT:  Sure, or I can do it because I will

19    keep time here.

20         MR. BRESLOW:  Alternatively could we have

21    flexibility -- I don't mind if Ms. Shukla edges into my

22    time, you know, if she wants to go 55 minutes.  Depending

23    how the timing is, we have not really parsed our time out

24    but if she's at 50 and she's not done, I don't have any

25    objection to, you know, taking less time for rebuttal.

1              THE COURT:  You're doing the rebuttal?

2              MR. BRESLOW:  Yes.

3              THE COURT:  Sure.  We can do that.  In other

4    words, if you don't use your amount carry it over.

5              MR. BRESLOW:  If she uses more than her full

6    amount, take it away from mine.

7              THE COURT:  I see.

8              MR. BRESLOW:  Do it the same way if she ends up

9    early.

10             THE COURT:  I guess I don't -- do you have any

11   problem?

12             MS. LEVINSON:  I don't have any problem.

13             THE COURT:  I don't have a problem with that

14   either.

15             MS. SHUKLA:  I'd still appreciate that

16   ten-minute warning.

17             MS. LEVINSON:  I would too.

18             THE COURT:  Okay.  So a ten-minute warning and

19   I'll give a couple.

20        Okay.  Now when do you want to take an opportunity to

21   -- I tweaked the jury instructions again, very little bit

22   but --

23             MR. BRESLOW:  We've reviewed them.  Primarily

24   Ms. Shukla has and we have no objections.

25             THE COURT:  All right.  So there's some small

1    changes.  Take your ten minutes and when we come back, we

2    are going to talk about the new changes that I put in.

3              MS. SHUKLA:  New since the draft?

4              THE COURT:  I changed some words.  There's one

5    of more substance and we will talk about that.

6              MR. BRESLOW:  Could we have until about 10:15?

7              THE COURT:  That will be more than ten minutes.

8    You just keep working.

9              MS. LEVINSON:  He is very persistent.

10   (End of sidebar conference.)

11             THE COURT:  Ladies and gentlemen, we are going

12   to take a break so that the parities can get their

13   paperwork in order and kind of get organized because you

14   will be hearing closing arguments.  So 10 to 15 minutes

15   just to get the paperwork in order and get things lined up

16   and ready to go and you will back here.

17        My plan is -- I'll give you my plan --

18   (Laughter)

19             THE COURT:  My plan is for you to come back and

20   hear closing arguments and then for us to take more of a

21   15-20 minute, whatever, coffee break and come back in and

22   let me instruct you and then you go and have your lunch.

23   That may mean starting lunch later in the day.  We'll see

24   how long the timing is on the closings but we will see.

25   All right.

1    So as you go for this very short break, please

2  remember my standard instruction:  Do not discuss the

3  case, begin deliberations in any way, allow yourself to be

4  exposed any media cover, do any research or investigation

5  of the case on social media or anything.  All right.

6  Thank you.

7  **(The jury left at 10:04.)**

8       THE COURT:  All right.  So we will see you back

9  in about ten minutes, and before the jury comes back in in

10 ten minutes we will go over the new editions and talk

11 about the jury charge.  All right.

12 **(A recess was taken at 10:05 until 10:17.)**

13      THE COURT:  Does each of you have your copy of

14 the instructions?  I'm just going to go through for the

15 most part minor but one has a little more substance.  On

16 page 18 I just need some acknowledgement that both parties

17 have them?

18      MS. SHUKLA:  Yes.

19      MS. LEVINSON:  Yes.

20      THE COURT:  On page 18 starting in the second

21 sentence I have added the word "nervous" to describe the

22 physical responses.  So it will read "displayed certain

23 nervous physical responses," and the word nervous did

24 appear later on in the instruction as well.

25      MS. LEVINSON:  I don't see nervous.

```
 1              MR. BRESLOW:  He is adding it now.

 2              THE COURT:  The second sentence "to have

 3    displayed certain nervous physical responses," is it not

 4    there?

 5              MS. LEVINSON:  No.

 6              THE COURT:  All right.

 7              THE CLERK:  The other one it shall be there.

 8              THE COURT:  All right.  The next change will be

 9    page 13 -- did the government's include the word nervous?

10              MS. SHUKLA:  No.

11              THE COURT:  All right.  On page 13, page 13

12    defendant's testimony, I am adding to the last sentence.

13    The last sentence will now read:  "You should not

14    discredit his testimony simply because he was charged as a

15    defendant or give his testimony more credit based only on

16    his decision to testify."

17              MS. LEVINSON:  That's there.

18              THE COURT:  That's there?

19              MS. LEVINSON:  That is there.

20              THE COURT:  Okay.

21              MR. BRESLOW:  What was the change?

22              THE COURT:  I added the words "or give his

23    testimony more credit based on his decision to testify,"

24    that wasn't there previously.

25              MR. BRESLOW:  I see.
```

1           THE COURT:  All right.  On page 12, at the very

2    bottom of page 12, the very last half sentence it should

3    read "any of the benefits they received from the

4    government."  It previously read any benefits "he"

5    received.

6           MS. LEVINSON:  I see that change.

7           THE COURT:  All right.

8           MS. SHUKLA:  Yes.

9           THE COURT:  Now, the change that does have some

10   substance is on page 7, number 4.  It should now read --

11   and I just want to confirm whether you have this, it

12   should now read "any verbal or nonverbal conduct by any

13   member of the government's team appearing to be commentary

14   or opinion relative to testimony or any other aspect of

15   this case is not evidence.  This includes, but is not

16   limited to, any facial expressions, laughter, or audible

17   conversations from the prosecution table."

18       It's very similar to what was there but it does have

19   some changes that are much more significant than the

20   previous version.  Do you have those changes?

21           MR. BRESLOW:  Yes, no objection.

22           THE COURT:  Those are the changes.  So the only

23   thing we have to make sure is nervous, that change.  All

24   right.  Good.  We're ready to go?

25           MS. LEVINSON:  Yes.  At this time should we put

1    on the record any objections to the charge?

2             THE COURT:  I would prefer those be made at the

3    closing, in other words, after --

4             MS. LEVINSON:  Okay.

5             THE COURT:  -- after closing arguments and the

6    full charge is given, although it might benefit me to hear

7    them now so at least I can be giving them some thought.

8             MS. LEVINSON:  Well, it's nothing new, Your

9    Honor.  I had objected to this during our charging

10   conference and I just want to make a record.

11            THE COURT:  Not new objection.

12            MS. LEVINSON:  Not new.  I want to make sure the

13   record is clear.

14            THE COURT:  All right.

15        To the extent anyone needs monitors up and going, do

16   you need any evidence?  Have you everything you need?

17            MS. SHUKLA:  We are going to need the computer

18   monitors up.

19            THE COURT:  So we will get that.

20        Ms. Shukla, you want a warning at ten minutes?

21            MS. SHUKLA:  Ten minutes and then your standard

22   two.

23            THE COURT:  Ten and two.  Okay.

24            MS. LEVINSON:  Me too.

25            THE COURT:  Okay.

1    **(The jury entered at 10:27.)**

2              THE COURT:  Are the parties going to be using

3    the large exhibits in your closings?

4              MS. SHUKLA:  Yes.

5              THE COURT:  All right.  Everyone could be

6    seated.

7         All right.  Ladies and gentlemen, during the break

8    were you able to comply with my instruction not to have

9    communications about the case?  Not begin deliberations in

10   any way?  Not to allow yourself to be exposed to the media

11   about the case?  Not to go on the internet or social media

12   or other forms of electronic investigation about the case?

13             THE JURY:  Yes, Your Honor.

14             THE COURT:  All right.  Thank you.  The jury

15   remains fair and impartial.  All right.

16        We are going to begin the closing arguments.  Again,

17   if at any point during closing arguments someone has a

18   problem hearing, if there's an issue, just raise your

19   hand.  I'll probably be standing up to look.  If you want

20   my attention, stand on your stand.  Okay?

21             A JUROR:  No problem.

22             THE COURT:  All right.  Okay.  Whenever the

23   parties are ready.

24             MS. SHUKLA:  May I just confirm that the

25   computer is are hooked up?

1          THE COURT:  Let's make sure that everything is

2     wired and on and ready to go.

3          MS. SHUKLA:  Yes, it looks like it's working.

4     **CLOSING ARGUMENT BY MS. SHUKLA**

5          MS. SHUKLA:  Good morning.

6          THE JURY:  Good morning.

7          MS. SHUKLA:  For 14 years Joseph Buffis stole

8     nearly $120,000 from the Laliberte Toy Fund, and he took

9     that money and he spent it on his personal bills including

10    thousands of thousands for his son's motocross hobby.

11    Then in 2012 he used his position as chief of police to

12    extort Tom Fusco and Tara Viola of $4,000 in exchange for

13    dropping criminal charges.  Then he took that money and

14    put it into the toy fund which he controlled and he again

15    took to all of the money for himself.  That's what this

16    case was about.  That's the evidence you heard, and I'm

17    going to take this time today to talk to you in three

18    different sections.

19        The first thing I'm going to talk to you about is the

20    evidence that proves that the defendant stole about

21    $55,000 in toy fund money and then used it on himself, and

22    those counts are Counts 5 through 11 of the indictment.

23        Then I'm going to talk to you about how the defendant

24    extorted $4,000 from Tom and Tara and then stole that

25    money, and those are Counts 1 through 4.

1      Lastly, I'm going to explain to you how the

2  defendant's claim that he didn't steal any of this money

3  and didn't extort Tom and Tara is simply not believably.

4      Now as you've heard several times the toy fund

5  started about 65 years ago by Ed Laliberte, and by all

6  accounts it was a wonderful program started by a generous

7  and decent man, but then the defendant took over and he

8  controlled the toy fund for about 30 years all by himself.

9      Donations to the toy fund went to the defendant,

10  whether a check or cash, and nobody checked in on him.  He

11  was the sole signer on the bank account and the bank

12  account statements went to his personal P.O. box.

13      Nobody looked at how much money was being donated to

14  the toy fund or what the money was being spent on, and

15  nobody looked to see if there were toys being purchased

16  with that money or who received those toys.  There was

17  nobody to check on the defendant.  He could do whatever he

18  wanted to do with the money and no one would know.

19      So how did the defendant's fraud scheme worked?

20  Well, you'll see on your screen how he pulled this off.

21  Every year the defendant would ask people, the people of

22  Lee and the surrounding community, to donate to the toy

23  fund, and how would he do that?  He sent three wires year

24  after year by fax or e-mail to the Berkshire Eagle, and

25  you heard from Jean Maschino from the Berkshire Eagle that

1    she would take those faxes and e-mails and copy them

2    verbatim and put them into a copy version to be printed by

3    the Berkshire Eagle and then donors would read the

4    Berkshire Eagle and they would donate to the toy fund, and

5    the fraud occurred when the defendant took that money and

6    used it on himself and never told anyone he was doing

7    that.

8         Now the judge will instruct you on what the

9    government needs to prove to prove wire fraud, that's

10   Counts 5 to 7.  Those instructions will come after these

11   closing arguments, but for now the government doesn't need

12   to prove that the toy fund was a complete sham or that no

13   one ever got any toys.  That's simply not what the

14   government needs to prove.

15        In any event, you know that a precious few people, if

16   any, received any toys from the toy fund.  And how do you

17   know that?  Because you heard from four women who applied

18   to get toys from the toy fund in the relevant period we're

19   talking about here, 2007 to 2012, and they were all turned

20   away, and one was even told that she would have to donate

21   to the toy fund in order to receive toys.

22        Now you also heard from several citizen of Lee, some

23   of these people knew thousands of people in town -- it's

24   pretty crazy but it's a small town -- and not one person

25   knew a single person who received toys from the toy fund.

1    Now you also heard from the toy fund donors, Robert

2    Bartini, Terrie Gardino, and Sandra Spinney.  Two of those

3    donors were former recipients years ago when Ed Laliberte

4    was running the toy fund, and they told you about the joy

5    that was brought by the toy fund donations to their

6    families.  Terrie Gardino told you she had eight siblings

7    and that box of toys meant so much to her and her eight

8    siblings.  Sandra Spinney even remembers the toys she

9    received in that box and sharing those toys with her three

10   sisters.  She told you she got that board game Kerplunk

11   and the doll with the velvet hair.

12   Well, each one of those toy fund donors told you that

13   they donated to the toy fund because they wanted to make a

14   child's christmas brighter, and every single one of those

15   donors, including the defendant's own witnesses who

16   donated, told you they thought that the defendant was

17   spending all of those donated money to buy toys for

18   children.

19   So was he using their donations to buy toys?  No, he

20   was using their donations on himself.  The defendant took

21   $55,000 in donations in the toy fund from 2007 to 2012,

22   and he deposited almost all of that money into his own

23   accounts.  Now remember we're talking about this $55,000

24   donation number, but do you remember the testimony you

25   heard about the cash that was received?  That's not

1    reflected in that $55,000 number.

2         You heard from Robert Bartini, one of the donors,

3    that he donated about a thousand dollars in cash over ten

4    years to the toy fund, and you heard from the dispatcher

5    Frank Speth who told you he was uncomfortable accepting

6    cash donations because it was cash and it couldn't be

7    tracked but the defendant told him you have to accept the

8    cash, and then the defendant came in and he took those

9    envelopes of cash.

10        The defendant himself testified on the stand that he

11   received cash donations from people on the street for the

12   toy fund, and how many cash donations did you see

13   deposited into the toy fund that made up that $55,000

14   number?  One deposit in those six years for $145 so that

15   55,000 number we're talking about is probably much higher.

16        So of the $55,000 we know about, let's talk about

17   that, why didn't that money -- I'm sorry.  How did that

18   money -- how did the defendant spend that money?  Well,

19   you can see on your screen how he spent it.  And beside

20   that red sliver, $980, he took the rest of that $55,000

21   and he either cashed it or put it into one of his personal

22   accounts, including bank accounts and credit cards.

23   That's what the defendant did with the money.

24        Now you heard the testimony from a forensic

25   accountant, Chris Gizzi.  He created this large chart.

1    It's pretty complicated, but I encourage you to look at

2    this chart when you get to the jury room.  You will have

3    it in there with you, and you'll see that on the left side

4    it tracks all of the donations into the toy fund, all the

5    checks and the $145 cash and then it shows you where all

6    the money went to the defendant's accounts.

7        And of these defendant's accounts you can see every

8    single transaction the defendant made with his money, and,

9    by the way, the defendant doesn't contest that this is all

10   true.  So you can take this as true, and you'll see that

11   out of all of these bank accounts there was not one toy

12   purchase made.  The only toy purchase made on that entire

13   chart was off the defendant's Visa card.

14       So let's take a look at that Visa card.  Here's an

15   example of how the defendant spent his money using that

16   Visa card, and I know it's a little small but I'll go over

17   a couple of charges with you.

18       You can see here there's charges for Home Depot,

19   Exxon Mobil, Dunkin Donuts, Blimpie Subs, Walmart, Olive

20   Garden, UPS.  How did the defendant use his Visa card?

21   Just like most people do, not under emergencies like he

22   said.  He used them to buy food, to buy gas, and things

23   that you spend your money on.  But beside those every day

24   expenses, the expenses in yellow, he spent thousands of

25   dollars on motocross expense for his son's hobby.

1        Well, those probably aren't emergencies either, but

2    you heard him testify that if you knew my son, those are

3    emergencies.  And you heard him testify that for him the

4    holiday season runs from January 1st to December 31st.  So

5    the defendant took the toy fund and turned it into the

6    Konnor Buffis toy fund.  For Konnor Buffis Christmas came

7    every day of the year.

8        Now when you look at chart you might see some scatter

9    purchases in some stores like Costco, Target, J.C.

10   Penney's, stores that aren't necessarily toy stores but

11   might sell toys.  Let's remember the defense witnesses'

12   testimony on this point.

13       You heard from Susan Wheeler, the defendant's

14   sister-in-law.  She said she went on shopping trips to buy

15   toys with her sister Janet Buffis, and she told you she

16   went to Costco.  Actually she admitted on the stand that

17   she falsely testified in the grand jury that she went

18   shopping at Costco for toys with Janet Buffis.  So how

19   many of those other shopping trips that she made with

20   Janet Buffis were fabricated by her?

21       You heard the defendant say that he bought toys at

22   Costco too.  Well, if you remember, you saw every single

23   purchase that the defendant made at Costco.  If you want

24   to go look back at those records, that is at Exhibit 87,

25   and you heard from the Costco manager that they tracked

1    every single purchase a member makes including with cash

2    and there is not one single toy purchase at Costco.  There

3    was one toy purchase made for Guitar Hero but that didn't

4    make the spreadsheet because it was returned a month

5    later.

