```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2                          WESTERN SECTION

 3

 4
                                      )
 5                                    )
        United States of America   )
 6                                    )          13cr30028-MGM
             vs                       )
 7                                    )
        Jospeh Buffis                 )
 8     _____)

 9

10            Before The Honorable Mark G. Mastroianni
                  United States District Court Judge
11                  Sentencing Hearing Held on
                         May 17, 2016.

12

13

14
        APPEARANCES:
15

16     For the government:  Steven H. Breslow and Deepika Shukla,
        Assistant United States Attorneys, 300 State Street, Suite
17     230, Springfield, MA 01105-2926.

18

19     For the defendant: Lori Levinson, Esq., 500 Main Street,
        Suite 2, Great Barrington, MA 01230.

20

21

22                      Alice Moran, CSR, RPR, RMR
                          Official Federal Court Reporter
23                       300 State Street, Room 303D
                            Springfield, MA 01105
24                            (413)731-0086
                          alice.moran@verizon.net
25
```

1    **(Hearing commenced at 9:38.)**

2    **(The defendant is present.)**

3            THE CLERK:   The matter before the court, U.S.A.

4    versus Joseph Buffis Docket No. 13-30028.

5        Counsel, please identify yourself for the record.

6            MR. BRESLOW:   Steven Breslow for the United

7    States.   Good morning, Your Honor.

8            THE COURT:   Good morning.

9            MS. SHUKLA:   Deepkia Shukla for the United

10   States.

11           THE COURT:   Good morning.

12           MS. LEVINSON:   Lori Levinson for Mr. Buffis.

13   Good morning, Your Honor.

14           THE COURT:   Good morning.   Mr. Buffis is

15   present.

16           THE DEFENDANT:   Good morning, Your Honor.

17           THE COURT:   Everyone can be seated.   All right.

18       Let's start this sentencing by just indicating the

19   materials that I have reviewed.   So I have reviewed the

20   government's submission for sentencing, along with its

21   attachments which include letters from the Lee Police

22   Department staff, Chief Roosa, a Tracy Dunn, e-mails,

23   e-mail correspondence to the office regarding restitution

24   or monies being sought by Ms. Viola and Mr. Fusco, and a

25   letter from Edward Laboy or Labey, I'm not sure how you

1    spell the last name, which came in last night by a fax.

2        I have reviewed the defendant's sentencing memorandum

3    as well as all the attachments, and there are quite a few

4    letters.  To avoid going through all the names, there was

5    33 letters, is that correct, Ms. Levinson?

6            MS. LEVINSON:  I thought --

7            THE COURT:  There was one letter from a Ms.

8    Young that was submitted three times, but it was the same

9    letter.

10            MS. LEVINSON:  So I counted wrong so you're

11    right.

12            THE COURT:  All right.  So I have 33 letters,

13    and I guess just to make the record clear I'll run through

14    the names so we have it:  Joseph Buffis, Janet Buffis,

15    Kaila Merchant, Gabrielle Merchant, Susan Wheeler, Erin

16    Sullivan, David Dickhaus, Peter and Sheila Coughlin, Budd

17    Brown, Ralph and Susan Olds, Deacon Robert Esposito,

18    Bonnie Kelly, Daniel Soules, Michael Deep, Nina McDermott,

19    William Abderhalden, Daniel Keegan, Margaret Thomas, James

20    and Gail Morrison, Janice Castegnaro Braim, Patrick

21    Carnevale, Karen and Dean Hutson, Catherine Leonard, Donna

22    and John Quallen, Ryan Williams, Teresa Bragdon, Mark and

23    Debora Lange, Caroline Meyer Young, which is the one for

24    some reason I had multiple copies of, Bernice Martin, Tina

25    and Laura Naughton, Kathie and Daniel Swift, Mary

1    McGinnis, and Marie and Patrick Gormalley.

2         I'll ask if that includes all the letters?

3              MS. LEVINSON:  Yes, Your Honor, it does.

4              THE COURT:  All right.  So obviously I thank

5    both parties for their well done submissions, the

6    government and the defense.  I have reviewed those

7    completely and thoughtfully, and then reviewed them

8    multiple times because I think there was good information

9    in each of those that needed to be considered and then

10   reconsidered.

11        I have obviously reviewed the presentence report.  I

12   have reviewed the presentence report just like the

13   sentencing memorandums multiple times on multiple levels,

14   and I have reviewed that to give me both the history of

15   Mr. Buffis, a case overview, and consideration of all the

16   conduct that the presentence report wrote on.

17        Also, of course, the presentence report calculated

18   the advisory Sentencing Guidelines, which took me some

19   time to go through the calculation and analyze and assess

20   the calculation under the challenge of the objections that

21   were filed, so I did that as well and we will go through

22   each objection one by one.

23        Now at this sentencing hearing obviously for the

24   defense, Ms. Levinson will have the right to be heard.

25   Mr. Buffis, you have submitted a letter but you also have

1    the right, if you want, to say anything additionally in

2    court if you choose --

3              THE DEFENDANT:   Thank you.

4              THE COURT:   -- to do so.   I will tell you that

5    right now.

6              THE DEFENDANT:   Thank you.

7              THE COURT:   The first issue that needs

8    resolution I think, and I welcome the parties to correct

9    me or point me in another direction if you think other

10   matters need to be resolved first, but I think the first

11   matter that should be resolved is the defendant's motion

12   to exclude from consideration at sentencing the

13   government's proffered victim-impact statements.

14        All right.   I'll hear you on that.

15             MS. LEVINSON:   Thank you, Your Honor.

16        Under the Crime Victims Act the parties who submitted

17   the letters that the government included with their

18   sentencing memorandum are not victims who should have a

19   voice at sentencing.

20        These are people who perhaps feel personally affected

21   in some way or another or have personal opinions about Mr.

22   Buffis, but under the law they are not cognizable as crime

23   victims.   There are only two "crime victims" for the count

24   of conviction and those two victims are Tara Viola and

25   Thomas Fusco.   Neither of whom opted to submit letters or

1    to appear at sentencing under the Crime Victims Act to

2    address this court as victims of the crime.

3        So I understand completely the government's argument

4    that under sentencing law Your Honor is permitted to take

5    into account many, many facts and circumstances, and

6    obviously you can take into account what kind of impact

7    this conviction may or may not have had on individuals,

8    but to give these people standing as crime victims is not

9    correct under the law and they should not be heard by this

10   court as crime victims.

11           THE COURT:  So you're referring to the Lee

12   Police Department's staff letter signed by multiple --

13           MS. LEVINSON:  Yes.

14           THE COURT:  -- individuals from that office?

15   Chief Roosa and Tracy Dun is who you're talking about,

16   right?

17           MS. LEVINSON:  Yes.

18           THE COURT:  Those three?

19           MS. LEVINSON:  And also that last letter that we

20   all received last night.  The first copy that I got wasn't

21   signed.

22           THE COURT:  Me too, it wasn't signed.  I'm not

23   sure the government really meant to put that into their

24   package or if someone just mailed that to the court.

25           MR. BRESLOW:  Your Honor, we did not file that.

1    I think that was sent directly to the court and filed by

2    the court, by the court staff.  We only realized it when

3    we saw it on the docket.  We did not solicit the letter,

4    nor did we submit it to the court.

5            THE COURT:  I agree.  It didn't seem like the

6    government solicited that letter and would have that

7    letter in there.  That letter seemed more of the nature of

8    a member of the community --

9            MS. LEVINSON:  Correct.

10           THE COURT:  -- expressing to the court their

11   opinion which is appropriate for them to do and I'm used

12   to getting those kinds of letter.

13           MS. LEVINSON:  That I understand, but I'm

14   objecting to giving crime victims status to those members

15   of the police department who signed the group letter.

16           THE COURT:  The letter that I received directly

17   as Mr. Breslow just referenced was not the intent of the

18   government to make part of their package.

19           MS. LEVINSON:  I understand.  Now I understand.

20   I didn't know where that came from.

21           THE COURT:  I am not going to put that in the

22   group of letters that I would that are crime victim

23   letters relative to consideration of sentencing.

24       I welcome and get letters from members of the

25   community regarding the community's position on how they

1    feel about a number of things, and that all goes into my

2    general thought process about the criminal justice system

3    as a whole, which is what I took the letter that I got

4    last night from Mr. Labey for.

5        It's not that I'm not considering it but I'm not

6    applying what he said in that letter.  I don't think that

7    would be appropriate, and I don't think Mr. Breslow is

8    arguing it would be appropriate to consider that a

9    victim-impact letter under the circumstances.

10            MR. BRESLOW:  No, but just as Your Honor is

11   considering the letters from the family and the community

12   on behalf of Mr. Buffis, Your Honor should consider that

13   letter under 18 U.S.C. 3661.

14            THE COURT:  For some very general thoughts on

15   sentencing matters perhaps you're right, but it does take

16   on a different tone than a pure victim-witness letter.

17            MR. BRESLOW:  Referring to the fourth letter,

18   Your Honor?

19            THE COURT:  Yes.

20            MR. BRESLOW:  We absolutely agree.  We

21   absolutely agree.

22            THE COURT:  All right.  So what do you say,

23   Mr. Breslow, about the police-related letters, the letters

24   from Chief Roosa and the Lee Police Department staff and

25   employee Tracy Dunn of the police department?

1    I do see those -- I think it's a point well made by

2    Ms. Levinson.  However, I see those in a little bit of a

3    different light and think that perhaps you will have a

4    valid argument relative to their consideration as more

5    pure victim/witness letters.

6                MR. BRESLOW:  So I have three points to make,

7    Your Honor.  The first is that the defendant was convicted

8    of extortion under color of official right.  Now if he had

9    been convicted of extortion for fear -- under wrongful use

10   of fear we might have a different position, but the

11   defendant was convicted of extortion under color of

12   official right.

13       He was convicted simply put for abusing his office,

14   the same office that he shared with all the members of the

15   Lee Police Department and as they explained, more

16   eloquently than I ever could to you, their department and

17   their work as individuals has been seriously damaged and

18   so because the defendant's count of conviction the court

19   should consider them as victims as much as Tom Fusco and

20   Tara Viola were.

21       The second point that I want to make is that in our

22   post-trial sentencing motions, Your Honor decided that we

23   had established beyond a reasonable doubt that the

24   defendant had embezzled from the Lee Police Association,

25   essentially from his brother and sister officers, in the

1    same capacity as chief of police or the police officer in

2    charge of that fund and so they're victims under that

3    misconduct as well.

4         And lastly, Your Honor, to the extent that Your Honor

5    doesn't consider them as classic crime victims under the

6    Crime Victims Act, we submit that Your Honor should

7    consider these letters as completely as Your Honor would

8    if they weren't deemed crime victims under Title 18 United

9    Code 3661 which states simply that no limitation should be

10   placed on factors for the court's consideration at

11   sentencing.

12            THE COURT:  All right.  I agree more strongly

13   with two points.  I think that there are no factors that

14   should be limited for the court's consideration because

15   the court is in a position to be able to filter out the

16   appropriate versus the inappropriate that might be

17   submitted relative to these types of -- the letters in

18   this case applying that rationale to this case.  Of

19   course, there are some limitations in other cases where

20   letters may be completely irrelevant, but these letters

21   are certainly not irrelevant.

22        The charge, extortion under color of official right,

23   certainly does invoke the Lee Police Department position

24   that Mr. Buffis held, and it does draw in -- that

25   conviction does draw in unfortunately for the police

1   department in a negative light the police officers since

2   the color of official right that Mr. Buffis was acting

3   under was that of the Lee Police Department.

4           MS. LEVINSON:  May I be heard?

5           THE COURT:  No, not right now.  I'll give you a

6   second.

7       My ruling relative to consideration of the Lee Police

8   Association conduct, the rationale and my ruling under how

9   the guidelines might be affected and under the rules of

10  criminal procedure, my analysis of that Lee Police

11  Association incident does not make that a conviction.  And

12  so because it does not make it a conviction in the

13  official sense, I disagree with your middle argument that

14  that would make them victims because that's what I found.

15  However, I am satisfied based upon your other two reasons

16  that you proffered.