6        So how do you know that the defendant wasn't just

7    reimbursing himself for payments he made out of his own

8    money?  Well, you know that from the defendant's own

9    words.  That is, his words before he got on the witness

10   stand.  You can see that he said the only funds he used to

11   reimburse himself was when he used his Visa card to

12   purchase toys.

13       Now the defendant testified that that statement he

14   made was just generalities and he wasn't being specific.

15   Well, you can go back and read that statement.  It looks

16   pretty specific, doesn't it?

17       Well, under that statement you can see what the

18   defendant did with his Visa card.  He took in about

19   $18,000 in toy fund money and he spent his Visa card only

20   once at a toy store on one single transaction in 2007 for

21   $311.

22       So what the defendant did was money laundering.  It

23   wasn't a simple mistake or a misunderstanding.  It wasn't

24   incompetence; it was intentional theft.

25       So what's money laundering?  Again you're going to

1    get specific instructions from the judge on this, but I'm

2    just going to tell you briefly about the charges that

3    charge money laundering.

4        Start with Count 8 and that's on your screen.  What

5    money laundering is is that the defendant engaged in a

6    financial transaction, like depositing a check, with the

7    money obtained from fraud.  He got that money by putting

8    those ads in the Berkshire Eagle asking for donations and

9    those were fraudulent because he didn't say that he was

10   taking the money for himself, and he engaged in this

11   transaction for the purpose of concealing something about

12   that money; namely, where it came from, the toy fund and

13   that was the product of fraud.

14       In Count 8 what is charged is a single transaction of

15   the $975 check written to cash that the defendant did not

16   cash but then deposited.

17       In Count 9 and 10 on your screen there are two

18   transactions that are charged.  The first was the $3,000

19   check to cash that the defendant wrote out of the toy fund

20   and then again did not cash but deposited into his bank

21   account.

22       Count 10 is what he did the very next day.  He took

23   $3,000 in cash out of his account with his son further

24   making that money untraceable back to the toy fund.

25       Count 11 is another money laundering count.  Here

1    what's charged is the $325 check to cash that the

2    defendant wrote and again did not cash.  He deposited it

3    into his bank account with his wife and then what he did

4    with the money was spend it on his every day expenses,

5    including paying his daughter's school loans.  If you

6    remember he said on the stand that he doesn't pay for his

7    daughter's loans.  Well, you know in the records -- you

8    can go look at the records -- you can see that that's

9    Exhibit 97 his wife wrote a check to MEFA for his

10   daughter's school loans.

11       Now when asked about these checks to cash, this is

12   what he said:  "I write most checks to cash and cash the

13   check at the bank.  I then use the cash to buy toys."

14   Well, that's simply not true and the defendant admitted

15   that that's not true on the stand.

16       What he said was, oh, well, I thought when you write

17   a check to cash and deposit it, it's the same thing as

18   cashing a check.  Well, if you wrote a check to cash and

19   deposit it, how would you then use the cash to buy toys?

20   You wouldn't have any cash in hand.  That simply was a

21   cover story.

22       Now the defendant concealed his theft through the toy

23   fund in other ways too.  Remember that check to the Home

24   Depot Credit Card Services?  What did the defendant write

25   in the memo line?  He wrote, "kids' tools."  Now what

1   other reason would he have for writing kids' tools than to

2   conceal the fact that he was stealing toy fund money?

3        You can see on that chart everything he bought at the

4   Home Depot on his card.  He bought lumber and flooring,

5   and he was building a spec house at that same time and he

6   used that Home Depot card to buy things for his spec

7   house.  He did not buy kids' toys there.

8        He testified he bought kids tool boxes there, but

9   somehow that didn't make it because he spent cash.  Well,

10  he had a $6,000 credit card bill there but you're not

11  going to see any toys on that bill.  Him writing kids'

12  tools was an intentional act to cover the fact that he was

13  using toy fund money to pay his overdue credit card bill.

14       Now you heard about another way he tried to conceal

15  the fact that he was stealing from the toy fund.  You

16  heard from Nora Mann from the Massachusetts Division of

17  Public Charities.  She told you why a charity needs to

18  register with the state and that's to track the money

19  going into the charities and to make sure that money is

20  used for the proper intentions.

21       Well, how many years did the defendant register the

22  toy fund with the Massachusetts Division of Public

23  Charities?  Zero.  Could it be that the defendant didn't

24  know he had to register or he didn't know how to register?

25  Well, the defendant said on the stand that he didn't think

1    he had to but that's simply not believable because he

2    registered another charity.  He signed -- he wrote his

3    name and contact information and he registered the Lee

4    Police Association from 2001 to 2004 and then he stopped.

5        So why didn't he register the toy fund?  Because he

6    was stealing from it and he didn't want anyone to know.

7    Why did he stop registering the Lee Police Association?

8    Well, because in 2005 he started stealing from the Lee

9    Police Association too and he didn't want anyone to know

10   about that either.

11       The defendant's theft from the toy fund was not just

12   an innocent mistake, not just incompetence, because he

13   stole from the Lee Police Association in the exact same

14   way, and the Lee Police Association and the toy fund had

15   the same P.O. box where the defendant received all his

16   personal financial bills too.

17       You saw this chart at trial that the defendant took

18   money from the Lee Police Association in the form of

19   checks, deposited them into the toy fund, and then took

20   the money right out to pay his credit card bills and to

21   pay himself.  And do you remember the defendant's

22   explanation about why he did this?  Well, he said he was

23   running low on personal cash and that, well, I must have

24   bought toys for that much of the time.  That's up to you

25   to believe.

1    You saw also that the defendant wrote several checks

2    to cash and to himself in the same time period from the

3    Lee Police Association.  He did -- he stole from the Lee

4    Police Association in the same manner he stole from the

5    toy fund writing checks to himself and writing checks to

6    cash.

7        The defendant's failure to register the Lee Police

8    Association and the toy fund with the Massachusetts

9    Division of Public Charities was not a mistake and it

10   wasn't just ignorance.  It was calculated and it was on

11   purpose because this is what he was doing.

12       So why did the defendant steal from needy children to

13   pay his bills?  Well, because he had bills.  He was

14   drowning in debt at the time.  You heard lots of evidence

15   of this.  The defendant's financial ship was sinking and

16   he tried to find any way he could to plug those holes and

17   he used the toy fund money to plug those holes.

18       Now by 2012 the defendant had been getting away from

19   stealing from the toy fund for decades.  He still had

20   those leaks in his financial ship and in early 2012 he

21   spent all of the toy fund money for that year.  There was

22   a balance that was nearly zero, but then he found a way to

23   grab at more money for himself.

24       In January 2012 the Lee PD, along with the

25   Massachusetts State Police, had a sting investigation into

prostitution at the Inn at Laurel Lake.  You heard from
Tara Viola and Tom Fusco.  They were the subjects of that
investigation, and when Tara Viola was caught she
immediately wanted to cooperate and she wanted to give her
money to charity.  And what did Officer Ryan Lucy and
Sergeant Meiklejohn say in response to her?  They said no,
we can't take your money.  It has to be forfeited in a
court in front of a judge.

Well, we all know because Clerk Magistrate Bartini
told you that he's not a judge and he can't forfeit money
but that's what ended up happening.

So why did Tara Viola say she wanted to donate the
money?  Well, she just didn't want to get charged.  She
was petrified of it.  She had three small children and she
didn't want them to find out, and she didn't want them
embarrassed in the small town of Lee among her neighbors.
Sure, what she did was unsavory but she ended up getting
extorted and she didn't deserve that.

So none of the MSP officers or Officer Lucy wanted to
go public either.  They wanted to continue the
investigation.  They wanted to do a reverse sting
operation to target johns, but overnight Tom and Tara
become front page news.

The reports of the arrests were put on the front page
of Berkshire Eagle and hit the internet all over the

1     country, and that's because the defendant falsely reported

2     to the Berkshire Eagle that Tom and Tara had been arrested

3     but they hadn't.  He found out shortly after but did he

4     then call his friend at the Berkshire Eagle and say, hey,

5     I made a mistake, retract that, or don't print that?  No,

6     he didn't do that.  And later did he tell Tom Fusco that

7     I'm sorry, I was the one who contacted the Berkshire Eagle

8     and I feel really bad about it?  I'm sorry.  No, he didn't

9     do that.  In fact, he did the opposite.

10          You saw in his written statement that he told Tom

11    that he wasn't the person who reported the arrest to the

12    Berkshire Eagle.  Well, you all know because he told you

13    on the stand that he was.

14          So Tom and Tara told you how devastated they were

15    when they saw the news they had been arrested and they

16    hadn't and all this was out in the open.  And they told

17    you about the devastating effects on their business, and

18    you don't have to take them at their word on that because

19    it's in the other evidence that you saw and heard.

20          You saw that he had a wedding cancelation e-mail, the

21    couple canceling a $10,000 wedding, and you can read in

22    the transcript that's at I believe Exhibit 12 that Tom

23    says on the transcript that he lost a $10,000 wedding and

24    a $5,000 party and that that was the worth part of

25    everything.

1          Now in the midst of this devastation and humiliation

2     that was their mindset, Tom and Tara's mindset, when they

3     stepped in the hearing on February 21, 2012.  Then the

4     defendant walked in knowing that he had hundreds of

5     thousands of dollars in debt that he still had to pay.

6          Now Tom and Tara appeared there without a lawyer that

7     day and that's because the defendant told them it would be

8     a waste of money to show up with a lawyer.  And how do you

9     know that that's the truth?  Because you can look back at

10    that transcript in Exhibit 12 where Clerk Magistrate

11    Bartini asks Tom and Tara, why didn't you show up with a

12    lawyer today?  It's not an odd thing to have a lawyer

13    there like the defendant testified.  If it was, why was

14    the clerk magistrate asking why you didn't have a lawyer,

15    and they responded we came without a lawyer on Joe's

16    recommendation.  He told us we didn't need one.

17         Now before the clerk magistrate held the hearing the

18    defendant had a secret meeting with Tom and Tara, and

19    before -- even before that meeting he had talked to Clerk

20    Magistrate Bartini before the hearing even started and he

21    said you know what, I'm going to plan to dismiss the case

22    at the end of the day and Clerk Magistrate Bartini said

23    "you're crazy."  You are opening the town of Lee up to a

24    lawsuit.  He didn't say, oh, that sounds like a great

25    idea.  Go ahead.  He said, you're crazy and when the

1    defendant was on the stand he said you're nuts, but even

2    still the defendant went in and he had that private

3    meeting with Tom and Tara.

4        In that private meeting he presented them with a

5    nondisclosure agreement.  There was a little bit of

6    negotiation back and forth as the defendant testified

7    because first Tom and Tara only wanted to donate a

8    thousand dollars to the dog rescue and the defendant

9    admitted that on the stand.  You don't have to believe

10   them.

11       Then the defendant said, no, it's going to have to be

12   more and the defendant admitted that on the stand and in

13   his written statement.  He said it had to be the toy fund.

14   And do you know how you believe that?  Because the

15   Laliberte Toy Fund was already in that agreement that the

16   defendant admitted that he drafted with no help.

17       There was no negotiation over where this money was

18   going to go.  It was going to go to the toy fund because

19   the defendant controlled the toy fund which nobody was

20   checking on and he was going to steal all this money for

21   himself.

22       Now the nondisclosure agreement contained provisions

23   that were for one purpose, the benefit of the defendant.

24   You can see at the top that it kept everything

25   confidential.  Whose benefit was that for?  You heard Tom

1    and Tara say they wanted to tell the press that the

2    charges had been dismissed.  They were barred from doing

3    that because the defendant put in this nondisclosure

4    agreement.

5         Tom and Tara were also prevented from suing the town

6    of Lee or the defendant.  Well, they expressed that they

7    dod want to because of the false media reports but they

8    couldn't because the defendant put it in his agreement.

9         And then the last part, proceeds in the amount of

10   $4,000 donated to the Laliberte Toy Fund in exchange for

11   dropping the charges.  Well, you heard that they wanted to

12   donate a thousand dollars to the dog rescue.  Tom Fusco

13   testified that he didn't like even one provision of this

14   agreement, but ultimately they agreed because they didn't

15   want to get charged and they didn't want those devastating

16   losses to their business.  This agreement was extortion.

17        Now again you're going to get detailed instructions

18   on what extortion is, what the government needs to prove

19   for extortion, but I'll tell you briefly here what the

20   government needs to prove is that the defendant obtained

21   property that he was not entitled to from someone else,

22   that's the $4,000 from Tom and Tara, in exchange either by

23   the use of fear or by using his official position as a

24   police chief.  And the defendant (sic) can prove either

25   one of those, the use of fear or using the official

1    position, in order to prove beyond a reasonable doubt that

2    he is guilty of extortion.

3         Now let me start with the use of fear.  Fear here

4    doesn't just include fear of reputation.  It also includes

5    fear of the loss of business and it's economic fear.

6         What the government needs to prove is that Tom and

7    Tara, or either one, feared economic loss or something

8    else and that that fear was reasonable.

9         Well, you knew that they feared losing business at

10   the Inn and that fear was reasonable because they had

11   already lost business at the Inn.  They lost that $10,000

12   wedding and the $5,000 party, and you know that Tom Fusco

13   no longer owns that Inn.  It was foreclosed on by the

14   bank.  That Inn where his children grew up where guests

15   came and were like grandparents to his kids year after

16   year he does not own anymore.  His fears came true today.

17        Now on the other prong, how the defendant used his

18   official position, that's pretty simple.  The defendant

19   obtained the property, the $4,000, from Tom and Tara he

20   wasn't entitled to that and he did it in exchange for

21   using his official capacity to do something.

22        Well, he used -- he got that $4,000 because he

23   dropped the charges and no one in that courthouse that day

24   had the power to drop the charges except for him, the

25   defendant.  The clerk magistrate couldn't say we're

1   dropping the charges today, that was up to the police.  So

2   the defendant took that $4,000 in exchange for dropping

3   the charges.

4       Now you have heard a lot of testimony about, well,

5   Tara wanted to give up the money.  She just wanted to give

6   it up.  How could it be extortion?  Well, that just simply

7   doesn't matter because if one of the elements the

8   government needs to prove is that the defendant took the

9   $4,000 with the consent of Tom or Tara, they gave the

10  $4,000 consensually so the fact it was voluntary doesn't

11  matter.

12      Even if you do care about voluntariness, let's look

13  at the donation.  You heard that Tom Fusco said when you

14  donate to a charity, you usually get to pick the charity.

15  And when you donate to a charity, you always get to pick

16  the amount.  Well, here's the donation.  They didn't get

17  to pick the charity, the toy fund.  They wanted it to go

18  to the dog center, and they didn't get to pick the amount.

19  They wanted it to be a thousand dollars.  This is not a

20  donation.  This is extortion.

21      So what happened next after the hearing?  Well, the

22  defendant took steps to cover up what he had done at the

23  hearing.  He went back to the station and he told Ryan

24  Lucy that I can't tell you what happened at the hearing

25  even though Ryan Lucy was the case officer.  And what was

1    the excuse that the defendant gave on the stand?  He says

2    his wife was there, but what did he then admit on

3    cross-examination, no, the reason I didn't tell him was

4    because I was barred by the nondisclosure agreement.  And

5    who wrote that nondisclosure agreement?  He did.  So what

6    is it?

7         Then the very next day he posted the dissemination of

8    information memo at the Lee PD.  No one in the Lee PD

9    could talk about police matters and so he kept his

10   extortion private from the outside world including the

11   State Police.

12        So why did the defendant want to gag Viola, Fusco and

13   the entire Lee Police Department?  Well, he wanted to keep

14   his extortion secret.  And why did he want to keep his

15   extortion secret?  Because he was going to steal that

16   $4,000 and he didn't want anyone to know about that

17   either, and he stole that money in the same manner he

18   stole the other toy fund money.

19        He took the check from Tom Fusco.  He deposited it

20   the same day.  He took out a check written to cash and

21   deposited it into his own bank account.  He did the same

22   thing with two other checks.  He used the same manner.  He

23   wrote a check to cash, didn't cash it, deposited it, then

24   spent that money on his own personal expenses.

25        Well, then the Massachusetts State Police came

1    knocking and that's when he began to tell story after

2    story.  The first story he told to Captain Smith in his

3    home was that the Tom and Tara wanted to donate that

4    $4,000 and they wanted $2,000 to go to DARE and $2,000 to

5    the toy fund and that's where it went and that he had

6    spent a thousand dollars of the money.