17      I'll let you respond to that if you want to respond

18  briefly, Ms. Levinson.

19          MS. LEVINSON:  I do.  The way the people who

20  wrote those letters from the Lee Police Department portray

21  themselves as victims is by saying that their job as

22  police officers have been so negatively affected because

23  of Mr. Buffis's conduct in the extortion conviction, but

24  Your Honor, I must say two things.

25      I'm a resident of Berkshire County.  I read all the

1   local press and I read all the comments that citizens post

2   in response to arguments about Mr. Buffis, and I never

3   read one that said anything about losing faith in the Lee

4   Police Department.  They lost faith in Mr. Buffis and in

5   Chief Buffis but no one ever talked about loosing faith in

6   the Lee Police Department.

7        In fact, as you've seen there are some 30 letters

8   with more than 30 signatories because many of them -- a

9   lot of these people are from Lee.  They haven't lost

10  confidence in the Lee Police Department, and so I think

11  it's wrong to say that Mr. Buffis's actions and the count

12  of conviction have negatively impacted the Lee Police

13  Department and have made their jobs harder.

14       Now they all personally may have thoughts and

15  feelings and Mr. Breslow is absolutely correct, as is Your

16  Honor, under 3661 you can consider all sorts of things but

17  again I don't believe that these individuals are crime

18  victims.

19            THE COURT:  All right.  I think they are

20  involved enough.  I think Mr. Buffis's actions as part of

21  that department affected them as members of that

22  department and affected that department as a whole.

23       At the time of conviction he was holding himself out

24  to be and in fact was the highest-ranking member of that

25  department.  It's more than a collateral consequence that

1    the Lee Police Department would be aggrieved and harmed by

2    the crime of conviction here.

3         As I said, the court has the ability at sentencing to

4    filter out the relevant from the irrelevant, the

5    irrational from the rational and the emotional from the

6    fact based and that's what I plan on doing.  I'm going to

7    consider those letters.  I think they are appropriately

8    submitted.  All right.  So your objection is going to be

9    overruled on that, Ms. Levinson.

10        We should move to the quite substantial task of the

11   objections to the guidelines.  So I have put on the record

12   what I've considered in preparation for the sentencing.

13   The presentence report included a calculation of the

14   guidelines.  There have been objections filed, and unless

15   the parties have an alternative suggestion, I think we

16   should just go through them one by one.

17             MR. BRESLOW:  Yes, Your Honor.

18             THE COURT:  All right.  Ms. Levinson, I'll be

19   going by the presentence report starting at page 34 for

20   the objection numbers and I recognize that your memorandum

21   discusses also each of these in more detail, but for

22   purposes of organization that's how I'm going to go

23   through them from the presentence report.

24             MS. LEVINSON:  Okay.  That's good, but there's

25   also one objection that I made very generally and didn't

1    flesh out because in reading the presentence report I was

2    a little bit confused and I'll highlight that when we get

3    to that area.

4              THE COURT:  All right.

5              MS. LEVINSON:  That has to do with the

6    calculations relative to the Lee Police Association funds.

7              THE COURT:  All right.

8              MS. LEVINSON:  Having reviewed those, I think

9    there's something wrong in the probation department's

10   calculation and I'll address that as we get to that.

11             THE COURT:  You found in your opinion there was

12   a lot wrong with the probation department's calculation

13   but we'll get to it.

14             MS. LEVINSON:  Yes.

15             THE COURT:  It might come up just in the natural

16   course so we'll see.

17             MS. LEVINSON:  Okay.

18             THE COURT:  Objection No. 1 you object to the

19   government's statement of the offense in the presentence

20   report at paragraph 9, at 9, 13 and 24.  So you object to

21   the government's statement of offense.

22             MS. LEVINSON:  Yes.

23             THE COURT:  Do you want to be heard?

24             MS. LEVINSON:  Well, yes, Your Honor.  What we

25   object to is that the presentence report should be setting

1    forth the facts.  However, what has happened in the

2    presentence report, specifically in those paragraphs, is

3    that the probation department lifted wholesale the

4    government's statement of the facts which included, you

5    know, prosecutorial commentary about how some of the

6    evidence should be viewed.  You know statements about --

7              THE COURT:  The presentence report generally

8    does get the government's version of the offense and the

9    presentence report appropriately indicates that it's the

10   government's version.

11        In other words, the presentence report doesn't

12   purport to say this is an independent view by the

13   presentence report writer of the facts.  It says this is

14   the government's view.  So knowing that it's the

15   government's view and it's an adversarial system that is

16   the government's view of the evidence, a sentencing court

17   has the ability to look at that and again weed out things

18   that it thinks are appropriate and accurate versus the

19   things that may appear more argumentative or opinion based

20   in the government's version and that's just part of the

21   litigation process at sentencing so I'm going to deny

22   Objection No. 1.

23        Objection No. 2 there's I think two objections in

24   there.  There's an objection as to paragraphs 10, 11, and

25   12 to the extent that they contain reference to acquitted

1    conduct, and as to Objection No. 2 as it relates to

2    paragraphs 10, 11, and 12 I will sustain the objection

3    relative to acquitted conduct for the reasons stated in my

4    written memorandum on the issue.  Acquitted conduct won't

5    be considered by me and I think that pretty much takes

6    care of the objection.

7        My ruling was I'm not going to consider it so the

8    fact that some acquitted conduct will appear as described

9    in the presentence report is one thing just for the sake

10   of thoroughness, but it's not being considered by me as my

11   written findings indicate.

12       So as to paragraphs 10, 11, 12 technically that

13   objection will be sustained.  As to paragraphs 37 and 47,

14   also raise an objection to, it seems to me that the PSR

15   took that out in their second version.

16           MS. LEVINSON:  Correct.

17           THE COURT:  So they agreed with your objection

18   and they removed those portions so your motion on that

19   part is denied because it doesn't matter.  The probation

20   department has removed it.

21       Objection No. 3 again this had to do I think with

22   acquitted conduct, but you reference paragraphs 51 and 53

23   and 57 and 59 and it seems that the probation department

24   on your objection and their own review took this out of

25   the final draft.

1          MS. LEVINSON:  Yes, and, of course, my objection

2     letter was submitted before.

3          THE COURT:  Of course, yes.  Right.  So this is

4     actually the system working the way it should.  You made

5     your objections.  The probation department considered them

6     and then made modifications to the final report as is

7     appropriate.  So Objection No. 3 is denied just because

8     that's been resolved already.

9          Objection No. 4, all right, you object to paragraph

10    25 to the inclusion of language that says the quotation

11    "numerous falsely exculpatory statements."  This is again

12    an objection as to what you are perceiving as a factual

13    spin in the presentence report, correct?

14         MS. LEVINSON:  Correct, and I understand the

15    court's ruling on that.

16         THE COURT:  That's going to be denied because

17    the court -- I believe the sentencing court has the

18    ability if there is any factual spin, and I'm not saying

19    there is, but if there was the court has the ability to

20    see through that and apply what facts it believes are

21    appropriate.

22         Objection No. 5 again it's an objection to certain

23    language, the same type of language that was characterized

24    in Objection No. 4, and for the same reason that Objection

25    No. 4 was denied I'm denying Objection No. 5.

1          Objection No. 6 is very similar.  You're objecting to

2     the entirety of paragraph 31 in which the government lists

3     what they allege to be false claims.

4          Now again the recurring theme is that this is perhaps

5     one sided, this is the government's opinion, this is the

6     government advocating through -- accomplishing advocacy

7     through the presentence report which would be

8     inappropriate and I agree with you.

9          The government if they were able to accomplish

10    advocacy through a presentence report it would be

11    inappropriate.  However, I think the presentence report

12    indicates what the government is telling them as opposed

13    to independent facts being found by the presentence

14    report, and for the reasons I've denied the other

15    objections the court is in the position to make a

16    determination as to what in the presentence report is

17    legitimately there and what may be more slanted towards

18    advocacy and cut through that and find a fair way to deal

19    with all this information in sentencing.  So Objection 6

20    is denied.

21         Objection 7, the same thing.  You're objecting to

22    certain facts that are in the police report that you may

23    disagree with.  I sat through the trial.  The government

24    can present and has the right to present what they believe

25    the facts are for inclusion in the PSR labeled as the

1    government facts and for the same reason as other

2    objections have been denied, Objection 7 is denied.

3        Objection 8 you object to paragraph 36 in which the

4    government alleges that Mr. Buffis presented false

5    testimony at trial in regards to the extortion.  That's

6    denied for the same reasons that we've been talking about.

7    However, this issue is going to come up again, the issue

8    as to whether or not Mr. Buffis provided false testimony

9    in regards to the extortion is going to come up again when

10   we talk about a potential increase or enhancement because

11   of obstruction based upon lying on the witness stand.  So

12   we will take that issue up again I think in another

13   objection that comes up but as Objection 8 is worded it is

14   denied.

15       Objection 9 deals with paragraph 50 and that again

16   that was based upon your objection the probation

17   department reconsidered and then took it out of the final

18   draft, is that correct?

19           MS. LEVINSON:  Umm.

20           MR. BRESLOW:  Yes, Your Honor.

21           THE COURT:  All right.  So to the extent that

22   the probation department has removed the language that was

23   objectionable to you, that motion is denied.

24       Objection No. 10 is a ruling on the obstruction of

25   justice enhancement.  So obstruction of justice if applied

1    as an enhancement would add two points to the calculation,

2    and this was a little bit involved in Objection 8 as I

3    said, which was denied as Objection 8 but it raised this

4    issue which now we'll kind of take on in full.

5        I think this is more of substantive issue, Objection

6    10, the consideration of obstruction of justice

7    enhancement.  There are two theories essentially that I

8    see for an obstruction of justice enhancement:  One is

9    false statement to law enforcement officers during their

10   investigation and the other theory is false trial

11   testimony, either of which if I'm satisfied would be

12   sufficient to add a two-point enhancement under

13   obstruction of justice.  But there certainly is a lot more

14   there to argue than in the other objections so go ahead,

15   Ms. Levinson.

16            MS. LEVINSON:  Okay.  As to the suggestion that

17   an enhancement for obstruction is warranted because of

18   false statements to investigators during the course of

19   their investigation, we object to that for reasons more

20   thoroughly set forth I believe in my sentencing

21   memorandum, but under the guidelines and the notes to the

22   section for obstruction, which is U.S. Sentencing

23   Guidelines 3C1.1, any false statements made during an

24   investigation have to be found to have been significant,

25   significant misstatements, and also having material effect

1    on the investigation.

2         The statements that the government proffers as having

3    been obstructionist were made by Mr. Buffis in what he

4    believed were informal interviews with fellow police

5    officers, law enforcement officers.

6              THE COURT:  By informal you mean they were not

7    under oath?

8              MS. LEVINSON:  Right.

9              THE COURT:  They were not Mirandized?

10             MS. LEVINSON:  There was only one that I believe

11   was Mirandized and that was later on after he had made

12   earlier statements, firstly in his driveway to

13   Investigator Smith or Detective Smith in his driveway,

14   extremely informal.

15             THE COURT:  But at any rate, none under oath?

16   One might have been Mirandized?

17             MS. LEVINSON:  Yes, totally not under oath.

18   Again by telephone, again with Detective Smith, again not

19   under oath or having been Mirandized and then again sort

20   of in a lengthy interview not Mirandized, not under oath

21   at the detective's office in which Mr. Buffis was

22   attempting to clarify what he had said earlier in his

23   driveway and on the telephone, and you know were just

24   conversational actually, Your Honor, and should not be

25   held to the level of significant misstatements that were

1    intended to mislead an investigation.

2        I should note that by the time Mr. Buffis was making

3    many of these statements that the government are

4    proffering as having been designed to mislead an

5    investigation, the investigators were already in

6    possession of numerous documents and supporting evidence

7    and so if statements were misleading, they did not

8    significantly impede the trail of the investigation

9    because as we all know the trail of the investigation

10   ended up resulting in a three-week trial here in this

11   court.