7        Well, that was false because as I just told you he

8    had spent almost all of it, all but ten dollars starting

9    the day he deposited the money.

10       The second day -- the second time he talked to

11   Captain Smith on the phone, just a few hours later, he

12   said he didn't spend any of the money and then he offered

13   to give it all back to Captain Smith, and that was false

14   because he had spend all but $10 of it and then he started

15   to try to undue his crimes.

16       He showed up at Clerk Magistrate Bartini's home in

17   the nighttime, something that Clerk Magistrate Bartini

18   told you he had never done in the 15 years of appearing

19   before him.  But before he did, he called him on his cell.

20   He called him at home and then he came knocking at his

21   door, and he said he wanted to undue everything.  He

22   wanted the charges to come back.  He wanted to give the

23   money back to Tom Fusco and Clerk Magistrate Bartini said,

24   no, I'm not doing that without talking to Smith, to

25   Captain Smith or the DA's office.

1          Well, at this time the defendant knew he was going to

2     talk to Captain Smith the very next day and he had to give

3     him some answers and he was unsuccessful with Clerk

4     Magistrate Bartini undoing this.

5          So he showed up the next morning with Captain Smith

6     and he tried it with him.  He presented him with a refund

7     check, Tom Fusco for the same amount.  It was dated the

8     31st the next day for $4,000.  But the only problem was

9     there wasn't any money in the toy fund account to cover

10    that check.

11         What he was going to do was scramble and go back when

12    he was done with the interview and put more money in the

13    account so he could cover that check.  This check was

14    going to bounce.  So why did he try and turn back the

15    clock with Bartini and Captain Smith?  Well, he was

16    desperate.  He wanted to rewind the tape on his crimes.

17         He used to be the head guy in town, the police chief,

18    you know.  He was used to this, but this time somebody

19    else was watching, someone higher, the State Police, and

20    they were asking questions and he had to give them

21    answers.  He wasn't used to giving answers, and his

22    behavior in trying to turn back the clock was that of

23    someone with a guilty conscience.

24         So after being interviewed by the State Police

25    several times, he told his final cover-up story about that

1    $4,000 and he made sure he told it to multiple people, a

2    story so absurd and completely false but people actually

3    believed it.

4        He told Officer Lucy, Sergeant Roosa, his neighbor

5    and best friend Dick -- Dave Dickhaus and his

6    sister-in-law Susan Wheeler that he was keeping Tom and

7    Tara's $4,000 in his safe, and then later he said he gave

8    it to a businessman in Lee.  Well, that was false because

9    you know what he did with the money.  He deposited it into

10   his own account and then promptly spent all that money on

11   his own expenses.

12       So why did all these people believe him?  Well, he's

13   the police chief and they trusted him, just like Tom and

14   Tara trusted him, just like the Lee Police Department

15   officers trusted him who put in dues into the Lee Police

16   Association's saving account, and just like the donors of

17   toy fund trusted him.

18       Now the defendant testified that he didn't steal

19   anything from the toy fund and that he was simply

20   reimbursing himself for $120,000 of toy purchases that he

21   paid out of his own cash, and he said he didn't keep a

22   single receipt.  Well, that just doesn't make sense.  It's

23   just not believable.  And how do we know that?

24       Well, in the real world when people have real jobs

25   and they have bank accounts and credit card accounts, they

1    use those to spend on regular expenses.  They don't go out

2    and spend over $100,000 in cash on things like toys, and

3    then they don't do that and then neglect to keep any

4    receipts or lists of who got the toys or keep any records

5    at all, and they especially don't do that when they're

6    running a public charity that receives over $10,000 in

7    donations from the public every single year.  It's just

8    not believable.

9        Now the defendant operated this toy fund that took in

10   at least $120,000 since 1999 and supposedly serviced

11   hundreds of kids every year.  The defendant is an educated

12   and sophisticated man.  He testified that he beat out a

13   pool of applicants for the sergeant position by getting

14   the highest score on the test, and he testified that he

15   beat out a pool of 81 applicants to get the police chief

16   job.  And what did you hear about that police chief job?

17       Well, you heard from Sergeant Roosa who told you that

18   the main responsibilities are to cover the finances and to

19   monitor the budget and that budget is for a million

20   dollars each year, and the defendant himself testified

21   that he had to keep meticulous financial records in his

22   job as police chief.

23       Now another place you heard about meticulous

24   financial records was in the defendant's own home.

25            THE COURT:  Ms. Shukla, ten minutes.

1              MS. SHUKLA:  Okay.  You heard that his wife kept

2       a filing cabinet and you saw that filing cabinet.  You go

3       back and look at the pictures of it in the jury room if

4       you want, and there were tabs for every single expense of

5       the family.

6              The defendant says, well, that's just my wife.  I

7       wasn't involved with that.  All I did was keep receipts

8       and put them on the top of the file cabinet.  Oh, now he's

9       keeping receipts.

10             Well, remember the testimony you heard about his wife

11      and how involved she was with the shopping trips.  So is

12      it believable that his wife went on all those shopping

13      trips, his wife who kept meticulous records, but never

14      once kept a toy fund receipt and that he never kept any of

15      those toy fund's receipts to put on top of the filing

16      cabinet to go along with those other personal receipts.

17             The defendant was a sophisticated police chief and he

18      spent his money like most other people do, through credit

19      cards and bank accounts.  You see all those on that chart.

20      If he didn't have credit cards and bank accounts, we would

21      not have a chart to show you.

22             And the one area in his life that he testified he did

23      not use bank accounts and credit cards was to buy toys for

24      the toy fund.  The one area where he would suspend the

25      conveniences of modern banking was for the toy fund, and

1    the one area where he didn't keep receipts was for the toy

2    fund.  How convenient is that?

3        He used untraceable cash and didn't keep receipts and

4    he testified that he used cash because it was easy, but

5    think about how easy this is.  Remember how he said he

6    shopped?  Well, he would go to Costco or Target or Walmart

7    and he'd get his money together and he'd go buy his

8    household goods and he'd be out there and he'd see toys on

9    sale.

10       So he'd make his purchase of house goods and he'd go

11   all the way back home.  He'd put his stuff away, and then

12   he'd go up to his sock drawer and take the toy fund cash

13   and then he'd go all the way back to the store and then

14   he'd go by those toys that were on sale and then he'd go

15   and the way back home and put the toys away in his

16   basement.

17       He testified he did that with Costco, and Costco for

18   four trips.  Two round trips would be 180 miles from his

19   home, and then when the lawyer took a break he came back

20   and said, no, no, I didn't do that with Costco.  Costco I

21   would go back the next day.  Well, you can rely on your

22   memory of the testimony and what he said.

23       And this is why the defendant's statement to you that

24   he used his own cash to buy over $100,000 in toys is

25   simply not believable, but the real reason is that he

wrote those checks to cash to deposit into his own account

to use on his own expenses, and another reason that it's

not believable is because he told story after story about

the toy fund.

His first story was that he writes checks to cash and

then he cashes them at the bank and uses the cash for the

toys.  Well, he testified that that wasn't true, and then

a second story was that he uses two-party checks -- he

uses his personal cash because they won't take the toy

fund checks because they are two-party checks.  Well, you

heard from the store managers that they would take those

checks.

Now his next story was that -- well, he told the

story again that he used the checks to cash and used the

cash, and then Sergeant Meiklejohn showed him the three

checks to cash that he deposited.  Well, first he just

showed him the checks.  He said, well, those are the

checks that I cashed, and then Sergeant Meiklejohn showed

him the bank account statements showing he deposited them.

Then he took a break and he came back with a brand new

story that he was reimbursing himself, a story he had not

told before that time.  And on the stand he told you a

third brand new story that all of a sudden he kept

receipts on the bulletin board in his home and he

reimbursed himself using those receipts and then he threw

1    them away.  Well, that was the first time he had ever told

2    that story over months and months of investigation with

3    the State Police.

4        Now in his statement he admitted to dozens of

5    falsities on the stand that he said before he got here and

6    also within his own testimony and because of all those

7    stories he's simply not believable.  But what can you

8    believe?

9        Well, you can believe the documents that follow the

10   money and you can believe the mountain of evidence that

11   shows that he stole from the toy fund and that he extorted

12   Tara and Tom of the $4,000, and based on all of the

13   evidence you heard and the credibility assessments that

14   you're going to make the government asks you to find the

15   defendant guilty of all eleven counts of the indictment.

16   Thank you.

17           THE COURT:  Whenever you're ready.

18           MS. LEVINSON:  Ms. Pelegano, could you flip on

19   the document viewer?

20   **CLOSING ARGUMENT BY MS. LEVINSON**

21           MS. LEVINSON:  Okay.  So as you all might

22   imagine I have been spending a lot of time trying to think

23   of what I'm going to say to you today in Joe Buffis's

24   defense and wracking my brain with how I can best convey

25   to you that Joe Buffis is not the lying, thieving criminal

1    that the government says he is.

2         So I've been trying for myself to simplify what the

3    government is saying so that we can really all understand

4    it simply, and simply what I realize the government is

5    saying is that Joe pretended to be this wonderful,

6    benevolent, charitable giver of toys to needy children at

7    Christmastime but that's not he was at all and he was a

8    fraud.  And then all of a sudden I put that simplification

9    together and I realized that just like me and I guess some

10   of you have seen the movie Miracle on 34th Street where

11   Kris Kringle thought he was or was Santa Clause but no one

12   believed him.  Everybody said he was a fraud, and they

13   actually persecuted him for thinking he was Santa Claus.

14   He was actually prosecuted for thinking he was Santa

15   Claus.  He was brought to trial and then it turned out

16   that he really was Santa clause.

17        Now, in a lighter moment at this trial we all heard

18   that Joe Buffis did not walk around in a Santa suit, but

19   the evidence in this case clearly showed you that he was

20   Santa to hundreds of needy children in the small town of

21   Lee for 30 some years and the government has not proven

22   beyond a reasonable doubt that he wasn't.

23        The government has not proven beyond a reasonable

24   doubt that he stole that money from the Laliberte Toy Fund

25   and used it for himself.  So, yes, we concede and we

1    always have that if you just look at the records, this

2    Government Exhibit 68, and all of the other charts and pie

3    charts and the documents and the bills and bank records,

4    it looks pretty bad for Joe Buffis.

5        But that evidence, those records, those charts, those

6    graphs it's only one part of the story.  There is much

7    more to what happened than what the government says, and

8    just because the government says it doesn't mean it's true

9    and just because the government says it doesn't mean there

10   was proof beyond a reasonable doubt.

11       So what the case is about is what the government says

12   happened and what really happened.  What did Joe Buffis

13   really do?  Well, let's go over the evidence.  I know it's

14   been a long time you've been sitting here for weeks, it

15   feels like years already.  Ms. Shukla just went over the

16   evidence.  I know you've been paying attention.  Bear with

17   us a little bit longer.  Here we go again.

18       Everybody knows how this whole thing got started, the

19   Lee Police Department investigation into the Inn at Laurel

20   Lake and Tara Viola's prostitution business.

21       Can everybody see that?  This is how it all got

22   started when a confidential informant known to Lee Police

23   Officer Ryan Lucy contacted him and said this woman in Lee

24   is giving happy ending massages and so they started an

25   investigation into what she was doing there at the Inn.

1        Now, Joe Buffis was the chief of police so he didn't

2    have any day-to-day activities with respect to this

3    investigation.  He knew about it.  He approved of it but

4    he didn't participate in it any way.

5        So lo and behold the big day comes, the raid team is

6    in place.  Now we have the Berkshire County Detective Unit

7    ready to go and also we have an undercover officer.  We

8    have backup officers and everyone goes to the Inn and we

9    all know what happens.

10       Tara Viola is confronted with her john who's really

11   an undercover trooper and immediately or almost

12   immediately she says you got me.  Yes, I've been giving

13   happy ending massages here at the Inn, and I have made

14   about $6,000 from this nasty business and I can't live

15   with that money.  I can't live with myself.  I want to

16   donate that money to charity.

17       I could play you the clips from her interview and I

18   was going to with the electronics here but I'm not going

19   to interrupt myself.  You remember and you will have the

20   clips with you in the jury room if you want to see it.

21   Over and over and over again that day when she went back

22   to the police department with Officer Lucy and Sergeant

23   Meiklejohn she said I want to donate this money.  It's

24   dirty money.  I'll give it to charity.  It's $6,000.

25   Please let me donate, and the law enforcement says we're

1    not going to do that here.  Let's talk about an

2    investigation.  Let's get you getting other people

3    involved.  You can talk about the money in court where

4    that's a proper place to talk about it.

5        And lo and behold she is advised that, yes, she will

6    be going to court.  She will receive a notification that

7    she is going to go to court.  In her mind we can infer

8    that she thinks that she can donate this money to charity

9    when she goes to court.

10       Now, we know what happens.  Joe Buffis, chief of

11   police, not involved in the investigation thought this is

12   a big deal in the small town of Lee.  So as chief he comes

13   to the Inn to see what's going on, how did the operation

14   go, and one of his officers who was involved in the raid

15   comes up to him and says something like, yeah, we did it.

16   It's success.  Tom and Tara are in custody, and so what

17   does he do as chief of police of a small town of Lee that

18   doesn't have anything more exciting than a traffic stop

19   going on?  He calls his friend at the local Berkshire

20   Eagle to tell him about this pretty juicy case that just

21   erupted in his town. He wanted to tell the people of Lee

22   that their Lee Police Department is on it.  And then

23   officer who was the case officer comes into his office and

24   says, listen, chief, we're in there with Tara Viola.

25   She's going to cooperate with us.  Sergeant Meiklejohn

1    says don't call the press.  Joe says it's too late for

2    that.  I already called, and then we have some conflicting

3    testimony about what happens next.

4         Ryan Lucy testified that after he had a conversation

5    with Joe Buffis, Sergeant Meiklejohn was pretty pissed off

6    because now their undercover operation was going to be

7    blown and that he heard raised voices in the Lee Police

8    Department of Sergeant Meiklejohn and Joe Buffis yelling

9    at each other about Joe's leak to the press.

10        Now, Sergeant Meiklejohn testified differently.  He

11   said that they had a discussion over the telephone the

12   next day, and that, yes, he was not happy but there were

13   no raised voices, no yelling, and that it was not the

14   conversation that Ryan Lucy, a government witness, told

15   you that he had had heard.

16        Now I will tell you now and the judge will tell you

17   it is not my recollection of the evidence that counts,

18   it's not Ms. Shukla's recollection of the evidence that

19   counts, it is yours.  If you remember that testimony

20   differently from what I just said, do not believe what I

21   said.  Substitute your own memory.  I'm just doing the

22   best at what I remember the evidence to be, and I'm not

23   asking for you to take my memory and substitute it for

24   yours.  You are the fact finders here.  It is up to you to

25   remember what the testimony was.

1          So you learn that right there, right from the very

2     beginning, Chief Buffis learned that Tara wanted to donate

3     the $6,000 she made in prostitution to a charity and to

4     that end he instructed his officer, Officer Lucy, to get

5     in touch with the DA's office to see what they should do

6     about instituting some kind of a formal legal forfeiture

7     action.

8          And you heard evidence at the trial that Officer Lucy

9     did try to contact the DA's office but he didn't get a

10    response.  He didn't get a response not because -- we

11    don't know why except there was a big apparent triple

12    homicide case that they were working on at that time, and

13    we can infer that they thought that might have been a

14    little bit more important.

15         So meanwhile Thomas Fusco and Tara Viola are

16    relatively hysterical that their crime had been advertised

17    all over the news, this media frenzy that we have been

18    talking about here for the past couple of weeks, and they

19    are very, very upset.  They cannot believe that the

20    newspaper printed that they were arrested when they

21    weren't really arrested.  They're just beside themselves

22    and they're calling the police department, calling the

23    police department, and asking what's going to happen when

24    they got to court and finally Chief Buffis says, listen,

25    you know, I know Tara Viola wants to donate the

prostitution money to charity, we haven't heard anything

back from the district attorney's office yet, tell her she

can donate it at the hearing that we're going to go to in

court.

And you can also tell her that I'm not going to go

forward and bring a criminal case against them because

what we learned and what we heard over and over again at

the trial is that Joe Buffis felt really, really badly for

these people.  He felt really, really badly that these

people who had committed a crime in the town of Lee but he

knew that he had mistakenly caused this media frenzy and

if he hadn't called the press word wouldn't have gotten

out.