12       And so anything that Mr. Buffis said that could have

13   been taken as misleading, although not intended as

14   misleading, did not significantly impact the investigation

15   and did not result in law enforcement officers having to

16   go deeper than just relying on statements unMirandized,

17   on uncounseled statements by Mr. Buffis.

18       So I don't believe that any purported misstatements

19   that Mr. Buffis may have made -- and we don't concede that

20   there were misstatements -- but any purported

21   misstatements were not designed to mislead or obstruct an

22   investigation.  The investigation was going full tilt

23   ahead like a run-away train with or without Mr. Buffis's

24   statements and so I don't believe that that branch of

25   obstruction has been met.

1    As to false statements under oath, testifying at this
2    trial, the example -- the statements that the government
3    relies upon were solely an exchange between Mr. Breslow
4    and Mr. Buffis during a vigorous and lengthy and grueling
5    cross-examination where what the two parties were doing
6    basically was quibbling over the meaning of the word
7    "negotiation."  Was this a negotiation?  Was it -- what
8    was it?
9    It's almost like Bill Clinton's famous what is "is."
10   What is the definition of is here?  What is the definition
11   of negotiation?  So I respectfully submit that the alleged
12   false testimony the government relies on was not false
13   testimony at all.  It was statements made in the heat of
14   cross-examination and quibbling over the usage of a term
15   and what a term really means.
16   THE COURT:  Well, the trial testimony is broken
17   down into three, four, five, I think five separate
18   examples at least in paragraph 61 of the presentence
19   report and that would be, A, in his testimony a concession
20   by Mr. Buffis that his earlier testimony about not
21   discussing the $4,000 donation with the State Police was
22   false.
23   The next reference was he admitted that his direct
24   testimony about not using his credit card was admittedly
25   false.

1      The next one is he admitted that his earlier

2   testimony about money made by his wife's business was

3   false.

4      The next example would be that he admitted testimony

5   about driving home from Walmart or Costco after seeing

6   toys on sale, he would drive home, get toy fund cash and

7   then drive back even though it was a significant distance

8   he admitted that was false.

9      Then there was the trial testimony regarding what you

10  just said, the negotiation issue about whether or not when

11  he was engaged in a conversation with the victims of the

12  extortion whether or not that was "the definition of

13  negotiation" and there was back and forth on cross-examine

14  about that.

15     So there was more than just the one issue, but taking

16  as a whole what do you say about that type of trial

17  testimony as a whole?

18         MS. LEVINSON:  Well, firstly as to everything

19  other than the "negotiation" testimony, everything else

20  had to do with acquitted conduct, and so our position with

21  that is that it shouldn't be considered at all because

22  anything about that is acquitted conduct that should not

23  be considered by this court in sentencing.

24     If the court doesn't agree with that analysis, which

25  I think it should, but if the court doesn't agree with

1    that then our objection remains that any of these

2    statements that the government is characterizing as false

3    were again made during the heat of an extensive and

4    sometimes quite confusing cross-examination between

5    Mr. Breslow and Mr. Buffis with Mr. Breslow -- sometimes

6    as a skilled cross-examiner does and should do -- putting

7    words in Mr. Buffis's mouth and just having him simply

8    agree during the heat of a two-day cross-examination.  So

9    for that reason I don't believe that this court should

10   consider those as false testimony but should look at it

11   more in the context of a heated cross-examination.

12              THE COURT:  All right.  Thank you.

13        Mr. Breslow, do you want to be heard on the

14   obstruction of justice objection?

15              MR. BRESLOW:  Very briefly.  I think Your Honor

16   is right that there are two completely independent bases

17   for the court to find obstruction of justice, one is what

18   happened during the investigation and the other is what

19   happened at trial.

20        With respect to what happened during the

21   investigation, I'll say that one of these interviews, the

22   interview with Captain Smith on March 30th, yielded like

23   an eight-page written statement which the defendant had an

24   opportunity to correct and he made one small correction to

25   a single word.  So that was a quite formal interview.

1    The second one, the one on June 25th with Sergeant

2    Meiklejohn, was conducted after *Miranda* and with an

3    attorney by his side the entire time and so that's the

4    context in which many of these false statements were made.

5    I'll note that the defendant at trial conceded that

6    he repeatedly gave false statements to the investigators,

7    and I'll note that at trial the defendant conceded that he

8    provided false statements in his direct trial testimony.

9    Your Honor, we excerpted that piece of the trial

10   transcript concerning negotiation so that you could see it

11   again in your own words and Your Honor may recall exactly

12   what happened.  The defendant on his own volunteered that

13   it was a negotiation.  I wasn't putting words into his

14   mouth; that was what he volunteered, and then a short

15   while later when I pressed him on that point he

16   backtracked I think realizing that he couldn't have --

17   that it was a mistake to have volunteered that it was a

18   negotiation.

19   You may remember that I went to sidebar.  I said,

20   Your Honor, I'm not sure what we should do here because I

21   think the defendant just completely contradicted himself

22   and we should -- I'm thinking we should have the court

23   reporter read this back to the jury and Your Honor said,

24   no, it happened, we all saw it.  Frankly, I think that was

25   plain as day and that false statement at trial went to the

core issue of the count of conviction.  It was directly
pertinent to the count of conviction.

I think with respect to what he did during the
investigation, it's pretty clear that he took numerous
steps to obstruct any investigation.  He forced Tom and
Tara to engage in a nondisclosure agreement.  He told
Officer Ryan Lucy that he was not at liberty to say what
had happened at the hearing concerning the extortion.

The very next day, he posted a non-dissemination memo
that prohibited Officer Lucy from telling anything about
what happened.  He told Ryan Lucy that he could not --
that Officer Lucy, who was the case officer in the State
Police and LPD joint investigation, that he couldn't
provide a copy of the non-dissemination memo to the State
Police, and then he made numerous false statements to the
investigator.

I do want to point out that many of these false
statements, particularly the ones that were made on March
29th and March 30th, were made when the investigation had
no idea what the defendant had done with this donation
because they didn't have the financial records.

So when the defendant on March 30th in that
relatively formal interview that yielded the written
statement when the defendant said there's $4,042 in the
toy fund account and $4,000 of that came from the

1    donation, meaning the actual extortion, Captain Smith had

2    no reason to disbelieve what the defendant was saying.

3         It was only after they took numerous steps to get --

4    I think they had to get a search warrant because it was a

5    State court investigation to get the financial records did

6    they realize that the defendant hadn't had $4,042 in the

7    toy fund account but there was only $50 there because the

8    defendant had moved the money out and then spent it on

9    personal expenses.

10        So I think it's very clear that the statements that

11   were made during the investigation had a material impact

12   on the investigation, and I think it's also very clear

13   that the defendant repeatedly gave false testimony,

14   including many points which he conceded were false.

15        Your Honor was at the trial.  Your Honor paid

16   exquisite attention to the defendant's testimony, and Your

17   Honor obviously can make its own determination as to

18   whether the defendant was telling the truth to the jury or

19   was in many instances simply lying.

20             THE COURT:  All right.  Thank you.

21        Relative to the first theory of obstruction

22   enhancement for false statements -- that is, false

23   statements to law enforcement during the investigative

24   effort -- it would be infrequent if law enforcement were

25   engaged in any type of criminal investigation and didn't

1    come across people who tried to mislead them, who tried to

2    confuse them, who tried to tell them half-truth or no

3    truth at all, who tried to deflect focus on themselves or

4    on their criminal endeavor in order to pull one over on

5    law enforcement.

6         That's just the nature of law enforcement

7    investigations, especially high-level law enforcement

8    investigations, and certainly all law enforcement officers

9    know that but high-level detectives, such as were involved

10   in this case, know that and are certainly used to that and

11   are used to conducting investigations dealing with that

12   type of issue of being given misleading or false

13   information as part of their investigation.  But as

14   professional, seasoned, accomplished, and good

15   investigators that's just another day at the office for

16   them and they deal with it.

17        So the question becomes under the guidelines whether

18   or not -- and these terms are important -- whether or not

19   Mr. Buffis's statements that the government is alleging

20   were misleading or untrue or false or confusing to law

21   enforcement, the key words are whether or not those

22   significantly impeded the investigation, and it's at that

23   point I do not see that what he was telling law

24   enforcement and the circular reasoning and the statements

25   and misstatements that he was giving law enforcement I do

1     not see that it satisfies the definition of significantly

2     impeding the investigation.

3          It, quite frankly, didn't seem to impede the

4     investigation at all, which is a credit to the

5     investigators, but it just didn't rise to the level of

6     substance of obstruction to qualify as a significant

7     impeding event to essentially derail the police

8     investigation and from my reading of the guidelines that

9     is what needs to be there.

10          So I'm certainly not saying that false statements,

11     misleading statements, circular reasoning didn't happen by

12     Mr. Buffis.  I'm not saying that.  I'm just saying it

13     doesn't rise to the level of significantly impeding the

14     investigation.  It went forward.  They saw through it.

15     They did what they did, and it just doesn't qualify I

16     don't think for an obstruction enhancement under the

17     guidelines that the rules give me.

18          The next theory for applying an obstruction of

19     justice enhancement is the false testimony at trial, and

20     for the false testimony at trial the guidelines

21     application note have kind of a user's warning on the

22     limits of applicability, and that is that the guideline

23     application note warns that courts should be cognizant

24     about the perils, and I'm quoting, "of giving inaccurate

25     testimony during the process of trial."

1    Those are the perils of trying to judge what is a

2    thoughtful, significant lie blatant and designed and has

3    the ability to obstruct the prosecution versus what are

4    inconsistent statements, statements that seem to make no

5    sense, statements that seem to trip over themselves, and

6    statements that are made during the middle of

7    cross-examine where there is or has become an adversarial

8    nature and tone and the cross-examine word is difficult to

9    control.

10    Clearly at trial Mr. Buffis made many statements

11    which, to be generous, could be considered inconsistent

12    both with his prior testimony on the stand, with his prior

13    statements, and inconsistent with the evidence.

14    Many of those statements he simply made on his own in

15    his protracted explanations and then in re-explaining of

16    what he did, he would explain things in different ways

17    with versions crossing and therefore causing one version

18    to be inconsistent with the other.

19    Those types of statements, misstatements, false

20    statements at trial again are part of the trial process,

21    and that is not that giving false statements should be

22    part of the trial process but judging the credibility and

23    truth or falseness of testimony is something for the jury

24    to do and in this case the jury acquitted on the majority

25    of counts.

1      However, the jury did convict on a very serious count

2      and so the ramifications or the effect of Mr. Buffis's

3      testimony, as impaired as sometimes it was, was considered

4      by the jury and the jury perhaps, and this would only be

5      speculation, considered that when they convicted on one

6      count and perhaps considered what they believed about his

7      testimony when they acquitted.

8          The point is that I'm comfortable and think it's

9      appropriate to leave issues and quibbling about trial

10     testimony and what was lied about or not lied about to the

11     judgment and analysis of the jury, and the jury has spoken

12     in this case.  And certainly as a perfect example of where

13     the court should not go in assessing an obstruction of

14     justice analysis is to get involved in the

15     cross-examination section regarding negotiating with the

16     victims of the extortion.

17         Now, Mr. Breslow is correct that Mr. Buffis talked

18     about that donation, used the word negotiating and then

19     backed off the word negotiation and said it wasn't

20     negotiation.  It was completely obvious to the jury.

21         The question is was it completely obvious that he was

22     lying or just completely confused or trying to cover his

23     tracks?  Trying to change his testimony?  Or whether he

24     was at the moment embroiled in a heated contest with the

25     cross-examination and the cross-examiner?

1        And at times the cross-examination of the

2   government's lead attorney created that type of atmosphere

3   where there was a witness on the stand just perhaps not

4   even knowing what question is being asked or what he's

5   being answered having his head spun around so many times.

6   And if that's the environment in which false statements or

7   allegedly false statements comes out, the guidelines and

8   the application notes warn a judge not to apply, I think,

9   not to apply an obstruction enhancement for those types of

10  issues, but rather leave it as we did in this case for the

11  jury to decide and make a judgment about that.  So for

12  those reasons I'm not going to apply an obstruction of

13  justice enhancement.  So that is Objection No. 10 and that

14  objection would be sustained.