So he said to people -- you heard evidence at this

case that early on he said I felt really badly and I felt

like they suffered enough.  I didn't think they needed to

be prosecuted criminally because what they went through

with the media is punishment enough and so I don't want

these people to suffer anymore, and remember what you

heard from a number of witnesses?

Joe Buffis was the kind of police officer who would

give people the benefit of the doubt.  He would give them

a second chance and that's exactly what he wanted to do

with Tom and Tara.  They had been fine citizens.  He had

never heard any run-ins with them and they had young

1    children in the community and he had actually been his

2    daughter's softball couch.  Enough harm had been done and

3    so the way he's done it before over his course of being a

4    police officer, a sergeant and a chief, he was not going

5    to go forward with the charges.

6         You did not hear one word of evidence at this trial

7    that he specifically conditioned that donation of money on

8    the dismissal of charges.  They were two separate things.

9    The donation came up from Tara from the very, very start

10   and his dismissal came up because that is the kind of

11   police officer he was.  And if they wanted to donate those

12   proceeds, if Tara Viola would feel better getting rid of

13   her dirty money, then, darn it, that money should go to a

14   charity that benefits the people of Lee.  It shouldn't go

15   to a charity that benefits the dogs of Pittsfield.  You

16   know, that's what he was thinking.

17        Now, she wanted to give a thousand dollars to the

18   dogs of Pittsfield and he said, I'm sorry.  You know, you

19   do have a choice of how much to donate but a thousand

20   dollars when you said you made $6,000, that doesn't jibe;

21   that's not what you were saying.  You made 6,000 so, okay,

22   you want 4,000, do 4,000.  You want the dogs of

23   Pittsfield, no.  You're giving to a worthy charity in the

24   town of Lee and what did they say?  They said okay.

25        They were familiar with the DARE program.  They had

1   no clue about the Laliberte Toy Fund, but he explained it

2   to them and they said okay.  We will do half DARE and half

3   toy fund.  And this conversation, according to Joe Buffis,

4   occurred on the telephone before the show cause hearing

5   with Tom Fusco and he assured Tom that charges would not

6   be brought.  That they would -- he would dismiss the

7   charges at the show cause hearing.

8        When they asked do we need to bring a lawyer with us

9   to court he said, well, you know, if you want to waste

10   your money we already know that you're not going to be

11   charged so it's up to you if you want to pay some lawyer

12   money.  Okay.  Go ahead, but you know you don't have to

13   and in my mind it's a waste of money.

14        And then Ms. Shukla spent some time talking about the

15   agreement that Mr. Buffis prepared with the nondisclosure

16   clause in it, and it's been explained for you a number of

17   times at trial that that nondisclosure clause was there

18   for a couple of reasons, most of them being to protect Tom

19   and Tara from more media attention and also because the

20   results of show cause hearings where no complaint issues

21   are confidential.

22        Nobody has the right to have access to those and

23   Joseph Buffis was doubly ensuring that nobody would have

24   access by putting that in the agreement and insuring that

25   he wouldn't spread the word about it too because of

1    course, remember in his mind, he is feeling badly that he

2    was the one who initially leaked it to the press so this

3    covered everybody.

4         The fact the government finds sinister intent in that

5    Joe prepared the agreement beforehand and had written in

6    the Laliberte Toy Fund and left the amount blank, so as

7    Joe testified the day of the hearing it was a negotiation.

8    The number 4,000 was agreed upon.  Tom Fusco wrote that

9    number in and Tom Fusco said to Chief Buffis I only

10   brought a check for a thousand dollars, that's what we had

11   wanted to donate.  I don't have $4,000 today.  Could you

12   wait?  And Joe Buffis said, yes, I can wait.

13        And what do we know -- what do we know happened from

14   the evidence?  We know that at 4 p.m. on February 21, 2012

15   the day of the hearing that case was dismissed.  We also

16   know as of 4 p.m. on February 21, 2012 Joe Buffis had not

17   received the donation of $4,000 for the Laliberte Toy Fund

18   or DARE.

19        We know and the evidence in this case shows that that

20   check from Tom Fusco for $4,000 was not deposited into the

21   Laliberte Toy Fund account until Friday, February 23rd or

22   24th.  I'm a little unclear on the dates but you can check

23   that, but it wasn't deposited until like three days after

24   the show cause hearing, three days after the charges were

25   dismissed.

1          So did the government prove to you beyond a

2     reasonable doubt that Joe Buffis conditioned the dismissal

3     of those charges on the donation of those funds?  They did

4     not, not even close, and there is much more than a

5     reasonable doubt that that is what happened here.

6          Did he use fear of economic harm to extort money from

7     Tom and Tara?  He did not.  Tom and Tara testified and as

8     Ms. Shukla said to you on February 17, 2012 before the

9     show cause hearing, before he allegedly extorted $4,000,

10    they had already suffered economic harm.  So he wasn't

11    threatening them with economic harm if they didn't donate.

12    Economic harm had already come, and why did it come?  Did

13    it come because Joe Buffis had mistakenly reported they

14    were arrested or did it come because Tom and Tara decided

15    that they were going to commit illegal acts that Tom was

16    going to support his wife in the prostitution business?

17    They willingly took that risk and for them to now come

18    crying to you and saying, well, he extorted this money out

19    of us because we were so scared of all the publicity is

20    just not believable and it's just not true.

21          They put themselves out there on the internet.  Those

22    pictures that you saw of Tara Viola were out there for all

23    to see.  If she was so scared of economic harm, so

24    extortable, do you think she would have ever done what she

25    did?

1      And just very briefly when you think about Tom and

2   Tara's testimony in court because clearly they said to you

3   we felt we didn't have a choice.  We felt that we had to

4   make the donation in order to make the charges go away.

5   Well, just keep in mind that Judge Mastroianni will

6   instruct you about this, both of them testified here under

7   a grant of immunity which means that they cannot be

8   prosecuted for any crimes they committed, not prosecuted

9   by the federal government.

10      The grant of immunity did not cover state court, and

11   you learned that they do currently as we stand here today,

12   I don't know today, but when they testified there were

13   state court charges pending against them and I'd suggest

14   to you that you should look at their testimony in light of

15   any benefit that they may have hoped to get in state court

16   by providing testimony for the federal government.

17      Now Ms. Shukla argues that there's proof that Joe

18   Buffis knew he was extorting or knew he was doing

19   something illegal because of his actions after the show

20   cause hearing.  He goes back to the station, Ryan Lucy

21   says what happened at the show cause hearing?  He says,

22   I'm not at liberty to tell you.  Well, Ryan Lucy even

23   admitted that, yes, his wife was there with him at the

24   police station when he asked and Joe explained that you

25   don't talk about police business in front of someone's who

1   not a police officer.

2       So then the government says, a-ha, what about the

3   non-dissemination memo that Chief Buffis posted the very

4   next day after the show cause hearing putting a lid,

5   putting a gag order on the Lee Police Department from

6   saying anything about this show cause hearing?

7       Well, guess what?  That argument is meaningless

8   because what we know from Ryan Lucy is that nobody at the

9   Lee Police Department knew what happened at the show cause

10  hearing so how could they possibly be prevented from

11  disseminating information that they didn't have?

12      The reason that memorandum was posted was, as now

13  Chief Roosa told you and Joe Buffis told you, was because

14  there had been a little controversy in the Lee Police

15  Department about the sergeant selection process and word

16  had leaked out that there was some information from inside

17  the police department that had gone outside the police

18  department and Joe is in the middle because he was the new

19  chief of police revising all of the old policies and

20  procedures, and darn if it wasn't the worst possible

21  timing you could imagine in light of allegations that

22  arose from the show cause hearing that he posted that

23  non-dissemination memo so close in time to the show cause

24  hearing, but you know that it didn't have anything to do

25  with the show cause hearing because nobody in the police

station knew anything except for Joe Buffis.

So then we get to this investigation that was launched into Joe Buffis's activity and the government argues to you that it was lies, lies, lies and more lies from Joe Buffis during the investigation. That there were three or four interviews depending on if you count the phone conversation as an interview, and that Buffis was asked all these different questions and he kept giving all these different answers and that that proves that he's a liar and that proves that he's a thief, but think about it.

Here he was, he was first approached in sort of friendly conversation way by Captain Smith just tell me what happened at the show cause hearing. We're looking into that and so the focus was the show cause hearing. The focus was not the toy fund and so he didn't go into specifics of the toy fund because that's not what the interview was about. It was about the show cause hearing, and he gave a very detailed statement about what happened at the show cause hearing and it's in evidence as Government's Exhibit 30 and you will be able to see that entire -- the statement of Mr. Buffis at that time, and you'll see that most of that interview was about the show cause hearing and a very limited part of that interview was about the toy fund and so he spoke in generalities.

1        Did he misspeak during his three or four interviews?

2   Of course.  Did he forget things?  Did he leave things

3   out?  Did he try to portray himself in the best light

4   possible?  Of course he did.  Wouldn't any of you if your

5   integrity were being questioned?

6        So the charge of money laundering as it relates to

7   the extortion charge, Judge Mastroianni will tell you that

8   if Mr. Buffis did not extort money, then clearly he didn't

9   launder the money.  So if you find that he's not guilty of

10  extortion, you don't even consider whether he laundered

11  money on those charges because there's no illegal money to

12  launder.

13       I want to just point out to you a couple of things at

14  this point about the investigation into Mr. Buffis.  Think

15  about the fact that it was Sergeant Meiklejohn who was

16  assigned to investigate this whole episode after he and

17  Mr. Buffis had gotten into it over Joe's leak to the press

18  and now he's the lead investigator when he's already

19  pissed off at Joe Buffis.

20       And Rick Smith who Joe Buffis testified he already

21  had a little bit of a testy relationship with because over

22  the years of being in separate units of territorial kind

23  disputes so these are the two guys who are heading up the

24  investigation into him.

25       And then the evidence showed that it actually became

1       a federal investigation as Agent Lewandowski told you

2       because the local cops were too close to this and that

3       wasn't really appropriate and so it became a federal

4       investigation which leads me to have to comment to you

5       about all of the time and the money spent on your

6       government investigating what is a small town matter.

7            A half a year's salary went to Mr. Gizzi of the FBI

8       who is a forensic accountant who has worked on the World

9       Trade Center case, on the Marathon Bombing case, on the

10      attempted bombing of Time Square, and now he's spent a

11      half of a year investigating Joe Buffis and he spent a

12      half a year putting together that chart and the graphs and

13      going through every piece of paper that the government

14      could have possibly subpoenaed, record after record.

15           You saw the time and the attention that the

16      government has gone in prosecuting this case, highlighting

17      single purchases out of hundreds of pages of records and

18      receipts.  Hundreds of hours of two assistant United

19      States attorneys to investigate Joe Buffis and the

20      Laliberte Toy Fund.  All the might and the power of the

21      United States Government has been marshaled against Joe

22      Buffis who was just running this toy fund in the simple

23      old fashion way that his predecessor Ed Laliberte taught

24      him to do.

25           Remember Joe was 19 years old when Ed Laliberte took

1   him under his wing and said, hey, kid, I'm going to turn

2   this toy fund over to you.  Here's 800 bucks.  You go

3   shopping.  You distribute the toys.  You keep it anonymous

4   because, you know, people don't necessarily want everyone

5   in town to know that they don't have money to buy toys for

6   their kids.  He didn't have a bank account.  He didn't

7   have records.  He didn't have receipts.  He didn't

8   register it with the Department of Public Charities.  He

9   turned it over to a 19-year-old kid and said go with it.

10      And so after a little while Joe Buffis said, okay,

11   well, it is a little bit more of a modern era let's get a

12   checking account so in 1999 he opens a checking account

13   and brings one of these Laliberte checks to a big national

14   store in 1999 or 2000 and the store tells him we're not

15   going to take this kind of a check and he just says, okay.

16   I'm done.  I'm not going to use the checks.  I'm not going

17   to use the checks to purchase.

18      I'm going to use cash. I'm going to use cash the way

19   Ed Laliberte did.  I'm going to use cash the way the

20   Buffis family uses cash, and you heard the lots of

21   evidence at this trial about how the Buffis family manages

22   their finances and how they operated on this cash-basis

23   with Janet taking his paycheck every week, putting it in

24   separate envelopes and cash.  You saw pictures of the

25   cash.  This was a cash-based family.

1      When Joe Buffis and Janet Buffis and anybody else was

2   helping went out to buy toys, they bought it with cash

3   because it was just easier, and especially in light of the

4   fact that Ed Laliberte didn't keep records, didn't train

5   him to keep records, he just did it the way Ed Laliberte

6   did it which was informal, and as it turns out, in

7   retrospect as I'm standing here today defending Joe

8   Buffis, it was really stupid.

9      As I said when I stood in front of you on day one

10   incompetence is not criminal, and Joe Buffis was clearly

11   running this toy fund in an incompetent way if it gets put

12   under a microscope but he ran it the way he was taught.

13   He ran it in a way that was comfortable.  He ran it in a

14   way that worked.

15      Now the government says that Joe Buffis committed the

16   crimes of mail fraud and wire fraud because he advertised

17   in the Berkshire Eagle and other media to solicit

18   donations from the toy fund, and the government argues

19   that that was baloney.  He wasn't soliciting for the toy

20   fund.  He was soliciting for the Konnor Buffis Christmas

21   fund, not for the Laliberte Christmas fund.

22      But over again you have heard Mr. Buffis saying over

23   again that the way he ran the fund was by getting the

24   donations, putting it in the toy fund, and then

25   reimbursing himself and his family for money that they

1    spent from January to December buying toys.  They didn't

2    just go on toy shopping trips in November and December,

3    they bought toys in January right after Christmas during

4    the sales.  If they were in a sale in April and they saw

5    dump trucks on sale, bam, out comes the cash.  Here come

6    the toys.

7        You heard from witnesses who were in the Buffis

8    basement who saw toys piled up in the basement from floor

9    to ceiling at different times during the year.  Now you

10   may say, and the government may suggest to you, that these

11   people who testified that they saw toys piled up in the

12   basement were just testifying, you know, falsely to help

13   Joe.  But what about Allison Rada from the toy fund in

14   Barrington who testified that she met with Joe Buffis in

15   November of 2012 after this investigation had been started

16   and she picked up from him about $3,000 worth of toys that

17   he still had on hand from prior -- coming from the toy

18   fund because he stopped the toy fund when it became the

19   subject of an investigation and so the toys were still on

20   hand and, yeah, there were Teeny Beanies babies that had

21   been donated by McDonald's but Ms. Rada didn't count that

22   in her $3,000 estimate of the value of toys that Joe

23   Buffis provided to her that had been for the toy fund.

24       So was this toy fund a sham?  Was this something that

25   Joe Buffis just pretended he was running?  Ms. Shukla

1    pointed you to four women who came to court to testify

2    they had applied for toys and they didn't get any.

3         Well, do you remember what they said about how they

4    applied?  One of them applied before the donations --

5    before the application season had opened.  She went to the

6    police department, spoke to some lady that she didn't

7    know, left her name and number on a piece of paper and

8    never heard back.  Well, surprise, surprise.

9         The other three went to the police station.  They

10   didn't have the formal applications that were published in

11   the newspaper.  They left their names and numbers.  They

12   didn't put down the number of kids they had, the sex of

13   the kids, the ages of the kids, and that's a big surprise

14   that they don't got toys?

15        What about the people who did get toys?  What about

16   Erin List (Sic) who testified that she submitted an

17   application.  She got a letter back with a number telling

18   her where to go pick up the toys and lo and behold she

19   goes and picks up the toys.  They're in a black bag that

20   you've seen a dozen times already.  I'm not going to drag

21   it out here but she picked up her black bag filled with

22   toys and was very happy.

23        What about lead Liliana Bermudez?  Nobody got toys?

24   Liliana Bermudez got toys.  She submitted an application

25   the way you're supposed to.  She got a letter telling her

1    where to go to pick them up.  She went and picked up her

2    black bag full of toys and she said they were regular,

3    new, fine, good, American toys and one big Japanese doll

4    that he kept for herself.  So this is the sham, this is

5    the sham that the government says Joe Buffis has been

6    running.

7         In the beginning of this case I told you that you

8    have to keep an open mind and I know that you have

9    throughout this entire trial, and it's important for you

10   to keep in mind the important rules that govern criminal

11   trials and Judge Mastroianni is going to instruct you on

12   those rules after our closing arguments are done.

13        You must apply the presumption of innocence and you

14   must hold the government to its burden of proving guilt

15   beyond a reasonable doubt, and keep in mind the government

16   alone has the burden of proving guilt beyond a reasonable

17   doubt.