15      Objection 11 is the calculation of the relevant

16  conduct advisory enhancement.  Mr. Levinson, you had

17  raised this before.  The relevant conduct that I ruled

18  that could be considered was related to the Lee Police

19  Association and the part of the guidelines that address

20  this are advisory.

21      There's an advisory section within the advisory

22  guidelines, and that leaves it to the court's discretion

23  to apply an enhancement if the court thinks it appropriate

24  or to consider in whatever way the court thinks

25  appropriate that relevant conduct regarding the Lee Police

1    Association.

2        Ms. Levinson, I think that kind of sharpens the issue

3    for you.  Do you want to be heard on that now?

4            MS. LEVINSON:  I do, but I'm still a little bit

5    confused about how the Lee Police Association conduct

6    should be figured into the advisory Sentencing Guidelines.

7    I admit I didn't -- I wasn't aware of the fact that there

8    was an advisory portion within the advisory guidelines.

9            THE COURT:  Well, that's how I took the reading

10   of it.  That's how I read how it was prepared that if I

11   chose to do this, then the guidelines could be increased

12   in that way.

13           MS. LEVINSON:  Okay.  So taking the probation

14   department's view of how that should be calculated --

15           THE COURT:  In other words, the current

16   guideline calculations don't include that enhancement.

17           MS. LEVINSON:  Right.

18           THE COURT:  Mr. Breslow argues in his sentencing

19   memorandum that it should but the guidelines don't have

20   it.

21           MS. LEVINSON:  Right.  But in whatever paragraph

22   it now is in the sentencing -- okay, paragraphs 73 through

23   82 now address the probation department's view of how that

24   should be calculated, so I'd like to address what I think

25   the proper view should be if the court is to use it at

1    all.  For some reason --

2             THE COURT:  If I'm to use it at all for what?

3             MS. LEVINSON:  In the advisory sentencing range

4    or in enhancing the sentence in any way.

5         So turning to paragraph 73, actually 74, the

6    probation department is using for the Lee Police

7    Association theft the guideline for money laundering.

8    That would not be the correct guideline for theft.  My

9    understanding that the correct guideline for theft would

10   be the theft guidelines under 2B1.1(a)(1) with a base

11   offense level of six.

12        I could not object to a two-point enhancement under

13   2B1.1(b)(2) for more than ten victims because my

14   understanding is that there were more than ten police

15   officers at the Lee Police Department -- no.  I'm getting

16   a head nod from my client so that could be discussed, but

17   I cannot argue against a two-point increase for abuse of

18   position of trust since at the time of this conduct Mr.

19   Buffis was the chief of police.  So we have at least a

20   level 8 and perhaps a level 2.

21        The probation department goes on to ask for or to

22   suggest that it's appropriate to add a two-level

23   enhancement for a representation that he was acting on

24   behalf of a charity.  This LPA conduct had nothing to do

25   with a charity so we don't believe that two-level

1    enhancement is appropriate.

2        He wasn't convicted under Section 1956, which the

3    probation department suggests provides for another

4    two-level enhancement, and again they suggested a

5    two-level enhancement was appropriate for obstruction.  So

6    that would leave us with either a level 8 or a level 10

7    for the LPA conduct.

8        If it was a level 8 because there were less than ten

9    victims, then there were would no additional enhancement

10   to the advisory sentencing range because it's less than

11   ten levels.  If it was a level 10, according to our

12   calculations, there would be a one-level adjustment under

13   3D1.4.

14       So the worst possible case scenario the way we view

15   it would be adding one level to whatever advisory

16   guideline level the court finds is appropriate or no

17   additional level.  I hope I've been clear on that.

18            THE COURT:  All right.  Mr. Breslow.

19            MR. BRESLOW:  Well, the first point that I'll

20   note is that none of these objections were made to the

21   calculation of the guidelines, these ones Ms. Levinson is

22   making.  I think she basically was saying that they should

23   not apply as a whole but these technical objections she

24   did not make earlier.

25       I think that the probation department correctly

1    calculated these guidelines based on what the defendant

2    did, and just responding briefly to Ms. Levinson's

3    comments I think she said that the LPA was not a charity

4    but it was a charity.

5         In fact, as Your Honor may recall from the trial

6    testimony a witness from the Massachusetts Division of

7    Public Charities testified that the defendant himself had

8    registered the LPA as a charity for a period of time until

9    2005 which is when he stopped registering the LPA as a

10   charity and that's when the major extraction occurred

11   right after that failure to register the charity again.

12        Secondly, I think it's very clear that at least

13   purportedly the toy fund operated as a public charity.

14   And with respect to the toy fund and the money laundering,

15   Your Honor may recall that there were two ways in which

16   the defendant extracted funds from the LPA.

17        Donations were made to the LPA and the LPA was at

18   least a nominally functioning charity.  So donations were

19   made and then the defendant either wrote checks directly

20   to himself or to pay his wife's credit card in one

21   instance or to cash, and in the second respect the

22   defendant took the donations from the LPA and then moved

23   them at a time when the toy fund was not operating into

24   the toy fund.  And then as soon as those monies came into

25   the toy fund, he wrote checks out of the toy fund to pay

1    his credit cards or I think in some instances to cash.

2    And that entire conduct, that entire course of conduct

3    Your Honor found that we had established beyond a

4    reasonable doubt that the defendant had embezzled from the

5    LPA so I think the probation department's calculations are

6    correct.

7        I simply can't respond to the -- I'm not sure she is

8    making the claim or not that the offense involved ten or

9    more victims because it's late, but my recollection of the

10   bank records is that there were numerous donors to the LPA

11   and numerous members of the LPA and I'm just not prepared

12   to respond at this late moment to that particular claim.

13       MS. LEVINSON:  And just to add to more

14   confusion, of course, my client tells me that at the time

15   there were only eight or nine patrolmen in the Lee Police

16   Department and so it was under ten.

17       MR. BRESLOW:  The one thing that I will add,

18   Your Honor, is that this pattern of what we think was and

19   what I think Your Honor found was stealing from the LPA

20   took place over a number of years, from 2005 all the way

21   up until about 2011 or 2012, when the toy fund had very

22   little money but the defendant was still extracting

23   whatever donations came in for his own personal benefit.

24       THE COURT:  All right.  As to how the guidelines

25   calculates it I agree with Mr. Breslow and some of these

1    arguments have not been raised before, Ms. Levinson, but

2    to the extent that the presentence report assigns numbers

3    in their calculation that it's up to me as to whether or

4    not I want to adopt.  I think the way they calculated that

5    relevant conduct of Lee Police Association type of conduct

6    was correct.

7         The issue that's there, which was a little bit

8    sidestepped by both parties, is I think Mr. Rinaldi -- the

9    probation department correctly did the calculations if I

10   want -- if the court thinks it's appropriate to add them

11   to an enhancement.  The question is do we turn this

12   relevant conduct into a sentencing enhancement?  In other

13   words, does the court impose a punishment by increasing a

14   sentence based upon Lee Police Association conduct?

15        Now, I made findings based upon my hearing the trial

16   that I was satisfied that the government demonstrated the

17   Lee Police Association related events did occur and I made

18   that clear in my written findings.

19        I am going to consider and have been thinking about

20   that Lee Police Association conduct relative to the

21   overall fairness of sentence that I will need to impose on

22   Mr. Buffis.  So I am considering the Lee Police

23   Association conduct for things like Mr. Buffis's state of

24   mind, a pattern or method, even loosely applied of

25   handling money.

1      I think notably I'm considering it for the lack of

2   mistake as I analyze the extortion conviction.  I am

3   looking at it in that type of way in considering as the

4   guidelines and the rules and statutorily I'm allowed to

5   consider that relevant conduct.

6      It advises me not only on the character of Mr. Buffis

7   but it advises me in some way on how and why and the

8   thought process behind the extortion, and I think it

9   advises me about Mr. Buffis to his detriment, quite

10  frankly, my consideration of that but I am going to

11  consider that Lee Police Association conduct.

12     What I'm not going to do is I'm not going to

13  wholesale sentence him for the Lee Police Association

14  conduct that I believe occurred.  It remains uncharged

15  conduct.  Because I thought it happened and I'm going to

16  consider it in the overall sentencing of Mr. Buffis does

17  not substitute for the process of him being officially

18  charged with it and convicted.

19     In my mind it offends our notion of justice that I

20  would without him being formally charged and formally

21  convicted of that Lee Police Association act that I would

22  send him to jail, arguably is what the government wants,

23  for that Lee Police Association conduct and punish him as

24  if he was convicted of that charge.

25     The guidelines talk about it in a different way and

1    no one uses the words that you're going to sentence him

2    for committing that uncharged conduct, and there's all

3    sorts of technical language that in my mind don't do a

4    good enough job separating out how an individual can be

5    sentenced for something they were never convicted of and

6    so I am not going to allow the relevant conduct to create

7    a number enhancement to Mr. Buffis's guideline range.

8        I am, however, absolutely considering that conduct

9    when I consider Mr. Buffis as a whole and when I am

10   considering the seriousness of the extortion conviction.

11   So as to Objection 11 I believe that ruling would be a

12   partial allowance and a partial denial of the objection as

13   explained on the record.

14       All right.  Accordingly we have the guidelines in

15   this case and the question is where the guidelines are now

16   based upon my rulings on the objections.

17       Based upon my rulings on the objections we have a

18   base offense level of 14 under the Sentencing Guidelines.

19   We have a four-point enhancement which is appropriate and

20   I adopt the appropriateness of it.  It's a four-point

21   enhancement for a crime committed by a public official in

22   a high-level decision-making position which Mr. Buffis was

23   at the time of the conviction.  So four points will be

24   added to his base offense level.

25       As I said, there is no relevant conduct numerical

1   enhancement for the Lee Police Association conduct.  As
2   important as it is, I'm not going to assign a numerical
3   enhancement, and there is no enhancement for the uncharged
4   or acquitted conduct and that has been written about in my
5   ruling on acquitted conduct so there will be no sentencing
6   enhancement on the acquitted conduct.
7        That leaves Mr. Buffis at a total offense level of
8   18, a Criminal History Category of 1, providing for a
9   guideline range of 27 to 33 months.  Those will be the
10  adjusted guidelines as found by the court.
11       Now built into our discussion on the objections
12  there's already been some argument on each side, but
13  certainly I am interested in hearing each side on what you
14  think would be the appropriate sentence.
15       All right.  Did you have a question, Ms. Levinson?
16            MS. LEVINSON:  Yes, there's just one more
17  objection, that was Objection 13 that had to do with
18  restitution and/or payment of attorney fees.
19            THE COURT:  Yes.  Thank you.
20       The restitution is appropriate in this case.  The
21  question is how restitution is going to be made.  There's
22  some reference in the papers that the money is held by the
23  State but the State has the money right now and that can
24  be worked out I'm sure.  Restitution is going to be part
25  of any sentencing.  I'm just going to need the parties to

1    tell me where the monies are.

2              MR. BRESLOW:  Okay.  So the $4,000 donation

3    Your Honor may recall from the trial was given to Mr.

4    Buffis and put in the toy fund account and then put into

5    his joint bank account and spent.

6         During the investigation another individual provided

7    the State Police with what was purported to be that

8    $4,000.  The State Police have that $4,000 and the

9    government has moved to forfeit that $4,000.  That $4,000

10   cannot be applied to restitution because it will be

11   forfeited.

12        Now Tom and Tara --

13             THE COURT:  That's under a civil forfeiture

14   proceeding in the State court?

15             MR. BRESLOW:  No.  We have moved to forfeit that

16   money before Your Honor.

17             THE COURT:  I see.

18             MR. BRESLOW:  There's a formal motion for

19   forfeiture of that money.  I'm pretty sure the preliminary

20   order was granted already, and so that's the $4,000 that

21   came from this individual in Lee to the State Police.

22        Now Tom and Tara are still owed the $4,000 that they

23   provided to the defendant and that's their restitution

24   request, plus they have an assorted really unspecified,

25   relatively unspecified claims of attorney's fees.