18        The defendant, Joe Buffis, does not have to prove his

19   innocence.  He has to prove nothing.  He doesn't have to

20   prove there was a toy fund.  They have to prove there

21   wasn't, and keep in mind that the defendant under our

22   Constitution has no burden of proof.

23        Remember that Joe Buffis did not have to testify at

24   trial here because he doesn't have to prove anything.  He

25   had every right to just sit at that table just like he is

1    right now and do nothing.  He did not have to subject

2    himself to hours and hours of cross-examination, scathing,

3    sneering, leering, cross-examination by an extremely

4    experienced and extremely able prosecutor.  He did not

5    have to do that but he did because he wanted to tell you

6    what he has been wanting to say since this came to light

7    when he was charged with these horrible crimes back in

8    2012 - I did not do what they say I did.  I am not a

9    fraud.  I am not pretending to be something I'm not.  I

10   helped hundreds of children in the town of Lee for a long,

11   long time.  I am may not walk around in a Santa suit but I

12   have brought Christmas to hundreds of children.

13        I know I'm going to be getting my ten-minute warning

14   very soon and I'm losing my voice and you probably are

15   losing your patience so I will stop talking in a couple of

16   minutes, but before I do I've just got to tell you a

17   couple things.

18        I mean when I stop talking -- well, the reason I'm

19   afraid to stop talking is because when I stop, Mr.

20   Breslow, the experienced and able prosecutor, gets to

21   stand up and try to poke holes in everything that I have

22   said to you because the government has the burden of proof

23   so they get last lick so I don't get to pop up again and

24   respond.  So your job really as jurors is if Mr. Breslow

25   makes a point that you think I would respond to and, I'm

1    sure he will, when you're talking to yourselves in the

2    jury room, you know, make the arguments for me.  You know,

3    debate the points among yourselves and talk about how we

4    may have responded to some of those points.

5         When you go into the jury room today to begin your

6    deliberations, I know you know how big a responsibility

7    you have in your hands.  And as Judge Mastroianni will

8    tell you, the jury deliberations do not have room for

9    speculation, for guesswork, for trying to fill in the

10   blanks with evidence that isn't there.  You've got to be

11   really, really sure.

12        I mean, you've got to -- if you're going to find Joe

13   Buffis guilty, you have to believe beyond any reasonable

14   doubt that he did what the government says he did.

15        Now let me suggest to you that if you are going to be

16   having any reasonable doubts, which I suggest the evidence

17   shows you have to have based on everything that you've

18   heard here, but if you're going to have any reasonable

19   doubts, the time to do that is when you are deliberating

20   and when you're talking to each other because I know -- I

21   mean, you've been here for a long time and in the weeks

22   and the months to come, the days, you're going to think

23   about this case and you are going to wonder, you may

24   question yourself, was justice done?  Was our verdict the

25   right one?

1        Well, let me suggest if you're going to have any

2   reasonable doubts like that, the time to have them is in

3   the jury room because in the weeks or months to come any

4   reasonable doubt that might pop up would be too late.

5        Finally let me end by commenting that Mr. Breslow may

6   suggest to you that sympathy and a plea for sympathy for

7   Mr. Buffis, I don't mean to, and Mr. Breslow could rightly

8   argue to you that sympathy for Joe Buffis or his family

9   has no place in your deliberations and he is right, and I

10  assure you that Mr. Buffis is not asking for your

11  sympathy.  He is asking only for what he deserves and what

12  he deserves is justice and what justice demands is that

13  your verdict be not guilty.  Thank you.

14  **REBUTTAL CLOSING ARGUMENT BY MR. BRESLOW**

15        MR. BRESLOW:  Good morning.

16        THE JURY:  Good morning.

17        MR. BRESLOW:  Well, I appreciate Ms. Levinson's

18  compliment.  I really do and I have to agree that she is

19  also a very skilled litigator, a more skilled litigator

20  and more experienced litigator and she delivered to you a

21  terrific summation and that's exactly why summations are

22  not evidence.

23        Evidence only comes from the witnesses who sit over

24  there and the exhibits like the one here, Government

25  Exhibit 68, that are received into evidence through the

1    court and that's what you should be focusing on.

2        I'm going to try to focus you on some of the pieces

3    of evidence and some of the pieces of testimony.  I want

4    to start by saying that the defendant is not Kris Kringle.

5    The defendant is not Santa Claus.  The defendant may have

6    an oil pointing of Santa Claus in his home and may have

7    knickknacks in his home of Christmas, but really the

8    defendant was much more like the Grinch who stole

9    Christmas because from 2007 to 2011 the defendant took

10   $55,000 of donors' donations that were in the bank of the

11   toy fund that he controlled and he spent it on himself and

12   his family, and the defense does not dispute that.

13       The defense does not contest that that's exactly what

14   he did with virtually all of that money.  And what did the

15   defendant do after that?  Well, when the State Police

16   began to investigate he gave cover story after cover story

17   after cover story and that concealment and cover-up

18   extended, I submit, into this very trial when he gave

19   testimony under oath to you.

20       Now, Ms. Levinson mentions that there were donors who

21   received toys, people like Liliana Bermudez and Ms.

22   Albert, and Ms. Levinson carefully constructed Ms.

23   Bermudez's testimony.  She told you about the Japanese

24   doll that she kept for herself.  What Ms. Levinson

25   skillfully I think failed to tell you or remind you was

1   that all of this happened in 1999, like 15 years ago.  And

2   even Ms. Albert who testified that she received toys

3   received them in 2004, 2005, and 2006, and the $55,000

4   figure that we are talking about here and this chart here

5   is 2007 through 2012.

6        I want to underscore a point that Ms. Shukla told you

7   earlier.  The government does not have to prove that the

8   toy fund was a complete sham.  The government does not

9   have to prove that Mr. Buffis never gave out a single toy.

10  The government does not have to prove that the toy fund

11  was a 100 percent fraud.

12       You will see the indictment during your deliberations

13  and you will realize that what the government has to prove

14  here with respect to the wire fraud count is that the

15  defendant defrauded the donors of the toy fund, people

16  like the four donors who testified in court before you, by

17  failing to tell them that he was using a substantial part

18  of their donations for himself and for his family, and,

19  once again, the defendant does not -- the defense does not

20  concede that he spent $55,000 or virtually all of the

21  money that came into the toy fund on himself.

22       Now, the defense really rests with this easy cash

23  method that the defendant explained to you.  The defendant

24  explained, after having told cover story upon cover story

25  to the State Police earlier, the defendant's final story

1     is that I didn't use my Visa card to buy toys.

2          You remember that he told Captain Smith in writing on

3     March 30th the only time I reimbursed myself is when I

4     used my Visa card to buy toys, and when I used that Visa

5     card I pay toy fund money into my Visa card.  That would

6     make sense; that actually would not be a bad method for a

7     person who doesn't like keeping receipts because then if

8     you went to the Visa card, as the government did -- this

9     is all the way on the right.  It's the final columns on

10    the right and it says Visa -- then there would be evidence

11    of purchases of toy purchases and we could go to stores

12    and get those receipts and see what exactly he bought even

13    if the defendant didn't keep them.

14         That's what the defendant told Captain Smith.  The

15    only times I reimbursed myself were toys -- were when I

16    used my Visa card and then I pay money from the toy fund

17    in my Visa card.  So that, as the defendant conceded is

18    completely false because in this five-year period the

19    defendant spent $17,000 of toy fund money for his Visa

20    card payments but by comparison there was one charge, we

21    can see it highlighted there, at KB Toys in like 2007 or

22    2008 for $311.

23         So the defendant made one payment $311 -- one charge

24    and he shoveled $17,000 of payments from the toy fund to

25    reimburse himself for that one charge.  That's why that's

1    completely false.  The defendant had another cover story

2    for Captain Smith and this is also in writing.  He said,

3    "I write most checks to cash.  I cash the checks at the

4    bank and I use the cash to buy toys with."  This is not my

5    words, not even Captain Smith's words.  It's the

6    defendant's words in writing in a document that he

7    reviewed and initialed and corrected with one change,

8    natural to neutral.

9         So did he write most checks to cash and then cash

10   those checks at the bank to buy toys with?  No, he did

11   not.  The defendant conceded that and he conceded that

12   because he had to.  And why did he have to?  Because

13   $25,000 of these toy fund checks -- right over here

14   there's a list, I'm referring to Government Exhibit 68,

15   there's a list of all the checks that the defendant wrote.

16   Fifty-four checks and of those checks I think it's 21 that

17   he wrote to cash but did not cash, instead he deposited

18   them into his bank account, and that's why that second

19   cover story is completely false.

20        Now, the defendant testified -- the defendant tried

21   to explain to you what he meant when he wrote "I write

22   most checks to cash.  I cash the checks at the bank and

23   then I use the cash to buy toys."  He tried to give you an

24   explanation for what he meant there but remember on

25   cross-examination I asked him, I said you're a smart guy,

1    aren't you?  He deferred a little bit.  Maybe he was

2    modest, I don't know.  And then I asked him again after

3    reviewing his background and he conceded, yes, he actually

4    was a pretty smart guy.  Then I said to him, you know what

5    it is to cash a check, right?  And then I said to him and

6    you know what it is to deposit a check, right?

7         My questions really don't matter, it's his answers.

8    He knew what it was to cash a check and he knew what it

9    was to deposit a check, and he knew those two things were

10   different.

11        Every single member of the jury knows what it is to

12   cash a check and knows what it is to deposit the check in

13   the bank.  They're two completely different things, and if

14   you use your common sense, if you use the common sense

15   that's literally in your pinky you will know that there's

16   a mountain of difference between cashing a check --

17   actually going to a bank and getting cash and using that

18   to buy toys and writing a check to cash and putting it

19   into your own bank account and spending the money on

20   personal expenses and somehow reimbursing yourself for

21   other cash that you purchased things with.

22        That argument makes no sense at all.  It is -- it

23   defies common sense and moreover it's just not easy.  It's

24   actually very complicated, and you may remember that on

25   the defendant's second day of cross-examination -- Ms.

1    Shukla mentioned this but I think it bears repeating given
2    Ms. Levinson's comments -- that the defendant said this
3    was easy, and even with respect to Costco he would drive
4    45 minutes to Costco for household items or business items
5    and if he saw dump trucks on sale he wouldn't buy them
6    then.

7         He would drive all the way back 45 minutes all the
8    way back and he'd dropped the stuff off at home and he'd
9    go to that sock drawer, that famous sock drawer that he
10   testified to it was safer than Lee Bank, the Lee Savings
11   Bank to keep his cash, and he'd grab the cash from the
12   sock drawer and then he would get in the car.  He
13   literally would get right back in the car and drive
14   another 45 minutes back and buy the toys with the cash in
15   sock drawer and drive all the way back, and I suggest to
16   you that if you use your common sense you will conclude
17   that that is ridiculous.  That it makes no sense and that
18   beyond that it's just not believable that somebody would
19   do it that way.

20        If you were running a charity, a public charity, a
21   true public charity that received donations from your
22   friends or your neighbors or your colleagues, that receive
23   donations from strangers who are giving money to people --
24   to the charity because they were remembering people who
25   had died, grandparents, grandchildren, spouses, if you

1    were receiving that money would you after having put those

2    checks into the bank account from all those donors, would

3    you go to a cash basis?

4        Would you, having been entrusted with the public

5    donations, buy all of the toys with cash?  And even if you

6    did, would you not keep a single receipt?  It makes

7    absolutely no sense to do it that way, and I submit to you

8    that the trial proved the defendant didn't do it that way.

9        Rather, he did not spend $55,000 in cash on toys for

10    2007 to 2012 and he did not transfer $55,000 of toy fund

11    money into his account to reimburse himself for these cash

12    purchases.  He took the toy fund money and he stole it in

13    the manner that he did and he spent it for himself and his

14    daughter and his wife and his son, and he did it for maybe

15    the oldest reason in time because he needed to, because he

16    was absolutely drowning in debt.

17        And when the State Police came to ask him how he had

18    spent the toy fund money, he told cover story after cover

19    story after cover story.

20        Your Honor, how much time do I have?

21            THE COURT:  Two minutes.

22            MR. BRESLOW:  I want to turn to the extortion

23    for a moment.  Ms. Levinson has suggested to you very

24    skillfully, very eloquently that the $4,000 payment was a

25    donation but use your common sense and you know it wasn't.

1    It was an extortion.

2        How do you know?  Well, first Tom and Tara wanted to

3    spent a thousand dollars and the defendant said a thousand

4    dollars will not work.  Tom and Tara wanted to donate to a

5    dog rescue and the defendant said that's not going to work

6    either.  Tom said it perfectly.  If you -- you heard the

7    testimony.  It's not a donation if you don't get to choose

8    the charity.

9        So use your common sense and draw on your experience

10   and ask yourselves how many donations have you made in the

11   course of your life where you didn't get to choose the

12   amount and you didn't get to choose the charity?  That's

13   because this was not a donation.  It was an extortion.

14       Tom Fusco testified that he gave that $4,000 check in

15   court that day, and even the defendant -- your

16   recollections will recall, your notes, check your notes

17   and check you memory, but the defendant himself

18   characterized this as a negotiation.  Nobody negotiates a

19   donation.  People negotiate extortion, and the defendant

20   knew perfectly well what Tom and Tara knew, which was he

21   held their fait in his hands and if he chose to move

22   forward with the complaints their business would continue

23   to suffer, their lives would continue to get worse, and so

24   they had a genuine real fear that what had already

25   happened to them would happen to them again and that's why

1    they made that payment.

2         How much time, Your Honor?

3              THE COURT:  A little under a minute.

4              MR. BRESLOW:  And you know that the defendant

5    knew that this was an extortion because he concealed it.

6    He concealed it in the nondisclosure agreement that barred

7    Tom and Tara.  Of course, Tom and Tara would have loved to

8    go out after that show cause hearing and say our names are

9    cleared, no charges, they're dismissed.  The defendant

10   barred them from doing so because he did not want them to

11   talk about what had happened in court.  He wanted to keep

12   the extortion secrete.  He didn't even tell his own case

13   officer Ryan Lucy, and then when recording the events of

14   that day he omitted any discussion of what happened in

15   court from Tom and Tara and the records that are otherwise

16   extremely comprehensible according to his own testimony.

17        And the very next day he published the memo

18   prohibiting anybody from the police department to talk

19   about what happened, including Ryan Lucy who he didn't

20   know what happened in the case but he knew the chief said

21   I'm not at liberty to talk about it and that was concern

22   enough.  He refused to tell the press when they asked.  He

23   never told Adrian Kohlenberger, the DARE officer, that

24   they had donated $2,000 to the toy fund and $2,000 to

25   DARE.

1    He never told any officer what happened in court

2    until the State Police investigation began and then he

3    told cover story after cover story, that story about how

4    he took the donation and he put it in the safe.  That's

5    not what he did with the money of course, and that's how

6    you knew that he was trying to conceal his extortion.

7              THE COURT:  Please wrap up.

8              MR. BRESLOW:  And that's why you should find the

9    defendant guilty of wire fraud, guilty of defrauding the

10   toy fund donors, guilty of laundering three checks that he

11   wrote to cash that he did not deposit that constituted the

12   proceeds of that fraud, guilty of extorting Tom and Tara

13   under both legal theories under color of official right,

14   meaning his own capacity, and by wrongful use of fear,

15   including fear of lost business, and then money laundering

16   again the three checks to cash that he did not cash but

17   that he instead deposited into his own bank account so

18   that he could spend the money on himself.  Thank you very

19   much for your attention during this very long trial.

20             THE COURT:  All right.  Thank you to the

21   parties.

22        We're going to take our break.  All right?  My idea

23   here is there's a fruit platter or something in there now

24   and then your lunch will be here in about an hour, but I

25   wanted you to take that type of mid-morning break and then

1    come back here and let me instruct you and then give you

2    the case and you can have your lunch and start doing what

3    you're doing, that way we don't have to have you back and

4    forth.  But I wanted to ask a follow-up to what I asked

5    you some questions yesterday.

6         Will anyone be inconvenienced to stay today up until

7    a little before five o'clock?  If there is such a problem,

8    you can tell Ms. Pelegano back in the room and she will

9    bring it to my attention.

10        The other issue was, as I said to you yesterday, we

11   had thought from the beginning, we're not too far off,

12   this was a three-week trial but I'm sure most of you

13   thought and adjusted your personal and professional lives

14   to be finished with this probably by the end of this week.