1          Now, they are requesting that money but the

2     government is not asking that the court order restitution

3     of those attorney's fees.  Your Honor can certainly grant

4     their restitution request, but we are only asking that the

5     court forfeit the $4,000 that was seized during the

6     investigation and order that the defendant repay Tom and

7     Tara the $4,000 that they paid him.

8               THE COURT:  So you have $4,000, if I order it

9     forfeited, do you then turn it over to the victims?

10              MR. BRESLOW:  No, it will be forfeited and --

11    well, in some cases we can do that.  In some cases we can

12    do that.  Your Honor may recall I think we discussed this

13    in I think the context of the Tubolino investigation, but

14    in this context we think the defendant has the ability to

15    repay the money and we think he should repay the money and

16    that forfeiture is appropriate of the monies that the

17    police recovered in the course of the investigation.

18         That $4,000 that the State Police obtained from this

19    individual in Lee, that's not the $4,000 that Tom and Tara

20    gave to the defendant.  That money he spent, and so those

21    two things are separate.  In this case we are asking that

22    the court forfeit the $4,000 the police recovered and we

23    are asking that the court order restitution simply for the

24    $4,000 that Tom and Tara paid.  To the extent that Your

25    Honor wants to provide restitution for their claims of

1     attorney's fees, we are not taking any position on that.

2          THE COURT:  The attorney's fees claim seems to

3     be related to representation in what started out as a

4     criminal case against the victims of the extortion?

5          MR. BRESLOW:  Well, Your Honor may recall I

6     think in the trial testimony that they did not have an

7     attorney.  They did not have an attorney at the hearing.

8     That they asked the defendant if they should bring an

9     attorney and he said only if you want to waste your money.

10         My understanding is that the attorney's fees relate

11    to the ensuing criminal case that was brought by the

12    district attorney's office after the defendant's

13    indictment here in federal court.  I don't believe that

14    they had extended any attorney's fees in connection with

15    the underlying Lee Police Department investigation.

16         THE COURT:  All right.  So after all this

17    happened the victims of the extortion had criminal matters

18    that remained with the district attorney's office and they

19    retained a lawyer trying to deal with those?

20         MR. BRESLOW:  They did.  The attorney's name I

21    believe was Elizabeth Quigly.  She also represented them

22    in connection with our investigation.

23         THE COURT:  I'm not seeing the connection there.

24         MR. BRESLOW:  Neither am I and that's why I'm

25    leaving it to the court's discretion.

1           THE COURT:  The court is not going to entertain

2     the reimbursement of attorney's fees.  I think it was

3     $7,500.  I'm not seeing the connection.

4           MS. LEVINSON:  Okay.

5           THE COURT:  Restitution will be ordered.  We are

6     going to have to sort out this issue of restitution.  It

7     doesn't need to be sorted out right now but it needs to be

8     sorted out.

9        Mr. Breslow made a good point.  Someone brought the

10    $4,000 and said, well, here's the $4,000 that came from

11    the victims.  How do we really know it's the same $4,000?

12    And then you have this issue of theoretically it's

13    proceeds of illegal activity and who has it and will it be

14    forfeited by the State under some type of civil forfeiture

15    action on the money as proceeds of illegal activity or

16    not?  There's multiple levels here of illegally-gained

17    money and who rightfully should have illegally-gained

18    money.

19       So I think it's beyond what we need to resolve here,

20    where that $4,000 is and if it's the same $4,000, and so

21    I'm going to allow your objection as to attorney's fees.

22    I'm going to deny your objection as it is to restitution,

23    but that leaves the door open to have a continued argument

24    about where the money comes from.

25           MS. LEVINSON:  Okay.  That would be fine, Your

```
 1     Honor.  We understand that Tom Fusco and Tara Viola should
 2     receive $4,000 one way or another.
 3                THE COURT:  It's their $4,000.  If the State has
 4     no action against them for that money, then it's going to
 5     be -- they're going to have restitution paid to them in
 6     that amount.  We don't need to decide right now.  You may
 7     have arguments about, well, you may say, government, you
 8     do have the $4,000 and the government may say, no, we
 9     don't.
10                MS. LEVINSON:  I do have that argument and so I
11     suppose we'll have that argument at some other time.
12                MR. BRESLOW:  I think the statute provides for
13     90 days for the court to make this decision, and I would
14     just request at the end of the hearing that we set up a
15     date.
16                THE COURT:  We'll set up a very short schedule
17     that will give you two an opportunity to talk about this
18     issue.
19                MR. BRESLOW:  Yes.
20                THE COURT:  Counsel have been extraordinary
21     during this entire process of working together and if
22     there is an ability to come to a mutual understanding, I'm
23     sure you will.  If not, I'll decide where the money comes
24     from.  All right?
25                MR. BRESLOW:  Okay.
```

1            MS. LEVINSON:  Okay.

2            THE COURT:  So am I finished with the

3    objections, Attorney Levinson?

4            MS. LEVINSON:  Yes, you are.

5            THE COURT:  We've got to the end of the

6    objections. Attorney Levinson, I will allow you to go

7    first.  Go right ahead.

8            MS. LEVINSON:  So, Your Honor --

9            THE COURT:  Let me just say to the parties that

10   are in court, Mr. Black and Attorney Wagner, you're both

11   so very perceptive.  I'm sure you understand that your

12   case is going to be delayed at this point.  All right.

13   You're certainly welcome to stay but if you want to, you

14   can just come back at quarter to twelve.

15           MR. BLACK:  Thank you.

16           MS. WAGNER:  Thank you, Your Honor.

17           THE COURT:  All right.

18           MS. LEVINSON:  Thank you, Your Honor.

19      As I stated in our sentencing memorandum to this

20   court, we understand that the advisory guideline range in

21   this case does provide for a sentence of incarceration.

22   However, we ask this court to vary from that advisory

23   guideline range and to impose a sentence that does not

24   include any term of incarceration, and we suggest that an

25   appropriate sentence for Mr. Buffis based upon the count

1    of conviction and everything else this court has observed

2    and learned during the course of this litigation is a

3    sentence of probation with the requirement that Mr. Buffis

4    provide community service in any manner in any amount of

5    hours that either the court or the department of probation

6    feels is appropriate.

7         The reason we believe that a sentence of probation

8    and not a sentence of incarceration are appropriate in

9    this case are many.  As I asked this court to consider in

10   our sentencing memorandum, what would constitute just

11   punishment for the serious count of conviction?

12        Yes, the jury found that Mr. Buffis committed a

13   serious offense of abusing his position as the chief of

14   the Lee Police Department to obtain $4,000 from two

15   citizens, and that he somehow enticed them to do that by

16   using his office as a Lee police officer.  But what you

17   should be considering in weighing incarceration,

18   probation, are many things, many things that are set forth

19   in 18 U.S.C. 3553(a) as to the proper considerations that

20   a court should take in making an appropriate sentence.

21        So, first of all, let's look at what has happened.

22   What kind of "punishment" -- I put that in quotes -- Mr.

23   Buffis has already endured.  From the day the news story

24   broke about a search at the Lee Police Department and his

25   home, he has been and his family have been bombarded by

1    hundreds, literally hundreds of newspaper articles about

2    what a horrible person he is, what a crooked cop he is.

3        According to the government's words he's a brazen

4    liar and thief, and this is what has been plaster in all

5    the local newspapers since the day the search warrants

6    were executed back in Lee and at his home.

7        I know that this is not really that relevant to

8    sentencing, but it's relevant to the punishment that Mr.

9    Buffis has endured and that has to do with the way this

10   investigation proceeded like a run away train, running

11   over everything in Mr. Buffis's life, and the fact that

12   there were in fact some illegal searches conducted during

13   the course of the investigation, not really relevant to

14   sentencing but relevant to the punishment that he's

15   already endured.  The search warrants authorized search

16   and seizure for any and all records of the show cause

17   hearings.

18       There was a binder on Mr. Buffis's desk in the Lee

19   Police Department clearly marked show cause hearing that

20   was not seized.  What was seized were records of the Lee

21   Police Association which was nowhere enumerated on the

22   search warrant.

23       Officers conducted an unlawful search of the Araldi

24   building where Mr. Buffis stored toys and indeed they saw

25   bags of toys there.

1          Mrs. Buffis was subjected to harassment at her

2     workplace by IRS agents.  She was threatened with

3     prosecution at her workplace in front of workers publicly

4     humiliated and embarrassed in this wide-ranging

5     investigation designed to get Joe Buffis.

6          So they endured that and endured it they have.  Mr.

7     Buffis, of course, lost his job as chief of police.  He

8     will never ever work again in law enforcement.  As he

9     stated to Your Honor in his letter to the court and I

10     believe I probably mentioned it, it took him 18 months to

11     find a menial job.

12          He goes to work every day trying to hold his head up

13     high and earn some amount of money to support his family.

14     However, the amount of money he makes now is nothing

15     compared to what he made as police chief, and the Buffis

16     family has been living through the financial kindness of

17     friends and families and whatever hard work he and his

18     wife can continue doing.

19          I also note as punishment that Mr. Buffis will most

20     likely lose his pension, a pension that he and his family

21     were relying on to support them comfortably in their

22     retirement.

23          Mr. Buffis calculates that his pension benefits would

24     come out to somewhere in the $900,000 to a million-dollar

25     range depending on how long he lives.  So we must ask

1    ourselves what other crime of conviction for a $4,000

2    extortion amounts to what is in effect an approximate

3    million-dollar fine?

4         Mr. Buffis and his family now have nothing left to

5    support them in retirement, and that is a huge punishment

6    that he's going through.

7              THE COURT:  Well, the loss of pension would be

8    speculative.  I mean, an extraordinarily serious

9    ramification if it occurred but wouldn't it be speculative

10   at this point?

11             MS. LEVINSON:  Well, it's speculative but I've

12   been in touch with attorneys in the field and it is likely

13   that he will lose his pension because the crime of

14   conviction had to do with his employment with the police

15   department and it's a police pension.

16        Had the conviction not had anything to do under color

17   of right, we may be in a different position, but because

18   it was a conviction under color of right I believe that he

19   faces that very real possibility but, yes, Your Honor,

20   you're correct it is speculation at this time but there's

21   a likelihood, a high likelihood.

22             THE COURT:  There may be some likelihood, but

23   I'm sure you're aware there was a SJC case that came out

24   just a little over a month ago that has a different take

25   on it and that found that taking of an officer's pension

1    would be prohibited considering it an excessive fine under

2    the Eightth Amendment and forfeiture of a pension was

3    something that was not allowed.  I don't know if that's

4    going to be applicable or not to Mr. Buffis's case but

5    that certainly just makes this review speculative.

6            MS. LEVINSON:  Okay.  So putting that aside then

7    for now, let's look at the count of conviction which was

8    extortion under color of right which there's no argument,

9    no question is a serious crime and a serious abuse of

10   trust.  But as Mr. Buffis stated when he testified and as

11   he wrote to this court in his letter and as he maintains

12   to this day what he did he did because he thought he was

13   doing the right thing at the right time.

14       He believed with his heart that Tara Viola and Thomas

15   Fusco had been punished enough by the negative publicity

16   that he unintentionally engendered by reporting

17   prematurely to the news outlets that they had been

18   arrested.

19       He didn't know they hadn't been arrested.  He had

20   been at the raid.  He knew that Tom and Tara were brought

21   over to the police station.  He knew that the plan was to

22   arrest them and he knew that this was big news in the town

23   of Lee.  It's not every day a small town like Lee busts

24   open a prostitution ring, and so he made the call to the

25   press and then later found out that they had not been

1    arrested, but he had no malicious intent there.

2         And then like he had done so many other times in his

3    career as both a police officer covering show cause

4    hearings and later as chief covering show cause hearings,

5    he found a way to help people who were facing possible

6    criminal charges.

7         He recognized that other than this one huge mistake

8    in judgment that Ms. Viola and Mr. Fusco had engaged in,

9    they had otherwise been law-abiding citizens and were

10   parents.  They had children in school.  They had been

11   publicly humiliated and he believed in his heart that

12   giving them a break, not forcing them to go through

13   criminal process, was the right thing for him to do, and

14   he thought that the right thing to do would be to follow

15   Ms. Viola's request to donate the proceeds of her unlawful

16   activities to charity.