15        You, as the jury, can decide a case in as short of a

16   time as you think is appropriate or as long a time as you

17   think is appropriate.  But given that it's Thursday I just

18   want to check with anyone who would be distracted by the

19   thought of if you needed it -- if the jury needed to come

20   back next week, if that would be a distraction or a

21   problem for anyone?

22              THE JURY:  (Indicating.)

23              THE COURT:  No?  No?  All right.  Okay.  Very

24   well.  If you think that might be a problem during the

25   break you can tell Ms. Pelegano and she will bring it to

 1    my attention and I will discuss it with you.

 2        So the standard -- I'm not going to be able to tell

 3    you this much longer, but the standard instruction is

 4    please, really, we're right there but do not begin

 5    discussing the case, do not begin your deliberations.  All

 6    right.  Do not let yourself be exposed to the media on

 7    this case, investigate the case on the internet, social

 8    media or anything like that.  All right.  Thank you.

 9    **(The jury left at 12:17.)**

10            THE COURT:  When we come back at quarter of, the

11    parties can let me know if they've reviewed the verdict

12    forms and if there are any issues with them.

13            MS. LEVINSON:  Yes.

14            MR. BRESLOW:  Yes.

15    **(A recess was taken at 12:19 until 12:48.)**

16            THE COURT:  Verdict form?  Well, first of all,

17    let's go on the record are there any objections regarding

18    the closing?

19            MS. LEVINSON:  For the defense, Your Honor, I

20    wanted to renew my objection to the subsequent intent or

21    attempts --

22            THE COURT:  That's instructions but are there

23    any objections to the government's closing?

24            MS. LEVINSON:  No.

25            THE COURT:  No objection?

1              MS. LEVINSON:  No objection.

2              THE COURT:  Any objections to the defense

3    closing?

4              MR. BRESLOW:  No, Your Honor.

5              THE COURT:  All right.  So objections you want

6    to put on the record about the instructions?

7              MS. LEVINSON:  Yes.  I'm renewing my earlier

8    objection to subsequent intent or attempts to rectify

9    detrimental effect of a crime is not a defense charge.

10              THE COURT:  All right.  Very well.  For the same

11    reasons I articulated, I think it's appropriate in this

12    case.  I think it's a correct statement of the law.  All

13    right.  Anything else?

14              MS. LEVINSON:  Other than that, no.

15              THE COURT:  All right.  Thank you.  For the

16    government, any objections you want to place on the

17    record?

18              MR. BRESLOW:  For the instructions?

19              THE COURT:  Yes.

20              MR. BRESLOW:  No.  We had objected to the

21    immunity sentence but you know --

22              THE COURT:  So that objection stands.  Any

23    objections you made earlier will stand.

24              MR. BRESLOW:  We don't have any new

25    objections.

1          THE COURT:  Verdict form?

2          MS. LEVINSON:  No objection.

3          MR. BRESLOW:  I think it looks good.

4          THE COURT:  Okay.

5          MR. BRESLOW:  Will you be giving them the

6     redacted exhibit?  It was marked as a court exhibit.

7          THE COURT:  We will check before it all goes in.

8     That was giving a court exhibit number as opposed to a

9     defense or prosecution.

10          MR. BRESLOW:  What process do you want us to

11     take with respect to our exhibits, meaning do you want us

12     to confer with each other and deal with any objections

13     before they go back to the jury?

14          THE COURT:  Exactly, yes.  After we're finished

15     with the instructions and the jury retires, yes, have a

16     meeting with the two of you and Ms. Pelegano to organize

17     it and if there's any issue regarding the exhibits I'll

18     come out and deal with it.

19          MR. BRESLOW:  Can you just instruct the jury

20     that that's what's going to happen?

21          THE COURT:  Yes.

22     **(The jury entered at 12:52.)**

23          THE COURT:  Now during the break was everyone

24     able to comply with my instructions not to begin

25     discussion in any way, shape, or form about the case, to

1    avoid media exposure, and not try to access the case or do

2    any investigation by way of the internet or social media?

3                    THE JURY:  Yes, Your Honor.

4                    THE COURT:  All right.  The jury remains fair

5    and impartial.

6        All right.  Now ladies and gentlemen, I am about to

7    instruct you on the law as it applies to the specific

8    charges in this case and also on the general principles

9    that guide you as jurors in your deliberations.  All of

10   the instructions are equally important.  You shouldn't

11   give more or weight to one instruction over another

12   instruction.

13       If at any time you have a problem hearing me during

14   this charge raise your hand.  I'll probably give half of

15   them standing and then I'll move to the microphone.  Can

16   everyone hear me good now?

17                   THE JURY:  (Indicating.)

18                   THE COURT:  Now, you all have copies of the

19   complete instruction that I am going to be reading to you.

20   If you want to follow along, if you think that's going to

21   help you digest this material, then follow along.  If you

22   don't want to follow along, you don't have to.

23       You're going to be taking these jury instructions

24   back with you into the deliberation room to consult with,

25   to look at, to look at the elements, to look at what I

1    talk about so do want you want.  Don't think you need to

2    write down notes about everything I'm going to be

3    describing to you.  Okay?

4        Now as I read this sometimes in my reading I'll

5    paraphrase things or I'll skip a line or I might even add

6    a sentence or two to what is in here.  So if you think I'm

7    not reading it exactly the way it is, well, maybe I'm not

8    but what I'm telling you is still an instruction.  So if I

9    say something that's not written on this form, that still

10    is an instruction that you should be following.  All

11    right?

12        Before I give you your final instructions, I want to

13    remind you of something we discussed at the beginning of

14    this trial.  As jurors, it is your duty to decide from the

15    evidence what the facts are.  You should not take anything

16    I have said or done during the trial as indicating what I

17    think of the evidence or what the verdict should be.

18        You, and you alone, are the judges of the facts.  To

19    those facts, you must apply the law as I give it to you,

20    whether you agree with the law or not.  That is how you

21    will reach your verdict.

22        As you deliberate, you must keep in mind two

23    fundamental principles of our criminal justice system:

24        First, that the defendant is presumed innocent until

25    proven guilty.

1      Second, that the government has the burden of proving

2    the defendant guilty beyond a reasonable doubt.

3      Remember that each charge is to be considered

4    separately and independently.  Evidence relevant to one

5    charge may or may not be relevant to another.

6      The law permits nothing but legal evidence presented

7    before the jury to be considered in support of any charge

8    against an accused person.  The presumption of innocence

9    alone is sufficient to acquit Mr. Buffis unless you, the

10   jurors, are satisfied beyond a reasonable doubt of his

11   guilt after careful and impartial consideration of all of

12   the evidence in the case.  Jurors must always keep in mind

13   that a defendant is never to be convicted on mere

14   suspicion or conjecture.

15     The burden is always upon the government to prove the

16   defendant's guilt beyond a reasonable doubt and it never

17   shifts.  The law does not require a defendant to prove his

18   innocence or to produce any evidence.  The defendant has

19   the right to rely upon the failure or inability of the

20   government to establish beyond a reasonable doubt any

21   essential element of the crimes charged.

22     What is reasonable doubt?  It is a term often used,

23   probably pretty well understood, but not easily defined.

24   It is not mere possible doubt because everything relating

25   to human affairs, and depending on moral evidence, is open

1  to some possible or imaginary doubt.  It is that state of

2  the case which, after comparison and consideration of all

3  the evidence, leaves the minds of jurors in that condition

4  that they cannot say that they feel an abiding conviction,

5  to a moral certainty, of the truth of the charge.

6      It is not sufficient to establish a probability, even

7  a strong probability, that the defendant is more likely to

8  be guilty than not.  Instead, the evidence must establish

9  the truth of the charge to a reasonable and moral

10  certainty, a certainty that convinces and directs the

11  understanding and satisfies the reason and judgment of

12  those who are bound to act conscientiously upon it.  This

13  we take to be proof beyond a reasonable doubt.

14      As you deliberate, you must keep in mind. However,

15  that while the government's burden of proof is a heavy

16  one, my instruction should not be taken to mean that Mr.

17  Buffis's guilt must be proved beyond all possible doubt.

18      In sum, I instruct you that what the government must

19  do to meet its burden is to establish the truth of each

20  part or element of each offense charged by proof that

21  convinces you and leaves you with no reasonable doubt and

22  thus satisfies you that you can, consistent with your oath

23  as jurors, base your verdict upon it.

24      If you find as to a particular charge against Mr.

25  Buffis, you may return a verdict of guilty on that charge.

1    If, on the other hand, you find that there is a reasonable

2    doubt about whether he is guilty of a particular charge,

3    you must give him the benefit of that doubt and find him

4    not guilty of that charge.

5        What is evidence?  The evidence from which you are to

6    decide the facts in this case consists of sworn testimony

7    of the witnesses, both on direct and cross-examination,

8    regardless of who called the witnesses; the exhibits that

9    have been received into evidence, and any facts to which

10   the lawyers have agreed or stipulated.

11       A stipulation means simply that the government and

12   the defendant accept the truth of a particular proposition

13   or fact.  Since there is no disagreement, there is no need

14   for evidence apart from the stipulation.  You must accept

15   the stipulation as fact to be given whatever weight you

16   choose.

17       Some of the exhibits presented in this case summarize

18   underlying documents that may or may not have been

19   separately entered into evidence.  You should consider

20   these summaries as you would any other evidence.

21       During the trial you heard portions of recorded

22   conversations.  These recordings are proper evidence for

23   you to consider.  In some cases you were provided with

24   transcripts to assist you in understanding what was said

25   in a particular recording.  Those transcripts were not

evidence.  If you perceived there to be any variation between a recording and the transcript of that recording, you should be guided solely by what you heard with your own ears on the recording.

Although you may consider only the evidence presented in this case, you are not limited to only considering the plain statements made by the witness or contained in the documents.  In other words, you are not limited solely to what you see and hear as the witnesses testify.  You are permitted to draw reasonable inferences as you believe are justified in the light of common sense and personal experience.

An inference is simply a deduction or conclusion that may be drawn from the facts that you find have been proven.  Any inference you draw must be reasonable and based on the facts as you find them. Inferences may not be based on speculation or conjecture.

There are two kinds of evidence:  Direct and circumstantial.  Direct evidence is direct proof of a fact, such as testimony of an eyewitness that the witness saw something.  Direct evidence could be a simple assertion by someone, for example, that it's raining outside.

Circumstantial evidence is indirect evidence; that is, proof of a fact or facts from which you could draw an

inference, by reason and common sense, that another certain fact exists, even though it has not been proven directly.

Suppose that instead of having someone report to you that it was raining outside, someone came in wearing a wet raincoat or shaking water off from an umbrella.  The observer would have some direct evidence to consider, that direct evidence would be observing the raincoat and the umbrella.  Thinking about those pieces of direct evidence might lead the observer to draw a conclusion, or an inference, from an unobserved fact that it is raining outside.

You are entitled to consider both kinds of evidence, direct and circumstantial.  The law permits you to give equal weight to both types of evidence, but it's for you to decide how much weight to give any of it.

Circumstantial evidence alone may be sufficient to convict the defendant if it persuades you beyond a reasonable doubt that the defendant is guilty of the offenses charged.

What is not evidence?  Certain things are not evidence.  Arguments and statements by lawyers are not evidence.  The lawyers are not witnesses.  What they say in their opening statements, closing arguments, and at other times is intended to help you interpret the

1    evidence; however, it is not evidence.

2         If the facts as you remember them from the

3    presentation of the evidence differ from the way the

4    lawyers have stated them, then your memory of the evidence

5    controls.

6         Questions by the lawyers are not evidence.

7    Objections by the lawyers and what they say is based on

8    the objections are not evidence.  Lawyers have a duty to

9    their clients to object when they believe a question is

10   improper under the rules of evidence.

11        If I sustain an objection -- in other words, if I

12   agree with the lawyer who is objecting -- you must ignore

13   the question or exhibit and must not try to guess what the

14   answer might have been or what the exhibit might have

15   contained.

16        Any verbal or non-verbal conduct by any member of the

17   government's team appearing to be commentary or opinion

18   relative to testimony or any other aspect of this case is

19   not evidence.  This includes, but is not limited to, any

20   facial expressions, laughter, or audible conversations

21   from the prosecution table.

22        Anything you may have seen or heard when the court

23   was not in session is not evidence.  You are to decide the

24   case solely on the evidence received at trial.

25        Anything that I have excluded from evidence or

1   ordered stricken and instructed you to disregard is not

2   evidence.

3       Any evidence received for a limited purpose is not

4   evidence for any other purpose beside the limited purpose

5   that I indicated.  I am going to tell you what evidence

6   has been received in this case for a specific limited

7   purpose, and I'm going to tell you what that very specific

8   limited purpose is at a later time in this instruction.

9       Now, the indictment itself or a summary list of the

10  charges is not evidence.  You will be getting this summary

11  list of the charges with you when you go into the

12  deliberation room.  You have to understand that this

13  summary is not evidence.

14      A criminal case starts with an indictment which is

15  simply, and only, an accusation.  It is the procedural way

16  that the government brings allegations or charges before

17  the court.  I caution you that the fact that the defendant

18  had charges brought against him is no evidence whatsoever

19  of guilt.

20      You must decide this case solely upon the evidence.

21  Therefore, you must not be influenced by any personal

22  likes or dislikes, prejudice, or sympathy.  You may also

23  not consider or be influenced by any possible punishment

24  that may be imposed on the defendant or any possible

25  consequences of a conviction.

1    Your function is to weigh the evidence in this case

2    and determine whether the government has proved the

3    defendant's guilt beyond a reasonable doubt solely upon

4    the basis of the evidence.  Your verdict must be based

5    solely on the evidence and the law as I have given it to

6    you in these instructions.

7    As to the preparation of the witnesses, some mention

8    has been made of the preparation of witnesses who were

9    testifying.  There is really absolutely nothing wrong with

10   a lawyer preparing a witness to testify.  As a matter of

11   fact, if the lawyer did not do some preparation, this case

12   would have been longer than it has been.

13   It is to be expected that when an attorney puts a

14   witness on the stand for direct examination, he will have

15   met with that witness and know what the answers are going

16   to be most of the time; that is, assuming the witness is

17   even willing to talk to the lawyer ahead of time when the

18   lawyer is trying to prepare.

19   The fact that a witness met with an attorney prior to

20   that witness testifying before you, standing alone, should

21   not usually cause you to discredit the testimony of that

22   witness.  You may, however, consider the fact that a

23   witness was willing to meet, or not meet, with one side or

24   the other prior to the case in evaluating the witness's

25   testimony.  You may also consider whether any such meeting

did, in fact, influence the testimony of the witness.

The question of whether the government has met its burden of proof does not necessarily depend upon the number of witnesses it has called, the number of exhibits it has offered, or the number of times it repeated what you believe is the same evidence, but instead depends upon the nature and quality of the evidence presented.

You may choose not to accept the testimony of any witness if you find the witness not credible.  You must decide which witnesses to believe and which facts are true.  To do this, you must look at all the evidence, drawing upon your common sense and personal experience.

You may believe all of the testimony of a witness, some of what a witness says, or absolutely none of what a witness says.  You alone are the judges of the credibility of the witnesses.

In deciding whether to believe a witness's testimony, you may want to take into consideration such factors as the witness's conduct and demeanor while testifying; any apparent fairness or any bias they may have displayed; any interest or motive you may discern that they may have in the outcome of the case; any prejudice they may have shown; their opportunities for seeing and knowing the things about which they have testified; the reasonableness or unreasonableness of the events that they have related

1      to you in their testimony; and any other facts or

2      circumstances disclosed by the evidence that tend to

3      corroborate or contradict their versions of the events.

4          You have heard the testimony of Tara Viola and Thomas

5      Fusco as cooperating, what's called a cooperating witness.

6      They provided evidence under agreements with the

7      government and testified under a grant of immunity.

8          Immunity means that the United States has agreed not

9      to use Tara Viola and Thomas Fusco's testimony or any

10     other information they provided, directly or indirectly,

11     against them in any subsequent federal criminal

12     proceeding.

13         However, if they testified untruthfully, they could

14     be prosecuted for perjury or making a false statement even

15     though they were testifying under a grant of immunity.  No

16     state or local prosecutors were bound by this agreement.

17         The fact that the United States Attorney has provided

18     a grant of immunity does not indicate that the government

19     has any way of knowing that their testimony was, in fact,

20     actually truthful.  It is for you to determine if the

21     testimony of one or both of them is credible.