17        As trial testimony was clear, it was Ms. Viola

18   herself who first brought up the idea of making a donation

19   to charity.  Now, yes, she wanted to donate it to a dog

20   shelter in Pittsfield.  She wanted to donate a thousand

21   dollars.  Mr. Buffis said no, you told me or you told

22   investigator Lucy you made $6,000 as a prostitute.  How

23   about I give you the benefit of the doubt, $4,000 but the

24   charity has to benefit the people of Lee, that's who's

25   being hurt, not the people of Pittsfield, and as we all

1    know the Laliberte Toy Fund was Joe Buffis' pet charity.

2    He had run it, it was his passion, and that is where he

3    thought the donation should go.

4       Now Tom and Tara never made a fuss about anything

5    until they were confronted by law enforcement who told

6    them that this was not the right thing to do.  I note

7    that, Your Honor, that Tara Viola and Thomas Fusco have

8    not submitted victim-impact letters.

9            THE COURT:  They're not required to.

10           MS. LEVINSON:  They are not required to.

11           THE COURT:  I'm not making any inference

12   relative to that negative or positive.  They're not

13   required to.

14           MS. LEVINSON:  And they haven't and they have

15   gone on with their lives.  Mr. Buffis gave them a break;

16   that's what he wanted to do and that's what he thought was

17   right.

18           THE COURT:  Ms. Levinson, the jury convicted

19   your client under the theory of extortion that they found

20   and your sentencing argument so far is just not accepting

21   the verdict of the jury.

22           MS. LEVINSON:  Well, we do accept it.  We

23   understand why the jury found that, but what I'm saying is

24   that --

25           THE COURT:  You're not accepting it when you're

1    saying they wanted to give up the money and Mr. Buffis was

2    doing the right thing and he wanted the money to go to the

3    charity and it was all good and it was all right.

4         MS. LEVINSON:  Well, it turns out it wasn't all

5    good and it turns out it wasn't all right, but at the time

6    that's not the perspective that he had.

7         THE COURT:  Now this is where it's a significant

8    benefit to the defense that I did not allow the Lee Police

9    Association conduct to be included in the guideline

10   enhancement, significant for the defense because his

11   guidelines would have been higher.

12        But what I said I would consider and I'm considering

13   it right now in listening to you make this argument about

14   he thought it was the right thing, he thought this was

15   good, I am considering what I found to have occurred

16   relative to his handling of the Lee Police Association

17   funds, and I'm having a difficult time reconciling the Mr.

18   Buffis that you're describing to me with the Mr. Buffis's

19   character that I know from applying facts that I found

20   were shown relative to the Lee Police Association.

21        MS. LEVINSON:  Well, I understand that, Your

22   Honor, but as I was about to say, could he turn back the

23   clock, would he have done this?  Absolutely not.  Would he

24   have just let the process go forward?  Yes, he would have.

25        But what I was coming to is that, you know, in these

1    small town courts frequently police officers will find a

2    way to not go forward with criminal cases, to give people

3    who they believe are otherwise law abiding a second

4    chance.  Tom and Tara Viola were given or attempted to

5    give a second chance.  It was wrong.  It was done.  It was

6    not executed appropriately or lawfully but it was done,

7    and that's really the point I'm trying to make here, Your

8    Honor.

9         So I understand that you are considering the

10   diversion of Lee Police Association funds by Mr. Buffis

11   and again as Mr. Breslow has stated the same kind, and as

12   Your Honor has alluded to, you know, in the same kind of

13   way he diverted the funds from the toy fund to his own

14   personal use, but as he testified at trial and I ask you

15   to consider was that those funds were used to purchase

16   toys through the toy fund, just not in the right way, not

17   in the good way, not in the proper way, and it was just a

18   mess and he concedes that.  He accepts responsibility for

19   that.

20        He knows he did it wrong, but, again, you know, again

21   he thought what he was doing was for the right purposes

22   but just not done correctly and as it turns out obviously

23   not lawful.

24        Now, you're considering, of course, the letters

25   submitted by officers of the Lee Police Department as you

1    are absolutely allowed to and probably even required to

2    do, just as you are allowed to and probably are required

3    to consider the letters of support that have been

4    proffered to the court by Mr. Buffis's family and by his

5    friends and even by some acquaintances, people of Lee, the

6    people that the police officers say don't trust them

7    anymore.

8         There are still many people out there who firmly

9    believe Joe Buffis is a good man, is a man worthy of

10   forgiveness, is a man worthy of being given a second

11   chance, a man worthy of remaining at liberty so that he

12   can contribute to offer the good that he has offered

13   throughout his life to the people who want it and need it.

14        The letters are full of references to the kind of

15   police officer Patrolman Buffis was, Chief Buffis was, and

16   the kind of human being he is; the kind of person who

17   would go out of his way to help people; the kind of police

18   officer who did engender the respect and admiration from

19   his community, from his fellow officers, and these fellow

20   officers who now condemn him so wholeheartedly respected

21   him and loved him and honored him before these allegations

22   came up.

23        It seems to me -- it strikes me that, like so many

24   people, they have accepted what the government alleged as

25   all of the conduct that Mr. Buffis allegedly engaged in

1    but that twelve jurors found he did not commit most of the

2    conduct that had been alleged, but so many people in the

3    town of Lee and the Berkshires and obviously in the Lee

4    Police Department disagree with the jury's verdict on ten

5    counts.  Obviously they wholeheartedly agree with the

6    verdict on one count, but I think that that is a

7    consideration.

8         And the officers who have written to this court feel

9    personally hurt and offended by Mr. Buffis's conduct and

10   it's perfectly understandable that they would, but I ask

11   the court to consider that it would appear that they have

12   accepted every allegation as true, although many of them

13   were not proven to the satisfaction of jurors who sat in

14   this courtroom for three weeks and heard all of the

15   testimony.

16        THE COURT:  Hold on one moment.  I'm sorry.  Go

17   ahead.

18        MS. LEVINSON:  I'm getting there, Your Honor.

19        THE COURT:  No, that wasn't it at all.  I don't

20   want to suggest that you should skip anything that you

21   want to go over.  Go ahead.

22        MS. LEVINSON:  Well, I know from a prior

23   sentencing proceeding with the court that this court and

24   every court who's faced with a sentencing decision must

25   consider the aspect of general deterrence in imposing an

1    appropriate sentence.

2         So what kind of deterrence will a sentence of

3    incarceration versus a sentence of probation provide?   I

4    don't know that there's any evidence that imprisoning

5    somebody will lead to any greater deterrence than the

6    punishment that Mr. Buffis has already received and will

7    continue to receive.

8         You know, as a society I think we can do better than

9    to fill our jails with nonviolent offenders.  As a society

10   I think we can use people like Joe Buffis who have spent a

11   life time in public service to continue to provide public

12   service by means of a community service, rather than

13   having taxpayers pay extraordinary amounts of money to

14   keep him housed in a cage for as many months as the

15   government suggests is appropriate in this case.

16        Will the fact that, you know, a career has ended, he

17   will never obtain meaningful employment again, wouldn't

18   that be a huge deterrence to police officers considering

19   stepping over the line?  A potential loss of pension

20   benefits, wouldn't that make somebody in his position

21   think more than twice about ruining a lifetime career for

22   what could amount to a huge financial penalty?

23        What about the shame, the humiliation, the public

24   nature of the shame and humiliation that his family have

25   endured for all of this time?  Any police officer thinking

1    of crossing the line will now know that if they cross the

2    line, their names will be splashed over the headlines for

3    months if not years and they will forever be tabled a

4    crooked cop.  That is a horrible badge to substitute for

5    the proud badge of police officer and police chief and I

6    believe that that is more than adequate general

7    deterrence.

8         As for specific deterrence, I think I need not even

9    address that.  Obviously Mr. Buffis lived his entire life

10   without any criminal activity.  He has certainly learned

11   his lesson from what he has gone through in the last four

12   years since this all began.  He has paid dearly with his

13   career, with his livelihood, and with his health.

14              THE COURT:  Can I just interrupt you just one

15   moment?  Excuse me, one moment, Ms. Levinson.

16        Ms. Wagner, you and Attorney Black can report to

17   Judge Robertson's courtroom.

18              MS. WAGNER:  Thank you, Your Honor.

19              THE COURT:  Thank you.

20              MS. LEVINSON:  Thank you.  So as to the specific

21   deterrence I think that that is a lesson much more than

22   learned and hit home.  Clearly this is not a person who

23   will re-offend in any way whatsoever.  And then, of

24   course, we can't ignore the collateral consequences of a

25   felony conviction.

1          This is man who possessed a firearm for his whole

2     life, not just used it in his job but he used it

3     recreationally with his family.  That was a family

4     activity.  That's over.  That's over.  His voting rights

5     are over for now.  There are a huge collateral

6     consequences to a conviction so that goes to both a

7     general and specific deterrence.

8          So in closing I just want to say, Your Honor, that I

9     have personally known Joe Buffis as a policeman since I

10    was a defense lawyer -- I still am a defense lawyer in

11    Berkshire County and I had cases where Joe Buffis was the

12    arresting arrest or the show cause officer and I always

13    personally admired and respected him.

14         I always believed he conducted himself honorably and

15    I believe that most people in the Berkshire County court

16    system felt the same way about him.  But for the past four

17    years I've gotten to know him as a person and his family

18    as people, and I can tell Your Honor that this is a very

19    big hearted individual.  He cares so much about people.

20    He cares so much about his family.

21         He is -- there are no words to describe his shame,

22    his humiliation, and the impact that this ordeal has had

23    on him and his family.  And so with all of those things in

24    mind I do believe that a sentence of probation where Mr.

25    Buffis can continue to contribute to society, not be a

1    burden on society, not make his family a burden on

2    society, would be appropriate in light of the crime of

3    conviction here.  I thank you for your time and

4    consideration.

5              THE COURT:  All right.  Mr. Breslow.

6              MR. BRESLOW:  Yes, Your Honor.

7              THE COURT:  We will reserve -- as I told you,

8    Ms. Levinson, your client will have the opportunity to

9    address the court if he wishes.

10              MS. LEVINSON:  Thank you.

11              MR. BRESLOW:  Your Honor, after a lot of thought

12    during this sentencing proceeding we are going to revise

13    our recommended sentence which was 51 months, the top of

14    the advisory guidelines as calculated by probation with

15    the relevant conduct, and we are going to recommend the

16    top of the guidelines as calculated by the court which is

17    33 months.

18        We think that this guideline sentence is warranted

19    based upon all of the factors in Section 3553, but I want

20    to emphasize three or four.  We discussed more in our

21    memo.

22        A guideline sentence is warranted because, first, of

23    the seriousness of the offense.  Second, because of the

24    defendant's personal history and circumstances, including

25    the defendant's complete lack of acceptance of

1    responsibility for his crime, and to promote respect for

2    the law and general deterrence and specific deterrence.

3        Now I want to say a few things at the outset.  First,

4    the government respects the jury's verdict of acquittals,

5    and the government's respects the court's ruling on our

6    motion to consider the defendant's conduct relating to the

7    money laundering of the extortion proceeds.

8        The alleged theft from the toy fund, the alleged

9    iPhone fraud, and the alleged theft from St. Mary's

10   church, we are not going to be discussing any of that at

11   sentencing.  We respect the court's ruling on our motion.

12   But the jury's verdict of conviction on the most serious

13   count in the indictment, the top count, demands just as

14   much respect, and this court affirmed that conviction by

15   rejecting the defendant's post-trial Rule 29 motion and so

16   that's what we have to focus on today.

17       What the jury convicted the defendant of, extortion

18   under color of official right and what this court found

19   beyond a reasonable doubt that in addition to abusing his

20   office, the defendant had engaged in a long time and

21   repeated theft from his fellow officers by taking money

22   from the Lee Police Association account.

23       Now the jury convicted the defendant of extortion

24   under color of official right.  This is the most serious

25   offense.  The defendant abused his position as police

1    chief to extort money from a couple, from really one of

2    the most vulnerable couples -- one of the most vulnerable

3    aspects of society which are criminal defendants.