22         Some people in this position are entirely truthful

23     when testifying.  Still, you should consider the testimony

24     of Tara Viola and Thomas Fusco with greater care and

25     caution then you would for an ordinary witness.  They may

1    have had reason to make up stories or exaggerate what

2    others did because they wanted to help themselves.  You

3    must determine whether the testimony of such a witness has

4    been affected by any interest in the outcome of this case,

5    any prejudice for or against the defendant, or by any

6    benefits they have received from the government.

7        In a criminal case, as you have heard, a defendant

8    cannot be required to testify, but if he chooses to

9    testify, he is, of course, permitted to take the witness

10   stand on his own behalf.

11       In this case Mr. Buffis decided to testify.  You

12   should examine and evaluate his testimony just as you

13   would the testimony of any other witness.  You should not

14   discredit his testimony simply because he is charged as a

15   defendant.  You should not give his testimony more credit

16   based only on his decision to take the stand and testify.

17       Now, this next instruction is relative to proof of

18   prior acts for a limited purpose.  Remember, when I

19   started the instruction I said there will be some evidence

20   that you can consider only for a limited purpose and for

21   nothing beyond that limited purpose and so this is going

22   to be the explanation of that.

23       You have also heard testimony about the defendant's

24   involvement with and conduct related to the financial

25   functioning of the Lee Police Association fund.  That

1    testimony was offered for a very limited purpose in this

2    case.  Mr. Buffis is not charged with any crime related to

3    or connected with the Lee Police Association fund.  All

4    right?

5         Now Mr. Buffis is not charged with any crime related

6    to or connected with the Lee Police Association fund.  I

7    instruct you that any such evidence of the defendant's

8    alleged prior conduct in this regard with the Lee Police

9    Association fund may not be considered by you, the jury,

10   as a substitute for proof that the defendant committed the

11   acts he has actually been charged with in this case.  Nor

12   may you consider this evidence as proof that the defendant

13   has a criminal propensity or bad character.

14        Rather, you may consider this evidence solely as it

15   may bear on one or more of the following issues:

16   Opportunity, intent, preparation, plan, knowledge, absence

17   of mistake or lack of accident on the part of Mr. Buffis

18   in connection with the crimes charged by the government.

19        As I have instructed you, the government must prove

20   every essential element of the crimes that have been

21   actually charged against the defendant beyond a reasonable

22   doubt.

23        Before considering whether such evidence of the

24   defendant's alleged prior conduct may tend to demonstrate

25   opportunity, intent, preparation, plan, knowledge, absence

1    of mistake or lack of accident on the part of Mr. Buffis

2    with respect to the crimes charged, you must first be

3    convinced beyond a reasonable doubt that the alleged prior

4    conduct and the crimes charged in this case have

5    meaningful similarities.

6        Put another way, the government must prove to you

7    beyond a reasonable doubt that there is a distinctiveness

8    shared by the prior conduct and the conduct of the crimes

9    charged.

10       The distinctiveness must tend to prove that any

11   opportunity, intent, preparation, plan, knowledge, absence

12   of mistake or lack of accident on the part of Mr. Buffis

13   with respect to prior conduct is equally applicable with

14   respect to the crimes for which he's actually charged.  It

15   is not enough that there is some general, less than unique

16   or less than distinct, similarity between the incidents.

17       If you find the required unique or distinct

18   connection, then you may consider that evidence, along

19   with all the other evidence presented in this case, in

20   determining whether the government has proved the

21   defendant guilty beyond a reasonable doubt of the crimes

22   with which he is charged.

23       Finally, let me emphasize to you again that under no

24   circumstances are you, the jury, to consider or utilize

25   any evidence of the defendant's alleged prior conduct with

1    the Lee Police Association fund as any direct proof that

2    he committed the crimes with which he is now actually

3    charged.  That is not the purpose for which this evidence

4    has been offered, and it would be improper for you to

5    consider this evidence as any evidence that the defendant

6    had a bad character or as any evidence that he has a

7    propensity or likelihood to commit the crimes with which

8    he is presently charged.

9        Now, inconsistencies or discrepancies in the

10   testimony of a witness or between the testimony of

11   different witnesses may or may not cause you to disbelieve

12   or discredit such testimony.

13       Innocent misrecollection or inconsistent

14   recollection, like failure of recollection, is not an

15   uncommon experience.  Also, two or more persons witnessing

16   an event or a transaction may simply see or hear it

17   differently.

18       In weighing the effect of a discrepancy, always

19   consider whether it pertains to a matter of importance or

20   an insignificant detail and consider whether the

21   discrepancy results from an innocent error or intentional

22   falsehood.

23       As to statements of the defendant, you have heard

24   evidence that Mr. Buffis made statements in which the

25   government claims he admitted certain facts.  It is for

1    you to decide whether Mr. Buffis made the statements, and,

2    second, if so, how much weight to give any particular

3    statement.

4         It making these decisions, you should consider all of

5    the evidence about the statement, including the

6    circumstances under which the statement may have been made

7    and any facts or circumstances tending to corroborate or

8    contradict the version of events described in the

9    statements.

10        On the issue of consciousness of guilt, you have

11   heard assertions that Mr. Buffis made voluntary,

12   intentional, and knowing false statements when questioned

13   or appeared to have displayed certain nervous physical

14   responses when asked particular questions.

15        If the government has proved Mr. Buffis made such

16   false statements or displayed such particular physical

17   responses, you are permitted to consider whether such

18   actions indicate feelings of guilt by Mr. Buffis and

19   whether, in turn, such feelings of guilt might tend to

20   show actual guilt on one or more of these charges.  You

21   are not required to draw such inferences and you should

22   not do so unless they appear to be reasonable in light of

23   all the circumstances in this case.

24        If you decide that such inferences are reasonable, it

25   will be up to you to decide how much importance to give

1    them.  However, you should always remember there may be

2    numerous reasons why an innocent person might do such

3    things or appear nervous.  Such conduct does not

4    necessarily reflect feelings of guilt.

5        Please also bear in mind that a person having

6    feelings of guilt or feelings of nervousness is not

7    necessarily guilty in fact, for such feelings are

8    sometimes found in innocent people.

9        Finally, remember that, standing alone, such evidence

10   is never enough by itself to convict a person of a crime.

11   You may not find Mr. Buffis guilty of such evidence of

12   consciousness of guilt alone, but you may consider it in

13   your deliberations along with all the other evidence.

14       As to variance in any dates, you will note that the

15   verdict form states that the offenses in question may have

16   occurred -- I'm quoting now -- "on or about" certain

17   specific dates.

18       It does not matter if the form indicates that

19   specific acts occurred in or around a certain date and the

20   evidence indicates that, in fact, it was another date.

21   The law only requires any variance between the dates

22   alleged and the dates established by the testimony or

23   exhibits to be reasonable.  Whether a variance is, in

24   fact, reasonable will be determined by the court.  As you

25   deliberate, you may assume any variance in this case is

reasonable.

As to summaries of evidence, during this trial you have seen some exhibits which are in the form of summaries presented by the government.  The law permits summarizing evidence as a convenience to the jury, but summaries do not produce any new evidence.  The summaries simply attempt to summarize what is elsewhere in the evidence when there are a large number of documents in a case.

Such summaries are not independent evidence of the subject matter and are only as valid and reliable as the underlying evidence they summarize.  So it is up to you to decide whether the summaries accurately, completely, and objectively reflect the content of the underlying documents.  You are free to discard them.  It is up to you.

You should make the evaluation based on what you have heard or how they are prepared, who prepared them, what considerations went into the preparation of them and so forth, and they are subject to your criticism and judgment just as any other piece of evidence is.

We're going to be now turning more directly to the specific crimes charged.  Now as to proof of knowledge, willfulness and intent, you will hear reference now throughout these instructions as to whether the government has proven beyond a reasonable doubt that the defendant

1    committed certain acts knowingly, or knew, willfully, or

2    intentionally.

3        So as I go through the crimes -- when I finish this

4    instruction we'll start going through the crime separately

5    and you're going to hear some of the elements of each

6    crime, words to the effect that the government is required

7    to prove Mr. Buffis knew something or knowingly did

8    something or acted willfully, and so these are the

9    definitions of those terms that you can flip back to and

10   look so you're sure you understand what you need to find

11   in this case.

12       A person acts "knowingly" or "knew" if the person is

13   conscious and aware of their actions, realizes what they

14   are doing or what was happening around them.  If a person

15   acts because of ignorance, mistake, or accident, the

16   person has not acted knowingly.

17       You may infer, but you are certainly not required to

18   infer, that a person intends the natural and probable

19   consequences of acts knowingly done or knowingly omitted.

20       An act or failure to act is "willful" if done

21   voluntarily, intentionally, and intelligently with the

22   specific intent to do something the law forbids, or with

23   specific intent to fail to do something that the law

24   requires to be done; that is to say, with bad purpose

25   either to disobey or disregard the law, not by accident,

1    ignorance, or mistake.

2         If an element of a crime is willful conduct, a

3    defendant cannot be convicted of that crime if he honestly

4    acted in good faith.  A person acts in good faith if the

5    person acts on the basis of a belief or opinion honestly

6    held, even if the belief or opinion turns out to be wrong.

7         Now to act "with intent" or "intentional" refers to a

8    mental condition or state of mind; that is, the state of

9    mind with which an act is intended to be done or failed to

10   be done.

11        All of these terms concern the defendant's state of

12   mind.  Because there is no way of directly scrutinizing

13   the workings of the human mind, it is frequently necessary

14   to resort to circumstantial evidence to decide whether

15   something is done knowingly, willfully, or intentionally.

16        In reaching your decision, you may consider the

17   actions of the defendant, what he said or did, all of the

18   facts and all of the circumstances surrounding his conduct

19   and any reasonable inferences to be drawn from those facts

20   and circumstances.

21        It is entirely up to you, however, to decide what

22   facts are proven by the evidence received during this

23   trial.  The burden to prove an act was done knowingly,

24   willfully, or intentionally, as with all other elements of

25   a crime, rests with the government.

1    You may infer, but are not required to do so, that a

2    person intends the natural and probable consequences of

3    acts knowingly done or knowingly admitted or -- sorry.  I

4    see a typo in there, but knowingly done or knowingly

5    omitted.

6    Now as to the crime charged that is extortion, Joseph

7    Buffis is charged with one count of extortion.  For you to

8    find Mr. Buffis guilty of extortion, you must be convinced

9    that the government has proven each of the following

10   things beyond a reasonable doubt:

11   First, that on or about February 21, 2012, Mr. Buffis

12   knowingly and willfully obtained property from Tara Viola

13   and Thomas Fusco.

14   Second, that Joseph Buffis did so by means of either

15   extortion by fear or extortion under color of official

16   right, or by means of both.

17   Third, that the extortion affected interstate

18   commerce.

19   The term "interstate commerce" means commerce between

20   any point in a state and any point outside the state.  It

21   is only necessary that the government prove beyond a

22   reasonable doubt that there is a realistic probability

23   that the acts committed by Mr. Buffis as charged in the

24   indictment had some slight or minimal effect on interstate

25   commerce.

1       It is not necessary to you to find that Mr. Buffis

2    knew or intended that his actions would affect interstate

3    commerce.

4       Extortion:  Extortion means obtaining property from

5    another with his or her consent through either the

6    wrongful use of fear or under color of official right.

7    The government can prove extortion by proving Mr. Buffis

8    committed either type of extortion.  It is not necessary

9    for the government to prove both types.

10      To prove extortion by fear, the government must show

11   (1), that the alleged victim believed that economic loss

12   would result from failing to comply with Mr. Buffis's

13   demands, and (2), that the circumstances made the fear

14   reasonable.

15      Economic loss may include the possibility of lost

16   business opportunities.  But the loss feared must be a

17   particular economic loss, not merely the loss of a

18   potential benefit.

19      To prove extortion under color of official right, the

20   government must show that Mr. Buffis was a public official

21   and he received a payment that he was not entitled to

22   receive with knowledge that the payment was provided to

23   him in exchange for some official act.

24      It is not necessary for the government to show that

25   Mr. Buffis made any specific request or demand for money

or acted in a particular way in order to induce Tara Viola
or Thomas Fusco to pay the money.  Passive acceptance of a
benefit by a public official is sufficient if the official
knows that he is being offered or tendered the payment in
exchange for the exercise of his official power.

To the charge of wire fraud, Joseph Buffis is charged
with three counts of violating the federal statute making
wire fraud illegal.  The charges relate to transactions
occurring on the following dates:  November 16, 2009,
November 28, 2010, and December 2, 2011.

For you to find Mr. Buffis guilty of wire fraud, you
must be convinced that the government has proven each of
the following things beyond a reasonable doubt:

First, that there was a scheme, substantially as
charged in the indictment, to defraud or to obtain money
or property by means of false or fraudulent pretenses.

Second, that the scheme to defraud involved the
misrepresentation or concealment of a material fact or
matter or the scheme to obtain money or property by means
of fraud or fraudulent pretenses involved a false
statement, assertion, half-truth or knowing concealment
concerning a material fact or matter.

Third, that Mr. Buffis knowingly and willfully
participated in this scheme with the intent to defraud.

Fourth, that for the purpose of executing the scheme

1    or in furtherance of the scheme, Mr. Buffis caused an

2    interstate wire communication to be used, or it was

3    reasonably foreseeable that for the purposes of executing

4    the scheme or in furtherance of the scheme an interstate

5    wire communication would be used on or about the date

6    alleged.

7        A scheme includes any plan, pattern, or course of

8    action.  It is not necessary that the government prove all

9    the details alleged in the indictment concerning the

10   precise nature and purpose of the scheme, or that the

11   alleged scheme actually succeeded in defrauding anyone.

12   But the government must prove beyond a reasonable doubt

13   that the scheme was substantially as charged in the

14   indictment.

15       The term "defraud" means to deceive another in order

16   to obtain money or property.  The term "false or

17   fraudulent pretenses" means any false statements or

18   assertions that were either known to be untrue when made

19   or were made with reckless indifference to the truth and

20   that were made with the intent to defraud.  The term

21   includes actual, direct false statements as well as

22   half-truths and the knowing concealment of facts.

23       A "material" fact or matter is one that has a natural

24   tendency to influence or be capable of influencing the

25   decision of the decisionmaker to whom it was addressed.

An "interstate wire communication" includes a telephone or facsimile communication from one state to another, an e-mail transaction, or internet communication. The term also includes a wire transfer of funds between financial institutions. An intrastate communication that results in an interstate communication will suffice to satisfy the interstate nexus so long as the interstate communication was reasonably foreseeable by Mr. Buffis.

The wire communication does not itself have to be essential to the scheme, but it must have been made for the purpose of carrying it out. There is no requirement that Mr. Buffis himself was responsible for the wire communication; that the wire communication itself was fraudulent, or that the use of the wire communications facilities in interstate commerce was intended as the specific or exclusive means of accomplishing the alleged fraud. But the government must prove beyond a reasonable doubt that Mr. Buffis knew, or could reasonably have foreseen, that the use of a wire communication would follow in the course of the scheme.

Now as to the charges of money laundering, Joseph Buffis is charged with seven counts of violating that portion of the federal money laundering statute that prohibits concealment of certain unlawful activities.

The charges relate to transactions occurring on the

following dates:  December 16, 2011, January 4, 2012,
January 5, 2012, January 11, 2012, February 23, 2012,
February 27, 2012, and March 20, 2012.

For Mr. Buffis to be convicted of this crime, you
must be convinced that the government has proven each of
the following things beyond a reasonable doubt:

First, that Mr. Buffis entered into a financial
transaction, on or about the date alleged, with a
financial institution engaged in interstate commerce.

Second, that the transaction involved the use of the
proceeds of unlawful activities, specifically proceeds of
the extortion or wire fraud.

Third, that Mr. Buffis knew that these were the
proceeds of some kind of crime that amounts to a state or
federal felony; and fourth, that Mr. Buffis knew that the
transaction or transactions were designed, in whole or in
part, to conceal the nature, the location, source,
ownership or control of the proceeds of the specified
unlawful activity.

A withdrawal, deposit, or transfer of funds from a
bank is a financial transaction.  A financial institution
is engaged in interstate commerce if its business
activities involve people or businesses in at least two
states.  An FDIC-insured bank is engaged in interstate
commerce.

1        "Concealment" means that at least one purpose for the

2    transaction was to conceal or disguise the illegal origin

3    of assets.  It is not necessary for the government to show

4    that Mr. Buffis concealed his own identity during the

5    transaction.