4         So every day criminal defendants come into court and

5    they are faced with serious charges that have enormous

6    repercussions, similar to the repercussions that Ms.

7    Levinson cited have befallen the defendant in his own

8    prosecution.

9         So a criminal defendant, as Your Honor knows from

10   representing criminal defendants and seeing them come in

11   here and from prosecuting them, is among the most

12   vulnerable people in our society and the defendant

13   exploited that vulnerability.

14        We are going to be asking for a sentence at the top

15   of the guidelines because we think the defendant's crime,

16   just his sole count of conviction, warrants it, but in

17   addition the defendant's conduct through the

18   investigation, through the trial, and even now to this

19   very day at sentencing also warrants it and because the

20   defendant engaged in that theft from the LPA.

21        Now we could be asking for an upward variance based

22   on all of these things but we're not.  We are asking that

23   the court provide respect to the guidelines that apply

24   here and sentence him to no more than the top of the

25   guideline range, even though we think an upward variance

1    could be justified from these facts.

2        Now the court in dealing with our motion on the

3    defendant's false or misleading statements to

4    investigators said something I thought that was very

5    interesting.  The court said for a skilled investigator

6    that is just an every day occurrence at the office.

7        Skilled investigators like Sergeant Meiklejohn who's

8    here today they're used to coming in and conducting

9    investigations and dealing with people who lie or mislead

10   them.  That's part of their every day job, but the

11   defendant was the chief of police.  He was the top law

12   enforcement officer for the entire town of Lee.  There was

13   no one above him, and for him that's not supposed to be an

14   every day at the job.  He's supposed to go in and tell the

15   truth or invoke his Fifth Amendment right against

16   self-incrimination.

17       The chief of police is not supposed to lie to the

18   State Police.  The chief of police is not supposed to take

19   the stand in a federal courtroom and tell false or

20   misleading statements, and we think that Your Honor should

21   consider that when deciding where within the guideline

22   range his sentence should fall.

23       This charge of conviction is extremely serious.  The

24   letters submitted by the Lee Police Department which Your

25   Honor has read and which we've excerpted underscore why

1    the crime is so serious.

2        Ms. Levinson would have you view this crime as a

3    simple $4,000 offense, but that's not what this crime is

4    about at all.  That's not why the base offense level is

5    set at 14 and that's not why there is an enhancement for

6    four levels for abuse of a serious position of trust like

7    that of police chief because it's not about $4,000.  It's

8    about the integrity of the criminal justice system.  It's

9    about the integrity in this case of the Lee Police

10   Department as a whole and as individuals.

11       This is what those officers said to the court.  "We

12   were terribly deeply and personally affected by Mr. Buffis

13   and his conduct.  His conduct has had a lasting and

14   immensely harmful collective effect on the Lee Police

15   Department.  We will forever be associated with Joe, the

16   former chief who extorted people in uniform and used his

17   badge to say give me your money or else."

18       Now, Ms. Levinson I believe characterized what the

19   defendant did as one huge mistake in judgment, but the

20   court knows that's not so.  The court knows that that's

21   just skillful advocacy because the court knows that prior

22   to that day when he extorted the money from Tom and Tara

23   he had been stealing systematically from his fellow

24   officers at the Lee Police Association.

25       So this was not just one huge mistake in judgment.

1    This was part of a course of conduct relating to what he

2    did as a police officer.

3        Now, Ms. Levinson noted that Tom and Tara have not

4    submitted any victim-impact statements.  They have not.

5    They're not here in court but they testified and they

6    endured cross-examination for an extremely long time.

7    They talked about their personal sexual history and

8    aspects of their lives that no person should have to say

9    to a roomful of strangers, much less in open court.  So

10   there's a reason that they're not here today.  They have

11   done enough.

12       Now, I want to emphasize what I think is an extremely

13   important aspect of this case and in particular the

14   sentencing now.  The defendant has shown absolutely no

15   remorse for what he's done.

16       Ms. Levinson said that the defendant has learned his

17   lesson, but the government respectfully submits otherwise.

18   There is no recognition from the defendant that he's

19   committed a single crime.  There's no recognition that he

20   exploited Tom and Tara.

21       There's no recognition, for example, that he forced

22   them into a nondisclosure agreement that precluded them

23   from going outside court that day after he took their

24   money and telling the whole world we are no longer under a

25   cloud.  These charges are dropped.  That's what they

1    wanted to do, these vulnerable defendants (sic).  They

2    told you that in court.  They told the jury that.

3         Of course, they would have wanted to say we are no

4    longer under the cloud of suspicion for prostitution.  Our

5    charges are cleared.  They had every reason to want to do

6    that and the defendant had every reason not to want to

7    have anybody say what happened in court that day.

8         So there's no recognition even today that he caused

9    any harm to Tom and Tara.  There's no recognition that he

10   abused his office.  There is no recognition for acceptance

11   -- that he seriously damaged the reputation and the

12   effectiveness of his former colleagues at the Lee Police

13   Department.

14        Instead, this is what he's told the court and I

15   believe he's sincere he says this:  "I believe" -- I'm

16   quoting now.  "I believe today in my heart and mind, as

17   did I nearly four years ago, that I was doing the right

18   thing at the right now for the right reasons."

19        The defendant insists that all he was doing was

20   giving Tom and Tara a second chance, but what the

21   defendant ignores even to this very day at sentencing and

22   we think it's relevant to the defendant's personal history

23   and characteristics and his specific deterrence in this

24   case, what the defendant ignores is that his second chance

25   came with strings attached.

1    His second chance came with a price tag, a $4,000
2    donation to his personal charity; not a donation to their
3    charity and not a donation of a thousand dollars but as
4    everybody recognizes $4,000 to my personal charity, and
5    the second chance came with a nondisclosure order that
6    would have prevented them from saying anything to anyone
7    ever about what happened at court.
8    Now, that's not benevolence.  That's not the act of a
9    police chief who's trying to do the right thing.  This
10   court knows what that is.  The jury knows what that is.
11   That's extortion.  That's what the jury found and that's
12   what this court found post trial and that is what the
13   defendant should be sentenced for.
14   The court should completely reject the defendant's
15   portrayal of what he did as an aberration as a single
16   mistaken act particularly in light of the LPA breach.
17   The government submits that the defendant's personal
18   history and characteristics which are a factor for the
19   court to consider warrant the requested sentence.
20   We reviewed for the court the pertinent aspects of
21   the defendant's personal history, and there is nothing in
22   the defendant's personal history to warrant what he did.
23   There's absolutely nothing.
24   He came from a loving and financially secure
25   household.  He went to school.  He was gainfully employed.

He had the love and respect of his family members and in
fact he still does.  There's absolutely nothing to excuse
or warrant leniency for his abuse of trust.

Now, the defendant has submitted a great number of
letters and I know the court has read them, but really in
those letters there's nothing extraordinary.  There's
nothing so extraordinary to warrant a variance from the
guidelines range.

The defendant was a police officer for 30 years, and
as a police officer for 30 years he did his job.  He
shouldn't get a benefit now at sentencing in the form of
leniency for doing a job for which he was paid every week.

And lastly, Your Honor, the sentence is warranted to
promote respect for the law, general deterrence, and
specific deterrence.

I want to touch on those in reverse order.  With
respect to specific deterrence, as Your Honor knows
defendants come into court convicted either at trial or
with a guilty plea and they have an opportunity to address
the court either by way of a letter or in person.  And as
Your Honor knows, hardened criminals have come in here,
criminals who have done terrible things, serious drug and
gun offenses, and they have stood up and they have taken
responsibility and they've said you're right.  I know what
I did is wrong.  I've got to change my ways.  That's

acceptance of responsibility.

As Your Honor knows, acceptance of responsibility is the fundamental key to specific deterrence.  If one does not accept responsibility for one's conduct, one is likely to repeat that conduct in the future.

Now with respect to general deterrence, I believe that this is the first conviction of a police chief in Western Massachusetts for abusing his office, and police chiefs all over Western Massachusetts -- in fact, police departments, police officers not just in Lee, but all over Western Massachusetts will be looking to this courtroom for the court's sentence.  And a sentence of probation I think sends the wrong message to all of those officers who themselves might be tempted to shakedown a drug dealer, another vulnerable person, or extract money in exchange for a deal.

That temptation exists every day on the street, every day for every officer, and 99.9 percent of the officers do the right thing.  They turn down their temptation.  They don't abuse their shields.  They enforce the law and don't seek to personally benefit by abusing their office.

If this court grants the defendant's request for probation after the defendant has misled and provided false testimony after his crime to investigators, after the defendant has in whatever circumstances provided

1    misleading or false testimony to a jury, those officers

2    and those police chiefs may well think that there's not a

3    lot of deterrence for crimes like that.

4         Now lastly, the final factor is the sentence that we

5    are requesting, which is simply a guideline sentence at

6    the top of the range based on nothing else, no other

7    calculations is warranted to promote respect for the law.

8         There can be no other way to promote respect for the

9    law here than to impose a guideline sentence where the

10   defendant on his count of conviction completely turned the

11   law -- a position that he had been entrusted to -- on its

12   head and extracted money from the most vulnerable of

13   people in society, and that's why we're asking for a

14   guideline sentence at the top of the range.

15             THE COURT:  Thank you, Mr. Breslow.

16        Ms. Levinson, does your client wish to say anything

17   to the court?

18             MS. LEVINSON:  Yes, Your Honor.

19             THE COURT:  All right.

20             THE DEFENDANT:  Thank you, Your Honor.  I stand

21   here today a vastly different person than I was four years

22   ago.  I take full responsibility and I accept the

23   repercussions for my actions.  I wish the Violas and

24   Fuscos were here today so that I can sincerely apologize

25   to them for creating all the turmoil and upset that I have

1    caused in their lives.

2        I've never had any nefarious ideas when I undertook

3    the show cause hearing.  I've been changed very, very much

4    by this.  I sincerely apologize to the court.  I sincerely

5    apologize to my family.  I sincerely apologize to the

6    citizens of Lee.  Thank you, Your Honor.

7            THE COURT:  Thank you, Mr. Buffis.

8    (Off-the-record discussion with probation officer.)

9            THE COURT:  All right.  I thank each side, Ms.

10   Levinson and Mr. Breslow, for your sentencing arguments

11   which were very well done.

12       As I have said and I, quite frankly, credit the

13   government for their adjusted recommendation given my

14   rulings.  This is not an open forum to sentence under an

15   ulterior motive Mr. Buffis for uncharged or acquitted

16   conduct.  That's not what this is.  Mr. Buffis was

17   acquitted of a majority of counts but was convicted by a

18   jury of his peers of a very serious charge.

19       I watched the trial unfold.  The trial was full of

20   very nuanced as well as obvious facts about what happened,

21   why it happened and how it happened, and those nuanced

22   facts as they came out during the trial wouldn't be

23   something that is going to appear on the cold reading of

24   the transcript, but I certainly feel as a judge who

25   oversaw the case that I have a very good understanding of

1  all the facts and circumstances surrounding the crime of

2  conviction.

3      So, Ms. Levinson, I agree when you say that, you

4  know, this wasn't Mr. Buffis's idea.  It was the named

5  victims of the extortion that came up with this plan, and

6  that's true.  However, the defendant really seized on that

7  opportunity when it came up, and that seizing on the

8  opportunity I go back to me factoring in how and why I can

9  consider his character as I know it from the Lee Police

10  Association chain of events.  And what I know about that

11  or sense about that is that seizing upon that opportunity

12  was a way to get those funds not for the betterment of the

13  criminal justice system and the effectuation of an

14  appropriate sentence.  He is not the judge.  He is not the

15  jury, but funds for Mr. Buffis.

16      Mr. Buffis was the highest ranking police officer.

17  He used, he used his highest ranking police position to

18  essentially auction off his own concept of justice.

19  Whether or not, Mr. Buffis, you have come to terms with

20  that and it's I'm sure brutality hard for you and your

21  family to come to terms with this, but your auctioning off

22  of justice was corrupt.  It was corrupt behavior, and

23  that's what the jury found.