6        The government may prove concealment through direct

7    evidence, like a defendant's own statements, or by

8    circumstantial evidence, like the steps a defendant took

9    to disguise a transaction.

10       If you find the defendant commingled proceeds of

11   extortion or fraud with other funds, you may infer but are

12   not required to do so, that he intended to conceal the

13   true source of the money.

14       Finally, you may find concealment even if a

15   particular transaction is not concealed, provided you have

16   found it to have been part of a larger scheme to conceal

17   or disguise the illegal origin of assets.

18       "Proceeds" means any profits that someone acquires or

19   retains as a result of the commission of the unlawful

20   activity.  Where proceeds of extortion are commingled with

21   other money, the government does not need to trace the

22   specific money constituting criminal proceeds.

23       In other words, the government does not need to show

24   that the funds withdrawn from Mr. Buffis's account could

25   not possibly have come from any other source other than

extortion or fraud.

Now, if you find that the government has proved all the elements of a crime beyond a reasonable doubt, you should find Mr. Buffis guilty of that crime.

A crime is complete when the elements of that crime have been satisfied beyond a reasonable doubt and, therefore, if a person takes any subsequent steps, successfully or unsuccessfully, to rectify the detriment effect of that crime, it is completely irrelevant to your decision.  For example, returning an item that was stolen is not a defense if all the elements of the theft have been proven.

Your verdict must be based solely on the evidence and on the law as I have given it to you in these instructions.  However -- again I'm saying this several times -- however, nothing that I have said or done is intended to suggest what your verdict should be; that decision is entirely up to you.

Now as we come to a close, I'll explain to you how the deliberations will take place.  The last part of the instructions deal with your deliberations.

When you retire you will discuss the case with the other jurors to reach agreement if you can do so.  As your first order of business, you should select a foreperson. You shall permit the foreperson to organize and preside

1   over your deliberations, and your foreperson will speak

2   for you in court.

3        The opinion of the foreperson, relative to the

4   verdict, has no more weight than that of any of the other

5   jurors.  If your decision on a particular count requires

6   specification as to the theory or theories you found, the

7   jury must also be unanimous as to such finding on a

8   particular theory that is laid out in the verdict form.

9        Your foreperson will write the unanimous answer of

10   the jury in the space provided opposite each question or

11   space on the verdict form and then will date and sign the

12   special verdict form when completed.

13        When you have reached unanimous agreement as to each

14   question on the special verdict form, you will have your

15   foreperson fill it in, date, and sign the form at the

16   bottom of the last page.  After completing the verdict

17   form, you will return to the courtroom and render your

18   verdict to the court.  There will be an officer seated

19   outside your jury room.  You'll notify that officer and

20   you will hand over the verdict form to the clerk.  Ms.

21   Pelegano will take that from you.

22        As to reaching agreement, each of you must decide the

23   case for yourself, but you should do so only after

24   considering all the evidence, discussing it fully with the

25   other jurors, and listening to the views of the other

1    jurors.

2        Do not be afraid to change your opinion if you think

3    you are wrong, but do not come to a decision simply

4    because other jurors think it is right.

5        If it looks at some point as if you may have

6    difficulty in reaching a unanimous verdict, and if the

7    greater number of you are agreed on a verdict, the jurors

8    in both the majority and the minority should reexamine

9    their positions to see whether they have given careful

10   consideration and sufficient weight to the evidence that

11   has favorably impressed the jurors who disagree with them.

12       You should not hesitate to reconsider your views from

13   time to time and to change them if you are persuaded that

14   that is appropriate.  It is important that you attempt to

15   return a verdict, but, of course, only if each of you can

16   do so after having made your own conscientious

17   determination.  Do not surrender an honest conviction as

18   to the weight and effect of the evidence simply to reach a

19   verdict.

20       If it becomes necessary during your deliberations to

21   communicate with me, you may send a note through the jury

22   officer signed by your foreperson or by one or more

23   members of the jury.

24       No member of the jury should ever attempt to

25   communicate with me on anything concerning the case,

1    except by way of a signed writing, and I will communicate

2    with any member of the jury on anything concerning the

3    case again only in writing or I will speak to you if it is

4    here in open court.

5         So if you have a note or a question, you can give it

6    to the officer outside the door.  Generally I speak with

7    the attorneys about what the question is and I can respond

8    back in writing or I'll bring you all back in court and

9    we'll talk about it in open court on the record.

10        Remember that you are not to tell anyone, including

11   me, how the verdict stands, numerically or otherwise,

12   until after you have reached a unanimous verdict or have

13   been discharged.

14        Now as to the verdict form, after you have reached

15   unanimous agreement on your verdict, your foreperson will

16   fill in the form, date it, and sign it as I have

17   explained.

18        Now you're not going to be able to read this from

19   where you're seated but you'll give a sense of the

20   outline.  I'm holding up the verdict form.

21        Now the verdict form you follow in order.  You don't

22   skip ahead.  It has to start at the beginning, and there

23   will be a space for you to place a check box next to your

24   appropriate verdict.

25        There will also be check boxes.  As I said in the

1    instructions, if you select a certain verdict it is

2    required for you to identify a specific theory under which

3    you found that verdict.  So there will be appropriate

4    check boxes next to each theory.  Now remember on each

5    theory, for you to find a theory, you have be to unanimous

6    on that theory.

7        Now, at the end of some of the questions -- at the

8    end of the some counts, the verdict form is broken down by

9    counts, Count one, then two, three, four so follow in

10    order.  At the end of some of the counts there is an

11    instruction part.

12        The instruction part simply reads that if you

13    answered one way on that last question, then you move to

14    questions two, three, four, et cetera.  But the

15    instruction will tell you if you answered another way on

16    that first question, then you should skip two, three,

17    four, and move on.  It will tell you what number to move

18    on so follow the instruction at the end of each count on

19    the verdict form.  If you have any confusion at all on

20    this, read it again.  (Laughter)

21            THE COURT:  And then if there is a question,

22    simply put it a note and we'll come back and go through

23    it.  All right?

24        Now members of the jury, it is now time for this case

25    to be submitted to you.  I will submit to you as I told

1   you a written copy of the jury instructions.  All of you

2   who are on the jury must be together at all times when

3   you're deliberating.

4       Whenever you need a recess for any purpose, your

5   foreperson may declare a recess.  So if you just need a

6   break, someone needs to take a walk, the deliberations

7   stop.  You can't have discussions of the case unless

8   everyone is there.  So don't discuss the case during any

9   recess in your deliberations.  All of your discussions of

10   the case should occur only when you are all together and

11   your foreperson has indicated deliberations may proceed.

12       All right.  This should be your procedure so that

13   everyone in the jury has the equal opportunity to

14   participate and to hear all of what the other members of

15   the jury have to say.

16       The exhibits, all the exhibits and those documents,

17   everything that came into evidence that we told you you

18   will be seeing, there's a procedure at the end of every

19   trial where the attorneys and the clerk and myself make

20   sure everything is organized, everything we think is here

21   is here and correctly identified with the right letter or

22   number.  As soon as we get all that organized, it will be

23   brought into you.  All right.

24       Now, at this point the clerk is going to name the

25   alternates.  Now, in a case like this, alternates are

1    going to be chosen.  I think we discussed this a little

2    bit at the beginning of the trial.  The alternates are

3    there in case someone becomes ill or gets sick or for some

4    reason can't be here and has to drop out of the

5    deliberations, the alternate will then take their space.

6        The difficulty at this point when we name the

7    alternates, especially in a trial like this, is that you

8    just -- I feel bad telling the alternates, well, you're

9    not sitting in the deliberations.  It's been so obvious

10   how much attention all of you have paid to this case.  All

11   right.

12       The role of the alternates are extremely important.

13   We need alternates to make sure that we would have enough

14   members because it's required under the law that there be

15   a certain number of jurors deliberate and reach a

16   unanimous verdict.

17       Ms. Pelegano, can you name the alternates?  The

18   alternates will just step to the side and Ms. Pelegano

19   will take you to a separate room.

20            THE CLERK:  It's the last three jurors, Juror

21   No. 13, Juror No. 14, and Juror No. 15.

22            THE COURT:  So to the extent that's bad news,

23   that's why I have someone else deliver it.

24   (Laughter)

25            THE COURT:  All right.  I'm going to see the

1   attorneys at sidebar.

2   (Sidebar conference.)

3           THE COURT:  I am told by legal minds greater

4   than mine that objections should be -- I should ask you

5   now about objections after completing the charge.  So can

6   you just make a record of what your objections were?

7           MS. LEVINSON:  I object to the charge on

8   subsequent intent or attempts to rectify detrimental

9   effect of a crime is not a defense.

10          THE COURT:  All right.  I heard the objection

11  and I'm overruling the objection.

12          MR. BRESLOW:  We object to that line of the

13  immunity agreement regarding whether the government knows

14  or not.

15          THE COURT:  Okay.

16          MR. BRESLOW:  I don't think this is an

17  objection, it's more of a correction.  I think that this

18  is mistaken.

19          MS. LEVINSON:  Which is what?

20          MR. BRESLOW:  Circumstantial and direct

21  evidence.  I think you -- I think the point is that the

22  observations of the wet raincoat and a dripping umbrella

23  are circumstantial evidence that it was raining.

24          THE COURT:  The observations of the wet raincoat

25  and dripping umbrella would lead you to circumstantial

1    evidence.

2              MR. BRESLOW:  Well, circumstantial evidence is

3    indirect evidence of the facts, so I mean --

4              THE COURT:  I see what you're saying.  It might

5    be a little confusing.  I don't think so given the

6    instructions as a whole.

7              MR. BRESLOW:  I don't think it matters.

8              THE COURT:  I'll take a look at that for the

9    future.

10             MR. BRESLOW:  That's all.

11             THE COURT:  Anything else?

12             MS. SHUKLA:  No.

13             THE COURT:  I'm overruling the objection as to

14   the language in the cooperation agreement portion of the

15   instructions.  All right?

16             MS. LEVINSON:  All right.

17             THE COURT:  So I'll discharge the jury and you

18   can go through the exhibits.

19             MS. SHUKLA:  Do you instruct the alternates not

20   to deliberate because they may be needed later?

21             THE COURT:  I will.

22             MS. SHUKLA:  Thank you.

23   (End of sidebar conference.)

24             THE COURT:  All right.  So you're going to be

25   discharged now to begin your deliberations.  Let me say to

1    the alternates when you are now in a separate room,

2    separated from everyone else, do not begin your own

3    deliberations.

4        So the alternates should not start discussing the

5    case with the other alternates in the room.  The reason

6    being if an alternate is called upon to go and start

7    deliberating with the rest of the jury, deliberations have

8    to start new.  All right.  They have to start fresh from

9    the beginning and be unaffected by any deliberations that

10   the alternates might be engaged in on their own.  So for

11   you the rule still applies, don't discuss the case,

12   communicate about the case.  All right?

13       So, ladies and gentlemen, you can retire to your jury

14   deliberation room.

15               A JUROR:  Do we take our book?

16               THE COURT:  You can take your notes; you can

17   take your instructions with you.  All right.

18       Were the transcripts admitted in evidence?

19               MR. BRESLOW:  They were.

20               THE COURT:  Yeah.  You can take them.

21               MR. BRESLOW:  They will have the original

22   versions as well.

23               THE COURT:  All right.

24               A JURY:  Do I leave my stuff here since I can't

25   do anything?

```
1              THE CLERK:  That's totally up to you.

2              THE COURT:  For the alternates, just leave your

3     things on your seat.  If you need them, we'll come get

4     them for you.

5     (The jury left at 1:59.)

6     (A person approached sidebar.)

7              THE COURT:  Hi.  You're Ms.?

8              MS. WRIGHT:  Julie Wright.

9              THE COURT:  I'm Mark Mastroianni as you know,

10    the judge.

11             MS. WRIGHT:  I do.

12             THE COURT:  It's been brought to my attention

13    that someone from the marshal's office may have already

14    talked to you, a security guard may have talked to you

15    about your camera or phone.

16             MS. WRIGHT:  An iPhone.

17             THE COURT:  There was a concern that some jurors

18    were captured in a photograph.

19             MS. WRIGHT:  I didn't know.  I just --

20             THE COURT:  I understand.

21             MS. WRIGHT:  We deleted everything, so.

22             THE COURT:  Here's what I just need to ask you

23    to make sure.  On the setup of your phone, do pictures go

24    to a cloud?

25             MS. WRIGHT:  Yes, they might still be.
```

```
 1              THE COURT:  Go on your laptop and then if
 2    they're all shared, if it's an iPhone or iPad, whatever
 3    you use --
 4              MS. WRIGHT:  They're not on my phone or
 5    computer.
 6              THE COURT:  I need to reinforce what you already
 7    know, and that is that there cannot be photographs of the
 8    jurors taken or floating out there so we have to make
 9    every effort to work with you to try to make sure those
10    photos are destroyed.
11         I'm going to ask that the marshals and Ms. Pelegano
12    talk to you and make sure you've checked your hard drive
13    or the cloud and whatever needs to be done to make sure
14    that there are no photographs --
15              MS. WRIGHT:  Sure.
16              THE COURT:  -- of the jurors.
17              MS. WRIGHT:  Sure.
18              THE COURT:  All right.  Great.  You can take
19    care of that?
20              A MARSHAL:  I can, Your Honor.
21              THE COURT:  Can you please make the same inquiry
22    regarding any portraits or sketching of jurors?
23              A MARSHAL:  Yes.  Report back to the court?
24              THE COURT:  Yes.  Thank you.
25              A MARSHAL:  Thank you.
```

1    (End of sidebar conference.)

2    **(A recess was taken at 2:07 until 4:33.)**

3              THE COURT:  Okay.  Everyone can be seated.

4        We are going to end for the day.  We will be back

5    tomorrow, meet at the same time, go to the same locations.

6         Theresa, the alternates will go to the same location?

7              THE CLERK:  We'll try to put them in a nicer

8    deliberation room tomorrow.

9              THE COURT:  A nicer deliberation room?

10             THE CLERK:  Yes.

11             THE COURT:  In the morning?

12             THE CLERK:  In the morning they gather in the

13   same place.

14             THE COURT:  In the morning everyone will gather

15   in the same place and then what will happen is before --

16   don't just come here in the morning and start your

17   deliberations like that.  We have to bring you in court

18   first when all the parities will be here.

19        I'll ask you the questions if you've complied with my

20   instruction and then we'll have that on the record and

21   then you'll start your deliberations for the day.  Just

22   meet here and we'll bring you in court and then you will

23   start your deliberations.

24        Now the instructions are just about the same because

25   you've started deliberating and discussing the case with

1   each other, but you cannot discuss the case with other

2   people still.  You're obviously now thinking about the

3   case but any communication can only be with other jurors

4   during times you are officially deliberating.

5       So the instructions are do not discuss the case or

6   discuss anything about the case with anyone this evening.

7   Do not allow yourself to be exposed to any media coverage

8   about the case.  Don't go on social media; don't do any

9   internet investigation about the case.  All right?

10      So we are done for the day.  We will resume

11  deliberations.  I will see you tomorrow morning and do not

12  begin talking about the case until you are in court first.

13  All right?

14              THE JURY:  Okay.

15              THE COURT:  Thank you.

16  **(The jury left at 4:37.)**

17              THE COURT:  All right.  If there's anything, we

18  will see you all in the morning.

19              MR. BRESLOW:  Nine o'clock?

20              THE COURT:  Well, I mean, just as usual, I

21  imagine by the time everyone gets rounded up we will

22  coming in here between 9:10 and 9:20, somewhere between

23  that and then we'll send them out.  So, yeah, be here at

24  nine o'clock.  All right?

25              MR. BRESLOW:  Okay.

1          MS. LEVINSON:   Thank you.

2          MR. BRESLOW:  Have a good evening.

3          THE COURT:   Thank you.

4     **(Court recessed at 4:39.)**

5

6               C E R T I F I C A T E

7

8      I, Alice Moran, RMR, RPR, CSR, Official Court

9     Reporter for the United States District Court for the

10    District of Massachusetts, do hereby certify that the

11    foregoing transcript constitutes, to the best of my skill

12    and ability, a true and accurate transcription of my

13    stenotype notes taken in the above-entitled matter.

14

15    Date:   September 28, 2016

16

17    /s/ Alice Moran

18    _____
      Alice Moran
19    Offical Court Reporter

20

21

22              Alice Moran, CSR, RPR, RMR
                  Official Court Reporter
23             300 State Street, Room 303D
                   Springfield, MA 01105
24                   413-731-0086
                 alice.moran@verizon.net
25