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  It's deeply, deeply offending to the

1   criminal justice system to have any police officer

2   involved in such conduct, nonetheless the highest ranking

3   police officer in the town.

4        The integrity of the police department was affected.

5   I'm not considering this as a reason why I would give you

6   more of a sentence, but it is considered in my overall

7   evaluation of the case.

8        To be a law enforcement officer, to be a police

9   officer, as I have had the unique opportunity to view from

10  both sides of the courtroom, I have never met more

11  honorable individuals than I have in my time interacting

12  with police officers.  Their integrity and dedication and

13  selflessness is something that has impressed me all of my

14  years of defense work, all of my years at prosecuting, and

15  as my time as a judge.  And to impugn the integrity of a

16  department like you did is a monumental terribly unfair

17  thing, a selfish thing.

18       The mark on the integrity of the Lee Police

19  Department is, I hope and I think I know, something that

20  will pass.  Police departments are made up of human

21  beings, and I have seen human beings make mistakes no

22  matter what their rank in life, no matter what their job

23  is, no matter if they have some type of job that is above

24  a police officer or below a police officer or whatever

25  profession it is.  Those jobs are filled by human beings,

1    and you are the extraordinarily small percentage of law

2    enforcement officers who have displayed corruptive

3    behavior.

4        I agree with Mr. Breslow that you knew better.  You

5    had a good life.  You had a good job.  You had a good

6    upbringing.  There are none of those factors to consider

7    other than greed.

8        I must say I was impressed and am impressed by the

9    support you have received, the letters that you have in

10   your support, by the support of your family.  I'm very

11   impressed by that, and behind all that means that you

12   were, perhaps you are, a person with a lot to offer who

13   has done a lot of good in your life.

14       I don't -- I cannot imagine how you could have gotten

15   to the position you are in and accomplished what you have

16   accomplished without, number one, being very good at your

17   job, and, number two, being someone who really cares and

18   wants to make a difference.  But somewhere along the line

19   -- who knows where it is?  Only deep inside you is it

20   known -- somewhere along the line you changed.  Somewhere

21   along the line and you behaved in this way that is

22   completely polar opposite of the way that earned you the

23   respect and admiration and promotions throughout your

24   career.

25       I am to impose a sentence that is sufficient but not

1  greater than necessary; to address the seriousness of the

2  crime.  I acknowledge the point well made by Attorney

3  Breslow that the sentence should deter criminal conduct

4  and promote rehabilitation.

5      I had been considering frankly a sentence lower than

6  a sentence that I'm going to impose, and your behavior and

7  your maintaining that you did nothing wrong and your

8  failure to accept or recognize even that you abused your

9  position is distressing.

10     So where I am coming down with a number in this

11  system that we have where we act as if a number that you

12  give to a person somehow makes things better, and perhaps

13  sometimes it does, there are some behaviors that need to

14  be punished.  Just because they're so egregious they need

15  to be punished and if deterrence flows from that, that is

16  a positive side effect of the punishment that is imposed.

17     So I'm balancing things, including your life history,

18  in my recognition that you had a lot and gave a lot back

19  to your family and community, but that is not the Mr.

20  Buffis that was convicted.  Something changed, something

21  happened.  Where that was, I don't know.

22     There needs to be and there is not yet with you a

23  recognition that you abused your office, and perhaps that

24  is a deep psychological issue for someone who's reached

25  and gained and had the accomplishments that you have had

1    to find yourself in this position and that's very

2    understandable and you are a fortunate man for having the

3    support that you have.

4         Nonetheless, I need to impose a sentence that I think

5    is fair given what the crime of conviction was and

6    considering all the factors, and so the sentence that I

7    now think is fair as I have and I don't mind telling you

8    increased what I think you should get for a punishment

9    because of your lack of recognition that you abused your

10   office is as follows.

11        Please stand, Mr. Buffis.

12             THE DEFENDANT:  Yes, Your Honor.

13             THE COURT:  Pursuant to the Sentencing Reform

14   Act of 1984 having considered the sentencing factors of

15   3553(a), it is the judgment of the court that Joseph

16   Buffis be incarcerated to be imprisoned for a term of 27

17   months.

18        Upon release from imprisonment you will be supervised

19   for two years.  You will do 200 hours community service

20   during your supervised release.  Restitution is ordered to

21   be paid.  The parties will have approximately two weeks to

22   have something filed and we can schedule a hearing in

23   court to determine the logistics of the payment of that

24   restitution.

25        The conditions of supervision will be as follows:

1    Attorney Levinson, I'm on page 40 of the presentence

2    report.  Mandatory condition one, not committing another

3    state, local crime -- state, federal, or local crime and

4    not possessing a controlled substance.

5        Number 3, you shall submit to the collection of a DNA

6    sample to the probation office.

7        Number 4, you shall comply with the standard

8    conditions that have been adopted by the court pursuant to

9    the Sentencing Guidelines 5D1.3(c).

10       I wanted to ask the probation department or the

11    government the applicability and need for mandatory

12    condition two, which will be the controlled substance

13    testing.  There certainly did not seem to be any evidence

14    in this case that controlled substance was an issue.

15       Is the government looking for that as a mandatory

16    condition?

17          MR. BRESLOW:  You know, we deter to probation,

18    Your Honor.

19          PROBATION OFFICER:  If Your Honor wants to waive

20    that, that's fine.

21          THE COURT:  I'm going to waive condition number

22    2, so I just named the three mandatory conditions.

23       The proposed special conditions will be you're

24    prohibited from possessing a firearm or other dangerous

25    weapon.

1          You are to pay pending the outcome of a hearing

2     restitution.  And unless the government or probation wants

3     to be heard on proposed special conditions three or four,

4     I don't know why those would be imposed.

5          MR. BRESLOW:  Your Honor, we think that's

6     appropriate for two reasons.

7          THE COURT:  Which one?

8          MR. BRESLOW:  Number 3, and -- actually we think

9     three and four are appropriate for two reasons.  The first

10    reason is that Tom and Tara have not been paid their

11    $4,000 and it's been a long time.

12         The second reason is the defendant is living in his

13    home and maintaining a relatively good lifestyle, all

14    while being paid -- all along receiving the benefits of a

15    Criminal Justice Act attorney.

16         This issue was brought up a long time ago at the very

17    beginning of the litigation before Judge Neiman, and we're

18    not convinced that the defendant deserves to have the

19    public pay for the cost of his representation.  Judge

20    Neiman ordered the defendant to sell his home.  He has not

21    done so.  It's been like two or three years and so we

22    think that these are appropriate.

23         THE COURT:  How is the defendant being

24    prohibited from incurring credit card charges?

25         MR. BRESLOW:  Well, while the defendant owes Tom

1    and Tara $4,000 and while the defendant may owe the

2    government many, many tens of thousands of dollars, we

3    don't think it's appropriate that he incur additional

4    debt.

5              THE COURT:  All right.  And as to number four,

6    providing access to requested financial information.  It's

7    hard to imagine that there's nothing the government

8    doesn't already have.

9              MR. BRESLOW:  I don't think we got a -- we would

10   like to have an accurate picture of his finances so that

11   we can determine whether or not to move for some remedy

12   relating to the Criminal Justice Act funds that he has

13   used to provide through his defense.

14             THE COURT:  All right.  I am going to deny

15   special condition number 3.  I don't think there's any

16   need to prohibit him from incurring new credit.  He will

17   be ordered to pay restitution.

18        I am going to deny number 4 ordering him to turn over

19   financial information to be shared with the financial

20   litigation unit.  That is essentially making a condition

21   of probation forcing him to participate in your

22   investigation of him of further charges so I'm not going

23   to impose number 4.

24        I will impose 200 hours of community service and that

25   is part of the special conditions.

1          There's a special assessment of $100 due and payable

2     immediately.

3          You have the right to appeal and you can discuss with

4     your attorney any appellate rights that you wish to

5     pursue.

6          Do the parties have a position on Mr. Buffis's

7     continued custodial status right now?

8              MR. BRESLOW:  Yes, Your Honor.  We've already

9     informed the defense and probation that we don't have any

10    objection to self-surrender within a reasonable period of

11    time as ordered by the court.

12             MS. LEVINSON:  We join in that request of

13    course, Your Honor.

14             THE COURT:  I am extremely reluctant to agree to

15    that.

16             MS. LEVINSON:  Your Honor --

17             THE COURT:  I will -- let me tell you what I'm

18    thinking I'm going to do.  I was impressed by the

19    government's modification of their request after the

20    rulings on the objections and believe that the government

21    clearly demonstrated to me a reasonableness in assessing

22    the case for what it was, for what it is.  Therefore, I am

23    going to defer and also accept as it's the government's

24    request that he self-surrender.  I will go along with

25    that.  All right.

```
 1              MS. LEVINSON:  Thank you.

 2              THE COURT:  That is but for the government's

 3    agreeing to that.

 4              THE DEFENDANT:  Thank you, Your Honor.

 5              THE COURT:   All right.

 6              MR. BRESLOW:  Your Honor, we have I believe a

 7    preliminary order of forfeiture which I'm pretty sure the

 8    court has granted already.  The court has to pronounce

 9    forfeiture as part of its sentence pursuant to the federal

10    rules.

11              THE COURT:  Yes, I do pronounce the $4,000 is

12    subject to forfeiture, but we are going to mark up a

13    hearing or we might not need to.  The parties should

14    discuss this.  We should pick a two-week date if you think

15    that's enough time just to work out how the restitution is

16    paid, where it comes from.

17              MR. BRESLOW:  Okay.  We will attempt to

18    negotiate it prior to filing motions, but would the court

19    entertain a defense motion in two weeks' time if we can't

20    work it out?

21              THE COURT:  Yes, absolutely.

22              MS. LEVINSON:  So I request in light of that

23    that the court defer entering an order of forfeiture right

24    now since it's still an issue.

25              THE COURT:  Is there a time limit that I have
```

1    rule on that within?

2              MR. BRESLOW:  I honestly don't know, but I fail

3    to see how -- so I certainly understand that the court --

4    that the defense wants to potentially litigate restitution

5    and they are entitled to do that.  There is a procedure in

6    Title 18 to allow for 90 days of litigation before the

7    court to determine the exact amount of restitution, but

8    forfeiture is different.  I believe we made a preliminary

9    order forfeiture.  There's been no opposition and those

10   two things are completely separate.

11             THE COURT:  I agree.  Forfeiture is allowed.

12   We'll set up a hearing in two weeks if we need talk about

13   the payment of restitution.

14             MR. BRESLOW:  Your Honor, one last thing.  We

15   did agree to a reasonable time period for self-surrender,

16   but I think Your Honor needs to select some date.

17             THE COURT:  I think we're in the four- to

18   five-week range.

19             PROBATION OFFICER:  Four weeks.

20             THE COURT:  Four weeks should be enough.  That's

21   a little bit faster than usual, but four weeks we'll get

22   the judgment in and the Bureau of Prisons will deal with

23   that.    Rich, any conditions for released?

24             PROBATION OFFICER:  He's going to continue with

25   bail as was until today.

1          THE COURT:  Continuing with the same conditions
2     of release until you are notified of the self-surrender
3     location.  All right.
4        Anything else?
5              MS. LEVINSON:  No, Your Honor.
6              MR. BRESLOW:  No further, Your Honor.
7              THE COURT:  All right.
8              THE CLERK:  All rise.
9     **(Court recessed at 12:08.)**

1                     C E R T I F I C A T E

2

3

4          I, Alice Moran, RMR, RPR, CSR, Official Court

5    Reporter for the United States District Court for the

6    District of Massachusetts, do hereby certify that the

7    foregoing transcript constitutes, to the best of my skill

8    and ability, a true and accurate transcription of my

9    stenotype notes taken in the above-entitled matter.

10

11

12   Date:   October 25, 2016

13

14   /s/ Alice Moran

15   _____
     Alice Moran
16   Offical Court Reporter

17

18

19                Alice Moran, CSR, RPR, RMR
                    Official Court Reporter
20               300 State Street, Room 303D
                    Springfield, MA 01105
21                     413-731-0086
                  alice.moran@verizon.net
22

23

24

25